**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **GC2 INCORPORATED,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 16 C 08794** |
| | ) | |
| **INTERNATIONAL GAME TECHNOLOGY** | ) | |
| **PLC, INTERNATIONAL GAME** | ) | |
| **TECHNOLOGY (IGT), DOUBLEDOWN** | ) | |
| **INTERACTIVE LLC, MASQUE PUBLISHING,** | ) | |
| **WD ENCORE SOFTWARE, DOE** | ) | |
| **DEFENDANTS 1-100, DOE DEFENDANTS** | ) | |
| **101- 2,000,000, IGT, WD ENCORE** | ) | |
| **SOFTWARE, LLC, MASQUE** | ) | |
| **PUBLISHING, INC., and INTERNATIONAL** | ) | |
| **GAME TECHNOLOGY,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

GC2 Incorporated (GC2) has filed suit against 1) International Game Technology PLC along with International Game Technology, IGT NV, and DoubleDown Interactive LLC (DoubleDown) (collectively, IGT), 2) Masque Publishing and Masque Publishing Inc. (collectively, Masque), 3) WD Encore Software and WD Encore Software, LLC (collectively, WD Encore), and 4) the consumers of IGT, Masque, and WD Encore, alleging that they have infringed GC2's copyright. IGT, Masque, and WD Encore have moved under Federal Rule of Procedure 12(b)(6) to dismiss all claims against them.

## Background

The Court takes the following factual allegations from GC2's amended complaint

and exhibits.

GC2 develops videos and images for games that are primarily displayed on physical wagering machines, such as slot machines.  Am. Compl. ¶¶ 22-23.  GC2 has created artwork and videos for a series of wagering games, including games called Coyote Moon, Lucky Lion Fish, and Pharaoh's Fortune.  *Id.* ¶ 24.

GC2 licensed its artwork to IGT NV—a wholly owned subsidiary of IGT PLC— from 2003 to 2007.  *Id.* ¶ 81.  GC2 and IGT's relationship was described in their original agreement and seven amendments to the agreement.  GC2 agreed to "provide IGT with video graphics and artwork necessary for implementing the GC2 Projects on the IGT Platform."  Compl., Ex. 18 (Agreement) § 3.14.  IGT's Platform is defined as "IGT electronic gaming machines and conversion kits . . . ."  *Id.* § 1.1.  GC2 also agreed to "assist IGT engineers in the implementation of such video graphics and artwork onto the IGT Platform."  *Id.* § 3.14.  GC2 granted to IGT "the sole and exclusive worldwide right and license to make, manufacture, use, market, and sell gaming equipment (utilizing the IGT Platform) incorporating the GC2 Projects for use in legalized gaming jurisdictions."  *Id.* § 3.2.  The license applied to stand-alone games on "video gaming devices operated on licensed gaming premises."  *Id.*  The license did not apply to certain wagering devices, such as "devices used for mobile gaming" and "internet gaming."  Compl., Ex. 20 (Amend. 7) § 1.  The license also did not apply to "nonwagering devices, machines and systems such as:  (a) pinball, (b) arcade machines, and (c) gaming consoles, including but not limited to general purpose computers, for non-wagered gaming."  *Id.*  In exchange for GC2's exclusive license, IGT agreed to pay GC2 royalty fees.  Agreement § 3.6(a).  The Agreement defines the royalty fee as "the particular fee [] paid

to GC2 for each gaming unit sold by IGT that utilizes the IGT Platform and incorporates a GC2 Project." *Id.* § 1.15.

GC2 and IGT also agreed on terms of ownership regarding intellectual property. Specifically, the parties agreed to the following terms:

> Except as otherwise provided in this Agreement, each Party shall retain all rights to ownership, title or interests to any proprietary information, any inventions and any Intellectual Properties independently developed by them prior to the Commencement Date of this Agreement and during the Term of this Agreement. All independently developed Intellectual Properties shall remain the property of the Party that developed it.

*Id.* § 4.1. The "Intellectual Properties" are defined as "patents, copyrights, trade secrets, trademarks, trade names . . . or improvements including any and all devices and computer software, whether or not patentable." *Id.* § 1.13.

The parties agreed to some exceptions to the general rule of intellectual property ownership set out in section 4.1 of the Agreement. Specifically, they agreed that "ownership of the copyrights in and to the software for the GC2 Projects developed by or on behalf of IGT shall remain the sole and exclusive property of IGT." *Id.* § 4.2. GC2 also granted to IGT "any and all rights it may have" in GC2 Bonus Concepts sold to IGT, so that IGT could obtain a patent on such works. *Id.* § 4.3. In the event IGT was awarded a patent, the "[o]wnership of any and all patents related to GC2 Bonus Games [would] remain the sole and exclusive property of IGT." *Id.*

Sometime after IGT ended its relationship with GC2, IGT entered the online gaming industry and sold games through its subsidiaries online. For example, IGT owns the company DoubleDown. Am. Compl. ¶ 104. IGT, through DoubleDown, offers the product DoubleDown Casino to consumers on its website and on third-party websites, such as Facebook. *Id.* DoubleDown Casino "operates as a single casino

application with multiple games where all games are available to the player within a single application." *Id.* IGT's games incorporating GC2's artwork are among the games available on DoubleDown Casino. *Id.* ¶ 114. DoubleDown does not hold a license from GC2 to display GC2's artwork.

IGT also licenses games containing GC2's artwork to third-party publishers, including Masque and WD Encore. Masque runs a website, www.masque.com, where it sells licenses to IGT games. *Id.* ¶ 60-61. Masque's customers may download IGT games directly from the website or purchase them in CD/DVD format. Several of the IGT games made available on Masque's website contain GC2's copyrighted images and videos, such as Lucky Lion Fish and Pharaoh's Fortune. *Id.* ¶ 148. Masque also sells these games on third-party websites, such as Amazon.com. *Id.* ¶ 150. Masque has a licensing agreement with IGT to sell these games but no agreement with GC2. Pl.'s Resp. to Masque Mot. to Dismiss at 1 n.1.

IGT also maintains a license agreement with WD Encore. WD Encore is a provider of pre-packaged software services. Am. Compl. ¶ 65. On its website, WD Encore sells licenses to IGT's games to its end users. WD Encore's customers may purchase a license for IGT games in either digital or CD/DVD format. *Id.* ¶¶ 66, 68. Many of these games include GC2's artwork. WD Encore also sells these games on third-party websites, such as Amazon.com. *Id.* ¶ 69.

Masque and WD Encore require their end users to agree to a license agreement before they can the IGT game they purchased, regardless of where or in what format they purchased the game. Masque's license agreement states:

> The Software is licensed, not sold. By installing, copying, downloading, accessing or otherwise using the Software, You agree to be bound by the

terms of this SOFTWARE LICENSE.  If You do not agree to the terms of
this SOFTWARE LICENSE, do not install, access or use the Software.

Pl.'s Resp. to Masque's Mot. to Dismiss, Ex. A (Masque License).  WD Encore's license

agreement states:

> ENCORE IS WILLING TO GRANT YOU THE LICENSE TO USE THE
> SOFTWARE ACCORDING ONLY ON THE CONDITION THAT YOU
> ACCEPT ALL TERMS IN THIS AGREEMENT. . . . IF YOU DO NOT
> AGREE TO ANY OF THE TERMS BELOW, YOU SHOULD CLICK ON
> THE "NO" OR "DO NOT ACCEPT" BUTTON BELOW OR OTHERWISE
> DISCONTINUE THE INSTALLATION PROCESS.

Pl.'s Resp. to WD Encore's Mot. to Dismiss, Ex. A (Encore License).  Once an end user

agrees to the license agreement, the user is permitted to make a copy of the game on

her personal computer.  Under both agreements, if an end user violates the licensing

agreement by, for example, making an unauthorized copy of the game, Masque and

WD Encore have the authority to terminate the license and pursue legal action against

the end user.  Specifically, Masque's licensing agreement states:

> Masque Publishing, Inc. [] grants to you a nontransferable, right to use the
> copy of the software program being installed[.]  You may not copy the
> Software or any accompanying materials [], except that you may make
> one copy for backup purposes.  You may not place the Software on a
> computer that would allow multiple users to access it.  You may not
> reverse engineer, disassemble, decompile, modify, adapt, translate, or
> create derivative works of the Software or Documentation.  MASQUE
> retains all rights, title, and ownership in the Software.  MASQUE may
> terminate this license immediately if you fail to comply with its terms.

Masque License § 1.  WD Encore's license states:

> Except as expressly permitted by applicable law, You may not decompile,
> modify, reverse engineer, disassemble or otherwise reproduce the
> Software. . . . You may not evade the digital rights management
> technology, copyright protection, access restrictions or other authorization
> mechanisms for the Software.
>
> . . . .

This Agreement will terminate automatically without notice from Encore if You fail to comply with any provision of this Agreement. Upon notice of termination, You agree to promptly destroy all of Your copies of the Software. There shall be no refund if this Agreement is terminated by Encore for Your failure to comply with the terms of this Agreement. All provisions of this Agreement as to warranties, limitation of liability, remedies and damages will survive termination. The parties agree to waive any provisions, procedures and the operation of any legislation to the extent that a court order or approval is required to terminate this Agreement.

Encore License §§ 6, 8.

GC2 filed its complaint in this case on September 9, 2016 and amended it on October 28, 2016. GC2 alleges that IGT, along with Masque, WD Encore, and their end users, infringed its copyrights by selling games containing its artwork without a license. GC2 alleges that IGT is liable for direct copyright infringement (count 1 and 2), vicarious copyright infringement (counts 7 and 8), contributory copyright infringement (count 11), providing false copyright management information (count 12), and consumer fraud under Illinois law (count 13). GC2 asserts that Masque is liable for direct copyright infringement (count 3) and vicarious copyright infringement (count 9). GC2 also alleges that WD Encore is liable for direct copyright infringement (count 4) and vicarious copyright infringement (count 10). GC2 also alleges that IGT, Masque, and WD Encore's consumers—sued as "John Doe" defendants—directly infringed GC2's copyrights (counts 5 and 6).

IGT, Masque, and WD Encore have all moved to dismiss GC2's claims against them pursuant to Federal Rule of Civil Procedure 12(b)(6). IGT PLC has also moved to dismiss GC2's claims pursuant to Federal Rule of Civil Procedure 12(b)(2). The latter motion will be the subject of a separate ruling after it is fully briefed.

**Discussion**

"A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) challenges the viability of a complaint by arguing that it fails to state a claim upon which relief may be granted." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). To survive dismissal, a "complaint must contain sufficient factual matter [] to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). A claim has facial plausibility "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct allege." *Id.* In considering a motion to dismiss, the Court "construe[s] the complaint in the light most favorable to the plaintiff," accepting as true all of GC2's factual allegations and draws all plausible inferences in its favor. *Peters v. West*, 692 F.3d 629, 632 (7th Cir. 2012) (internal quotation marks omitted).

IGT argues that GC2's claims against it should be dismissed because 1) the complaint is excessively long and runs afoul of Federal Rule of Civil Procedure 8(a); 2) GC2 does not own the rights to the artwork used in IGT's games; 3) IGT's website does not convey false copyright management information relating to GC2's artwork; and 4) IGT did not engage in any deceptive acts. Masque and WD Encore argue that GC2's vicarious liability claim is improper because direct and vicarious liability cannot both be imposed based on a single transaction.

**A.    Federal Rule of Civil Procedure 8(a)**

IGT contends that GC2's 81-page complaint with 75 exhibits violates Rule 8(a) because the complaint is unduly long and difficult to sort through. IGT also argues that

GC2's complaint violates Rule 8(a) because it contains a series of legal conclusions and conclusory allegations.

"Rule 8(a) requires parties to make their pleadings straightforward, so that judges and adverse parties need not try to fish a gold coin from a bucket of mud." *US. ex rel. Garst v. LockheedMartin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003). "[W]here the lack of organization and basic coherence renders a complaint too confusing to determine the facts that constitute the alleged wrongful conduct, dismissal is an appropriate remedy." *Stanard v. Nygren*, 658 F.3d 792, 798 (7th Cir. 2011).

GC2's complaint satisfies Rule 8(a). The complaint is organized in an appropriate way; each section is separated by claims and then by party. And the complaint does not consist simply of legal conclusions. Rather, GC2 asserts a series of factual allegations that support each claim or conclusion. And although GC2's complaint is long, this is because it has sued a number of defendants, and the complaint involves and depicts many examples of GC2's artwork.

For these reasons, and because GC2's claims all revolve around the artwork used by IGT, the complaint is not unnecessarily long or confusing. Finally, though IGT is correct that the complaint is repetitive at times, a "district court is not authorized to dismiss a complaint merely because it contains repetitious and irrelevant matter." *Garst*, 328 F.3d at 378 (internal quotation marks omitted).

**B.     Ownership of the copyrighted works**

IGT argues that the claims in GC2's complaint alleging copyright infringement by IGT (counts 1, 2, 7, 8, 11, and 12) should be dismissed because GC2 cannot establish

ownership of the rights in the artwork incorporated in IGT's games.[1]  IGT contends that

its Agreement with GC2 unambiguously states that IGT is the copyright owner of all

GC2's artwork that has been incorporated into IGT's platform.  As support for this

interpretation, IGT cites to section 4.2 of the Agreement.  Section 4.2 states that

"[o]wnership of the copyrights in and to the software for the GC2 Projects developed by

or on behalf of IGT shall remain the sole and exclusive property of IGT."

Like IGT, GC2 argues that the Agreement is unambiguous.  GC2, however,

contends that the Agreement unambiguously states that it is the owner of the copyrights

in all of its artwork incorporated into IGT's platform.  As support, GC2 cites to several

sections of the Agreement, including section 4.1, which states that "[a]ll independently

developed Intellectual Properties shall remain the property of the Party that developed

it."

Both parties agree that the Agreement is subject to Nevada contract law.  Under

Nevada law, where a contract is unambiguous and no facts are in dispute, "contract

interpretation is a question of law."  *Am. First Fed. Credit Union v. Soro*, 359 P.3d 105,

106 (2015) (internal quotation marks omitted).  "When a contract contains clear and

unequivocal provisions, those provisions shall be construed according to their usual and

ordinary meaning."  *TCA Properties, LLC v. FJ Mgmt., Inc.*, No. 3:14-CV-0267-LRH-

WGC, 2016 WL 1169458, at *2 (D. Nev. Mar. 22, 2016).  "[W]here two interpretations of

a contract provision are possible, a court will prefer the interpretation which gives

meaning to both provisions rather than an interpretation which renders one of the

provisions meaningless."  *Quirrion v. Sherman*, 109 Nev. 62, 846 P.2d 1051, 1053

---

[1] WD Encore also makes this argument, but, for the sake of simplicity, the Court will
only refer to IGT.

(1993).

The Agreement unambiguously makes GC2 the copyright owner of the artwork it created.  Section 4.1 states that each party "shall retain all rights to ownership" of its intellectual property and that "[a]ll independently developed Intellectual Properties shall remain the property of the Party that developed it."  The Agreement defines "intellectual property" as including all copyrights.  Because GC2 created the artwork at issue, under section 4.1 it owns the copyrights to those works.

IGT relies on section 4.2 of the Agreement, which states that "[o]wnership of the copyrights in and to the software for the GC2 Projects developed by or on behalf of IGT shall remain the sole and exclusive property of IGT."  Agreement § 4.2.  But this simply means that IGT owns the copyrights to the software, not the artwork incorporated into the games.  If it meant otherwise, section 4.1 would be rendered meaningless, or virtually so.  The self-evident purpose of section 4.2 is to make it clear that IGT retains ownership of the software platform it created even though it is being used as a platform for a game created by GC2.  In addition, IGT's interpretation of section 4.2 as entitling it to the copyrights in GC2's artwork once it is incorporated into a game would render superfluous other provisions in the agreement, including the Agreement's royalty term, under which IGT agreed to pay GC2 a per-unit royalty for the games it developed.  *See* Agreement § 3.6(a).  GC2's grant of a license to sell gaming equipment "incorporating the GC2 projects" likewise would be unnecessary if IGT owned GC2's artwork as soon as the artwork is incorporated into an IGT platform.  *Id.* § 3.1.

For these reasons, the Court overrules IGT and WD Encore's contentions that GC2's claims based on copyright infringement should be dismissed for lack of standing.

In its response brief, GC2 asks the Court to make a definitive ruling on its favor on the copyright ownership issue—akin to a partial summary judgment—but the Court declines to do so because GC2 has not filed a motion seeking such relief.

## C.     False copyright management information

IGT moves to dismiss GC2's claim (count 12) that IGT violated the provisions of the Digital Millennium Copyright Act (DMCA) concerning copyright management information (CMI).  DMCA defines CMI as "any of the following information conveyed in connection with copies . . . or displays of a work, including in digital form":

> (1) The title and other information identifying the work, including the information set forth on a notice of copyright.

> (2) The name of, and other identifying information about, the author of a work.

> (3) The name of, and other identifying information about, the copyright owner of the work, including the information set forth in a notice of copyright.

> . . . .

> (6) Terms and conditions for use of the work.

17 U.S.C. § 1202(c)(1)-(3), (6).

Section 1202 of the DMCA prohibits knowingly providing or distributing false CMI "with the intent to induce, enable, facilitate, or conceal infringement."  *Id.* § 1202(a)(1)-(2).  Section 1202 also prohibits the removing or altering of CMI.  Specifically, section 1202(b) states:

> No person shall, without the authority of the copyright owner or the law—

>> (1) intentionally remove or alter any copyright management information,

>> (2) distribute or import for distribution copyright management

information knowing that the copyright management information has been removed or altered . . . or

> (3) distribute, import for distribution, or publicly perform works . . . knowing that copyright management information has been removed or altered . . . knowing, or . . . having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

*Id.* § 1202(b)(1)-(3).  Under these provisions, a cause of action exists where CMI is falsified, altered, or removed.  *Pers. Keepsakes, Inc. v. Personalizationmall.com, Inc.*, 975 F. Supp. 2d 920, 928 (N.D. Ill. 2013).

GC2 alleges that IGT, through its wholly owned subsidiary, DoubleDown, conveys false CMI on its website by claiming through its terms of use agreement that it owns or licenses all the artwork contained on its website, despite the fact that it displays GC2's unlicensed artwork.  GC2 also alleges that IGT altered or removed its CMI by omitting GC2's trademark on its artwork contrary to their agreement for physical wagering machines.  IGT contends that DoubleDown's website does not contain false CMI because DoubleDown's terms of use agreement is not "conveyed in connection with" GC2's artwork.  IGT further contends that DoubleDown's website does not contain altered CMI because authorship by way of trademark is not protected by the DMCA.  Finally, IGT contends that even if the omission of GC2's trademark is actionable under the DMCA, GC2 cannot show that any entity other than IGT NV intentionally omitted GC2's trademark.

### 1. Terms of use

DoubleDown's terms of use state that DoubleDown "and/or its licensors and affiliates own all right . . . copyrights . . . and other intellectual property rights" on its website, including rights to the "graphics, texts, information, pictures, video" displayed.

Compl., Ex. 2. GC2 has adequately alleged that the terms of use contain false statements in that DoubleDown does not own or have a license to display GC2's copyrighted materials and yet displays GC2's artwork on its website.

GC2 has failed to adequately allege, however, that the false statements in DoubleDown's terms of use are "conveyed in connection with" GC2's artwork. GC2 contends that DoubleDown's terms of use are conveyed in connection with GC2's artwork because every page of the website containing GC2's artwork has a link at the bottom of the page (or in a dropdown menu) to DoubleDown's terms of use agreement. Courts, however, have generally required more than a boilerplate terms of use notice near a copyrighted work in order to find a party liable for distributing false CMI. For example, another court in this district found that a plaintiff's poem was not conveyed with false CMI where the defendant's "copyright notice [was] not close to the poem; rather, it [was] at the bottom of every page of the website in the generic website footer." *Pers. Keepsakes, Inc.*, 975 F. Supp. 2d at 929; *see also*, *e.g.*, *Stevens v. Corelogic, Inc.*, 194 F. Supp. 3d 1046, 1051 (S.D. Cal. 2016) (finding that a plaintiff failed to state a false CMI claim where the defendant "displayed its own copyright notice on the same webpage as Plaintiffs' photographs."); *Ward v. Nat'l Geographic Soc.*, 208 F. Supp. 2d 429, 449 (S.D.N.Y. 2002) (dismissing plaintiff's false CMI claim against National Geographic where "each page printed from The Complete National Geographic contain[ed] [National Geographic's] copyright notice."). The same is true here. DoubleDown's terms of use link simply appears at the bottom of every page on its website. The Court concludes that given these circumstances, GC2 cannot properly allege that the allegedly false statements in DoubleDown's terms of use agreement

were "conveyed in connection with" GC2's copyrighted works.

### 2. Trademark

GC2 also alleges that IGT is liable for distributing false CMI because
DoubleDown displays GC2's artwork without showing its trademark.  Instead, GC2
alleges that IGT either included its own logo and trademark on the artwork or did not
include any indication of ownership.  GC2 contends that IGT's omission of GC2's
trademark constitutes altering or removing CMI.  IGT, on the other hand, takes issue
with GC2's contentions that the DMCA can be interpreted to cover trademark violations
and that it imposes an affirmative duty on IGT to include an indication of authorship on
artwork that did not originally include one.  IGT also calls into question GC2's ability to
prove that it or other IGT defendants acted with the requisite intent.

First, IGT argues that GC2's trademark information on its artwork does not
constitute CMI as contemplated by the DMCA.  IGT's interpretation of section 1202(b)
conflicts with the DMCA's broad language.  The DMCA prohibits removing the "name of,
and other identifying information about, the author of a work."  17 U.S.C. § 1202(c)(2).
Nothing in section 1202 requires copyright owners to convey their ownership by way of
a copyright notice.  Thus, trademark information may constitute CMI if it is used to
signal authorship of a copyrighted work, as it is here.  GC2 identified its authorship by
including a trademark logo on its artwork, and GC2 and IGT agreed to this designation
with regard to GC2's artwork displayed on IGT's physical wagering machines.

Second, IGT contends that the DMCA is only meant to impose liability where CMI
is affirmatively removed or altered from copyrighted works, not where CMI is simply
omitted.  This contention is contrary to the admittedly limited case law on this matter,

which indicates that there is liability where a party intentionally omits CMI or facilitates the omission of CMI. By way of example, a court in another district found that liability could be imposed if a copyrighted work is displayed without reference to authorship even where the original work did not indicate authorship. *See Agence France Presse v. Morel*, 769 F. Supp. 2d 295, 305 (S.D.N.Y. 2011). In *Morel*, the plaintiff published his photographs online without a copyright notice or watermark on the photographs. *Id.* Instead, the plaintiff's images were displayed with his name, "Morel," or handle name, "by photomorel," in text near the photographs. *Id.* The court rejected the defendant's argument that "CMI must be removed from the photograph itself to state a claim for removal or alteration of CMI." *Id.* The court stated that it was "implausible that a viewer of Morel's photos would not understand the designations 'Morel' and 'by photomorel' appearing next to the images to refer to authorship." *Id.* The court concluded that a defendant's decision to display Morel's photographs without reference to Morel could constitute the falsification of CMI. *See, e.g.*, *Monotype Imaging, Inc. v. Bitstream, Inc.*, No. 03 C 4349, 2005 WL 936882, at *8 (N.D. Ill. Apr. 21, 2005) (although defendant did not "remove" copyright notices "but instead [made] copies of the font software without including the copyright notice, [this did] not preclude liability under the DMCA."). The Court finds these cases persuasive.

Finally, IGT contends that, even if an omission of authorship is actionable under the DMCA, GC2 cannot show that DoubleDown or other IGT defendants intentionally omitted GC2's trademark. This argument is forfeited for purposes of the motion to dismiss because it was not made in IGT's opening brief but rather was asserted for the first time in IGT's reply. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) (A

"district court is entitled to find that an argument raised for the first time in a reply brief is forfeited.").

For these reasons, the Court denies IGT's motion to dismiss on count 12 of GC2's complaint but limits GC2's claim against IGT in accordance with the discussion in this section.

**D.     Illinois Consumer Fraud and Deceptive Business Practices Act**

IGT argues that GC2's consumer fraud claim (count 13) fails because GC2 fails to allege facts plausibly indicating that IGT engaged in a deceptive act or practice, that it had an intent to deceive, or that its alleged deception was a proximate cause of GC2's injuries.

Section 2 of the ICFA states that "[u]nfair methods of competition and unfair or deceptive acts or practices, including . . . the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . are [] unlawful whether any person has in fact been misled, deceived or damaged."  815 ILCS 505/2.  A non-consumer plaintiff suing under the IFCA must prove that there is a nexus between the alleged fraud and consumer injury.  This means that GC2 "must plead and [ultimately] prove (1) that its actions were akin to a consumer's actions to establish a link between it and consumers; (2) how defendant's representations . . . concerned consumers other than plaintiff; (3) how defendant's particular action involved consumer protection concerns; and (4) how the requested relief would serve the interests of consumers."  *Glob. Total Office Ltd. P'ship v. Glob. Allies, LLC*, No. 10 C 1896, 2011 WL 3205487, at *2 (N.D. Ill. July 28, 2011) (citing *Brody v. Finch Univ. of Health Sciences/The Chicago Medical School*, 298 Ill.

App. 3d 146, 161, 698 N.E.2d 257, 270 (1998)) (internal quotation marks omitted).

GC2's complaint satisfies these elements. GC2 alleges that IGT represented through DoubleDown that it owned the copyright to the content in IGT games made available on DoubleDown Casino—the gaming application offered on DoubleDown's website. GC2 further alleges that DoubleDown Casino's consumers relied on this representation when they agreed to DoubleDown's terms of use, in which they released IGT of all liability that may arise from downloading content from DoubleDown Casino. GC2 also alleges that these consumers were injured by IGT's representation because they are now being sued for copyright infringement. GC2's requested relief would serve the interest of consumers because it will prevent IGT from continuing to expose DoubleDown Casino users to liability for copyright infringement. The Court denies IGT's motion to dismiss GC2's ICFA claim.

**E.      Vicarious copyright liability**

Masque and WD Encore have moved to dismiss GC2's vicarious copyright liability claims (counts 9 and 10). GC2 alleges that Masque and WD Encore are vicariously liable for copyright infringement by their end users. According to GC2, consumers may purchase an IGT casino game containing GC2's unlicensed work through Masque and WD Encore's websites. Once a game with the infringing content is purchased from these websites, a consumer receives a license to make a copy of the game on her personal computer. GC2 contends that the consumer copy infringes its copyright and that Masque and WD Encore's decision to distribute GC2's unlicensed artwork makes them vicariously liable for this infringement. Masque and WD Encore argue that they cannot be vicariously liable for the actions of their end users because

they do not have the ability to control them. Masque and WD Encore also argue that they cannot be liable because they do not benefit financially from any copyright infringement by their end users.

To prevail on a claim for vicarious copyright infringement, a plaintiff must establish that "the defendant has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity." *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 673 (9th Cir. 2017). For "vicarious liability to attach, [] the defendant must have the right and ability to supervise and control the infringement, not just affect it." *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n*, 494 F.3d 788, 805 (9th Cir. 2007). In other words, a defendant must have "the legal right to stop the direct infringement" by a third-party. *Routt v. Amazon.com, Inc.*, 584 F. App'x 713, 715 (9th Cir. 2014). For instance, the Ninth Circuit found in *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259 (9th Cir. 1996), that a swap meet operator was vicariously liable for the sale of a vendor's pirated goods. The court concluded that the operator had control over the infringing conduct because the operator "had the right to terminate vendors for any reason." *Id.* at 262; *see also, e.g. A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) (finding that defendant was vicariously liable for peer-to-peer file sharing of pirated work on its system because it retained the right to control access to the system).

Masque and WD Encore argue that GC2 cannot show that they have the ability control their end users as is required to state a claim for vicarious copyright liability. First, they contend that they have no relationship with their end users after the one-time purchase of their games. This, however, is not an accurate characterization, at least

based on the allegations in GC2's complaint.  Masque and WD Encore are licensors.

Under their respective licensing agreements, Masque and WD Encore remain the

owners of the content provided to the consumer.  Masque's license agreement states

that the software it provides its customers "is licensed, not sold" and that customers

using the software "agree to be bound by the terms of [Masque's] SOFTWARE

LICENSE."  Masque License.  Furthermore, Masque's license states that Masque

"retains all rights, title, and ownership in the Software."  *Id.* § 1.  Likewise, WD Encore's

license states that it "IS WILLING TO GRANT YOU [the user] THE LICENSE TO USE

THE SOFTWARE ACCORDING ONLY ON THE CONDITION THAT YOU [the user]

ACCEPT ALL TERMS IN THIS AGREEMENT."  Encore License.  As such, their

relationship with their consumers extends beyond the initial purchase.

Second, Masque and WD Encore argue that they have no real authority to

supervise their consumers' copyright infringement.  GC2 adequately alleges, however,

that their end-user license agreements indicate otherwise.  Under these agreements,

Masque and WD Encore have the authority to terminate a license or bring a lawsuit

where a consumer violates the terms of the agreement.  Masque's license states that it

"may terminate this license immediately if you [the user] fail to comply with its terms."

Masque License § 1.  Similarly, WD Encore's license states that its licensing agreement

"will terminate automatically without notice from Encore if You [the user] fail to comply

with any provision of this Agreement."  Encore License § 8.  In other words, Masque

and WD Encore are alleged to have the authority to put a stop to the infringing conduct

even after a consumer's one-time purchase.

With respect to the second element of a claim for vicarious liability, a financial

benefit exists where there is evidence of a direct financial gain or that the "availability of infringing material acts as a draw for customers." *Ellison v. Robertson*, 357 F.3d 1072, 1078 (9th Cir. 2004) (citation and internal quotation marks omitted). This is so where the availability of an infringing work is a contributing factor in a consumer's decision to purchase a product or service. "The size of the 'draw' relative to a defendant's overall business is immaterial." *Perfect 10, Inc.*, 847 F.3d at 673. Under either method of proof, "[t]he essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any financial benefit a defendant reaps, regardless of how substantial the benefit is in proportion to a defendant's overall profits." *Ellison*, 357 F.3d at 1079.

GC2 has adequately alleged that both Masque and WD Encore received a direct financial benefit from the infringement of the copyrights in GC2's artwork. They allegedly sell consumers games containing GC2's artwork despite the fact that they do not have a license from GC2 to sell its artwork. Thus, Masque and WD Encore received the financial benefit of selling GC2's copyrighted works without paying for GC2's licensing fees. In addition, both Masque and WD Encore are alleged to have included GC2's artwork on their website and on game covers. For example, one product description on Masque's website that includes GC2's artwork on the cover states, "[m]ore of the best IGT slot machines are available on your computer . . . featuring . . . Lucky Lion Fish." Compl., Ex. 47. Similarly, a description of a product offered on WD Encore's website that includes GC2's artwork states: "Run wild with IGT's Wild Wolf and Coyote Moon . . . . [a]mazing graphics and video bonus rounds make these exciting games addicting." Compl. ¶ 175. A reasonable inference may be drawn that Masque

and WD Encore intended to gain the interest of consumers from these types of advertisements.

The elements of vicarious liability aside, WD Encore argues that GC2 has no factual basis for its claim of vicarious liability. WD Encore states in a footnote in its reply that the license agreement cited by GC2 is actually between a non-party, Encore Software, Inc. (not WD Encore) and its end users. But GC2's allegations that WD Encore "had the full right and ability to supervise and control the content" sold on its website, Am. Compl. ¶ 286, are sufficient to state a claim for vicarious liability, and reliance on the point made by WD Encore in its reply would require the Court to make factual determinations inappropriate in the present procedural context.

Masque argues that GC2 cannot assert a claim that Masque is vicariously liable as a manufacturer because GC2 did not make such a claim in its complaint. In its response brief, GC2 argues that Masque, as a manufacturer, is vicariously liable for the infringing products and packaging it distributes to consumers. This is consistent with GC2's allegations in its amended complaint and thus is appropriately considered in deciding the motion to dismiss. *See, e.g., Bausch v. Stryker Corp.*, 630 F.3d 546, 559 (7th Cir. 2010) (plaintiff may, in responding to a motion to dismiss, hypothesize facts consistent with its complaint). For example, paragraph 154 of the amended complaint states that "IGT NV and/or Masque have created packaging for the disks that uses GC2 Copyrighted Works without license, which is also an act of infringement." Am. Compl. ¶ 154. Accordingly, GC2 does not assert a new theory of liability in response to the motion to dismiss.

For the reasons just described, the Court denies Masque and WD Encore's

motions to dismiss counts 9 and 10 of GC2's complaint.

**F.     Damages**

Finally, Masque argues that GC2 is seeking double recovery.  Masque contends that GC2's vicarious liability claim mirrors GC2's direct infringement claim.  As such, Masque argues that GC2 should not be able to recover twice for the same copyright infringement.  Perhaps so, but Federal Rule of Civil Procedure 8(d)(2) & (3) permit GC2 to plead alternative or even inconsistent claims.

### Conclusion

For the reasons described above, the Court denies certain defendants' motions to dismiss [dkt. nos. 57, 60, 66] but narrows count 12 of plaintiff's complaint as described in this opinion.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  June 5, 2017