**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **GC2 INCORPORATED,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 16 C 8794** |
| ) | |
| **INTERNATIONAL GAME TECHNOLOGY** ) | |
| **PLC, INTERNATIONAL GAME** ) | |
| **TECHNOLOGY, IGT, DOUBLEDOWN** ) | |
| **INTERACTIVE LLC, MASQUE** ) | |
| **PUBLISHING, INC., WD ENCORE** ) | |
| **SOFTWARE, LLC, DOE DEFENDANTS** ) | |
| **1-100, DOE DEFENDANTS 101-2,000,000,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

GC2 Incorporated (GC2) has filed suit against 1) International Game Technology

PLC, International Game Technology, and IGT; 2) DoubleDown Interactive LLC (DDI),

3) Masque Publishing Inc., 4) WD Encore Software, LLC, and 5) users of those entities'

products, alleging that they have infringed GC2's copyrights. International Game

Technology PLC (IGT PLC) has moved under Federal Rule of Procedure 12(b)(2) to

dismiss all claims against it for lack of personal jurisdiction.

### Background

The Court takes the facts from the complaint and its exhibits as well as the

affidavits and exhibits filed in connection with the motion to dismiss.

### 1.      Current lineup of IGT defendants

International Game Technology PLC (IGT PLC) is a public limited company

organized under the laws of England and Wales.  It is the sole shareholder of International Game Technology, a Nevada corporation.  The Court will refer to this entity as IGT (US).  IGT (US) is the sole shareholder of IGT, also a Nevada corporation, which the Court will refer to as IGT (NV).  IGT (US) is also the sole member of DoubleDown Interactive LLC (DDI), a limited liability company formed in the state of Washington.

## 2.     IGT (US) and the Georgia / GTECH entities

**IGT (US)**.  IGT (US) is a gaming company that specializes in "the design, development, manufacture, and marketing of casino-style gaming equipment, systems technology, and game content across multiple platforms."  Pl.'s Ex. 2 at 17.

**GTECH S.p.A.**  GTECH S.p.A. (GTECH), which was formed under the laws of Italy, was a business-to-business "provider of lottery and gaming technology solutions and services worldwide."  *Id.*

**GTECH Corporation**.  GTECH Corporation was a wholly owned United States subsidiary of GTECH, incorporated in Delaware.  *Id.*  The Court will refer to this entity as GTECH (US).

**Georgia Worldwide Limited / Holdco**.  On July 11, 2014, Georgia Worldwide Limited was registered as a limited liability corporation under the laws of England and Wales.  Pl.'s Ex. 4 at 7; Pl.'s Ex. 2 at 17.  On September 16, 2014, Georgia Worldwide Limited was re-registered as a public limited company under the legal name Georgia Worldwide PLC (Holdco).  Pl.'s Ex. 2 at 17.

**Georgia Worldwide Corporation**.  On July 11, 2014, Georgia Worldwide Corporation was incorporated in Nevada.  *Id.* at 18.  It was a wholly owned subsidiary of Holdco.  *Id.*  Georgia Worldwide Corporation was formed "solely for the purpose of

affecting" a merger between IGT (US) and GTECH.  *Id.*

## 3.  IGT (US)—GTECH merger

On July 15, 2014, IGT (US) merged with GTECH.  *Id.* at 17.  Specifically, GTECH, GTECH (US), Georgia Worldwide Limited, Georgia Worldwide Corporation, and IGT (US) signed a merger agreement.  Pl.'s Ex. 3 at 6.

On September 22, 2014, an integration steering committee was formed, consisting of senior leaders from GTECH and IGT (US), including Renato Ascoli—former general manager at GTECH and now chief executive officer (CEO) of North America Gaming Interactive (NAGI), an operating segment of IGT PLC.  Pl.'s Ex. 5-a at 5; Pl.'s Ex. 8 at 30.  The steering committee was "responsible for overseeing and guiding the integration planning" of the merger, which included setting key targets, making final decisions, and eliminating obstacles on the path toward integration.  Pl.'s Ex. 5-a at 5.  An integration management office was also created, which was "responsible for integration planning and the day-to-day project operations."  *Id.*  The office was managed by Fabio Celadon and supported by Victor Duarte, senior vice president and chief product officer of IGT (US).  *Id.*; Pl.'s Ex. 2-a at 37.

On January 2, 2015, IGT (US) submitted a proxy statement to the U.S. Securities and Exchange Commission (SEC).  Pl.'s Ex. 2 at 33.  In the statement, under the header, "GTECH's Intentions Regarding GTECH and IGT," IGT (US) wrote:

> Prior to the Closing, GTECH will commence, and following the Closing, Holdco [Georgia Worldwide PLC] will continue, a comprehensive evaluation of the combined company's operations and will identify the best way to integrate the organizations in order to further improve Holdco's ability to serve its customers, as well as achieve revenue and cost synergies.  Employees from both GTECH and IGT will be involved in the evaluation, formation and execution of the integration plans.

*Id.*

## 4.    IGT PLC and its subsidiaries

On February 26, 2015, Holdco—which as noted earlier was registered in England and Wales—changed its legal name to IGT PLC.  Pl.'s Ex. 4 at 7.  On April 7, 2015, GTECH merged into IGT PLC, and Georgia Worldwide Corporation merged into IGT (US).  *Id.*  Currently, IGT PLC is the sole shareholder of IGT (US), and IGT (US) is the sole shareholder of IGT (NV) and the sole member of DDI, a limited liability company. IGT Global Solutions Corporation (previously GTECH (US)) is a wholly owned subsidiary of IGT (NV).  Pl.'s Ex. 7 ¶ 4(a); Def.'s Reply, Ex. (Def.'s Ex) A (Boccia Decl.) ¶ 7.

IGT PLC is a public limited company established under the laws of England and Wales.  Pl.'s Ex. 8 at 3.  It has its corporate headquarters in London, England and its operating headquarters in Rome, Italy; Providence, Rhode Island; and Las Vegas, Nevada.

IGT PLC describes itself as the "world's leading provider of end-to-end gaming solutions with cutting-edge technology, innovation content, and expertise that drive customer and player demand."  Pl.'s Ex. 4 at 3.  It has four operating segments:  NAGI, North America Lottery, Italy, and International.  *Id.* at 5.  NAGI is primarily operated by IGT PLC's wholly owned subsidiary, IGT (US).  Boccia Decl. ¶ 5.  NAGI's business includes land-based casino games, internet-based interactive wagering games, play-for-fun casino applications disseminated through DDI, commercial gaming research and development, and casino management systems.  Pl.'s Ex. 4 at 6.  NAGI provides these products in the United States and Canada.  *Id.* at 7.  In 2015, NAGI revenue made up

23% of IGT PLC's total revenue at over one billion dollars.  *Id.* at 5.

5.    **GC2 and IGT (NV)**

GC2, the plaintiff in this case, develops videos and images for games that are primarily displayed on physical wagering machines, such as slot machines.  Am. Compl. ¶¶ 22-23.  GC2 licensed its artwork to IGT (NV) from 2003 to 2007.  *Id.* ¶ 81.  GC2 granted to IGT (NV) "the sole and exclusive worldwide right and license to make, manufacture, use, market, and sell gaming equipment [] incorporating the GC2 Projects for use in legalized gaming jurisdictions."  Am. Compl., Ex. 18 (Agreement) § 3.2.  The license applied to stand-alone games on "video gaming devices operated on licensed gaming premises."  *Id.*  The license did not apply to certain wagering devices or platforms, such as "devices used for mobile gaming" and "internet gaming."  *Id.*, Ex. 20 (Amend. 7) § 1.  The license also did not apply to "nonwagering devices, machines and systems such as:  (a) pinball, (b) arcade machines, and (c) gaming consoles, including but not limited to general purpose computers, for non-wagered gaming."  *Id.*  In exchange for GC2's exclusive license, IGT (NV) agreed to pay GC2 royalty fees.  *See* Agreement § 3.6(a).

Sometime after IGT (NV) ended its relationship with GC2, IGT (NV) entered the online gaming industry.

6.    **IGT-GC2 negotiations**

On April 15, 2016, an IGT Global Solutions Corporation employee, Todd Nash, reached out to GC2 to discuss purchasing the rights to GC2's copyrighted works for IGT (US)'s internet-based games.  Pl.'s Ex. 12-e at 18.  Nash both called and emailed GC2. Nash used a GTECH email address to contact GC2, and the following disclaimer was

contained in all his email communications with GC2:

> CONFIDENTIALITY NOTICE: This message is the property of International Game Technology PLC and/or its subsidiaries and may contain proprietary, confidential or trade secret information. This message is intended solely for the use of the addressee. If you are not the intended recipient and have received this message in error, please delete this message from your system. Any unauthorized reading, distribution, copying, or other use of this message or its attachments is strictly prohibited.

*Id.* at 19.

In his first email to GC2, Nash explained that he came across a list of games with

GC2's works, stating:

> The issue arose from an overall portfolio assessment as part of the new IGT (since our acquisition last year). We were investigating utilization of rights across multiple channels for all trademarks in the group. When we came across this list of games we realized that we did not have all rights and wanted to explore getting them. Upon further review, we have realized that somehow this gap in rights slipped through the cracks and these games were brought to interactive.

*Id.* at 18.

Nash's email led to negotiations between IGT (US) and GC2. Nash got Michael

Prescott, NAGI's senior vice president and legal counsel, and Luke Orchard, IGT Global

Solutions' chief compliance and risk management officer, involved in the negotiations.

Def.'s Ex. C at 13:11-15:19; Pl.'s Ex. 12-g at 27; Pl.'s Ex. 13-c at 11. Nash also

reported the status of these negotiations with Duarte (again, a senior vice president of

IGT (US)) and Bryan Upton—director of content management at IGT—via email with the

subject line "GC2 Issue." Pl.'s Ex. 13-b at 9; Pl.'s Ex. 13-c at 11.

Nash and Prescott collectively emailed GC2 thirty-seven times regarding the

purchase of rights for GC2's works. Pl.'s Resp. at 1. To facilitate an agreement

between GC2 and IGT (US), Prescott drafted a non-disclosure agreement between

GC2 and "IGT, a Nevada corporation, and its [a]ffiliates," which GC2's president and

Nash signed on June 3, 2016. Pl.'s Ex. 16 at 2, 5. The agreement defined "affiliate" as

"any entity that directly owns or controls, is owned or controlled by, or is under common

ownership or control with a Party." *Id.* at 5. It also stated that control "exists whenever

there is an ownership interest representing at least 50% of the total interests of the

pertinent entity then outstanding." *Id.*

Ultimately, GC2 and Nash were not able to come to an agreement regarding IGT

(US)'s purchase of the rights to GC2's works.

**7.    Present litigation**

In the present lawsuit, GC2 alleges that the defendants, including IGT PLC,

infringed GC2's copyrights by displaying and disseminating or using its copyrighted

works without a license. IGT PLC has moved to dismiss the claims against it for lack of

personal jurisdiction. The other named defendants moved to dismiss GC2's claims

under Federal Rule of Civil Procedure 12(b)(6). The Court denied their motion but

narrowed count 12 of GC2's complaint. *See GC2 Inc. v. Int'l Game Tech. PLC*, No. 16

C 8794, 2017 WL 2424223 (N.D. Ill. June 5, 2017).

<strong>Discussion</strong>

IGT PLC has moved to dismiss the claims asserted against it by GC2 for lack of

personal jurisdiction. When a defendant moves to dismiss a complaint for lack of

personal jurisdiction under Rule 12(b)(2), "the plaintiff bears the burden of

demonstrating the existence of jurisdiction." *Kipp v. Ski Enter. Corp. of Wis.*, 783 F.3d

695, 697 (7th Cir. 2015) (internal quotation marks omitted). Where, as in this case, a

court is asked to find personal jurisdiction without holding an evidentiary hearing, the

plaintiff must establish a *prima facie* case for personal jurisdiction. *Id.* "In evaluating whether the *prima facie* standard has been satisfied, the plaintiff is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record." *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (internal quotation marks omitted).

When a federal court sits in diversity jurisdiction, it "must apply the personal jurisdiction rules of the state in which it sits." *Kipp*, 783 F.3d at 697. In Illinois, a court may "exercise jurisdiction on any [] basis [] permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2-209(c). In other words, Illinois law permits the exercise of jurisdiction "up to the limits of the [d]ue [p]rocess [c]lause of the Fourteenth Amendment." *Kipp*, 783 F.3d at 697. In that sense, federal due process and Illinois state-law requirements are indistinguishable. *State of Illinois v. Hemi Group LLC*, 622 F.3d 754, 757 (7th Cir. 2010) ("[Illinois] courts have noted that no case has yet arisen where federal due process would allow the exercise of personal jurisdiction over a defendant but the Illinois Constitution would not.").

There are two types of personal jurisdiction—specific and general. "[S]pecific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (internal quotation marks omitted). The exercise of specific personal jurisdiction "requires that the claims in the lawsuit arise from the defendants' contacts with the forum state." *Johnson v. Hartwell*, No. 16-4071, 2017 WL 2506540, at *1 (7th Cir. June 9, 2017). For a court to exercise general personal jurisdiction, the defendants "must have had 'continuous and systematic' contacts with

the forum state." *Id.* General jurisdiction gives a court the right to hear any claims asserted against a defendant regardless of where the controversy occurred. *Goodyear Dunlop Tires Operations*, 564 U.S. at 919.

GC2 asserts that both specific and general personal jurisdiction exists here. With regard to specific jurisdiction, the crux of GC2's argument is that IGT PLC engaged in tortious conduct intended to injure GC2 in Illinois. As for general jurisdiction, GC2 contends that IGT PLC's involvement in Illinois's gaming industry establishes continuous and systematic contacts with Illinois.

**A.    Specific jurisdiction**

Specific personal jurisdiction is appropriate "where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Tamburo v. Dworkin*, 601 F.3d 693, 702 (7th Cir. 2010). In cases involving tortious activity, conduct is purposefully directed at the forum state where a plaintiff makes a showing that there was "(1) intentional conduct []; (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state." *Felland v. Clifton*, 682 F.3d 665, 674-75 (7th Cir. 2012) (internal quotation marks omitted). Exercise of specific jurisdiction must also "comport with traditional notions of fair play and substantial justice as required by the Fourteenth Amendment's [d]ue [p]rocess [c]lause." *Tamburo*, 601 F.3d at 702.

GC2 argues that IGT PLC purposefully directed activities at Illinois because 1) it contacted GC2 several times to negotiate a licensing agreement; 2) it signed a non-

disclosure agreement with GC2 intended to facilitate that agreement; 3) IGT PLC's agents contacted GC2 in Illinois, making their contacts also IGT PLC's contacts; 4) IGT PLC exerts substantial control over its subsidiaries, permitting the finding of specific jurisdiction based on the subsidiaries' contacts with Illinois; and 5) IGT PLC's products are used in Illinois.

a. **IGT PLC**

GC2 contends that IGT PLC, by way of Nash and Prescott, purposefully directed activities at Illinois because it reached out to GC2—an Illinois based company—several times to discuss IGT PLC's purchase of GC2's licensing rights. As support for this contention, GC2 notes that Nash's emails contained references to "IGT and/or its affiliates" and that Nash did not disavow his connection with IGT PLC. Pl.'s Resp. at 16 & n. 25. GC2 also says that Prescott executed a non-disclosure agreement on behalf of IGT PLC. *Id.* at 16. GC2 also argues that Orchard was involved in the GC2 negotiations on behalf of IGT PLC. *Id.* at 16 & n. 25. GC2 contends that this evidence is sufficient to show that IGT PLC engaged in conduct aimed at Illinois.

The record does not support a finding that IGT PLC was involved in the IGT (US)-GC2 negotiations. First, none of the employees involved in the negotiations were employed by IGT PLC. Nash's W-2 wage statement indicates that he is an employee of IGT Global Solutions Corporation—a subsidiary of IGT (NV). Pl.'s Ex. 14 at 2. Orchard is also employed by IGT Global Solutions Corporation, as its chief compliance and risk management officer. Def.'s Ex. C at 13:11-15:19; *see* Pl.'s Ex. 12-g at 27. And although Prescott's exact employer is subject to dispute, the evidence does not support a finding that he was an employee of IGT PLC. Prescott was identified to GC2 as the

senior vice president, legal and intellectual property counsel for NAGI.  Pl.'s Ex. 12-g at 27; Pl.'s Ex. 12-k at 48.  Though NAGI consists of several IGT PLC subsidiaries, in an Illinois-mandated disclosure, Prescott was listed as an employee of "IGT," a term used to indicate one of the US-based IGT entities.  Pl.'s Ex. 2-a at 37.  And prior to the IGT-GTECH merger, Prescott was an employee of GTECH (US).  Pl.'s Ex. 3 at 25.

Second, the language of the non-disclosure agreement does not support a finding that IGT PLC directed conduct aimed at Illinois.  The agreement was between GC2 and "IGT, a Nevada corporation, and its [a]ffiliates."  Pl.'s Ex. 16 at 2.  The agreement defines "affiliate" as an "entity that directly owns or controls" IGT, and it states that control "exists whenever there is an ownership interest representing at least 50% of the total interests of the pertinent entity then outstanding."  *Id.* at 5.  IGT PLC certainly fits this definition, as it is IGT (US)'s sole shareholder.  But the inclusion of IGT PLC in the non-disclosure agreement is based solely on its financial ties to IGT, not any conduct by IGT PLC itself.

Without evidence showing that IGT PLC directly participated in the negotiations with GC2, there is no basis for a finding that it directed conduct aimed at Illinois via these negotiations.

### b.    IGT PLC agents

GC2 asserts that even if IGT PLC did not directly participate in negotiations with GC2, specific personal jurisdiction exists pursuant to the doctrine of agency liability.  "To bind the principal, the agent must have either actual authority, apparent authority, or the principal must ratify [the agent's] actions."  *Anetsberger v. Metro. Life Ins. Co.*, 14 F.3d 1226, 1234 (7th Cir. 1994).

GC2 contends that Nash and Prescott had actual authority to act on behalf of IGT PLC.  Pl.'s Resp. at 17.  To establish actual authority, the evidence must show "(1) a principal/agent, master/servant, or employer/employee relationship existed; (2) the principal controlled or had the right to control the conduct of the alleged employee or agent; and (3) the alleged conduct of the agent or employee fell within the scope of the agency or employment."  *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 731-32 (7th Cir. 2014) (internal quotation marks omitted).  Actual authority may be express or implied.  *Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000).  An agent acts with express authority when the "principal explicitly grants the agent the authority to perform a particular act."  *Id.* (internal quotation marks omitted).  "Implied authority is actual authority that is implied by facts and circumstances and it may be proved by circumstantial evidence."  *Id.* (internal quotation marks omitted).  In determining whether an agent acted with actual authority, "only the words or conduct of the alleged principal, not the alleged agent, establish the actual [] authority of an agent."  *Id.* (internal quotation marks omitted).

GC2 argues that Nash and Prescott acted as IGT PLC's agents, so their contacts with Illinois are imputed to IGT PLC.  Pl.'s Resp. at 17-18.  With regard to Prescott, however, GC2 offers no factual support for this contention.  With regard to Nash, GC2 asserts that he was part of a team formed by IGT PLC tasked with integrating IGT (US) and GTECH.  GC2 contends that, in his effort to integrate IGT (US) and GTECH, Nash discovered that IGT (US) did not have rights for some of GC2's works.  GC2 also asserts that Nash's communications with GC2 constitute evidence that he was working on behalf of IGT PLC.  Specifically, GC2 notes that Nash contacted GC2 using a

GTECH email address and that his emails contained a disclaimer that referenced IGT PLC. GC2 also contends that Nash's status as IGT PLC's agent is evident from his ability to sign a non-disclosure agreement with GC2 on behalf of IGT PLC. In addition, GC2 asserts that Nash's status as IGT PLC's agent is apparent based on his email reports to Upton—who GC2 alleges works for IGT PLC—and Duarte—who GC2 alleges is an executive at IGT PLC—regarding his negotiations with GC2. GC2 contends that Nash received "marching orders" from Upton and Duarte during his negotiations with GC2. Pl.'s Resp. at 18.

As a preliminary matter, the Court will correct some of GC2's inaccurate factual contentions. First, Nash did not sign the non-disclosure agreement directly on behalf of IGT PLC. Though IGT PLC was included in the non-disclosure agreement as an affiliate of IGT (US) affiliate based on its financial ties, there is no evidence that IGT PLC or its employees were actually involved in the negotiations between Nash and GC2. Without evidence of IGT PLC's direct involvement, GC2 cannot establish that the agent acted with actual authority. *See Opp*, 231 F.3d at 1064.

Second, nothing in the record supports the proposition that Upton is an employee of IGT PLC. GC2 points to Upton's LinkedIn profile, in which he wrote that he is an IGT (US) employee based in London. Pl.'s Ex. 23-g at 38. GC2 contends that because IGT PLC has its headquarters in London, this must mean that Upton is an IGT PLC employee. That is a *non sequitur*. Upton's LinkedIn profile makes no mention of IGT PLC, but IGT (US) and GTECH are mentioned multiple times. *Id*.

Third, the record does not support a finding that Duarte is an executive of IGT PLC. GC2 notes that Bloomberg reports that Duarte is employed as the "[g]lobal [c]hief

[p]roduct [o]fficer of [g]aming at International Game Technology PLC since April 2015" and that the Wall Street Journal reports that Duarte is an "executive" at IGT PLC. Pl.'s Exs. 23-e at 27 & 23-f at 32. GC2 provides an affidavit from Todd Price, the chief technology officer at Page Vault Inc., "a cloud-based service that enables [u]sers to control a remote, cloud-based browser to make captures of webpages." Pl.'s Ex. 23 at Price Aff. ¶ 3. Price states that the screen captures of the Bloomberg and Wall Street Journal websites were not altered in any way. *Id.* ¶¶ 5-10. The content of the reports on these websites, however, is inadmissible hearsay. Moreover, an IGT (US) filing with the Illinois gaming board lists Duarte as IGT (US)'s senior vice president. Pl.'s Ex. 2-a at 37. Additionally, Pierfrancesco Boccia—head of corporate affairs and board secretary of IGT PLC—states that Duarte's W2 forms for 2015 and 2016 do not indicate that he was an employee of IGT PLC. Boccia Decl. ¶ 9. GC2 also asserts that Duarte was working as IGT PLC's agent in his role in the integration management office created to integrate IGT (US) and GTECH. Duarte, however, was placed in the office before the creation of IGT PLC. The integration office was created in 2014, as part of the IGT-GTECH merger before Holdco (now IGT PLC) merged with IGT-GTECH. Even assuming that IGT PLC adopted the oversight of this office following the Holdco merger, GC2 has not shown that Duarte's involvement with the GC2 negotiations was something he was doing as part of a grant of authority by IGT PLC. Moreover, GC2 has not offered evidence supporting the proposition that Duarte initiated or directed Nash's negotiations with GC2 on behalf of IGT PLC.

The Court finds that GC2 has not shown that Nash acted as an agent for IGT PLC. The record does not support that Upton and Duarte gave Nash "marching

orders"; among other things, neither Duarte or Upton replied to Nash's emails.  Though GC2 points to a call log indicating that Upton spoke to Nash for about fifteen minutes to "discuss GC2," it provides no other information regarding this phone call.  Pl.'s Ex. 13-c at 11.  And even if Upton and Duarte did give Nash directions, the record does not support a finding that they were acting on behalf of IGT PLC.  As previously discussed, Upton and Duarte are employed IGT (US), not IGT PLC, and Duarte did not involve himself in Nash's negotiations with GC2 at the direction of IGT PLC.

Nash's emails, email address, and email disclaimer similarly do not support the proposition that he was an agent of IGT PLC.  GC2 is correct that the issue of IGT (US)'s "gap in rights" regarding some of GC2's works "arose from an overall portfolio assessment as part of the 'new IGT.'"  Pl.'s Ex. 12-e at 18.  And the content of Nash's email supports the inference that he came across this information as part of the effort to integrate the "new IGT" (IGT (US)) with GTECH.  GC2 has not shown, however, that Nash engaged with GC2 on IGT PLC's behalf or at its direction.  With regard to the email address, prior to the merger, Nash worked for GTECH (US), which was later renamed IGT Global Solutions Corporation—a subsidiary of IGT (NV).  Nash's continued use of a GTECH (US) email address rather than an IGT (US) email address suggests nothing more than that GTECH (US) had not yet completely transitioned over to IGT Global Solutions Corporation.  That aside, Nash's use of a *GTECH* email address certainly does not tend to show that he was acting as *IGT PLC's* agent.  As for the footer in Nash's emails, it states that the email belongs to IGT PLC *and* its subsidiaries—one of which was an entity that wholly owned the parent of the company by which Nash was employed.  In any event, a boilerplate reference in a footer of an

email does not tend to show that Nash was acting as an agent for IGT PLC.

GC2 also argues that IGT PLC has forfeited its right to dispute Nash's status as its agent. Pl.'s Resp. at 18. GC2 notes that, in its opening brief, IGT PLC disputed only Nash's status as an employee and not his status as an agent. Perhaps so, but that does not mean that IGT PLC forfeited the point; the clear thrust of its argument was that it was disputing that Nash was acting on its behalf. The focus on the question of agency, as distinguished from employment, became clearer once GC2 filed its response to the motion, making it appropriate for IGT PLC to address the point in its reply.

### c.    IGT PLC's subsidiaries

GC2 next argues that specific jurisdiction over IGT PLC exists here because it has sufficient contacts in Illinois through the contacts of its subsidiaries, including IGT (NV), the party that originally contracted with GC2. Pl.'s Resp. at 19. GC2 notes that IGT PLC's subsidiaries (which are parties in this lawsuit) do not contest that personal jurisdiction exists. GC2 argues that IGT PLC exerts an unusually high degree of control over its subsidiaries, permitting the Court to exercise specific jurisdiction over IGT PLC based on the subsidiaries' Illinois contacts.

In the Seventh Circuit, the general rule is that "the jurisdictional contacts of a subsidiary corporation are not imputed to the parent." *Purdue*, 338 F.3d at 788 n. 17. Illinois state law treats "a parent corporation as a separate legal entity from a wholly owned subsidiary, even where the two entities have mutual dealings." *Old Orchard Urban Ltd. P'ship v. Harry Rosen, Inc.*, 389 Ill. App. 3d 58, 69-70, 904 N.E.2d 1050, 1061 (2009). A court will make an exception to this rule if a parent has "an unusually high degree of control" over a subsidiary or the parent's "subsidiary's corporate

16

existence is simply a formality." *Abelesz v. OTP Bank*, 692 F.3d 638, 658-59 (7th Cir. 2012) (internal quotation marks omitted); *see also, Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943 (7th Cir. 2000). Under these circumstances, a court may impute a subsidiary's contacts to the parent to establish specific jurisdiction over the parent. *See Abelesz*, 692 F.3d at 658-59; *see also Old Orchard*, 389 Ill. App. 3d at 70, 904 N.E.2d at 1061 ("Illinois will disregard this legal separation and pierce the corporate veil only where the subsidiary is so controlled, and its affairs so conducted by a parent that observance of the fiction of separate identities would sanction a fraud or promote injustice.").

A parent of a wholly owned subsidiary "necessarily control[s], direct[s], and supervise[s] the [subsidiary] to some extent." *Abelesz*, 692 F.3d at 659 (internal quotation marks omitted) (citing *IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537, 540 (7th Cir. 1998)). Accordingly, a court considers the following factors in determining whether a parent corporation exerts an unusually high degree control of a subsidiary or is doing business in Illinois through its subsidiary:

> (1) the degree of control exercised by the parent over the subsidiary, (2) the obligations of the subsidiary to service the parent's products, (3) inclusion of the subsidiary's name and address in the parent's advertising, (4) joint sponsorship of promotional activities, (5) interlocking directorships, (6) location of the meetings of the subsidiary's board of directors, and (7) whether the subsidiary is authorized to prosecute trademark infringement suits in the parent's name.

*Palen v. Daewoo Motor Co.*, 358 Ill. App. 3d 649, 661, 832 N.E.2d 173, 184 (2005) (internal quotation marks omitted).

GC2 argues that IGT PLC exerts an unusually high degree of control over IGT (US), IGT (NV), and/or DDI because IGT PLC and IGT (US) effectively operate as one

entity. Pl.'s Resp. at 16. It points to Ascoli's position at IGT (US) as evidence of this. GC2 highlights the facts that Ascoli is the CEO of NAGI, a US-based business segment of IGT PLC; he was placed on the steering committee that was created to integrate IGT (US) and GTECH; he is the sole director and president of IGT (US) and IGT (NV); and he is the sole manager and president of DDI. Pl.'s Exs. 5-a at 5, 5-d at 136, 10 at 2-4, & 11 at 14. GC2 also cites to IGT PLC's 2015[1] 20-F annual report to the SEC as evidence that IGT PLC considers itself and its subsidiaries to constitute a single entity. Pl.'s Ex. 8 at 22. Specifically, GC2 cites to portions of the report where IGT PLC refers to itself and its subsidiaries as "we." Pl.'s Resp. 21-22.

GC2's evidence does not show that IGT PLC exhibited the degree of control over its subsidiaries needed to impute the subsidiaries' Illinois contacts to the parent. Ascoli's role does not support a finding that IGT PLC, through Ascoli, exerts a high degree of control over IGT (US), IGT (NV), or DDI. GC2 has not shown that IGT PLC's operating segments are under the direct control of IGT PLC. References to NAGI appear in IGT PLC-related publications that provide a broad overview of IGT PLC's corporate family. *See* Pl.'s Ex. 4 at 7; Pl.'s Ex. 8 at 24, 30. The content of these publications reflects that IGT PLC uses these operating segments as a convenient way of grouping subsidiaries that target a specific market, for example, the North American lottery market. Pl.'s Ex. 5 at 137; Boccia Decl. ¶ 5. In other words, an operating segment is not a single entity with its own corporate governance under the control of IGT PLC. Boccia states that "each segment [of IGT PLC] is operated by one or more of IGT PLC's subsidiaries." Boccia Decl. ¶ 5. This is consistent with the evidence that

---

[1] GC2 incorrectly states that the report is from 2016.

NAGI is run primarily by IGT PLC's subsidiaries IGT (US), IGT (NV), and DDI. Similarly, GC2 has not shown that Ascoli works for IGT PLC. As previously discussed, Ascoli is the CEO of NAGI, the sole director and president of IGT (US) and IGT (NV), and the sole manager and president of DDI. In other words, Ascoli's employment has been confined to companies within NAGI. Without evidence showing that IGT PLC runs NAGI or its component parts—which is lacking here—Ascoli's role in NAGI cannot support a finding that IGT PLC exerts an unusually high degree of control over IGT (US) and its subsidiaries. GC2 also has not shown that Ascoli's position in the integration steering committee supports a finding that IGT PLC exerts a high degree of control over Ascoli or IGT (US). The steering committee was formed after the IGT-GTECH merger with the objective of integrating IGT (US) and GTECH. Assuming that the steering committee is controlled by IGT PLC, this shows, at most, that IGT PLC had some oversight over IGT (US)'s integration efforts and that Ascoli provided IGT PLC with some assistance. This kind of oversight is common in a parent-subsidiary relationship and does not suggest an unusually high degree of control.

Similarly, IGT PLC's use of "we" and "our" in its 20-F report to the SEC is too thin a reed to support an inference that IGT PLC exerts an unusually high degree of control over its subsidiaries. Pl.'s Resp. at 19. The report states:

> In the following discussion, unless otherwise specified or the context otherwise indicates, all references to "IGT PLC," "we," "us," "our," and the "Company" refer to the business and operations of International Game Technology PLC and consolidated subsidiaries.

Pl.'s Ex. 8 at 22. This is nothing more than a means to simplify references to the corporate family in IGT PLC's filing; it does not imply that IGT PLC is controlling the operations of all members of the family or that they do not actually have a separate

existence.  In fact, in the same report, IGT PLC provides an organizational chart where it separates IGT (NV), IGT, and DDI as distinct entities.  *Id.* at 19.  *See, e.g.*, *Gruca v. Alpha Therapeutic Corp.*, 19 F. Supp. 2d 862, 868 (N.D. Ill. 1998) (finding that the use of "our" in an annual report was entirely consistent with the parent and subsidiary being separate entities).

### d.    IGT PLC products

Finally, GC2 argues that IGT PLC purposefully availed itself of the privilege of conducting business in Illinois through the stream of commerce.  GC2 contends that IGT PLC controls IGT (US)—the parent company of IGT (NV)—and that IGT (NV) has admitted that its games have been sold and used in Illinois.  Pl.'s Resp. at 22.  The Court has already determined, however, that GC2 has not shown that IGT PLC controls IGT (US), including IGT (NV) and its products.  *See supra* at 18-19.  As such, due process does not permit this Court to exercise specific jurisdiction over IGT PLC based on the stream of commerce theory.

## B.    General jurisdiction

GC2 argues in the alternative that general personal jurisdiction over IGT PLC exists in Illinois.  "The [d]ue [p]rocess [c]lauses of the Fifth and Fourteenth Amendments permit courts [] to exercise general jurisdiction only when the continuous corporate operations within a state [are] so substantial and of such a nature as to justify suit on causes of action arising from dealings entirely distinct from those activities."  *Kipp*, 783 F.3d at 698 (internal quotation marks omitted).  For a corporation, general personal jurisdiction is normally found in the forum in which the corporation was incorporated or has its "principal place of business."  *Id.*  In effect, "general jurisdiction exists only when

the organization is essentially at home in the forum."  *Id.* (internal quotation marks omitted).

GC2 contends that IGT PLC has maintained significant and continuous contacts in Illinois, thus making it subject to general jurisdiction here.  Pl.'s Resp. at 24-25.  As support, GC2 points to the fact that IGT PLC had to submit disclosures to the Illinois Gaming Board in order for IGT (NV) to obtain an Illinois gaming license.  Pl.'s Ex. 17. GC2 argues that by doing this, IGT PLC "subjected itself to the IGB's authority and committed itself to an ongoing relationship with Illinois."  Pl.'s Resp. at 24.  GC2 also says that IGT PLC registered as a lobbyist in Illinois.

IGT PLC's contacts with Illinois are insufficient to give rise to general jurisdiction. First, its submissions to the Gaming Board are not evidence that *it* does business in Illinois; it made the submissions to enable *IGT (NV)* to conduct business in Illinois.  *See* Pl.'s Ex. 11.  Second, it is not clear that IGT PLC is a registered lobbyist in Illinois.  The exhibits cited by GC2 reflect that "IGT and its affiliates" are registered lobbyists in Illinois, not IGT PLC.  Pl.'s Ex. 19-a at 13-19.  And even if "IGT and its affiliates" includes IGT PLC, the company's status as a lobbyist does not tend to show that the company is "essentially at home" in Illinois.

## C.  Admissible evidence

GC2 asks the Court to find that the declaration of Kristin DiTraglia is inadmissible along with the evidence she refers to in the declaration.  Pl.'s Resp. at 11.  GC2 argues that DiTraglia—a paralegal—did not have the personal knowledge regarding many of the statements in her declaration.  In drawing its conclusions in the present decision, the Court did not rely on DiTraglia's declaration or the exhibits submitted with it.  Thus the

request is moot.

## Conclusion

For the foregoing reasons, the Court grants defendant IGT PLC's motion to dismiss for lack of personal jurisdiction [dkt. # 63].

_____

MATTHEW F. KENNELLY
United States District Judge

Date: July 13, 2017