UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GC2 INCORPORATED, | ) |
| | ) |
| Plaintiff, | ) Case No.: 1:16-cv-08794 |
| | ) |
| vs. | ) Judge: Matthew F. Kennelly |
| | ) Magistrate Judge: Mary M. Rowland |
| INTERNATIONAL GAME TECHNOLOGY PLC, ET AL. | ) |
| | ) |
| Defendants. | ) |

## MOTION TO COMPEL PRODUCTION OF DEFENDANTS' FINANCIAL INFORMATION PURSUANT TO GC2'S DISCOVERY REQUESTS

Plaintiff GC2 Incorporated ("GC2") respectfully requests that this Court issue an order under Federal Rules of Civil Procedure 26 and 37 compelling Defendants International Game Technology ("IGT"), IGT ("IGT NV") and DoubleDown Interactive LLC ("DDI") (collectively, "Defendants") to produce relevant financial documents that GC2 has sought in order to meet its burden of proof on damages on its claims for copyright infringement and to rebut Defendants' affirmative defenses.

In summary, GC2 seeks documents reflecting ***gross revenue*** Defendants have derived from their infringing activity, documents reflecting ***deductible expenses*** which Defendants contend should reduce Plaintiffs' actual damages, and documents reflecting ***apportionment expenses*** Defendants seek to use to offset or reduce gross revenue derived from their infringing activity. This Motion also seeks an order requiring Defendants to provide complete revenue

1

information for each product line[1] ***through the entire distribution channel***, and the underlying documentary support for claimed deductible expenses and apportionment relating thereto.

As a copyright owner, GC2 is entitled to damages and profits under 17 U.S.C. § 504(b) for each act of copyright infringement. Specifically, section 504(b) provides that GC2 is:

> entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages.

*Id.* In establishing the infringers' profits, Section 504(b) provides that "the copyright owner is required to present proof only of the infringer's **gross revenue**, and the **infringer is required to prove his or her deductible expenses** and the **elements of profit attributable to factors other than the copyrighted work**." *Id.* (Emphasis added.)

## FACTUAL BACKGROUND

This is, in significant part, a copyright infringement case.[2] GC2 alleges that Defendants have infringed their copyrighted works mainly through three product lines, namely the IGT Interactive Remote Game Server (RGS) product line,[3] the DoubleDown Casino product line,[4] and PC-based products (Masque and Encore products).[5] For each of these three product lines, Defendants use ***others*** in a distribution channel to display and distribute GC2 works. The

---

[1] At this time, this Motion is not directed at Defendant Masque because its counsel have represented that responsive information will be produced. Moreover, in light of Encore's bankruptcy filing and the stay, this Motion will not address Defendant Encore. Counsel for IGT NV acknowledged, however, that the stay does not apply to IGT NV's possession of Encore-related revenues and costs and its potential vicarious liability for these revenues and expenses.
[2] This case also involves a DMCA count.
[3] The IGT Interactive RGS product line includes the following games: Pharaoh's Fortune, Coyote Moon, and, on information and belief, Kitty Glitter.
[4] The DoubleDown Casino product line includes the following games: Pharaoh's Fortune, Coyote Moon, and on information and belief, Kitty Glitter.
[5] The Masque product line includes the following games: Pharaoh's Fortune, Coyote Moon, Kingpin Bowling, Lucky Lion Fish, Fesitval Fantastico, Wild Goose Chase, and, on information and belief, Kitty Glitter and Maid of Money. The Encore product line includes Pharaoh's Fortune, and, on information and belief, Kitty Glitter.

"others" in the distribution channel not only display and distribute GC2 works they obtained from Defendants, but they also share or split profits (revenue) with Defendants either (1) per the terms of so-called "revenue share" agreements or (2) via royalty agreements. In light of the *multiple* ways in which Defendants and "others" in its distribution channel have infringed GC2's Copyrighted Works, GC2 has asserted multiple theories of liability against each of the Defendants, directly, jointly and vicariously. The statutory basis for each theory is set forth in 17 U.S.C. § 504(b) and 17 U.S.C. §§ 106(1)-(5).

## **LEGAL STANDARD**

The scope of discovery under Rule 26 is broad and liberal. Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002). A party may discover "any nonprivileged matter that is relevant to the party's claim or defense and proportional to the needs of the case considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. Information within this scope of discovery need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26. A party may file a motion to compel discovery under Rule 37 if another party fails to respond to a discovery request or where the party's response is evasive or incomplete. Kodish v. Oakbrook Terrace Fire Prot. Dist., 235 F.R.D. 447, 449 (N.D. Ill. 2006). In responding to a motion to compel, "[t]he burden rests upon the objecting party to show why a particular discovery request is improper." Id. at 450. As with all discovery matters, courts have broad discretion in deciding motions to compel. Medicines Co. v. Mylan Inc., No. 11 C 1285, 2013 WL 120245, at *2 (N.D. Ill. Jan. 9, 2013) (citing Peals v. Terre Haute Police Dept., 535 F.2d 621, 629 (7th Cir. 2008)).

3

## ARGUMENT

I. **Defendants' Have Failed to Produce/Respond Fully to GC2's Requests for Information and Documents Evidencing Defendants' Gross Revenues, i.e., Direct Profits.**

In order to obtain the financial information that Plaintiffs need to establish gross revenue or direct profits under section 504(b), GC2 served multiple interrogatories and requests for production in February and March of 2017 on Defendants IGT, IGT NV and DDI. Defendants IGT, IGT NV, and DDI's discovery responses are attached as **Exhibits A, B,** and **C,** respectively. Thereafter, Defendants sought and obtained an extension of time (until April/May 2017) to produce documents and/or provide their responses. (See Dkt. 128.) As set forth below, and despite the extension and months of meet and confer exchanges, Defendants still have not produced the requested documents and information.

A. **Defendants Have Failed to Produce Complete Revenue Information for the Remote Game Server Distribution Channel (Defined in the Standard Terms and Conditions of both the RGS Deployment Agreement and the Standard Partner Agreement RGS Deployment Model).**

There are at least three "At Issue Games" that Defendants distribute through Remote Game Server casino customers (hereinafter "RGS Customers") – Pharaoh's Fortune, Coyote Moon and Kitty Glitter.[6] This is undisputed. The www.igt.com website identifies the RGS customers. (See Copy of IGT RGS webpage, attached hereto as **Exhibit D**.) Nevertheless, despite GC2's service of a proper request for production, **Defendants have not produced the website information.**[7] Thus, GC2 requests an order compelling production of website information.

---

[6] In fact, IGT NV has admitted in its interrogatory responses that it converted these games from the land-based games for online or mobile use, even seeking to deduct this act of infringement as a "cost." (See IGT NV answer to Interrogatory No. 11.)

[7] GC2's First Set of Requests for Production to IGT NV No. 7b-d requests copies of each variation of the Remote Game Server website from 2015 to 2017 in an effort to identify each RGS customer in this time

4

Each RGS Customer is bound by a written contract that █████████████ ████████████[8] █████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████ Despite GC2's service of a proper request for production, **Defendants have not produced all agreements for each RGS Customer.** Thus, GC2 requests an order compelling the production of all RGS Customer agreements.

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
█████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████████████████████████

█████████████████ Nevertheless, despite GC2's service of proper requests for production,

---

period. It has also been requested because the August 2015 Website page uses the GC2 Graphics for Coyote Moon, and it is needed as a trial exhibit. (See August 2015 webpage, attached hereto as **Exhibit E**.) During the briefing on jurisdictional issues, Defendants challenged the foundation of Exhibit 5f, thereby necessitating a request to have Defendants' produce the webpage in their possession. The requested webpages *have not* been produced.

[8] See GC2's First Set of Requests for Production No. 7, which seeks agreements with all RGS customers.
[9] See GC2's First Set of Interrogatories to IGT NV No. 9, which requests that IGT NV identify gross revenues earned by Defendants and Interactive Casino customers; see also GC2's First Set of Requests for Production to IGT NV No. 15, which seeks the underlying documents supporting such figures. See GC2 first Set of Requests for production No. 16 (royalty revenue reports).
[10] ████████████████████████████████████████████████████████


**Defendants have failed to produce any of this relevant financial information;** ▮ ▮ Thus, GC2 requests an order regarding production of ▮ ▮ regarding the games Pharaoh's Fortune, Coyote Moon, and Kitty Glitter.

Moreover, ▮

▮

Nevertheless, despite GC2's service of a proper request for production, **none of the requested accounting information for the games Pharaoh's Fortune, Coyote Moon, and Kitty Glitter has been produced.** Thus, GC2 requests an order compelling the production of accounting information for these games.[11]

The only revenue information IGT NV has provided to-date for the RGS Customer usage of the "At Issue Games" is ▮ ▮ The ▮ omits relevant revenue information and is deficient for one or more of the following reasons:

*First,* ▮.

*Second,* ▮ is not a contemporaneous business record or other certified record created by an unbiased employee of IGT NV. This bears on the veracity of information contained therein – based on language in a previously identified email in

---

[11] GC2 requested production of these accounting records in Request for Production No. 16, 18, and requested an identification of such information in Interrogatory No. 7, 8, 9.

which Todd Nash asked Ms. Baker to create more "official" looking documents during settlement discussions (which she did).[12]

*Third,* ██████████ does not include any underlying information that would provide ██████████, and therefore does not provide GC2's counsel with adequate information to independently test its veracity or to examine a witness about its creation or underlying data.

*Fourth,* ██████████ does not bear a certification on it that would suggest that it was prepared pursuant to internal controls. (<u>See</u> Ex. H.)

*Fifth,* in its current form, ██████████ is not a document this Court could find reliable enough for admissibility under the Rules of Evidence, nor is it a document an expert on damages could find reliable enough for preparation of a report.

*Sixth,* ████████████████████████████████████████████████[13] This is not an insignificant withholding of information as it relates to revenues and the potential damages in this case.

*Seventh,* ████████████████████████████████████, for which Defendants possess, and for which Defendants are alleged to be directly, jointly and/or vicariously liable. (Note that 17 U.S.C. § 106 reserves "authorizing" others to distribute to the Copyright holder.)

*Finally,* ████████████████████████████████████, which hides evidence regarding how the various IGT defendants may be participating in the revenues and/or accounting for the revenues and/or costs. This also relates to vicarious liability issues.

GC2 does not dispute that under 17 USC § 504, it has the burden to prove revenue attributable to the infringement. Therefore, there is no question that information sought regarding this subject is relevant to at least the issue of damages and disgorgement of Defendants' profits. The above requested information is clearly in IGT Defendants' possession, custody and control but it has

---

[12] Defendants' own employee Todd Nash identified this issue in an internal email exchange. (See Nash/Baker Email Exchanged labeled IGTNV_010829 – 010834, attached hereto as **Exhibit H**.)

[13] ██████████████████████████████████████████████████████████ (Ex. H.) Defendants have indicated that they consider these submissions inadmissible settlement exchanges, but have refused to explain this large discrepancy or to produce documents that would allow GC2 to test the veracity of revenue information provided to-date.

not been produced by the IGT Defendants. This information is being improperly withheld and GC2 respectfully requests an order requiring production of the above identified information.

    **B.** **Defendants Have Failed to Produce Complete Revenue information for DoubleDown Casino Distribution Channel.**

In addition to the above, there are at least three "At Issue Games" that are distributed via the DoubleDown Casino – Pharaoh's Fortune, Coyote Moon and Kitty Glitter. **This is undisputed.** Per DDI's interrogatory responses, these "At Issue Games" were "ported over to DoubleDown Casino after DDI was acquired by [IGT]." (*See* DDI's Answer to GC2's First Set of Interrogatories No. 14.) And, as noted above, IGT NV admits to converting the games from land based games to online, mobile and PC formats. (See IGT NV's Answer to GC2's First Set of Interrogatories No. 11.)

In fact, the "At Issue Games" are distributed through the DoubleDown Casino website and through service provider platforms under so-called revenue share agreements with those platforms, which include Facebook, Apple, Google Play, Amazon and Samsung. (See DDI's Answer to GC2's First Set of Interrogatories No. 2.)

    **1.** **GC2's Request for an Order Compelling Production of Service Provider Agreements**

In Interrogatory No. 2 and Request for Production No. 8 to DDI, GC2 has requested that DDI produce its agreements with service providers as well as information related to the terms of the agreements with service providers. DDI has not produced the agreements or information, even though it is indisputably relevant to revenue earned by other infringers in the distribution channel for which Defendants are jointly or vicariously liable. Alternatively, the documents are relevant because DDI is inexplicably and incredulously seeking to deduct ███████████

██████ This information is not only relevant to calculate revenue, but is also relevant for the purpose of evaluating and calculating DDI's claimed deductible expenses or costs. Thus, **GC2 requests an order compelling their production.**

> 2. **GC2's Request for an Order Compelling Production of the 2017 License Agreement with DoubleU Games and Underlying Royalty Payments Arising Therefrom.**

In 2017, during the pendency of this litigation, DDI was "sold" to an unnamed "affiliate" of a North Korean company called DoubleU Games.[14] According the IGT Defendants' SEC filings, since June 2017, GC2 Games on the DoubleDown Casino have been distributed per the terms of a "game development and distribution agreement pursuant to which DoubleU Games will offer [IGT's] extensive casino game library on DoubleU Games' social casino platforms, in exchange for ongoing royalties to the Company." (See IGT PLC Form 20-F, available at https://www.sec.gov/Archives/edgar/data/1619762/000162828017003934/igt-123116x20f.htm.) In other words, despite DDI's transfer or sale to DoubleU Games, DDI and/or the IGT Defendants continue to receive royalties from DoubleU Games for its use of GC2's games.

GC2 also served discovery requests to Defendants requesting license information[15] as well as royalty reports and payments.[16] Despite these requests, Defendants have not produced the 2017 License Agreement with DoubleU Games or any information concerning royalty

---

[14] Per its SEC filing, on April 17, 2017, the Company [IGT] reached an agreement to sell its social casino subsidiary, DDI, to an affiliate of DoubleU Games Co., Ltd. ("DoubleU Games"), a global social casino operator headquartered in Seoul, South Korea, for a cash purchase price of approximately $825 million (the "Sale"). Per the terms of that agreement, upon the closing of the Sale, the parties will enter into a game development and distribution agreement pursuant to which DoubleU Games will offer the Company's extensive casino game library on DoubleU Games' social casino platforms, in exchange for ongoing royalties to the Company. The Sale has been approved by the board of directors of each of the Company and DoubleU Games, and remains subject to customary closing conditions, including regulatory approvals. The Sale is anticipated to be completed in the second quarter of 2017.

[15] See GC2's First Set of Requests for Production to IGT NV Nos. 5 and 9; GC2's First Set of Requests for Production to IGT No. 2; GC2's First Set of Requests for Production to DDI No. 2.

[16] See GC2's First Set of Requests for Production to IGT No. 9; GC2's First Set of Requests for Production to IGT NV No. 16; GC2's First Set of Requests for Production to DDI No. 15.

payments or reports. Accordingly, GC2 requests an order compelling Defendants' production of this information.

### 3. GC2's Request for Order Compelling the Production of Underlying Data and Accounting Information Supporting the IGT NV Summary.

There has been significant usage of the three GC2 "At Issue Games" by DDI's end users (for fun and for money), which has generated substantial revenue. In fact,  GC2 has requested updated revenue information through 2017, but DDI has failed to-date to produce it. Just as it did with the ▮▮▮▮, GC2 likewise has requested that DDI produce the underlying financial information supporting ▮▮▮▮, so that GC2 may independently test the veracity of these figures and understand how DDI calculated them. To-date, DDI has failed and/or refused to produce this underlying financial information. **Accordingly, GC2 seeks an Order compelling DDI's production of** ▮▮▮▮[17]

▮▮▮▮ GC2 requested that DDI produce both a Chart of Accounts ▮▮▮▮ and the underlying documents

---

[17] See GC2's First Set of Interrogatories Nos. 8, 9, 11, 12, 13, 14, and 15 requesting such information, and DDI's responses thereto, refusing to produce the information requested other than the ▮▮▮▮. GC2 similarly requested production of related documents from IGT through Requests for Production to DDI Nos. 11, 15, 16, 17, 18, 19, 20 (revenue), 21 (costs), 22 (apportionment), Request No. 23 (intercompany operational reporting). See also GC2's First Set of Requests for Production to DDI No. 15 and GC2's First Set of Requests for Production to IGT NV No. 9.

supporting DDI's revenue and deductible expense information in Interrogatory No. 9, 11, 12, 13, 14, and 15 and Request for Production Nos. 11, 15, 16, 17, 18, 19, 20 (revenue), 21 (costs), 22 (apportionment), Request No. 23 (intercompany operational reporting). However, other than the production of ████████████████████████, GC2's request was refused. GC2 also requested production of related documents in Request No. 11, 15, 16, 17, 18, 19, 20 (revenue), 21 (costs), 22 (apportionment), Request No. 23 (intercompany operational reporting). As DDI has provided **no underlying accounting or financial information supporting** ████████████████████████, **GC2 requests an order compelling the production of this information.**

### 4. GC2's Request for Order Compelling the Production of Underlying Cost and Apportionment Detail

Defendants contend in their responses to discovery that "principles of apportionment should be applied in connection with any damage calculation because the GC2 Copyrighted Works are only one very small part of the GC2 Games that utilize them and that are made available through IGT NV." (See, e.g., IGT NV Response to Interrogatory No. 12.) However, to-date, no Defendant has produced any financial information relating to such defense.

Despite the fact that it is Defendants' sole burden under 17 U.S.C. § 504(b) to prove their claimed deductible expenses and apportionment, Defendants have failed to produce any apportionment information and any underlying support for their claimed deductible expenses. Indeed, Defendants have taken the untenable position that GC2 must wait until it receives their expert's report to receive the underlying cost and apportionment information. While GC2 recognizes that the burden of proof on these issues falls on Defendants, GC2 respectfully submits that Defendants' failure to produce any of this information to-date deprives GC2 of a full and fair opportunity to evaluate Defendants' claims in this regard and to conduct follow-up discovery

well in advance of the discovery cut-off in the event it is necessary. Therefore, GC2 respectfully suggests that if Defendants fail to provide their underlying and supporting deductible expense and apportionment information during discovery, the Court should preclude them from having their expert rely upon such information in expert reports and/or at trial. Fed. R. Civ. P. 37(2)(A)(ii).

Yet another reason that GC2 requests production of this information is that the underlying cost/deductible expense information in Defendants' accounting system will likely lead to relevant, material evidence on liability. For example, ███████████████ ███████████████████████████████████████████████████████ as a *cost*. GC2 believes that ███████████████████████████████ ██████████████████████████████████████ is not a cost but rather additional revenue, revenue that is split between multiple infringers (DDI and its service providers).

The manner in which revenue is recorded by Defendants in their accounting system and the service provider for which each revenue entry is attributed is also directly relevant to the issues of vicarious liability. This is precisely why GC2 served requests on all defendants seeking general ledger and other intercompany accounting information. After all, according to the Terms of Use for DoubleDown Casino, IGT NV has purportedly "licensed" the GC2 artwork and graphics to DDI. (See Dkt. 18 Ex. 2 (Terms of Use).) If the Terms of Use are accurate, then there should be intercompany transactions noted in DDI's accounting records, for example in the "Due to/Due From" accounts. Although requested, DDI has not produced this information.

With respect to costs, ███████████████████████████████████ ████████████████████████████████████████████████████████ Yet

***DDI has produced no supporting documentation for*** ▮▮▮▮▮▮▮▮▮▮ Therefore, GC2 requests an order compelling production of all detailed underlying accounting entries and records supporting such costs. Failure to provide the underlying and supporting deductible expenses should result in precluding DDI from allowing their expert to rely upon such information in expert reports and/or at trial. Fed. R. Civ. P. Rule 37(2)(A)(ii).

Because Defendants have not provided this information, GC2 cannot provide this Court with a specific example from Defendants' current accounting system that would reveal the relevance of this information. However, an ▮▮▮▮▮▮▮▮▮▮ illustrates the type of underlying accounting and supporting information that is likely to exist with respect to the alleged costs, and why the underlying documentation is relevant to the issues in this case. (See ▮▮▮▮▮▮▮▮▮▮, attached hereto as **Exhibit M**.)

5.  **GC2's Request for Order Compelling the Production of Underlying Data Supporting DDI's Manipulated "User Metrics" Spreadsheet.**

In response to GC2's discovery requests, ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ Although this spreadsheet was presented by DDI to GC2 as a "native production" for an interrogatory answer, upon GC2's inspection, the native document appears to have been impermissibly manipulated. For example, the "Properties" section (which would identify or describe who prepared the document and when it was prepared) was stripped. **Thus, DDI has not provided GC2 with any information identifying the author of the summary spreadsheet.** More troubling is the fact that the purported native spreadsheet contains hidden tabs across the bottom, and whited out text. GC2 brought these irregularities to the attention of DDI's counsel and requested correction of ▮ ▮▮▮▮▮▮▮▮▮▮ via a production of the complete and un-manipulated document (including the Properties) so that GC2 may understand how it was prepared and by

13

whom, for use in depositions. Defendants have refused this request, instead taking the position that this document was provided as "an interrogatory answer" and that now, since GC2 has "unhidden" the tabs, GC2 possesses the "hidden" information. But the issue with Defendants' response is simple – GC2 does not quarrel with what was verified in Defendants' interrogatory answer as long as the verification covers the unhidden information, but rather with the fact that GC2 cannot be sure that it has located and "unhidden" all information in the document, and further that GC2 has no way of recovering the deleted properties in the file. **GC2 requests a Court order compelling DDI's production of a true, correct, complete and un-manipulated version of** ▬▬▬▬**, along with the Properties for this document, in a verified form, if it is to stand as Defendants' interrogatory answer.**

      6.      **GC2's Request for Order on Identification of DDI End Users (DOE Defendants)**

GC2 has requested that DDI identify its end users. (See GC2's First Set of Interrogatories to DDI No. 4 and GC2's First Request for Production to DDI No. 10.) This information is necessary for GC2 to identify the end user DOE defendants. **To-date, DDI has not produced <u>any</u> of this information that it possesses with respect to end users.** Instead DDI generically characterizes information it claims it "only" has with respect to end users (specifically, DDI identified IP addresses associated with guest players and information that paying players have authorized DDI to receive from Facebook.) But DDI has not provided any of this information admittedly in its possession. In addition, GC2 is aware (and has informed DDI's counsel in meet and confers) that DDI requests its users to provide email addresses when they sign up to play games on the DoubleDown Casino, as shown below:



Therefore GC2 has requested that DDI provide this email information in meet and confer calls with DDI's counsel. To-date, however, DDI has failed to produce these email addresses. Given that DDI has not been transparent on this issue, it is possible that DDI also possesses additional information concerning its end users. Accordingly, GC2 seeks an order compelling DDI's production of all of the information in its possession, custody or control regarding its end users.

## II. Overall Summary of Financial Related Documents Sought Via Court Order

In an effort to condense the issues for the Court, the two charts contained on **Exhibit N** summarize GC2's discovery requests to Defendants for the information/documents that GC2 now seeks to compel the production of in this Motion. Specifically, the charts identify the information sought in each applicable GC2 discovery request and provide GC2's basis for seeking the requested information.

## CONCLUSION

For the reasons detailed above, Plaintiff GC2 respectfully requests that this Court enter an Order requiring Defendants to produce the information and documents identified in Exhibit N to this Motion within fourteen (14) days, and for such other and further relief as this Court deems just and proper.

Dated: October 5, 2017      By:    /s/ Kara E. F. Cenar
Kara E. F. Cenar (ARDC 6198864)
(kcenar@greensfelder.com)
Ricardo Meza (ARDC 6202784)
(rmeza@greensfelder.com)
Ryan J. Yager (ARDC 6308231)
(ryager@greensfelder.com)
Greensfelder, Hemker & Gale, P.C.
200 W. Madison St., Ste. 3300
Chicago, IL 60606
312-419-9090 (T); 312-419-1930 (F)

John E. Petite
(jep@greensfelder.com)
Kirsten Moder Ahmad
(km@greensfelder.com)
Greensfelder, Hemker & Gale, P.C.
10 South Broadway, Ste. 2000
St. Louis, Missouri 63102
314-241-9090 (T); 314-241-8624 (F)

*Attorneys for Plaintiff GC2 Incorporated*

## **CERTIFICATE OF SERVICE**

    I hereby certify that a copy of the foregoing document was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system this 5th day of October, 2017, upon all counsel of record.

                                              /s/ Kara E. F. Cenar

## RULE 37 CERTIFICATION

Pursuant to Local Rule 37.2, I hereby certify that Ryan Yager, counsel for GC2, held meet and confer telephone conferences with Josh Liebman, counsel for IGT Defendants, when their responses were initially provided in April and May 2017. Thereafter some the summary documents were produced. After answers and affirmative defenses were provided in June, GC2 provided a financial recovery assessment that identified a number of meet and confer issues related to financial and other discovery issues on August 31, 2017. A detailed meet and confer email was sent on the financial and other issues September 9, 2017 between Kara Cenar and Joshua Liebman. Multiple written and telephonic meet and confer exchanges were held thereafter, including email and letter exchanges on September 18, 19, 25, 27, 29 and meet and confer calls on September 27 and September 29, 2017, where impasse was finally reached. We informed the Court on October 3, 2017 at the telephone status conference that GC2 would be bringing a Motion to Compel.

Respectfully submitted,

/s/Kara E. F. Cenar