UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GC2 INCORPORATED, | ) |
| Plaintiff, | ) Case No.: 1:16-cv-08794 |
| vs. | ) Judge: Matthew F. Kennelly |
| INTERNATIONAL GAME TECHNOLOGY PLC, ET AL. | ) Magistrate Judge: Mary M. Rowland |
| Defendants. | ) |

## GC2'S OPPOSITION TO IGT DEFENDANTS' MOTION FOR PROTECTIVE ORDER AND GC2'S CROSS MOTION TO COMPEL

### I. Summary of Argument

The IGT Defendants are inappropriately asking this Court for two things. First, they are trying to limit GC2 discovery to "four entities" before answering GC2's interrogatory that asks them to identify which of the 191 entity IGT Family are involved in infringing acts relating to IGT's Interactive RGS Product line.[1] Second, the IGT Defendants are asking this Court to ***prevent any discovery*** relating to material financial information GC2 needs to conduct a disgorgement of profit and reasonable willing licensor/willing licensee analysis – even with regard to the four entities the IGT Defendants have conceded are involved in infringing activity. Both requests are inappropriate. Interestingly, the IGT Defendants do not object to providing information requested by GC2 because it does not have the information within its "control."[2]

Through its discovery requests, GC2 has only requested **complete** revenue information from IGT Entities and those in their distribution channel that have directly or indirectly used

---

[1] The IGT Defendants' responses are now past due (December 4, 2017) and this, coupled with their promise to provide GC2 with an answer "soon," is sufficient reason to reject their limitation.

2 The issue of control was one of the concerns raised by the Court at the October 24, 2017 hearing when it suggested that GC2 send a request like Request No. 1 directed to the entities in the "IGT Family." See Transcript p. 31-32.

GC2's works. GC2 has requested this financial information in order to allow its experts to conduct a damages analysis. And, unlike Defendants' Motion, GC2 provides case law supporting its position and the relevance of information GC2 is seeking. The IGT Defendants, on the other hand, continue to delay, withhold, and hide the ball as it relates to which entity(ies) in the IGT Family are involved in the various infringing acts vis-à-vis IGT Interactive's Remote Game Server (RGS) product line. This conduct flies in the face of GC2's efforts to obtain the information this Court needs in order to rule on whether or not it is able to compel any of the IGT defendants to produce certain information. To be sure, on October 24, 2017, the Court commented as follows:

> "And then what we'll have is that you'll have stuff that has either already been produced, you will have stuff that's going to get produced, and you'll have stuff that the defendant is going to say either. I don't have access to that information, or, I don't think it's producible because it's an overseas entity that is not – you know, that is separated by, you know, 14 different dotted lines or whatever. And then I'll have something that I can decide because then I will be able to decide can I compel somebody in this case to produce information related to that entity."

*See* Transcript p. 31-32.

To no surprise, the IGT Defendants are seeking to circumvent GC2's requests and are thwarting efforts for this Court to rule on what should or should not be produced per its October 24, 2017 comments. In other words, by not providing timely answers to GC2's interrogatory asking them to identify the entity(ies) in the IGT Family that have been involved in the use of the GC2 works and by not providing any written response or objections to all Requests for documents regarding any purported lack of control over the information before filing their motion, the IGT Defendants are now extending their game playing with the court. Although the IGT Defendants propose that they not be required to ask their own IGT family members or

2

provide written responses[3] on the basis of burdensome, the more likely reason they are seeking protection is their fear of discovering additional infringing uses of GC2 works, uses that may ultimately give rise to either new claims or additional damages. (Motion p. 7.)

In any event, despite their burdensome assertion, it is apparent that IGT Defendants' counsel has performed some investigation sufficient to allow them to represent, under Rule 11 Fed. R. Civ. P., that "***only 4 entities*** in the IGT Family are involved."[4] Regardless, counsel's representations in a Motion are not evidence, nor is it something GC2 can use, and in any event, contradicts Defendants' earlier interrogatory responses in which more than "four entities" likely involved in infringing activities were identified. For example,

- Omitted entity International Game Technology (IGT): IGT is omitted from counsel's "four entity" list claiming that this entity has "no documents." On the other hand, IGT is identified in the IGT PLC interrogatory answers (attached as **Exhibit C**) as the owner and controller of the website content at www.igt.com. In addition, based on the latest meet and confer discussion (January 2, 2018), counsel for defendants stated that the www.igt.com website content has a private log in section that makes certain artwork and graphics for the GC2 games (known as the "Shorrock files"[5]). The artwork and graphics are available for distribution to the RGS customers so that they can create the "game icon" displayed on the rgs customers' authorized websites and then used by the end users to trigger the distribution of the GC2 games to their devices for internet gaming. Making a work available for distribution, under the law, is a violation of a copyright owner's distribution right, even if no distribution was ever made. GC2 continues to wait for production of these files.

- Omitted entity IGT Interactive, Inc.: Also omitted from the "four entities" list is IGT Interactive, Inc., the entity identified by both International Game Technology and IGT NV in response to GC2 Interrogatory No. 2 (Attached as **Exhibit D**) as an entity allowed to "copy, display, distribute, host on a server, or use the graphics and/or 2d

---

[3] The Court should note that ***before*** this lawsuit was filed, ***and again*** in September 2016 right after this lawsuit was filed, IGT represented that it had investigated and asked, ***and, IGT Defendants already gathered the information they are now saying is purportedly too burdensome to investigate, gather and provide.*** So they know, and have known all along, which IGT Entities are involved. As alleged in the Amended Complaint (see Dkt. 163 ¶¶ 187-191) there was some question as to whether this information was missing certain revenue information, which is what led to the filing of this lawsuit.

4 If Defendants' claim is that it is too burdensome an oppressive to investigate each entity, then how can they represent that only four entities are involved?

[5] Mr. Shorrock's deposition is scheduled for January 9, 2018.

3

Artwork." [6] Astonishingly, these IGT and IGT NV Defendants improperly object to identifying what the IGT Interactive Inc. entity has been allowed to do (and thus they do not provide an answer to this part of the interrogatory) – on the basis that the phrases "has allowed" and "has been permitted" are vague. IGT and IGT NV purportedly do not know what GC2 means by these phrases. In the January 2, 2018, meet and confer discussions, Defendants' counsel stated that IGT Interactive Inc. was involved in developing the games at issue with IGT NV, but because that activity "did not generate revenue" they left this entity off the list the "four entity" list.

- Omitted entity(ies) IGT family of Companies in China: Also omitted from the "four entities" is information contained in IGT NV's "supplemental response" to GC2 Interrogatory No 15 (**Exhibit E**) (provided only after Court Order). This interrogatory asked how the artwork and graphics for the games at issue were created. In response, IGT NV omitted any reference to IGT Interactive Inc. and instead referred to "employees of the IGT family of companies in China" without identifying the names of the entities in the IGT family in China. Again, the IGT family entity in China is not one of the "four entities" identified in IGT Defendants' Motion.

- Additional omitted entities: In addition to the above omitted entities, IGT PLC's answer to Interrogatory No. 2 (See Exhibit C) lists in answer 2(a), the names of *six entities* in the IGT Family that purportedly own and operate Remote Game Servers; IGT PLC Interrogatory Answer No 2(b) regarding owners and operators of IGT PLC Software lists *seven entities*; IGT PLC answer to Interrogatory No. 2(c) & (d) lists *three entities* identifying the entities that "own and operate separate Game Libraries," IGT PLC Interrogatory answer 2e lists five entities that own and operate Central Systems. In other words, it is clear there are more the "four entities" that have been involved in the infringing activity.

In short, there is good reason to question the veracity of the motion's representation that "only four entities" are involved in the infringing activity. The IGT Defendants should be held accountable for not providing Interrogatory responses by the due date (December 4, 2017) and for not providing objections to the issue of control which this Court highlighted at the October 24, 2017 hearing.[7]

---

[6] The Court should also note that the IGT Gibraltar and IGT Alderny entities were not identified at all in IGT and IGT NV's response to GC2's Interrogatory No. 2, even though now IGT Defendants are agreeing to produce information regarding these entities. Defendants should be ordered to immediately supplement their answer to Interrogatory No. 2.

[7] IGT's organizational chart identifies a significant number of IGT family members that are either 100% owned by International Game Technology, and a significant number more than 100% owned by a 100% owned subsidiary of International Game Technology. Organizational Chart, attached as **Exhibit F**. The Standard Terms and Conditions on the RGS Agreements also evidence control for regulatory purposes.

4

The difficulty GC2 has encountered in obtaining accurate or direct answers to very basic and highly relevant information is what led GC2 to file its initial Motion to Compel. (Dkt. 172.) In fact, in regards to obtaining this very basic financial information, at the same October 24, 2017 hearing, the Court mentioned what GC2 was entitled to obtain when commenting that:

> "The plaintiff is entitled to get information from which they can derive revenue that is earned from the alleged copyrighted materials. And, even though the way it works is that the burden is then on the defendant to show its costs, you don't have to wait for that: they can get the cost information now. And they basically need to have not just kind of bottom line but the information from which we can kind of verify that the numbers are actually, you know kosher."

(*See* Transcript at page 3-4.) As of today's date, it is clear that not all the revenue information has been provided to GC2. In fact, at the January 2, 2018 meet and confer, GC2 was informed that the cost information and apportionment information has not yet been completely provided.

Defendants' bringing this Motion is a waste of time and resources. For these reasons, the IGT Defendants' Motion should be denied, the objections deem waived, and the discovery ordered produced.

## II. ARGUMENT

### A. GC2's Third Set of Combined Requests to International Game Technology and IGT NV

Defendants are improperly seeking to have their discovery obligations limited to certain entities and even then to only categories of information from those limited number of entities. In doing so, they ignore/fail to address at all how their proposed categories of information they "agree" to provide are sufficient for the needs of the case and in particular for expert reports. For the reasons discussed above and below, the Defendants proposed categories of production are not sufficient. Defendants' Motion should be denied and an order entered requiring production of the documents GC2 has requested.

### 1. Defendants' Control the Documents

Rule 34 Fed. R. Civ. P. requires a Defendant to produce documents in its possession, custody ***and control***.[8] During the October 24, 2017 hearing, the Court identified the control issue for the parties and allowed GC2 to serve a discovery request directed to "anybody in the IGT Family" so that the Court could be more specifically informed as to whether Defendants' objection would be that the information is not within their possession, custody and control.[9] Defendants' never provided any written objections to Request No. 1. As such Defendants' objections should be deemed waived.[10]

However even assuming Defendants' Motion serves as its written objection, never once do they object on the grounds that they do not have control over the documents requested by GC2 in Request No. 1. Defendants have control. *Wilson v. Sundstrand Corp.*, 99 C 6944, 2003 WL 21961359, at *7-*9 (N.D. Ill. Aug. 18, 2003). (Kennelly); *Republic Techs. (NA), LLC v. BBK Tobacco & Foods, LLP*, 16 C 3401, 2017 WL 4287205, at *2–3 (N.D. Ill. Sept. 27, 2017) (parent [Republic Technologies] was in "control" of documents in possession of its subsidiary [Republic Technologies International] where the parent was the 100% owner of the sub, and therefore ordered the parent to produce document possessed by its sub that were relevant to the claims at issue.); *Wachovia Sec., LLC v. Loop Corp.*, No. 05 C 3788. 2008 WL 2625907, at *2 (N.D. Ill. June 27, 2008); *SRAM, LLC v. Hayes Bicycle Grp., Inc.*, No. 12 C 3629, 2013 WL 6490252, at *4 (N.D. Ill. Dec. 10, 2013); *Pine Top Receivables of Illinois, LLC v. Banco De*

---

[8] Generally, a party need not have actual possession of documents to be deemed in control of them. *Dexia Credit Loc. v. Rogan*, 231 F.R.D. 538, 542 (N.D. Ill. 2004) (citing *In re Folding Carton Antitrust Litig.*, 76 F.R.D. 420, 423 (N.D. Ill. 1977)). Whether a corporation is in "control" of documents within the meaning of Rule 34 turns on whether it has the legal right to obtain the requested documents. *In re Folding Carton Antitrust Litigation*, 76 F.R.D. 420, 423 (N.D.Ill.1977).

[9] The Court's comment were directed to "the revenue generated by and the costs related to, you know, use of the copyrighted products *by anybody in the IGT family.* Okay?" (Transcript p. 31.)

[10] *Autotech Techs. Ltd. P'ship v. Automationdirect.Com, Inc.*, 236 F.R.D. 396, 398 (N.D. Ill. 2006) ("Failure to timely assert objections to discovery requests may result in a waiver of all objections that could have been seasonably asserted.").

*Seguros Del Estado*, No. 12 C 6357, 2013 WL 3776971, at *3 (N.D. Ill. July 18, 2013) (ordering a party to produce records in the possession of a third party where the party had a contractual right to access those records). Where the litigating corporation is the parent of the corporation possessing the records, some courts have found the requisite control based on the fact that the parent had the power to elect a majority of the board of directors of the subsidiary.[11]

### 2. The Documents Are Highly Relevant to the Copyright Damages Issues

Without citing to *any* case on Copyright damages, Defendants seek an order from this Court blocking GC2 from highly relevant and material discovery needed for proper damages expert analysis under the Copyright Act. 17 U.S.C. §504.[12] Defendants' Motion invites legal error because it improperly (and predictably) seeks to block and delay providing information necessary for GC2's expert witnesses to prepare and complete their reports within the Court's case schedule. As set forth in 17 U.S.C. §504(b) titled "Actual Damages and Profits"—

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.
>
> The value of the infringer's use is a permissible basis for estimating actual damages.

*Deltak, Inc. v. Advanced Systems Inc.*, 767 F.2d 357 (7th Cir 1985), *citing Sid & Marty Krofft*

---

[11] IGT's organizational chart identifies the number of IGT family members 100% owned by International Game Technology, and a significant number 100% owned by a 100% owned subsidiary. Chart attached as Exhibit F. The organizational chart also shows additional entities in IGT's corporate family 100% owned by IGT NV. *Id.* It also reveals that International Game Technology owns 100% of IGT Interactive Inc. (f/k/a Wagerworks, Inc.). *Id.* This is significant because part of the information Defendants are withholding is information IGT Defendants have already gathered. *See* GC2_00020724 to GC2_00020834, attached as **Exhibit G**, which contains what was represented to be then complete financial summaries of all IGT Interactive Revenue as of September 2016 for the GC2 Games at Issue (per Game) that Michael Prescott gathered when initially trying to settle this case.

[12] Defendants seek to avoid responding to very common and typical factual information involving copyright actual damages and disgorgement of profit damages, both allowable and recognized areas of recovery under the Copyright Act. 17 U.S.C. § 504.

7

*Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1174 (9th Cir. 1977). Value of use "amounts to a determination of what a willing buyer would have been reasonably required to pay to a willing seller for plaintiff['s] work" is a general principle which remains a known acceptable measure in the Seventh Circuit. *McDonald's*, 562 F.2d at 1174; *see also* Seventh Circuit Jury Instruction 12.8.2 Damages -Actual Damages and cases cited therein; *see, e.g., In Design v. K-Mart Apparel Corp.*, 13 F.3d 559, 563 (2d Cir. 1994) (decrease in market value); *Davis v. The Gap, Inc.*, 246 F.3d 152, 161, 167 (2d Cir. 2001) (cost of hypothetical license; lost profits); *McDonald'*, 562 F.2d at 1174 (cost of hypothetical license); *McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 569 (7th Cir. 2003) (same). In fact, the so-called *Georgia-Pacific* factors[13] are one of the recognized methodologies used in hypothetical negotiation cases for both patent and copyright. *Shepherd Mgmt. Grp., Inc. v. Michael Wilkov Cantoni, LP*, No. 1:07-CV-0678-RLV, 2008 WL 11336460, at *6 (N.D. Ga. Dec. 17, 2008) (stating that consideration of the Georgia-Pacific factors is not unreasonable in a copyright infringement case "as they contain common-sense factors that a licensor and licensee would use when negotiating a licensing agreement."); *Real View, LLC. v. 20-20 Techs., Inc.*, 878 F. Supp. 2d 282, 285 (D. Mass. 2012)

---

[13] The *Georgia-Pacific* Factors for Determining Reasonable Royalty are as follows: 1) Royalties patentee receives for licensing the patent in suit; 2) Rates licensee pays for use of other comparable to the patent in suit; 3) Nature and scope of license in terms of exclusivity and territory/customer restrictions; 4) Licensor's established policy and marketing program to maintain patent monopoly by not licensing others to use the invention; 5) Commercial relationship between licensor and licensee, such as whether they are competitors or inventor and promoter; 6) Effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales; 7) Duration of patent and term of license; 8) Established profitability of the products made under the patent, its commercial success and its current popularity; 9) Utility and advantages of patent property over old modes and devices; 10) The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefit of those who have used the invention; 11) The extent to which the infringer has made use of the invention and the value of such use; 12) The portion of profit or selling price customarily allowed for the use of the invention; 13) The portion of realizable profit attributable to the invention as distinguished from non-patented elements, significant features / improvements added by the infringer, the manufacturing process or business risks; 14) Opinion testimony of qualified experts; 15) Outcome from hypothetical arm's length negotiation at the time of infringement began. *See Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1119-20 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir.); *Unisplay, S.A. v. American Electronic Sign Co., Inc.*, 69 F.3d 512, 517 n.7 (Fed. Cir. 1995).

(finding it a reasonable methodology to consider *Georgia-Pacific* factors in a copyright dispute); *Recursion Software, Inc. v. Double-Take Software, Inc.*, No. 4:10-CV-403, 2012 WL 1576252, at *7 (E.D. Tex. May 4, 2012) (considering the *Georgia-Pacific* factors in a copyright infringement case); *McRoberts*, 329 F.3d at 566 (7th Cir. 2003)("it is not improper for a jury to consider either a hypothetical lost license fee or the value of the infringing use to the infringer to determine actual damages, provided the amount is not based on 'undue speculation'").

The document requests GC2 has served are fairly standard document requests. They are directed to disgorgement of profits, actual damages determined under a willing buyer/willing seller analysis and the *Georgia-Pacific* factors. In fact, the Requests were drafted and served in order to obtain the relevant information damages experts will need to conduct their analysis for the various types of damages. The requests GC2 served are typically produced in every case for expert reports and analysis. Moreover, the Definition of IGT Entities was drafted to include the listing of each of the entities in the "IGT Family" from the organizational chart because, as suggested by the Court, GC2 is directing its requests to "the revenue generated by and the costs related to" the "use of the copyrighted products *by anybody in the IGT family.*" *See* Transcript p. 31. Each GC2 request and reason for seeking the information is set forth and discussed in Exhibit A separately. Since Request No. 1 was highlighted in IGT Defendants' Motion GC2 will discuss herein.

> **GC2 Request No.** 1. For each of the IGT Entities:
>
> Request: 1a. Any and all documents showing whether the IGT Entity is or has ever been a wholly owned subsidiary of IGT, a Nevada corporation and a wholly owned subsidiary of International Game Technology.

***Reason needed:*** Per the terms of the GC2 Agreement with Defendant, entities not wholly owned subsidiaries of IGT NV are not permitted any use of GC2 works. (*See* AC EX 18-20.) In other words GC2 did not license or permit use by the IGT Family.

9

<u>Request</u>: 1b. Any and all documents showing if the IGT Entity has copied, displayed, distributed, or hosted on a server, the graphics for at least one of the accused games, from 2007 to Present.

***Reason needed***: Liability. The court suggested this interrogatory and this is simply the corresponding document request. In order to determine whether the entity is or is not covered under the license agreements between GC2 and IGT in order to calculate disgorgement of profits. If as Defendants contend there is no such act by a particular entity, then no answer would be required for that entity for this or any of the remaining interrogatories.

<u>Request</u>: 1c. Any and all documents showing the IGT Entity's U.S gross revenue and net revenue received from customers or any other IGT Entity for each of the accused games played online, from 2007 to Present.

***Reason needed***: Damages. In order to calculate disgorgement of profits. If as Defendants contend there is no such revenue by a particular entity, then none would be the answer.

<u>Request</u>: 1d. Any and all documents showing the IGT Entity's non-U.S. gross revenue and net revenue received from customers or any other IGT Entity for each of the accused games played online, from 2007 to Present.

***Reason needed***: Damages. To calculate disgorgement of profits and has been asked separately in order to address issues regarding US and Non-US revenue. If as Defendants contend there is no such revenue by a particular entity, then none would be the answer.

<u>Request</u>: 1e. Any and all documents showing the IGT Entity's U.S. units sold, gross revenue and net revenue received from customers or any other IGT Entity for each of the accused games and non-accused games sold on land-based gaming machines from 2003 to Present.

***Reason needed***: Damages. In order to make adjustments so that license agreements are comparable and in order to calculate a reasonable royalty. If as Defendants contend there is no such revenue by a particular entity, then none would be the answer.

<u>Request</u>: 1f. Any and all documents showing the IGT Entity's non-U.S. units sold, gross revenue and net revenue received from customers or any other IGT Entity for each of the accused games and non-accused games sold on land-based gaming machines from 2003 to Present.

***Reason needed***: Damages. In order to make adjustments so that license agreements are comparable and in order to calculate reasonable royalty.

10

> Request: 1g. Any and all documents showing the cost of goods sold for the U.S. revenue of the IGT Entity for each of the accused games played online, from 2007 to Present.

*Reason needed*: Damages. In order to calculate disgorgement of profits. If as Defendants contend there is no such revenue by a particular entity, then none would be the answer.

> Request: 1h. Any and all documents showing the cost of goods sold for the non-U.S. revenue of the IGT Entity for each of the accused games played online, from 2007 to Present.

*Reason needed*: Damages. In order to make adjustments so as to make license agreements comparable and in order to calculate a reasonable royalty. If as Defendants contend there is no such revenue by a particular entity, then none would be the answer.

> Request: 1i. Any and all documents showing the cost of goods sold for the U.S. revenue of the IGT Entity for each of the accused games and non-accused games sold on land-based gaming machines from 2003 to Present.

*Reason needed*: Damages. In order to make adjustments so as to make license agreements comparable and in order to calculate a reasonable royalty.

> Request: 1j. Any and all documents showing the cost of goods sold for the non-U.S. revenue of the IGT Entity for each of the accused games and non-accused games sold on land-based gaming machines from 2003 to Present.

*Reason needed*: Damages. In order to make adjustments so as to make license agreements comparable and in order to calculate a reasonable royalty.

> Request: 1k. Any and all documents that detail all costs and cost margins and/or pertain to gross, operating, net, and incremental profit margins for U.S. revenue of the IGT Entity for each of the accused games played online, from 2007 to Present.

*Reason needed*: Damages. In order to calculate disgorgement of profits.

> Request: 1l. Any and all documents that detail all costs and cost margins and/or pertain to gross, operating, net, and incremental profit margins for non-U.S. revenue of the IGT Entity for each of the accused games played online, from 2007 to Present.

*Reason needed*: Damages. In order to calculate disgorgement of profits.

> Request: 1m. Any and all documents that detail all costs and cost margins and/or pertain to gross, operating, net, and incremental profit margins for U.S. revenue of the IGT Entity for each of the accused games and non-accused games sold on land-based gaming machines from 2003 to Present.

11

*Reason needed:* Damages. Adjustments to make license agreements comparable and calculation of reasonable royalty.

> Request: 1n. Any and all documents that detail all costs and cost margins and/or pertain to gross, operating, net, and incremental profit margins for non-US revenue of the IGT Entity for each of the accused games and non-accused games sold on land-based gaming machines from 2003 to Present.

*Reason needed:* Damages. In order to make adjustments so as to make license agreements comparable and in order to calculate a reasonable royalty.

> Request: 1a. o. Any and all agreements from 2007 to Present between the IGT Entity and any other IGT Entity that involve the licensing, sale, transfer, or distribution of the accused games.

*Reason needed:* Damages. In order to calculation disgorgement of profits.

> Request: 1p. Any and all agreements from 2007 to Present between the IGT Entity and any companies that are not an IGT Entity, which involve the licensing, sale, transfer, or distribution of the accused games.

*Reason needed:* Damages. In order to calculate disgorgement of profits.

> Request: 1q. Any and all contracts and agreements from 2007 to Present that show how revenue from the accused games has been and is currently shared between the IGT Entity and any other IGT Entities.

*Reason needed:* Damages. In order to calculate disgorgement of profits.

> Request: 1r. All annual detailed profit and loss ("P&L") statements and/or income statements, from 2007 to Present, for all IGT Entities that have copied, displayed, distributed, or hosted on a server, the graphics for at least one of the accused games.

*Reason needed:* Damages. In order to calculate disgorgement of profits.

> Request: 1s. Any and all invoices, from 2007 to Present, from the IGT Entity to any other IGT Entity or non-IGT Entity containing revenues related to the accused products.

*Reason needed:* Damages. In order to calculate disgorgement of profits and *Georgia-Pacific* factors 6, 8, 10, and 11.

> Request: 1t. Any and all royalty reports from 2007 to Present related to the accused product received by the IOT Entity from any other IOT Entity or non-IOT Entity.

*Reason needed:* Damages. In order to calculate disgorgement of profits and *Georgia-Pacific* factors 6, 8, 10, and 11.

In addition to the above, at pages 8-9, Defendants lodge additional complaint with respect to Request No. 1. Defendants complain the requests are confusing and will take countless hours to go through. Yet in the proposed summary on page 13-14, Defendants indicate that information from only four entities are necessary which sounds like they have already done the work. If not, how can they say their proposed categories limited to four entities is appropriate and what is needed for the case. Defendants also complain about other requests. GC2 identified in Exhibit A the specific issue the GC2 requests is directed to and its relevance to the issues in the case.

With respect to Request No. 2-3, IGT contends that "only four IGT entities are relevant" but: do not identify the four entities; never say why only these four are relevant; and there is no indication they even asked any other entity for this information. Then, presumably to limit damages, Defendants state they "have already produced or would be willing to produce all agreements, monthly reports, and invoices for these four entities." GC2 is entitled to production of all items requested in Request No 2-3 because it relates to Damages, disgorgement of profits and *Georgia-Pacific* factors. See Exhibit A for specific discussion per request.

On page 11, Defendants Complain about Request No. 5-6 because it seeks IGT Licensing efforts, claiming that "Defendants' 'licensing efforts' are not relevant to the claims and defenses in this action." (Motion p. 11.) On page 11, Defendants complain that with regard to Request No. 7, "there is simply no rationale for producing any of these agreements. They have nothing to do with this lawsuit." Respectfully, Defendants are again wrong because such licensing agreements are needed to identify comparable license agreements needed for damages and the market approach and *Georgia-Pacific* factors 2, 12, 13, and 15.

Defendants object to GC2 Request Nos. 8-9 because according to Defendants "This is preposterous. Marketing plans, studies, industry reports, and general articles about the social,

13

online, mobile and casino gambling industries have absolutely nothing to do with this lawsuit." Defendants are wrong. This information is needed in order to identify *Georgia-Pacific* factors 6, 8, 10, 11, and 15.

On page 12, Defendants complain about Requests No 10-12 as being overbroad and "disproportionate" but never provide the required information for the analysis. According to Defendants, "These requests seek ten years of documents related to the At-Issue Games and are not even limited to online usage. These materials are not relevant to determining infringement or damages." **Reason needed**: Damages. This information is needed in order to calculate disgorgement of profits, as well as *Georgia-Pacific* factors 6, 8, 10, 11, and 15.

On page 12, Defendants complain with respect to Requests Nos. 13-20 stating they are duplicative and have already been produced. However, Defendants do not and cannot identify any bates number showing where such production was made, because the documents have not been produced. In any event, below is a list of the requests and why the documents are needed.

Request: 13. **Reason needed**: Damages. Calculation of disgorgement of profits and *Georgia-Pacific* factors 6 and 15.

Request: 14. **Reason needed**: Damages. Calculation of disgorgement of profits and *Georgia-Pacific* factors 6 and 15.

Request: 15. **Reason needed**: Damages. Calculation of disgorgement of profits and *Georgia-Pacific* factors 6, 13 and 15.

Request: 16. **Reason needed**: Damages. Calculation of disgorgement of profits and *Georgia-Pacific* factors 6, 13, and 15.

Request: 17. **Reason needed**: Damages. Calculation of disgorgement of profits and *Georgia-Pacific* factors 6, 13, and 15.

Request: 18. **Reason needed**: Damages. Calculation of disgorgement of profits and *Georgia-Pacific* factors 6, 13, and 15.

Request: 19. **Reason needed**: Damages. Calculation of disgorgement of profits and *Georgia-Pacific* factors 6 and 15.

Request: 20. **Reason needed**: Damages. Calculation of disgorgement of profits and *Georgia-Pacific* factors 6 and 15.

The proposed limited categories set forth on pages 13-14 of the Motion do not, in any logical or meaningful way, provide the necessary underlying factual information or data needed by an expert for a damages analysis on disgorgement of profits, market value, reasonable royalty, or willing buyer willing seller analysis. As such it is not a sufficient proposal for production.

As a catchall, IGT Defendants throw in the Request for Protective Order for document requests served on DoubleDown Interactive, a separate defendant. Defendants counsel held no meet and confer discussion regarding the Requests. GC2 sets forth the relevance in Exhibit B. GC2 requests that the Motion for protective order be denied for this portion of IGT Defendants brief, and for the reasons set forth in the contemporaneously filed Opposition and Cross Motion to DoubleDown's Request for Protective Order.

## V. Defendants' Recent Discovery Related Games

Through various filings, the Court is aware of Defendants' discovery games and abuses they have engaged in. In the January 8, 2017 status report, GC2 will update the court on Defendants' additional prejudicial acts. In any event, GC2 represents that it has properly and diligently pursued legitimate discovery needed to present its case at trial. Defendants' tactics are aimed at nothing other than preventing GC2 from having any meaningful opportunity to consider this information before discovery closes.

## VI. CONCLUSION

GC2 requests that the Court Deny the Motion for Protective Order, overrule Defendants' objections and order that all responsive documents be produced within 15 days. Defendants should then be ordered to sit for a deposition on the late produced documents.

Dated: January 3, 2018

Respectfully submitted,

By: /s/ Ricardo Meza
Kara E. F. Cenar (ARDC 6198864)
(kcenar@greensfelder.com)
Ricardo Meza (ARDC 6202784)
(rmeza@greensfelder.com)
Ryan J. Yager (ARDC 6308231)
(ryager@greensfelder.com)
Greensfelder, Hemker & Gale, P.C.
200 W. Madison St., Ste. 3300
Chicago, IL 60606
312-419-9090 (T); 312-419-1930 (F)

John E. Petite
(jep@greensfelder.com)
Kirsten M. Ahmad
(km@greensfelder.com)
Greensfelder, Hemker & Gale, P.C.
10 South Broadway, Ste. 2000
St. Louis, Missouri 63102
314-241-9090 (T); 314-241-8624 (F)

*Attorneys for Plaintiff GC2 Incorporated*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system this 3rd day of January, 2018, upon all counsel of record.

/s/ Ricardo Meza