1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3

 4    GC2 INCORPORATED,                  )   Docket No. 16 C 8794
                                         )
 5                      Plaintiff,       )
                                         )
 6             vs.                       )
                                         )
 7    INTERNATIONAL GAME TECHNOLOGY PLC, )   Chicago, Illinois
      et al.,                            )   January 4, 2018
 8                                       )   10:15 o'clock a.m.
                        Defendants.      )
 9

10                 TRANSCRIPT OF PROCEEDINGS - MOTION
              BEFORE THE HONORABLE MATTHEW F. KENNELLY
11

12    APPEARANCES:

13
      For the Plaintiff:      GREENSFELDER, HEMKER & GALE, P.C.
14                            BY:  MS. KARA EVE FOSTER CENAR
                                   MR. RYAN J. YAGER
15                            200 West Madison Street, Suite 2700
                              Chicago, IL  60606
16                            (312) 345-5018

17

18    For the Defendants:     NOVACK & MACEY, LLP
                              BY:  MR. ERIC NEAL MACEY
19                                 MS. REBEKAH HAVA PARKER
                                   MR. BRANDON M. THOMPSON
20                            100 North Riverside Plaza, Suite 1500
                              Chicago, IL  60606
21                            (312) 419-6900

22

23
      Court Reporter:         MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                            Official Court Reporter
                              219 S. Dearborn Street, Suite 2102
25                            Chicago, Illinois  60604
                              (312) 435-5639
```

1    (The following proceedings were had in open court:)

2        THE CLERK:  Case No. 16 C 8794, GC2 Incorporated v.

3    International Games.

4        MR. MACEY:  Good morning, your Honor.  Eric Macey

5    with Novack & Macey on behalf of the defendants and the movant

6    in this case.

7        MS. CENAR:  Good morning, your Honor.  Kara Cenar on

8    behalf of GC2.

9        THE COURT:  I was confused by one thing on the

10   responses.  So it was one motion, and you filed two responses,

11   one relating to the IGT defendant part of it and one relating

12   to the DoubleDown part of it.  I didn't see two motions.  Did

13   I miss something?

14       MS. CENAR:  No, your Honor.  We responded to the IGT

15   motion, and then we filed a cross-motion.

16       THE COURT:  No, I understand.  I'm just talking -- I

17   understand that there's something in here where you're

18   asking -- because you filed two -- you broke down the response

19   into two parts, basically, and you filed two separate things.

20       MS. CENAR:  Right.

21       THE COURT:  Okay.  So then the thing that I was a

22   little confused by was -- it's over on page -- on the

23   DoubleDown response --

24       MS. CENAR:  Yes.

25       THE COURT:  -- over on page 3.  You're referring to

1    the motion for protective order that the defendants filed.

2    And you say that the portion of the motion for protective

3    order concerning DDI's request for production of documents

4    confirmed that no meet and confer was held, citing motion

5    page 10, footnote 7.

6         So, number one, there is no footnote 7 in the motion.

7    Actually, there is, but it's not on page 10.  It's on page 12,

8    and it doesn't say anything about -- I don't think it says

9    anything about DDI, but it really wasn't clear to me.  So

10   that's what threw me off.

11        I mean, I basically -- I spent an inordinate amount

12   of time this morning because I saw it when I was walking the

13   dog at 5:00 o'clock that you guys had filed something, so I

14   came in here and was kind of looking to try to figure out --

15   first I had to figure out why there were two responses, and

16   then I had to figure out where was this thing that confirms

17   that there was no meet and confer.

18        So were you referring to footnote 7 that's actually

19   on page 12?  Defendants' counsel met and conferred with

20   plaintiff's counsel about the combined request and offered the

21   proposed compromise, et cetera, et cetera?  I'm asking you.

22             MS. CENAR:  Yes.

23             THE COURT:  Okay.  All right.  Okay.  Fine.  Now I

24   get that.

25        So the question -- the main question I have for you,

1  Mr. Macey, is you say in the motion -- let me just find where

2  it is.  You say in the motion, it's on about page 3 I want to

3  say.  It's the part where you say for the first time that

4  there's four relevant entities.  I should have dog eared the

5  page, and I didn't.

6          MR. MACEY:  But I recall where -- I mean, I know what

7  that sentence said.

8          THE COURT:  Yeah.  Wait a second.  I want to find it

9  because it was -- there was a significant point in how it was

10 said.  It was -- well, whatever.  You referred -- wherever it

11 was you said it, you referred to section 3(d) of the motion

12 which was going to explain -- at least I thought it was going

13 to explain why these are the four entities.  And I got to

14 section 3(d), and it really doesn't.  The four entities are

15 IGT, Gibraltar, and there's three other ones.  I forgot what

16 they are.

17         So what am I supposed to look at to confirm the

18 proposition that there's only four of the entities that are

19 relevant?

20         MR. MACEY:  We have produced every single licensed

21 agreement between those entities and another IGT entity.  So,

22 in other words, if I can indulge, there is a parent

23 non-operating company called IGT.

24         THE COURT:  Right.

25         MR. MACEY:  It's administrative.  It doesn't generate

1    revenue.

2              THE COURT:  Right.

3              MR. MACEY:  Okay.  It has a subsidiary called IGT NV.

4              THE COURT:  NV, right.

5              MR. MACEY:  In Nevada.  It is an operating

6    subsidiary.

7              THE COURT:  Okay.

8              MR. MACEY:  Land-based casino games.  And it

9    generates revenue digitally two other ways.  One, it has a

10   license agreement, which we have produced, with a company

11   called DoubleDown Interactive.

12             THE COURT:  Right.

13             MR. MACEY:  Okay.  It also has a license agreements,

14   if you want to call them that, okay, with certain casinos in

15   New Jersey.  Okay?

16             THE COURT:  Okay.

17             MR. MACEY:  I believe we produced all of those.  If

18   we haven't, we will get them, but that's what it is.  Okay?

19             That's all -- that's the only revenue that IGT NV

20   generates from the casino business.  That is it.  There's

21   three other non-U.S. entities:  Canada, Gibraltar, and

22   Alderney in the Channel Islands.  Those entities have license

23   agreements with other IGT entities.  It's a Dutch entity,

24   Dutch limited liability partnership.  We have produced those

25   license agreements, every single one.  Those entities, in

1   turn, then have, okay, agreements with casino operators.

2   Okay?  We are gathering those and producing those.  I don't

3   know if we have produced some, but we are gathering them; they

4   can have them all.  All right?  That's the business.  That's

5   the extent of the business.  Okay?  For reasons --

6           THE COURT:  It sounds like so far, though, that

7   you're just talking about land based.

8           MR. MACEY:  No.  This is digital.

9           THE COURT:  Okay.  This is the digital.

10          MR. MACEY:  Yeah, in other words, for example,

11  Alderney, when it enters into an agreement with a casino

12  operator, it can use it for land base, or if that casino

13  operator happens to have a digital business, I don't know that

14  they do or they don't --

15          THE COURT:  Okay.  Here is my question to you.  And I

16  recognize that when you get a document request that lists, I

17  think you said --

18          MR. MACEY:  191 entities.

19          THE COURT:  -- 191 entities.  Right.

20          MR. MACEY:  Right.

21          THE COURT:  So give me the answer for all 191

22  entities that that looks, you know, let's just say, a tad

23  daunting.  But why isn't it just -- if what you're telling me

24  just now is accurate, then it sounds like the answer for 187

25  out of the 189 is none, there's nothing.  Why can't you just

1  say that?

2        MR. MACEY:  That's not completely -- the requests are

3  broader than that.  They want land-based data too.  And so,

4  for example, there might be an Argentine IGT entity.  There is

5  one in Macau.  There's one in Peru.  There's one in Ireland.

6  There's all over.

7        THE COURT:  Stop for a second.  What's the need that

8  you have for the land-based stuff?

9        MS. CENAR:  The only requests that are related to the

10  land based are for the entities that have -- that are involved

11  in the digital, and it's for the disgorgement of profits and

12  for a portion.

13        MR. MACEY:  I don't understand why -- I'm sorry.

14        THE COURT:  I'm just trying to process what you just

15  said.  The only request that's related to land base is for the

16  entities that are involved in the digital.  So which of the

17  191 are those?

18        MS. CENAR:  Well, they've identified four that he

19  just described.  We have concerns about that that we laid out

20  in our motion.

21        THE COURT:  Got it.

22        MS. CENAR:  Whatever the ultimate entities are that

23  are identified, those are the ones that we --

24        THE COURT:  Got it.  Now I understand what you're

25  saying.

1    Okay. So back to you, Mr. Macey. So if what -- if I

2  were to interpret this request to say that it only applies to

3  the other 187 to the extent that they are getting revenue from

4  digital use of the games that are at issue, would the answer

5  for the 187 be there isn't any?

6    MR. MACEY: Not for land based.

7    THE COURT: I understand.

8    MR. MACEY: Okay.

9    THE COURT: But I'm --

10    MR. MACEY: I believe the answer is the 187.

11    THE COURT: If I limited it to digital, the answer to

12  the 187 would be none.

13    MR. MACEY: Correct.

14    THE COURT: Why shouldn't I do that?

15    MR. MACEY: Because --

16    THE COURT: I'm asking her, "Why shouldn't I do

17  that?" Because you're saying that she wants the land-based

18  stuff too --

19    MR. MACEY: Yeah.

20    THE COURT: -- and I'm asking why do you really need

21  the land-based stuff. The profits that you're entitled to

22  would be the profits out of the improper use of the copyright,

23  which the allegation is that's the online gaming, not the

24  land-based gaming.

25    MS. CENAR: And the social, yes.

1       THE COURT:  Social, you mean like through --

2       MS. CENAR:  DoubleDown Casino.

3       THE COURT:  Yeah, yeah, fine.  Okay.  So what would

4   be the basis on which you'd be entitled to any financial

5   information about land-based revenues, expenses, profits,

6   this, that, and the next thing?

7       MS. CENAR:  Because it goes to the apportionment

8   issue in responding to their apportionment as to, you know --

9       THE COURT:  Basically, you're concerned that they're

10  putting all the costs into the -- they're going to put all the

11  costs into the digital part and none of the costs into the

12  land base to make it look like the digital stuff doesn't make

13  any money?

14      MS. CENAR:  Yes and no.  But I'm talking more about

15  them saying that the artwork and graphics is only a small

16  portion of the revenue that is generated, and, therefore, once

17  we do the disgorgement of profit analysis, the apportionment

18  of that should be X.

19      THE COURT:  What does the land-based stuff get you on

20  that?  I mean, that's just a question -- that's just a

21  question of how much of the profit is really attributable to

22  the use of the copyright.

23      MS. CENAR:  Because if they're taking -- if there's

24  inconsistent apportionment with respect to the value of the

25  artwork and graphics when they use it in other --

1      THE COURT:  You think their records are going to

2  apportion what part of their profit comes from how pretty the

3  game looks and what portion of it comes from where the game is

4  placed in the casino, is it right on the aisle or is it in the

5  middle of the row?

6      MS. CENAR:  Your Honor --

7      THE COURT:  It isn't, is it?  You really think that?

8      MS. CENAR:  Your Honor, apportionment is their

9  defense, and they haven't laid out what their defense is other

10  than a laundry list of things in an interrogatory answer.

11  So --

12      THE COURT:  So my takeaway on this, okay, and I'm not

13  as deeply into this as you all are, of course, but my takeaway

14  on this is that when you're asking for the land-based stuff, I

15  understand why you're doing it, but it strikes me as a

16  hypothetical concern that may not end upcoming to pass.  In

17  other words -- so if you get something -- if I limit it to the

18  money that was made off the digital and the costs that are

19  attributable to that, assuming that it's broken down that way,

20  there is a little asterisk there which I'll come back to in a

21  second, and you get some sort of an allocation that you and

22  your expert look at, it kind of makes sense the way they have

23  allocated it.  Or more likely they don't allocate it at all,

24  okay, and you're kind of doing it on your own.  You're not

25  going to need to see how they allocated other things for other

1    purposes.  It's going to be pretty tangential.

2         It's only if you get some allocation, you know, when

3    they come back to you and say, well, you know, the profit we

4    made off of this is really, you know, one penny because

5    there's all of these costs and expenses and so on.  Then you

6    might need to do that, but without that, no.

7         Now, I mean, the asterisk would be if their records

8    don't really permit any kind of an allocation of revenues at

9    all -- excuse me -- of expenses at all.  But it just strikes

10   me as hypothetical and something that we could worry about it

11   later if it comes to pass and you come in with an expert

12   signing an affidavit saying, I can't figure this out without

13   this information, and here is why I can't figure it out

14   without this information, which I don't have right now.

15        That's kind of -- what did I miss?

16        MS. CENAR:  Well, it sounds to me that you're

17   focusing on identification of the profits.  So in my

18   understanding --

19        THE COURT:  Well, that's good.  I'm reacting to what

20   you said.

21        MS. CENAR:  Right.  My understanding of disgorgement

22   of profits in a copyright case is our burden is to come

23   forward with the revenues; their burden is to come forward

24   with the costs.  And then after --

25        THE COURT:  Right.  I said later that you can get

1    discovery of the costs now. But I have to say, when I said

2    that, I didn't know that I was going to get a document request

3    that asked for information from 191 entities.

4           MS. CENAR: We didn't ask for information from 191

5    entities. What we asked for was an identification of which

6    entities were involved in the infringing activity of the 191

7    and then the information from those entities that were

8    identified.

9           MR. MACEY: Wow.

10          MS. CENAR: So we did not. And we did that because

11   at the last hearing, your Honor, you said serve a request

12   asking for which entities were involved in the infringing

13   activity of the IGT family.

14          THE COURT: And that's why I don't have a problem

15   with request 1(b), for example.

16          MS. CENAR: Okay. What you have done in limiting in

17   saying only the ones that generate revenue is what you have

18   allowed them to do is only -- not identify all of the entities

19   in the IGT family that are involved in the infringing

20   activity; you're relying on a subset of only those that

21   generate revenue. And there is a reason why it's important

22   that you don't do that.

23          THE COURT: Um-hmm. And that is?

24          MS. CENAR: Because under the Deltek case, even if

25   they don't generate a revenue, there is a value of use, actual

1    damage calculation, that we can do.  So even if they don't

2    generate revenue --

3           THE COURT:  But it's all predicated -- it's all

4    predicated on them actually using the thing, right?  If they

5    don't use the copyright, you can't get anything.  If entity

6    number 186 has never used the copyrighted material in any kind

7    of an online game, then they're off the table.

8           MS. CENAR:  Agreed.  And I'm not interested in that.

9    What I'm --

10          THE COURT:  Pause for a second.  So what's wrong --

11   let me ask you this question.  1(b) says -- it's a document

12   request that says, Documents showing if the particular entity

13   has copied, displayed, distributed, or hosted on a server the

14   graphics for at least one of the accused games.

15          Did you ask that in an interrogatory too?

16          MS. CENAR:  Yes, we did.  It was due on December 4th.

17   They asked for two extensions until December 22nd.  They let

18   the December 22nd date pass without providing that response.

19   When we came back from Christmas on the 26th, I met and

20   conferred.  They gave me a partial response but not the one

21   identifying the entities.  I had a meet and confer again on

22   January 2nd asking when I'm going to get that.  I was told

23   soon.

24          THE COURT:  Okay.  So when is she going to get that?

25          MR. MACEY:  First, I disagree that that interrogatory

1    was asked.  Notwithstanding that, I know that I've been

2    advised that today or tomorrow the verification will be signed

3    to be able to provide the answers to all the interrogatories.

4         THE COURT:  You don't think that that interrogatory

5    or something close to it got asked?

6         MR. MACEY:  Exactly.  And I've represented here, and

7    I'll represent again, but no one wants to take my word for it,

8    that the data for Internet gaming, digital gaming, is only

9    distributed from the four entities I said.  No one else --

10   there is no other use, and it only goes --

11        THE COURT:  Everybody stop talking except me.  Okay?

12        So here's the way I look at this.  I don't -- you

13   know, I guess I don't want to get into the muck of deciding or

14   talking about why somebody does something as a document

15   request or not, but it seems to me that step one is what

16   entities copied, displayed, distributed, or hosted on a server

17   the graphics for at least one of these three games.  Okay?

18        And I don't care -- it ought to be an interrogatory

19   rather than a document request because it's just easier to

20   answer something yes or no than to go gather all the documents

21   that show that.  Okay?

22        And then once you have that, then you've got a

23   universe.  And the universe is probably going to be smaller

24   than 191.

25        You're starting to shake your head.  That counts as

1    talking.

2          MS. CENAR:  I'm starting to shake all over.

3    Interrogatory --

4          THE COURT:  That counts as talking, and I said don't

5    do that.  Okay?  So just try to keep a poker face for the

6    moment.

7          Unless I'm a complete idiot, let me preface it that

8    way, unless I'm a complete idiot, and the jury is maybe still

9    out on that, liability in a copyright case is premised on

10   having something to do with use of copyrighted material.  Here

11   we're talking about online gaming; we're talking about

12   graphics, and so we're talking about use of the graphics.

13         I understand that there are claims for contributory

14   copyright infringement and inducing copyright infringement,

15   but in terms of who the infringer -- who is actually

16   accomplishing the infringement, it's the party that copied,

17   displayed, distributed, or hosted it on a server.  So it seems

18   to me that the first step is to find out who those entities

19   are.

20         MR. MACEY:  Which --

21         THE COURT:  It sounds like to me Mr. Macey is saying

22   there's four.  It's 1, 2, 3, 4.  Okay?

23         MR. MACEY:  Right.

24         THE COURT:  So if the answer to that -- if that's the

25   answer to that, or if it's five, or if it's seven, or if it's

1   two, or whatever, then on the rest of these document requests,
2   with a fairly large exception that I'll come back to in a
3   second, when I say "the rest of these," I'm talking about the
4   one in the subparagraphs, it seems to me that everything else
5   should be limited to the entities for which that answer is
6   yes.

7           So, in other words, if there is an entity that has
8   copied, displayed, distributed, or hosted on a server the
9   graphics, then it seems to me that it's completely legitimate
10  to find out what their revenue is, what they've sold, what
11  their cost to goods sold is, what their margins are, full
12  stop.   Okay?

13          If they haven't, then at the moment, I'm not prepared
14  to require that to be produced, because I think -- I mean, I
15  don't think that it's, A, relevant, and, B, I don't think it's
16  proportional even if it is relevant.   The big exception is
17  this reference that pops up in about a half a dozen of these
18  requests.   I think it's E, F -- this is under paragraph 1 -- E
19  F, I, J, M, and N that changes the time period to 2003, and it
20  also includes non-accused games.

21          The answer to that is no.   All of these are to be
22  limited to accused games.   You are to strike out the language
23  that says "non-accused games."   You are to strike out -- the
24  time period is going to be the same for all of them.   It's
25  2007 to now.   I understand the theory on which the non-accused

1  game stuff is relevant, but I think it's tangential, and I

2  don't think you're entitled to it.

3          So this is what I think ought to happen with request

4  1 and the subparts.  There ought to be -- and, honestly, I

5  don't even care if it's been asked.  There ought to be -- I'm

6  just telling you.  There ought to be some disclosure that

7  basically turns 1(b) into an interrogatory, and the defendant

8  says, here's a list of the IGT entities that are copied,

9  displayed, distributed, or hosted on a server the graphics for

10 at least one of these three games.  And then everything else

11 flows from that under 1.  I am now moving on.

12         MS. CENAR:  You Honor, may I --

13         THE COURT:  By the way, this is called a ruling, so

14 you will talk when I am finished.

15         I'm skipping over to No. 4.  Number 4 asks for

16 expected performance.  Don't think you're entitled to that

17 because you're going to get the records for the actual

18 performance.

19         Number 5 asks for licensing agreements for other

20 types of games.  I understand the argument in favor of it.  I

21 think it's tangential.  You are not entitled to that.

22         Number 6 relates to licensing arrangements for other

23 copyrights, same answer, same reason.  Not entitled to it.

24         Settlement agreements for other litigation involving

25 copyrights other than copyrights, same answer, not entitled to

1   it.

2   Number 9, all documents, studies, reports, and

3   articles for the last ten years that have anything to do with

4   online gambling.  You've got to be kidding me.  No, you're not

5   entitled to that.

6   Number 8, because of the way it's limited, plans or

7   studies relating to marketing, operations, competition,

8   et cetera, related to the accused games, I think you're

9   entitled to at least the parts of any marketing documents that

10  involve these games, so that one I'm enforcing and to that

11  extent.

12  10, 11, and 12, I'm not sure there will be any

13  documents, but I think those are relevant.  But it's to be

14  limited to the entities that actually have, as I said before,

15  displayed, copied, distributed, or hosted on a server the

16  alleged copyrighted material.

17  And on the rest of these, they talk -- there's this

18  term that's used, which you capitalized, but I don't know the

19  definition of it.  It's U.S. support revenue.  What does that

20  mean?  You used the term.  What does it mean?

21  MS. CENAR:  It's the U.S. entities' revenue.

22  THE COURT:  What does that -- how does that get you

23  anything different from the other stuff in paragraph 1 and all

24  the subparagraphs?

25  MS. CENAR:  Your Honor, technology has failed me.  I

1    don't have that in front of me.  I can't answer that right

2    now.

3              THE COURT:  A little piece of advice.  Bring paper

4    with you because that doesn't fail you.

5              Well, I'm not persuaded that 13 through 20 are things

6    that you're entitled to, so I'm not enforcing those.

7              So is that all clear enough?

8              MR. MACEY:  Yes.

9              THE COURT:  So on the DoubleDown stuff, I guess I'm

10   not sure that I'm understanding how this is -- how it differs

11   from anything else.  And I kind of need to bring this to a

12   close.  So my -- I know I skipped over a couple.  So my

13   suggestion is this, or my advice -- or not my "advice" or my

14   suggestion.  It's my direction is this.  The two that I

15   skipped over were -- I believe it was numbers 3 and 4.  Hang

16   on a second.  Excuse me.  Numbers 2 and 3.

17             MR. MACEY:  Right.

18             THE COURT:  I'm hoping that you get the drift of what

19   I think is properly discoverable and what I think is not

20   properly discoverable.  You're to go back and talk about 2 and

21   3 and the DoubleDown stuff based on what I said.  Okay?  And

22   assume that if you come back, I'm going to say the same thing.

23   So try to work that out that way.

24             There needs to be some sort of a deadline by which

25   this stuff is all going to get produced.  It needs to be

1  pretty soon because we've got -- you're going to send me --

2  you're going to send me a status report --

3          MR. MACEY:  A status report.

4          THE COURT:  -- next Monday, so just put in there

5  whatever you've worked out on that.

6          MR. MACEY:  Thank you.  And then I do have a motion

7  for protective order on the 144 document requests that go to

8  DoubleDown, Inc., and IGT separately.  There's three document

9  requests that are subject to motion for protective order.

10  One, there was the combined request, which you just addressed,

11  which were the 20 with the subparts.

12          THE COURT:  Yeah.

13          MR. MACEY:  And then there's two other requests,

14  which total 144 separate document requests.

15          THE COURT:  Wait a second.  Which page am I looking

16  at in your motion?

17          MR. MACEY:  It goes to specifically page 12,

18  section C.

19          THE COURT:  The fourth request?

20          MR. MACEY:  Yeah.  There's two sections of them.

21  They were attached to the motions.

22          THE COURT:  Yeah.  So here's the deal.  I say this

23  respectfully.  When you say at the top of page 13 -- actually,

24  you say at the bottom of page 12 that you think that these

25  requests are overly broad, and then the first full sentence

1   that appears on page 14 says, and I quote, "Defendants do not

2   have space to specifically address the fourth request in this

3   motion."

4           MR. MACEY:  Without going 15 pages.

5           THE COURT:  File a different motion.  I'm telling

6   you, Mr. Macey, I'm not going to go through it --

7           MR. MACEY:  I will file another motion.

8           THE COURT:  If you're not going to tell me -- if

9   you're not going to take the time and tell me what's wrong

10  with them, I'm not going to go through it myself.  So if you

11  file a motion, do it.  My advice to you is, again, I'm hoping

12  you're getting the drift.  I'm not sure that you are, but

13  hopefully you are.  I'll see you next week.  Bye.

14          MR. MACEY:  Thank you, Judge.

15          MS. CENAR:  Your Honor, I have a quick question.

16          THE COURT:  Yeah.

17          MS. CENAR:  We have a status hearing before you at

18  8:30 in the morning on the 10th.

19          THE COURT:  Yes.

20          MS. CENAR:  We have depositions in San Francisco on

21  the 9th.  We will be having to take a red eye home to try to

22  make that 8:30.

23          THE COURT:  I can do it by phone.  I don't have a

24  problem doing it by phone.

25          MS. CENAR:  Okay.

1    THE COURT:  We can change it to a phone call.  So

2  just somebody set up a call-in number and just get it to my

3  office a day ahead.

4        MR. MACEY:  We will take care of it.

5        MS. CENAR:  Perfect.

6        MR. MACEY:  Thank you.

7        THE COURT:  All right.

8        MS. CENAR:  Your Honor?

9        THE COURT:  No, you're done.  I'm sorry.  Talk to you

10  next week.  You're going to see me in six days.  I've got to

11  talk to some other people.

12        MS. CENAR:  It's a scheduling thing.  The

13  cross-motion was noticed up for the 10th.

14        THE COURT:  Okay.  I'll take care of it.  Good-bye.

15    (Which were all the proceedings had in the above-entitled

16  cause on the day and date aforesaid.)

17    I certify that the foregoing is a correct transcript from
   the record of proceedings in the above-entitled matter.

18

19  _____        _____
   Carolyn R. Cox                  Date
   Official Court Reporter
20  Northern District of Illinois

21  /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR

22

23

24

25