# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| GC2 INCORPORATED, | ) | Case No.: 1:16-cv-08794 |
| | ) | |
| Plaintiff, | ) | JURY TRIAL DEMANDED |
| | ) | |
| vs. | ) | Judge: Matthew F. Kennelly |
| | ) | Magistrate Judge: Mary M. Rowland |
| International Game Technology PLC, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## GC2's STATEMENT OF ADDITIONAL MATERIAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

I.    GC2 CREATED ORIGINAL GAMES WITH ORIGINAL ARTWORK AND GRAPHICS AND GC2 IS THE AUTHOR OF THE GAMES AT ISSUE ...................... 1

II.    GC2 OWNS THE COPYRIGHT RIGHTS ........................................................ 2

III.    CORRECT "TERMS AND CONDITIONS" FOR USE OF GC2 WORKS ON LIMITED PLATFORMS WERE KNOWN ................................................... 3

    A.    Agreement Required GC2 Mark Placed on GC2 Games ........................... 3

    B.    Contemporaneous Actions on Authorized Games Evidence Knowledge of Marking Requirement ........................................................................ 5

IV.    BAD FAITH, INTENT, WILLFUL BLINDNESS, AND CRIMINAL COPYRIGHT INFRINGEMENT ............................................................. 6

    A.    Removal of GC2's Mark ........................................................................ 6

    B.    REMOVAL OF GC2 MARK FROM PHARAOH'S FORTUNE ................ 7

    C.    REMOVAL OF GC2 MARK FROM COYOTE MOON ........................ 10

    D.    REMOVAL OF GC2 MARK FROM KITTY GLITTER ........................ 12

    E.    FALSE "TERMS AND CONDITIONS" FOR USE – FALSE TERMS OF USE .......... 15

        i)    False License of GC2 Games ....................................................... 15

        ii)    False Representation of Ownership .............................................. 16

        iii)    False Copyright Agent ................................................................ 16

    F.    USE IS DELIBERATE, WIDESPREAD, EXTENSIVE, AND LUCRATIVE .............. 16

        i)    Interactive Version .................................................................... 16

        ii)    DoubleDown Version ................................................................ 21

    G.    Defendants Admit They Can Make The Infringement Stop But Willfully Allow Infringement To Continue .......................................... 22

    H.    DEFENDANTS' CLAIMED LACK OF KNOWLEDGE IS NOT CREDIBLE NOR IS IT MADE IN GOOD FAITH ............................... 23

    I.    IGT's Self-Identification of Distribution Channels "Gap in Rights" ............... 24

V.    PRACTICAL PARTNERING ...................................................................... 25

    A.    Defects in Defendants' Evidentiary Submissions .................................. 25

    B.    Defendants' Partnering on Technology ................................................ 26

    C.    Defendants' Partnering on Revenue Share: .......................................... 29

    D.    Partnering on the Gaming Licenses Necessary to Distribute the Games: ......... 30

    E.    Joint Liability for Masque/Encore Profits, Intentional Acts and Partnering .......... 31

        i)    Masque Hard Drive with GC2 layered files and Willful Blindness ............ 31

        ii)    Partnering By Sharing And Masque In Possession Of IGT NV Art Assets ....... 32

        iii)    IGT NV Supervises and Controls Masque by Approving Games. ........... 32

54688

|  | iv) | IGT NV Supervising and Controlling Masque Use on Packaging by Approving Packaging | 32 |
|  | v) | Masque/IGT Partnering on Look of the Game | 33 |
|  | vi) | Masque CD/DVD's | 33 |
|  | vii) | Masque/IGT Partnering on Creation of Downloadable Version of Game | 34 |
|  | viii) | Masque/IGT Partnering on Distribution and Display | 34 |
|  | ix) | Masque/IGT Partnering and Approval of License to End User | 34 |
|  | x) | Partnering with Encore | 34 |
| F. | | DoubleDown Interactive Partnering Post Sale | 35 |
| G. | | DDI Liable For Profits of Service Providers (Misdescribed As "Payment Processors") | 39 |
| H. | | Recover for Disgorgement of Gain on Sale of DoubleDown | 39 |

**VI. UNAUTHORIZED DOUBLEDOWN CASINO WORKS ........................ 40**

| A. | | Non-Wagering Use Game | 40 |
| B. | | DoubleDown Casino Technology | 43 |
|  | i) | Amazon Web Services | 43 |
|  | ii) | Unauthorized Loading Pages | 52 |

**VII. THE KITTY GLITTER ISSUE ........................................ 56**

| A. | The Kitty Glitter and Maid of Money Issues Generally. | 56 |
| B. | IGT Provides a Math Structure; GC2 Designs and Creates a Game | 57 |
| C. | GC2 Delivers Original Kitty Glitter Game to IGT, IGT Copies and Adapts It for Land Based Use, Making an Authorized Derivative Work Which is Substantially Similar to the Original Kitty Glitter Game. | 65 |
| D. | IGT and DDC Copy the Original Kitty Glitter Game and the Land Based Game and Adapt Them; Making Unauthorized Infringing Works. | 70 |
| E. | COMPARISON CHARTS: | 71 |
| F. | The Maid of Money Issue | 75 |
| G. | Relevant Files Not Produced. | 77 |

54688

I.   **GC2 CREATED ORIGINAL GAMES WITH ORIGINAL ARTWORK AND GRAPHICS AND GC2 IS THE AUTHOR[1] OF THE GAMES AT ISSUE[2]**

1.     The IGT Defendants admit that all games referenced in paragraph 24 of the Amended Complaint ("GC2 Games") relate to IGT NV's contractual relationship with GC2. (App. A-1: ¶44).

2.     The IGT Defendants and DoubleDown Interactive ("DDI") admit that IGT NV is a wholly owned subsidiary of IGT Parent and that IGT NV had a contractual relationship with GC2 to create, develop, and deliver to IGT NV "originally designed, demonstrable" ***games*** to be used by IGT NV with the "IGT Platform" (App. A-1: ¶44, 22, 83); *See also* (App. A-1: ¶80, 81, 91, 92, 93); (App. A-6).

3.     During calendar years 2003 through 2007, inclusive, the Initial Prior Agreement was supplemented by seven separate exclusive game development amendments between GC2 and IGT NV (each amendment, a "Prior Amendment") (See App. A-6); (App. A-1: ¶81).

4.     In the Sixth Amendment of the Agreement between GC2 and IGT NV, there is a delivery schedule signed by both parties showing dates GC2 delivered and IGT NV received each GC2 Game, including Kitty Glitter and Maid of Money. (See App. A-6); (App. A-1: ¶81).

5.     IGT NV admits that it had access to and possession of GC2 artwork and graphics. (App. A-1: ¶¶44-46).

6.     GC2 created, produced and provided a playable demo of each original GC2 Game and delivered each GC2 Game to IGT NV on disk, including Kitty Glitter and Maid of Money, and created and delivered the artwork and graphics for each game listed in the Agreement

---

[1] GC2 is the author of the GC2 Games and "Author" is a type of Copyright Management Information 17 U.S.C. §1202 (c)(2).
[2] Subject Matter Jurisdiction, Personal Jurisdiction, and Venue have been admitted in each Defendants' Answer. (App. A-1: ¶¶18-20; App. A-2: ¶¶18-20; App. A-3: ¶¶18-20).

54688

between GC2 and IGT NV, including Kitty Glitter, Maid of Money, Pharaoh's Fortune and Coyote Moon[3]. (App. A-55 (Jankowski Dep.): pp. 35-44 and 192-197).

## II.  GC2 OWNS THE COPYRIGHT RIGHTS[4]

7.  GC2 is the copyright owner of the artwork and graphics for the GC2 Games because GC2 created them. (App. A-55 (Jankowski Dep.): pp. 192-197, 35-44).

8.  The plain language of the Agreement provides that GC2 is the owner of the copyrights in the artwork and graphics it provided for the GC2 Games. (App. A-6); (Dkt. at 152).[5]

9.  IGT NV (in its Rule 30(b)(6) deposition) admitted that GC2 is the owner of the copyrights and that it does not dispute ownership of the art for Coyote Moon or Pharaoh's Fortune but that there was some contention with respect to Kitty Glitter. (App. A-38 (Kastner Dep.): pp. 48-49).

10.  GC2 applied for and registered its works with the U.S. Copyright Office and the Court is able to play the "playable demos" GC2 submitted to the Copyright Office for Coyote Moon, Pharaoh's Fortune, Kitty Glitter and Maid of Money. (App. A-5A-5D)[6]

11.  IGT Defendants and DDI admit knowledge of the rights of a copyright owner (App. A-1: ¶100) and admit knowledge of the GC2 Copyright Registrations at least as early as July 3, 2017, (App. A-1: ¶100) even though the U.S. District Court's Docket shows IGT Defendants had copies of GC2's Copyright Registrations at least as early as September 9, 2016, when they were provided with the original Complaint. (Dkt. at 1).

---

[3] These are the GC2 Games addressed in Defendants' Motion.
[4] Copyright Ownership is a form of Copyright Management Information. 17 U.S.C. §1202 (c)(3). Information set forth on a copyright notice is a form of Copyright Management Information. 17 U.S.C. §1202 (c) (1). No registration is required.
[5] On June 5, 2017, this Court denied Defendants' Motion to Dismiss finding that the plain language of the Agreement states GC2 is the owner of the copyrights in the artwork and graphics it provided. (Dkt. at 152).
[6] These were original works of authorship and GC2 delivered them to IGT NV. (App. A-55 (Jankowski Dep.): pp. 40-43).

54688

III. **CORRECT "TERMS AND CONDITIONS"[7] FOR USE OF GC2 WORKS ON LIMITED PLATFORMS WERE KNOWN**

   A. **Agreement Required GC2 Mark Placed on GC2 Games**

   12.     GC2 required "Terms and Conditions" for the use of the GC2 Games with respect to types of Gaming Machine Platforms. (App. A-6).

   13.     IGT NV was contractually required to create the glass for the gaming machines, using GC2 artwork, provided by GC2, and to place the GC2 Mark on the glass and provided IGT with GC2 artwork for the glass for the games at issue. (App A-55 (Jankowski Dep.): pp. 70, 77-82, 92-94, 118-119, 161-163).

   14.     The IGT Defendants and DDI admit Section 3.15 of the Initial Prior Agreement (attached as Exhibit 18 to the First Amended Complaint ("FAC") states that:

   > IGT [NV] agrees to integrate the GC2 Projects' video graphics and artwork into IGT [NV]'s programs for use on gaming machines utilizing the IGT Platform. IGT shall test, approve and market the GC2 Projects. IGT shall be responsible for all duties and expenses associated with the development and implementation of mathematical pay tables, source code and programming, sounds, and glass designs for use in gaming machines incorporating the GC2 Projects. (App. A-1: ¶87).

   15.     The IGT Defendants and DDI admit that Section 3.16 of the Initial Prior Agreement, attached as Exhibit 18 to the FAC states that:

   > IGT [NV] shall, at no cost to GC2, have GC2's and its parent's names, logos and appropriate legal notices, such notices, content and formats to be mutually agreed upon by the Parties, displayed in the exterior video displays and glass in machines in which the GC2 Projects are installed, to the extent allowed by gaming regulations.

   (App. A-1: ¶88). The IGT Defendants and DDI admit and that this section (3.16), was incorporated into and/or ratified by each Prior Amendment. (App. A-1: ¶88).

---

[7] "Terms and conditions" for use of the work is a form of Copyright Management Information. 17 U.S.C. §1202 (6).

54688

16. The IGT Defendants and DDI admit that on or about January 3, 2007, the parties executed Prior Amendment #7, a true and correct copy of which is attached as Exhibit 20 to the FAC. (App. A-1: ¶94), which defines gaming machine as follows:

    a)      excluded "**nonwagering devices, machines and systems** such as: (a) pinball, (b) arcade machines, and (c) gaming consoles, including but not limited to general purpose computers, for non-wagered gaming;" (App. A-1: ¶96: at Exh. 20). (Emphasis Added);

    b)      excluded "the following wagering devices, machines and systems: . . . (d) devices used for **mobile gaming** in the State of Nevada as defined by NRS 463.0176, (e) devices legally used for **mobile gaming** outside the State of Nevada as defined in that jurisdiction's laws, and (f) **Internet gaming**." (App. A-6: at Exh. 20, ¶ 1.) (Emphasis added.); *See also* (App. A-1: ¶97); and

    c)      included Section 3 which states, in part:

         Except for those rights specifically provided for hereunder, GC2 retains all rights, title and interests in GC2 licensed or owned trademarks, copyrights or trade secrets, in the GC2 Projects, and nothing herein shall be construed as granting to IGT an express or implied right in any such intellectual property. (App. A-1: ¶98).

17. The IGT Defendants and DDI admit that Section 5 of Prior Amendment #7, attached as Exhibit 20 to the FAC, states, in part:

         "The GC2 registered trademark shall continue to be displayed, in accordance with the Agreement and in a fashion of similar size and style as featured on previously released GC2 Projects, on all GC2 Projects specifically identified on Exhibit D herein should IGT release and place such games." (App. A-1: ¶99).

18. The IGT Defendants knew and understood the express exclusions at the time the Seventh Amendment was entered into in 2007 because:

    a)      the express and specific language in the Agreement with GC2, and

    b)      IGT Defendants' accounting staff memorialized the terms in a contemporaneous accounting "GC2 White Paper" documenting that GC2 games can be used on any platform "except nonwagering use, internet, mobile" and that the GC2 logo should still be placed on GC2 Games. (App. A-13).

### B. Contemporaneous Actions on Authorized Games Evidence Knowledge of Marking Requirement

19. The IGT Defendants admit that examples of how GC2's Mark was featured on previously released projects are identified in Exhibits 68-73 of the FAC and that they accurately show land based games GC2 developed. (App. A-1: ¶¶89-90).

20. The GC2 Games were made into land based games and distributed onto casino floors in Gaming Machines. (App. C-26, C-36, C-44).

21. The below photos depict land based GC2 Games bearing GC2's Mark for GC2 Games Pharaoh's Fortune, Coyote Moon and Kitty Glitter that IGT provided to the U.S. Trademark Office, under oath, as specimens of use. (*Id.*).

| COYOTE MOON | PHARAOH'S FORTUNE | KITTY GLITTER |
|:---:|:---:|:---:|

 

22. For over a decade, and even today, IGT holds out to the public that the land based Kitty Glitter Game is a GC2 Game reflected by video taken of land based games for Coyote Moon, Pharaoh's Fortune and Kitty Glitter (depicting GC2's Marks). (App. A-7); (App. A-118).

54688

23.     Marking requirements for agreements with third party developers are typical for IGT.  (App. A-119-120).   When other games were converted to DoubleDown Versions, they appeared with the logo of the third party developer and recognition in the attribution line (but not so with GC2 Games). See, as an example (App. A-24 (Sigrist Dep.): pp. 294-297).



See, (App. A-143).

## IV.    BAD FAITH, INTENT, WILLFUL BLINDNESS, AND CRIMINAL COPYRIGHT INFRINGEMENT

### A.    Removal of GC2's Mark

24.     Electronic files that contain GC2 artwork are "layered files,"[8] and according to IGT's Kurt Andersen, are easy to remove or change. (App. A-77 (Andersen Dep.): 64-67).  *See also*, (App. A-64 (Wisler Dep.): pp. 86-87).

---

[8] Defendants produced native PSD files that require special software to open the layered files.

54688

25.     The art for the GC2 Games are in different layers that can be turned on or off in "illustrator" program and the "IGT logo" and "GC2 logo" can be seen on different layers. (App. A-64 (Wisler Dep.): p. 86-87).

**B.     REMOVAL OF GC2 MARK FROM PHARAOH'S FORTUNE**

26.     GC2's Mark appears on the permitted land based games. (App. C-11); (App. A-19 (Sigrist Dep.): pp. 121, 132).

27.     Video footage of GC2's land based Pharaoh's Fortune game depicts GC2's Mark. (App. A-7); (App. A-118).

28.     A photo of GC2's land based Pharaoh's Fortune game is depicted on the right. (App. C-26); *See also* (App. C-27); (App. A-4). Removal of GC2's Mark can be seen in (App. C-28, 29, 30, 31); (App. A-98).



GC2's Mark is here

29.     The art files for the land based GC2 Game Pharaoh's Fortune contain the image with GC2's Mark depicted in "layered files," as set forth below. (App. C-28: GC2's Mark is layered file 1); (App. A-98); (App. A-64 (Wisler Dep.): pp. 40-46, 54-58); (App. A-11 (Kastner Dep.): pp. 218-219, 256-257).

54688



GC2's layered file here

GC2's Mark is here

30.     The DoubleDown Casino loading screens produced by DDI do not display a GC2 Mark and only display an "IGT logo." (App. C-29); (App. A-99).



GC2 Mark not here

See the loading screen on DoubleDown Casino (App. C-29); (App. A-99). Pharaoh's Fortune loading screen has no GC2 Mark.

54688

31. DDI production numbers below are native productions of the above Pharaoh's Fortune image and do not reflect GC2's Mark depicted in "layered files," as set forth below.



(App. C-30: native production, screen shot showing layered files, no GC2 Mark or GC2 layered file); (App. A-100); (App. C-31: native production, screen shot showing no layered files, no GC2 Mark)(App. A-101).

32. Ed Jankowski, the GC2 artist who created Pharaoh's Fortune, testified and circled the GC2 artwork on the DDI loading screen confirming it was GC2 Artwork. (App. C-29); (App. A-99); (App. A-55 (Jankowski Dep.): pp. 132-133).

33. In DDI's production, there are several copies of this image, slightly edited, with the GC2 layered file removed and IGT's Mark placed on a layered file. (App. C-28-31); (App. A-98).

34. "Sprite Sheets" for Pharaoh's Fortune have the GC2 image with GC2's Mark removed. (App. C-18; App. A-25B, A-117). The images from the Sprite Sheets also have GC2's Mark removed. (Id.); (App. A-59: ¶¶ 51-59 for explanation of "Sprite Sheets").

54688

## C.    REMOVAL OF GC2 MARK FROM COYOTE MOON

35.    Video footage of GC2's land based Coyote Moon Game depicts GC2's Mark.
(App. A-7); (App. A-118).

36.    See photo of land based GC2 Game. (App. C-36 at Exh. 4-6); (App C-20)

37.    See photo of land based GC2 Game admitted in Complaint. (App. C-37 at Exh. 69); (App C-20); (App. A-4).



38.    Removal of GC2's Mark can be seen in the images provided in (App. C-14: (lobby)); (App. A-51, 111); (App. C-49: (Sprite Sheets)), (App. C-33: (loading pages-desktop)); (App. C-34: (loading pages mobile)), (App. A-51) and (App. C-38-39 (native images screen shots showing layers)). Compare these to (App. C-36) and (App. C-37); (App. A-4). Depicted below are select images.

54688



GC2's Mark not here

Lobby graphics mobile version. (App. C-14 at Exh. 11); (App. A-51, 111).



GC2's Mark not here

Compare land based images with screen shot of DDI loading page. (App. C-34); (App. A-51).

-11-



(App. C-39)



(App. C-38).

### D. REMOVAL OF GC2 MARK FROM KITTY GLITTER

39. Video of the land based Kitty Glitter Game depicts GC2's Mark. (App. A-7),

Also, photos of the land based game depict GC2's Mark below. (App. A-43); (App. C-44-45);

(App. A-4).

-12-

54688




40.    Removal of GC2's Mark from Kitty Glitter can be seen in (App. C-41: (Sprite Sheet)), (App. A-117), (App. C-42: (loading pages-Desktop)), (App. C-43: (loading pages-mobile)), (App. C-46: (native image of Kitty Glitter with GC2 Layer removed)).  Compare to (App. C-44-45); (App. A-4). Select images depicted below. Compare land based image with DDI's native screen shot to show layers which display neither a GC2 Mark nor a GC2 layered file. (App. C-46, C-28, C-47); (App. A-98).  See images depicted below.

54688



App-C-46 (native image of Kitty Glitter with GC2 layered file removed).



App-C-28 (loading pages-mobile) (App. A-98).

-14-

54688



App C-47.

**E.    FALSE "TERMS AND CONDITIONS" FOR USE – FALSE TERMS OF USE[9]**

   **i)    False License of GC2 Games**

41.    Defendants' distribution model was a "terms of use" distribution model. FAC Ex 2, admitted as a true and correct copy of the "terms of use" DoubleDown Casino used. (Dkt. 163 ¶9).

42.    DoubleDown Casino "licenses" the end user the right to use the GC2 Games under certain "terms and conditions."   (App. A-24 (Sigrist Dep.): p. 439-442); (App. A-121, 122); (App. A-52 (Clelland Dep.): pp. 13, 51-63).

43.    In 2017, IGT NV entered into an agreement with DoubleU in which IGT NV purported to license DoubleU three GC2 Games for non-wagering use even though IGT NV did

_____

[9] The "terms and conditions" of use is Copyright Management Information (17 U.S.C. §1202(c)(6)) and links to terms and conditions of use is Copyright Management Information. 17 U.S.C. §1202 (c)(7).

54688

not have a license from GC2. (App. A-23: pp. D-1 through D-12). IGT NV nevertheless required

DoubleU to use ███████████████ which IGT Parent agreed t███████ DoubleU for

this case. (App. A-14: ¶3); (App. A-12: ¶¶4-7).

ii)     **False Representation of Ownership**[10]

44.     The DDI terms of use represent that DDI or its licensors own the graphics even

though IGT NV does not contend it owns the GC2 art.  (App. A-38 (Kastner Dep.): pp. 48-49);

(App. A-19 (Sigrist Dep.): pp. 132-138).

iii)    **False Copyright Agent**

45.     The DDI terms of use represent that IGT employee Kimberly Dimino is the

Copyright Agent even though Ms. Dimino did not work for DDI, did not know she was

identified on the terms of use and was unaware of the existence of an email mailbox. (App. A-8

(Dimino Dep.): pp. 38-53).

F.    **USE IS DELIBERATE, WIDESPREAD, EXTENSIVE, AND LUCRATIVE**

i)     **Interactive Version**

46.     The GC2 Games (depictions of which are below) were selected for conversion to

interactive because of their known graphics and revenue generating ability for interactive. (App.

A-27(Shorrock Dep.): p. 154-164).

---

[10] Ownership is Copyright Management Information 17 U.S.C. §1202 (c)(3).

54688

**COYOTE MOON**  **PHARAOH'S FORTUNE**  **KITTY GLITTER**



(App. A-27 (Shorrock Dep.): pp. 30-36, 60-61, 72-76, 97, 101-102, 154-164). (App. A-38 (Kastner Dep.): pp. 27-30, 51-52, 58-59, 84-85); (App. A-105); (App. A-42); (App. A-52 (Clelland Dep.): pp. 112-119, 198-199); (App. A-53(Moro Dep.): p.p. 38-41, 66); (App. A-84). (App. A-11 (Kastner Dep.): pp. 346, 425).

47.     When creating interactive versions of land based games, IGT aimed to closely replicate the appearance of the original land based games. (App. A-11 (Kastner Dep.): pp. 33-34, 69-73, 76, 143); (App. A-27 (Shorrock Dep.): pp. 33-34, 69-73, 76, 143).  (App. A-27 (Shorrock Dep.): pp. 69-73, 76, 143).

-17-

54688

48.     Without any recognition to GC2, GC2 artwork and graphics were:

a)     used extensively in the games themselves, (App. A-11 (Kastner Dep.): pp. 10-14); (App. A-32: GC2 artwork and graphics from the land based game were used to create the interactive version shown in this exhibit); (App. A-27 (Shorrock Dep.): p. 118); (App. A-33); (App. A-34).

b)     used in marketing and advertising materials (App. A-27 (Shorrock Dep.): pp. 78-82, 177-184). (App. A-40). (App. A-38 (Kastner Dep.): pp. 236-237); (App. A-42). (App. A-41). (App. A-43). (App. A-44), (App. A-49: ¶¶ 1, 4, 7); and,

c)     used in materials available for distribution from the igt.com website (customer log in section) graphics, movies, icons, images etc. (App. A-38 (Kastner Dep.): pp. 204-244); (App. A-39) (App. A-38 (Kastner Dep.): pp. 204-205). (App. A-38 (Kastner Dep.): pp. 207-210; 220-222); (App. A-27 (Shorrock Dep.): pp. 204-205). See e.g. A-40 and samples below, full listing and native images can be seen at App.-40.

Examples shown in index below.

54688



49.     In addition to the customer log in only section, the IGT.com website otherwisel,[11] depicts GC2 artwork and graphics without any recognition to GC2. (App. A-49: ¶¶ 10-11); (App. A-49: ¶¶ 14, 20, 24); (App. A-49: ¶¶ 28-29)

50.     GC2 artwork and graphics also were used on game icons. (App. A-27(Shorrock Dep.): pp. 27-31); (App. A-45: containing hundreds of page-captures of IGT Internet online casino operator websites illustrating graphics displayed to the public.); (App. A-27(Shorrock Dep.): p. 52).

51.     These game icons contain game artwork. (For an example, *See* App. A-47 at GC2_00032572, App. A-46, and App. A-48 at GC2_00032607). The images below depict the

---

[11] The link for the below image can be found at IGT.com, "Pharaoh's Fortune® - Video Slot," https://www.igt.com/games/pharaohs-fortune--interactive-interactive-0gn The link for the below image can be found at IGT.com, "Coyote Moon® - Video Slot," https://www.igt.com/games/coyote-moon--interactive-interactive-lt7. The link for the below image can be found at IGT.com, "Kitty Glitter® - Video Slot," https://www.igt.com/games/kitty-glitter--interactive-interactive-nu3.

54688

portions of the menu on www.caesarscasino.com where game icons are illustrated for GC2's

Pharaoh's Fortune and Coyote Moon. (App. A-48).



(App. A-27 (Shorrock Dep.): pp.51-52); (App. A-46); (App. A-47); (App. A-48).

52.    Although there is no GC2 Mark, GC2 artwork also is depicted on:

    a)    "for free demo play," (See, App. A-30; Dft. Ltr. to court with log in credentials for interactive.)

b) "splash screens,"[12] (App. A-27 (Shorrock Dep.): p. 27-31, 35-36, 52, 230); (For an example, *See* App. A-47 at GC2_00032572, App. A-46, and App. A-48 at GC2_00032607),

c) "gameplay," which begins when an end user accesses online casino games through their preferred online casino operator. (App. A-27 (Shorrock Dep.): pp. 51-52).

### ii) DoubleDown Version

53.     The DoubleDown version of games were selected and ported over to DoubleDown because of their known graphics and revenue generating capability. (App. A-27 (Shorrock Dep.): pp. 12-13, 30-36, 97, 161-163); (App. A-52 (Clelland Dep.): pp. 32, 158, 112-114); (App. A-84); (App. A-53 (Moro Dep.): pp. 38-41, 66-69, 206-207 ); (App. A-55 (Jankowski Dep.): p. 75); (App. A-87 (Waldow Dep.): pp. 23-24); (App. A-29 (Kastner Dep.): p. 346).

54.     DoubleDown General Manager Joseph Sigrist displayed the below image in a presentation he gave to depict why authentic slots mattered. (App. A-86).



---

[12] The splash screen is the first screen seen after an end user clicks on the game icon on a casino operator website.

54688

55.     DDI made no effort to determine if it could use GC2 Games. In addition, post-sale, DDI took no independent steps to determine whether DDI had the rights to use Coyote Moon, Pharaoh's Fortune or Kitty Glitter.  (App. A-19 (Sigrist Dep.): pp. 119, 129: "it wasn't a task we decided to undertake." 132-133, 134-138, 141: no research after DDI learned of GC2).

56.     The Court can go online today (October 2018) and play the three primary GC2 Games at issue: Pharaoh's Fortune, Coyote Moon and Kitty Glitter on the internet real money gaming channel, and on DoubleDown Casino on line channels and can see that GC2's Mark is still not placed on these games.[13] (Excluded Channels).[14]

### G.     Defendants Admit They Can Make The Infringement Stop But Willfully Allow Infringement To Continue.

57.     **DoubleDown Casino:** DDI's Rule 30(b)(6) witness Joe Sigrist confirmed that DDI has the ability to stop presenting any type of games including any type of slot games to its end users on any platform at any time. (App. A-24(Sigrist Dep.): p. 406).

58.     IGT and IGT NV's control over the servers also allows IGT and IGT NV to make the infringement stop. (App. A-16 (Baker Dep.): pp. 277-278, 298); (App. A-19 (Sigrist Dep.): pp. 269-270); (App. A-20 (Sigrist Dep.): pp. 112-113).  (App. A-25A); (App. A-25B); (App. A-25C).

59.     Technical Experts have shown how quickly the infringing works on DoubleDown Casino can be removed, corrected or updated within minutes. (App. A-59: ¶ 72).

60.     **Internet Real Money Gaming**: International Game Technology (IGT Parent) and IGT NV admit that they have the requisite control and ability to make the infringement of GC2's Copyrighted works stop. (App. A-26: ¶ 2). From a technological standpoint, the removal of the infringing works is as simple as "flipping a switch." (App. A-27(Shorrock Dep.): p. 51).

---

[13] https://www.doubledowncasino2.com/login.
[14] Masque has stopped distributing the infringing games.

54688

### H. DEFENDANTS' CLAIMED LACK OF KNOWLEDGE IS NOT CREDIBLE NOR IS IT MADE IN GOOD FAITH

61.     Defendants International Game Technology and IGT NV shared legal and accounting departments, (App. A-14: ¶¶ 16, 18) and DDI shared legal departments with IGT NV. (*Id.*) Defendants maintained a database of contracts with third parties that exist in the legal department. (App. A-113), (App. A-13).

62.     The IGT Defendants, through Todd Nash, learned of the GC2 Agreement in June 2015. (App. A-15 (Nash Dep.): p. 196).

63.     In February 2016, Leon Erickson. A member of IGT Defendants' legal department, reviewed the GC2 Agreement and had concerns over what he read in the GC2 Agreement. Nash re-familiarized himself with the GC2 Agreement at that time.  (App. A-15 (Nash Dep.): pp. 119-121).

64.     IGT's legal staff informed Nash of their opinion in late February and early March 2016 (App. A-15 (Nash Dep.): pp. 124-128), after which then IGT General Counsel Michael Prescott was informed of this information. (*Id.*).

65.     In March 2016, IGT through Nash, after consultation with IGT's legal department (Leon Erickson and Michael Prescott) attempted to see if GC2 was still in business. (App. A-15 (Nash Dep.): pp. 129-134). IGT then took steps to buy the missing rights from GC2 for $ ▮▮▮ per game, without disclosing it had already made ▮▮▮ of millions of dollars on the unlicensed use. (*Id.* at 134, 251).

66.     Only after GC2 asked if the games had already been used, did Nash finally admit to GC2 that the IGT Defendants had a "gap in rights." (App. A-1: ¶3); (App. A-15 (Nash Dep.): pp. 129-134).   The IGT Defendants sought, unsuccessfully, and without full or complete

54688

disclosure to GC2, to buy or license GC2's rights. (App. A-1: ¶3); (App. A-15 (Nash Dep.): p. 170).

67.     When this litigation was started in September 2016, GC2 requested that the unauthorized use of the GC2 Games be taken down, (App. A-17), but CEO of DDI Joe Sigrist claims he was not made aware of GC2's takedown request.  (App. A-19 (Sigrist Dep.): p. 142). GC2 sent the complaint and take down request to DDI's terms of use Copyright agent, Kimberly Dimino, who admits receiving it. (App. A-8 (Dimino Dep.): pp. 44-48).

## I.     IGT's Self-Identification of Distribution Channels "Gap in Rights"

68.     Three unauthorized distribution channels were identified by IGT in its discussions with GC2 relating to the "gap in rights," and were as follows:

    A.     Internet Real Money Gaming
    B.     DoubleDown Casino (a/k/a Social Gaming or non-wagering use)
    C.     Masque/Encore

(App. A-1: ¶¶3, 185); (App. A-2: ¶¶3, 185); (App. A-3: ¶¶3, 185).  IGT by its own investigation further identified and represented to GC2 that IGT had used the following GC2 Works or derivatives thereof in the Excluded Channels:

- Pharaoh's Fortune
- Kitty Glitter
- Festival Fantastico
- Maid of Money
- Coyote Moon
- Lucky Lion Fish
- King Pin Bowling

69.     In October 2016, GC2 again requested that the GC2 Games be taken down from DoubleDown Casino, however, IGT and DDI, through their agents and lawyers, threatened GC2 with a lawsuit and liability:

> *"Fourth, if your client serves takedown notices on Double Down's service providers, your client does so at its own risk.  As you know, Double Down's website generates a substantial amount of revenue on a daily basis.  If it is inaccessible for any period of time through one or more of our service providers' platforms as a result of your takedown notice (possibly between*

54688

> *10-14 days), we will seek to recover damages from your client including,*
> *without limitation, lost profits and attorneys' fees. See 17 U.S.C. § 512(f)."*

(App. A-21: (Nov 14, 2016 E-mail from Joshua Liebman to Kara Cenar)). Sigrist, however, did

not have knowledge of this threat nor did he authorize it. (App. A-19 (Sigrist Dep.): pp. 142-

143).

      70.    From January 2016 (the approximate date Defendants realized they did not have

GC2's rights) until the first quarter of 2018 (which exceeds the 180-day period set forth in 17

U.S.C. §506)[15] IGT Defendants, DDI and their online casino customers ***generated $▮ million in***

***revenue*** through the use of GC2 Games Pharaoh's Fortune, Coyote Moon and Kitty Glitter.

(App. A-103: Exh. 7.4 at p. 1). The Defendants' continued infringing uses were for commercial

advantage and private financial gain as the gross revenue generated from all the unauthorized

uses of the GC2 Games, Pharaoh's Fortune, Coyote Moon and Kitty Glitter, on on-line channels

(either (a) internet real money gaming, or (b) DoubleDown Casino) is approximately $▮

million. (App. A-102: p. 59).

## V.    PRACTICAL PARTNERING

###     A.    Defects in Defendants' Evidentiary Submissions

      71.    Declarants (Millar and Manning) describe the IGT RGS Interactive version as

technology that distributes the games ***through*** a casino operator's website (Defendants' Appx. 3

(Millar Decl.); (Defendants' Appx. 31 (Manning Decl.)). However, IGT NV Company testimony

evidences that the games are ***not distributed through the website***. (App. A-11 (Kastner Dep.):

pp. 208-218)

---

[15] 17 U.S.C. §506 defines Criminal Copyright Infringement as any person who willfully infringes a copyright ...if
the infringement was committed a) for purposes of commercial advantage or private financial gain or b) by the
reproduction or distribution, including by electronic means, during a 180 day period, of one or more copies or phone
records of one or more copyrighted works, which have a total value of more than $1,000.

54688

**B.    Defendants' Partnering on Technology**

72.    The Defendants' partnering that occurs with Casino Partners on the IGT RGS

Interactive Gaming Technology will be discussed using the below graphic and materials.



(App. A-31).

73.    **Point #1: Creation of GC2 unlicensed games and placement on central**

servers:  In regards to #1 of the diagram above, Defendant IGT NV, which is wholly owned by

IGT:

   a)    Created infringing internet gambling versions of GC2 Games in the United
         States for exploitation in the United States and abroad. (App. A-11
         (Kastner Dep.): pp. 23-27, 32, 47-48, 118).

   b)    Took all steps necessary to get the games tested for internet gambling
         regulatory approval. (*Id.* at pp. 64-66).

-26-

54688

c)    Sought and obtained approval for the internet gambling version in four different regulatory jurisdictions, namely New Jersey, Gibraltar, Alderney and Canada. (*Id.* at pp. 38-40, 83-85); (App. A-38 (Kastner Dep.): pp. 109-110, 170-171, 174-176).

d)    Participated in making the infringing games available in its data center in the United States for copying onto ██████████████████ in the other respective jurisdictions. Made digital copies of the infringing games in the United States. Places unlicensed GC2 Games onto ██████████ used for each jurisdiction. IGTNV places unauthorized games ██████████████ (App. A-11 (Kastner Dep.): pp. 19-23, 58-62, 81, 96, 102-103).

74.    **Point #2: Partnering on the Code:** In regard to #2 of the diagram above, Appendix 2 of the Casino Partner RGS Agreements prove Defendants partner on technology. (App. A-125). IGT Defendants and their casino partners intentionally work ***together*** to insert computer code and functionality on the Casino Partner's website without which the GC2 Games could not be distributed from the IGT central server to the end user. (App. A-11 (Kastner Dep.): pp. 254-255: "What is it that IGT provides to the casino operator that allows the end user to click on an icon, the casino operator's website to trigger this distribution? A. They're described up here

██████████████████████████████████████████████████

75.    **Point #2: Partnering on the Casino Partner Website Graphic Display:** As reflected in the above diagram at #2, the Defendants' Casino Partners have a website where they use unauthorized artwork and graphics as a game icon for the purpose of displaying the availability of the unauthorized GC2 Games. (App. A-11 (Kastner Dep.): pp. 202-207); (App. A-1: ¶¶ 109-112); (App. A-123, 124). Both IGT and the Casino operator have to do something together for the Game icon to be displayed on the Casino operator website. (App. A-11 (Kastner Dep.): p. 205). IGT NV creates ████████████████ provided to and distributed to Casino Partners by IGT NV, by IGT Casino Lounge, and/or are made available through IGT website

54688

www.igt.com. (App. A-27(Shorrock Dep.): p. 35); (App. A-11 (Kastner Dep.): pp. 202-207, 224, 256-257); (App. A-37, 38 (Kastner Dep.): pp. 214-215).

76. **Point #2: Partnering on Marketing Materials:** IGT NV and International Game Technology makes available for distribution (through the customer only log in section of the website www.igt.com), numerous: a) infringing ███████████████; b) infringing ██████ of the unlicensed works; and c) infringing copies of ████████████ unlicensed GC2 works. The IGT.com website is owned by International Game Technology. (App A-38 (Kastner Dep. pp. 204-244, 207-210; 220-222); (App. A-40).

77. **Points #'s 3-6: Partnering on Mass Distribution of GC2 Unlicensed works:** IGT NV describes the process by which the artwork and graphics get from the IGT RGS central server to the end user device. (App. A-11 (Kastner Dep.): pp. 208-218). The RGS Server operates the same way in each location. (*Id.*)

78. As shown in the above diagram, an end user (#3 above) clicks on an icon on the Casino Partner's Website (#2 above). The code that was placed on the website by IGT (#2 above) sends ████████████████████████ has been made. The IGT Central Server sends ████████████████ directly to the end user. It does not get distributed through the casino website. (*Id.*)

79. **Point #6: Game Packet with GC2 graphics copied:** The ████████ with GC2 graphics is copied t████████ of the end user device. See #6 above. With each "spin" by the end user, the code on the end user device (#6) ████████████████████████████ ("RNG") (#6) letting it know to ████████████ end user device. (#6) The ████████ sent by ████████████████████████████████ of the device to display certain images on the screen in a certain way. (*Id.*)

-28-

54688

**C.** **Defendants' Partnering on Revenue Share:**

80.    Defendants share revenue from the exploitation of GC2 Games with their Casino

Partners, in allowable gaming jurisdictions (App. A-16 (Baker Dep.): p. 38) and:

    a)    The Casino Partners provide ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ at IGT.

    b)    Casino Partner information can and is accessed throughout IGT NV for various reasons including ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Amy Baker, of IGT's Accounting Department testified that: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.* at 57).

    c)    Casino Partner reports are available to IGT and IGT is able ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

81.    IGT's RGS partner agreements for New Jersey, Canada, Gibraltar, and Alderney

require that IGT ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (App. A-125); (App. A-126); (App. A-127); (App. A-128)(App. A-94: identifying "IGT Casino rgs partners.")

82.    IGT's RGS partner agreements for New Jersey, Canada, Gibraltar, and Alderney

also require that IGT ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (App. A-125); (App.A-126); (App. A-127); (App. A-128).

83.    IGT's RGS partner agreements for New Jersey, Canada, Gibraltar, and Alderney

require that the casino customers provide ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

54688

128); (App. A-125).[16] For example, IGT's November 2013 RGS Deployment Agreement with



(App. A-125).

IGT's RGS agreements sometimes require casino customers to ███████████ For example, IGT's Alderney RGS agreement with ████████████████████ ██████████████████████████████████████

84.     Through its RGS partner agreements with casino customers, IGT has received detailed financial statements showing ████████████████████████████████ ████████████████████████████ (App. A-125); (App. A-127); (App. A-128); (App. A-90 (Haffke Dep.): pp. 42, 67-70). IGT produced financial documents in this case showing ████████████████████████ (App. A-103).

### D.     Partnering on the Gaming Licenses Necessary to Distribute the Games:

85.     Gaming is a regulated industry and it would be a crime to distribute even regulatory tested and approved games in unauthorized jurisdictions.   (App. A-27 (Shorrock Dep.): pp. 136-137).   Operators in a legal gaming jurisdiction also must be an authorized operator with a license to distribute games. (*Id.* at 52).

---

[16] The terms of IGT's RGS agreements in Canada ████████████████████████████ ████████████████████████ For example, see (App. A-125 at IGTNV_244960).

-30-

54688

86.     Certain IGT Casino Partners are listed as "Approved Partners" and "Approved Websites" under IGT licenses.[17]

**E.      Joint Liability for Masque/Encore Profits, Intentional Acts and Partnering[18]**

87.     IGT NV and Masque admit that they have a relationship with each other for creation, sale, packaging, and distribution of games incorporating one or more of GC2's Works. (App. A-1: ¶50, 51, 60 )(App. A-2: ¶¶50-51¶; ¶60-61).   Copies of the Agreement between Masque and IGT NV can be found in (App. A-66).

**i)      Masque Hard Drive with GC2 layered files and Willful Blindness**

88.     Masque admits that it is an entertainment software publisher and developer located in Colorado. (App. A-2: ¶¶58-59).  Masque is sophisticated in this business.  Copies of GC2 artwork and graphics in the "Masque Hard Drive" have GC2's Marks on them. The art comes in different layers that can be turned on or off in illustrator. The IGT logo and GC2 logo were on different layered files. (App. A-64 (Wisler Dep.): pp. 86-87).

89.     Masque did not have any conversation with IGT regarding the fact that the GC2 logo appeared in some of the artwork and graphic files provided by IGT. (App. A-64 (Wisler Dep.): pp. 112-113). Masque admits knowledge of exclusive rights granted to Copyright Owners; (App. A-2: ¶100). Masque admits that it does not have a license from GC2. (App. A-2: ¶220).

---

[17]          See,         e.g.         Approved       partners       for       2016 https://www.gibraltar.gov.gi/new/sites/default/files/HMGoG_Documents/IGT_1.pdf  See Approved Partners for 2013 https://www.gibraltar.gov.gi/sites/default/files/docs/IGT.pdf .
[18] Defendants argue on page 27 that GC2 alleged DDI was responsible for Masque/Encore profits.  GC2 had not alleged that, and GC2 has very consistently identified IGTNV and Masque and IGTNV and Encore as the parties involved with those product lines (with IGT being the wholly owned subsidiary).  As these claims were not asserted, Summary judgment should be denied.

54688

ii) **Partnering By Sharing And Masque In Possession Of IGT NV Art Assets**

90.     IGT NV transmitted to Masque files containing names, artwork, and sound via an external hard drive. (App. A-64 (Wisler Dep.): pp. 40-46, 54-58). IGT NV's Steve Kastner testified by Rule 30(b)(6) and confirmed that Masque received art assets from IGT NV. (App. A-11 (Kastner Dep.): pp. 256-257). IGT NV further admits via its Rule 30(b)(6) witness that the copies of the GC2 artwork IGT NV gave to Masque are in the Bates range shown in Exhibit 165 (App. A-11 (Kastner Dep.): pp. 218-219) and those copies were produced in discovery. (App. A-64 (Wisler Dep.): pp. 40-46, 54-58).

iii)     **IGT NV Supervises and Controls Masque by Approving Games.**

91.     IGT had final approval on the final version of Masque games. (App. A-64 (Wisler Dep.): pp. 77-80).

iv)     **IGT NV Supervising and Controlling Masque Use on Packaging by Approving Packaging**

92.     Masque created its packaging for its products. (App. A-2: ¶154). GC2 artwork for Wild Goose Chase, Festival Fantastico, Lucky LionFish, Pharaoh's Fortune, and Kingpin Bowling have been copied onto Masque's packaging. (App. A-2: ¶¶156, 162, 166); (App. A-64 (Wisler Dep.): pp. 97-109). GC2's artwork and graphics on Masques' packaging is distributed to the public. (App. A-2: ¶155: Masque admits that some customers receive disks from Amazon or Masque in Masque packaging).

93.     Masque admits that the packaging shown in (App. A-2: ¶166) includes artwork for Pharaoh's Fortune and KingPin Bowling as those games are sold by Masque and the Maid of Money Game is also shown on the package. (*Id.*) The IGT Defendants admit that the packaging

54688

includes certain artwork for the games titled Pharaoh's Fortune and KingPin Bowling. (App. A-1: ¶166).[19]

### v) Masque/IGT Partnering on Look of the Game

94.     In order to develop the games, Masque artists start with the art and graphics produced by IGT NV. (App. A-64 (Wisler Dep.): p. 59.) A single game can ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮ (App. A-64 (Wisler Dep.): pp. 61-62). The goal was to make the games similar to the games on the casino floor. (App. A-64 (Wisler Dep.): pp. 69-70, 72). The agreement permits Masque to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

### vi) Masque CD/DVD's

95.     Masque admits that it sells the following CD's/DVD's:

- "IGT SLOTS WolfRun" that contains the games Wild Goose Chase and Festival Fantastico. (App. A-2: ¶157). Masque admits the images in (App. A-2: ¶158) contain images of Festival Fantastico when it is played.

- "IGT SLOTS Texas Tea" that contains the game Lucky LionFish as that game is sold by Masque. (App. A-2: ¶163). Masque admits the images in (App. A-2: ¶164) are screens leading up to the playing of the game Lucky LionFish as that game is sold by Masque.

- "IGT SLOTS Diamond Galaxy" that includes the games Pharaoh's Fortune and Kingpin Bowling. (App. A-2: ¶167). Masque admits that the images shown in (App. A-2: ¶168) are screens leading up to playing the game KingPin Bowling as that game is sold by Masque. Masque admits that the images in (App. A-2: ¶170) are images of screens leading up to playing the game Pharaoh's Fortune as that game is sold by Masque. Maid of Money also appears on this Disk.

---

[19] IGT's General Counsel Michael Prescott ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Paragraph 166 of the answer shows this is one work on the packaging and one game. IGT NV is representing to the Court in its Motion that Maid of Money is not a derivative work.

54688

### vii) Masque/IGT Partnering on Creation of Downloadable Version of Game

96.     Masque admits maintaining the website www.masque.com where it permits downloading games incorporating GC2 Copyrighted works and admits customers download Masque games off of Amazon website. (App. A-2: ¶'s 61 and 78).

### viii) Masque/IGT Partnering on Distribution and Display

97.     Masque admits it has a website that permits games to be ordered or downloaded. (App. A-2: ¶147). Masque admits that the items listed in (App. A-2: ¶148) are copies of its webpages offering Lucky LionFish, Festival Fantastico, Wild Goose Chase, Pharaoh's Fortune, KingPin Bowling and Maid of Money for sale.

### ix) Masque/IGT Partnering and Approval of License to End User

98.     Masque admits that the when an end user puts a CD containing Masque games into a PC or Mac, they are given a series of instructions to Copy the game onto a PC or Mac. (App. A-2: ¶ 172). IGT NV had final approval on the final version of Masque games and thus approved these instructions. (App. A-64(Wisler Dep.): pp. 77-80).

### x) Partnering with Encore

99.     The Court has stayed the case against Encore. The IGT Defendants admit that IGT NV has an agreement with WD Encore. (App. A-1: ¶67). WD Encore admits to a relationship with IGT NV and having an agreement with IGT NV relating to GC2 games. (App. A-3: ¶¶50-51).

100.    The IGT Defendants admit that WD Encore sells and distributes copies of games by physical CD/DVD from WD Encore's website and from other websites, such as Amazon, that GC2 alleges include images GC2 claims are GC2 Copyrighted Works. (App. A-1: ¶68).

101.    WD Encore admits that it sells software packaged products. (App. A-3: ¶65). WD Encore admits that it maintains a website, www.encore.com, which permits end users to download GC2 games and that (App. A-114-115) are printouts from their website. (App. A-3: ¶66).

102.    WD Encore admits to selling copies of GC2 games by physical CD and by encore website and amazon website. (App. A-3: ¶68). WD Encore also admits that (App. A-73) are pictures of games sold by CD by Encore).

103.    WD Encore admits to selling games through Amazon, and that Exhibits 66 and 67 are screen shots of games Encore offered on Amazon.com. (App. A-3: ¶177). WD Encore admits that the image in paragraph 178 is picture of front and back of Encore Packaging. (App. A-3: ¶178).

104.    WD Encore admits that when a consumer end user puts a disk in computer they are provided with instructions to copy the games onto P.C. (App. A-3: ¶179) and that it does not have a license from GC2. (App. A-3: ¶231). WD Encore admits that it has the right and ability to supervise the content on its website. (App. A-3: ¶286).

F.    **DoubleDown Interactive Partnering Post Sale**

105.    DDI refers to IGT as DDI's Partner.  (App. A-20: (Sigrist Dep.): pp. 217-218:
                                                                          ")

106.    DDI identified a press release given by DoubleU wherein DoubleU refers to its relationship with IGT as a deep and valuable accreditive partnership. (App. A-74).  When a DDI Company representative was presented with the Game Development Agreement (App. A-133), the DDI representative stated, "This is the Agreement that defines the partnership that was referred to in the press release." (App. A-19 (Sigrist Dep.): p. 223).

-35-

54688

107. DoubleDown Casino is distributed by Defendants through servers they lease through Amazon Web Services. Defendant DDI has ███████████████████ IGT NV and IGT have ████████████████ App. A-22: Signed by Renato Ascoli in April 2017) ███████████████████████████████████

██████; (App. A-23: dated May 31, 2017, signed by Renato Ascoli wherein ████████████████████████████████████████; (App. A-16 (Baker Dep.): pp. 277-278, 298); (App. A-19 (Sigrist Dep.): pp. 269-270); (App. A-20 (Sigrist Dep.): pp. 112-113).

108. In April 2017, after the lawsuit was filed, IGT Parent "sold" its shares of DDI to DoubleU Diamond. (App. A-22: Signed by Renato Ascoli dated April 2017 wherein sole and ████████████████████████████████████████); (App. A-23: dated May 31, 2017, signed by Renato Ascoli wherein IGT NV's sole and exclusive ██████████████████████████████

109. IGT Parent's "Purchase Agreement" had, as a material part, a required ███████ ████████████████████████████████ (App. A-22: pp. 5, 16 at § 2.04); *See also* (App. A-23).

110. As part of this "sale" and "licensing" arrangement, International Game ████████████████████████████████████████ (App. A-22: p. 73 at § ████████████████████████████████████████

54688



111. The "License Agreement" (a required part of IGT's sale) made co-Defendant IGT

112. The Purchase Agreement between DoubleU Diamond LLC and International Game Technology (IGT Parent)

(eee)).

113. The Amazon Web Services servers are where unauthorized GC2 art and graphics are for the unauthorized Coyote Moon, Pharaoh's Fortune and Kitty Glitter DoubleDown Casino version of the GC2 Games hosted in the form of "Sprite Sheets." (App. A-25A); (App. A-25B);

114. IGT Parent's "Purchase Agreement" also required, as part of the required License Agreement, contains the false

-37-

representations regarding ownership and right to license the end user. (App. A-23: pp D-1 through D-12).[20]

115.   Renato Ascoli, wearing his IGT Parent hat, signed the Purchase Agreement on behalf of the IGT Parent.   (App. A-22). Renato Ascoli, thereafter wearing his IGT NV hat, signed the License Agreement on behalf of IGT NV.   (App. A-23). After that signature, IGT NV continued its active participation in the infringement of the GC2 works.

116.   The Game Development, Distribution and Services Agreement between IGT NV (Licensor) and DoubleU Diamond LLC   (which was entered into as ▮▮▮▮▮▮▮▮▮▮▮▮▮▮



distribution channels. (App. A-22: p. C-2 at § 3.1).

---

[20] Defendants Partial Motion for Summary Judgment (p. 48) erroneously claims there is no evidence linking IGT or IGT NV to the terms of use found on DDC.

54688

118.   DoubleDown Casino is distributed through servers leased by DDI from Amazon Web Services. (App. A-16 (Baker Dep.): pp. 277-278, 298); (App. A-19 (Sigrist Dep.): pp. 269-270); (App. A-20 (Sigrist Dep.): pp. 112-113).

### G.   DDI Liable For Profits of Service Providers (Misdescribed As "Payment Processors")

119.   Defendants partner on technology, as they are responsible to provide the content and the code, and DDI considers service providers partners.  (App. A-24 (Sigrist Dep.): pp. 344, 349-350: ( ▮ as an ad partner); 357: ( ▮ as an ad partner to secure new players); 363-364: ▮ as a processing partner); 366: ▮ a processing partner); 392: ▮ as a partner)

120.   DDI has written license agreements with service providers to distribute their mobile Apps (*Id.*) and shares revenue with them and these license agreements evidence defendants' intentional acts with the service providers. (App. A-134: ▮ ); (App. A-135, 136: ▮ ); (App. A-137: ▮ ; (App. A-138: ▮ App Distribution); (App. A-139: ▮ ).

### H.   Recover for Disgorgement of Gain on Sale of DoubleDown

121.   An IGT press release reveals that the purchase price agreed between IGT and DoubleU was based on 2016 earnings from the time of the sale and in specific states: "The cash purchase price is $825 million, which represents 10.5x DoubleDown's full-year 2016 Adjusted EBITDA." (App. A-74). DoubleU's CEO, Ga-Ram Kim, claimed that the transaction represented "a unique and value accretive-partnership combining the operational excellence of DoubleU Games with IGT's world class slot content."  Since the games at issue comprise part of DoubleDown Casino's game offerings and the revenues generated on those games drove the transaction price, it is clear that these games are causally connected to the transaction. *Id.*

54688

122.    IGT produced documents showing that ██ % of DoubleDown's revenue for 2016 was the result of the GC2 Games at issue. (App. A-103: p. 148).  Expert analysis was conducted to show that individual games do not generate different levels of supporting expenses and therefore it is reasonable to assume that ██ % of DoubleDown's Adjusted EBITDA is likewise due to the GC2 Games. (*Id.*)  Since the DoubleDown sale price was calculated based on its 2016 Adjusted EBITDA, then ██ % of the sale price was derived from profits GC2 Games generated. Thus, there is a clear nexus between the amount received by IGT from the sale and the alleged infringement of the games at issue.  (App. A-102: pp. 84-87); (App. A-103: pp. 147-149; Exh. 9).

123.    DoubleU ████████████████████████████████ ████████████████████████████████████ App. A-22). The license agreement for the rights to the games and the purchase agreement for ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

124.    The DoubleDown book value at the 2012 purchase was the capitalized purchase price of ██████ million (as shown in (App. A-140: 95)) and the book value at the time of the 2017 sale was ████████ (App. A-103).

## VI.    UNAUTHORIZED DOUBLEDOWN CASINO WORKS

### A.    Non-Wagering Use Game

125.    Using the artwork and graphics from the interactive games, IGT NV and DoubleDown Interactive made a version for Social Gaming (non-wager use) on the DoubleDown

54688

Casino. (App. A-27 (Shorrock Dep.): pp. 145-149); (App. A-52 (Clelland Dep.): pp. 198-199). IGT NV Supplemental Answer to Interrogatory No. 14, 15.

126. As part of the process, Sprite Sheets also were created using GC2 artwork and graphics. (App. A-25A); (App. A-25B); (App. A-25C).

127. On September 14, 2018, Defendants' Counsel confirmed that Sprite Sheets produced were uploaded to the AWS server. (App. A-146).

128. The layouts of the GC2 copies on the Sprite Sheets are necessarily different than the "copies" of the Display and "copies of the "performances." Below is a chart of screen shots Defendants produced for the Mobile version of GC2 Games. Compare with Sprite Sheets that were made using GC2 artwork and graphics. (App. A-25A); (App. A-25B); (App. A-25C). (App. A-59: ¶¶ 51-59). See, below generally.

54688



129.    IGT NV provided DoubleDown Interactive with access to the graphics and artwork for Pharaoh's Fortune, Coyote Moon and Kitty Glitter used on IGT's Interactive platform. (App. A-52 (Clelland Dep.): pp. 114-115); (App. A-116).  Defendant DDI represented that it produced art and graphic files in their possession.   They were required to produce a witness knowledgeable about their use, but the witness came unprepared and did not review the files. (App. A-24 (Sigrist Dep.): pp. 313-327).

54688

130. No steps were taken to make sure IGT had rights to give the artwork and graphics. (App. A-52 (Clelland Dep.): pp. 115, 122).

**B.   DoubleDown Casino Technology**

   **i)   Amazon Web Services**

131. Amazon offers connectivity and computer services through Amazon Web Services, commonly referred to as "AWS." One AWS service is known as Simple Storage Service, or S3, which allows customers to place files for storage on AWS infrastructure. (App. A-59: ¶¶ 33-40).

132. DoubleDown Casino is operated through an S3 account at Amazon Web Services. (App. A-20 (Sigrist Dep.): p. 113: Amazon Web Services is essentially the environment owned by Amazon that we use to ██████████████████████████████████████ ███████████████████ of DoubleDown Casino.)

133. With respect to the DDC App version[21] (and Defendants' incorrect contention on page 43 that they are not responsible for updates to the App), according to DDI's agreement with ████████ regarding the distribution of the App, the "Content" of the App is defined to be Defendants' material (not ████████, and the upgrades and versions are Defendants acts (not ████████). (App. A-24 (Sigrist Dep.): pp. 401-406); (App. A-138: App Distribution Agreement with ████; (App. A-59: ¶¶74-83).[22]

134. **Mobile Distribution:** Forensic examination revealed that Sprite Sheets for the GC2 Games were placed by Defendants onto the S3 server at Amazon Web Services. An example of a single Sprite Sheet for Coyote Moon (IGT NV 244762) is shown on the left, and

---

[21] "Apps" are software applications, games, and other digital products of Defendants that Defendants submit to service providers like Amazon for sale, distribution or promotion" through Amazon.
[22] Other service provider agreements have similar provisions and requirements.

54688

for Pharaoh's Fortune on the right. Sprite Sheets for each GC2 Game can be seen at (App. A-24A-C); (App. A-59: ¶¶40-41).



135.    Sprite Sheets are used in conjunction with computer code provided by the ▮▮▮▮▮ (controlled by IGT NV) to instruct what quadrants on the Sprite Sheet to locate and copy in order to create a copy for display during a performance of the GC2 Game. (App. A-59: ¶¶51-59).    IGT and IGT NV control the ▮▮▮ Servers and the ▮▮▮ that is responsible for the display.

136.    DDI Answer to Interrogatory No. 3 represents that IGT provides the Copyright Management Information reflected in the screen shots it produced (App. A-142).    The layered files show the layer called "IGT legal" indicating IGT's participation in the acts of providing. (See, for example, App. C-30, 38-39, 44-45) (App. A-100).  See also, (App. A-59: ¶¶25-26).

137.    **Step 1, The App Store:**  Each platform has an application store where a consumer can locate and ask to download the DoubleDown Casino App.  There is information here at the point of download that identifies DDI as the provider. (App. C-5-6).  There is also a link to a "license" and "privacy policy."  The "License" is the terms of use. The terms of use at the time of filing the Complaint are attached as (App. A-89: 49, 51, 81-88) and are admitted in the Defendants Answer (App. A-1).  The display page looks like this:

-44-



138.   The "terms of use" is a contract between the consumer end user and DDI. It represents that DDI or its "licensors" own all the content (including the artwork and graphics) and that DDI is licensing the end user.  Under the DMCA, "links" to author, owner, terms of use, is within the definition of Copyright Management Information.  17 U.S.C. §1202(6).

139.   <u>**Step 2, Initial Download but before the Application is open on the phone:**</u> When a consumer downloads an app from the App Store for the first time, what gets distributed/downloaded (out of view of the consumer) to the phone/tablet is a package of computer code and "mobile tournament slots lobby page sprite sheets" containing GC2 graphics. (App. A-59: ¶¶ 21-22); (App. C-7, 10-14). The screen display on the phone or tablet is simply an icon for the App. (App. A-59: ¶ 60).

54688

**Out of View:** computer code and mobile tournament slots lobby page sprite sheets with unlicensed GC2 Pharaoh's Fortune and Coyote Moon Artwork and Graphics, App. C-7, 11).

**Display View:** on the Screen of phone or tablet



GC2's work

GC2's work



*See also* (App. A-59: ¶ 22).[23]

140.    Defendant DDI did not appear prepared for their Rule 30(b)(6) deposition to discuss any of the specific graphics they produced. (App. A-24 (Sigrist Dep.): pp. 313-327). (App. C-18); (App. A-117) was produced as a native PSD file and appears to be the native for the lobby graphics tournament sprite sheets.  Below is a screen shot of images in the native file. The images show copies of GC2 graphics.

---

[23] The purpose of the code placed on the end users device is to provide DDI with a device (software code) on the end users device to update the content displayed to the consumer and to provide a device which permits acts of infringement on the device. (App. A-59: ¶ 72).

54688



(App. C-8); (App. C-9); (App. A-60).

141.   **Step 3, Opening the App to reach the Lobby Page**: When end users open the DoubleDown Casino, they begin with the DoubleDown lobby page, which contains icons representing each game available on the casino. (App. A-52 (Clelland Dep.): pp. 146-147); (App. C-29); (App. A-99). Clicking on the screen icon "opens" the App and the Game Lobby appears on the screen. (App. A-59: ¶ 70); (App. C-1, 13 (Desktop), 14 (Mobile)). Below is the screenshot of the **Mobile version of lobby**.  GC2 Graphics appear on the display.

-47-

54688

Similarly, the below images are screen shots produced by Defendants of the lobby graphics for the mobile version of the DoubleDown Casino. (App. A-58.)



Game Lobby Graphics Mobile

Coyote Moon Lobby Icon (App. C-14); (App. A-51, 111).



Pharaoh's Fortune Lobby Icon (*Id.*).



GC2's Games

Kitty Glitter Lobby Icon (*Id.*).



-48-

142. The images below depict screen shots of the **desktop version** of the DoubleDown lobby page showing the game icons for Coyote Moon, Kitty Glitter, and Pharaoh's Fortune. (App. A-56); (App. A-57).



54688



143.    Unlicensed GC2 images can be seen in the images of the **Mobile Lobby screen**. In addition, the upper right hand corner of the screen display is a small square with three lines and a forensic examination reveals that the computer code (outside the view) conveyed in connection with these images contains a link to the terms of use. (App. A-59: ¶ 73); (App. A-142).

144.    **Step 4, clicking Lobby icon for a GC2 Game and reach loading pages**: The user clicks a game icon to select and play a particular game. (App. A-52 (Clelland Dep.): pp. 136, 145, 149).

54688

145.    When an end user clicks on a displayed GC2 graphic representing a Lobby icon for a particular GC2 Game, the software code (digitally signed by DDI and placed on the end user device) sends a communication out to the IGT/DDI Amazon Web Servers to copy a certain game packet (containing another set of Sprite Sheets with unlicensed GC2 graphics and IGT computer code) that can connect with the math server at the IGT/DDI S3 Amazon Web Services account (controlled by IGT/DDI).  (App. A-59: ¶¶ 41-44); (App. C-2-3).

146.    There are things happening out of view of the consumer that are different from the display on the screen. The computer code contains the text of the copyright management information and instructions to display the IGT logo with the images on the loading screens.[24] There is also a link to the terms of use. (App. A-59: ¶ 46); (App. A-142).  GC2 contends this is false CMI which is conveyed in connection with the GC2 graphics for the game.  GC2 will illustrate it below.  (App. A-59: ¶ 46); (App. C-2).

---

[24] This evidences IGT NV and DDI acting jointly to provide and distribute false CMI.

54688

| Sprite Sheet Copies Conveyed Out of View: Example when Pharaoh's Fortune Game Selected. See (App. C-18, 49; App. A-25B, A-117) for each Pharaoh's Fortune Sprite Sheet produced | Copies Conveyed In View and Displayed on Screen: Pharaoh's Fortune Game Selected Loading pages Screen Shots Pharaoh's Fortune Mobile. See (App. C-20). |





**(App. C-20).**





**(App. C-20).**

### ii)    Unauthorized Loading Pages

147.    When an end user selects a game icon, they are taken to certain loading pages for the selected game, and then to the game itself. (App. A-53(Clelland Dep.): pp. 166-169, 136, 145, 149). To illustrate this process, the images below depict the loading pages and gameplay screen for Pharaoh's Fortune on the mobile and desktop versions of DoubleDown Casino. These images appear from the point of selection of the game in the lobby up to the time the game appears on the screen for play. (App. A-61); (App. A-62) (App. C-3) (App. A-59: ¶ 70); (App.

-52-

54688

A-59). The IGT/DDI code instructs what Sprite Sheet images to copy in order to create the displays. (App. C-19-20 (Desktop and Mobile loading pages of Pharaoh's Fortune); App. C-33-34 (Desktop and Mobile loading pages of Coyote Moon); App. C-42-43 (Desktop and Mobile loading pages of Kitty Glitter).

148. The computer code gives instructions to copy the IGT logo and place it on Pharaoh's Fortune loading page graphic, and the code has the copyright information text to convey in connection with this image. (App. A-59: ¶¶ 22, 26). There is no GC2 Mark. (App. C-18-25); (App. A-117).

149. Defendants add incorrect CMI here resulting in the IGT logo and the false attribution line on the bottom both of which are separate DMCA violations and are conveyed in displays and performances by IGT/DDI code only when the game is launched. (App. C-2-3, 18-25, 32-36, 41-43 and 48); (App. A-117). Because of the way this technology is set up, the statutory damages are per game launch. See also removal discussion below.

Sprite Sheet Copies Conveyed Out of View: Example when Coyote Moon Game Selected. See (App. C-54, A-25A) for each Coyote Moon Sprite Sheet produced

Loading pages Screen Shots
Coyote Moon Mobile



(App. C-54).



(App. C-34); (App. A-51).

-53-

 

CONFIDENTIAL                    IGTNV_244778

(App. C-54).

150.    The computer code gives instructions to distribute the Coyote Moon loading page graphic, and the code has the copyright information text to convey in connection with this image. (App. A-59: ¶ 85); (App. C-2, 3, 32-34, 36).

151.    Forensic examination shows what is conveyed in connection with the loading page images include computer code and imbedded in the code is the copyright notice and a link to the terms of use. (App. A-59: ¶ 85). DDI digitally signs the computer code. (*Id.* at ¶ 85). Both are conveyed in connection with the copies that appear on the Sprite Sheets. (*Id.* at ¶¶ 51-59).

152.    Because this is also a separate game where the Sprite Sheet copies and display copies are only provided or distributed when this game is launched it is a separate DMCA violation with each game launch. See also removal section below and (App. A-59).

-54-

Sprite Sheet Copies Conveyed Out of View: Example when Kitty Glitter Game Selected. See (App. C-41, 59, App. A-25C, 117).

Loading pages Screen Shots Kitty Glitter Mobile (App. C-43).




(App. C-41), (App. A-117).




GC2 includes screens for Kitty Glitter here because there is evidence of removal of GC2 Mark from the loading page image that will be addressed below in the removal section. (App. C-2, 3 41-43 and 48).

153.   **Step 5, during game play:** The Sprite Sheet images for the particular GC2 Game is provided and copied onto the cache of the end user device with a link to the terms of use. While the display shows a drop down menu in the upper right hand corner, the copies in cache have the link to the false Terms of Use provided with the copies in the sprite Sheet. (App. C-4, 49-53 (Pharaoh's Fortune)(C-4, 54-58 (Coyote Moon)(C-4, 59-63 (Kitty Glitter)).

154.   During a "spin" computer code sends a message back to the Amazon Web Server holding the "math." This server sends back code saying display these certain images at this time.

54688

What occurs on the device is that certain images are copied from the Sprite Sheet and displayed on the screen to create the performance. As shown in the Game Development Agreement, the math server is controlled solely by IGT NV. The link to the terms of use are present with and provided with the copies in Cache, and the link to the terms of use are provided with the copies of each display. (App. A-59: ¶ 85); (App. C-4, 49-53 (Pharaoh's Fortune) (C-4, 54-58 (Coyote Moon) (C-4, 59-63 (Kitty Glitter)).

155.    Because of the unique set of combination of images that exist with each spin due to the random number generator, each display is different.[25]  (App. A-59: ¶ 30).

## VII.    THE KITTY GLITTER ISSUE

### A.    The Kitty Glitter and Maid of Money Issues Generally.

156.    Defendants themselves identified Kitty Glitter and Maid of Money as GC2 Games used by Defendants as part of the "gap in rights" analysis. (App. A-1: ¶3); (App. A-15(Nash Dep.): pp. 129-134).  IGT Defendants mark the Kitty Glitter derivative land based game with GC2's Mark.  (App. A-1: ¶89); (App. A-7). Defendants now claim Kitty Glitter derivative land based game with GC2's Mark is not a derivative of GC2 games.

157.    IGT Parent, IGT NV and DDI admit that under paragraph 3.1 of the Agreement GC2 agreed to *develop games for IGT NV*.  (App. A-1: ¶22).

158.    The Agreement describes what "common elements of a slot machine game" are: Each GC2 Project shall include such video graphics and artwork commonly incorporated into a video reel gaming machine including interface, bonus round, game symbols, screens (help, attendant, and pay) and various animations. (App. A-1: ¶85).

---

[25] GC2 submits that a separate DMCA violation is proper at this stage because the sprite sheets and display are conveyed with the link to the false terms of use.

54688

159.  The IGT Defendants further admit that ***all of the games referenced in paragraph 24 of the Amended Complaint*** relate to IGT NV's contractual relationship with GC2. (App. A-1: ¶44). The GC2 Games, Kitty Glitter, and Maid of Money which Defendants discuss in their partial Summary Judgment Motion, are listed in paragraph 24 of the Amended Complaint as are 28 other GC2 games. (*Id.*); (App. A-1: ¶24). Each has a different expression of these common slot machine elements. See e.g. images from GC2's Coyote Moon, Pharaoh's Fortune and Kitty Glitter Games.

**COYOTE MOON**      **PHARAOH'S FORTUNE**      **KITTY GLITTER**







**B.**    **IGT Provides a Math Structure; GC2 Designs and Creates a Game**

160.  Currently employed by IGT, Edward Jankowski was formerly an art director at GC2 who designed the original GC2 Kitty Glitter Game. (App. A-55 (Jankowski Dep.): pp. 11, 13, 15-17). IGT asked GC2 to create a game with a particular math model that would be known as the original Kitty Glitter. (*Id.* at 182).

161.  IGT provided a math PAR sheet to GC2. (*Id.* at 186).

54688

162.    A PAR sheet is the expression of the math and how it works; it defines the hit rate and frequencies of symbols landing on the screen.    (*Id.* at 18).    The PAR sheet has representations of the symbols.  (*Id.* at 18-19).  The major symbols represent the "chase" for a game and are indicated on the PAR sheet as M1, M2, M3, M4.  (*Id.*)

163.    The "chase" is a set of symbols that drive wins and losses and lures a player into putting more money into a game or, in the social context, wanting more chips or credits.  (*Id.* at 57-59).

164.    Employed by DDI, Rogelio DeCasa was formerly the game designer at IGT who created the math and led the team in the development of the land based Kitty Glitter game. (App. A-9 (DeCasa Dep.): p. 18).  The math dictated what symbols pay and what features, such as a bonus, are in the game.  (*Id.* at 48-49).  It identified major and minor symbols, "[b]ut not that the major symbol must be a picture of X."  (*Id.*)  IGT did not show GC2 how it wanted GC2 to make the game Kitty Glitter.  (App. A-55 (Jankowski Dep.): p. 182).  It did not provide direction on how to make the game or on the artwork and graphics.  (*Id.* at 183).  GC2's creative team looked at the math to figure out what the game needed and to fit the graphics into that form.  (*Id.* at 57-59, 187).  The artwork and graphics are a really important part of the game.  (*Id.* at 59-60).

165.    GC2's creative team designed the direction of the game, conceived the symbols, characters, specific character aspects, animations, and scheduled milestones to create the game. (*Id.* at 187-189).  GC2's creative team created the base game interface, laid out symbol sizes, and the symbol matrix, determined whether there would be a gutter between the reel strips and pay line indicators, and designed the pay line lines.  (*Id.*)  They captured the design of "every single major piece of a gambling machine…."  (*Id.*)

-58-

166.    GC2 selected the minor symbols as "… the royal set, Ace through 9." (*Id.* at

198). The letters A, Q, J, K and the number 10 was art that GC2 created and it was a "design

parameter that designers liked more than fruits or cherries or bananas or some other symbol that

doesn't look as elaborate as the major symbols." (*Id.* at 197-199).   Royal symbols were not

dictated to be used when GC2 created the Original Kitty Glitter game.  (App. A-9 (DeCasa

Dep.): pp. 106-107).



Examples of the GC2 Kitty Glitter minor symbols, the Royals.  (App. A-144).

167.    For the major symbols, GC2 decided on kittens (App. A-55 (Jankowski Dep.): p.

189).  It decided to feature four different types of cats: a white one; a Siamese cat; an orange

tabby cat; and a gray/brown tabby.  (*Id.* at 200-201).  They appear variously facing forward,

sitting up, at play, and featuring the animal's whole body, with the term WILD below their head

as the bonus symbol, or below their whole body in the bonus collection feature when the symbol

is turned wild.

Bonus

   

-59-



Bonus Symbols Turned Wild

Regular Play

Bonus Collection Feature

Bonus Collection Feature Turned Wild

Examples of the major symbols, the Cats. Bonus symbols excerpted from bonus play video from submission to US Copyright Office; regular play symbols shown here are copies of separate images - excerpts from (App. A-144).

168. GC2 designed the base game interface, making choices about symbol sizes and other features (App. A-55 (Jankowski Dep.): p. 188).

54688



 

The base game interface and selected symbols from submission to US Copyright Office; excerpt

from (App. A-144).

169.   Once the base game was done, GC2's creative team:

- started designing the free spin bonus and other items such as the math boxes, payout screens, and bonus screens. (App. A-55 (Jankowski Dep.): pp. 187-189).

- made deliberate choices about the bonus interface including putting the four cats at the top. (*Id.* at 200-201).

- chose diamonds as the collection feature next to the major symbols at the top of the bonus interface. (*Id.* at 201-202).

- decided on a bowl as a bonus symbol. (*Id.* at 202, 203).

- elected a "Pretty Kitty Bonus" symbol. (*Id.* at 202).

- decided to put diamonds along the sides of the frame. (*Id.*)

- added sparkles to the letters – "[t]o make it look more wealthy. So this is a kitten game, and it's a wealth game. ...  Glitter is sparkly so that's why we did that." (*Id.*)  The GC2 creative team decided to put diamonds on top of the "i" letters in the title, "Kitty Glitter." (*Id.*)

-61-

54688

- chose to put the four cats at the top of the interface as a bonus collection feature and created the artwork and graphics for those characters. (*Id.* at 199-200).

- decided to add diamonds at the top by the four cats to serve as the bonus collection feature and designed the associated artwork and graphics. (*Id.* at 201). It was a lot of work to create the working Kitty Glitter game, "[i]t was a big game." (*Id.* at 193).



GC2 Bonus Play Interface

170. GC2 decided to add animations for the kittens throughout the game. (*Id.* at 187). Getting three of the Pretty Kitty Bonus Symbols in the second, third, and fourth reel will initiate the free spin bonus. When the diamond appears in the fifth reel, the diamond glows and spins and the word WILD and BONUS spin around the turning diamond. (App. B-1A-C).

171. In the bonus interface, getting three bowls initiates the re-trigger feature – earning extra spins. The bowls splash white milk and the words PRETTY KITTY BONUS appear across the symbol frame; the words flash and bounce inside the frame of the symbol box. (App. A-5A).

172.     Then the Free Spins Announcement appears on the screen – it appears in white and purple letters with a blue background.  In the bonus round, the diamond in the fifth reel it triggers the diamond collection feature.  The diamond symbol glows, the cat in the collection feature above the interface that will receive the diamond glows, and then the first diamond in the collection feature next to the first cat above the interface lights up (*Id.*)



173.     Once the three diamonds are populated, the respective cat turns wild – the collection cat spins, changes its attention and the word WILD appears underneath.  Then the collecting continues in the same manner with the rest of the cats. (App. B-1A-C).

   

174.     When the bowls line up, they spin, splash white milk around, the symbol frame changes color, the words PRETTY KITTY BONUS move around the symbol screen. *Id.*




*Id.*

175.     Other creative choices GC2 made included how to design the pay lines, the backgrounds, the animations, and the information aspects of the game.

Pay Lines for the Base Play and Bonus



Patterned Backgrounds for the Base Play and Solid Backgrond for the Bonus. *Id.*



The heirarchy and value of the symbols. *Id.*



The bonus collection feature at the top of the interface. *Id.*



The bonus interface. Bonus symbols, bonus collection features, and pay line designs excerpted from bonus play video and images from submission to US Copyright Office. (App. A-144); (App. B-1A-C).

-64-

54688

### C. GC2 Delivers Original Kitty Glitter Game to IGT, IGT Copies and Adapts It for Land Based Use, Making an Authorized Derivative Work Which is Substantially Similar to the Original Kitty Glitter Game.

176. GC2 delivered the original artwork and graphics it had created with a working game disk of the Original Kitty Glitter game to IGT in 2005. (App. A-55 (Jankowski Dep.): pp. 35, 43-44, 192, 197-98). GC2 gave IGT "everything they needed to create a game. … 99.9 percent of everything that they needed to create a game was delivered to them with the working demo." (*Id.* at 192-193). (App. B-1, A-C); (App. A-9 (DeCasa Dep.) pp. 75-76, 164-90).[26]

177. IGT used GC2's artwork and graphics from the delivered GC2 Original Kitty Glitter game and created a prototype game. (*Id.* at 55). It put that artwork and graphics into the prototype and played the game. (*Id.* at p. 56, 58-59).



(App. B-1A-C)

178. Later, IGT determined that it wanted the artwork and graphics to be "realistic" looking and decided to change the artwork. (App. A-9 (DeCasa Dep.): pp. 24-26). IGT assigned Kurt Anderson from the art department, and his manager, Jack Liddon, to revise the graphics on the Kitty Glitter game. (*Id.* at 216-217). All the game design department, the project managers, the artist, the technical artist, the math team, and the prototypers reviewed the GC2 artwork and graphics for the Original GC2 Kitty Glitter Game. (*Id.* at 212-214). Anderson saw the state of the Original GC2 Kitty Glitter Game. (*Id.* at 229-230). IGT reviewed GC2's artwork, and using the same game structure and symbol choices, revised that artwork. (*Id.* at 59-60).

---

[26] GC2 has asked that this disk be supplied to the Court. Defendants refused that request. A "copy" of the Disk has been represented in (App. B-1, A-B). GC2 has not been allowed an inspection of the original to insure that this representation is accurate. Mr. DeCasa testified that he had in his possession and used this disk while at IGT and took the GC2 disk with him when he went to work for DoubleDown. (App. A-9 (DeCasa Dep.) pp. 77-82). DeCasa worked at DDI after IGT NV and at the time DDI was creating a Kitty Glitter DeLuxe game.

54688

179. DeCasa told the IGT artists, "hey guys, we need to change up this art, let's make it more realistic. And they asked for more details and like you guys figure it out." (*Id.* at 64-65). DeCasa did not actually observe the artists and see what they did to change the artwork. (*Id.*) He did not know whether the artists copied portions of GC2's artwork and graphics. (*Id.*) He did not know how the artists created any of the artwork and graphics for the Land Based Kitty Glitter Game. (*Id.*) The math did not dictate what artwork and graphics were used. (*Id.* at 69-70). Yet, there were constraints on that creative process. (*Id.* at 65-67).

180. Within a much shorter time than it usually takes to create a game as complicated as Kitty Glitter, IGT finished the land based Kitty Glitter Game and distributed it to casino floors. (*Id.* at 218-220: "Four months to develop art is a short time back then, yes."); (App. A-55 (Jankowski Dep.): p. 193: "It was a big game"). IGT put GC2's Mark on the land based Kitty Glitter Game that it distributed to casinos. (*Id.* at 180-181). The GC2 Mark remains on all the land based Kitty Glitter Games on casino floors today.

181. Comparing the land based Kitty Glitter Game to the GC2 Kitty Glitter artwork and graphics, there is a white cat, a Siamese cat, a bowl. (*Id.* at 203). There is a "Kitty Glitter" symbols square. (*Id.* at 203-204). The minor symbols as royals are similar. (*Id.* at 204). The symbol matrix frame, the pay line indicators are decorated by colors, diamonds, sparkles, or rectangles. (*Id.*) There is a diamond above the "i" in the words Kitty and Glitter. (*Id.* at 205). There are the same types of cats, the same letters, sparkles on the letters. (*Id.*)

182. When Mr. Jankowski was asked about the bowl symbol, he replied, "the bowl is obvious repurposing." Asked if it is a derivative, he responded, "yes." (*Id.* at 205-206). The use of the "Kitty Glitter" as a bonus in a square is the same as originally delivered by GC2.

183. Mr. DeCasa confirmed that Anderson was not required to put sparkles on the royal set. (App. A-9 (DeCasa Dep.): pp. 234-235). He was not required to keep the same special symbol for the collection feature – it wasn't required to be a diamond. (*Id.* at 235). Anderson was not required to have the shape where the collected symbol appears be a diamond. (*Id.* at 235-236). He wasn't required to use a bowl as a collection symbol. (*Id.* at 236). Anderson did not have to make the bowl the retrigger symbol. (*Id.*) Ultimately, DeCasa said that IGT simply required the art department to transform a cartoony version into a more realistic version. (*Id.* at 236-237).



-67-



(App. A-7).

184. Hitting three bowls initiates the free spin bonus. The bowls splash white diamonds and the words BONUS! and INITIATED appear across the symbol frame; the words flash and expand and light crosses the symbol box. (App. A-7).


(*Id.*)


(*Id.*)


(*Id.*)

185. Then the Free Spins Announcement appears on the screen – it appears in white letters with pink and purple borders and a blue glow behind the letters while highlighted by sparkles. (*Id.*) When the diamond appears in the fifth reel, the diamond glows and the word

-68-

WILD appears across the diamond. This triggers the diamond collection feature. The diamond symbol glows, diamond flies up to the spot in the collection feature next to the first cat above the interface. (*Id.*)

 

(App. A-7).

186. Once the three diamonds are populated, the respective cat turns wild – the symbol in the interface glows, the word WILD appears underneath and flashes. Then the collecting continues in the same manner with the rest of the cats. (*Id.*)



187. When the bowls line up, they spin, splash white diamonds around, the symbol frame changes color, the words BONUS appear across the symbol screen. (App. A-7).

 

-69-

**D.     IGT and DDC Copy the Original Kitty Glitter Game and the Land Based Game and Adapt Them; Making Unauthorized Infringing Works.**

188.    Mr. Jankowski, the original artist for GC2, agreed that the <u>online</u> version of Kitty Glitter bears many similarities with the GC2 artwork, answering "yes" to whether the bowl is a derivative work.  (App. A-55 (Jankowski Dep.): pp. 205-206).  He agreed that the letters are the same, the sparkles are the same, and the cats are the same as GC2 originally delivered.  (*Id.* at 205).

189.    Mr. DeCasa, who directed the math for the land based Kitty Glitter Game at IGT and later moved to DoubleDown, and was responsible for creating the DoubleDown Kitty Glitter Dynasty Edition game for <u>social gaming</u>.  (App. A-9 (DeCasa Dep.): p. 287). He acknowledged that he pulled artwork and graphics from the ███████████ server (where the original GC2 Kitty Glitter files and prototype were housed) (*Id.*).

54688

### E.   COMPARISON CHARTS:

190.   The Major Symbols. Comparison of (App. A-7) with (B-1A-C):

| GC2 | IGT Derivative | GC2 BONUS | IGT Derivative BONUS |
|:---:|:---:|:---:|:---:|
| White Kitten | White Cat | White Kitten | White Cat |
|  |  |  |  |
| Siamese | Siamese | Siamese | Siamese |
|  |  |  |  |
| Orange Tabby | Orange Tabby | Orange Tabby | Orange Tabby |
|  |  |  |  |
| Calico Mixed Tabby | Calico Mixed Tabby | Calico Mixed Tabby | Calico Mixed Tabby |
|  |  |  |  |

54688



Comparison of (App. A-7) with (B-1A-C): The Royals:



Comparison of (App. A-7) with (B-1A-C): The Bonus Symbols:



-72-

Comparison of (App. A-7) with (B-1A-C): Other Symbols:

**GC2**

**IGT Derivative**




Comparison of (App. A-7) with (B-1A-C): Bonus Collection Feature Symbol:

**GC2**

**IGT Derivative**




Comparison of (App. A-7) with (B-1A-C): Creative Choices/Features:

**GC2**

**IGT Derivative**




Base Play Pay Lines

Land Based Base Play Pay Lines

54688



Bonus Play Pay Lines



Double Down Casino Pay Lines



Bonus Collection Features - Masthead



Land Based Bonus Collection Features – Masthead





Base Play Interface Background Pattered





Base Play Interface Background Pattered

-74-

54688

 

Bonus Play Interface Background Solid   Bonus Play Interface Background Solid

Bonus Play Interface Background Solid   The Diamond Symbol Glows and triggers the
The Diamond Symbol Glows and triggers   Diamond Collection Feature
the Diamond Collection Feature

List of Animations from Videos   List of Animations from Videos

Comparison of (App. A-7) with (B-1A-C).

### F. The Maid of Money Issue

191. For context, Maid of Money is a single game among two others that appear on packaging shown in (App. A-2: ¶ 166) which also includes artwork for Pharaoh's Fortune and Kingpin Bowling as those games are sold by Masque. GC2 created the artwork and graphics for Maid of Money. (App. A-55 (Jankowski Dep.): p. 42).

192. GC2 delivered a working demonstration game to IGT of Maid of Money. (*Id.* at 196). IGT Reviewed it. (App. A-110) Exhibit 453 includes images of Maid of Money on Diamond Galaxy. (App. A-64 (Wisler Dep.): pp. 25-26). IGT put the Maid of Money artwork and graphics and electronic files on a drive and sent it to Masque. (*Id.* at 44).

193. By agreement, Masque made games of the IGT files including Maid of Money. (*Id.* at 154-157). Masque made digital recordings of the Maid of Money land based game in IGT's demo room. (*Id.* at 51-53). Masque created packaging for the Masque CD and DVD

-75-

54688

products including Maid of Money. (*Id*. at 92-93). Finally, Masque released Maid of Money. (*Id*. at 231-233).

194.    IGT's General Counsel, Michael Prescott, provided GC2 with the identification of Maid of Money as a derivative of GC2's Maid of Money game. (App. A-18(Prescott Dep.): pp. 141-144, 155-156: Information provided was accurate and intended to provide GC2 with information).

195.    GC2's Maid of Money artwork and graphics were in IGT NV possession as they were trying to get GC2 to make the derivative work. GC2 declined to make the derivative work and IGT thereafter created the derivative Maid of Money land based game. (App. A-70).

196.    IGT NV Rule 30(b)(6) witness Michael Shorrock testified that ▮▮▮▮▮▮▮ is a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮. (App. A-27(Shorrock Dep.): pp. 22-23). Any evidence and ESI files on what was done with GC2's original artwork to create the land based derivative is and was always in IGT NV's sole and exclusive possession. GC2 requested the development files specifically as part of its request for production. (App. A-1: ¶¶ 5-6).

197.    IGT NV's initial answer raised a generic boilerplate 5th Affirmative Defense that stated: "Fifth Affirmative Defense: The FAC is barred, in whole or in part, because any copying of protected material is so trivial as to be *de minimis* and/or fall below the quantitative threshold of substantial similarity." (App. A-1: p. 103). Defendants refused to produce the development files for any game. (Dkt. at 220).

198.    IGT initial disclosures (Dated December 6, 2017) and Supplemental Initial Disclosure (Dec. 28, 2017) do not identify anything about the intent of any Defendant to assert that the Maid of Money derivative identified by IGT NV through Michael Prescott, was going to

54688

be challenged in the case as not being a derivative work of GC2's Maid of Money. Neither disclosure identifies any witnesses with knowledge of the Maid of Money development, any category of documents it intends to use to support its affirmative defenses, nor do the disclosures identify or disclose any ESI or game related development files. No files on ███████ have been disclosed or identified in the initial disclosures.

199.    Defendants moved for a protective order asking the court to preclude GC2 from questioning IGT NV Defendant via Rule 30(b)(6) about Derivative works. The Court granted this limitation. (Dkt. at 182, 238). Defendants' counsel used the order to limit GC2 examination of IGT NV on derivative works. (App. A-11(Kastner Dep.): p. 200).

## G.    Relevant Files Not Produced.[27]

200.    Masque produced certain final land based files they received from IGT NV regarding Maid of Money in 2011. (App. A-64(Wisler Dep.): pp. 42-46). The final land based files in Masque's possession do not include the game creation/development files leading up to the derivative Maid of Money.

/s/Kara E. F. Cenar
Kara E. F. Cenar (ARDC 6198864)
(kcenar@greensfelder.com)
Ricardo Meza (ARDC 6202784)
(rmeza@greensfelder.com)
Susan Meyer (ARDC 6226450)
smeyer@greensfelder.com
Greensfelder, Hemker & Gale, P.C.
200 W. Madison St., Ste. 3300
Chicago, IL 60606
312-419-9090 (T); 312-419-1930 (F)

---

[27] GC2 requested production of development files as part of its discovery related to Defendants affirmative defenses. IGT Defendants objected to and did not produce any of the game creation/development files off of the ███████ server for Maid of Money leading up to the derivative land based game.

54688

John E. Petite
(jep@greensfelder.com)
Kirsten M. Ahmad
(km@greensfelder.com)
Greensfelder, Hemker & Gale, P.C.
10 South Broadway, Ste. 2000
St. Louis, Missouri 63102
314-241-9090 (T); 314-241-8624 (F)

*Attorneys for Plaintiff GC2 Incorporate*

54688

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system this 11th day of October 2018, upon all counsel of record including those listed in the attached service list.

_____ /s/ _____ Kara Cenar _____

54688