**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GC2 INCORPORATED, | ) | Case No.: 1:16-cv-08794 |
| | ) | |
| Plaintiff, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| vs. | ) | Judge: Matthew F. Kennelly |
| | ) | Magistrate Judge: Mary M. Rowland |
| International Game Technology, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**GC2 INCORPORATED'S RESPONSE TO DEFENDANTS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I.     INTRODUCTION AND SUMMARY OF GROUNDS FOR DENIAL ............................ 1

II.    ARGUMENT ....................................................................................................... 6

    A.    Summary Judgment Is Improper ..................................................................6

    B.    The Land Based Kitty Glitter/Maid of Money Games are Authorized Derivative Works and the Interactive and Social Gaming Platforms Are Infringing Copies of those Works...............................................................8

    C.    GC2's Kitty Glitter Game ............................................................................9

        1.    Defendants Copied and Adapted GC2's Kitty Glitter Game To Produce Unauthorized Games - Substantial Similarity Exists....................9

        2.    Features of a Video Slot Machine Game Merit Copyright Protection. ..................................................................................10

    D.    Comparing GC2's Kitty Glitter Game with Land Based Kitty Glitter Game Compels a Finding of Substantial Similarity ................................................11

        1.    GC2's Kitty Glitter Game's Elements Are Not Merely Scènes À Faire, Functional or Useful Articles............................................13

        2.    The Land Based Kitty Glitter Game is a Derivative Work.......................15

III.   JOINT LIABILITY FOR DISGORGEMENT OF PROFITS IS ALLOWABLE AND PROPER IN THIS CASE .................................................................................. 17

    A.    JOINT LIABILITY FOR PROFITS IS ALLOWABLE IN THIS CASE .............17

        1.    GC2 Holds an Equitable Interest in and a Constructive Trust over Profits Generated By the Exploitation of Its Works .................................17

        2.    Disgorgement Is Entwined With Issues of Actual Damages .....................18

        3.    Joint Liability for Profits Is Allowable When Infringement is Intentional .........................................................................................19

        4.    Longstanding Exception Under Practical Partner Allows Joint Liability for Profits .........................................................................19

        5.    The Technology Partnering with Casino Partners ......................................19

        6.    The Revenue Partnering with "Casino Partners" ......................................21

        7.    The Licensing Partnering with Casino Partners (SAF: 85-86) ................22

        8.    The Masque/Encore Partnering.................................................................23

        9.    The DoubleDown Interactive Partnering - Post Sale ................................23

    B.    DDI Is Liable for Profits of Service Providers (Misdescribed as "Payment Processors") ..............................................................................................24

    C.    Recover for Disgorgement of Gain on Sale of DoubleDown ...............................24

IV.   THE DIGITAL MILLENNIUM COPYRIGHT ACT .................................................... 25

A.    Summary Judgment on DMCA §1202(b) Removal Claim Should be Denied ....................................................................................................26

     1.    GC2 Created Art and Delivered the GC2 Mark for the GC2 Works.........26

     2.    The GC2 CMI was Removed and Altered................................................27

     3.    "The Failure to Affix" or "Omission" is Actionable ...............................27

     4.    Defendants Ignore the Other Prohibitions of DMCA §1202(b) and Misrepresent Their Own Technology ......................................................28

B.    Summary Judgment on GC2's DMCA §1202(a) Claim Should be Denied .........29

     1.    Defendants Ignore and Misrepresent Their Own Technology..................30

     2.    False Terms and Conditions Of Use Is CMI and Links to the False Terms and Conditions Is Actionable...........................................................31

         a.    Terms and Conditions of Use is CMI ............................................ 31

     3.    §1202(a) Claims: Based on False CMI About Author, Owner, Copyright Notice Is Actionable. ..............................................................32

     4.    The Desktop Version is Different than the Mobile App With Respect to the Terms of Use Placement and Distribution. ......................33

C.    There is Sufficient Evidence of Defendants' Intent to Infringe............................34

D.    Knowledge and Intent Elements: ........................................................................36

     1.    The "Entity Distinction Game" Lacks Credibility and Does Not Avoid Liability..................................................................................36

     2.    Defendants Violate Section 1202 (a)'s "Knowingly and With Intent to Induce, Enable, Facilitate or Conceal Infringement" Elements..................................................................................................38

     3.    Defendants Violate Section 1202 (b)'s "Knowing" and "Without the Authority of the Copyright Owner or The Law" Elements. ...............40

E.    Defendants' Own Acts – not end users is the basis for GC2 Statutory Damages................................................................................................................42

V.    ILLINOIS CONSUMER FRAUD ACT ........................................................... 45

A.    Defendants' Preemption Argument Fails..............................................................46

B.    GC2 is Financially Harmed .................................................................................47

VI.    CONCLUSION................................................................................................ 50

## I. INTRODUCTION AND SUMMARY OF GROUNDS FOR DENIAL

This case is about Defendants' deliberate, willful, and continuous infringement of GC2 Incorporated's ("GC2") copyrighted works ("GC2 Works"). As will be shown below and at trial, Defendants "with intent to induce, enable, facilitate or conceal infringement" have used, mass distributed, and mass displayed a multitude of GC2 Works with both false and altered Copyright Management Information ("CMI") in violation of multiple provisions of the Digital Millennium Copyright Act ("DMCA").



*DoubleDown Platform, Diag. #1*

Defendants operate two "interactive" technology platforms for their mass use, distribution, display, and infringement of the GC2 Works. The first is the "DoubleDown Platform" (illustrated on right). It is used for "social gaming" or "non-wagering" games. The DoubleDown Platform hosts DoubleDown Casino ("DDC"),[1] which provides interactive games on desktop computers and mobile devices ("Mobile App."). The second platform that Defendants use to infringe the GC2 Works is called the "Internet Real Money Gaming Platform" (illustrated on next page). This is the platform involving the so-called "Casino Partners." In their Motion for Partial Summary Judgment (hereinafter "Mtn."), Defendants allege that they are not responsible for the profits of their Casino Partners because Defendants are not "practical partners" with them (Mtn 22-28). The evidence, however, establishes otherwise.

---

[1] Prior to June 2017, DDC was operated by DoubleDown Interactive ("DDI"), a subsidiary of IGT Parent with IGT NV. After June 2017, DDC was operated by DDI as a partner with IGT Parent and IGT NV controlling the servers.

In total, Defendants have generated over $[ ] million in revenue through the use of GC2 Works on both the DoubleDown and Internet Real Money Gaming Platforms. In fact, approximately $[ ] million of that revenue was derived *after* January 2016 when they re-confirmed that they did not have the rights to the GC2 Works. The $[ ] million in revenue helps



*Internet Real Money Gaming Platform, Diag. #2*

explain why they have refused to take down the unlicensed GC2 Works.

GC2's Mark has been removed (GC2's Additional Statement of Material Fact:[2] 19-40), altered (with GC2's Mark omitted)(SAF: 129-155)(App. C-1, 18-48) a §1202(b) violation, distributed with CMI knowing it has been altered or removed (App. C-1, 17, 35, 40, 48) a §1202(b)(2) violation, and distributed as "works," and "copies of works," and "publicly performed works" with altered and omitted CMI a §1202(b)(3) violation, (App. C-1, 17, 35, 40, 48) (App. A-102, 103, and 104). GC2 submits the Declaration of expert Erik Laykin.[3] Mr. Laykin provides evidence from a forensic perspective about how Defendants' technology works vis-à-vis the GC2 works and CMI. (App. A-59: ¶ 32). *See also,* SAF: 125-155 (App. C-1-66). In addition, the Declaration of Erik Laykin (App. A-59) and (App. A-59)(SAF: 41-45, 125-135) and (App. C-1, 25, 32-35, 40, 48, 50-58, 60-66) shows how false terms and conditions CMI and

---

[2] GC2's Statement of Additional Material Facts will be cited as "SAF: ___."
[3] Erick Laykin's Declaration will be cited as "(App. A-59: ¶__)."

-2-

links to same, are conveyed in connection with copies or displays or performances. These and the other false CMI (author owner and copyright notice) are provided and distributed in violation of §1202(a). The evidence firmly establishes that the DMCA violations are Defendants' own acts.

Denial of Defendants' Motion is appropriate for the following reasons: *First*, in regard to the **Internet Real Money Gaming Technology**, Defendants give an inaccurate description of their own technology and actions. In their Motion, Defendants use inadmissible declarations[4] for the proposition that the games are distributed ***through*** the Casino Operator's website, and to argue that Defendants and the Casino Operators are not partners. These recently fashioned declarations assert the very ***opposite*** of what Defendants' sworn company testimony provided which establishes that the games are ***not distributed through the website***, but rather that IGT NV partners with the Casino Operators on the technology infrastructure. (SAF: 71) (App. A-11).[5] This is an important distinction. (SAF: 72-87) shows how they partner. Their own website (www.igt.com) calls the online casinos their "Casino Partners,"[6] and the licensing of those overseas online sites (with which IGT and IGT NV are directly involved because of their ownership) tie those "operator" websites to the IGT License as "Approved Partners"[7] or "Approved Websites."[8] (SAF: 85-86).

*Second,* in regard to **DoubleDown Casino**, Defendants represent that "neither IGT NV nor DDI acts to send the graphics to the end user" and that all they do is "upload the games onto

---

[4] The Manning Declaration should be stricken because he was not disclosed in the initial disclosures. The Millar Declaration should also be stricken because it seeks to put into the record Canadian agreements that were not produced or identified in initial disclosures and his declaration lacks foundation for them.
[5] GC2's Appendices A, B, and C are cited herein respectively as "App. A- ," "App. B- ," and "App. C- ."
[6] https://www.igt.com/products-and-services/playdigital/playplatform/playrgs
[7] *See,* e.g. Approved Partners for IGT 2016
 https://www.gibraltar.gov.gi/new/sites/default/files/HMGoG_Documents/IGT_1.pdf.    See Approved Partners for IGT 2013 https://www.gibraltar.gov.gi/sites/default/files/docs/IGT.pdf.
[8] *See,* approved websites for IGT https://www.gamblingcontrol.org/licensees/egambling-licensees/.

various servers." (Mtn. at p. 42). This assertion is disingenuous because both forensic evidence (*which shows DDI's digital signature on its software code*), and the Purchase Agreement that the Defendants submitted (Exhibits A and B to Sigrist Declaration)[9] expressly show their direct involvement. In fact, IGT Parent[10] (via its CEO Renato Ascoli) required IGT NV (also via CEO Ascoli) to have exclusive control over the Amazon Web Servers ("AWS") used for DoubleDown. The same agreement also states that IGT NV would be providing "managed services" for the AWS servers and requires the terms of use agreement. (App. A-22)(SAF: 105-120). For the DDC interactive platform, and in particular the Mobile App platform,[11] Defendants' control over the AWS servers[12] and control of the code and requirement for use of terms of use creates a material question of fact about Defendants' characterization of its acts which relates to both the DMCA (providing and distributing issues) and patterning (App. A-59)(SAF: 105-118). The Laykin Declaration (App. A-59: ¶¶ 18-32) and an illustration describing the steps that trigger §1202(a) and §1202(b) DMCA violations are shown in Appendix C-1-4, 64-66 (images and charts outlining the number of DMCA violations) reveal what occurs when removed, altered, or false CMI is provided or distributed. (App. C-1-66).

*Third*, in regard to **discovery violations**, Defendants withheld material evidence including key GC2 graphics appearing on "Sprite Sheets" and only produced them in late July 2018 and September 2018 (after the completion of fact discovery), and only after being notified that GC2's forensic expert had captured the evidence. (App. C-7, 18, 32, 41) (App. A-59: ¶¶ 51-59). The Sprite Sheets are part of the "interactive" nature of the copyrighted works as they are used with the Mobile Apps. (SAF: 131-155) (App. A-59) (App. C-1-66). Indeed, they factually

---

[9] Sigrist Dec. Exs. A & B was the Purchase Agreement (App. A-22) and the Distribution Agreement (App. A-23).
[10] The Motion refers to IGT Parent as IGT Holdco. GC2 will refer to it as "IGT Parent" herein.
[11] Defendants have seemingly abandoned their claims regarding the Mobile App platform as it is not referenced in their Motion.
[12] *See* Statement of Fact 131 for explanation of the AWS servers; *See also* (App. A-59: ¶¶ 33-40).

establish DMCA violations because they prove that GC2 Works were "conveyed in connection with" "copies," or "displays," or "performance," as set forth in Section 1202 (c) of the DMCA. Importantly, the Sprite Sheet "copies" (App. C-18, 32, 41) and the "copy" of the GC2 Works that appear on the "display" during "game loading" (App. C-19-20, 33-34, 42-43) and "game play" (App. C-50-53, 55-58, 61-63) and "App updates" (App. C-16-17) are *not* the same, and these different Sprite Sheets prove that false and altered CMI (each a separate DMCA violation) are conveyed in connection with different "copies," "displays," and "performances," on multiple occasions and at different times.   (App. A-59: ¶¶ 68-59) (App. C-1-4, 35, 40, 48).   At a minimum, these facts create material questions of fact directed at the number of DMCA violations which compels the denial of Defendants' Motion.

*Fourth*, in regard **to version updates by third parties**, Defendants' representation that they should not be held responsible for "updates by third parties" because "there is no evidence" of their involvement is equally disingenuous.  (Mtn. p. 43) (SAF: 133) (App. A-59: ¶¶74-83) (App. C16-17).  Defendants' are continually pushing updates with their own false CMI and perpetrating other infringements through their game and distribution technology.

*Fifth*, in regard to the **Kitty Glitter and Maid of Money Games**, Defendants' Motion should be denied because the Infringing Works are substantially similar[13] to the GC2 Works and, in any event, substantial similarity is typically a question of fact. (SAF: 156-200)(App. A-1: ¶89), Exhibit 68 (admitted photo) which is an example of Defendants' decade long display of the GC2 Mark on the game now claimed not to be GC2's Game. (App. A-13).  The Court should deny the Motion because Defendants concede that there are disputed factual issues over their copying of GC2 Works.  (Mtn. p. 15).

---

[13] GC2 has consistently asserted that all of the land based games are authorized derivative works, but Defendants' interactive and social gaming versions are unauthorized copies and therefore "Infringing Works."

*Sixth*, the **Consumer Fraud Count** is based on Defendants' compulsory "terms of use" agreement, as well as the IGT/GC2 Agreement, and as such, is not preempted by the Copyright Act. The Defendants' claim that GC2 has not been financially damaged is wrong. IGT was GC2's customer and the remaining contractual rights that GC2 owns are valuable, IGTNV wanted to buy them, and that value is now lost because consumers get it for free on DDC. (SAF: 65) (App. A-15 (Nash Dep.): pp. 129-134, 251).

## II.  ARGUMENT

### A.  Summary Judgment Is Improper

As the movant, IGT has the initial burden to meet the legal standard for a motion for summary judgment. If that burden is not met, as it is not here, the Motion should be denied. When considering a motion for summary judgment, the Court views the record of admissible evidence in the light most favorable to GC2, the non-moving party, and draws all inferences in GC2's favor. *Est. of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017). Summary judgment is not appropriate where the record shows that there are genuine issues of material fact. *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017). A genuine issue of material fact exists "when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

***In Regard to the Issue of Derivative Works/Substantial Similarity***: "Courts generally disfavor summary judgment on the issue of substantial similarity." *Games Workshop Ltd. v. Chapterhouse Studios*, LLC, 105 U.S.P.Q.2d 1524 (N.D. IL. 2012). In an action for copyright infringement, summary judgment for the defendant is only appropriate "where works are so dissimilar that a claim of infringement is without merit." *S.A.M. Elecs., Inc. v. Osaraprasop*, 39 F. Supp. 2d 1074, 1081 (N.D. IL. 1999) (internal quotations omitted).

*In Regard to the Issue of Disgorgement of Profits*: "It is well established in this circuit and others that summary judgment is notoriously inappropriate for determinations of claims in which issues of intent play dominant roles." *Clark Equip. Co. v. Lift Parts Mfg. Co., Inc.*, 1986 WL 4423, at *2 (*citing Stumph v. Thomas & Skinner, Inc.,* 770 F.2d 93, 97 (7th Cir.1985)). The Defendants' "practical partner" analysis requires a factual inquiry into the relationships involving infringement. *Nelson-Salabes v. Morningside Dev. LLC*, 284 F.3d 505, 517 (4th Cir. 2002). *See also, Bergt v. McDougal Littell*, 661 F. Supp. 2d 916, 929 (N.D. Ill. 2009) (Denying defendant's motion for summary judgment on plaintiff's request for disgorgement of profits). When there is a material dispute of fact to be resolved or discretion to be exercised in selecting a financial award, then either side is entitled to a jury. *See Segrets, Inc. v. Gillman Knitwear Co., Inc.*, 207 F.3d 56, 65 (1st Cir. 2000).

*In Regard to the Issues Relating to GC2's DMCA Claims*: The DMCA claims are issues of first impression for this district and they are entangled with digital age technology. Courts prefer not to grant summary judgment absent a full factual record that explains the relevant aspects of the technology. *Top Rank, Inc. v. Gutierrez*, 236 F. Supp. 2d 637, 651 (W. D. Tex. 2001). Assessing the amount of statutory damages is an exercise of discretion for the jury to perform. *Kobs v. Arrow Serv. Bureau, Inc.,* 134 F.3d 893, 898 (7th Cir. 1998). In the context of statutory damages under the Copyright Act, the Seventh Circuit indicated that even if the facts are not disputed, unless a rule of law eliminates the fact-finder's discretion, summary judgment on statutory damages is not permissible. *BMG Music v. Gonzalez,* 430 F.3d 888, 892–93 (7th Cir. 2005); *Gillespie v. Blitt & Gaines, P.C.,* 123 F. Supp. 3d 1029, 1034 (N.D. IL. 2015). *Browne v. John C. Bonewicz*, P.C., 2015 WL 6165033, at *3 (N.D. IL. E. D.). GC2 is entitled to a jury trial to determine statutory damages under the DMCA. GC2 has a right to a jury's exercise

of discretion in applying the amount within the statutory range, and the number of violations for the "per violation" portion of the statute.

*In Regard to the Issues Involving Consumer Fraud*: Causation for an Illinois Consumer Fraud Act claim is recognized as one "best left to the trier of fact." *Bell Enterprises Venture v. Santanna Nat. Gas Corp.*, 2001 WL 1609417, at *4-5 (*quoting Oliveira v. Amoco Oil Co.*, 726 N.E. 2d 51, 57 (Ill. App. Ct. 2000)). In short, there are material fact questions precluding summary judgment on all of the issues in this case.

> B.    **The Land Based Kitty Glitter/Maid of Money Games are Authorized Derivative Works and the Interactive and Social Gaming Platforms Are Infringing Copies of those Works.**

To prove copyright infringement, a plaintiff must show "(1) ownership of a valid copyright and (2) copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Schrock v. Learning Curve Intern., Inc.,* 586 F.2d 513 (7th Cir. 2009); *Games Workshop Ltd.*, 105 U.S.P.Q.2d 1524. To establish copying, GC2 must demonstrate that Defendants copied original (protectable) elements of the GC2 Original Kitty Glitter Game. *Granite Music Corp. v. United Artists Corp.*, 532 F.2d 718, 720 (9th Cir. 1976). GC2 can establish copying either by evidence of direct copying or indirectly by evidence of Defendants' access to the copyrighted material and probative similarity between the works.[14]

Defendants ask the Court to assume that there is a "dispute over copying." (Mtn. p. 15). There is no dispute. GC2 delivered a working playable Kitty Glitter demo game. (SAF: 176). IGT received it, copied the artwork onto its shared server, and made a working prototype game. (App. A-9) (SAF: 177). There is no evidence it was independently created. IGT admits using

---

[14]*Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607 (7th Cir. 1982); *Wildlife Express Corp. v. Carol Wright Sales, Inc.,*18 F.3d 502 (7th Cir. 1994*); Lewinson v. Henry Holt & Co.,* 659 F. Supp. 2d 547, 563 (S.D. N.Y. 2009); *Wildlife Express Corp. v. Carol Wright Sales, Inc.,*18 F.3d 502 (7th Cir. 1994)

the land based Kitty Glitter files to make interactive (online real money gaming) versions of the Kitty Glitter (including for desktop and mobile). (SAF: 46-47). IGT authorized DDI to use the same files to create an online version. (SAF: 53-55). There is no evidence they were independently created. Given the undisputed evidence of direct copying, there is no need to demonstrate access and probative similarity, though indirect means can be shown as well.

C. **GC2's Kitty Glitter Game**

Defendants' contention that the Kitty Glitter Games is not substantially similar to the land based version of Kitty Glitter game bearing the GC2 Mark, or that they did not make a derivative work or unlawful copy of GC2's Kitty Glitter Game is against the substantial evidence in this case. (SAF: 156-190). Defendants seek to deflect attention from their conflicting evidence by falsely asserting that GC2 has changed its position about what is a derivative work in this case. (Mtn. p. 17). GC2 has not wavered: the <u>land</u> <u>based</u> Kitty Glitter game is an authorized derivative work, which is why it bears the GC2 Mark and the interactive and social gaming versions are unauthorized copies.

1. **Defendants Copied and Adapted GC2's Kitty Glitter Game To Produce Unauthorized Games - Substantial Similarity Exists.**

Once actual copying is established, to find infringement, there must be substantial similarity between the protectable elements of the works. *Wildlife Express Corp.,* 18 F.3d at 508. The test for substantial similarity in the Seventh Circuit is the ordinary observer test: "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking materials of substance and value." *Atari*, 672 F. 2d at 614; *Wildlife Express Corp.*, 18 F.3d at 508. This test requires a side by side comparison of the protectable elements of the works. *Wildlife Express Corp.*,18 F.3d at 506 n1, 510; *Silver Streak Indus., LLC v. Squire Boone*

*Caverns, Inc.*, 2015 WL 3884605 at *2 (S.D. Ind. June 24, 2015). But the "sine qua non of the ordinary observer test … is the overall similarities rather than the minute differences between the two works." *Atari*, 672 F.2d. at 618. The Seventh Circuit's test "does not involve 'analytic dissection and expert testimony. It depends on whether the accused work has captured the 'total concept and feel' of the copyrighted work. *Atari*, 672 F. 2d at 614. Inherently, these are questions of fact. Substantial similarity cases involving slot machines or video games that involve characters, cartoons, graphics, or fictional depictions do not support Defendants' position.

> 2.     **Features of a Video Slot Machine Game Merit Copyright Protection.**

In *Big Daddy*, a game developer created three video slot machine games. Each of the games had numerous images, graphics, features, and attributes which the developer combined in a unique manner to represent the themes, and as such, the games were sufficiently original to merit copyright protection. The court recognized that the choice of graphics, symbols, background colors, borders to graphics, design of "royals," layer styles, fonts, colors, symbol hierarchy, animation, and payouts, and the arrangements were protectable. *Big Daddy Games, LLC. v. Reel Spin Studios, LLC*, 2013 WL 12233949 *3 (W.D. Wisc. 2013). ("selection, compilation and arrangement of the graphics used in the three games … was sufficient to meet the 'slight' originality required under the copyright laws." *Id.* at *14 *quoting Feist Publications, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 345 (1991); "even if elements of a work are not capable of protection individually, 'it is the unique combination of these common elements which form the copyrighted material.'" *Id.* at *14 *quoting Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 939 (7th Cir. 1989)).

Defendants cannot avoid liability by changing the faces or locations of certain elements. In *DaVinci Editrice S.R.L. v. ZiKo Games, LLC*, the plaintiff created a Wild-West themed role

playing card game called *Bang!* featuring a Sheriff, Deputy, Outlaw, and Renegade. 2014 WL 3900139, 111 U.S.P.Q.2d 1692 (S.D. Texas 2014) ("[g]iven the similarities between the attributes of the characters in *Bang!* and in [defendant's game] LOTK, a reasonable factfinder could conclude that the characters of the two games are substantially similar despite the transposition and translation from the Wild–West theme of *Bang!* to the ancient China theme of LOTK." *Id.*, at *10). Also, merely changing the appearance of characters does not avoid liability in the context of video games. *Spry Fox, LLC v. LOLApps Inc.,* 2012 WI 5290158 (W.D. Wash. 2012) (even a small amount of copying can permit the trier of fact to find substantial similarity. *Id.* at *8).

> ### D. Comparing GC2's Kitty Glitter Game with Land Based Kitty Glitter Game Compels a Finding of Substantial Similarity

An ordinary observer, conducting a side by side comparison, looking at the similarities of the two works and considering the total concept and feel would find that there is substantial similarity between the works and find that the Defendants unlawfully appropriated the plaintiff's protectable expression in the GC2 Kitty Glitter Game. (App. B-1A).

GC2 delivered to Defendants a complete, working demo version of its Kitty Glitter Game with artwork, graphics, animation, music, bonus features, symbols, pay-lines, borders, and help pages. Its 3x5 video reel slot game featured four particularly selected types of kittens: White, Siamese, Orange Tabby, and a Calico Mix Tabby characters as the major symbols, and selected royals (i.e. A, K, Q, J, 10) as the minor symbols (App. A-55 (Jankowski Dep.): pp. 197-199) at a time when royals were not required. (App. A-9 (DeCasa Dep.): pp. 106-107). GC2 made deliberate choices about the theme, background colors, mood, setting, pace, sequence of events, layer styles, fonts and colors, and hierarchy of the symbols. GC2 captured the design of "every

single major piece of a gambling machine...." (App. A-55 (Jankowski Dep.): pp. 187-189) (SAF: 156-176).

Defendants copied the GC2 Kitty Glitter Game. (SAF: 177-190). Defendants revised some of the graphics, but there is more than substantial similarity between the games. (SAF: 190-191). Defendants compare only selected screen shots of the animated video game – this does not capture a total concept and feel. It is necessary to experience the animation, sparkles, selections, arrangements, and excitement generated by each game as it is played. "[S]creen shots are in turn less effective as a comparison between the two games than actually playing them." *Spry Fox*, 2012 WL 5290158 at *1.

GC2 had a wide array of choices to represent a cat-themed game named Kitty Glitter. It could have used other expressions for "Glitter" such as actual glitter, stars, or fireworks. In fact, it made deliberate selections of graphics, designs, animations, and other game features. (SAF: 166-177). *See Big Daddy*. In this case, the theme is the same – the symbols are the same – the action is the same – the bonus play is the same – the colors are the same - the hierarchy of the cats is the same – the order of the pay tables is the same - the animation is the same. In short, the game is the same. That's why GC2's mark is on it.

Defendants protest that GC2's Kitty Glitter Game contains unprotectable elements that are not eligible for copyright protection. What Defendants fail to appreciate is that courts evaluate substantial similarity differently depending upon a work's content and the media in which it exists. Defendants first rely on *Fooey Inc. v. Gap, Inc.*, 2103 WL 2237515 (N.D. Ill. 2013) for the proposition that an idea is not protectable – only the expression of that idea is. Defendants then inappropriately conclude that the creative elements of GC2's Kitty Glitter Game are not protectable. However, for clothing items dominated by a design, especially common, <u>real</u>

objects such as a flower, courts require that the objects be very similar. *Klauber Bros v. Target*, 2015 WL 4393091 at \*4 (S.D. N.Y 2015)(finding that defendants failed to show as a matter of law that lace patterns were not protectable). Defendants also cite *Rozenblat v. Sandia Corp.*, 79 Fed App'x. 904, 907 (7th Cir. 2003). That case involved fragmentary words and phrases that were used for opposite propositions between the two works, and the plaintiff sought protection for an illustration of an <u>actual</u> piston compared to an illustration for a piston-free engine. These are fundamentally different from the artistic, creative elements as components of a video game.

Ironically, Defendants then list the very type of components that courts using the standard in this Circuit have found to be protectable (types of cats, sparkles, bowl and diamond as symbols, and diamond accents over letters), especially when those elements are part of a larger compilation. *Big Daddy Games*, 2013 WL 12233949 at \*14.

        1.    **GC2's Kitty Glitter Game's Elements Are Not Merely Scènes À Faire, Functional or Useful Articles.**

GC2's selection of graphics, features, elements, and themes from the nearly available options are protectable copyrighted expressions. They are not merely common elements necessary to express an idea or unprotectable *scènes à faire*. The *scènes à faire* doctrine finds unprotectable those "elements or themes that are 'so rudimentary, commonplace, standard, or unavoidable that they do not serve to distinguish one work within a class of works from another.'" *Bucklew v. Hawkins, Ash, Baptie & Co., LLP.*, 329 F.3d 923, 929 (7th Cir. 2003). GC2's choices are protectable. *Big Daddy* ("wide array of graphics to choose from and the games' themes did not dictate the specific graphics or arrangements that [the author] chose for either the regular playing screen or the bonus screens.") 2013 WL 12233949 at \*15; *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607 (PacMan figures not *scènes à faire* because "gobbler" or "ghost monsters," not required.) The Court in *Spry Fox* found some of the

functional elements there to be *scènes à faire,* such as use of points and coins to reward a player, the method of scoring, and the using a display to provide visual game tips in the margins of the screen is a standard feature. 2012 WL 5290158 at *5. However, importantly, "[t]he visual style of the tip display, by contrast, is protectable expression." (*Id.*) [*emphasis added.*]

Defendants rely principally upon *Incredible Technologies, Inc. v. Virtual Technologies, Inc.,* 400 F.3d 1007 (7th Cir.2005) to advance their contention that many of the elements of a video arcade game are common *scènes à faire* and only protected from virtually identical copying. In that case, this Court properly found that a video game recreating a realistic golf game contained elements necessary to an actual game of golf. The court in *DaVinci Editrice S.R.L. v. ZiKo Games, LLC,* 2014 WL 3900139 *11 (S.D. Tex. 2014) distinguished that case from the near infinite choices available for other types of video games.

> *Incredible Technologies* is based on golf, a real sport with a well-established form of game play. That is important because the expressive elements in a golf arcade game are necessarily limited by golf itself. There is a limited number of ways for the game designer to show a golfer, a course, a swing, and the ultimate goal: putting the ball in the hole. Such limits do not apply to role-playing games like Bang!. There are nearly infinite ways of expressing the concepts of player elimination or a contest between authorities and their opponents. Instead of choosing a different manner of expressing these concepts, the defendants copied into LOTK protectable elements of DaVinci's original and creative expression in Bang! (*Id.*)

Defendants point to the existence of certain common elements (interface, minor symbols represented by royal cards, pay lines) and contend that they are therefore not protectable. However, it is the creative expression of those elements - how those features are adorned, arranged, and animated that renders the expression of them protectable.

Defendants next contend that the name "Glitter" in the title of a video game immediately calls to mind diamonds as a required element, and thus GC2's expressions are not protectable. In support, they list other games featuring diamonds, all of which include "Diamond" in the title:

"Double Diamond;" "DaVinci Diamonds;" and "Diamond Club." There is a creative leap to associate glitter with diamonds. Glitter could be represented by anything that sparkles or is in tiny pieces such as stars, fireworks, glass, or confetti.

Defendants assert that because of the differences between the works, they cannot be substantially similar as a matter of law and rely upon *Murphy v. Murphy*, 2007 WL 1649988 *4 (N.D. IL 2007) (MSJ p.20). However, that case is not at all applicable. There, plaintiff's work was a disconnected series of interviews with <u>real</u> people and defendants created a cartoon with fictional characters and plots. "…[P]laintiff cannot own a copyright in someone else's appearance or the way a building looks. It is well-settled that real-life facts and real life people are not copyrightable…." (*Id.*) Defendants also cite *Silver Streak Industries, LLC v. Squire Boone Caverns, Inc.,* 2014 WL 6474105 (S.D. Ind. 2014). That case involved a functional display that defendants redesigned in an attempt to distinguish it from the prior version. The court recognized that copyright protection is limited for <u>useful articles</u>. (*Id.* at *3). That simply does not apply to a creative entertainment game.

2.      **The Land Based Kitty Glitter Game is a Derivative Work.**

Derivative works are one of the bundle of rights belonging exclusively to a copyright owner. 17 U.S.C. §103(a). It is based upon one or more pre-existing works … which is recast, transformed, or adapted. 17 U.S.C. §101. A derivative work, like other original works, must have merely "enough expressive variation from [the original] to enable the new work to be readily distinguished from its predecessors." *Bucklew*, at 929, quoted in *Schrock* (p. 3). An unauthorized derivative work infringes on the original work. *DC Comics v. Towle*, 802 F.3d 1012 (9th Cir. 2015) (Batman television show and movies were authorized derivative works of the comic books; defendant's creation of an actual Batmobile constituted infringement "regardless of whether the defendant copied directly from the underlying work, or indirectly via

-15-

the derivative work." *Quoting* 1 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 3.05, at 3– 34.31 (Matthew Bender, Rev. Ed.) (*Id.* at 12). The Agreement only permits IGT to use the GC2 artwork and graphics to produce a land based game. It did so and placed the GC2 Mark on it. This admission creates a material question of fact. Likewise, the interactive and social gaming Kitty Glitter games are unauthorized copies and therefore infringing works.

GC2 did not authorize IGT to use its works for any interactive or social gaming purpose. *Schrock v. Learning Curve Intern., Inc.,* 586 F.3d 513 (7th Cir. 2009) ("the owner of a copyrighted work has the exclusive right to control the preparation of derivative works, the owner could limit the derivative-work author's intellectual-property rights in the contract, license, or agreement that authorized the production of the derivative work." *citing Liu v. Price Waterhouse LLP,* 302 F.3d 749, 755 (7th Cir.2002)). There is sufficient evidence for a jury to find that the land based Kitty Glitter Game is an authorized derivative work owned by GC2. Accordingly, Defendants' Motion for Summary Judgment should be denied.

Defendants make the same argument for the GC2 Maid of Money game as they did for Kitty Glitter. This one equally fails. Once again, GC2 delivered a working demo with associated artwork and graphics in layered files pursuant to the same Agreement. (App. A-55). IGT copied the game and modified the graphics. They further copied those images and delivered them to Masque, which made copies and modified the files to create Masque CDs and DVDs, which they released for sale. (App. A-64). A jury will find that the games are substantially similar; as can best be appreciated by playing them. Like Kitty Glitter, however, Defendants copied the creative expression of the game: the main symbol is a maid, she has her hair pulled back, she is wearing a solid colored dress with lace on the sleeves and neckline; the minor symbols are royals that appear in the same colors in a serif font (blue, green, yellow, red); there

-16-

are gold bars between the reels; there is light colored solid background for the interface; there are

no frames around the royals, there are interesting backgrounds behind the other symbols; there is

a duster symbol represented by a brown handle and green feathers with blue in the background.

Statement of Facts 191-200 identify other grounds for denial of the motion.

Defendants' Motion for Summary Judgment must be denied. There is more than ample

evidence from which a jury could find that the unauthorized Masque games are infringing copies

of the derivative GC2 Maid of Money Game, and that, in any event, there is substantial similarity

between the GC2 Maid of Money Game and the unauthorized Masque games.

## III.    JOINT LIABILITY FOR DISGORGEMENT OF PROFITS IS ALLOWABLE AND PROPER IN THIS CASE

Summary Judgment on the issue of disgorgement of profits is improper. As an initial

matter, as movants, Defendants bear the initial burden of proof. They have failed to meet it.

Defendants rely open new declarations of Manning and Millar. These declarations are improper

because they lack foundation, Manning is an undisclosed witness and Millar's testimony about

Canadian RGS agreements was also not disclosed nor documents produced. Both testify about

IGT Holdco without foundation and both conflict with company testimony (SAF: 48), They

should be stricken with the associated paragraphs in the Motion and Statement of Facts. Fed. R.

Civ. P. 26; Fed. R. Evidence. 602.

### A.    JOINT LIABILITY FOR PROFITS IS ALLOWABLE IN THIS CASE

#### 1.    GC2 Holds an Equitable Interest in and a Constructive Trust over Profits Generated By the Exploitation of Its Works

IGT NV made unlicensed digital interactive versions of GC2 Works in the United States

(from which the works could be reproduced); this is a predicate act of infringement resulting in a

constructive trust over the revenues and profits generated through that exploitation of the GC2

Works. *Los Angeles News Service v. Reuters Television International Ltd.* 149 F.3d 987, 992

(9th Cir 1998), *cited by, Seals v. Compendia Media Group*, 2003 WL 731369 ND IL 2003. GC2 acquired an equitable interest in the unlicensed versions as soon as they were made, which in turn attached any profits from their exploitation. *See, Sheldon v. Metro Goldwyn Pictures Corporation*, 106 F.2d 45, 52 (2d Cir. 1939) (L. Hand, J) (The negatives were records from which the work could be reproduced, and it was a tort to make them in this country. The Plaintiffs acquired an equitable interest in them as soon as they were made, **which attached to any profits from their exploitation…**"), *aff'd.* 309 US 390, 60 S. Ct. 681, 84 LED 825 (1940); *see also, Ahbez v. Edwin H Morris & Co., Inc.* 548 F. Supp. 664, 667 (SDNY 1982); *Famous Music Corp v. Seeco Records, Inc.*, 201 F. Supp. 560, 568-69 (S.D. NY 1961).[15] Under this line of authority, related foreign entities and their casino partners' profits are recoverable. The "inequity" claim is unfounded. Defendants have the "missing" cost information which are not incremental.

2.      **Disgorgement Is Entwined With Issues of Actual Damages**

GC2 is entitled to actual damages and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. 17 U.S.C. §504. Defendants concede that they can be held jointly and severally liable for actual damages.[16] (Mtn. p. 22) Thus, to the extent the analysis of actual damages and disgorgement of profits is intertwined, it would be premature and improper to rule on what portion of the profits are or are not recoverable under Defendants' theory below.

---

[15] *See also Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 73 (2d Cir.1988) (permitting recovery of copyright damages accruing abroad from illegal copying in the United States; *Famous Music Corp. v. Seeco Records, Inc.*, 201 F. Supp. 560, 568–69 (S.D.N.Y.1961) (same). *See also* 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 14.05, at 14–96 (1996) (stating that copyright holders acquire an equitable interest in infringing works produced in the United States as soon as they come into being).
[16] In the Seventh Circuit, actual damages include the value of use to the Defendants.  *Deltak, Inc., v. Advanced Systems, Inc.*, 767 F.2d 357 (1985).

3. **Joint Liability for Profits Is Allowable When Infringement is Intentional**

The law also provides that there are circumstances under which Defendants, because of the intentional nature of their acts, can be held jointly and severally liable for the disgorgement of profits from the intentional exploitation of the GC2 games. *See* Nimmer on Copyright § 12.04[c][3], cited in *Softel, Inc. v. Dragon Medical and Scientific Communications Ltd*, 1995 Copr.L.Dec. P 27,476, 37 U.S.P.Q.2d 1282 (S.D. NY 1995) there may be an exception to this general rule "where the infringement was not innocent." *Abeshouse*, 754 F.2d at 472; *Harris v. Miller*, 50 U.S.P.Q. 625 (S.D.N.Y. 1941); *See* M. Nimmer, Nimmer on Copyright § 12.04[C][3] (1994). Defendants request that the Court assume infringement for purposes of their argument. (Mtn. pp. 22-31). Infringement is intentional. (SAF: 46-52, 87-104).

4. **Longstanding Exception Under Practical Partner Allows Joint Liability for Profits**

Defendants concede, as they must, that under a "practical partner" analysis they can be held jointly and severally liable for the profits generated from the exploitation of the works. *Nelson-Salabes v. Morningside Dev. LLC*, 284 F.3d 505 (4th Cir 2002) and *Belford v. Scribner*, 144 U.S. 488 (1892) (in participes criminis with Defendant). Both cases require a factually intensive inquiry into the "partnering acts" related to the infringement. The *Nelson* court remanded the case back to the district court to conduct the necessary factual inquiry. To be clear, the cases do not suggest that boilerplate contract language is relevant at all, and certainly the cases support the notion that it would not be the only relevant factor to consider. At a minimum there are material issues of fact.

5. **The Technology Partnering with Casino Partners**

The technology partnering that occurs with Casino Partners on the IGT Remote Game Servers ("RGS") Interactive Gaming Technology is set forth in Statement of Facts 72-79.

-19-

**Diagram Point 1:** There is a US creation of unlicensed GC2 Games and placement on central servers by IGT NV, which is wholly owned by IGT Parent. This is a predicate act of infringement that creates GC2's equitable interest in the profits generated. (SAF: 73).

**Diagram Point 2:** There is partnering on technology infrastructure with Casino Partner's website, partnering on code, and icon placed on Casino Partner's website. (SAF: 73). Appendix 2 of the Casino Partner RGS Agreements prove Defendants partner on technology infrastructure. IGT Defendants, and their casino partners, intentionally work ***together*** to insert computer code and functionality on the Casino Partner's website without which the games would not distribute from the IGT central server to the End User. (App. A-11 (Kastner Dep.): pp. 254-255). In addition, the Casino Partners have a website where they use unauthorized artwork and graphics as a game icon to display the availability of the unauthorized GC2 games. (*Id.* at 202-207) (App. A-1: ¶¶ 109-112) (App. A-123) (App. A-124). In other words, both IGT and the Casino operator have to do something ***together*** for the Game Icon to be displayed on the Casino Operator's website. (App. A-11 (Kastner Dep.): p. 205).

Also at **Diagram Point 2:** There is partnering on marketing materials. (SAF: 76). IGT NV and IGT Parent make available for distribution (through the customer only log in section of the website), (www.igt.com), numerous items of infringing ███████████████ ███████████████████████████████ from the unlicensed GC2 works to the Casino Partners.[17] The IGT.com website is owned by IGT Parent. (SAF: 74-76).

---

[17] See *BMG Music v. Gonzales*, 430 F.3d 888, 889–91 (7th Cir.2005) (*citing Metro–Goldwyn–Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005)); *In re Aimster Copyright Litig.*, 334 F.3d 643, 645 (7th Cir.2003) ("[M]aking and transmitting a digital copy of [copyrighted] music infringes copyright."); *Capitol Records v. Mattingly*, 461 F.Supp.2d 846, 850 (S.D.Ill.2006) The Seventh Circuit has held that merely making copyrighted material available to others is an act of copyright infringement. *See Capitol Records, Inc. v. Koyate*, 2008 WL 2857237, at *7 (N.D. Ind. July 22, 2008) (*citing BMG Music v. Gonzales*, 430 F.3d 888, 889–91 (7th Cir.2005)); *see also Capitol Records v. Mattingly*,461 F.Supp.2d 846, 850 (S.D.Ill.2006) (finding a prima facie case of copyright infringement where the defendant made plaintiff's copyrighted sound recordings "available for distribution to others')

This is an act of infringement by IGT Parent and an area of IGT Parent testimony that conflicts with Millar and Manning.

**Diagram Point 3:** Partnering on mass distribution of unlicensed GC2 Works. (SAF: 77) IGT NV describes the process by which the artwork and graphics get from the IGT RGS central server to the end user device. The RGS Server operates the same way in each location. As shown in the above diagram, an end user (Point 3) clicks on an icon on the Casino Partner's Website (Point 2). The code put on the website (Point 2) sends direction to the IGT Central Server that a bet has been made. (App. A-59: ¶ 60); (SAF: 77-78).

**Diagram Points 4-6:** End User Device. IGT's Central Server sends a "client side game packet" to be copied to the cache of the end user device, and it sends direction to the Random Number Generator (RNG) letting it know to send a result to the end user device. (SAF: 78).

**Diagram Point 6:** The Result. The "result" sent by the RNG is direction to the game packet on the cache of the device to display certain images on the screen in a certain way. (SAF: 77-80). Technology partnering supports a practical partner finding.

6.      **The Revenue Partnering with "Casino Partners"**

In addition to partnering on technology, the facts set forth at SAF: 80-84 demonstrate that IGT Parent and IGT NV partner with their "Casino Partners" on revenue generated from GC2 Works, which they refer to as "Revenue Share."[18] (SAF: 80-84). The Defendants share revenue from the exploitation of the GC2 Works with their Casino Partners. The Casino Partners provide Defendants detailed financial information through "progress reports'" which are entered into IGT's "centralized system." The information can be and is accessed throughout IGT NV for various reasons including payment of royalties that IGT may owe third party game developers. (SAF: 80). In fact, IGT's RGS Partner Agreements for New Jersey, Canada, Gibraltar, and

---

[18] None of the cases Defendants cite in their section involve the revenue share agreements similar to those here.

Alderney require that IGT provide the casino customers (also called Operators or RGS Partners) with certain financial reports. The extensive revenue and cost information Defendants possess from their partners undercuts their claim of inequity. (SAF: 82, 83).

Through its RGS partner agreements with casino customers, IGT receives detailed financial statements showing casino gross gaming revenue and expenses such as ███████

████████████████████████████████████████████████████

████████████████████████████ (SAF: 84). IGT produced financial documents in this case showing the casino customer gross gaming revenues, expenses, and casino net gaming revenues for the GC2 Games. See (*Id.*) for examples of such documents. In fact, financial information like this supports a practical partner finding.

### 7. The Licensing Partnering with Casino Partners[19]

Defendants assert that IGT Parent never had any relationship of any kind with the Casino Partners. (Mtn. p. 25). Gambling and gaming is a highly regulated industry[20] and it is a crime to distribute even regulatory tested and approved games in unauthorized jurisdictions. Operators in a legal gaming jurisdiction also must be an authorized operator with a license to distribute games. The Alderney egaming rules[21] lay out the role IGT and IGT NV would have had to set up and assist the IGT family member in obtaining a license, getting the games approved (which IGTNV admits it does) and getting the technology approved. The websites are listed as "approved websites" for IGT's License.[22] Agreements expressly reference International Game Technology Compliance and its Regulatory Committee. According to the Alderney

---

[19] (SAF: 85-86)

[20] The State of New Jersey also has a stringent set of gaming regulations. Article 6 (c) is the Internet Gaming Act. Subsections 26, 27 and 28 speak to criminal acts for offering unapproved or tampered games online. Subsection 1.5, subsections (u) and (v) involves situations such as the Casino Partner Agreements in NJ where the operator is operating their license under a Golden Nugget's NJ license. NJ Online Gaming Act. In Canada it is Section 207 of the Criminal Code (Canada) defines Lottery Scheme to include slot games.

[21] Alderney Gaming Commission https://www.gamblingcontrol.org/.

[22] https://www.gamblingcontrol.org/licensees/egambling-licensees/ (App. A-130).

regulations[23] the licensee must appoint an executive officer to fulfill the duties of a compliance officer and gambling equipment (i.e. games and RGS) must be approved through another application.[24] Gibraltar has similar regulations for remote gaming.[25] And the license ultimately granted to the IGT family member in Gibraltar can only operate with "Approved Partners."[26] All evidence that impeaches Millar and Manning and proves their testimony lacks foundation.

### 8.     The Masque/Encore Partnering[27]

Defendants attempt to argue that IGT NV is not a "practical partner" with Masque or Encore (Mtn. at p. 26-27), *but see* SAF: 87-104 for admitted facts showing acts of partnering on infringing works.   This is a factual inquiry appropriate for a jury.   Sharing valuable assets (i.e. GC2 Works), allowing internal access to its land based games for video, access to IGT internal assistance, collaboration on creation and final approval of games and packaging and sharing revenue is enough for the jury to find them to be practical partners. (SAF: 88-104).

### 9.     The DoubleDown Interactive Partnering - Post Sale[28]

As an initial matter this Court should not entertain summary judgment on this ground because IGT Parent failed to appear prepared to testify about the Purchase Agreement; indeed, the proffered witness had not even read the agreement at all. (SAF: 129, 140).  DDI testified that

---

[23] https://www.gamblingcontrol.org/wp-content/uploads/2015/06/Part1.pdf ; Alderny eGambling Regulations 2009, Chapter II, Category 1 egambling license, Para 4 (d); Alderney eGambling Regulations 2009, Chapter III, Category 2 eGambling Licenses, Paragraph 6(d).

[24] https://www.gamblingcontrol.org/regulation-framework/a-core-service-provider-associate-certificate/ .

[25] https://www.gibraltar.gov.gi/new/remote-gambling#ancla1.

[26] See, e.g.  Approved partners for 2016 https://www.gibraltar.gov.gi/new/sites/default/files/ HMGoG_ Documents /IGT_1.pdf. (App. A-131). *See* Approved Partners for 2013 https://www.gibraltar.gov.gi/sites/default/ files/docs/ IGT.pdf. (App. A-132).

[27] Defendants argue on page 27 that GC2 alleged DDI was responsible for Masque/Encore profits.  GC2 had not alleged that, and GC2 has consistently identified IGT NV and Masque and IGT NV and Encore as the parties involved with those product lines (with IGT being the wholly owned subsidiary).  Since the claim was not asserted, Summary judgment should be denied.

[28] Defendants seek a ruling that they are not jointly liable for profits under only a claim of vicarious liability (not under GC2's claim of direct liability).  And even then, Defendants seek only a finding that they are not liable for profits under the vicarious liability count "[s]ince the sale of IGT Holdco's [IGT Parent's] membership interest in DDI to DoubleU on June 1, 2017." (Mtn. p. 27).

IGT was DDI's partner and further testified that the Distribution Agreement defines "partnership." (SAF: 105-106). DoubleU's CEO, Ga-Ram Kim, claimed that the transaction represented "a unique and value accretive-partnership combining the operational excellence of Double U Games with IGT's world class slot content." (SAF: 121).

The Purchase Agreement (App. A-22) and Distribution Agreement (App. A-23) contractually require joint partnering over the technology and control over the server on Amazon Web Services. (SAF: 107-118). Moreover, IGT Parent is indemnifying DoubleU and DDI for liability related specifically to <u>this</u> case. Statement of Facts 105-118 is sufficient for a jury to find this relationship one of "practical partnering."

### B. DDI Is Liable for Profits of Service Providers (Misdescribed as "Payment Processors")

DDI testified and called each of these service providers "partners." DDI has written agreements with each to distribute their mobile apps. DDI shares revenue with them and indemnifies them for infringement. These agreements and the Defendants' intentional actions in partnering with the service providers permit GC2 to recover both actual damages and disgorgement of profits for their portion of the revenue share. (SAF: 119-120).

### C. Recovery for Disgorgement of Gain on Sale of DoubleDown

IGT argues that GC2 cannot claim indirect profits from the sale of DoubleDown to DoubleU because in their view: 1) the purchase transaction did not include the transfer of rights to the games at issue and therefore the purchase price could not have contemplated Double U's use of the games at issue, and 2) GC2 has not proven that the transaction was driven by the games at issue. (SAF: 121-124). Both arguments are wrong.

There is a clear nexus between the amounts IGT received from the sale and the allege infringement of the games. The purchase price agreed to between IGT and DoubleU was based

-24-

on a multiple of 2016 earnings. An IGT press release from the time of the sale states: "The cash purchase price is $825 million, which represents 10.5x DoubleDown's full-year 2016 Adjusted EBITDA." (SAF: 106, 121). IGT produced documents showing that ██% of DoubleDown's revenue for 2016 was the result of the games at issue. Expert disclosures and analysis evaluated levels of expenses per game to arrive at an opinion that ██% of DoubleDown's adjusted EBITDA is due to the GC2 Games. Since the DoubleDown sale price was calculated based on this calculation, then ██% of the sale price would be attributed to profits generated by the GC2 Games. (SAF: 122). Also, the DoubleU purchase was not independent of the games at issue. (App. A-22 and 23). The license agreement for the rights to the games was integral part of the purchase agreement itself. It was a requirement before sale and for DoubleU's purpose of operating the DoubleDown Casino. DoubleU agreed to pay $825 million, a 10.5x multiple of earnings, for a gaming platform with no games. GC2 Games at issue comprise part of DoubleDown Casino's game offerings and the revenues generated on the GC2 Games drove the price. GC2 Games are causally connected to the transaction. (SAF: 121).

Additionally, the DoubleDown book value of the 2012 purchase was the capitalized purchase price of $██ million. (SAF: 124). The book value at the time of sale (2017) was $██████ (*Id.*) GC2 Games were three of the 65 games on the platform and no doubt helped grow the book value.

## IV.   THE DIGITAL MILLENNIUM COPYRIGHT ACT

Defendants seek dismissal of the entire DMCA count, but fail to address all of the DMCA issues involved in the Count. Summary judgment on the entire count is improper.

Defendants' Motion has four sections: (1) §1202(b); (2) §1202(a); (3) Intent; and (4) Damages, each is discussed below.[29]

### A. Summary Judgment on DMCA §1202(b) Removal Claim Should be Denied

For their challenge to the 1202(b) Removal claim the Defendants contend that: i) the removal of the GC2 Mark from the artwork for the slot machine glass is not actionable under 1202(b) because GC2 did not supply its artwork for the glass with a GC2 Mark on it; and ii) because IGT NV claims it created the artwork for the glass, it thus did not remove it from "GC2's Product." (Dft. Mtn. p. 34-35); and iii) "failure to affix" or "omission" of CMI is not actionable as a 1202(b) claim. All three arguments fail factually and legally.

#### 1. GC2 Created Art and Delivered the GC2 Mark for the GC2 Works

As a threshold matter, the land based games at issue ***all bear the GC2 Marks on them***. (SAF: 20-21)(App. C-26-27: Pharaoh's Fortune) (App. C-36-37: Coyote Moon) (App. C-44-45: Kitty Glitter). Defendants know full well that their contract obligated them to place GC2's Mark on the glass artwork of every GC2 Project – and they did so. GC2 provided the artwork for the glass, (SAF: 13)[30] and GC2 provided its GC2 Mark as its CMI to be placed on the glass. (SAF: 12-15, 17). IGT admits in its Motion that the glass artwork incorporates GC2's artwork and witnesses testified that GC2 artwork is present in the glass of the land based GC2 games. To argue that this is not a GC2 product, or a work having GC2 artwork and GC2 provided CMI is baseless. (SAF: 12-22). *Personal Keepsake v. Personalizationmall.com*, 975 F. Supp. 2d 920, 929 (N.D. IL. 2103), cited by Defendants, provides that CMI must be removed from or near the work. The artwork and graphics used for the glass is layered artwork, which permits different

---

[29] The motion also asserts "abandonment" and seeks preclusion of any claim for Kitty Glitter which was pled on information and belief because it required discovery. This is unfounded. GC2 will address this argument in context of the 1202(b) and 1202 (a) Sections below, but Defendants assertion shows they have not evaluated their own games. Each is different.

[30] The glass for Kitty Glitter was done after GC2 and IGT executed the 7th Amendment to their Agreement, and beyond the original artwork was not supplied by GC2. (SAF: 6, 176-177).

layers to be turned on so that their content appears in the image. (App. C-24-25). Witnesses explained that these images can be easily altered. (SAF: 24-25). The layered files used for the belly glass for Pharaoh's Fortune artwork (App. C-28) is shown, with the GC2 layer, and the GC2 CMI in the body of the image. (SAF: 26-29). This certainly qualifies as "on or near" GC2's artwork. Jankowski testified that the land based belly glass was all GC2's artwork. (SAF: 13-15). In addition, SAF: 26-40 show it was altered with CMI and copies were provided and distributed with false and altered CMI (and GC2 Mark omitted) on DoubleDown Casino. (App. C-18, 13, 14, 31-40) (App. A-59: ¶ 19-85).

### 2. The GC2 CMI was Removed and Altered

Defendants' second attack fails as well. As shown in (App. C-28-31), the GC2 CMI layer was **_removed_** from the glass artwork for Pharaoh's Fortune (SAF: 26-34) (App. C-38-39), **_removed_** from the Glass artwork of Coyote Moon (SAF: 35-38), and **_removed_** from Kitty Glitter. (SAF: 39-40) (App. C-38-39). Defendants' motion must be denied.

### 3. "The Failure to Affix" or "Omission" is Actionable

Defendants also argue that a "failure to affix" or "omission" of GC2 CMI is not actionable. (Mtn. p, 32)[31] In our case, Defendants' decision to distribute and display GC2's Works without reference to GC2 (as required under the Seventh Amendment) clearly constituted the falsification of CMI in violation of §1202(a) of the DMCA. Moreover, Defendants' argument is contrary to the plain language of Section 1202(b)(2) and (b)(3) of the statute, and other courts also disagree with Defendants' position. *See, Kelly v. Arriba Soft Corp.*, 77 F. Supp. 2d 1116 (1999) ("Here, where the issue is the absence of copyright management information

---

[31] This Court addressed this issue in its order denying Plaintiff's Motion to Dismiss, holding:
"The court concluded that a defendant's decision to display Morel's photographs without reference to Morel could constitute the falsification of CMI. *See, e.g., Monotype Imaging, Inc. v. Bitstream, Inc.*, No. 03 C 4349, 2005 WL 936882, at *8 (N.D. Ill. Apr. 21, 2005) (although defendant did not "remove" copyright notices "but instead [made] copies of the font software without including the copyright notice, [this did] not preclude liability under the DMCA."). The Court finds these cases persuasive." (Mem. Op. p. 15.)

from copies of Plaintiff's works, the applicable provision is § 1202(b)(3)"). As shown in the referenced exhibits, and which will be demonstrated in more detail below, not only was the GC2 image removed, but the CMI was thereafter *altered* to add the IGT CMI, and GC2's Mark was omitted. The images in (SAF: 38-40, 146-152) show the existence of the altered CMI in the sprite sheet and the loading page display for the Mobile version of DoubleDown Casino.

    4.      **Defendants Ignore the Other Prohibitions of DMCA §1202(b) and Misrepresent Their Own Technology**

17 U.S.C. §1202(b) has three sections, one to address the removal and altering of CMI (a §1202 (b)(1) violation); one to address the act of *distributing CMI*, knowing CMI has been altered or removed (a §1202 (b)(2) violation); one to address the acts of *distributing "works" or "copies" of works* with altered or removed CMI, **or** *publicly performing "works" or "copies of works"* (a §1202(b)(3) violation). The Laykin Declaration and the images in Appendix C are evidence of such violations. Defendants' acts violate §1202(b)(1) for removal and altering CMI and in particular:

- For Removal of CMI for Coyote Moon, as shown in (App. C-36-39) and for Pharaoh's Fortune, as shown in (App. C-26, 31). GC2 is not asserting a removal claim for Kitty Glitter, even though its CMI was removed. A summary chart of the multiple violations is included at (App. A-64).

- For Altering of CMI based on 1202(1) for which GC2 submits (App. C-1-4), and for Coyote Moon (App. C-32-34, 38-40). For Pharaoh's Fortune (App. C-18-20, 29-31 and 35). For Kitty Glitter there is a factual issue regarding Kitty Glitter as a derivative work. Upon that finding the following altered CMI is shown by (App. C-43-48). A summary chart is included in (App-64).

Defendants' acts also violate §1202(b)(2) and §1202(b)(3) because the Defendants are *distributing CMI* knowing CMI has been altered or removed (§1202(b)(2)), and for *distributing "works" or "copies" of works* with altered or removed CMI, **or** *publicly performing "works" or "copies of works"* (a §1202(b)(3) violation)(App. A-59).

- Altered CMI images and images with CMI removed have been made into compiled game packages (Desktop) or Sprite Sheets (Mobile in two sizes) and placed onto an AWS server. This would be a §1202(b)(2) and §1202(b)3 violation. For Coyote Moon (App-C-13: Desktop lobby); (App. C-7, 9, 32: Mobile Version- two sizes) For Pharaoh's Fortune (App. C-19-20: Desktop, App. C-18: Mobile). For Kitty Glitter upon a finding that it is a derivative, (App. C-41-40). Summary Chart: (App. B-64).

- Altered CMI images for Coyote Moon in the Lobby Graphics Display are shown in (App. C-7-9, 13: Desktop, 14: Mobile); (App. C-64: Summary Chart). This would be a §1202(b)(2) and (b)3 violation. This part is not applicable to Pharaoh's Fortune or Kitty Glitter.

- Altered CMI Images are in the two sizes of sprite sheets on the AWS server. Summary Chart is at App. C-64D and E. Coyote Moon is shown at (App. C-32), Pharaoh's Fortune at App. C-18, and Kitty Glitter at (App. C-41). This would be a §1202(b)(2) and (b)(3) violation.

- Altered CMI Images appear in the Game Specific loading pages for both Desktop and Mobile. This would be a §1202(b)(2) and (b)(3) violation. For Desktop: Summary Chart is App C-64E. For Coyote Moon, (App. C-33); for Pharaoh's Fortune, (App. C-19); Kitty Glitter is on (App. C-42). For Mobile: Summary Chart is App. C-64F & G because of the two sizes. For Coyote Moon, (App. C-34); For Pharaoh's Fortune, (App. C-20); Kitty Glitter is on (App. C-42).

B.     **Summary Judgment on GC2's DMCA §1202(a) Claim Should be Denied**

For its attack on the §1202(a) DMCA claim Defendants contend that there is no False CMI with the lobby graphics of only the desktop version (no mention of Mobile), that CMI must be "conveyed in connection with copies," and that its "generic website language is not "conveyed in connection with lobby graphics." (Mtn. 35-37). Defendants' arguments are flawed in several respects. *First*, the DoubleDown Casino technology is misdescribed, or in the case of Mobile Apps, not described at all. GC2 provides (App. A-59) and Demonstrative Exhibits at (App. C-1-4) to assist the Court's understanding of how the technology works, and how false CMI gets provided and distributed during several events of copies, displays, and performances. (SAF: 131-155).

*Second*, Defendants' claim is based on upon an incorrect reading of the statute. Section 1202(c) provides that CMI must be "conveyed in connection with copies _or_ displays _or_ performances." As a result of this misreading of the statute Defendants' analysis fails to consider the false CMI that is conveyed in connection with copies, displays, and performances. GC2 provides (App. A-59) and Demonstrative Exhibits at (App. C-1-4) to assist the Court's understanding of how the technology works, in this regard. (SAF: 131-155) (App. C-1-66).

*Third*, the Defendants fail to address the false CMI that is conveyed in connection with copies, or performances, or displays for the Mobile App version and fail to address the false CMI that is conveyed in connection with the loading screens and during gameplay of the desktop version. GC2 provides (App. A-59) and Demonstrative Exhibits at (App. C-1-4) to assist the Court view the what, when, and how false CMI gets conveyed.

### 1. Defendants Ignore and Misrepresent Their Own Technology

The DoubleDown Casino is provided and distributed through a Mobile App, through Facebook and through a DoubleDown Casino website (Desktop Version).[32] These are interactive products. They are not static images. (App. C-1-66). The Mobile App technology impacts the DMCA §1202(a) issues in a dramatic way that has material differences for the §1202(a) analysis. For the Mobile version, the materials on the server are Sprite Sheets, which are different copies than the copies on the display or the copies used in the performances. This necessitates an analysis of more than just the "desktop lobby images" or even the mobile lobby images in Defendants' brief. (SAF: 131-155). Each of the three works (Pharaoh's Fortune, Coyote Moon, and Kitty Glitter) have differences – but Defendants do not address these.

---

[32] Defendants provided the Court with a letter and instructions to access an online account.

2. **False Terms and Conditions Of Use Is CMI and Links to the False Terms and Conditions Is Actionable**

    a. **Terms and Conditions of Use is CMI**

It is necessary to address GC2's §1202(a) Count at the point in time when the violation events happen, and not just at the point where the work is placed on the server and the viewable game. (SAF: 131-155) (App. A-59) (App. C-1-66). Defendants' Motion fails to address the specific factual and legal differences involving their works. It has a material impact on their violations sufficient to justify denial of the motion. For example, GC2 has alleged that the terms of use are false CMI under §1202(c)(6). Links to the same are also CMI §1202(c)(7). (App. A-104). The evidence also shows a §1202(a) claim under §1202(a) (1) & (a) for False Terms and Conditions CMI (§1202(c)(6) and links to false terms and conditions (CMI §1202 (c)(7)) (App. A-59) (App. C-1-25, 33-35, 40, 42-43, 48-66). Because of space constraints, GC2 provides herewith a Summary Chart identifying the different violations at (App. C-65). Forensic evidence shows the link is conveyed in connection with GC2 Works, copies of the works and performances. There are multiple violations that occur at different events because Defendants' acts are different at each event. These are §1202(b)(2) and (b)(3) violations.

- Upon opening the Mobile App. for Coyote Moon Mobile: (App. C-1, 5-7, 10-12, 14, 15). For Pharaoh's Fortune Mobile: (App. C-1, 5-7, 10-12, 14, 15). Summary Chart of violations at (App. C-65C). These would be a 1202(b)(2) and (b)(3) violation.

- Upon selection of the Game: for Coyote Moon: (App. C-2, 3, 21-25, 32, Sprite: 33-34, loading pages: 40). For Pharaoh's Fortune: (App. C-2, 3, 18, Sprite: 19-20, loading pages: 21-25, 35). For Kitty Glitter: (App. C-2, 3, 21-25, 41, 48). Summary Chart of Violations at (App. C-65D). These would be a 1202(b)(2) and (b)(3) violation.

- Upon returning to Mobile App: Summary Chart Of violations at (App. C-65E). Mobile App Upgrades: Summary Chart of violations at (App. C-65F). These would be a 1202(b)(2) and (b)(3) violation.

There is evidence that the terms and conditions were updated at least once, and that causes another round of violations. These are §1202(b)(2) and (b)(3) violations. (App. A-59: ¶¶ 72-82); (App. C-16-17); Summary Chart of Violations at (App. C-65F).

3. **§1202(a) Claims: Based on False CMI About Author, Owner, Copyright Notice Is Actionable.**

Many of these violations occur with the link violation above, some do not. When they occur at once, GC2 would only seek statutory damages if they were supplied by different partners (*i.e.* if one party provides and another party distributes). *See e.g.* App. C-35, 40, 48. Section 1202(a)(1) and (a)(2) set forth violations for providing and distributing false CMI author, owner, copyright notice. GC2 provides a Summary Chart of DMCA violations at (App. C-66). There are several violations that occur at different events. These are 1202(b)(2) and (b)(3) violations. The various DMCA violations are best illustrated by describing each event that occurs at various times, including when:

- There is a placement of Sprite Sheets with false CMI onto AWS Servers, which is a §1202(a)(1) violation. (App. C-66A) (App. A-59) Coyote Moon: (App. C-32); Pharaoh's Fortune: (App. C-18); Kitty Glitter: (App. C-41).

- There is a placement of a Mobile App in an App Store, and upon Downloading and opening an App. (App. C-66B) (App. A-59); Coyote Moon: (App. C-1, 5-7, 12, 14, 15); Pharaoh's Fortune: (App. C-1, 5-7, 12, 14, 15); Kitty Glitter (App. A-59).

- Upon Selection of Game there are additional 1202(a)(1) & (a)(2) violations for providing and Distributing False CMI author, owner, Copyright Notice. (App. C-66C) (App. A-59); Coyote Moon: (App. C-2, 3, 32, 33, 40). Pharaoh's Fortune: (App. C-2-3, 18, 20, 21-25, 35). For Kitty Glitter: (App. C-2-3, 41-42, 48).

- During Game play there are other additional violations under 1202(a)(1) & (a)(2) for the Mobile Versions. (App. C-66D). (App. A-59); Coyote Moon: (App. C-2-4, 54-58); Pharaoh's Fortune: (App. C-2-4, 49-53); Kitty Glitter: (App. C-2-4, 59-63).

When users return to the App, there are additional violations when one opens the Mobile App, and selects games under §1202(a)(1) & (a)(2) for the Mobile Versions. (App. C-66) (App. A-59).

-32-

During DDC upgrades, there are additional violations upon opening the Mobile App and selecting games under 1202(a) (1) & (a)(2) for the Mobile Versions. (App. C-66F) (App. A-59) (App. C-16-17). There were at least two different terms of use used. Each triggers another round of violations. (App. C-66G) (App. A-59) (App. C-16-17). GC2 respectfully submits that there are material disputes of fact that preclude Summary Judgment on GC2's DMCA Count.

> 4. **The Desktop Version is Different than the Mobile App With Respect to the Terms of Use Placement and Distribution.**

As shown in Appendix C-13, in the desktop version there is a compiled game package with GC2 graphics on the server and there is a link to the terms of use that is present on the website screen at the Double Down Casino when the Lobby is viewed. This Court held (during Defendants' Motion to Dismiss) that the simple presence of CMI on a website footer was not sufficient for meeting the "conveyed in connection with" copies requirement of the statute. The Court did not consider the issue with respect to "conveyed in connection with" displays or performances. (App. C-19, 20-25, 33, 42). GC2 will address those briefly. The desktop version does not use Sprite Sheets but rather, graphic files. (App. A-104). There is no app download or other events that lead to the lobby page. Instead the end user goes to the lobby page on DDC. (SAF: 141). The lobby page has the three GC2 game icons with the TOU link. (App. C-19, 20-25, 33, 42). The Court's prior ruling appears to cover this stage of the desktop/website version because as ruled, there is no "conveyed in connection with copies."[33] That is different with respect to the Mobile App because the link does get conveyed with copies of GC2 Works. SAF: 131-155 (App. A-59). Since the Court was viewing the display of the desktop website lobby only, GC2 understands the ruling to be limited to the display at that stage. Upon game selection

---

[33] GC2 respectfully requests that the Court reconsider its ruling in view of the recent disclosures about how the technology works. However, there are additional violations that occur after this stage of Defendants' distribution scheme.

from the desktop, however, there is a conveyance of copies (game packets) to the cache of the end use. Next, a display and a performance occurs with specific game graphics and the TOU link is present at each of those stages. (App. C-19, 20-25, 33, 42). Links to CMI are within the definition and at those stages it is only GC2 Games. The events described above with respect to loading screens and game play for the respective games on the mobile device apply here. Defendants only seek summary judgment that the website desktop version does not meet the "conveyed in connection with" copies requirement of the statute for the website lobby graphics only as it relates to its DoubleDown branding. GC2 disagrees. Defendants do not address at all the "conveyed in connection with" displays or performances or the fact that the link to the TOU appears with the lobby graphics. Defendants' Motion must be denied.

### C. There is Sufficient Evidence of Defendants' Intent to Infringe

Defendants are among the world's largest gaming manufacturers, a public company in a regulated industry, they are leaders in their field and have sophisticated analytics and access to massive amounts of consumer data. They may not have intended to be caught and found liable for their actions, but they certainly intended to license these works as their own to profit from them (SAF: 69 (App. A-81-83)) Defendants now baldly assert that there is no evidence that any of them "possessed the requisite intent for liability under Section 1202(a) or (b)." (Mtn. p. 38-40). But licensing something as your own (when it is not) is facilitating infringement. Defendants have the initial burden in this Motion and have failed to meet that burden, thus the Motion should be denied. Moreover, even assuming anyone of them were not involved in the removal of CMI (though the evidence firmly shows that they were directly involved) forensic evidence demonstrates that the GC2 Works are still up and daily being conveyed with false, removed, and altered CMI. (SAF: 56).

Under the DMCA, Defendants are liable when they distribute GC2 images or copies knowing that the CMI had been altered or removed without GC2's consent. 1202(b)(2) & (3). *Agence France Presse v. Morel*, No. 10-CV-2730 AJN, 2014 WL 3963124, at *8 (S.D.N.Y. Aug. 13, 2014) (Although Getty itself did not participate in these actions, it might still be liable if it distributed the images knowing that the CMI had been altered or removed without Morel's consent.) *See* 17 U.S.C. § 1202(b)(3); *Morel II*, 934 F.Supp.2d at 578 n. 19. They are also liable under §1202(b)(2) for distributing CMI with respect to images with altered or removed CMI. Since Prescott was general counsel for IGT Parent and IGT NV and DDI, and was acting on their behalf, all three entities knew of the lack of rights in early 2016 and GC2's request to take down its works as of September 9, 2016 – before the sale and indemnification of DoubleU continued the distribution of GC2's unlicensed content with false, removed, and altered CMI. (SAF: 67, 110).[34] They know. Notably, in the Seventh Circuit, one who knowingly or strongly suspects that he is involved in shady dealings, takes steps to make sure that he does not acquire full or exact knowledge of the nature and extent of those dealings is held to have a criminal intent, because a deliberate effort to avoid guilty knowledge is all that the law requires to establish a guilty state of mind. *United States v. Giovannetti*, 919 F.2d 1223, 1228 (7th Cir.1990), *United States v. Josefik*, 753 F.2d 585, 589 (7th Cir.1985); *AMPAT/Midwest, Inc. v. Illinois Tool Works Inc.*, 896 F.2d 1035, 1042 (7th Cir.1990) ("to know, and to want not to know because one suspects, may be, if not the same state of mind, the same degree of fault.") *Casella v. Morris*, 820 F.2d 362, 365 (11th Cir. 1987); 2 *Goldstein*, supra, § 6.1, p. 6:6); *Louis Vuitton S.A. v. Lee*, 875 F.2d 584, 590 (7th Cir. 1989). So the blind eye or ostrich approach does not save them. And, in any event, issues of "intent" are steeped in facts, and courts disfavor summary judgment on such issues.

---

[34] DoubleU's counsel attended depositions in this matter.

D.     **Knowledge and Intent Elements:**

DMCA §1202(a) violations have elements of "knowingly" and with the "intent to induce, enable, facilitate, or conceal infringement;" Section 1202(b) violations have the elements "without the authority of the copyright owner or the law," "knowing," or "having reasonable grounds to know," and "will induce, enable, facilitate, or conceal an infringement element." Distribution of unlicensed content, holding it out in required terms and conditions as licensed, enables and facilitates infringement. *Agence France Presse v. Morel*, No. 10-CV-2730 AJN, 2014 WL 3963124, at *8 (S.D. N.Y. Aug. 13, 2014) (continued licensing without consent knowing CMI was removed or altered is facilitating infringement- even if it was fixing a mistake). There is powerful evidence of each DMCA element, creating, at a minimum, a factual issue for trial. See (SAF: 12-45, 129-155) (App. C-1-66) (App. A-59).

        1.     **The "Entity Distinction Game" Lacks Credibility and Does Not Avoid Liability.**

In asking the Court to enter summary judgment in their favor, IGT Parent[35] and DDI incredulously claim that there is no evidence of their knowledge of various acts or their "intent" to distribute false CMI. The Motion fails on multiple ground s. *First*, with respect to DDI, its failure to appear prepared to testify about the graphic files is ground for denial. (SAF: 140). IGT Parent's failure to appear prepared to testify about the Purchase Agreement is also grounds for denial. (App. A-38 (Kastner)).

*Second*, the evidence shows a clear "working together," "collaboration," and "partnership" among these three entities regarding the DoubleDown Casino games when IGT Parent bought DDI. App-A-19 (Sigrist 11/15/17) p. 29-34 ("worked together" to determine which games, "worked together" on converting the games,), 90-93 ("collaborated" on porting the

---

[35] IGT Parent is the entity that wholly owned DDI and IGT NV at the time the Infringing Games were created, and that still owns IGT NV 100%.

games and enabling the RGS technology to work). In fact, Defendants admitted that they used the GC2 derivative land based files to create the Infringing Games and conceded that GC2's Mark was in the layered files. (SAF: 53-125). DDI post "sale" still had GC2 artwork in its possession with the mark removed. (SAF: 26-40). Defendants put the Sprite Sheets with the GC2 artwork on the AWS server that the parties control with CMI altered and removed. (SAF: 34). Forensic evidence shows DDI controls the code and the AWS servers it uses to distribute the infringing content and false CMI. (SAF: 107). The Purchase Agreement shows the Defendants partnering on the technology that provides and distributes the CMI, and of course both DoubleU and DDI consider themselves currently to be in a form of partnership for distribution of unlicensed content. (App-A- 20 (Sigrist) p. 218) ("IGT" is "partner") (SAF 105-106). IGT Parent required the terms of use be conveyed with all content. (SAF: 114). Defendants withheld material evidence (the Sprite Sheets showing GC2's Works) and misrepresented their own technology - this is powerful evidence of knowledge, intent, and concealment. DDI's position is contradicted by the forensic evidence showing that its code affixes CMI. (App. A-59). IGT Parent's position is inconsistent with its contractual requirement that it maintain control over the Gameplay server which creates the performances. (SAF: 111-118). IGT Parent expressly ██████████████████ for liability in this very case. (SAF: 110). *Third*, GC2's Works are still available online, they remain popular, and continue to generate revenue. This is in spite of GC2's take-down requests (SAF: 67, 69) and abundant evidence that all three Defendants admitted that they knew at least as of February 2016 that there was a claim that they were providing and distributing false CMI. (SAF: 61-70). The obligations under DMCA do not stop once the lawsuit gets filed. *Agence France Presse v. Morel*, 111 U.S.P.Q. 2d 2017 (2014). Even after this lawsuit was filed, IGT Parent required

DDC to enter into a license to distribute the GC2 Games and adhere the false "terms of use" to the GC2 Works content. (SAF: 105-118). In other words, all three Defendants continue to intentionally provide and distribute false, removed, and altered CMI in violation of the DMCA. *Agence France* \*8. IGT Parent and DDI's request for summary judgment on this ground should be denied.

2. **Defendants Violate Section 1202 (a)'s "Knowingly and With Intent to Induce, Enable, Facilitate or Conceal Infringement" Elements**

Defendants' naked claim that they did not act "knowingly" is a strongly disputed fact and requires a jury to determine credibility of the evidence at trial. Defendants had actual knowledge about the GC2 contractual limitations for use of its works – indeed, IGT Parent and DDI share legal and accounting groups. (SAF: 12-23, 61-70, 110, 120, 130). They also have knowledge in the eyes of the law, and may not act like an ostrich or with willful blindness. See cases supra. Defendants proffer hearsay emails written years after Defendants placed the GC2 Games on DDC in a feeble attempt to try to claim that person lacked knowledge or intent with respect to CMI or copyright ownership. But that one person is not IGT, IGT NV, or DDI. Indeed the "buyout" referred to in those emails expressly contained the requirement to mark the GC2 Works with the GC2 Mark. (App. A-13). Thus, even if Defendants thought that they had "bought out the rights" to distribute the GC2 Works, it still would not authorize them to provide and distribute false CMI §1202(b) – without authority of owner or law. "Trying to correct its mistake," does not imply that it did not know its activities were infringing or that it was not facilitating infringement. *Agence France Presse v. Morel*, No. 10-CV-2730 AJN, 2014 WL 3963124, at \*8 (S.D.N.Y. Aug. 13, 2014). In any event, there is overwhelming evidence from which a jury could determine that each of the Defendants acted with knowledge and intent. Because Defendants' distribution model was a "terms of use" license model (SAF: 41-44), they

-38-

clearly knew or should have known that representations in their license agreements and on the face of the games as they are played would be the mechanism to "induce, enable, facilitate, and conceal" the acts of infringement. Defendants should have also known that the "Terms of Use" license that identifies DDI or its licensors as "owners" conceals infringement from those entering into the TOU agreements. In fact, DDI testified that they intend the end user rely on the representations in the "terms of use"[36] but itself does not know if it's true or not. *See* (App. A-20 (Sigrist) ("it was not a task we decided to undertake.")). *In Re Aimster*, (willful blindness is knowledge).

There is no question that all three Defendants know and understand that the technology used for DoubleDown Casino would cause acts of copying, display, distribution, and performance of the artwork and graphics of the games. It was designed to do just that. These Defendants provide the RGS technology and adapted the unlicensed GC2 games to specifically work with that technology. (App-A-19) (Sigrist p. 90-93) ("collaborated" on porting the games and enabling the RGS technology to work). In addition, Defendants control and manage the AWS server and with respect to knowledge of correct GC2 CMI, the admissions in the pleadings provide that the games were created by GC2, that GC2's Mark appears on the land based games (App. A-1 ¶89 Ex. 68-70), that GC2 participated in developing the games, and that there is a known contractual obligation to place GC2's Mark on all GC2 projects. (SAF: 1-23). In addition the evidence provides that the DDC version of the games were intentionally made to look like the land based version of the games, and GC2's Mark without question appears on the games. (SAF: 19-22). *See also* (SAF: 61; App-A-13).

---

[36] In their Motion, Defendants IGT and IGT NV represent that there is nothing connecting them to the Terms of Use. That is untrue. The purchase Agreement has the terms of use attached to it and IGT made it a required part of the distribution model after the "sale. (SAF: 114).

IGT legal maintains a database of third party agreements. (SAF: 61). All three defendants admit to knowing about the agreement and its terms and conditions for use (evidencing knowledge at least as early as filing of the Complaint). (SAF: 1-23). DDI represents and warrants in its agreements with its service providers (to get service providers to carry the Apps) that it owns or has obtained all rights to the licensed content. (SAF: 120). In the face of all of this evidence, Defendants' claims that they lacked knowledge are not credible. In *Microsoft v. Rechanik*, 249 Fed. Appx. 476, 479 (7th Cir. 2007), the Court noted that "ostrich-like"[37] business practices amount to willful blindness, which is sufficient to show . . . the intent necessary to be a contributory infringer." *See In re Aimster Copyright Litig.*, 334 F.3d 643, 650, 655 (7th Cir. 2003). *Video Views*, 925 F.2d at 1021. Summary judgment on the issue of knowledge and intent under §1202(a) should be denied.

### 3. Defendants Violate Section 1202 (b)'s "Knowing" and "Without the Authority of the Copyright Owner or The Law" Elements.

GC2 did not grant Defendants authority to use its games for online or social gaming, therefore, Defendants violate §1202(b) which finds liability when Defendants act "without authority of the copyright owner." Defendants knew the restrictions attached to the GC2 games. (SAF: 1-23, 68-69). GC2 asked Defendants to take down the works. (SAF: 67, 69). Defendants admit that they do not have a license with GC2. All Defendants know about the GC2/IGT NV Agreement by virtue of the shared accounting and legal departments (App. A-13), and all Defendants admit that the Agreement requires the GC2 Mark to be placed on all GC2 projects.[38] (SAF: 61). That Defendants violated §1202(b) provisions that "knowing" or "having reasonable

---

[37] "That is, one who undertakes a course of infringing conduct may neither sneer in the face of the copyright owner nor hide its head in the sand like an ostrich." *Video Views, Inc. v. Studio 21, Ltd.*, 925 F.2d 1010, 1021 (7th Cir. 1991).

[38] Defendants are not relying on advice of counsel, but have "clawed back" privileged documents repeatedly.

grounds to know" will induce, facilitate, enable or conceal infringement is supported by powerful evidence.

- The Technology used was their own technology that was intended to mass distribute in a way that copied Game packet or Sprite Sheets on end user devices and intended to cause copies, displays, and public performance. (SAF: 131-155) (App. A-59).

- They control both the server and the code that places the written attribution line and only the IGT mark on the work when displayed and performed. (App. A-22).

- The Terms of Use business model is a license to use copyright rights without which there would be infringement. (SAF: 41-45).

- Defendants are sophisticated parties with extensive experience in copyright and with marking requirements of 3rd party works. (SAF: 23).

- Since they control the servers, and pay for the service of distribution, they are technically able to mark GC2's Works correctly, are able to provide correct CMI, and are able to take unlicensed works down. (SAF: 57-58).

The Defendants made the Infringing Works together and acted in concert. (App-A-19) (Sigrist 11/15/17) p. 29-34, 55, 90-93). Defendants shared "collaborating" employees, legal, accounting, game files, and strategic direction of IGT Parent, implemented through Patti Hart and Renato Ascoli. (App. A-81, 82). DDI readily admits doing nothing to determine if it had the rights to use the GC2 Works. (SAF: 130). Defendants selected these games because the land based games made money. (SAF: 53). The DDC works were made expressly to look like the land based games which were clearly marked with GC2's Mark. (SAF: 21, 125, 129-130). The artwork files are layered - capable of being and were altered; there is typically a CMI layer on these works. (SAF: 24-25). Defendants used the images of the very same graphic where the GC2 Mark appeared on the land based game. (SAF: 24-40). Defendants' proprietary code is programmed to provide false, altered, and removed CMI at the time game is loaded and played, and the link to terms of use are sent as an intentional part of the download process which Defendants intend to be binding upon the end users. In other words, they knew that they were

-41-

providing altered CMI with these games and the graphics. (App. A-59). Defendants attempt to deflect attention away from their calculated behavior by asserting that their acts of marking the works with their own name is merely "in the ordinary course of business" to let the word know that it possessed a copyright in the game itself. But they cannot do so falsely under §1202(a). Nor with altered, omitted, removed CMI under §1202(a). They are knowledgeable about copyright law, diligent about protecting their own rights, and honor the rights of other third party developers. (SAF: 21-23). Further, Defendants' bad intent is not cured by the fact that they brought the gap in rights to GC2's attention. Even if you assume lack of knowledge beforehand (which the evidence proves existed) they cannot provide or distribute false CMI going forward. From that time forward, Defendants knowingly, intentionally, and without authority continued to distribute CMI, knowing that it was false, altered and removed, and they continued to license to others the unlicensed GC2 Works to DoubleU and to end users with altered and removed CMI and false CMI via the obligatory terms of use. *Agence France,* *8 (S.D.N.Y. Aug. 13, 2014) (continued licensing without consent knowing CMI was removed or altered is facilitating infringement- even if it was fixing a mistake). There are clearly issues of fact on all issues raised.[39]

      E.      **Defendants' Own Acts – not end users is the basis for GC2 Statutory Damages**

This case involves Defendants' own technology, that they know works with sprite sheets and in a manner that creates various copies, displays and performances at certain "events" (App opening, Game selection and loading screens, and during game play). They do not simply put their works on a server as they represent to the Court on page 41, or at a minimum GC2's evidence materially calls their representation into question for a jury to decide.

---

[39] Defendants are not relying on advice of counsel, and have "clawed back" privileged documents repeatedly.

It is precisely at these junctures that Defendants themselves sought to place CMI (albeit false), on images that they knew GC2 CMI had been removed or altered, and Defendants themselves chose to provide the works under a Terms of Use distribution model, knowing that terms and conditions and links to the same are CMI under the statute. Defendants knew all along that it had no rights to use the GC2 Games on DoubleDown, and even if it wants to claim to the jury that it did not, it certainly identified the gap in rights with a re-reading of the Agreement, because its plain reading also shows they had not rights. (SAF: 67, 69). Significant to this case, Defendants knew of GC2's request to take its works down, and not only intentionally chose to keep the games up with the false CMI being provided and distributed, but after the lawsuit was filed, IGT Parent undertook steps to License DoubleU (an indemnify Double U) to undertake the distribution, and required false Terms of Use agreement to continue to be used. (SAF: 105-120).

Relying on *McClatcey* and other like decisions on page 40, the Motion seek summary Judgment on the issue of Statutory damages because it contends (albeit incorrectly) that the DMCA violations at issue in this case are not based on their own acts, and that an award based on end users leads to an absurd result. Defendants' advance this argument out of context of their actual technology, or any particular event causing the DMCA violation. The evidence GC2 cites for the violations, and the Laykin Declaration, and forensic evidence disproves their unsupported contention that the violations are based on acts of end-users rather than themselves. The DMCA violations GC2 has submitted has been forensically shown to be undertaken by one of the three Defendants alone and acting in concert with one another for their collective financial gain. The failure to disclose Sprite Sheets is inexcusable. At a minimum there is a material question of fact for the Jury as to whether a violation has occurred at each event, the number of violations, and the range of statutory damages that should be awarded for each violation. As

-43-

discussed above in Section IIA, statutory damages is a question for the Jury and summary Judgment should not be granted on this issue.

Defendants next complain that a calculation that is based on acts of end users would lead to an absurd result, but they concede the acts based on their own conduct is proper. Since the evidence shows GC2's statutory damages calculation is based upon Defendants' acts, the Motion should be denied. Defendants cite to two cases for their "absurdity" argument. The *Craigslist* case cited by Defendants (Mtn. p. 43) did not involve a jury, but instead involved a Court addressing statutory damages under a §1201 claim where the calculation under the statute led to a very high number that the Court determined under the facts and procedural posture of that particular case at the default judgment stage was not reasonable. The Court recognized that deterrence was a principle factor under the DMCA, and it identified a two-step process by which it determined an alternative amount for a §1201 DMCA claim. Notably, there are a few differences in the DMCA statutory damages section under §1202(c) (3). Section 1202(c) (3) (A) deals with §1201 violations (not at issue in this case but at issue in the Craigslist decision), has a lower statutory damage range, and the language "as the court considers just" at the end of the section.[40] In contrast, §1202(c)(3)(B) deals with statutory damages of $2,500 to $25,000 per violation and does **not have** the "as the court considers just" language at the end. This difference in language is important and distinguishes the case decisions relied upon by the Defendants. Instead, §1203(c)(5)(A) provides the Court with the power to reduce or remit the total award of damages in any case where the violator sustains the burden of proving, and the Court finds, that the violator was not aware and had no reason to believe that its actions constituted a violation.

---

[40] The Arista Records case (p. 42) involved statutory damages under Section 504 of the Copyright Act, and is not a DMCA case. Statutory damages under 504 also contains the "as the Court considers just" language.

Defendants have not provided that defense in this case or in their initial disclosures (nor could they in view of the facts). Defendants certainly do not argue that as a basis in the Motion.

The Court should also deny the request for summary judgment on the issue of multiple CMI violations at a particular event. 1202(a) and (b) have provided and distributed as does 1202(b) and at some juncture (*i.e.,* game play and loading screens) some defendants provide while the other distributes.

## V.    ILLINOIS CONSUMER FRAUD ACT

The Illinois consumer fraud claim seeks to hold Defendants accountable for their terms of use agreement that binds customers who Defendants lured into accepting those terms by offering "free downloads" on the Mobile App and "free" chips to use on the DoubleDown Casino. Consumers must agree to the TOU to get the "free" App and use the "free" chips to play.[41] (App. A-52 (Clelland) p. 105-106). The TOU Agreement transfers liability for infringement to the duped consumer, and requires that consumer to indemnify DDI and its affiliates. Importantly, the consumer has no recourse, resources to investigate, or ability to know if the representations made in the TOU are true. (App. A-52 (Clelland Dep.): p. 64-65).[42] DDI admits that an end user must rely on the accuracy of the statements in the TOU, and "trust" DDI that those statements are true. (*Id.* at 65). DDI's Company testimony confirms that DDI takes no steps itself to independently make sure that the TOU are truthful. (App. A-20 (Sigrist Dep.): p. 192-221). DDI represents that it intends to have an end user rely on the truthfulness of the statements in the TOU (*Id.* at 66). The terms of use are not true.

---

[41] The false representation about ownership and right to license is material and because of the transfer of liability and indemnification for infringement, the "free" download and "free" chips are not "free;" this is a material component of the claim.

[42] DDI's Company testimony confirms that DDI takes no steps itself to independently make sure that the TOU are truthful. (App. A-20 (Sigrist Dep.): p. 192-221.) Instead they rely on "IGT," as a partner, who is indemnifying them. (App. A-20 (Sigrist Dep.): p. 192-221).

The TOU are false. (SAF: 42-45, 61-69)(App. A-1 ¶209, 265)(App. A-52 (Celland Dep.) p. 52-53, 62-64, 72). GC2 is a non-consumer Plaintiff with a contract with IGT NV[43] that restricts the use of the GC2 projects, and reserves to GC2 the right to use the GC2 Works on non-wagering platforms. (App. A-13). Three GC2 games are presented with the terms of use. The technology evidence shows that GC2's Games, artwork, and graphics get sent to every mobile app user and every player of the GC2 Games. GC2 respectfully opposes the motion.

### A.   Defendants' Preemption Argument Fails

There is no Pre-emption by the Copyright Act here.[44] GC2's consumer fraud claim is qualitatively different than GC2's Copyright claim and is factually distinct from every case cited in Defendants' Motion p. 44-46. This claim is based upon a fraudulent TOU agreement which "licenses" unauthorized content and transfers liability for illegal acts to an unsuspecting end user under the guise of "free" chips/"free" download. Additionally, contracts between private parties (such as between GC2 and IGT NV) are not pre-empted by the Copyright Act. *See ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447 (7th Cir 1996). (enforcement of shrinkwrap license not preempted by Copyright Act). *See, Sgouros v. TransUnion Corp.*, 817 F.3d 1029 (7th Cir 2016) (active misleading consumers in connection with Terms of Use makes arbitration provision unenforceable). Defendants admit that GC2 holds contractual rights that are broader than just its copyright rights. (SAF: 66-68). Providing a false license to consumers that causes the consumer to assume liability for Defendants' illegal acts and baiting the consumer to enter into the false license (and assume liability) under a "free chips" or "free download" is not pre-empted by the Copyright Act. Defendant IGT NV and GC2 have a contract that expressly prevents IGT NV

---

[43]IGT NV is a onetime successor in interest of DDI during the relevant time period, and as of July 2017 now a partner with DDI on the technology and servers used to provide game content.
[44] To the extent Defendants challenge GC2 ownership of copyright, this count would stand and GC2 is entitled to plead in the alternative.

from using the GC2 Works with non-wagering devices. (App. A-1: Answer. Ex 18-20. Appendix A, Tab 13). The DoubleDown Interactive Platform is a non-wagering device. Defendants admit that there are three GC2 Games placed on DoubleDown Casino by IGT NV after its Parent company bought DoubleDown Interactive and implemented a strategy to place known revenue generating land based games onto this newly acquired platform. (SAF: 70); (App. A-1) (App. A-4 (Exs. 68-73)) Admission in Answer that Coyote Moon, Pharaoh's Fortune, and Kitty Glitter are games GC2 participated in developing. (SAF: 157). GC2 developed complete games and complete playable demos and delivered them to IGT. GC2 also owns copyright rights in the artwork and graphics to those GC2 Works.

B. **GC2 is Financially Harmed**

Defendants contend that GC2 did not suffer any damages "caused by the alleged deception of consumers." Again, they are wrong. (Mtn. p. 46). GC2's financial harm is its lost licensing fees, lost sales, or value of use of not only its copyright rights, but of GC2's contractual rights permitting only GC2 and (not IGT NV) the right to place the GC2 games on non-wagering, internet, or mobile platforms. Causation for an ICFA claim is recognized as one "best left to the trier of fact," such that a plaintiff need only "allege they suffered damages as a result of Defendants' unfair and deceptive practices." *Bell Enterprises*, 2001 WL 1609417, at *4-5 (*quoting Oliveira v. Amoco Oil Co*., 726 N.E.2d 51, 57 (Ill. App. Ct.2000)). IGT NV is wholly owned by IGT Parent. IGT NV, through Todd Nash readily admits that IGT NV was a customer of GC2 for the very rights GC2 holds under this Agreement. IGT NV, when it was negotiating with GC2 for those rights, did a valuation of the "gap in rights" it sought to buy from GC2. While GC2 contends that valuation is materially understated, it is at a minimum, evidence of IGT NV's financial valuation of GC2's contract rights, not copyright rights. IGT and IGT NV general counsel confirms that license rights exists between IGT NV and GC2 and that IGT was

making an offer to buy GC2's remaining rights. (App. A-18 (Prescott) p. 139-140, 144-147, 162-173). Those rights were never obtained. Lost licensing is evidence of financial harm. GC2 customers like IGT NV avoid paying for the "gap" of rights they lack in GC2 Works, and end users who have unwittingly assumed liability cannot be identified or added to lawsuits seeking enforcement. That evidence was provided by experts. The ICFA permits a non-consumer plaintiff like GC2 to recover for harm it suffers by way of conduct a defendant perpetrates on consumers. *ABN AMRO, Inc. v. Capital Int'l Ltd.*, 595 F. Supp. 2d 805, 849 (N.D. Ill. 2008) ("Plaintiff has appropriately pleaded a consumer nexus by alleging that Defendants' trade practices were directed at the market generally and further alleging financial harm.").[45] *Par. v. Beneficial Illinois, Inc.*, No. 94 C 4156, 1996 WL 172127, at *6 (N.D. Ill. Apr. 10, 1996) ("This court is satisfied that the loan-flipping scheme alleged by Plaintiffs falls into [the] broad description" of an unfair act or deceptive practice under the ICFA). [46]

Important Connection to Illinois: Internet actions and agreements that serve to defraud Illinois consumers, harm and create damage to an Illinois business, and involve the relatively new legal area of internet contracts and law governing the same, create a powerful and important connection to Illinois. Plaintiff GC2 is an Illinois resident, does business here, and is harmed here. Defendants DDI, IGT[47] and IGT NV do business in Illinois. (App. A-1: ¶42).

---

[45] Importantly, the ICFA is to be liberally construed by courts in analyzing claims. *Am. Nat. Bank & Trust Co. of Chicago ex rel. Emerald Invesments LP v. Axa Client Sols., LLC*, No. 00 C 6786, 2002 WL 1008480, at *4 (N.D. Ill. May 16, 2002); *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 594 (Ill. 1996). GC2 "need only allege that the conduct complained of 'involves trade practices directed to the market generally or otherwise implicates consumer protection concerns.'" *Id.* (quoting *Athey Prods. Corp. v. Harris Bank Roselle*, 89 F.3d 430, 437 (7th Cir.1996)); *Stunfence*, 2002 WL 1838128, at *5 ("If the conduct complained of implicates consumer protection concerns, a commercial entity that is not a consumer can proceed under the ICFA.").
[46] Connection to Illinois and Consumers Being Sued: Defendants produced evidence of at least 18,000 Illinois consumers that have used the DDC.[46] Each has necessarily agreed to the "terms of use." The forensic evidence shows that each would have received GC2 unlicensed materials and access to GC2 unlicensed games. (App. A-59). Although this Court informed GC2 that it would not permit addition of individual end users to the copyright count, that does not mean that no claim exists.
[47] IGT Parent claims it is only a holding company, has no "employees" and thus "does not do business." However, its action of requiring a terms of use be used by DoubleU as part of the sale agreement, signed by Renato Ascoli,

-48-

DoubleDown Casino (DDC), which uses the TOU in question, is accessible in and has been accessed in Illinois. (App. A-1: ¶53-56). The GC2 games on DDC are accessible from Illinois and have been accessed and used in Illinois. (App. A-1: ¶42, 53-56). Defendants concede that there are so many daily users that it would be burdensome and oppressive to identify them. (Dkt. 163, ¶406). Defendants have very sophisticated forensics and can (but refused) to provide details in this case. There are admittedly at least 18,000 Illinois users that are identified, and Defendants' Answer admits Illinois consumers have purchased chips while in Illinois. (App.1-1: ¶54 and 56). Oddly, Defendants acknowledge that their "terms of use" contain fraudulent representations, and that they use fraudulent tactics to get the end user to agree to the terms (i.e. free chips and free download) but they indicate that an end user would have to follow Washington state arbitration venue provisions to address issues with the fraudulent Terms of Use. On the one hand it asks this Court under the DMCA to find the terms not sufficiently conveyed with the works but now claim it is close enough for enforceability of the arbitration provision. That arbitration provision is unenforceable. *Sgouros v. TransUnion Corp.*, 817 F.3d 1029 (7th Cir. 2016) (Terms of use arbitration provision unenforceable). This assertion alone weighs highly in favor of an Illinois court addressing the Defendants' fraudulent and deceptive practices against Illinois consumers and Illinois company GC2.

**Links to IGT Parent and IGT NV:** IGT Parent and IGT NV's contend that "there is no evidence linking it to the Terms of Use found on DDC." (Mtn. p. 44-49) (SAF: 41-45, 105, 106, 114) proves this position is wrong.

---

(Cont'd)
knowing the distribution model involved unlicensed content and indemnifying DoubleU for losses related to this case, crosses IGT Parent over the line to active participation in the issues in this case.

## VI.    CONCLUSION

For the reasons set forth herein, Defendants' Motion for Partial Summary Judgment must

be denied.

Respectfully submitted,

/s/Kara E. F. Cenar
Kara E. F. Cenar (ARDC 6198864)
kcenar@greensfelder.com
Ricardo Meza (ARDC 6202784)
(rmeza@greensfelder.com)
Susan Meyer (ARDC 6226450)
smeyer@greensfelder.com
Greensfelder, Hemker & Gale, P.C.
200 W. Madison St., Ste. 3300
Chicago, IL 60606
312-419-9090 (T); 312-419-1930 (F)

John E. Petite
(jep@greensfelder.com)
Kirsten M. Ahmad
(km@greensfelder.com)
Greensfelder, Hemker & Gale, P.C.
10 South Broadway, Ste. 2000
St. Louis, Missouri 63102
314-241-9090 (T); 314-241-8624 (F)

*Attorneys for Plaintiff GC2 Incorporate*