# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| GC2 INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: 1:16-cv-08794 |
| | ) | |
| INTERNATIONAL GAME TECHNOLOGY | ) | Judge Matthew F. Kennelly |
| PLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' REPLY IN SUPPORT OF
## THEIR MOTION FOR SUMMARY JUDGMENT

Eric N. Macey (#3122684)
*emacey@novackmacey.com*
Joshua E. Liebman (#6283377)
*jliebman@novackmacey.com*
Christopher S. Moore (#6256418)
*cmoore@novackmacey.com*
Rebekah H. Parker (#6301907)
*rparker@novackmacey.com*
Brittney N. Cato (#6323715)
*bcato@novackmacey.com*
NOVACK AND MACEY LLP
100 North Riverside Plaza
Chicago, Illinois 60606
(312) 419-6900

## TABLE OF CONTENTS

Page

I.      The Court Should Strike GC2'S Rule 56.1 Materials...............................................................1

II.     The Kitty Glitter And Maid Of Money Claims Fail...............................................................2

    A.      GC2's Copyright Is In The Artwork And 2D Graphics, Not The Games...................3

    B.      GC2 Fails To Compare The Copyrighted
    Material To The Allegedly Infringing Material................................................................3

    C.      GC2 Fails To Create A Triable Issue As To
    Substantial Similarity – Comparison Of The Works......................................................4

        1.      GC2's Principal Cases Are Distinguishable ....................................................4

        2.      No Triable Issue As To The IGT Kitty Glitter Artwork.................................4

        3.      No Triable Issue As To The Maid Of Money Artwork....................................6

    D.      GC2's Mark On Land-Based Games Does Not Create A Fact Issue ...........................7

III.    Defendants Are Only Severally Liable  For Their Own Profits (Counts I-V, VII, XI)............7

    A.      The IGT Defendants Are Not Liable For
    The Profits Of The Online Casino Operators.................................................................8

        1.      GC2's Equitable Interest/Constructive Trust Law Is Inapplicable .................8

        2.      Shared Technology ...........................................................................................9

        3.      Shared Revenue ................................................................................................9

        4.      Licensing Agreements ....................................................................................10

    B.      The IGT Defendants Are Not Liable For Masque's Profits..........................................11

    C.      The IGT Defendants And DDI Are
    Not Practical Partners Since June 1, 2017 ....................................................................11

    D.      DDI Cannot Be Liable For The Profits Of Its Payment Processors ...........................12

    E.      The "Intentional Infringement" Cases Are Outliers....................................................13

    F.      The Manning, Millar And Sigrist Declarations............................................................14

IV.     GC2 Cannot Recover IGT Holdco's Profits
From The 2017 Sale Of DDI To DoubleU Diamond ............................................................15

**Page**

V.    GC2's DMCA Claim ..................................................................................................... 16

    A.    GC2's DMCA Claim Is Limited To Pharaoh's Fortune And Coyote Moon ............. 16

    B.    GC2's Claim As To Omitted Or Removed CMI ...................................................... 16

        1.    Alleged Failure To Affix CMI ................................................................... 16

        2.    Alleged Removal From Glass .................................................................... 17

    C.    No False CMI Claim As To Lobby Images (Section 1202(a)) ..................................... 18

        1.    GC2's Concession Forecloses Its
            Claim As To The Desktop Lobby Images ................................................. 18

        2.    The Same Reasoning Applies Equally To The Mobile Lobby ....................... 18

        3.    Reconsideration Is Not Appropriate .......................................................... 19

        4.    GC2's Arguments Regarding Other Images Should Be Disregarded ............ 19

    D.    No Evidence Of Intent (Sections 1202(a) and (b)) ............................................ 20

VI.    GC2's Damages Are Limited (Count XII) ............................................................... 22

    A.    "Violations" Do Not Include Automatic Downloads ................................... 22

    B.    The Court Should Avoid An Absurd Result .......................................................... 23

    C.    Updates And Each Allegedly False Piece Of CMI ............................................ 23

VII.    GC2's Illinois Consumer Fraud Claim Fails (Count XIII) ......................................... 24

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abeshouse v. Ultragraphics, Inc.,*
754 F.2d 467 (2d Cir. 1985) .................................................................................13

*Agence France Presse v. Morel,*
934 F. Supp. 2d 547 (S.D.N.Y. 2013) ......................................................... 23, 24

*Agence France Presse v. Morel,*
934 F. Supp. 2d 584 (S.D.N.Y. 2013) .................................................................23

*Agence France Presse v. Morel,*
No. 10 C 2730, 2014 WL 3963124 (S.D.N.Y. Aug. 13, 2014) ...........................17

*Airframe Sys., Inc. v. L-3 Comm'ns Corp.,*
658 F.3d 100 (1st Cir. 2011) ................................................................................3

*Alonso v. Weiss,*
301 F. Supp. 3d 885 (N.D. Ill. 2018) ....................................................................1

*Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.,*
672 F.2d 607 (7th Cir. 1982) ........................................................................... 3, 5

*Bauman v. DaimlerChrysler AG,*
No. 04 C 194, 2005 WL 3157472 (N.D. Cal. Nov. 22, 2005)............................10

*Big Daddy Games, LLC v. Reel Spin Studios, LLC,*
No. 12 C 449, 2013 WL 12233949 (W.D. Wis. Apr. 10, 2013) ...................... 4, 5

*Carter v. Thompson Hotels,*
943 F. Supp. 2d 830 (N.D. Ill. 2013) ....................................................................1

*Cichon v. Exelon Generation Co., LLC,*
401 F.3d 803 (7th Cir. 2005)................................................................................2

*Ciomber v. Coop. Plus, Inc.,*
527 F.3d 635 (7th Cir. 2008) ................................................................................1

*Comm. Ins. Servs., Ltd. v. United Life Ins. Co.,*
No. 05 C 4105, 2007 WL 2710495 (S.D. Ill. Sept. 13, 2007) ...........................21

*Cooper v. City of Chi. Heights,*
No. 09 C 3452, 2011 WL 5104478 (N.D. Ill. Oct. 27, 2011)...................... 11, 14

*DaVinci Editrice S.R.L. v. ZiKo Games, LLC,*
183 F. Supp. 3d 820 (S.D. Tex. 2016) ..................................................................4

**Page(s)**

*DaVinci Editrice S.R.L. v. ZiKo Games, LLC,*
No. 13 C 3415, 2014 WL 3900139 (S.D. Tex. Aug. 8, 2014)...............................................4

*De v. City of Chi.,*
912 F. Supp. 2d 709 (N.D. Ill. 2012) .................................................................................19

*Dean v. Cameron,*
53 F. Supp. 3d 641 (S.D.N.Y. 2014) ...................................................................................5

*Deltak, Inc. v. Advanced Systems, Inc.,*
767 F.2d 357 (7th Cir. 1985).............................................................................................7

*Folkens v. Wyland Worldwide, LLC,*
882 F.3d 768 (9th Cir. 2018) .............................................................................................5

*Fulton v. Theradyne Corp.,*
No. 06 C 1321, 2007 WL 772953 (N.D. Ill. Mar. 12, 2007)..............................................21

*Grant v. Trustees of Ind. Univ.,*
870 F.3d 562 (7th Cir. 2017) ...........................................................................................25

*Harris v. Miller,*
50 USPQ 625, 1941 U.S. Dist. LEXIS 3950 (S.D.N.Y. 1941) ...................................... 13, 14

*Incredible Techs., Inc. v. Virtual Techs., Inc.,*
400 F.3d 1007 (7th Cir. 2005)...................................................................................... 5, 6

*Indyne, Inc. v. Abacus Tech. Corp.,*
876 F. Supp. 2d 1278 (M.D. Fla. 2012) .............................................................................3

*Jackson v. Casio Phonemate, Inc.,*
No. 98 C 6250, 2001 WL 740518 (N.D. Ill. June 29, 2001).............................................21

*The Joint Comm'n on Accreditation of Healthcare Orgs. & Joint Comm'n Res., Inc. v. The Greeley Co.,*
No. 14 C 10225, 2016 WL 1450051 (N.D. Ill. April 13, 2016) ...........................................6

*Kasalo v. Trident Asset Mgmt., LLC,*
53 F. Supp. 3d 1072 (N.D. Ill. 2014) ...............................................................................16

*Kelly v. Arriba Soft Corp.,*
77 F. Supp. 2d 1116 (C.D. Cal. 1999)
*aff'd in part, rev'd in part,* 336 F.3d 811 (9th Cir. 2003)...........................................17

*Krechmer v. Tantaros,*
17 C 4061, 2018 WL 4044048, at (2d Cir. Aug. 24, 2018)..............................................20

*LaFlamboy v. Landek,*
587 F. Supp. 2d 914 (N.D. Ill. 2008) ......................................................................... 12, 15

iv

**Page(s)**

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
735 F. Supp. 2d 856 (N.D. Ill. 2010) ......................................................................1

*Malec v. Sanford*,
191 F.R.D. 581 (N.D. Ill. 2000) ...................................................................passim

*Mannoia v. Farrow*,
476 F.3d 453 (7th Cir. 2007) ...................................................................24

*McClatchey v. Associated Press*,
No. 05 C 145, 2007 WL 1630261 (W.D. Pa. June 4, 2007)...................................24

*Modrowski v. Pigatto*,
712 F. 3d 1166 (7th Cir. 2013)...................................................................3

*Murray Hill Pubs., Inc. v. Twentieth Century Fox Film Corp.*,
361 F.3d 312 (6th Cir. 2004) ...................................................................2

*Nelson-Salabes, Inc. v. Morningside Dev., LLC*,
284 F.3d 505 (4th Cir. 2002) ...................................................................7

*OG Int'l, Ltd. v. Ubisoft Entm't*,
11 C 4980, 2011 WL 5079552 (N.D. Cal. Oct. 26, 2011)
*aff'd*, 468 Fed. Appx. 787 (9th Cir. 2012) ...................................................................5, 6

*Randolph v. Dimension Films*,
634 F. Supp. 2d 779 (S.D. Tex. 2009) ...................................................................7

*Reilly v. Plot Commerce*,
15 C 5118, 2016 WL 6837895 (S.D.N.Y. Oct. 31, 2016) ...................................................................22, 23

*Robert G. Stark Enters. v. Neptune Design Grp., LLC*,
No. 16 C 264, 2017 WL 1345195 (N.D. Ohio April 12, 2017) ...................................................................17

*SellPoolSuppliesOnline.com LLC v. Ugly Pools Ariz., Inc.*,
No. 15 C 1856, 2018 WL 4565901 (D. Ariz. Sept. 24, 2018) ...................................................................19

*Sheldon v. Metro-Goldwyn Pictures Corp*,
106 F.2d 45 (2d Cir. 1939) ...................................................................8

*Softel, Inc. v. Dragon Med. & Scientific Commc'ns. Ltd.*,
No. 87 C 0167, 1995 WL 606307 (S.D.N.Y. Oct. 16, 1995)...................................................................13

*Spencer v. Cent. States, Se. & Sw. Areas Pension Fund*,
778 F. Supp. 985 (N.D. Ill. 1991)...................................................................12, 16, 21

*Spry Fox LLC v. LOLApps Inc.*,
12 C 0147, 2012 WL 5290158 (W.D. Wash. Sept. 18, 2012) ...................................................................4

**Page(s)**

*Stevens v. Corelogic, Inc.,*
  899 F.3d 666 (9th Cir. 2018)................................................................................20

*Stockwire Research Grp., Inc. v. Lebed,*
  577 F. Supp. 2d 1262 (S.D. Fla. 2008).................................................................23

*Straus v. DVC Worldwide, Inc.,*
  484 F. Supp. 2d 620 (S.D. Tex. 2007) ................................................................15

*Sullivan v. Alcatel-Lucent USA, Inc.,*
  No. 12 C 7528, 2014 WL 1797520 (N.D. Ill. May 6, 2014) ..................................1

*Theotokatos v. Sara Lee Pers. Prods.,*
  971 F. Supp. 332 (N.D. Ill. 1997).........................................................................7

*U.S. v. Dunkel,*
  927 F.2d 955 (7th Cir.1991) ...........................................................................21, 24

*United Airlines, Inc. v. Mesa Airlines, Inc.,*
  219 F.3d 605 (7th Cir. 2000) ............................................................................8, 12

*Walker v. Time Life Films, Inc.,*
  784 F.2d 44 (2d Cir. 1986) ...................................................................................7

*Williams Elecs., Inc. v. Bally Mfg. Corp.,*
  568 F. Supp. 1274 (N.D. Ill. 1983)...............................................................2, 5, 6, 7

*Wozniak v. Ind. Univ. Bd. of Trs.,*
  No. 05 C 919, 2007 WL 869165 (S.D. Ind. March 20, 2007) ............................10

**Statutes**

17 U.S.C. § 504(b) .................................................................................................7

17 U.S.C. § 1202..............................................................................................passim

**Rules**

Fed. R. Civ. P. 60(c)............................................................................................19

Local Rule 56.1...............................................................................................passim

**Other Authorities**

Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* (Matthew Bender ed. 2015)................14

## I.   <u>The Court Should Strike GC2'S Rule 56.1 Materials</u>[1]

GC2's Response is a jumble of arguments, much of which are irrelevant, with confusing citations to thousands of pages of documents that make it difficult to sort through.  This disarray results, in principal part, from GC2's failure to provide in its Response a statement of facts with specific citations.  This was required.  *E.g.*, *Malec v. Sanford*, 191 F.R.D. 581, 585 (N.D. Ill. 2000); *Sullivan v. Alcatel-Lucent USA, Inc.*, No. 12 C 7528, 2014 WL 1797520, *1 (N.D. Ill. May 6, 2014).

Moreover, GC2's Response to Defendants' Rule 56.1 Statement ignores the dictates of Local Rule 56.1(b)(3)(B).  Even when GC2 does not dispute one of Defendants' Rule 56.1(a)(3) statements, it characterizes it as "materially incomplete" and uses that as a pretext for including additional "facts."  The Court, however, should not consider the additional facts proposed in GC2's Rule 56.1(b)(3)(B) statement.  *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 735 F. Supp. 2d 856, 863 (N.D. Ill. 2010); *accord Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 643-44 (7th Cir. 2008).

In addition, innumerable paragraphs in GC2's Rule 56(b)(3)(B) response that dispute one of Defendants' Rule 56.1(a)(3) facts ("Dfts.' SOF") cite to GC2's *own* Rule 56.1(b)(3)(C) statement ("Pltf.'s SOF").  This is improper.  *E.g., Makor Issues & Rights*, 735 F. Supp. 2d at 864-65; *Carter v. Thompson Hotels*, 943 F. Supp. 2d 830, 836-37 (N.D. Ill. 2013).  And numerous GC2 responses are argumentative and rely on conclusory statements that do not actually dispute Dfts.' SOF.  This, too, is impermissible.  *E.g., Alonso v. Weiss*, 301 F. Supp. 3d 885, 890-91 (N.D. Ill. 2018).

Pltf.'s SOAF is also plagued with improprieties.  It (a) cites material that does not support its statements (*e.g.*, ¶¶ 19, 80, 136); (b) mischaracterizes evidence (*e.g.*, ¶¶ 61, 119, 181); (c) cites voluminous documents without pin cites (*e.g.*, ¶¶ 12, 48, 171); (d) asserts legal and factual conclusions without foundation (*e.g.*, ¶¶ 7, 109, 120); (e) relies on material without authentication or foundation

---

[1] Unless otherwise stated, capitalized terms have the meanings ascribed to them in Defendants' Memorandum of Law in Support of Their Motion for Partial Summary Judgment ("Op. Br.").  (Dkt. No. 284.)

(*e.g.*, ¶¶ 10, 40, 124); (f) relies on testimony of individuals who lack personal knowledge (*e.g.*, ¶¶ 50, 130, 178); and (g) has multiple paragraphs with more than one statement and uses footnotes, subparagraphs, and bullet points to squeeze in at least 35 other "facts." (*E.g.*, ¶¶ 67, 70, 141, 178.) The foregoing are continuous, not sporadic, and the Court should not be expected to wade through this morass.

The Court is "'entitled to expect strict compliance with Rule 56.1.'" *Cichon v. Exelon Generation Co., LLC*, 401 F.3d 803, 809-10 (7th Cir. 2005) (citation omitted). Accordingly, the Court should (a) strike all additional facts GC2 improperly includes in its Rule 56.1(b)(3)(B) response;[2] (b) strike all responses that cite Pltf.'s SOAF as support;[3] (c) strike all argumentative and conclusory responses;[4] (d) deem as admitted the corresponding facts in Dfts.' SOF; and (e) strike Pltf.'s SOAF.[5]

## II.   The Kitty Glitter And Maid Of Money Claims Fail

It is telling that GC2 does not show the Kitty Glitter or Maid of Money artwork side-by-side in its brief. Even a cursory look at the parties' works compels a finding of no substantial similarity.[6] And while the parties agree on the applicable legal standard, they disagree on whether substantial similarity is "inherently" a question "of fact." (Resp. 9-10.) It is not. "Courts 'have frequently affirmed summary judgment in favor of copyright defendants on the issue of substantial similarity . . . .'" *Murray Hill Pubs., Inc. v. Twentieth Century Fox Film Corp.*, 361 F.3d 312, 321 (6th Cir. 2004) (citation omitted); *accord Williams Elecs., Inc. v. Bally Mfg. Corp.*, 568 F. Supp. 1274, 1281 (N.D. Ill. 1983).

---

[2] These are ¶¶ 10-26, 29-31, 33-34, 38-39, 45, 49-50, 135, 137-40, 142, 145, 148, 150-51, 153-55, 157-58, 160-65, 174-78, 180-82, 189-90, 192-93, 196-97.

[3] These are ¶¶ 1-5, 8-26, 29-35, 37-39, 45, 49-51, 53-59, 61, 68-72, 99-100, 107-08, 135, 137-40, 142, 145, 147-48, 150-51, 153-55, 157-58, 160-61, 163-66, 168-74, 176, 180-90, 197.

[4] These are ¶¶ 10, 12-16, 18-26, 29-31, 34, 38, 45, 99-100, 135, 137-40, 148, 155, 157-58, 160-61, 166.

[5] Further complicating GC2's submissions: (a) it filed 217 exhibits, 23 of which were not cited, and 12 of which were identified as "available to the Court," but not provided to Defendants.

[6] GC2 also argues copying (Resp. 8), but that is not at issue here.

2

### A.    GC2's Copyright Is In The Artwork And 2D Graphics, Not The Games

In a desperate attempt to conjure up a fact dispute, GC2 (at 11-12) tries to shift the focus away from the artwork and onto the games themselves. The Court should not be misled. *GC2 has no copyright in the games.* Even GC2 acknowledges that its copyright is "in the artwork and graphics to" the Principal At-Issue Games (*id.* 47), and the Amended Complaint alleges a copyright in only the "video artwork and 2D graphics" that were "used in the games" at issue. (Dkt. No. 18 ¶¶ 24, 195, 205, 216, 227.) The Court recognized this in its order on Defendants' motion to dismiss, and recognized that IGT NV owned copyrights in the software used for these games. (Dkt. No. 152 at 3, 6.)

### B.    GC2 Fails To Compare The Copyrighted Material To The Allegedly Infringing Material

Because substantial similarity is an element of GC2's copyright claim (Op. Br. 13-22), its Response must provide sufficient evidence to support that element. *Modrowski v. Pigatto*, 712 F. 3d 1166, 1168-69 (7th Cir. 2013). This it has not done. Instead, GC2 asks the Court to compare the *land-based* Kitty Glitter artwork to the artwork on the disc it delivered to IGT NV in *2005*. (Resp. 11, 15-17.) This is the wrong comparison. The Court must compare the "accused work" to the "copyrighted work." *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.,* 672 F.2d 607, 614 (7th Cir. 1982). This means comparing the 2D graphics and artwork used in the internet versions of the Kitty Glitter and Maid of Money games to GC2's copyrighted materials.

The Response fails to carry this burden. The disc GC2 delivered to IGT NV in 2005 is not the best evidence of the work that GC2 copyrighted in 2016. *E.g.*, *Airframe Sys., Inc. v. L-3 Commc'ns Corp.*, 658 F.3d 100, 106 (1st Cir. 2011); *Indyne, Inc. v. Abacus Tech. Corp.*, 876 F. Supp. 2d 1278, 1291-92 (M.D. Fla. 2012). GC2's failure to prove the content of its copyrighted material is fatal. *See, e.g.*, *Airframe Sys.*, 658 F.3d at 107 ("Having presented no evidence sufficient to prove the content of its registered source code versions, Airframe cannot show that any of its registered works is substantially similar to the allegedly infringing M3 program . . . ."). Likewise, GC2 fails to prove that the land based

3

Kitty Glitter artwork is the same as the allegedly infringing artwork.

### C.   GC2 Fails To Create A Triable Issue As To Substantial Similarity – Comparison Of The Works

#### 1.   GC2's Principal Cases Are Distinguishable

GC2's reliance on *Big Daddy Games, LLC v. Reel Spin Studios, LLC*, No. 12 C 449, 2013 WL 12233949 (W.D. Wis. Apr. 10, 2013), is inapposite. There, plaintiff's copyright included "computer program" and "compilation" for three games, and two copyrights expressly excluded "artwork." *Id.* at *6. The court considered whether *games* that included "copied clipart from the public domain" and resembled other games with the same theme had the requisite "slight amount" of creativity to be copyrightable. *Id.* at *14. It further found scènes à faire to be inapplicable because "virtually identical copying" was at issue. *Id.* at *15. Here, GC2 does not have a copyright in the game, the computer program, or the game "compilation." Also, there is no allegation of "virtually identical copying."

GC2's reliance on *DaVinci Editrice S.R.L. v. ZiKo Games, LLC*, No. 13 C 3415, 2014 WL 3900139 (S.D. Tex. Aug. 8, 2014), actually helps *Defendants*, not GC2. There, the court denied a *motion to dismiss* on the ground that, although the characters of the two games were different, the games' rules of play -- which were complex and creative in and of themselves -- were "nearly identical." *Id.* at *3, 14. Importantly, however, the same court subsequently *granted summary judgment* to defendant based on its finding that the protectable elements of the games were *not* substantially similar. *DaVinci Editrice S.R.L. v. ZiKo Games, LLC*, 183 F. Supp. 3d 820, 834 (S.D. Tex. 2016).

Lastly, GC2's reliance on *Spry Fox LLC v. LOLApps Inc.*, 12 C 0147, 2012 WL 5290158 (W.D. Wash. Sept. 18, 2012), is readily distinguishable. Just like *DaVinci*, it was decided on a *motion to dismiss*, and it concerned plaintiff's copyright in an original video *game*, not in 2D artwork and graphics incorporated into a video slot game. *Id.* at *8.

#### 2.   No Triable Issue As To The IGT Kitty Glitter Artwork

GC2 does not dispute that its Kitty Glitter Artwork and IGT's Kitty Glitter Artwork have an

entirely different look and feel. GC2's owner admitted it. (Op. Br. 21-22.) The entirely different look and feel is obvious and reason alone to grant summary judgment.

The Response (at 12) identifies the following as being "the same" between the two "games": (a) theme; (b) symbols; (c) action; (d) bonus play; and (e) animation, but fails to explain what these mean, *e.g*, which symbols, which colors, and which animations are similar.[7] What is meant by "action" and "bonus play," and how are those expressed in the 2D graphics and artwork -- as opposed to the game itself (which GC2 has no copyright in)? As the Opening Brief showed (at 18-20), IGT NV uses *different* symbols, colors, cats, and animations. Moreover, the "themes" of featuring cats and diamonds are not protected. *Big Daddy Games*, 2013 WL 12233949, at *14.

GC2 (at 14) tries to distinguish *Incredible Techs., Inc. v. Virtual Techs., Inc.,* 400 F.3d 1007 (7th Cir. 2005), because golf is a "real sport[.]" Cats are *real* animals. Elements in nature are not protected. *E.g., Folkens v. Wyland Worldwide, LLC,* 882 F.3d 768, 770 (9th Cir. 2018); *Dean v. Cameron*, 53 F. Supp. 3d 641, 649 (S.D.N.Y. 2014). Unlike the "fanciful monsters" in Pac-man, there are a limited number of ways to express the "feline" and "fancy" themes; a bowl is among the limited universe of cat-associated symbols. "Where artwork on two games is similar only in that both portray common objects likely to appear in any game based on the same idea, there is no infringement." *Williams Elecs.*, 568 F. Supp. at 1282 n.22; *see also OG Int'l, Ltd. v. Ubisoft Entm't*, 11 C 4980, 2011 WL 5079552, at *6 (N.D. Cal. Oct. 26, 2011) (similar), *aff d*, 468 Fed. Appx. 787 (9th Cir. 2012).

Generic features of online slot games include the use of royals and diamonds, among other things. (Op. Br. 17.)[8] These elements are protected only from virtually identical copying. *Incredible*

---

[7] While the Seventh Circuit disfavors dissecting the work and comparing it element by element (*Atari*, 672 F2d at 618), GC2 does exactly that, comparing minute, individual details from the artwork one at a time (Pltf.'s SOAF ¶¶ 190-91). GC2 also buries its comparisons in its SOAF and fails to explain them in the Response. This is improper. *See, e.g., Malec*, 191 F.R.D. at 585 ("it is inappropriate in one's memo to simply refer the Court to the 56.1 statement").

[8] The Response (at 14-15) notes that other IGT NV games featuring diamonds have "diamond" in the title, but that does not create an issue as to substantial similarity. Diamonds are symbols commonly used by IGT NV

*Techs.*, 400 F.3d at 1014. GC2 identifies no identical elements between the two games. The symbols, frames, and features are all expressed differently. (Op Br. 17.) Thus, given the difference in expression and "look and feel" between the works, the existence of similar themes and some generic symbols does not create a disputed issue of material fact. *See*, *e.g.*, *OG*, 2011 WL 5079552, at *7 (avatars were not substantially similar despite having "some elements in common"); *Williams Elecs.*, 568 F. Supp. at 1282 (no substantial similarity where "similarities are almost wholly the product of the games' reliance on similar but noncopyrightable game concepts"). "'The question in each case is whether the similarity relates to matter that constitutes a *substantial* portion of plaintiff's work[.]'" *Greeley*, 2016 WL 1450051, at *7 (emphasis added) (citation omitted). Here, the answer is obvious. No.

### 3. No Triable Issue As To The Maid Of Money Artwork

The Response (at 16-17) does not dispute the differences in the overall look and feel of the Maid of Money artwork; instead, it identifies alleged similarities in the artwork between the working demo of Maid of Money delivered by GC2 and the version IGT NV shared with Masque. Again, GC2 fails to compare the allegedly infringing artwork to the allegedly infringed artwork registered with the Copyright Office. (§ II.B, *supra*.) In any event, the "similarities" it identifies are unavailing:

(a) Maid -- GC2 cannot copyright the idea of centering a game around a maid.

(b) Maid's "hair" and "dress" -- The hair is a different color; uniforms are different styles.

(c) "Royals" in primary colors and "serif font" -- The use of royals, primary colors, and serif font in online slot machine games are too commonplace to be protected.

(d) "Gold bars between the reels" and "light colored solid" interface background -- Too common-place in video slot games to be protected.

(e) "No frames around the royals" and "interesting backgrounds" -- Too common to be protected and too insignificant to lead to a conclusion of substantial similarity.

---

and others in slot games, and centering a game around diamonds is an unprotectable idea. For 13 additional examples of games incorporating diamonds, *see* GC2's App. A-45 Part 1 at pp. GC2 23038-41, 23044 (Jewel Quest Riches, Double Wammy, Gems Gems Gems, Glitz, Secret Romance, Life of Riches, Crystal Clear, Frozen Diamond, Crown Gems, She's A Rich Girl, Triple Diamond, DaVinci Diamonds, Trivia Spin).

(f)     "Duster symbol" -- Expected element in game about maids and protected only from identical copying.  They are not identical in color, shading, or realism.  In any event, one arguably similar symbol, expressed differently, does not change the "look and feel" of the game.  *See, e.g., Williams Elecs.*, 568 F. Supp. at 1282.

The foregoing are either not protectable or insufficient to create a triable issue of fact.

### D.     GC2's Mark On Land-Based Games Does Not Create A Fact Issue

When considering the question of substantial similarity, "the works themselves supersede and control any contrary allegations, conclusions or descriptions of the works . . . .'"  *Theotokatos v. Sara Lee Pers. Prods.*, 971 F. Supp. 332, 341 (N.D. Ill. 1997).  "[C]omparison of secondary or descriptive materials cannot prove substantial similarity under the copyright laws, because the works themselves, not descriptions or impressions of them, are the real test for claims of infringement."  *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 51 (2d Cir. 1986) (internal citation omitted); *accord Randolph v. Dimension Films*, 634 F. Supp. 2d 779, 788 (S.D. Tex. 2009).  Consequently, IGT NV's placement of GC2's mark on the *land-based* Kitty Glitter game is irrelevant and does not create a material fact dispute.

## III.     Defendants Are Only Severally Liable For Their Own Profits (Counts I-V, VII, XI)[9]

Lacking any meaningful counter to the law and facts in the Opening Brief, GC2 tries to manufacture genuine disputes of material facts by citing a slew of irrelevant facts and hoping the Court concludes that because of the volume alone, this issue is best for a jury -- the proverbial "kitchen sink approach."  But the only facts relevant to the practical partner analysis are undisputed and mandate summary judgment for Defendants on this issue.  GC2's arguments are addressed below.[10]

---

[9] GC2 tries to conflate "disgorgement of profits" with "actual damages" asserting they are "intertwined." (Resp. 18.)  "Actual damages" and "profits" are clearly distinct theories of recovery under the Copyright Act. 17 U.S.C. § 504(b) (the "Act").  In the only case GC2 cites, *Deltak, Inc. v. Advanced Systems, Inc.*, 767 F.2d 357 (7th Cir. 1985), the court did not hold that a *non-party's* profits were actual damages recoverable by the plaintiff. It merely noted that "value of use" to the *defendant* is a measure of actual damages.  *Id.* at 363.

[10] The Response (at 19) claims that the practical partner test requires "a factually intensive inquiry," but neither case GC2 cites in support states that.  And GC2's reference to the *Nelson-Salabes* court's remand for factual inquiry is misleading.  *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 517-18 (4th Cir. 2002).  The case was remanded because the lower court imposed joint liability without factual findings, not because the issue was improper or too fact intensive for summary judgment.  *Id.*  GC2 also argues, without citation, that "boilerplate" contractual language is not the only relevant factor.  But contractual language allocating risks

### A. The IGT Defendants Are Not Liable For
### The Profits Of The Online Casino Operators

The Casino Operators are not parties in this case, and GC2 cites no case holding a defendant liable for profits of a *non-party*. Defendants could not find one either. The only case addressing this issue in any way is *Sheldon v. Metro-Goldwyn Pictures Corp*, 106 F.2d 45 (2d Cir. 1939) (Hand, J.), cited in GC2's Response. There, the court held that the defendant was not liable for the profits earned by the *non-parties*. *Id.* at 51. ("[Plaintiffs] can reach only the *defendants'* profits . . . . Not to allow the credit would be in substance to introduce the [non-parties] as defendants into this suit, and yet hold [defendant] liable for the recovery against them") (emphasis added). **Because they are not parties, summary judgment as to the Casino and Lottery Operators' profits should be granted.**

The Court, therefore, need not consider the arguments in the Response relating to the Casino and Lottery Operators' profits. (Resp. 21-22.) Even if it did, GC2 does not argue that the IGT Defendants and these operators share profits or risk of loss, or any other hallmarks of a partnership. Rather, it relies on completely inapplicable law and a series of irrelevant facts about the IGT Defendants' and Casino Operators' operations put in place to facilitate their various contractual relationships.[11]

### 1. GC2's Equitable Interest/Constructive Trust Law Is Inapplicable

GC2 (at 17-18) argues that the "casino partners' profits are recoverable" due to constructive trusts and equitable interests. The cases it cites (at 17-18) are wholly inapposite, do not address joint liability for *another* defendant's (let alone a *non-party's*) profits, and do not mention the "practical

---

between contracting parties is obviously relevant to whether they share profits or losses.

[11] The Response (at 3) argues that the IGT Defendants refer to the Casino Operators as "partners" on www.igt.com. That designation for marketing or branding purposes, however, says nothing about the actual sharing of profits and losses between them. GC2's references to deponents using the word "partner" to describe a contractual counterparty are also irrelevant. *See United Airlines, Inc. v. Mesa Airlines, Inc.*, 219 F.3d 605, 610 (7th Cir. 2000) ("Businesses often refer to suppliers, customers, and producers of complementary products colloquially as 'our partners' without summoning up fiduciary duties.").

partners" test. They only hold defendants liable for *their own* profits from extraterritorial infringement.

GC2 asserts that Defendants know the Casino Operators' costs so Defendants' argument regarding the inequity of requiring parties to pay non-parties' profits should fail. (Resp. 18; Op. Br. 24 n.9.) Aside from being entirely irrelevant, GC2 cites nothing to show that Defendants had the operators' *costs* for employee salaries, website design, website operation and maintenance, server leases, marketing, advertising, sales taxes, insurance, *etc.* (Resp. 22 (citing Pltf.'s SOAF ¶¶ 82-83).)

### 2. Shared Technology

The Response (at 19-20) relies on Pltf.'s SOAF ¶¶ 72-79, which purports to describe the technology used by IGT NV and the operators. That has nothing to do with sharing profits or losses. Having compatible technology does not create the requisite practical partnership, nor does making marketing materials available. GC2's conclusion that "[t]echnology partnering" supports a practical partner finding is wholly unsupported by any legal authority. GC2 cites none, and its cases do not discuss joint liability or the practical partner test at all. (*See* Resp. 20 n.17.)[12]

### 3. Shared Revenue

The Response (at 21-22) claims without support that sharing *revenue* and *revenue* related information makes parties practical partners. This ignores the cases in the Opening Brief (at 24-25) holding that sharing revenue or paying a royalty is not sharing profits. GC2 also conflates the IGT Defendants and the various operators, even though each has a different relationship (if any) with each counterparty. (*See id.* 2-6, 24-25.) Thus, even though IGT NV shares revenue with the N.J. Operators, there is no evidence of shared profits or losses. GC2 also provides no evidence that

---

[12] The Introduction to the Response (at 3) disingenuously claims that Defendants now state that the games are distributed "through" the Casino Operators' website, which is the opposite of prior deposition testimony. This is a red-herring. The statements in the Millar and Manning Declarations to which GC2 refers are not an attempt to detail the technological aspects of game delivery. (*See* Dfts.' SOF ¶¶ 56, 71, 82.) In any event, it does not matter whether the games pass "through" the operators' websites or not. The test is not based on the technology relationship. It is based on the sharing of profits and losses.

IGT Holdco and these operators share any revenue, let alone profits and losses.

Likewise, GC2 proffers no evidence that the IGT Defendants share revenue with the Foreign, Canadian or Historic Casino/Lottery Operators. While Pltf.'s SOAF ¶ 80 states, "Defendants share revenue from their exploitation of GC2 Games with their Casino Partners," the cited testimony says nothing of the sort. Most importantly, GC2 offers nothing to counter the express terms of contracts attached to the Millar and Manning Declarations, which unambiguously identify entities *other than* IGT NV or IGT Holdco as counterparties to these operators. Further, Pltf.'s SOAF ¶¶ 81-84 do not state that IGT NV or IGT Holdco *share revenue* with these operators. They merely set forth the operators' obligations to provide financial information. That is not evidence of a partnership, and GC2 cites no case holding otherwise.

### 4.   <u>Licensing Agreements</u>

GC2 never connects the dots to explain how IGT Holdco has a relationship with the Foreign and N.J. Operators due to regulatory requirements. (Resp. 22-23.) And most of GC2's alleged facts are unsupported or otherwise inadmissible. The following statements have no support at all: (a) IGT NV "admits" it gets the "games approved"; and (b) Agreements expressly reference International Game Technology Compliance and its Regulatory Committee. (Resp. 22.) The websites listed in footnotes 21-26 lack authentication and are inadmissible hearsay. *See Wozniak v. Ind. Univ. Bd. of Trs.*, No. 05 C 919, 2007 WL 869165, at *6 (S.D. Ind. March 20, 2007) (plaintiff failed to provide admissible evidence when her summary judgment brief merely cited internet addresses); *accord Bauman v. DaimlerChrysler AG*, No. 04 C 194, 2005 WL 3157472, *10 n.5 (N.D. Cal. Nov. 22, 2005). And while GC2 argues that the Alderney egaming rules "lay out the role IGT [Holdco] and IGT NV *would have had* to set up" (Resp. 22; emphasis added), that is not evidence of what the IGT Defendants actually *did*. It is speculation. Further, the eGambling licensee webpage GC2 cites identifies "IGT (Alderney 4) Limited" as the licensee, *not* IGT Holdco. (*See* Resp. 22 n.22 & Pltf. App. A-130 at 5.)

10

GC2 argues that the Alderney and Gibraltar regulations require licensees to appoint an executive officer. (Resp. 23.) There is no evidence that an IGT Holdco officer was appointed; nor does GC2 explain how this creates a practical partnership. Finally, the "Approved Partners" documents attached as Pltf. App. A-131 and A-132 are unauthenticated. Both documents reference "IGT (Gibraltar) Limited," *not* IGT Holdco or IGT NV, and the use of the word "partner" hardly makes one of the Defendants practical partners with the casino operators listed on the document.[13]

### B. The IGT Defendants Are Not Liable For Masque's Profits

GC2 claims that IGT NV partnered with Masque and Encore, citing Pltf.'s SOAF ¶¶ 87-104.[14] (Resp. 23.) The only facts therein regarding IGT NV relate to the operational mechanics under the licensing agreement between IGT NV and Masque, and have nothing to do with whether the parties shared profits or risk of loss. (*See id.* ¶¶ 90, 91, 94.) With regard to Encore, GC2 cites Pltf.'s SOAF ¶¶ 87-104, but only ¶¶ 99-104 relate to Encore, and none are relevant to the practical partner analysis. GC2 also does not contest any of the facts or arguments raised in the Opening Brief (at § III.B.)[15]

### C. The IGT Defendants And DDI Are Not Practical Partners Since June 1, 2017

The Response (at 24) argues that the IGT Defendants and DDI are practical partners since

---

[13] GC2 claims "[a]ll evidence [sic] impeaches Millar and Manning," but never explains how. (Resp. 23.) The evidence does not impeach either one in any way.

[14] GC2 does not argue that IGT Holdco was practical partners with Masque or Encore; thus, summary judgment on that point should be granted. (*See* Resp. 23; Op. Br. § III.B.3.) Likewise, GC2 does not argue that DDI was practical partners with Masque or Encore (Resp. 23 n.27), so summary judgment on that point should be granted. (*See* Op. Br. § III.C.)

[15] GC2 objects to the Hedstrom Declaration because he was not identified in Defendants' initial disclosures. (*See* Pltf. Resp. to Def.'s SOF ¶¶ 123-30.) Hedstrom was identified in two separate depositions as a member of IGT NV's legal department with access to files and knowledge of the company's agreements. (Dep. of K. Dimino dated 11/8/17 at 34:3-12, 44:13-17, 45:17-21, 176:20-24, 260:11-16; Dep. of C. Waldow dated 2/21/18 at 96:2-5, 97:9-14. Copies of the cited portions of these depositions are attached as Exhibits A and B, respectively.) He is also involved in at least three email chains produced in discovery. (*See* IGTNV_241291-96, 40018; copies of which are attached as Exhibit C.) Thus, his declaration is admissible. *See Cooper v. City of Chi. Heights*, No. 09 C 3452, 2011 WL 5104478, *1 (N.D. Ill. Oct. 27, 2011) (motion to strike portion of Rule 56.1 statement denied where witness was disclosed in depositions).

11

IGT Holdco's sale of DDI to DoubleU. *First*, it argues IGT Holdco's Rule 30(b)(6) witness was unprepared, citing Pltf.'s SOAF ¶¶ 129 and 140. (Resp. 23.) Neither paragraph supports the statement or refers to the witness. Rather, they concern statements regarding testimony from *DDI's* Rule 30(b)(6) witness. Moreover, GC2 cannot rely on purported discovery shortcomings to defeat summary judgment. *See, e.g., Spencer v. Cent. States, Se. & Sw. Areas Pension Fund*, 778 F. Supp. 985, 997 (N.D. Ill. 1991) (granting summary judgment where plaintiff failed to proffer necessary facts and attempted to blame this failure on the defendant's lack of cooperation in discovery). GC2's "course of action should have been to file a motion to compel . . . ." *Id.*

*Second*, the Response (at 23-24) claims DDI testified that it and IGT NV were partners and that the Distribution Agreement defines that "partnership." DDI's Rule 30(b)(6) witness' -- a non-lawyer -- definition of "partner" and DoubleU's CEO's use of the word "partnership" in a press release are irrelevant to the "practical partner" analysis. *See United Airlines*, *supra*. And the CEO's quote is inadmissible hearsay. *LaFlamboy v. Landek*, 587 F. Supp. 2d 914, 922 (N.D. Ill. 2008).

*Third*, as with the Casino Partners, the technology integration provisions in the Purchase Agreement and License Agreement do not give rise to a practical partnership. Neither do IGT Holdco's indemnification obligations. (Resp. 24.) IGT Holdco is obligated to provide indemnification for liability arising out of this lawsuit, not for operating profits or losses. (*See* Def.'s SOF ¶ 135, Def. Appx. 4.A p. 73.)

*Finally*, GC2's generic reliance on the facts in Pltf.'s SOAF ¶¶ 105-18 to find a practical partnership is insufficient. *See Malec*, 191 F.R.D. at 585. GC2 never identifies which facts relate to the practical partnership analysis or contradicts the facts Defendants relied on. (Resp. 23-24.)

### D.     DDI Cannot Be Liable For The Profits Of Its Payment Processors

The Payment Processors *are not parties to this case*, and DDI cannot be liable for a non-party's profits. ***This alone should end the analysis.*** GC2 meekly argues that DDI: (i) referred to the

Payment Processors as "partners"; (ii) contracts with the Payment Processors; (iii) shares revenue with the Payment Processors; and (iv) agreed to indemnify the Payment Processors. (*Id.*) As discussed, none of these "facts" are relevant to the practical partner analysis, and GC2 cites no contrary legal authority. DDI enters into form contracts with Payment Processors like Apple and Facebook to distribute DDI's product. (*See* Op. Br. 10, 28.) No profits or losses are shared. (*Id.*)

### E. The "Intentional Infringement" Cases Are Outliers

The Response (at 19) tries to argue there may be joint liability for profits where infringement is intentional, citing three cases. In *Abeshouse v. Ultragraphics, Inc.*, although the court noted that joint liability for profits "*may* be appropriate" where infringement is not innocent, the court only applied the practical partnership test, did not analyze whether the infringement was innocent, and ultimately held that the defendants were severally liable for their own profits. 754 F.2d 467, 472 (2d Cir. 1985) (emphasis added). In *Softel, Inc. v. Dragon Med. & Scientific Commc'ns. Ltd.*, No. 87 C 0167, 1995 WL 606307, *1 (S.D.N.Y. Oct. 16, 1995), the court's decision was based on New York trade secret law, not copyright law. Finally, in *Harris v. Miller*, 1941 U.S. Dist. LEXIS 3950, *4 (S.D.N.Y. 1941), the court explained that the Stokes brothers were jointly liable for their profits because they were not innocent infringers. But that case is almost 80 years old, was not applying the current Act, and failed to explain why the brothers were "not innocent" while the other defendants were.

In stark contrast, none of the cases from the four circuit courts and the Central District of Illinois that Defendants cited (Op. Br. 22-23) suggest that joint liability may be imposed because infringement is intentional. That position has not been adopted by the Seventh Circuit or its district courts, is not supported by language in the Act, and is contrary to the underlying equitable principle that is the basis for the recovery of profits in copyright cases. (*See* Op. Br. 23.) Moreover, none of

the GC2 cases held that a defendant could be jointly liable for the profits of a *non-party*.[16]

### F. The Manning, Millar And Sigrist Declarations

The Response (at 3 n.4) seeks to strike the Manning and Millar Declarations. GC2 complains that Manning was not identified in Defendants' initial disclosures; however, he was identified at two separate depositions as the source of financial and other information relating to the Foreign and Historic Casino Operators.[17] This is sufficient disclosure. *See Cooper, supra.*

Next, GC2 argues that the Millar Declaration introduces three Canadian contracts that were not previously produced or identified. One contract and multiple amendments to the other two were produced in December 2017, well before the close of discovery.[18] GC2 cannot feign surprise. Millar was also identified in Defendants' initial disclosures as having information regarding "the relationship between IGT NV and its casino partners," and Defendants disclosed the Canadian revenue information early in discovery. (Ex. F ¶¶ 10-12.) Even if the Court finds fault with the production date of two of the three contracts, that should not disqualify the Millar Declaration in its entirety.

The Response (at 21) asserts that IGT Holdco's purported ownership of www.IGT.com is an act of infringement that conflicts with the Millar and Manning declarations, but it fails to identify the allegedly conflicting statement(s). There are none. The Declarations say nothing about www.IGT.com or its owner. (*See* Defs.' App. Nos. 3 & 31.) Moreover, ownership of a website cannot be infringement because it does not violate any of the enumerated rights in Section 106 of the Act.

GC2 further claims that the Sigrist Declaration lacks foundation to: (i) interpret the Purchase Agreement; (ii) identify DoubeU affiliations; and (iii) testify that DDI's relationships with its Payment

---

[16] GC2 also cites Nimmer on Copyright § 12.04[c][3], but Nimmer relies solely on *Harris*, discussed above. In all events, Nimmer only refers to potential joint liability among "related defendants." It does not suggest that a defendant may be liable for the profits of a *non-party*.

[17] *See* Dep. of S. Kastner dated 1/16/18, at 411:12-20; Dep. of R. Haffke dated 2/28/18, at 7:23-9:12; 22:16-23:22, 28:23-29:3. Copies of the cited testimony are attached as Exhibits D and E, respectively.

[18] *See* Declaration of Christopher L. Sears ("Sears Aff.") at ¶¶ 4-9, attached as Exhibit F.

Processors are governed by contracts. (*See* Pltf.'s Resp. to Defs.' SOF ¶¶ 133-34, 147.) Sigrist does not "interpret" the Purchase Agreement. He simply authenticates the document and quotes or paraphrases key provisions with citations. As the most senior executive at DDI, foundation was sufficiently laid for that and his other statements. (*See* Defs.' App. No. 4.)

## IV.    GC2 Cannot Recover IGT Holdco's Profits <br> From The 2017 Sale Of DDI To DoubleU Diamond

GC2 does not cite a single case holding that a portion of profits earned from the sale of the equity in a company that owned an infringing product is recoverable as indirect profits. In fact, GC2 cites no cases in support of its "Disgorgement of Gain on Sale of DoubleDown" argument. (Resp. 24-25.) It also offers no evidence indicating that DoubleU bought DDI because of GC2's copyrighted artwork. This is fatal. (*See* Op. Br. 29-30.) Rather, it argues that the price was calculated based, in part, on the revenue generated by the At-Issue Games. (Resp. 24-25.) GC2 is wrong. *First*, GC2's analysis that ███ of the price should be attributed to the alleged infringement is akin to apportionment. This puts the cart before horse and fails to satisfy the causation requirement. *See Straus v. DVC Worldwide, Inc.*, 484 F. Supp. 2d 620, 645 (S.D. Tex. 2007) (distinguishing burden of establishing that profits are attributable to the infringed work from burden of apportioning profits).

*Second*, GC2 improperly relies on its own expert reports to support its ███ figure. (*See* Resp. 25 (*citing* Pltf.'s SOAF ¶ 122).) Those reports are unauthenticated and, thus, inadmissible. *See LaFlamboy*, 587 F. Supp. 2d at 921-22 (expert reports relied on in summary judgment must be authenticated and attached to an affidavit that meets the requirements of Rule 56(e)). Moreover, GC2's conclusion that ███ of the purchase price is attributable to infringement because ███ of DDI's adjusted EBITDA was generated by the At-Issue Games is inaccurate. GC2's copyright interest is in the *artwork*, not the *games*. Its conclusions that the games are causally connected to the sale and that the games "no doubt" helped grow the book value are purely speculative.

*Finally*, GC2's conclusion that the DoubleU License Agreement was connected to the

Purchase Agreement is insufficient.  (Resp. 25.)  There is no evidence that access to the artwork in the At-Issue Games was specifically required by DoubleU.  Without that, GC2 cannot prove causation.[19]

## V.   GC2's DMCA Claim

### A.   GC2's DMCA Claim Is Limited To Pharaoh's Fortune And Coyote Moon

GC2 waived any DMCA claim based on Kitty Glitter in its interrogatory response and damages disclosure.  (Op. Br. 31-32.)  The Response concedes (at 28) it is not asserting a "removal claim" but tries to hold onto its false CMI claim.  This it cannot do.  GC2 is bound by its interrogatory answer and offers nothing to dispute it.

### B.   GC2's Claim As To Omitted Or Removed CMI

#### 1.   Alleged Failure To Affix CMI

The Opening Brief (at 32-34) demonstrated that, in order to state a removal claim under Section 1202(b), there *must* be pre-existing CMI which is removed, and that is not the case here.  The Response's contrary arguments are inapplicable.  *First,* GC2 claims the Seventh Amendment creates an obligation on IGT NV to affix CMI.  (Resp. 27.)  That misses the point.  Even if the amendment required IGT NV to add a GC2 mark to land-based games, (i) it still does not mean that **GC2** placed its CMI on any artwork delivered to IGT NV; (ii) it pertains to land-based games only, not online; and (iii) this is not a breach of contract case.  *Kasalo v. Trident Asset Mgmt., LLC*, 53 F. Supp. 3d 1072, 1090 (N.D. Ill. 2014) (plaintiff cannot amend complaint through argument in its brief).

*Second,* GC2 argues that Sections 1202(b)(2) and (3) do not require the existence of preexisting CMI (impliedly conceding that Section 1202(b)(1) does).  (Resp. 27-29.)  This ignores the plain language of the statute, which requires that Defendants took certain action "knowing that [CMI] has

---

[19] GC2 objects that "sprite sheets" were not timely produced.  (Dfts.' SOF ¶¶ 150-51.)  As explained above, such discovery complaints are insufficient to defeat summary judgment.  *See Spencer, supra.*  GC2 also blindly cites Pltf.'s SOAF and other "evidence" without identifying any facts from those materials.  This is insufficient to defeat summary judgment.  *See Malec, supra.*

been removed or altered without authority of the copyright owner or the law." 17 U.S.C. § 1202(b)(2) & (3). Thus, subsections (2) and (3) also require the removal or alteration of *pre-existing* CMI.

GC2 also ignores the relevant case-law. Defendants cited *seven* recent cases to support the argument that "omission" of CMI is not actionable unless CMI *already existed*. And *Agence France Presse v. Morel*, No. 10 C 2730, 2014 WL 3963124, at *8 (S.D.N.Y. Aug. 13, 2014), and *Robert G. Stark Enters. v. Neptune Design Grp., LLC*, No. 16 C 264, 2017 WL 1345195, at *11 (N.D. Ohio April 12, 2017), made clear that subsections (b)(2) and (3) require the existence of pre-existing CMI. The Response ignores this and cites *Kelly v. Arriba Soft Corp.*, 77 F. Supp. 2d 1116, 1122 (C.D. Cal. 1999), *aff'd in part, rev'd in part*, 336 F.3d 811 (9th Cir. 2003), to argue that pre-existing CMI is not required. But *Kelly* actually disproves GC2's argument. There, defendant's "web crawler" converted online images into thumbnails and added them to an index. *Id.* at 1117. In doing so, it "removed Plaintiff's images from the context of Plaintiff's Web sites where their [CMI] was located," thereby separating plaintiff's work from its CMI. *Id.* at 1122. Thus, unlike here, in *Kelly* there was pre-existing CMI.

*Third*, GC2 lists, without explanation, alleged instances of CMI being removed or altered, and contends that the 37-page Laykin Declaration and the 66 exhibits in Appendix C "are evidence of such violations." (Resp. 28-29.) *But none of this "evidence" supports any claim that **GC2** put CMI on or around the images to begin with.* GC2's decision to ignore Defendants' central argument -- no evidence of pre-existing CMI on the relevant Coyote Moon and Pharaoh's Fortune images -- confirms that GC2 lacks any evidence to create a triable issue as to its removal claim.

### 2. Alleged Removal From Glass

GC2 concedes that IGT NV created the glass and placed GC2's mark thereon. (Pltf.'s SOAF 13.) The Response claims (at 26) that GC2 provided its mark "as its CMI to be placed on the glass" and that App. C-28 shows GC2's CMI in the body of an image from Pharaoh's Fortune. GC2's

SOAF citations do not support either claim.[20]  Importantly, GC2 presents no *evidence* to show *if* it provided its mark to IGT NV; *when* it provided its mark; and whether its mark was provided "in connection with" any of the artwork at issue as required to constitute CMI.

The Response also ignores that Section 1202(b) does not apply where, as here, CMI was not removed from "a plaintiff's product or original work."  (Op. Br. 34-35.)  GC2 argues that some of its artwork appears on the glass, but so what?  This does not create a disputed fact issue because:  (a) the artwork was never provided "in connection with" CMI; and (b) IGT NV created the final glass artwork from which the mark was allegedly removed.  GC2 fails to present evidence or legal authority on either of these critical issues.

### C.     No False CMI Claim As To Lobby Images (Section 1202(a))

#### 1.     GC2's Concession Forecloses Its Claim As To The Desktop Lobby Images

The Response (at 33) concedes that there can be no Section 1202(a) liability as to the desktop Slots Lobby:  "The Court's prior ruling [Dkt. No. 152] appears to cover this stage of the desktop/ website version because as ruled, there is no CMI 'conveyed in connection' with copies."

#### 2.     The Same Reasoning Applies Equally To The Mobile Lobby

The Response claims (at 29) that the Opening Brief makes "no mention of Mobile[.]"  Not so.  The brief (at 11-12) and Defendants' SOF (at 175-81) explain the differences between accessing DDC through desktop or mobile applications; defines the lobby of both as the "Slots Lobby"; and then demonstrates there is no CMI conveyed in connection with the Slots Lobby.

Defendants showed (at 36-38) that the name DoubleDown appearing in the Slots Lobby does not constitute CMI for the same reason the Court previously ruled that a generic website footer does

---

[20] The Response (at 27) claims that Jankowski testified "that the land based belly glass was all GC2's artwork." Not so.  GC2 cites SOAF 13-15, but they do not support this contention.  Moreover, Jankowski attested that IGT NV created the glass artwork, which made changes to and incorporated some of GC2's artwork, as well as IGT NV's artwork.  (Ex. 10, ¶¶ 5-10.)

not -- it is not "conveyed in connection with" the artwork at issue. A court recently granted summary judgment based on this same argument. *SellPoolSuppliesOnline.com LLC v. Ugly Pools Ariz., Inc.*, 15 C 1856, 2018 WL 4565901, *4 (D. Ariz. Sept. 24, 2018) ("generic footer" at bottom of website was not CMI because it was not "conveyed in connection with" the copyrighted photographs). GC2 does not address or dispute that the DDC name appearing on the Mobile version of the Slots Lobby does not constitute CMI. It merely argues that mobile should be treated differently because of the "Mobile App technology" (*i.e.*, "sprite sheets") discussed by its expert. (Resp. 30.) Neither GC2 nor its expert, however, identifies any evidence linking any sprite sheets to the Slots Lobby.

### 3.  Reconsideration Is Not Appropriate

The Response (at 31-33 & n.33) wants the Court to reconsider its dismissal of GC2's "terms of use" claim. (Dkt. No. 152 at 13-14.) The Court should deny this request outright. *First*, the argument is undeveloped and, therefore, waived. *See, e.g., De v. City of Chi.*, 912 F. Supp. 2d 709, 733-34 (N.D. Ill. 2012). *Second*, it is untimely because more than one year has passed since entry of the dismissal order on June 5, 2017. Fed. R. Civ. P. 60(c).

GC2 makes a confusing argument that the Court's ruling "did not consider the issue with respect to 'conveyed in connection with' <u>displays</u> or <u>performances</u>." (Resp. 33; emphasis in original.) Again, GC2 does not develop this argument or connect it to the nine exhibits cited in support. In any event, Section 1202(c) expressly states that the same "conveyed in connection with" element applies equally to CMI conveyed in connection with "performances" or "displays."

### 4.  GC2's Arguments Regarding Other Images Should Be Disregarded

Defendants seek summary judgment on GC2's Section 1202(a) claim *only* with respect to the mobile and desktop Slots Lobby. Yet, the Response (at 30-32) wants to focus on "more than just the . . . lobby images in Defendants' brief" and purports to identify violations beyond the lobby

images. This is irrelevant to the issue before the Court and should be disregarded.[21]

### D. No Evidence Of Intent (Sections 1202(a) and (b))

The DMCA has a "double scienter requirement[.]" *Krechmer v. Tantaros*, 17 C 4061, 2018 WL 4044048, at *2 (2d Cir. Aug. 24, 2018) (summary order). The Response focuses on the first, and largely ignores the second, which requires intent to "induce, enable, facilitate, or conceal an infringement" (with respect to 1202(a)), or knowledge of same (with respect to 1202(b)).

*Second Intent Prong*: The Response (at 38-40) conflates the two separate scienter prongs into one argument and fails to set forth *any* evidence in support of the "induce, enable, facilitate, or conceal" requirement with respect to its Section *1202(a)* claim.

As to its *1202(b)* claim, the Response (at 41) relies on: (a) the technology intended to cause copies, displays and performances; (b) Defendants' alleged control of the server and code; (c) the "Terms of Use business model"; (d) Defendants as "sophisticated parties"; and (e) Defendants' technical ability to affix GC2's mark. This "evidence" is far too speculative and attenuated to create a disputed issue of fact as to whether Defendants knew, or had a reasonable basis to know, that the removal of CMI or the distribution of works with CMI removed would aid or conceal infringement. *See, e.g., Stevens v. Corelogic, Inc.*, 899 F.3d 666, 674 (9th Cir. 2018) (plaintiff must make "an affirmative showing . . . that the defendant was aware or had reasonable grounds to be aware of the probable future impact of its actions" to withstand summary judgment). The Response also argues (at 39) that Defendants knew that the technology used for DDC would "cause acts of copying, display, distribution and performance of the artwork and graphics of the games[,]" but that does not evidence that any Defendant knew that could amount to infringement.

*First Intent Prong*: GC2 lacks evidence that the IGT Defendants or DDI *knowingly* affixed false

---

[21] GC2 submitted a confusing chart of purported DMCA violations (App. C-65), but the chart is not mentioned in Pltf.'s SOAF. It also lacks foundation and is not properly authenticated or supported. It should be disregarded.

CMI, intentionally removed CMI, or distributed CMI *knowing* it had been removed.  As to DDI and IGT Holdco, the Response (at 37) points to alleged collaboration between the entities regarding DDC.  But this does not demonstrate that either defendant *knew* of the allegedly false CMI.  Even if IGT NV did know (it did not), its knowledge would not be imputed to DDI or IGT Holdco.  *See, e.g., Comm. Ins. Servs., Ltd. v. United Life Ins. Co.,* No. 05 C 4105, 2007 WL 2710495, at *5 (S.D. Ill. Sept. 13, 2007) (granting summary judgment; subsidiary's knowledge could not be imputed to its parent).

GC2 also accuses Defendants of withholding evidence, misrepresenting their technology, and being unprepared to testify on certain 30(b)(6) topics during discovery.  These accusations -- while meritless -- are completely irrelevant.  "[I]f Plaintiff believed that it was improperly being denied discovery, then Plaintiff should have filed a motion to compel."  *Fulton v. Theradyne Corp.,* No. 06 C 1321, 2007 WL 772953, *2 (N.D. Ill. Mar. 12, 2007).  GC2 "cannot now seek refuge in [its] past failure to pursue" discovery.  *Jackson v. Casio Phonemate, Inc.,* No. 98 C 6250, 2001 WL 740518, *6 (N.D. Ill. June 29, 2001); *see also Spencer,* 778 F. Supp. at 997.

The Response (at 38) also points to IGT Holdco and DDI sharing legal and accounting groups but that is not evidence they knew of false or removed CMI.  Finally, the Response (at 37, 40) argues that Defendants knew of the Seventh Amendment and the infringement as of 2016 but did not take down the Principal At-Issue Games.  Those games were all released online *before* 2016, and there is no evidence that any Defendant had the requisite knowledge or intent at the time they released the games.

Accordingly, GC2 fails to create a disputed issue of fact as to the knowledge prong.[22]  This is true even if the Court adopted the "willful blindness" standard urged by GC2.  Even that requires a "deliberate effort to avoid guilty knowledge" (Resp. 35), and there is no evidence Defendants

---

[22] GC2 raises other arguments that should be disregarded.  It claims Defendants admit to using GC2 land-based files to create the At-Issue Games; in support, it cites to 73 paragraphs in its SOAF, each of which contains multiple alleged facts.  This is improper.  *See, e.g., U.S. v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991) ("Judges are not like pigs, hunting for truffles buried" in the record).

deliberately avoided discovering the alleged gap in rights before 2016.

## VI.     GC2's Damages Are Limited (Count XII)

GC2 seeks the absurd range of between \$5.579 to \$55.79 **billion** in statutory damages based on each instance an end-user opens the DDC lobby or the Pharaoh's Fortune or Coyote Moon games. (SOF ¶ 182.)  The Response reveals that the number is even higher because of additional "violations" occurring during "game play," "loading screens," and "returning to the mobile app."  (Resp. 42-45.) As usual, GC2 cites no case supporting its interpretation of the DMCA.

### A.     "Violations" Do Not Include Automatic Downloads

The DMCA allows an award of statutory damages for "each violative act performed by Defendant."  (Op. Br. 40-42.)  Courts unanimously hold that the number of recipients of the allegedly false or removed CMI is irrelevant.  *GC2 does not dispute this.*

GC2 argues that the alleged violations were Defendants alone and not based on end-users. (Resp. 43.)  GC2 relies heavily on its expert, Erik Laykin, but his testimony is entirely consistent with Defendants' arguments.  Laykin admits that artwork from the Principal At-Issue Games is temporarily downloaded on a user's device only after:  (1) the *user* downloads the app and selects a game; (2) the *user's* device communicates with a server requesting certain graphics; and (3) that server responds by *automatically* sending sprite sheets, computer code and media.   (App. A-59 ¶¶ 24, 36, 61-62, 69.) Similarly, during game play, the *user* presses a button to spin the reel; the *user's* device sends a message to the server; the server communicates the result of the spin; and computer code *automatically* assembles the correct scene and displays it to the user.  (*Id.* 62.)  While Laykin points to Defendants' creation of the computer code (App. A-59 ¶ 72), this may, at best, be one violative act.  It does not make Defendants liable for each instance in which that code performs.  *See, e.g., Reilly v. Plot Commerce*, 15 C 5118, 2016 WL 6837895, at *11 (S.D.N.Y. Oct. 31, 2016) (statutory damages based on single upload, not number of webpages image appeared on because "[a]n image (or other content) need only be

uploaded once to a database before it can be used to create multiple dynamic web pages based on the choices made by the user of the site"). In sum, Defendants do not perform any violative *acts* to cause the graphics to temporarily download on a user's device; as Laykin admits, it happens automatically.

GC2 points to IGT NV's refusal to take down the games, but this is irrelevant. (Resp. 43.) In *Stockwire Research Grp., Inc. v. Lebed*, 577 F. Supp. 2d 1262, 1265-66 (S.D. Fla. 2008), defendants distributed the unauthorized content despite "warnings and notices," and "controlled the ability to stop distribution and copying" of the work. Neither factor was relevant to the court's finding of three violations based on defendant uploading the unauthorized work to the internet on "three separate occasions." *Id.* at 1267; *cf. Agence France Presse v. Morel*, 934 F. Supp. 2d 584, 593-94 (S.D.N.Y. 2013) (continued infringement post "kill notice" did not result in "two separate infringements").

### B. The Court Should Avoid An Absurd Result

Awarding damages based on end-users leads to an absurd result. The Response claims (at 44) this only applies when a statute includes "as the Court considers just" language. *That* is absurd. Defendants' argument is based on the canon that courts "should avoid endorsing statutory interpretations that would lead to absurd results." (Op. Br. 42.) The two cases GC2 cites (at 44) did not even rely on this language. Instead, those cases and others focus on the absurdity of awarding statutory damages that would be "massively disproportionate when compared to the actual harm caused by the infringing defendants." *Agence France*, 934 F. Supp. 2d 547, 580-81 (S.D.N.Y. 2013), *granting reconsideration in part, opinion superceded in part on other grounds by*, 934 F. Supp. 2d 584 (S.D.N.Y. 2013). The Response also ignores *Reilly v. Plot Commerce*, *supra*, which applied this cannon to limit "violative acts" under Section 1202(b) to the number of web-uploads by defendant as opposed to webpages on which the material appeared.

### C. Updates And Each Allegedly False Piece Of CMI

GC2 barely addresses Defendants' argument (Op. Br. 43) regarding Google and ios updates.

It merely cites to an inapposite contract with Amazon and ten paragraphs of the Laykin Declaration (Resp. 5); this is improper. *Dunkel,* 927 F.2d at 956. Moreover, the Court should not consider Laykin's Declaration because his opinion on updates was not disclosed during discovery.[23] *See, e.g., Mannoia v. Farrow,* 476 F.3d 453, 456-57 (7th Cir. 2007) (affirming court's striking of "expert witness affidavit and accompany argument for non-compliance with Rule 26(a)"). The Response (at 45) also fails to address Defendants' argument that "the individual items of CMI" that are allegedly falsified or missing do not constitute separate violative acts. (Op. Br. 43.) Rather, it misses the mark, arguing only that provision and distribution constitute separate violations -- an issue not raised by Defendants.

Lastly, GC2 claims that statutory damages are for the jury, but that is not the issue. Defendants ask the Court to *interpret* the statute to limit the number of potential violations, which is exactly what the courts did in *Agence France*, *supra*, and *McClatchey v. Associated Press*, No. 05 C 145, 2007 WL 1630261 (W.D. Pa. June 4, 2007).

## VII.   GC2's Illinois Consumer Fraud Claim Fails (Count XIII)

*Preemption*: GC2 argues (at 46) that Count XIII is "qualitatively different" than its Copyright claims, but the only reason it offers in support is the existence of "contracts" between GC2 and IGT NV. Count XIII alleges a breach of the Consumer Fraud Act, not breach of contract. It is based on *DDI's* Terms of Use with end-users and has nothing whatsoever to do with the GC2 Agreement. Accordingly, the cases cited in the Response (at 46) are inapposite. The Response also makes evidentiary claims without citation (*e.g.*, p. 46 n. 43), and when it includes citations (*e.g.*, SOAF 66-68), they do not support the point for which they are cited.

*No Causation*: GC2 claims it lost licensing fees, sales, or "value of use" of its copyright and contractual rights due to the alleged deception of consumers. (Resp. 47.) Yet it nowhere explains

---

[23] *Compare* Laykin's Report (App. A-104) *with* his Declaration (App. A-59 ¶¶ 75-85.)

how any losses were *caused* by the deception of *consumers*, as opposed to an alleged copyright violation.[24] GC2 never sold its artwork directly to, nor entered into licensing deals with, end-users. (Op. Br. 47.) GC2 ignores this issue-dispositive point. Then, it claims that "end users who have unwittingly assumed liability cannot be identified or added to lawsuits seeking enforcement." (Resp. 48.) GC2 cites no support for this, conclusorily asserting that "evidence was provided by experts."

GC2 attempts to excuse its failure to cite to *evidence* by arguing it need only *allege* it suffered damages as a result of Defendants' alleged deception of consumers. (Resp. 47.) But this is "the put up or shut up moment in a lawsuit" where GC2 must respond "by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). GC2 has utterly failed to do so with respect to the causation issue.

*Insufficient Illinois Connection*: Count XIII alleges conduct occurring "primarily and substantially" in Washington. (Op. Br. 48-49.) GC2 (at 48) claims it was harmed in Illinois, but any "harm" was not caused by the alleged deception of end-users. And while GC2 claims (at 49) there are at least 18,000 DDC users in Illinois, that is insignificant compared to the approximately 1.785 million daily DDC users. (SOF ¶ 198.) Finally, GC2 argues (at 49) that the arbitration provision in the Terms of Use is unenforceable. GC2 doubtfully has standing to raise that issue, but Defendants cited the Washington law and venue provisions to show the substantial connection between the Terms of Use and Washington, not to argue enforceability, which is not at issue here.[25]

*      *      *

Based on the foregoing reasons, the Court should grant Defendants' Motion for Partial Summary Judgment, and grant them such other and further relief as is appropriate.

---

[24] As discussed, GC2's "contractual rights" are not at issue; there is no breach of contract claim.

[25] Defendants demonstrated (at 49-50) that, at the very least, Count XIII fails as to IGT Holdco and IGT NV. The Response (at 49) merely cites, without explanation, to eight paragraphs of GC2's SOAF. This is improper. *See Malec, supra.*

Respectfully submitted,

INTERNATIONAL GAME TECHNOLOGY,
IGT, DOUBLEDOWN INTERACTIVE LLC,
and MASQUE PUBLISHING, INC.

By:  _/s/ Eric N. Macey_
       One of Their Attorneys

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned attorney, upon oath, hereby certifies that on November 1, 2018 he caused a true and correct copy of the foregoing ***Defendants' Reply in Support of Their Motion for Summary Judgment***, to be filed electronically with the Court's CM/ECF system, and that notice of this filing was sent by electronic mail to all parties by operation of the Court's electronic filing system or by email to anyone unable to receive electronic filings as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF system.



*/s/ Eric N. Macey*