## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| GC2 INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.: 1:16-cv-08794 |
| | ) | |
| INTERNATIONAL GAME TECHNOLOGY | ) | Judge Matthew F. Kennelly |
| PLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' RESPONSE TO PLAINTIFF GC2 INCORPORATED'S LOCAL RULE 56.1 STATEMENT OF ADDITIONAL MATERIAL FACTS

Eric N. Macey (#3122684)
*emacey@novackmacey.com*
Joshua E. Liebman (#6283377)
*jliebman@novackmacey.com*
Christopher S. Moore (#6256418)
*cmoore@novackmacey.com*
Rebekah H. Parker (#6301907)
*rparker@novackmacey.com*
Brittney N. Cato (#6323715)
*bcato@novackmacey.com*
NOVACK AND MACEY LLP
100 North Riverside Plaza
Chicago, Illinois 60606
(312) 419-6900

Defendants International Game Technology ("IGT Holdco"), IGT ("IGT NV"), DoubleDown Interactive LLC ("DDI") and Masque Publishing, Inc. ("Masque") (collectively, "Defendants"), by and through their undersigned counsel, submit this Response to Plaintiff GC2's ("GC2's") Statement of Additional Material Facts in Opposition to Defendants' Motion for Partial Summary Judgment (the "Resp. to SOAF").

[**OMITTED HEADING**][1,2]

1.      The IGT Defendants admit that all games referenced in paragraph 24 of the Amended Complaint ("GC2 Games") relate to IGT NV's contractual relationship with GC2.  (App. A-1: ¶ 44).

**RESPONSE:**  Admitted.

2.      The IGT Defendants and DoubleDown Interactive ("DDI") admit that IGT NV is a wholly owned subsidiary of IGT Parent and that IGT NV had a contractual relationship with GC2 to create, develop, and deliver to IGT NV "originally designed, demonstrable" ***games*** to be used by IGT NV with the "IGT Platform" (App. A-1: ¶ 44, 22, 83); *See also* (App. A-1: ¶ 80, 81, 91, 92, 93); (App. A-6).

**RESPONSE:**  Defendants' object to GC2's citation to Pltf. App. A-6.  It is 31 pages, and GC2 fails to identify any page or section number that supports SOAF ¶ 2.  *See Malec,* 191 F.R.D. at 583 (summary judgment "citations must include page (or paragraph) numbers, as opposed to simply citing an entire deposition, affidavit, or other exhibit document"); *Buttron v. Sheehan*, No. 00 C 4451, 2003 WL 21801222, at *2 (N.D. Ill. Aug. 4, 2003) (striking statements that lack appropriate citation).

Defendants admit that IGT Holdco, IGT NV (collectively, the "IGT Defendants") and DDI admitted that IGT NV is a wholly owned subsidiary of IGT Holdco and that IGT NV had a

---

[1] GC2 is the author of the GC2 Games and "Author" is a type of Copyright Management Information 17 U.S.C. §1202 (c)(2).

**RESPONSE:**  Defendants object to footnote 1 because it contains factual and legal conclusions.  *See Buttron v. Sheehan*, No. 00 C 4451, 2003 WL 21801222, at *2 (N.D. Ill. Aug. 4, 2003) ("Conclusory statements of fact should be afforded no weight at the summary judgment stage."); *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) (it is inappropriate to allege legal conclusions in a 56.1 statement).

[2] Subject Matter Jurisdiction, Personal Jurisdiction, and Venue have been admitted in each Defendants' Answer.  (App. A-1: ¶¶ 18-20; App. A-2: ¶¶ 18-20; App. A-3: ¶¶ 18-20).

contractual relationship with GC2, and that GC2 *participated in* the creation and development of "originally designed, demonstrable" games to be used by IGT NV with the "IGT Platform" as that term is defined by the Initial Prior Agreement. (*See* Pltf. App. A-1 ¶¶ 83.) Defendants' deny that the IGT Defendants and DDI admitted that IGT NV had a contractual relationship with GC2 to create, develop, and deliver to IGT NV "originally designed, demonstrable" ***games*** to be used by IGT NV with the "IGT Platform" because GC2 does not cite material that supports that statement. (*See* Pltf. App. A-1 ¶¶ 22, 44, 80, 81, 83, 92, 93.) Parties "must adequately cite to the appropriate part of the record that supports their position." *Buttron*, 2003 WL 21801222, at *2 (striking counterstatement where plaintiff failed to provide proper and specific references).

3. During calendar years 2003 through 2007, inclusive, the Initial Prior Agreement was supplemented by seven separate exclusive game development amendments between GC2 and IGT NV (each amendment, a "Prior Amendment") (See App. A-6); (App. A-1: ¶ 81).

**RESPONSE:** Admitted.

4. In the Sixth Amendment of the Agreement between GC2 and IGT NV, there is a delivery schedule signed by both parties showing dates GC2 delivered and IGT NV received each GC2 Game, including Kitty Glitter and Maid of Money. (See App. A-6); (App. A-1: ¶ 81).

**RESPONSE:** Defendants' object to GC2's reliance on Pltf. App. A-6 for the same reasons set forth in Defendants' Response to SOAF ¶ 2. Subject to the foregoing objection, Defendants deny SOAF ¶ 4 because it is not supported by the cited material. (*See* Pltf. App. A-1 ¶ 81.) *See Buttron*, 2003 WL 21801222, at *2.

5. IGT NV admits that it had access to and possession of GC2 artwork and graphics. (App. A-1: ¶¶ 44-46).

**RESPONSE:** Admitted.

6. GC2 created, produced and provided a playable demo of each original GC2 Game and delivered each GC2 Game to IGT NV on disk, including Kitty Glitter and Maid of Money, and created and delivered the artwork and graphics for each game listed in the Agreement between GC2 and IGT

NV, including Kitty Glitter, Maid of Money, Pharaoh's Fortune and Coyote Moon[3]. (App. A-55 (Jankowski Dep.): pp. 35-44 and 192-197).

**RESPONSE:** Admitted.

**[OMITTED HEADING]**[4]

7. GC2 is the copyright owner of the artwork and graphics for the GC2 Games because GC2 created them. (App. A-55 (Jankowski Dep.): pp. 192-197, 35-44).

**RESPONSE:** Defendants object to SOAF ¶ 7 because it is vague. It is not clear whether the term "GC2 Games" refers to the GC2 or IGT NV version of Kitty Glitter and Maid of Money. Defendants also object because SOAF ¶ 7 calls for a legal conclusion. *See Malec*, 191 F.R.D. at 583.

Subject to the foregoing objections, Defendants deny that GC2 is the copyright owner of the artwork and graphics for *Kitty Glitter* and *Maid of Money* and denies that GC2 created the artwork and graphics for those two games. (Def. Appx. 11 (DeCasa Tr.) at 22:10-13, 209:9-211:22; Def. Appx. 13 (Andersen Tr.) at 19:1-17, 25:16-22, 34:17-35:1, 258:18-259:1, 274:6-16; Def. Appx. 10 (Jankowski Decl.) at ¶¶ 10; Def. Appx. 25 (1/22/18 Warzecha -- GC2 30(b)(6) Tr.) at 255:6-256:9, 256:19-257:3; Def. Appx. 26 (Deposition Ex. 211); Def. Appx. 23 (1/4/18 Warzecha Tr.) at 260:13-19, 263:16-19; *compare* Def. Appx. 24 (Sears Decl.) at Ex. A *to* Def. Appx. 51 (IGT SLOTS Diamond Galaxy).)

8. The plain language of the Agreement provides that GC2 is the owner of the copyrights in the artwork and graphics it provided for the GC2 Games. (App. A-6); (Dkt. at 152).[5]

---

[3] These are the GC2 Games addressed in Defendants' Motion.

[4] Copyright Ownership is a form of Copyright Management Information. 17 U.S.C. §1202 (c)(3). Information set forth on a copyright notice is a form of Copyright Management Information. 17 U.S.C. §1202 (c) (1). No registration is required.

**RESPONSE:** Defendants object to footnote 4 because it contains legal conclusions and is argumentative. *See Malec*, 191 F.R.D. at 583 (it is inappropriate to allege legal conclusions in a 56.1 statement, or use it "as a forum for factual or legal argument").

[5] On June 5, 2017, this Court denied Defendants' Motion to Dismiss finding that the plain language of the Agreement states GC2 is the owner of the copyrights in the artwork and graphics it provided. (Dkt. at 152).

**RESPONSE:**  Admitted.

9.    IGT NV (in its Rule 30(b)(6) deposition) admitted that GC2 is the owner of the copyrights and that it does not dispute ownership of the art for Coyote Moon or Pharaoh's Fortune but that there was some contention with respect to Kitty Glitter.  (App. A-38 (Kastner Dep.): pp. 48-49).

**RESPONSE:**  Defendants deny SOAF ¶ 9 because it is not supported by the cited material.

(*See* Pltf. App. A-38 (Kastner Dep.) pp. 48-49.)  *See Buttron*, 2003 WL 21801222, at *2.

10.    GC2 applied for and registered its works with the U.S. Copyright Office and the Court is able to play the "playable demos" GC2 submitted to the Copyright Office for Coyote Moon, Pharaoh's Fortune, Kitty Glitter and Maid of Money. (App. A-5A-5D)[6]

**RESPONSE:**  Defendants object to SOAF ¶ 10 because the materials cited in support lack

foundation and authentication, and there is no evidence to support that:  (a) GC2 applied for and

registered its works with the U.S. Copyright Office; or (b) that GC2 submitted the "playable demos"

in Pltf. App. A-5A-5D to the Copyright Office.  *See LaFlamboy v. Landek*, 587 F. Supp. 2d 914, 921-22

(N.D. Ill. 2008) (Rule 56(e) requires that "all documentary exhibits" be authenticated and attached to

an affidavit that meets the requirements of Rule 56(e).)

11.    IGT Defendants and DDI admit knowledge of the rights of a copyright owner (App. A-1: ¶ 100) and admit knowledge of the GC2 Copyright Registrations at least as early as July 3, 2017, (App. A-1: ¶ 100) even though the U.S. District Court's Docket shows IGT Defendants had copies of GC2's Copyright Registrations at least as early as September 9, 2016, when they were provided with the original Complaint. (Dkt. at 1).

**RESPONSE:**  Defendants' object to GC2's reliance on its initial Complaint (Dkt. 1) because:

(a) it has been superseded by the First Amended Complaint ("FAC") (Dkt. 18); and (b) GC2 cannot

rely on its own allegations as evidence.  *See Rhyan v. City of Waukegan*, 819 F. Supp. 2d 755, 758 (N.D. Ill.

2011) ("at the summary judgment stage, *a plaintiff can no longer rely on the allegations in her complaint and*

---

[6] These were original works of authorship and GC2 delivered them to IGT NV.  (App. A-55 (Jankowski Dep.) pp. 40-43).

*must point to evidence to support the claim* and show that there is a 'genuine dispute as to [a] material fact…'") (emphasis in original)(*quoting* Fed. R. Civ. P. 65(a), (c)).

Subject to the foregoing objections, Defendants admit that the IGT Defendants and DDI admit knowledge of the rights of a copyright owner. Defendants deny the remainder of SOAF ¶ 11 because it is not supported by the cited material. (*See* Pltf. App. A-1 ¶ 100; Dkt. 1.) *See Buttron*, 2003 WL 21801222, at *2.

**[OMITTED HEADING]**[7]

12. GC2 required "Terms and Conditions" for the use of the GC2 Games with respect to types of Gaming Machine Platforms. (App. A-6).

**RESPONSE:** Defendants' object to SOAF ¶ 12 because it relies solely on Pltf. App. A-6, and that document is a 31 page contract and GC2 fails to identify any page or section number that purportedly supports SOAF ¶ 12. *See Malec*, 191 F.R.D. at 583.

13. IGT NV was contractually required to create the glass for the gaming machines, using GC2 artwork, provided by GC2, and to place the GC2 Mark on the glass and provided IGT with GC2 artwork for the glass for the games at issue. (App A-55 (Jankowski Dep.): pp. 70, 77-82, 92-94, 118-19, 161-63).

**RESPONSE:** Defendants deny SOAF ¶ 13 because it is not supported by the cited material. (*See* Pltf. App. A-55 (Jankowski Dep.) pp. 70, 77-82, 92-94, 118-19, 161-63).) *See Buttron*, 2003 WL 21801222, at *2.

14. The IGT Defendants and DDI admit Section 3.15 of the Initial Prior Agreement (attached as Exhibit 18 to the First Amended Complaint ("FAC") states that:

> IGT [NV] agrees to integrate the GC2 Projects' video graphics and artwork into IGT [NV]'s programs for use on gaming machines utilizing the IGT Platform. IGT shall test, approve and market the GC2 Projects. IGT shall be responsible for all duties and

---

[7] ""Terms and conditions" for use of the works is a form of Copyright Management Information. 17 U.S.C. § 1202 (6).

**RESPONSE:** Defendants object to footnote 7 because it is argumentative. *See Malec*, 191 F.R.D. at 583.

expenses associated with the development and implementation of mathematical pay tables, source code and programming, sounds, and glass designs for use in gaming machines incorporating the GC2 Projects. (App. A-1: ¶ 87).

**RESPONSE:** Admitted.

15.     The IGT Defendants and DDI admit that Section 3.16 of the Initial Prior Agreement, attached as Exhibit 18 to the FAC states that:

> IGT [NV] shall, at no cost to GC2, have GC2's and its parent's names, logos and appropriate legal notices, such notices, content and formats to be mutually agreed upon by the Parties, displayed in the exterior video displays and glass in machines in which the GC2 Projects are installed, to the extent allowed by gaming regulations.

(App. A-1: ¶ 88). The IGT Defendants and DDI admit and [sic] that this section (3.16), was incorporated into and/or ratified by each Prior Amendment. (App. A-1: ¶ 88).

**RESPONSE:** Admitted.

16.     The IGT Defendants and DDI admit that on or about January 3, 2007, the parties executed Prior Amendment #7, a true and correct copy of which is attached as Exhibit 20 to the FAC. (App. A-1: ¶ 94), which defines gaming machine as follows:

a)      excluded "**nonwagering devices, machines and systems** such as: (a) pinball, (b) arcade machines, and (c) gaming consoles, including but not limited to general purpose computers, for non-wagered gaming;" (App. A-1: ¶ 96: at Exh. 20) (Emphasis Added);

b)      excluded "the following wagering devices, machines and systems: . . . (d) devices used for mobile **gaming** in the State of Nevada as defined by NRS 463.0176, (e) devices legally used for **mobile gaming** outside the State of Nevada as defined in that jurisdiction's laws, and (f) **Internet gaming**." (App. A-6: at Exh. 20, ¶ 1.) (Emphasis added.); *See also* (App. A-1: ¶ 97); and

c)      included Section 3 which states, in part:

> Except for those rights specifically provided for hereunder, GC2 retains all rights, title and interests in GC2 licensed or owned patents, trademarks, copyrights or trade secrets, in the GC2 Projects, and nothing herein shall be construed as granting to IGT an express or implied right in any such intellectual property. (App. A-1: ¶ 98).

**RESPONSE**: Defendants object to SOAF ¶ 16(a)-(c) because these contractual terms are immaterial to the motion for summary judgment. *See Malec*, 191 F.R.D. at 583 (the "statement should

6

be limited to *material* facts, that is, facts pertinent to the outcome of the issues identified in the summary judgment motion.").

Subject to the foregoing objection, Defendants admit that the IGT Defendants and DDI admitted that on or about January 3, 2007, the parties executed Prior Amendment #7, a true and correct copy of which is attached as Exhibit 20 to the FAC. Defendants deny the remainder of SOAF ¶ 16 because it is not supported by the cited material which fails to set forth the complete definition of "gaming machines" or accurately reflect the allegations of the FAC. (*See* Pltf.'s A-1 ¶¶ 96-98.) *See Buttron*, 2003 WL 21801222, at *2.

17. The IGT Defendants and DDI admit that Section 5 of Prior Amendment #7, attached as Exhibit 20 to the FAC, states, in part:

> "The GC2 registered trademark shall continue to be displayed, in accordance with the Agreement and in a fashion of similar size and style as featured on previously released GC2 Projects, on all GC2 Projects specifically identified on Exhibit D herein should IGT release and place such games." (App. A-1: ¶ 99).

**RESPONSE**: Admitted.

18. The IGT Defendants knew and understood the express exclusions at the time the Seventh Amendment was entered into in 2007 because:

a) the express and specific language in the Agreement with GC2, and

b) IGT Defendants' accounting staff memorialized the terms in a contemporaneous accounting "GC2 White Paper" documenting that GC2 games can be used on any platform "except nonwagering use, internet, mobile" and that the GC2 logo should still be placed on GC2 Games. (App. A-13).

**RESPONSE**: Defendants object to SOAF ¶ 18 because it is argumentative. *See Malec*, 191 F.R.D. at 583.

Subject to the foregoing objection, Defendants deny SOAF ¶ 18(a) because it is not supported by the cited material. (*See* Pltf. App. A-13.) *See Buttron*, 2003 WL 21801222, at *2. As to SOAF ¶ 18(b), Defendants admit that certain IGT NV accounting personnel memorialized the terms of the

Seventh Amendment in a "White Paper" documenting that GC2 games can be used on any platform "except nonwagering use, internet, mobile" and that the GC2 logo should still be placed on GC2 Games. (*See* Pltf. App. A-13.) Defendants deny that the IGT Defendants knew and understood the express exclusions at the time the Seventh Amendment was entered into in 2007 because that statement is not supported by the cited material. (*Id.*)

19. The IGT Defendants admit that examples of how GC2's Mark was featured on previously released projects are identified in Exhibits 68-73 of the FAC and that they accurately show land based games GC2 developed. (App. A-1: ¶¶ 89-90).

**RESPONSE:** Defendants deny SOAF ¶ 19 because it is not supported by the cited material. (*See* Pltf. App. A-1 ¶¶ 89-90.) *See Buttron*, 2003 WL 21801222, at *2.

20. The GC2 Games were made into land based games and distributed onto casino floors in Gaming Machines. (App. C-26, C-36, C-44).

**RESPONSE:** Defendants object to SOAF ¶ 20 because the images cited in support lack foundation and authentication. *See LaFlamboy*, 587 F. Supp. 2d at 921-22.

In the event Defendants' objection is overruled, Defendants deny SOAF ¶ 20 because it is not supported by the cited material. (*See* Pltf. App. C-26, C-36, C-44.) *See Buttron*, 2003 WL 21801222, at *2.

21. The below photos depict land based GC2 Games bearing GC2's Mark for GC2 Games Pharaoh's Fortune, Coyote Moon and Kitty Glitter that IGT provided to the U.S. Trademark Office, under oath, as specimens of use. (*Id.*).

**RESPONSE:** Defendants object to SOAF ¶ 21 because the images below and cited in the SOAF lack foundation and authentication. *See LaFlamboy*, 587 F. Supp. 2d at 921-22.

In the event Defendants' objection is overruled, Defendants deny SOAF ¶ 20 because it is not supported by the cited material. (*See* Pltf. App. C-26, C-36, C-44.) *See Buttron*, 2003 WL 21801222, at *2.

**COYOTE MOON**    **PHARAOH'S FORTUNE**    **KITTY GLITTER**

      

22.    For over a decade, and even today, IGT holds out to the public that the land based Kitty Glitter Game is a GC2 Game reflected by video taken of land based games for Coyote Moon, Pharaoh's Fortune and Kitty Glitter (depicting GC2's Marks).  (App. A-7); (App. A-118).

**RESPONSE:**  Defendants object to GC2's use of the term "GC2 Game."  That term is defined in SOAF ¶ 1, above, as "all games referenced in paragraph 24 of the Amended Complaint." But here it is appears that GC2 intends for the term "GC2 Game" to connote that GC2 has some sort of property right in, or ownership of, the game.

Subject to the foregoing objection, Defendants admit that the land based Kitty Glitter Game has a GC2 mark on it.  Defendants deny the remainder of SOAF ¶ 22 because it is not supported by the cited material.  (*See* Pltf. App. A-118.)  *See Buttron*, 2003 WL 21801222, at *2.  The cited material does not: (a) support the temporal scope referred to by GC2 -- "For over a decade, and even today . . . ."; or (b) indicate that IGT NV "holds out to the public that the land based Kitty Glitter Game is a GC2 Game."

23.     Marking requirements for agreements with third party developers are typical for IGT. (App. A-119-120).  When other games were converted to DoubleDown Versions, they appeared with the logo of the third party developer and recognition in the attribution line (but not so with GC2 Games). See, as an example (App. A-24 (Sigrist Dep.): pp. 294-297).



Third Party Developer

See, (App. A-143).

**RESPONSE:**  Defendants object to SOAF ¶ 23 as immaterial to the motion for summary judgment.  *See Malec*, 191 F.R.D. at 583.  Defendants also object to the notation "Third Party Developer" on the image because it lacks foundation.  *See LaFlamboy*, 587 F. Supp. 2d at 921-22.

In the event Defendants objections are overruled, Defendants deny SOAF ¶ 23 because it is not supported by the cited material.  (*See* Pltf. App. A-118.)  *See Buttron*, 2003 WL 21801222, at *2.

24.     Electronic files that contain GC2 artwork are "layered files,"[8] and according to IGT's Kurt Andersen, are easy to remove or change.  (App. A-77 (Andersen Dep.): 64-67).  *See also*, (App. A-64 (Wisler Dep.): pp. 86-87).

**RESPONSE:**  Defendants admit that layered files are easy to remove or change.  Defendants deny that electronic files that contain GC2 artwork are "layered files" because that statement is not

---

[8] Defendants produced native PSD files that require special software to open the layered files.

supported by the cited material. (*See* Pltf. App. A-77 (Andersen Dep.) 64-67; *see also*, Pltf. App. A-64

(Wisler Dep.) pp. 86-87.) *See Buttron*, 2003 WL 21801222, at *2.

     25.    The art for the GC2 Games are in different layers that can be turned on or off in "illustrator" program and the "IGT logo" and "GC2 logo" can be seen on different layers. (App. A-64 (Wisler Dep.): p. 86-87).

     **RESPONSE:** Admitted.

     26.    GC2's Mark appears on the permitted land based games. (App. C-11); (App. A-19 (Sigrist Dep.): pp. 121, 132).

     **RESPONSE:** Defendants object to GC2's use of the term "permitted" to describe the land based games, as the use of that term is not supported by the cited material. (*See* Pltf. App. C-11; Pltf. App. A-19 (Sigrist Dep.) at pp. 121, 132). Defendant further objects to GC2's reliance on Pltf.'s Exhibit C-11, which does not support SOAF ¶ 26. *See Buttron*, 2003 WL 21801222, at *2. Defendants also object to the notation on the image because it lacks foundation and is argumentative.



GC2's Mark is here

     Subject to the foregoing objections, Defendants admit that GC2's Mark appears on IGT NV's land based Pharaoh's Fortune and Coyote Moon games. Defendants deny that GC2's mark appears on IGT NV's land based Kitty Glitter game because that fact is not supported by the cited material. (*See* Pltf. App. C-11; Pltf. App. A-19 (Sigrist Dep.) at pp. 121, 132). *See Buttron*, 2003 WL 21801222, at *2.

27.     Video footage of GC2's land based Pharaoh's Fortune game depicts GC2's Mark. (App. A-7); (App. A-118).

**RESPONSE:** Admitted.

28.     A photo of GC2's land based Pharaoh's Fortune game is depicted on the right. (App. C-26); *See also* (App. C-27); (App. A-4). Removal of GC2's Mark can be seen in (App. C-28, 29, 30, 31); (App. A-98).

**RESPONSE:** Defendants object to SOAF ¶ 28 because the materials cited in support thereof -- Pltf. App. C-26, C-27, C-28, C-30, C-31, A-4, A-98 -- lack authentication and foundation. *See LaFlamboy*, 587 F. Supp. 2d at 921-22. Defendants also object to the second sentence of SOAF ¶ 28 because it is an improper factual conclusion, which is unsupported by the cited material. *See Buttron*, 2003 WL 21801222, at *3. Although in the materials cited by GC2, certain images have the GC2 Mark and others do not, GC2 cites no evidence of "removal."

29.     The art files for the land based GC2 Game Pharaoh's Fortune contain the image with GC2's Mark depicted in "layered files," as set forth below. (App. C-28: GC2's Mark is layered file 1); (App. A-98); (App. A-64 (Wisler Dep.): pp. 40-46, 54-58); (App. A-11 (Kastner Dep.): pp. 218-219, 256-257).



**RESPONSE:** Defendants admit that the art files for the land based Pharaoh's Fortune game contain an image with GC2's Mark depicted in "layered files." Defendants object to the remainder of

SOAF ¶ 29 including the image above and GC2's citation to Pltf. App. C-28 and A-98, because the image and exhibits lack foundation and authentication. *See LaFlamboy*, 587 F. Supp. 2d at 921-22. GC2 also objects to the notations on the images because they lack foundation and are argumentative.

30.     The DoubleDown Casino loading screens produced by DDI do not display a GC2 Mark and only display an "IGT logo." (App. C-29); (App. A-99).



See the loading screen on DoubleDown Casino (App. C-29); (App. A-99).  Pharaoh's Fortune loading screen has no GC2 Mark.

**RESPONSE:**  Defendants object to the notation on the image because it lacks foundation and are argumentative; otherwise, admitted.

31.     DDI production numbers below are native productions of the above Pharaoh's Fortune image and do not reflect GC2's Mark depicted in "layered files," as set forth below.



(App. C-30: native production, screen shot showing layered files, no GC2 Mark or GC2 layered file); (App. A-100); (App. C-31: native production, screen shot showing no layered files, no GC2 Mark)(App. A-101).

**RESPONSE:** Defendants object to SOAF ¶ 31 including the image above because the materials cited in support thereof lack authentication and foundation. *See LaFlamboy*, 587 F. Supp. 2d at 921-22. Defendants also object to the notations on the image because they lack foundation and are argumentative.

32. Ed Jankowski, the GC2 artist who created Pharaoh's Fortune, testified and circled the GC2 artwork on the DDI loading screen confirming it was GC2 Artwork. (App. C-29); (App. A-99); (App. A-55 (Jankowski Dep.): pp. 132-133).

**RESPONSE:** Admitted.

33. In DDI's production, there are several copies of this image, slightly edited, with the GC2 layered file removed and IGT's Mark placed on a layered file. (App. C-28-31); (App. A-98).

**RESPONSE:** Defendants object to SOAF ¶ 33 because the materials cited in support thereof -- Pltf. App. C-28, C-30, C-31, A-98 -- lack authentication and foundation. *LaFlamboy*, 587 F. Supp. 2d at 921-22.

Subject to the foregoing objections, Defendants deny SOAF ¶ 33 to the extent GC2 attempts to support it with Pltf. Appx. C-29, because that exhibit does not support the statement. *See Buttron*, 2003 WL 21801222, at *2.

34.      "Sprite Sheets" for Pharaoh's Fortune have the GC2 image with GC2's Mark removed. (App. C-18; App. A-25B, A-117).  The images from the Sprite Sheets also have GC2's Mark removed. (*Id.*); (App. A-59: ¶¶ 51-59 for explanation of "Sprite Sheets").

**RESPONSE:**  Defendants object to SOAF ¶ 34 because it is an improper factual conclusion, which is unsupported by the cited material. *See Buttron*, 2003 WL 21801222, at *3.  There is no citation to support that any GC2 Mark was removed from any Sprite Sheets.  Defendants also object to GC2's reliance on Pltf. App. A-59 ¶¶ 51-59.  Pltf.'s A-59 is the Declaration of Erik Laykin, one of GC2's expert witnesses.  The portion of that declaration cited herein (¶¶ 51-59), contains opinions and conclusions that were not disclosed in Laykin's Rule 26(a)(2) report.  (*Compare* Laykin's Report (Pltf. App. A-104) *with* his Declaration (App. A-59 ¶¶ 51-59.)  GC2 cannot rely on this newly disclosed material at summary judgment.  *See* Fed. R. Civ. P. 26(a) (all "data and other information considered by the witness in forming [his expert opinions]," as well as "a complete statement of all opinions the witness will express and the basis and reasons for them" must be disclosed in an expert's report.); *see Mannoia v. Farrow*, 476 F.3d 453, 456-57 (7th Cir. 2007) (affirming striking of expert affidavit and argument in violation of Rule 26(a)).

Subject to the foregoing objections, Defendants deny SOAF ¶ 34 to the extent it states that the images on the Sprite Sheets are GC2 images, because the cited materials do not support that statement.  (*See* Pltf. App. C-18, A-25B, A-117, A-59 ¶¶ 51-59.)  *See Buttron*, 2003 WL 21801222, at *2.

35.      Video footage of GC2's land based Coyote Moon Game depicts GC2's Mark.  (App. A-7); (App. A-118).

**RESPONSE:**  Admitted.

36.    See photo of land based GC2 Game. (App. C-36 at Exh. 4-6); (App C-20)

37.    See photo of land based GC2 Game admitted in Complaint. (App. C-37 at Exh. 69); (App C-20); (App. A-4).



**RESPONSE to 36:**  Defendants object to SOAF ¶ 36 to the extent GC2 attempts to support the statement with Pltf. App. C-36 because that exhibit lacks authentication and foundation.  *See LaFlamboy*, 587 F. Supp. 2d at 921-22.  Defendants also object to the notation on the image as lacking foundation and argumentative.

Subject to the foregoing objection, Defendants deny SOAF ¶ 36 to the extent it relies on Pltf. App. C-20 because that document depicts images from DoubleDown Casino and not land based games and, thus, does not support the statement.  *See Buttron*, 2003 WL 21801222, at *2.

**RESPONSE to 37:**  Defendants object to SOAF ¶ 37 to the extent GC2 attempts to support the statement with Pltf. App. C-37 and A-4 because those exhibits lack authentication and foundation.  *See LaFlamboy*, 587 F. Supp. 2d at 921-22.  Defendants also object to the notation on the image as lacking foundation and argumentative.

Subject to the foregoing objection, Defendants deny SOAF ¶ 37 to the extent it relies on Pltf. App. C-20 because that document depicts images from DoubleDown Casino and not land based games.

38.     Removal of GC2's Mark can be seen in the images provided in (App. C-14: (lobby)); (App. A-51, 111); (App. C-49: (Sprite Sheets)), (App. C-33: (loading pages-desktop)); (App. C-34: (loading pages mobile)), (App. A-51) and (App. C-38-39 (native images screen shots showing layers)). Compare these to (App. C-36) and (App. C-37); (App. A-4).  Depicted below are select images.



Lobby graphics mobile version.  (App. C-14 at Exh. 11); (App. A-51, 111).



Compare land based images with screen shot of DDI loading page.  (App. C-34); (App. A-51).



GC2's layered file not here

GC2's Mark not here

(App. C-39)



GC2's layered file not here

GC2's Mark not here

GC2's Mark here

(App. C-38).

**RESPONSE**: Defendants object to SOAF ¶ 38, including the above images, because it is an improper factual conclusion and argumentative, which is unsupported by the cited materials. *See Buttron*, 2003 WL 21801222, at *3. GC2 cites to nothing that indicates removal of any mark. Defendants also object to SOAF ¶ 38 to the extent GC2 attempts to support the statement with Pltf. App. C-36, C-37, C-38, C-39 and A-4 because those exhibits lack authentication and foundation. *See*

*LaFlamboy*, 587 F. Supp. 2d at 921-22.  Further, Defendants object to the notations on all the images as argumentative and lacking foundation.

39.    Video of the land based Kitty Glitter Game depicts GC2's Mark. (App. A-7).  Also, photos of the land based game depict GC2's Mark below. (App. A-43); (App. C-44-45); (App. A-4).



**RESPONSE:**  Defendants admit the first sentence of SOAF ¶ 39.  Defendants object to the second sentence of SOAF ¶ 39 because the materials cited in support -- Pltf. App. A-4, C-44 and C-45 -- lack authentication and foundation.  *See LaFlamboy*, 587 F. Supp. 2d at 921-22.  Defendants deny the second sentence of SOAF ¶ 39 to the extent it is based on Pltf. App. A-43, because that exhibit does not support the statement.  *See Buttron*, 2003 WL 21801222, at *2.

40.      Removal of GC2's Mark from Kitty Glitter can be seen in (App. C-41: (Sprite Sheet)), (App. A-117), (App. C-42: (loading pages-Desktop)), (App. C-43: (loading pages-mobile)), (App. C-46: (native image of Kitty Glitter with GC2 Layer removed)).  Compare to (App. C-44-45); (App. A-4).  Select images depicted below. Compare land based image with DDI's native screen shot to show layers which display neither a GC2 Mark nor a GC2 layered file. (App. C-46, C-28, C-47); (App. A-98).  See images depicted below.



App-C-46 (native image of Kitty Glitter with GC2 layered file removed.



App-C-28 (loading pages-mobile) (App. A-98).



App C-47.

**RESPONSE**: Defendants object to SOAF ¶ 40, including the above images, because it is an improper factual conclusion and argumentative, which is unsupported by the cited materials. *See Buttron*, 2003 WL 21801222, at *3. GC2 cites to nothing to indicate a mark was removed. Defendants also object to SOAF ¶ 40 to the extent GC2 attempts to support the statement with Pltf. App. A-4, A-98, C-44, C-45, C-46 and C-47 because those exhibits lack authentication and foundation. *See LaFlamboy*, 587 F. Supp. 2d at 921-22. Defendants further object to the notations on the images because they are argumentative and lack foundation.

Defendants deny SOAF ¶ 40, to the extent GC2 claims it is supported by Pltf. App. A-98 and C-28 because those exhibits are Pharaoh's Fortune images and, thus, do not support the statement. *See Buttron*, 2003 WL 21801222, at *2.

**[HEADING OMITTED]**[9]

41.     Defendants' distribution model was a "terms of use" distribution model. FAC Ex 2, admitted as a true and correct copy of the "terms of use" DoubleDown Casino used.  (Dkt. 163 ¶ 9).

**RESPONSE:**  Defendants deny the first sentence of SOAF ¶ 41 because GC2 does not cite any supporting material for that statement.  *See Buttron*, 2003 WL 21801222, at *2.  Defendants admit the second sentence of SOAF ¶ 41.

42.     DoubleDown Casino "licenses" the end user the right to use the GC2 Games under certain "terms and conditions."  (App. A-24 (Sigrist Dep.): p. 439-442); (App. A-121, 122); (App. A-52 (Clelland Dep.): pp. 13, 51-63).

**RESPONSE:**  Admitted.

43.     In 2017, IGT NV entered into an agreement with DoubleU in which IGT NV purported to license DoubleU three GC2 Games for non-wagering use even though IGT NV did not have a license from GC2.  (App. A-23: pp. D-1 through D-12).  IGT NV nevertheless required DoubleU to use a specific "terms of use" in which IGT Parent agreed to ███████████████ ███  (App. A-14: ¶ 3); (App. A-12: ¶¶ 4-7).

**RESPONSE:**  Defendants admit that, in 2017, IGT NV entered into an agreement with DoubleU under which IGT NV licensed the right for DoubleU to use certain IGT NV games, including Pharaoh's Fortune, Kitty Glitter and Coyote Moon, for non-wagering use.  Other than expressly stated above, Defendants deny the first sentence of SOAF ¶ 43 because the materials cited by GC2 do not support those portions of the statement.  (*See* Pltf. App. A-23 pp. D-1 through D-12.) *See Buttron*, 2003 WL 21801222, at *2.  Further, the Requests for Admission cited as Pltf. App. A-14 ¶ 3 and A-12 ¶¶ 4-7 also do not support the first sentence of SOAF ¶ 43 because, in addition to being substantively off point, that discovery was directed to, and responded to, by IGT Holdco, not IGT NV and, thus, is hearsay as to IGT NV.  Defendants also deny the second sentence in SOAF

---

[9] The "terms and conditions" of use is Copyright Management Information (17 U.S.C. §1202(c)(6)) and links to terms and conditions of use is Copyright Management Information. 17 U.S.C. §1202 (c)(7).

**RESPONSE:**  Defendants object to footnote nine because it is argumentative.  *See Malec*, 191 F.R.D. at 583.

¶ 43 because the materials cited by GC2 do not support the statement. (*See* Pltf. App. A-14 ¶ 3; A-12 ¶¶ 4-7.) *See Buttron*, 2003 WL 21801222, at *2.

**[OMITTED HEADING]**[10]

44.     The DDI terms of use represent that DDI or its licensors own the graphics even though IGT NV does not contend it owns the GC2 art. (App. A-38 (Kastner Dep.): pp. 48-49); (App. A-19 (Sigrist Dep.): pp. 132-138).

**RESPONSE:**  Defendants deny SOAF ¶ 44 because the materials cited by GC2 do not support the statement. (*See* Pltf. App. A-38 (Kastner Dep.) pp. 48-49; A-19 (Sigrist Dep.) pp. 132-138.) *See Buttron*, 2003 WL 21801222, at *2.  Both depositions cited are substantively inapplicable.  In addition, Pltf. App. A-38 is IGT Holdco's Rule 30(b)(6) deposition, not DDI's or IGT NV's.

45.     The DDI terms of use represent that IGT employee Kimberly Dimino is the Copyright Agent even though Ms. Dimino did not work for DDI, did not know she was identified on the terms of use and was unaware of the existence of an email mailbox. (App. A-8 (Dimino Dep.): pp. 38-53).

**RESPONSE:**  Admitted.

46.     The GC2 Games (depictions of which are below) were selected for conversion to interactive because of their known graphics and revenue generating ability for interactive. (App. A-27 (Shorrock Dep.): p. 154-164).

---

[10] Ownership is Copyright Management Information 17 U.S.C. §1202 (c)(3).

**RESPONSE:**  Defendants object to footnote 10 because it is argumentative.  *See Malec*, 191 F.R.D. at 583.

| COYOTE MOON | PHARAOH'S FORTUNE | KITTY GLITTER |
| --- | --- | --- |



(App. A-27 (Shorrock Dep.): pp. 30-36, 60-61, 72-76, 97, 101-102, 154-164).  (App. A-38 (Kastner Dep.): pp. 27-30, 51-52, 58-59, 84-85); (App. A-105); (App. A-42); (App. A-52 (Clelland Dep.): pp. 112-119, 198-199); (App. A-53(Moro Dep.): p.p. 38-41, 66); (App. A-84).  (App. A-11 (Kastner Dep.): pp. 346, 425).

**RESPONSE**:  Defendants' object to SOAF ¶ 46 because GC2 failed to appropriately cite to the record.  Rule 56.1 requires "specific references" which means "citations to exact pieces of the record that support the factual contention contained in the paragraph."  *Malec*, 191 F.R.D. at 583.  GC2 cites over 60 pages of deposition testimony to support a one sentence statement of fact.  GC2 also relies on three documents.  But, A-105 is "Reserved" and contains no materials; A-42 consists of 42 separate PDFs; and A-84 consists of four separate PDFs totaling over 100 pages.  GC2 fails to provide a pin cite to any of these documents.

Defendants also object because SOAF ¶ 46 is immaterial to the motion for summary judgment.  *See Malec*, 191 F.R.D. at 583.  Finally, Defendants object to the use of the images, above, because all of them lack authentication.  *See LaFlamboy*, 587 F. Supp. 2d at 921-22.

47.     When creating interactive versions of land based games, IGT aimed to closely replicate the appearance of the original land based games. (App. A-11 (Kastner Dep.): pp. 33-34, 69-73, 76, 143); (App. A-27 (Shorrock Dep.): pp. 33-34, 69-73, 76, 143).  (App. A-27 (Shorrock Dep.): pp. 69-73, 76, 143).

**RESPONSE:**  Admitted.

48.     Without any recognition to GC2, GC2 artwork and graphics were:

a)      used extensively in the games themselves, (App. A-11 (Kastner Dep.): pp. 10-14); (App. A-32: GC2 artwork and graphics from the land based game were used to create the interactive version shown in this exhibit); (App. A-27 (Shorrock Dep.): p. 118); (App. A-33); (App. A-34).

b)      used in marketing and advertising materials (App. A-27 (Shorrock Dep.): pp. 78-82, 177-184).  (App. A-40).   (App. A-38 (Kastner Dep.): pp. 236-237); (App. A-42). (App. A-41). (App. A-43). (App. A-44), (App. A-49: ¶¶ 1, 4, 7); and,

c)      used in materials available for distribution from the igt.com website (customer log in section) graphics, movies, icons, images etc. (App. A-38 (Kastner Dep.): pp. 204-244); (App. A-39) (App. A-38 (Kastner Dep.): pp. 204-205). (App. A-38 (Kastner Dep.): pp. 207-210; 220-222); (App. A-27 (Shorrock Dep.): pp. 204-205).  See e.g. A-40 and samples below, full listing and native images can be seen at App.-40.

Examples shown in index below.



**RESPONSE:** Defendants' object to SOAF ¶ 48 because GC2 failed to appropriately cite to

the record. *See Malec*, 191 F.R.D. at 583; *Buttron*, 2003 WL 21801222, at *2. GC2's citations will cause

Defendants and the Court to sift through 75 pages of three different depositions and nine additional

exhibits, one of which (A-42) has 22 separate PDFs, to determine whether the statement of fact has adequate support.

Defendants also object because SOAF ¶ 48 is immaterial to the motion for summary judgment. *See Malec*, 191 F.R.D. at 583.

49.     In addition to the customer log in only section, the IGT.com website otherwise,[11] depicts GC2 artwork and graphics without any recognition to GC2. (App. A-49: ¶¶ 10-11); (App. A-49: ¶¶ 14, 20, 24); (App. A-49: ¶¶ 28-29).

**RESPONSE:** Defendants deny SOAF ¶ 49 because the materials cited by GC2 do not support the statement. (*See* Pltf. App. A-49: ¶¶ 10-11; A-49: ¶¶ 14, 20, 24; A-49: ¶¶ 28-29.) The cited materials do not establish that the IGT.com website "depicts any GC2 artwork and graphics." No artwork or graphics are attached to the materials, and nothing cited shows that any artwork or graphics are GC2's. *See Buttron*, 2003 WL 21801222, at *2.

50.     GC2 artwork and graphics also were used on game icons. (App. A-27 (Shorrock Dep.): pp. 27-31); (App. A-45: containing hundreds of page-captures of IGT Internet online casino operator websites illustrating graphics displayed to the public.); (App. A-27(Shorrock Dep.): p. 52).

**RESPONSE:** Defendants object because GC2 fails to establish that the deponent has the requisite personal knowledge to testify that the artwork and graphics were "GC2 artwork and graphics." *See Buttron*, 2003 WL 21801222, at *3 (deposition testimony where the witness has no personal knowledge of the subject matter of his statements cannot be used to establish the existence of a genuine issue of material fact).

---

[11] The link for the below image can be found at IGT.com, "Pharaoh's Fortune® - Video Slot," https://www.igt.com/games/pharaohs-fortune--interactive-interactive-0gn. The link for the below image can be found at IGT.com, "Coyote Moon® - Video Slot," https://www.igt.com/games/coyote-moon--interactive-interactive-lt7. The link for the below image can be found at IGT.com, "Kitty Glitter® - Video Slot," https://www.igt.com/games/kitty-glitter--interactive-interactive-nu3.

**RESPONSE:** Defendants object because the websites GC2 cites lack authentication. *See Wozniak v. Ind. Univ. Bd. of Trs.*, No. 05 C 919, 2007 WL 869165, at *6 (S.D. Ind. March 20, 2007) (plaintiff failed to provide admissible evidence when her summary judgment brief merely cited internet addresses).

If Defendants' objections are overruled, then Defendants deny SOAF ¶ 50 because the materials cited by GC2 do not support the statement. (*See* Pltf. App. A-27 (Shorrock Dep.) pp. 27-31, 52; A-45.) The cited materials do not establish that GC2 artwork and graphics were used on any game icons. *See Buttron*, 2003 WL 21801222, at *2.

51.     These game icons contain game artwork. (For an example, S*ee* App. A-47 at GC2_00032572, App. A-46, and App. A-48 at GC2_00032607). The images below depict the portions of the menu on www.caesarscasino.com where game icons are illustrated for GC2's Pharaoh's Fortune and Coyote Moon. (App. A-48).



(App. A-27 (Shorrock Dep.): pp.51-52); (App. A-46); (App. A-47); (App. A-48).

**RESPONSE**:  Defendants object to SOAF ¶ 51 because the material cited in support -- App. A-46-48 are inadmissible under Fed. R. Evid. 901(13) & (14).  Defendants also object to the

notations on the images as argumentative and lacking foundation. Subject to the foregoing objections, Defendants deny SOAF ¶ 51 because the remaining citation (App. A-27) does not support the statement. *See Buttron*, *supra*.

52.    Although there is no GC2 Mark, GC2 artwork also is depicted on:

a)    "for free demo play," (See, App. A-30; Dft. Ltr. to court with log in credentials for interactive.)

b)    "splash screens,"[12] (App. A-27 (Shorrock Dep.): p. 27-31, 35-36, 52, 230); (For an example, S*ee* App. A-47 at GC2_00032572, App. A-46, and App. A-48 at GC2_00032607,

c)    "gameplay," which begins when an end user accesses online casino games through their preferred online casino operator. (App. A-27 (Shorrock Dep.): pp. 51-52).

**RESPONSE:**  Defendants object to SOAF ¶ 52(b) because the material cited in support (App. A-46-48) is inadmissible under Fed. R. Evid. 902(13) & (14) and the deponent cited lacks personal knowledge.

Subject to the foregoing objection, Defendants deny SOAF ¶ 52 because the materials cited by GC2 do not support the statement. *See Buttron*, 2003 WL 21801222.  The cited materials do not establish that GC2 artwork is depicted on "for free demo play," "splash screens," or "gameplay." (*See* Pltf. App. A-30; A-27 (Shorrock Dep.) pp. 27-31, 35-36, 51-52, 230; A-47 at GC2_00032572; A-46; A-48 at GC2_00032607.)

53.    The DoubleDown version of games were selected and ported over to DoubleDown because of their known graphics and revenue generating capability.  (App. A-27 (Shorrock Dep.): pp. 12-13, 30-36, 97, 161-163); (App. A-52 (Clelland Dep.): pp. 32, 158, 112-114); (App. A-84); (App. A-53 (Moro Dep.): pp. 38-41, 66-69, 206-207); (App. A-55 (Jankowski Dep.): p. 75); (App. A-87 (Waldow Dep.): pp. 23-24); (App. A-29 (Kastner Dep.): p. 346).

---

[12] The splash screen is the first screen seen after an end user clicks on the game icon on a casino operator website.

**RESPONSE:** Defendants' object to SOAF ¶ 53 because GC2 failed to appropriately cite to the record. *Malec*, 191 F.R.D. at 583; *Buttron*, 2003 WL 21801222, at *2. GC2 cites: (a) over 33 pages of deposition testimony; and (b) to Pltf. App. A-84, which is four separate PDFs totaling over 100 pages, without pin cites.

Subject to the foregoing objection, Defendants admit that the DoubleDown version of games were selected and ported over to DoubleDown because of their known revenue generating capability. Other than as expressly stated above, Defendants deny SOAF ¶ 53 because it is not supported by the cited material.

54.     DoubleDown General Manager Joseph Sigrist displayed the below image in a presentation he gave to depict why authentic slots mattered. (App. A-86).



**RESPONSE**: Defendants admit that App. A-86 is a PowerPoint presentation with DoubleDown's General Manager Joseph Sigrist's name on it. But Defendants deny the balance of SOAF ¶ 54 because the citation does not support that Sigrist ever gave a presentation of this PowerPoint.

55. DDI made no effort to determine if it could use GC2 Games. In addition, post-sale, DDI took no independent steps to determine whether DDI had the rights to use Coyote Moon, Pharaoh's Fortune or Kitty Glitter. (App. A-19 (Sigrist Dep.): pp. 119, 129: "it wasn't a task we decided to undertake." 132-133, 134-138, 141: no research after DDI learned of GC2).

**RESPONSE:** Defendants deny the first sentence of SOAF ¶ 55 because the cited materials do not support that statement. (*See* Pltf. App. A-19 (Sigrist Dep.) pp. 119, 129, 132-33, 134-38, 141.) *See Buttron*, 2003 WL 21801222, at *2. Defendants admit the second sentence of SOAF ¶ 55.

56. The Court can go online today (October 2018) and play the three primary GC2 Games at issue: Pharaoh's Fortune, Coyote Moon and Kitty Glitter on the internet real money gaming channel, and on DoubleDown Casino on line channels and can see that GC2's Mark is still not placed on these games.[13] (Excluded Channels).[14]

**RESPONSE:** Defendants object to SOAF ¶ 56 because it is argumentative and fails to cite any record material for support. *See Buttron*, 2003 WL 21801222, at *2.

57. **DoubleDown Casino:** DDI's Rule 30(b)(6) witness Joe Sigrist confirmed that DDI has the ability to stop presenting any type of games including any type of slot games to its end users on any platform at any time. (App. A-24 (Sigrist Dep.): p. 406).

**RESPONSE:** Admitted.

58. IGT and IGT NV's control over the servers also allows IGT and IGT NV to make the infringement stop. (App. A-16 (Baker Dep.): pp. 277-278, 298); (App. A-19 (Sigrist Dep.): pp. 269-270); (App. A-20 (Sigrist Dep.): pp. 112-113). (App. A-25A); (App. A-25B); (App. A-25C).

**RESPONSE:** Defendants deny SOAF ¶ 58 because it is not supported by the cited material. (*See* Pltf. App. A-16 (Baker Dep.) pp. 277-278, 298); A-19 (Sigrist Dep.) pp. 269-270; A-20 (Sigrist Dep.) pp. 112-113; A-25A; A-25B; A-25C.) *See Buttron*, 2003 WL 21801222, at *2.

59. Technical Experts have shown how quickly the infringing works on DoubleDown Casino can be removed, corrected or updated within minutes. (App. A-59: ¶ 72).

---

[13] https://www.doubledowncasino2.com/login.

[14] Masque has stopped distributing the infringing games.

**RESPONSE:** Defendants object to SOAF ¶ 59 because it is supported by only Pltf. App. A-59 (Laykin Declaration) ¶ 72, which consists of opinions and conclusions that Laykin did not disclose in his Rule 26(a)(2) report. (*Compare* Laykin's Report (Pltf. App. A-104) *with* his Declaration (Pltf. App. A-59 ¶ 72).); *See* Fed. R. Civ. P. 26(a); *Mannoia*, 476 F.3d at 456-57.

If Defendants' objection is overruled, then Defendants deny SOAF ¶ 59 because it is not supported by the cited material. (*See* Pltf. App. A-59: ¶ 72.) *See Buttron*, 2003 WL 21801222, at *2.

60. **Internet Real Money Gaming**: International Game Technology (IGT Parent) and IGT NV admit that they have the requisite control and ability to make the infringement of GC2's Copyrighted works stop. (App. A-26: ¶ 2). From a technological standpoint, the removal of the infringing works is as simple as "flipping a switch." (App. A-27(Shorrock Dep.): p. 51).

**RESPONSE:** Defendants object to the phrase "the infringement of GC2's Copyrighted works" as argumentative and a legal conclusion; otherwise, admitted.

61. Defendants International Game Technology and IGT NV shared legal and accounting departments, (App. A-14: ¶¶ 16, 18) and DDI shared legal departments with IGT NV. (*Id.*) Defendants maintained a database of contracts with third parties that exist in the legal department. (App. A-113), (App. A-13).

**RESPONSE:** Defendants object to the first sentence of SOAF ¶ 61 because it mischaracterizes the evidence. *See Buttron*, 2003 WL 21801222, at *2 (striking counterstatement where plaintiff mischaracterized the evidence). Defendants admit the second sentence of SOAF ¶ 61.

62. The IGT Defendants, through Todd Nash, learned of the GC2 Agreement in June 2015. (App. A-15 (Nash Dep.): p. 196).

**RESPONSE:** Admitted.

63. In February 2016, Leon Erickson. A member of IGT Defendants' legal department, reviewed the GC2 Agreement and had concerns over what he read in the GC2 Agreement. Nash re-familiarized himself with the GC2 Agreement at that time. (App. A-15 (Nash Dep.): pp. 119-121).

**RESPONSE:** Defendants admit that Nash became familiar with the GC2 Agreement in February 2016. Other than as expressly stated above, Defendants deny SOAF ¶ 63 because it is not

supported by the cited material. (*See* Pltf. App. A-15 (Nash Dep.) pp. 119-121.) *See Buttron*, 2003 WL 21801222, at *2.

64. IGT's legal staff informed Nash of their opinion in late February and early March 2016 (App. A-15 (Nash Dep.): pp. 124-128), after which then IGT General Counsel Michael Prescott was informed of this information. (*Id.*).

**RESPONSE:** Defendants object to SOAF ¶ 64 because it mischaracterizes the evidence. *See Buttron*, 2003 WL 21801222, at *2. Subject to the foregoing objection, Defendants admit that Leon Erikson informed Nash of his opinion in late February and early March 2016, after which then IGT General Counsel, Michael Prescott, got involved.

65. In March 2016, IGT through Nash, after consultation with IGT's legal department (Leon Erickson and Michael Prescott) attempted to see if GC2 was still in business. (App. A-15 (Nash Dep.): pp. 129-134). IGT then took steps to buy the missing rights from GC2 for ███ per game, without disclosing it had already made ██████████ of dollars on the unlicensed use. (*Id.* at 134, 251).

**RESPONSE:** Defendants admit the first sentence of SOAF ¶ 65. As to the second sentence, Defendants admit that IGT NV then took steps to buy the remaining rights from GC2 for ████ per game. Other than as expressly stated above, Defendants deny the second sentence of SOAF ¶ 65 because it is not supported by the material cited by GC2. (*See* Pltf. App. A-15 (Nash Dep.) pp. 129-134, 251.) *See Buttron*, 2003 WL 21801222, at *2.

66. Only after GC2 asked if the games had already been used, did Nash finally admit to GC2 that the IGT Defendants had a "gap in rights." (App. A-1: ¶ 3); (App. A-15 (Nash Dep.): pp. 129-134. The IGT Defendants sought, unsuccessfully, and without full or complete disclosure to GC2, to buy or license GC2's rights. (App. A-1: ¶ 3); (App. A-15 (Nash Dep.): p. 170).

**RESPONSE:** Defendants object to SOAF ¶ 66 because it is argumentative. Subject to that objection, Defendants admit that Nash sent an email to GC2 referring to a "gap in rights." Other than as expressly stated above, Defendants deny the remainder of the first sentence of SOAF ¶ 66 because the remaining statements are not supported by the cited material. (*See* Pltf. App. A-1: ¶ 3; A-

15 (Nash Dep.) pp. 129-134). Defendants deny the second sentence of SOAF ¶ 66 because the statement is not supported by the cited material. (*See* Pltf. App. A-1: ¶ 3; A-15 (Nash Dep.) p. 170.) *See Buttron*, 2003 WL 21801222, at *2.

67.     When this litigation was started in September 2016, GC2 requested that the unauthorized use of the GC2 Games be taken down, (App. A-17), but CEO of DDI Joe Sigrist claims he was not made aware of GC2's takedown request. (App. A-19 (Sigrist Dep.): p. 142). GC2 sent the complaint and take down request to DDI's terms of use Copyright agent, Kimberly Dimino, who admits receiving it. (App. A-8 (Dimino Dep.): pp. 44-48).

**RESPONSE:**     Defendants object to the first sentence of SOAF ¶ 67 because GC2's statement that the use was unauthorized is argumentative and a legal conclusion. Otherwise, Defendants admit that: "When this litigation was started in September 2016, GC2 requested that the GC2 Games be taken down." Defendants admit that Joe Sigrist stated that he was not made aware of GC2's takedown request. Defendants deny the remaining statements in SOAF ¶ 67 because they are not supported by the cited material. (*See* Pltf. App. A-8 (Dimino Dep.) pp. 44-48.) Dimino testified that she recalled receiving a package from DDI, but did not recall what was in the package. (*Id.*) *See Buttron*, 2003 WL 21801222, at *2.

68.     Three unauthorized distribution channels were identified by IGT in its discussions with GC2 relating to the "gap in rights," and were as follows:

    A.     Internet Real Money Gaming
    B.     DoubleDown Casino (a/k/a Social Gaming or non-wagering use)
    C.     Masque/Encore

(App. A-1: ¶¶ 3, 185); (App. A-2: ¶¶ 3, 185); (App. A-3: ¶¶ 3, 185). IGT by its own investigation further identified and represented to GC2 that IGT had used the following GC2 Works or derivatives thereof in the Excluded Channels:

- Pharaoh's Fortune
- Kitty Glitter
- Festival Fantastico
- Maid of Money
- Coyote Moon
- Lucky Lion Fish
- King Pin Bowling

**RESPONSE**:  Defendants deny SOAF ¶ 68 because it is not supported by the cited material.

(*See* Pltf. App. A-1: ¶¶ 3, 185; A-2: ¶¶ 3, 185; A-3: ¶¶ 3, 185).  *Buttron*, 2003 WL 21801222, at *2.

69.    In October 2016, GC2 again requested that the GC2 Games be taken down from DoubleDown Casino, however, IGT and DDI, through their agents and lawyers, threatened GC2 with a lawsuit and liability:

> *"Fourth, if your client serves takedown notices on Double Down's service providers, your client does so at its own risk.  As you know, Double Down's website generates a substantial amount of revenue on a daily basis.  If it is inaccessible for any period of time through one or more of our service providers' platforms as a result of your takedown notice (possibly between 10-14 days), we will seek to recover damages from your client including, without limitation, lost profits and attorneys' fees.  See 17 U.S.C. § 512(f)."*

(App. A-21: (Nov 14, 2016 E-mail from Joshua Liebman to Kara Cenar)).  Sigrist, however, did not have knowledge of this threat nor did he authorize it.  (App. A-19 (Sigrist Dep.): pp. 142-143).

**RESPONSE**:  Defendants object to SOAF ¶ 69 because it is irrelevant to Defendants' Motion for Partial Summary Judgment.

70.    From January 2016 (the approximate date Defendants realized they did not have GC2's rights) until the first quarter of 2018 (which exceeds the 180-day period set forth in 17 U.S.C. § 506)[15] IGT Defendants, DDI and their online casino customers **generated ████████ in revenue** through the use of GC2 Games Pharaoh's Fortune, Coyote Moon and Kitty Glitter.  (App. A-103: Exh. 7.4 at p. 1).  The Defendants' continued infringing uses were for commercial advantage and private financial gain as the gross revenue generated from all the unauthorized use of the GC2 Games, Pharaoh's Fortune, Coyote Moon and Kitty Glitter, on on-line channels (either (a) internet real money gaming, or (b) DoubleDown Casino) is approximately ██████.  (App. A-102: p. 59).

**RESPONSE:**  Defendants object to SOAF ¶ 70 because the material cited in support is not authenticated and lacks foundation.  *See LaFlamboy*, 587 F. Supp. 2d at 921-22 (Rule 56(e) requires that "all documentary exhibits" -- including expert reports -- be authenticated and attached to an affidavit

---

[15] 17 U.S.C. §506 defines Criminal Copyright Infringement as any person who willfully infringes a copyright …if the infringement was committed a) for purposes of commercial advantage or private financial gain or b) by the reproduction or distribution, including by electronic means, during a 180 day period, of one or more copies or phone records of one or more copyrighted works, which have a total value of more than $1,000.

**RESPONSE:**  Defendants object to footnote 15 because it is immaterial.  *See Malec*, 191 F.R.D. at 583.

that meets the requirements of Rule 56(e).)  Defendants further object to the second sentence as argumentative.

71.    Declarants (Millar and Manning) describe the IGT RGS Interactive version as technology that distributes the games **_through_** a casino operator's website (Defendants' Appx. 3 (Millar Decl.); (Defendants' Appx. 31 (Manning Decl.)).  However, IGT NV Company testimony evidences that the games are **_not distributed through the website_**.  (App. A-11 (Kastner Dep.): pp. 208-218).

**RESPONSE:**  Defendants object to SOAF ¶ 71 because it mischaracterizes the evidence.  *See Buttron*, 2003 WL 21801222, at *2.  Millar and Manning's statements that IGT-branded games are distributed "through" casino operator websites are not descriptions of how the "technology" works. (*See* Def. Appx. 3 ¶¶ 8, 26; Def. Appx. 31 ¶ 7.)

72.    The Defendants' partnering that occurs with Casino Partners on the IGT RGS Interactive Gaming Technology will be discussed using the below graphic and materials.



(App. A-31).

**RESPONSE:** Defendants object to SOAF ¶ 72 because it is not a statement of fact. Defendants further object because the statement contains an improper factual and/or legal conclusion -- that the Defendants "partner[]" with Casino Operators. *See Buttron*, 2003 WL 21801222, at *3; *Malec*, 191 F.R.D. at 583 (it is inappropriate to allege legal conclusions in a 56.1 statement). Defendants also object to the demonstrative exhibit shown above and at Pltf. App. A-31, because it lacks authentication and GC2 has failed to identify admissible underlying facts to support the exhibit. *See Mathews v. Bronger Masonry, Inc.*, No. 09 C 478, 2010 WL 4811914, *3 (S.D. Ind. Nov. 18, 2010) (rejecting unauthenticated demonstrative exhibit as inadmissible at summary judgment).

73.    **Point #1: Creation of GC2 unlicensed games and placement on central servers:** In regards to #1 of the diagram above, Defendant IGT NV, which is wholly owned by IGT:

  a)    Created infringing internet gambling versions of GC2 Games in the United States for exploitation in the United States and abroad.  (App. A-11 (Kastner Dep.): pp. 23-27, 32, 47-48, 118).

  b)    Took all steps necessary to get the games tested for internet gambling regulatory approval.  (*Id.* at pp. 64-66).

  c)    Sought and obtained approval for the internet gambling version in four different regulatory jurisdictions, namely New Jersey, Gibraltar, Alderney and Canada.  (*Id.* at pp. 38-40, 83-85); (App. A-38 (Kastner Dep.): pp. 109-110, 170-171, 174-176).

  d)    Participated in making the infringing games available in its data center in the United States for copying onto the "central servers" in the other respective jurisdictions.  Made digital copies of the infringing games in the United States. Places unlicensed GC2 Games onto central servers used for each jurisdiction. IGTNV places unauthorized games on the central server. (App. A-11 (Kastner Dep.): pp. 19-23, 58-62, 81, 96, 102-103).

**RESPONSE:** Defendants object to SOAF ¶ 73 to the extent it relies on the demonstrative exhibit set forth in SOAF ¶ 72 for the reasons set forth in Defendants' response thereto.  Defendants further object to SOAF ¶ 73 because it is irrelevant to any issue in Defendants' Motion for Partial Summary Judgment.

74.     **Point #2: Partnering on the Code:** In regard to #2 of the diagram above, Appendix 2 of the Casino Partner RGS Agreements prove Defendants partner on technology. (App. A-125). IGT Defendants and their casino partners intentionally work ***together*** to insert computer code and functionality on the Casino Partner's website without which the GC2 Games could not be distributed from the IGT central server to the end user. (App. A-11 (Kastner Dep.): pp. 254-255: "What is it that IGT provides to the casino operator that allows the end user to click on an icon, the casino operator's website to trigger this distribution? A. They're described up here under the first bullet. They provide an API or the application protocol interface. Q. Okay. A. And then we obviously have the game functionality that's sitting in the server.").

     **RESPONSE:** Defendants object to SOAF ¶ 74 to the extent it relies on the demonstrative

exhibit set forth in SOAF ¶ 72 for the reasons set forth in Defendants' response thereto. Defendants

further object to SOAF ¶ 74 because it is irrelevant to any issue in Defendants' Motion for Partial

Summary Judgment. Defendants also object because SOAF ¶ 74 is argumentative and contains

improper conclusions of fact and/or law. *See Buttron*, 2003 WL 21801222, at *3; *Malec*, 191 F.R.D. at

583. Defendants object to the second sentence of SOAF ¶ 74 because it mischaracterizes the evidence.

*See Buttron*, 2003 WL 21801222, at *2.

75.     **Point #2: Partnering on the Casino Partner Website Graphic Display:** As reflected in the above diagram at #2, the Defendants' Casino Partners have a website where they use unauthorized artwork and graphics as a game icon for the purpose of displaying the availability of the unauthorized GC2 Games. (App. A-11 (Kastner Dep.): pp. 202-207); (App. A-1: ¶¶ 109-112); (App. A-123, 124). Both IGT and the Casino operator have to do something together for the Game icon to be displayed on the Casino operator website. (App. A-11 (Kastner Dep.): p. 205). IGT NV creates the icon and the icon is provided to and distributed to Casino Partners by IGT NV, by IGT Casino Lounge, and/or are made available through IGT website www.igt.com. (App. A-27(Shorrock Dep.): p. 35); (App. A-11 (Kastner Dep.): pp. 202-207, 224, 256-257); (App. A-37, 38 (Kastner Dep.): pp. 214-215).

     **RESPONSE:** Defendants object to SOAF ¶ 75 to the extent it relies on the demonstrative

exhibit set forth in SOAF ¶ 72 for the reasons set forth in Defendants' response thereto. Defendants

further object to SOAF ¶ 75 because it is irrelevant to any issue in Defendants' Motion for Partial

Summary Judgment. Defendants also object because SOAF ¶ 75 is argumentative. *See Buttron*,

2003 WL 21801222, at *3; *Malec*, 191 F.R.D. at 583.

Defendants object to the second sentence of SOAF ¶ 75 because it mischaracterizes the evidence. *See Buttron*, 2003 WL 21801222, at *2. Kastner testified that IGT NV provides the casino operators with artwork to be used as a game icon, and that the casino operators then display it on their websites. Kastner did not testify that IGT NV and casino operators "have to do something together" to display the icon. (*See* Pltf. App. A-11 (Kastner Dep.) p. 205.)

As to the third sentence, Defendants deny that the icons are provided and distributed by IGT Casino Lounge, and/or are made available through IGT website www.igt.com because the materials cited do not support those statements. (*See* Pltf. App. A-27 (Shorrock Dep.) p. 35; A-11 (Kastner Dep.) pp. 202-207, 224, 256-257; App. A-37; A-38 (Kastner Dep.) pp. 214-215.) *See Buttron*, 2003 WL 21801222, at *2 (striking counterstatement where plaintiff failed to provide proper and specific references).

76. **Point #2: Partnering on Marketing Materials:** IGT NV and International Game Technology makes available for distribution (through the customer only log in section of the website www.igt.com), numerous: a) infringing marketing materials; b) infringing videos of the unlicensed works; and c) infringing copies of raw graphics from the unlicensed GC2 works. The IGT.com website is owned by International Game Technology. (App A-38 (Kastner Dep. pp. 204-244, 207-210; 220-222); (App. A-40).

**RESPONSE:** Defendants object to SOAF ¶ 76 to the extent it relies on the demonstrative exhibit set forth in SOAF ¶ 72 for the reasons set forth in Defendants' response thereto. Defendants further object to SOAF ¶ 76 because it is irrelevant to any issue in Defendants' Motion for Partial Summary Judgment. Defendants further object to SOAF ¶ 76 because it characterizes marketing materials, videos and copies of raw graphics as "infringing" and identifies works as "unlicensed." These references are factual and/or legal conclusions.

77. **Points #'s 3-6: Partnering on Mass Distribution of GC2 Unlicensed works:** IGT NV describes the process by which the artwork and graphics get from the IGT RGS central server to the end user device. (App. A-11 (Kastner Dep.): pp. 208-218). The RGS Server operates the same way in each location. (*Id.*)

**RESPONSE:** Defendants object to SOAF ¶ 77 to the extent it relies on the demonstrative exhibit set forth in SOAF ¶ 72 for the reasons set forth in Defendants' response thereto. Defendants further object to SOAF ¶ 77 because it is irrelevant to any issue in Defendants' Motion for Partial Summary Judgment. Defendants object to the first sentence of SOAF ¶ 77 because it is not a statement of fact. Subject to the foregoing objections, Defendants admit the second sentence of SOAF ¶ 77.

78. As shown in the above diagram, an end user (#3 above) clicks on an icon on the Casino Partner's Website (#2 above). The code that was placed on the website by IGT (#2 above) sends direction to the IGT Central Server that a bet has been made. The IGT Central Server sends a "client side" game packet directly to the end user. It does not get distributed through the casino website. (*Id.*)

**RESPONSE:** Defendants object to SOAF ¶ 78 to the extent it relies on the demonstrative exhibit set forth in SOAF ¶ 72 for the reasons set forth in Defendants' response thereto. Defendants further object to SOAF ¶ 78 because it is irrelevant to any issue in Defendants' Motion for Partial Summary Judgment. Defendants also object because SOAF ¶ 78 is argumentative and contains factual conclusions. Defendants deny the second sentence of SOAF ¶ 78 because it is not supported by the cited material. (*See* Pltf. App. A-11 (Kastner Dep.) pp. 208-218.) The cited material does not support the statement that "code was placed on the website by IGT." Defendants object to the last sentence of SOAF ¶ 78 because it mischaracterizes the evidence. Kastner did not testify that the games do not get distributed through the casino websites.

79. **Point #6: Game Packet with GC2 graphics copied:** The game packet with GC2 graphics is copied to the cache of the end user device. See #6 above. With each "spin" by the end user, the code on the end user device (#6) sends direction to the Random Number Generator ("RNG") (#6) letting it know to send a result to the end user device. (#6) The "result" sent by the RNG is direction to the game packet copied on the cache of the device to display certain images on the screen in a certain way. (*Id.*)

**RESPONSE:** Defendants object to SOAF ¶ 79 to the extent it relies on the demonstrative exhibit set forth in SOAF ¶ 72 for the reasons set forth in Defendants' response thereto. Defendants

further object to SOAF ¶ 79 because it is irrelevant to any issue in Defendants' Motion for Partial

Summary Judgment. Defendants also object to SOAF ¶ 79 because it contains factual conclusions

and mischaracterizes the evidence. Kastner did not say that the game packet and graphics *are copied* to

the cache of the device, he testified that the game packet and graphics *are cached* on the device. (*See*

Pltf. App. A-11 (Kastner Dep.) pp. 208-218.)

80. Defendants share revenue from the exploitation of GC2 Games with their Casino
Partners, in allowable gaming jurisdictions (App. A-16 (Baker Dep.): p. 38) and:

    a)    The Casino Partners provide detailed financial information through "progress reports"' which are entered into a "centralized system" at IGT.

    b)    Casino Partner information can and is accessed throughout IGT NV for various reasons including payment of royalties they owe third party game developers. Amy Baker, of IGT's Accounting Department testified that: Baker is familiar with the RGS Agreements. (*Id.* at 57).

    c)    Casino Partner reports are available to IGT and IGT is able to run reports from IGT NV in Nevada through IGT's "centralized system," including "performance reports" that are to be submitted to IGT Finance (Para 5.3) by the RGS casino operator identifying all deductions from hold required for the purpose of calculating net gaming revenue. (*Id.* at 65-76, 78-83).

**RESPONSE:** Defendants deny the preamble to SOAF ¶ 80 because the material cited does

not support the statement, and other materials directly contradict the conclusion that all "Defendants"

share revenue in all jurisdictions. (*See* Pltf. App. A-16 (Baker Dep.) p. 38; *see also* Def. Appx. 3 (Millar

Decl.) ¶¶ 11-13, 31-33, 36-37, 42-43; Def. Appx. 31 (Manning Decl.) ¶¶ 9, 13-15, 24-26, 30-31.)

Defendants deny SOAF ¶ 80(a) because it fails to cite any material for support, and the material cited

just before and just after the statement fail to support it. Defendants deny the first sentence of SOAF

¶ 80(b) because it fails to cite any material for support, and the material cited just before and just after

the statement fail to support it. *See id.* Defendants admit the second sentence of SOAF ¶ 80(b).

Defendants admit SOAF ¶ 80(c).

81.     IGT's RGS partner agreements for New Jersey, Canada, Gibraltar, and Alderney require that IGT provide the casino customers (also called operators or "RGS partners") with certain financial reports.  (App. A-125); (App. A-126); (App. A-127); (App. A-128)(App. A-94: identifying "IGT Casino rgs partners.")

**RESPONSE:**  Defendants object to SOAF ¶ 81 as vague because "IGT" is nowhere defined, and it is unclear to which entity GC2 refers.  Defendants also object to SOAF ¶ 81 because GC2 failed to appropriately cite to the record.  GC2 cites four large documents totaling over 170 pages without any pin cites.  (*See* Pltf. App. A-125, A-126, A-127, A-128.)  Further, the fifth document relied on by GC2, Pltf. App. A-94, is a blank slip sheet.

82.     IGT's RGS partner agreements for New Jersey, Canada, Gibraltar, and Alderney also require that IGT provide casino customers with additional support including "system integration planning" and "casino management" assistance, such as the creation of "Casino Gaming Analytics admin accounts for running reports and accessing summary transaction data." (App. A-125); (App. A-126); (App. A-127); (App. A-128).

**RESPONSE:**  Defendants object to SOAF ¶ 82 as vague because "IGT" is nowhere defined. Defendants also object to SOAF ¶ 82 because GC2 failed to appropriately cite to the record.  GC2 cites four large documents totaling over 170 pages without any pin cites.  (*See* Pltf. App. A-125, A-126, A-127, A-128.)

83.     IGT's RGS partner agreements for New Jersey, Canada, Gibraltar, and Alderney require that the casino customers provide IGT with financial reports showing casino gross revenues, casino deductions, casino net revenues, and royalties to IGT. (App. A-127); (App. A-128); (App. A-125).[16] For example, IGT's November 2013 RGS Deployment Agreement with Caesars Interactive Entertainment states:

████████████████████████████████████████████████

---

[16] The terms of IGT's RGS agreements in Canada vary more than those of IGT's RGS agreements in New Jersey, Gibraltar, and Alderney.  However, most Canada agreements do require the sharing of financial and technical information between IGT and the casino customer.  For example, see (App. A-125 at IGTNV_244960).

**RESPONSE:**  Defendants object to footnote 16 as vague because "IGT" is not defined.  Subject to this objection, Defendants deny footnote 16 because it is not supported by the cited material.

████████████████████████████████████████████

(App. A-125).

IGT's RGS agreements sometimes require casino customers to share additional data. For example, IGT's Alderney RGS agreement with Dumarca Gaming Limited requires the casino to provide IGT with certain demographic data for casino visitors. (App. A-128).

**RESPONSE**: Defendants object to SOAF ¶ 83 as vague because "IGT" is nowhere defined.

Defendants also object to SOAF ¶ 83 because GC2 failed to appropriately cite to the record. GC2

cites four large documents totaling over 170 pages without any pin cites. (*See* Pltf. App. A-125, A-

126, A-127, A-128.)

84.    Through its RGS partner agreements with casino customers.██████████████████████████████████████████████████████████████████ (App. A-125); (App. A-127); (App. A-128); (App. A-90 (Haffke Dep.): pp. 42, 67-70).██████████████████████████████████████████ (App. A-103).

**RESPONSE:** Defendants object to SOAF ¶ 84 as vague because "IGT" is nowhere defined.

Defendants also object to SOAF ¶ 84 because GC2 failed to appropriately cite to the record. GC2

cites three large documents totaling over 70 pages without any pin cites. (*See* Pltf. App. A-125, A-127,

A-128.) Defendants further object because GC2 mischaracterizes the evidence. *See Buttron*, 2003 WL

21801222, at *2. In particular, GC2 mischaracterizes Haffke's testimony. (*See* Pltf. App. A-90 (Haffke

Dep.) pp. 42, 67-70). Finally, Defendants object to GC2's reliance on its own expert report, Pltf. App.

A-103, because that document lacks authentication. *See LaFlamboy*, 587 F. Supp. 2d at 921-22.

85.    Gaming is a regulated industry and it would be a crime to distribute even regulatory tested and approved games in unauthorized jurisdictions. (App. A-27 (Shorrock Dep.): pp. 136-137). Operators in a legal gaming jurisdiction also must be an authorized operator with a license to distribute games. (*Id.* at 52).

**RESPONSE:** Defendants object to SOAF ¶ 85 because the statements therein are irrelevant

to Defendants' Motion for Partial Summary Judgment, argumentative and conclusions of law.

86.     Certain IGT Casino Partners are listed as "Approved Partners" and "Approved Websites" under IGT licenses.[17]

**RESPONSE:**  Defendants object to SOAF ¶ 86 because GC2 relies on nothing but an unauthenticated internet address for support, and not any materials in the record.  *See Wozniak*, 2007 WL 869165, at *6 (plaintiff failed to provide admissible evidence when her summary judgment brief merely cited internet addresses).

**[HEADING OMITTED]**[18]

87.     IGT NV and Masque admit that they have a relationship with each other for creation, sale, packaging, and distribution of games incorporating one or more of GC2's Works.  (App. A-1: ¶ 50, 51, 60 )(App. A-2: ¶¶ 50-51¶¶ 60-61).  Copies of the Agreement between Masque and IGT NV can be found in (App. A-66).

**RESPONSE:**  Defendants admit that IGT NV and Masque admitted that they have a relationship with each other that relates to the sale and distribution of games that GC2 alleges incorporate one or more of the GC2 Works.  Other than as expressly set forth above, Defendants deny the first sentence of SOAF ¶ 87 because it is not supported by the cited material.  (*See* Pltf. App. A-1: ¶¶ 50, 51, 60; A-2: ¶¶ 50-51, 60-61).  Defendants admit the second sentence of SOAF ¶ 87.

88.     Masque admits that it is an entertainment software publisher and developer located in Colorado.  (App. A-2: ¶¶ 58-59).  Masque is sophisticated in this business.  Copies of GC2 artwork and graphics in the "Masque Hard Drive" have GC2's Marks on them.  The art comes in different layers that can be turned on or off in illustrator.  The IGT logo and GC2 logo were on different layered files.  (App. A-64 (Wisler Dep.): pp. 86-87).

---

[17]  See, e.g.     Approved partners for 2016  https://www.gibraltar.gov.gi/new/sites/ default/files/HMGoG_Documents/IGT_1.pdf  See Approved Partners for 2013  https:// www.gibraltar.gov.gi/sites/default/files/docs/IGT.pdf.

**RESPONSE:**  Defendants object to footnote 17 for the reasons set forth in Defendants response to SOAF ¶ 86.

[18] Defendants argue on page 27 that GC2 alleged DDI was responsible for Masque/Encore profits. GC2 had not alleged that, and GC2 has very consistently identified IGTNV and Masque and IGTNV and Encore as the parties involved with those product lines (with IGT being the wholly owned subsidiary).  As these claims were not asserted, Summary judgment should be denied.

**RESPONSE:**  Defendants object to footnote 18 because it is argumentative.

**RESPONSE:** Defendants admit the first two sentences of SOAF ¶ 88. Defendants object to the third sentence of SOAF ¶ 88 because it mischaracterizes the evidence. Wisler's testimony related to only one game and did not mention a hard drive. (*See* Pltf. App. A-64 (Wisler Dep.) pp. 86-87.) Further, the cited material does not support that the artwork received by Masque was "GC2 artwork and graphics." (*See id.*) Defendants admit the fourth sentence of SOAF ¶ 88, but only to the extent it relates to Wild Goose Chase. (*See id.*)

89.     Masque did not have any conversation with IGT regarding the fact that the GC2 logo appeared in some of the artwork and graphic files provided by IGT. (App. A-64 (Wisler Dep.): pp. 112-113). Masque admits knowledge of exclusive rights granted to Copyright Owners; (App. A-2: ¶ 100). Masque admits that it does not have a license from GC2. (App. A-2: ¶ 220).

**RESPONSE:** Defendants admit the first sentence of SOAF ¶ 89. Defendants object to the second sentence of SOAF ¶ 89 because it mischaracterizes the evidence. Masque did not admit knowledge of rights granted to copyright owners. (*See* Pltf. App. A-2: ¶ 100.) Defendants admit the third sentence of SOAF ¶ 89.

90.     IGT NV transmitted to Masque files containing names, artwork, and sound via an external hard drive. (App. A-64 (Wisler Dep.): pp. 40-46, 54-58). IGT NV's Steve Kastner testified by Rule 30(b)(6) and confirmed that Masque received art assets from IGT NV. (App. A-11 (Kastner Dep.): pp. 256-257). IGT NV further admits via its Rule 30(b)(6) witness that the copies of the GC2 artwork IGT NV gave to Masque are in the Bates range shown in Exhibit 165 (App. A-11 (Kastner Dep.): pp. 218-219) and those copies were produced in discovery. (App. A-64 (Wisler Dep.): pp. 40-46, 54-58).

**RESPONSE:** Defendants admit the first sentence of SOAF ¶ 90. Defendants deny the second and third sentences of SOAF ¶ 90 because the materials cited do not support the statements. (*See* Pltf. App. A-11 (Kastner Dep.) pp. 218-19, 256-57).

91.     IGT had final approval on the final version of Masque games. (App. A-64 (Wisler Dep.): pp. 77-80).

**RESPONSE:** Admitted.

92.     Masque created its packaging for its products.  (App. A-2: ¶ 154).  GC2 artwork for Wild Goose Chase, Festival Fantastico, Lucky LionFish, Pharaoh's Fortune, and Kingpin Bowling have been copied onto Masque's packaging.  (App. A-2: ¶¶ 156, 162, 166); (App. A-64 (Wisler Dep.): pp. 97-109).  GC2's artwork and graphics on Masques' packaging is distributed to the public.  (App. A-2: ¶ 155: Masque admits that some customers receive disks from Amazon or Masque in Masque packaging).

**RESPONSE:**  Defendants admit the first sentence of SOAF ¶ 92.  With regard to the second sentence, Defendants admit that artwork for Wild Goose Chase, Festival Fantastico, Lucky Lion Fish, Pharaoh's Fortune, and Kingpin Bowling has been copied onto Masque's packaging, but deny that the artwork is GC2's artwork because the material cited fails to support that conclusion.  (*See* Pltf. App. A-2: ¶¶ 156, 162, 166; A-64 (Wisler Dep.) pp. 97-109.)  Defendants object to the third sentence of SOAF ¶ 92 because it mischaracterizes the evidence.  There is no admission that artwork and graphics on Masque's packaging is GC2's artwork and graphics or that packaging is distributed to the public.  (*See* Pltf. App. A-2: ¶¶ 156, 162, 166; A-64 (Wisler Dep.) pp. 97-109.)

93.     Masque admits that the packaging shown in (App. A-2: ¶ 166) includes artwork for Pharaoh's Fortune and KingPin Bowling as those games are sold by Masque and the Maid of Money Game is also shown on the package.  (*Id.*)  The IGT Defendants admit that the packaging includes certain artwork for the games titled Pharaoh's Fortune and KingPin Bowling.  (App. A-1: ¶ 166).[19]

**RESPONSE:**  Admitted.

94.     In order to develop the games, Masque artists start with the art and graphics produced by IGT NV.  (App. A-64 (Wisler Dep.): p. 59.)  A single game can take 2-9 months to develop.  (App. A-64 (Wisler Dep.): pp. 61-62.)  The goal was to make the games similar to the games on the casino floor.  (App. A-64 (Wisler Dep.): pp. 69-70, 72.)  The agreement permits Masque to come to IGT to view and film the land based games.

**RESPONSE:**  Defendants admit the first, second and third sentences of SOAF ¶ 94.  Defendants deny the fourth sentence because it lacks citation to the record.

---

[19] IGT's General Counsel Michael Prescott identified Maid of Money as a derivative work of GC2's work.  Paragraph 166 of the answer shows this is one work on the packaging and one game.  IGT NV is representing to the Court in its Motion that Maid of Money is not a derivative work.

**RESPONSE:**  Defendants object to footnote 19 because it is argumentative.  Defendants deny the first sentence of footnote 19 because it is not supported, and it is argumentative and calls for a legal conclusion.

95.     Masque admits that it sells the following CD's/DVD's:

- "IGT SLOTS WolfRun" that contains the games Wild Goose Chase and Festival Fantastico.  (App. A-2: ¶ 157).  Masque admits the images in (App. A-2: ¶ 158) contain images of Festival Fantastico when it is played.

- "IGT SLOTS Texas Tea" that contains the game Lucky LionFish as that game is sold by Masque.  (App. A-2: ¶ 163).  Masque admits the images in (App. A-2: ¶ 164) are screens leading up to the playing of the game Lucky LionFish as that game is sold by Masque.

- "IGT SLOTS Diamond Galaxy" that includes the games Pharaoh's Fortune and Kingpin Bowling.  (App. A-2: ¶ 167).  Masque admits that the images shown in (App. A-2: ¶ 168) are screens leading up to playing the game KingPin Bowling as that game is sold by Masque.  Masque admits that the images in (App. A-2: ¶ 170) are images of screens leading up to playing the game Pharaoh's Fortune as that game is sold by Masque.  Maid of Money also appears on this Disk.

**RESPONSE:**  Admitted.

96.     Masque admits maintaining the website www.masque.com where it permits downloading games incorporating GC2 Copyrighted works and admits customers download Masque games off of Amazon website.  (App. A-2: ¶'s 61 and 78).

**RESPONSE:**  Defendants object to SOAF ¶ 96 because it mischaracterizes the evidence.

Masque did not admit that the games "incorporate[e] GC2 Copyrighted works."  (*See* Pltf. App. A-2

¶¶ 61, 78.)  Defendants admit that Masque admitted that customers download Masque games off of

Amazon website.

97.     Masque admits it has a website that permits games to be ordered or downloaded.  (App. A-2: ¶ 147).  Masque admits that the items listed in (App. A-2: ¶ 148) are copies of its webpages offering Lucky LionFish, Festival Fantastico, Wild Goose Chase, Pharaoh's Fortune, KingPin Bowling and Maid of Money for sale.

**RESPONSE:**  Admitted.

98.     Masque admits that the when an end user puts a CD containing Masque games into a PC or Mac, they are given a series of instructions to Copy the game onto a PC or Mac. (App. A-2: ¶ 172).  IGT NV had final approval on the final version of Masque games and thus approved these instructions.  (App. A-64(Wisler Dep.): pp. 77-80).

**RESPONSE:** Defendants admit the first sentence of SOAF ¶ 98. Defendants object to the second sentence because it mischaracterizes the evidence. There is no testimony or evidence that IGT NV approved the instructions. (*See* Pltf. App. A-64 (Wisler Dep.) pp. 77-80.)

99. The Court has stayed the case against Encore. The IGT Defendants admit that IGT NV has an agreement with WD Encore. (App. A-1: ¶ 67). WD Encore admits to a relationship with IGT NV and having an agreement with IGT NV relating to GC2 games. (App. A-3: ¶¶ 50-51).

**RESPONSE:** Admitted.

100. The IGT Defendants admit that WD Encore sells and distributes copies of games by physical CD/DVD from WD Encore's website and from other websites, such as Amazon, that GC2 alleges include images GC2 claims are GC2 Copyrighted Works. (App. A-1: ¶ 68).

**RESPONSE:** Admitted.

101. WD Encore admits that it sells software packaged products. (App. A-3: ¶ 65). WD Encore admits that it maintains a website, www.encore.com, which permits end users to download GC2 games and that (App. A-114-115) are printouts from their website. (App. A-3: ¶ 66).

**RESPONSE:** Defendants admit the first sentence of SOAF ¶ 101. Defendants object to the second sentence of SOAF ¶ 101 because it mischaracterizes the evidence. WD Encore did not admit that the games were GC2 games. (*See* Pltf. App. A-3 ¶ 66.) Defendants admit that WD Encore admitted that Pltf. App. A-114-115 were printouts from the WD Encore website.

102. WD Encore admits to selling copies of GC2 games by physical CD and by encore website and amazon website. (App. A-3: ¶ 68). WD Encore also admits that (App. A-73) are pictures of games sold by CD by Encore).

**RESPONSE:** Defendants object to SOAF ¶ 102 because it mischaracterizes the evidence. WD Encore did not admit that the games were GC2 games. (*See* Pltf. App. A-3 ¶ 68.) Further, although some of Pltf. App. A-73 are pictures of games sold by CD by WD Encore, some are not.

103. WD Encore admits to selling games through Amazon, and that Exhibits 66 and 67 are screen shots of games Encore offered on Amazon.com. (App. A-3: ¶ 177). WD Encore admits that the image in paragraph 178 is picture of front and back of Encore Packaging. (App. A-3: ¶ 178).

**RESPONSE:** Admitted.

104. WD Encore admits that when a consumer end user puts a disk in computer they are provided with instructions to copy the games onto P.C. (App. A-3: ¶ 179) and that it does not have a license from GC2. (App. A-3: ¶ 231). WD Encore admits that it has the right and ability to supervise the content on its website. (App. A-3: ¶ 286).

**RESPONSE:** Admitted.

105. DDI refers to IGT as DDI's Partner. (App. A-20: (Sigrist Dep.): pp. 217-218: "We have partners we rely upon. IGT is one of those partners.")

**RESPONSE:** Defendants object to SOAF ¶ 102 because it mischaracterizes the evidence.

*See Buttron*, 2003 WL 21801222, at *2. Although the deponent referred to IGT NV as one of DDI's

partners during his deposition, that does not mean that DDI "refers to IGT as DDI's partner."

106. DDI identified a press release given by DoubleU wherein DoubleU refers to its relationship with IGT as a deep and valuable accreditive partnership. (App. A-74). When a DDI Company representative was presented with the Game Development Agreement (App. A-133), the DDI representative stated, "This is the Agreement that defines the partnership that was referred to in the press release." (App. A-19 (Sigrist Dep.): p. 223).

**RESPONSE:** Defendants object to the first sentence of SOAF ¶ 106 and GC2's use of Pltf.'s

A-74 because it is hearsay. Defendants admit the second sentence of SOAF ¶ 106.

107. DoubleDown Casino is distributed by Defendants through servers they lease through Amazon Web Services. Defendant DDI has paid for these hostings and server costs. IGT NV and IGT have control over these servers. ███████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████ (App. A-16 (Baker Dep.): pp. 277-278, 298); (App. A-19 (Sigrist Dep.): pp. 269-270); (App. A-20 (Sigrist Dep.): pp. 112-113).

**RESPONSE:** Defendants object to GC2's citations to Pltf. App. A-22 and A-23 because

GC2 failed to appropriately cite to the record. These two documents are 272 and 156 pages,

respectively, and GC2 fails to provide any pin cites.

Subject to the foregoing objection, Defendants deny SOAF ¶ 107 because the cited testimony fails to support the statement. (*See* Pltf. App. A-16 (Baker Dep.) pp. 277-278, 298; A-19 (Sigrist Dep.) pp. 269-270; A-20 (Sigrist Dep.) pp. 112-113.)

108. In April 2017, after the lawsuit was filed, IGT Parent "sold" its shares of DDI to DoubleU Diamond. (App. A-22: Signed by Renato Ascoli dated April 2017 ███████████ ██████████████████████████████████████████████████████ (App. A-23: dated May 31, 2017, signed by Renato Ascoli ████████████████████████████████ ████████████████████████████████████████████████████

**RESPONSE:** Defendants admit that in April 2017, after the lawsuit was filed, IGT Holdco sold its membership interests in DDI to DoubleU Diamond. Other than as expressly stated above, Defendants deny the first sentence of SOAF ¶ 108 because it is not supported by Pltf. App. A-22. Defendants object to the statements made in the parentheticals because GC2's citation to Pltf. App. A-22 and A-23 is improper. The two documents are 272 and 156 pages, respectively, and GC2 fails to provide any pin cites.

109. IGT Parent's "Purchase Agreement" had, as a material part, a required Game Development and Distribution Agreement for the distribution of the games (including unauthorized GC2 Games). (App. A-22: pp. 5, 16 at § 2.04); *See also* (App. A-23).

**RESPONSE:** Defendants admit that IGT Holdco's "Purchase Agreement" had, as a material part, a required Game Development and Distribution Agreement for the distribution of the games, including the Principal At Issue Games. Defendants object to GC2's characterization of the At Issue Games as "unauthorized GC2 Games" because that is a conclusion of fact and/or law.

110. As part of this "sale" and "licensing" arrangement, ████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████ (App. A-22: p. 73 at § 10.02). ████████████████████████ is inducing the infringement of GC2's Copyright rights, and ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████ (App. A-22, § 10.2).

**RESPONSE:** Defendants admit the first sentence of SOAF ¶ 110. Defendants object to the second sentence of SOAF ¶ 110 because it contains argument as well as factual and legal conclusions. The statement that the indemnification agreement is "inducing the infringement" is a conclusion of fact and law, and the statement that DDI's acts are "acts of infringement" is a conclusion of law.

111. The "License Agreement" (a required part of IGT's sale) ███████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████

**RESPONSE:** Defendants object to SOAF ¶ 111 because the reference to "IGT" is vague and undefined. Defendants also object to SOAF ¶ 111 because GC2 failed to appropriately cite to the record. GC2 cites only Pltf. App. A-23, which is 156 pages, and GC2 has failed to provide any pin cites.

112. █████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████

**RESPONSE:** Defendants admit the first sentence of SOAF ¶ 112. Defendants object to the second sentence as argumentative and containing conclusions of fact and/or law. Subject to the foregoing, Defendants deny the second sentence of SOAF ¶ 112 because the cited materials do not support the statement. (*See* Pltf. App. A-22 at p. 7; A-23 at p. A-5 (eee).)

113. The Amazon Web Services servers are where unauthorized GC2 art and graphics are for the unauthorized Coyote Moon, Pharaoh's Fortune and Kitty Glitter DoubleDown Casino version of the GC2 Games hosted in the form of "Sprite Sheets." (App. A-25A); (App. A-25B); (App. A-25C). The copies on the Sprite Sheets are used in conjunction with the "math" to create copies that appear in the displays. (App. A-59: ¶¶ 51-59).

**RESPONSE:** Defendants object to the first sentence of SOAF ¶ 113 because it contains conclusions of law. Subject to the foregoing, Defendants deny the first sentence of SOAF ¶ 113 because the cited materials do not support the statement. (*See* Pltf. App. A-25A; A-25B; A-25C.) Defendants object to the second sentence of SOAF ¶ 113 because it is supported by expert opinions and conclusions that were not disclosed in Laykin's Rule 26(a) report. (*Compare* Laykin's Report (Pltf. App. A-104) *with* his Declaration (Pltf. App. A-59 ¶¶ 51-59.) If Defendants objection is overruled, then Defendants deny the second sentence of SOAF ¶ 113 because the cited materials do not support the statement. (*See* Pltf. App. A-59 ¶¶ 51-59.)

114. ████████████████████████████████████████████████████

██████████████████████████████████████████ (App. A-23: pp D-1 through D-12).[20]

**RESPONSE:** Denied. (*See* Pltf. App. A-23 at p. 8, § 4(b) (requiring Licensee to use *an* End User License Agreement, but not *the* End User License Agreement attached to the Purchase Agreement as Exhibit D.)

115. Renato Ascoli, wearing his IGT Parent hat, signed the Purchase Agreement on behalf of the IGT Parent. (App. A-22). Renato Ascoli, thereafter wearing his IGT NV hat, signed the License Agreement on behalf of IGT NV. (App. A-23). After that signature, IGT NV continued its active participation in the infringement of the GC2 works.

**RESPONSE:** Defendants object to the first and second sentences of SOAF ¶ 115 because they are irrelevant to Defendants' Motion for Partial Summary Judgment. Defendants object to the third sentence because it is argumentative. Subject to the foregoing objections, Defendants deny the third sentence of SOAF ¶ 115 because it lacks any citation to material for support.

---

[20] Defendants Partial Motion for Summary Judgment (p. 48) erroneously claims there is no evidence linking IGT or IGT NV to the terms of use found on DDC.

**RESPONSE:** Defendants object to footnote 20 because it is argumentative and fails to cite to any material in support.

116.    The Game Development, Distribution and Services Agreement between IGT NV (Licensor) and DoubleU Diamond LLC  (which was entered into as a required part of the IGT Purchase Agreement) provides



**RESPONSE:**  Defendants object to SOAF ¶ 116 because it is irrelevant to Defendants' Motion for Partial Summary Judgment.

117.    IGT NV is providing these services in real-time to interface the Licensor Server with the Licensee's ████████████████████████████████████████████ (App. A-22: p. C-2 at § 3.1).

**RESPONSE:**  Defendants object to SOAF ¶ 117 because it is irrelevant to Defendants' Motion for Partial Summary Judgment.

118.    DoubleDown Casino is distributed through servers leased by DDI from Amazon Web Services. (App. A-16 (Baker Dep.): pp. 277-278, 298); (App. A-19 (Sigrist Dep.): pp. 269-270); (App. A-20 (Sigrist Dep.): pp. 112-113).

**RESPONSE:**  Admitted.

119.    Defendants partner on technology, as they are responsible to provide the content and the code, and DDI considers service providers partners.  (App. A-24 (Sigrist Dep.): pp. 344, 349-350: (Facebook as an ad partner); 357: (Facebook as an ad partner to secure new players); 363-364: (Facebook as a processing partner); 366: (Apple a processing partner); 392: (Google as a partner).

**RESPONSE:**  Defendants object to SOAF ¶ 119 because it is argumentative and contains conclusions of law and/or fact.  Defendants also object to GC2's statement that "DDI considers

service providers partners" because that statement mischaracterizes the evidence. Subject to the foregoing, Defendants deny that "Defendants partner on technology, as they are responsible to provide the content and the code," because the cited material fails to support that statement. (*See* Pltf. App. A-24 (Sigrist Dep.) pp. 344, 349-50, 357, 363-64, 366.)

120. DDI has written license agreements with service providers to distribute their mobile Apps (*Id.*) and shares revenue with them and these license agreements evidence defendants' intentional acts with the service providers. (App. A-134: Facebook); (App. A-135, 136: Apple); (App. A-137: Google Play); (App. A-138: Amazon App Distribution); (App. A-139: Paypal).

**RESPONSE:** Defendants object to SOAF ¶ 120 because it contains argument as well as factual and legal conclusions. Subject to the foregoing objections, Defendants admit that DDI has written license agreements with Payment Processors (incorrectly referred to by GC2 as "service providers) to distribute DDI's mobile app.

121. An IGT press release reveals that the purchase price agreed between IGT and DoubleU was based on 2016 earnings from the time of the sale and in specific states: "The cash purchase price is $825 million, which represents 10.5x DoubleDown's full-year 2016 Adjusted EBITDA." (App. A-74). DoubleU's CEO, Ga-Ram Kim, claimed that the transaction represented "a unique and value accretive-partnership combining the operational excellence of DoubleU Games with IGT's world class slot content." Since the games at issue comprise part of DoubleDown Casino's game offerings and the revenues generated on those games drove the transaction price, it is clear that these games are causally connected to the transaction. *Id.*

**RESPONSE:** Defendants admit the first sentence of SOAF ¶ 121. Defendants object to the second sentence because the statement by DoubleU's CEO is hearsay. Defendants object to the third sentence of SOAF ¶ 121 because it contains argument as well as factual and legal conclusions, and is not supported by the cited material.

122. IGT produced documents showing that ███ of DoubleDown's revenue for 2016 was the result of the GC2 Games at issue. (App. A-103: p. 148). Expert analysis was conducted to show that individual games do not generate different levels of supporting expenses and therefore it is reasonable to assume that ███ of DoubleDown's Adjusted EBITDA is likewise due to the GC2 Games. (*Id.*) Since the DoubleDown sale price was calculated based on its 2016 Adjusted EBITDA, then ███ of the sale price was derived from profits GC2 Games generated. Thus, there is a clear

nexus between the amount received by IGT from the sale and the alleged infringement of the games at issue. (App. A-102: pp. 84-87); (App. A-103: pp. 147-149; Exh. 9).

**RESPONSE:** Defendants object to SOAF ¶ 122 because the material cited in support, which are Plaintiff's expert reports, are not authenticated and lack foundation. Defendants object to the third and fourth sentences of SOAF ¶ 122 because they are argumentative and contain factual and/or legal conclusions.

123. DoubleU did not purchase the physical assets or the trade name or any other part of DoubleDown separately from obtaining the rights to the games offered on that platform. (App. A-22). The license agreement for the rights to the games and the purchase agreement for DoubleDown are and are not separately agreed-to contracts. The Purchase Agreement has the Game Development and Distribution Agreement and Manages Services Agreement as a required part of the purchase. The agreements are integral for DoubleU's purpose of operating the DoubleDown Casino.

**RESPONSE:** Defendants object to SOAF ¶ 123 because GC2 failed to appropriately cite to the record. GC2 cites a 272 page document, yet fails to provide any pin cites.

Defendants further object because the second sentence of SOAF ¶ 123 does not make sense (*i.e.*, vague); it states that the license agreement and the purchase agreement "are and are not" separately agreed-to contracts. Defendants object to the last sentence of SOAF ¶ 123 because it is a factual conclusion and lacks foundation.

124. The DoubleDown book value at the 2012 purchase was the capitalized purchase price of $339.8 million (as shown in (App. A-140: 95)) and the book value at the time of the 2017 sale was $772,440,000 (App. A-103).

**RESPONSE:** Defendants object to SOAF ¶ 124 because the material cited in support, GC2's expert report, is not authenticated and lacks foundation. Subject to the foregoing objection, Defendants admit that the DoubleDown book value at the 2012 purchase was the capitalized purchase price of $339.8 million.

125. Using the artwork and graphics from the interactive games, IGT NV and DoubleDown Interactive made a version for Social Gaming (non-wager use) on the DoubleDown

Casino.  (App. A-27 (Shorrock Dep.): pp. 145-149); (App. A-52 (Clelland Dep.): pp. 198-199). IGT NV Supplemental Answer to Interrogatory No. 14, 15.

**RESPONSE:**  Admitted.


126.    As part of the process, Sprite Sheets also were created using GC2 artwork and graphics.  (App. A-25A); (App. A-25B); (App. A-25C).

**RESPONSE:**  Defendants object to SOAF ¶ 126 because it is irrelevant to Defendants'

Motion for Partial Summary Judgment.  Subject to the foregoing objections, Defendants deny SOAF

¶ 126 because it is not supported by the cited material.  (*See* Pltf. App. A-25A; A-25B; A-25C.).


127.    On September 14, 2018, Defendants' Counsel confirmed that Sprite Sheets produced were uploaded to the AWS server.  (App. A-146).

**RESPONSE:**  Defendants object to SOAF ¶ 127 because the content of the email is hearsay.

*See Ind. ex. rel. Naylor v. Ind. State Teachers Ass'n*, 950 F. Supp. 2d 993, 1007 (S.D. Ind. 2013).


128.    The layouts of the GC2 copies on the Sprite Sheets are necessarily different than the "copies" of the Display and "copies of the "performances."   Below is a chart of screen shots Defendants produced for the Mobile version of GC2 Games.  Compare with Sprite Sheets that were made using GC2 artwork and graphics.  (App. A-25A); (App. A-25B); (App. A-25C). (App. A-59: ¶¶ 51-59).  See, below generally.



|  | | COYOTE MOON | PHARAOH'S FORTUNE | KITTY GLITTER |
|---|---|---|---|---|
| Lobby Graphics | | | | |
| Loading pages | | | | |
| Loading Pages | | | | |
| Game Play | | | | |
| Bonus/ Game Play | | | | |
| Bonus/ Game Play | | | | |

**RESPONSE**: Defendants object to SOAF ¶ 128. The first sentence is argumentative, vague and ambiguous. GC2 never identifies the source of the quoted words "copies" and "performances," nor does it provide a definition for the defined term "Displays." The second sentence references lacks foundation and authentication because there is no citation to any material to support: (a) GC2's statement that the images in the chart are screen shots; or (b) that the images are the types of screens identified by GC2 in the far left column. The third sentence should be disregarded because it is not a

statement of fact. Finally, Defendants object to CG2's reliance on Pltf. App. A-59 (Laykin Declaration) ¶¶ 51-59, which consists of opinions and conclusions that Laykin did not disclose in his Rule 26(a)(2) report. (*Compare* Laykin's Report (Pltf. App. A-104) *with* his Declaration (Pltf. App. A-59 ¶¶ 51-59).)

To the extent these objections are overruled, Defendants deny SOAF ¶ 128 because the cited materials fail to support the statement. (*See* App. A-25A; A-25B; A-25C; A-59: ¶¶ 51-59.)

129. IGT NV provided DoubleDown Interactive with access to the graphics and artwork for Pharaoh's Fortune, Coyote Moon and Kitty Glitter used on IGT's Interactive platform. (App. A-52 (Clelland Dep.): pp. 114-115); (App. A-116). Defendant DDI represented that it produced art and graphic files in their possession. They were required to produce a witness knowledgeable about their use, but the witness came unprepared and did not review the files. (App. A-24 (Sigrist Dep.): pp. 313-327).

**RESPONSE:** Defendants admit the first sentence of SOAF ¶ 129. Defendants object to the second and third sentences because they are argumentative, and GC2's discovery complaints are tardy and irrelevant. *See Fulton v. Theradyne Corp.*, No. 06 C 1321, 2007 WL 772953, *2 (N.D. Ill. Mar. 12, 2007) ("KMC is correct that if Plaintiff believed that it was improperly being denied discovery, then Plaintiff should have filed a motion to compel."); *Spencer v. Cent. States, Se. & Sw. Areas Pension Fund*, 778 F. Supp. 985, 997 (N.D. Ill. 1991) (granting summary judgment where plaintiff failed to proffer necessary facts and attempted to blame this failure on the defendant's lack of cooperation in discovery).

130. No steps were taken to make sure IGT had rights to give the artwork and graphics. (App. A-52 (Clelland Dep.): pp. 115, 122).

**RESPONSE:** Defendants object to SOAF ¶ 130 because the deponent lacked the requisite personal knowledge. The cited testimony states: "Not to my knowledge." (*See* Pltf. App. A-52 (Clelland Dep.) pp. 11:10-14, 115, 122).

131.     Amazon offers connectivity and computer services through Amazon Web Services, commonly referred to as "AWS." One AWS service is known as Simple Storage Service, or S3, which allows customers to place files for storage on AWS infrastructure.  (App. A-59: ¶¶ 33-40).

**RESPONSE:**  Defendants object to SOAF ¶ 131 because this Amazon Web Services information is irrelevant to Defendants' Motion for Partial Summary Judgment.  Defendants further object because the statements are hearsay.  GC2 cites the Laykin Declaration but Laykin is not offering an opinion, he is reciting information he gathered from various third party websites and AWS marketing materials.  (*See* Pltf. App. A-59 ¶¶ 33-40 nn.5-7.)  Finally, Defendants object because the information offered by Laykin in his declaration was not disclosed in his Rule 26(a)(2) report.  (*Compare* Laykin's Report (Pltf. App. A-104) *with* his Declaration (Pltf. App. A-59 ¶¶ 33, 35-38, 40).)

132.     DoubleDown Casino is operated through an S3 account at Amazon Web Services. (App. A-20 (Sigrist Dep.): p. 113: Amazon Web Services is essentially the environment owned by Amazon that we use to pretty much do everything from a technology standpoint in the creation and production use of DoubleDown Casino.**)**

**RESPONSE:**  Defendants admit that DoubleDown Casino is operated through Amazon Web Services, but deny that it is operated through an S3 account, because the cited material does not support that portion of the statement.  (*See* Pltf. App. A-20 (Sigrist Dep.) p. 113.)

133.     With respect to the DDC App version[21] (and Defendants' incorrect contention on page 43 that they are not responsible for updates to the App), according to DDI's agreement with Amazon regarding the distribution of the App, the "Content" of the App is defined to be Defendants' material (not Amazon's), and the upgrades and versions are Defendants acts (not Amazon's). (App. A-24 (Sigrist Dep.): pp. 401-406); (App. A-138: App Distribution Agreement with Amazon); (App. A-59: ¶¶ 74-83).[22]

---

[21] "Apps" are software applications, games, and other digital products of Defendants that Defendants submit to service providers like Amazon for sale, distribution or promotion" through Amazon.

**RESPONSE:**  Defendants deny footnote 21 because it lacks any citation to material for support.

[22] Other service provider agreements have similar provisions and requirements.

**RESPONSE:**  Defendants deny footnote 22 because it lacks any citation to material for support.

**RESPONSE:** Defendants object to SOAF ¶ 133 because it is argumentative. Defendants also object because GC2's use of the phrase "Defendants" is vague and not supported by the cited material. Further, Defendants object to GC2's reliance on the Laykin Declaration (Pltf. App. A-59) because the information offered by Laykin (at ¶¶ 74-81, 83) was not disclosed in his Rule 26(a)(2) report. (*Compare* Laykin's Report (Pltf. App. A-104) *with* his Declaration (Pltf. App. A-59 ¶¶ 77-81, 83).)

134. **Mobile Distribution:** Forensic examination revealed that Sprite Sheets for the GC2 Games were placed by Defendants onto the S3 server at Amazon Web Services. An example of a single Sprite Sheet for Coyote Moon (IGT NV 244762) is shown on the left, and for Pharaoh's Fortune on the right. Sprite Sheets for each GC2 Game can be seen at (App. A-24A-C); (App. A-59: ¶¶ 40-41).

 

**RESPONSE**: Defendants object to SOAF ¶ 134 because GC2 relies on the Laykin Declaration and the information offered by Laykin (at ¶ 40) was not disclosed in his Rule 26(a)(2) report. (*Compare* Laykin's Report (Pltf. App. A-104) with his Declaration (Pltf. App. A-59 ¶ 40).) To the extent this objection is overruled, Defendants deny SOAF ¶ 134 because it is not supported by the cited material. (*See* Pltf. App. A-24A-C; A-59: ¶¶ 40-41.)

135. Sprite Sheets are used in conjunction with computer code provided by the "Licensor Server" (controlled by IGT NV) to instruct what quadrants on the Sprite Sheet to locate and copy in order to create a copy for display during a performance of the GC2 Game. (App. A-59: ¶¶ 51-59). IGT and IGT NV control the AWS Servers and the math that is responsible for the display.

**RESPONSE:** Defendants object to SOAF ¶ 135 because it is irrelevant to Defendants' Motion for Partial Summary Judgment, and it contains conclusions of fact and/or law. Defendants

also object to SOAF ¶ 135 because it is supported by only the Laykin Declaration, and the information

offered by Laykin (at ¶¶ 51-57) was not disclosed in his Rule 26(a)(2) report.  (*Compare* Laykin's Report

(Pltf. App. A-104) *with* his Declaration (Pltf. App. A-59 ¶¶ 51-57).)

To the extent these objections are overruled, Defendants deny the first sentence of SOAF

¶ 135 because it is not supported by the cited material.  (*See* Pltf. App. A-59 ¶¶ 51-59.)  Defendants

deny the second sentence of SOAF ¶ 135 because it does not cite any support at all.

136.    DDI Answer to Interrogatory No. 3 represents that IGT provides the Copyright
Management Information reflected in the screen shots it produced (App. A-142).  The layered files
show the layer called "IGT legal" indicating IGT's participation in the acts of providing.  (See, for
example, App. C-30, 38-39, 44-45) (App. A-100).  *See also,* (App. A-59: ¶¶ 25-26).

**RESPONSE:**  Defendants' object to SOAF ¶ 136 because "IGT" is vague and undefined.

Defendants also object to GC2's reliance on Pltf. App. C-30, C-38-39, C-44-45 and A-100 because

those exhibits lack foundation and authentication.    To the extent Defendants' objections are

overruled, Defendants deny the first sentence of SOAF ¶ 136 because it is not supported by the cited

material.  (*See* Pltf. App. A-142.)  Defendants also deny the second sentence of SOAF ¶ 136 because

it is not supported by the cited material. (*See* Pltf. App. C-30; C-38-39; C-44-45; A-100; A-59 ¶¶ 25-

26.)

137.    **Step 1, The App Store:**  Each platform has an application store where a consumer
can locate and ask to download the DoubleDown Casino App.  There is information here at the point
of download that identifies DDI as the provider. (App. C-5-6).  There is also a link to a "license" and
"privacy policy."  The "License" is the terms of use.  The terms of use at the time of filing the
Complaint are attached as (App. A-89: 49, 51, 81-88) and are admitted in the Defendants Answer
(App. A-1).  The display page looks like this:

 

**RESPONSE**:  Defendants object to GC2's reliance on Pltf. App. C-5 and C-6, because those exhibits lack foundation and authentication.  Defendants also object to the images above because they lack foundation and authentication.  To the extent Defendants' objections are overruled, Defendants deny the first, second and fourth sentences of SOAF ¶ 137 because it is not supported by the cited material.  Defendants deny the third and sixth sentences because GC2 does not cite any material in support thereof.  Defendants admit the fifth sentence.

138.     The "terms of use" is a contract between the consumer end user and DDI. It represents that DDI or its "licensors" own all the content (including the artwork and graphics) and that DDI is licensing the end user.  Under the DMCA, "links" to author, owner, terms of use, is within the definition of Copyright Management Information.  17 U.S.C. §1202(6).

**RESPONSE:**  Defendants object to SOAF ¶ 138 because it contains argument as well as factual and legal conclusions.  To the extent Defendants objections are overruled, Defendants deny SOAF ¶ 138 because it is not supported by any record material or the citation to the DMCA.

139.     **Step 2, Initial Download but before the Application is open on the phone:** When a consumer downloads an app from the App Store for the first time, what gets distributed/ downloaded (out of view of the consumer) to the phone/tablet is a package of computer code and "mobile tournament slots lobby page sprite sheets" containing GC2 graphics.  (App. A-59: ¶¶ 21-22); (App. C-7, 10-14). The screen display on the phone or tablet is simply an icon for the App. (App. A-59: ¶ 60).

**Out of View:** computer code and mobile tournament slots lobby page sprite sheets with unlicensed GC2 Pharaoh's Fortune and Coyote Moon Artwork and Graphics. App. C-7, 11).

**Display View:** on the Screen of phone or tablet





*See also* (App. A-59: ¶ 22).[23]

**RESPONSE**: Defendants object to the notation on the images above as argumentative and lacking foundation. Defendants further object to GC2's characterization of artwork and graphics as "unlicensed." Defendants object to the "Display View" image above because it lacks foundation and authentication. Subject to these objections, Defendants deny SOAF ¶ 139 because it is not supported by the cited material. (*See* Pltf. App. A-59: ¶¶ 21-22, 60; C-7, 10-14.)

140.    Defendant DDI did not appear prepared for their Rule 30(b)(6) deposition to discuss any of the specific graphics they produced. (App. A-24 (Sigrist Dep.): pp. 313-327). (App. C-18); (App. A-117) was produced as a native PSD file and appears to be the native for the lobby graphics tournament sprite sheets. Below is a screen shot of images in the native file. The images show copies of GC2 graphics.

---

[23] The purpose of the code placed on the end users device is to provide DDI with a device (software code) on the end users device to update the content displayed to the consumer and to provide a device which permits acts of infringement on the device. (App. A-59: ¶ 72).

**RESPONSE:** Defendants object to footnote 23 because the only support it cites is Laykin's Declaration and the information offered by Laykin (at ¶ 72) was not disclosed in his Rule 26(a)(2) report. (*Compare* Laykin's Report (Pltf. App. A-104) with his Declaration (Pltf. App. A-59 ¶ 72).) To the extent Defendants' objection is overruled, Defendants deny footnote 23 because it is not supported by the cited material. (*See* Pltf. App. A-59 ¶ 72.)





(App. C-8); (App. C-9); (App. A-60).

**RESPONSE**:   Defendants object to the first sentence of SOAF ¶ 140 because it is argumentative.  Moreover, GC2's discovery complaints are tardy and irrelevant.  *See Fulton*, *supra*; *Spencer*, *supra*.  Defendants deny the second sentence of SOAF ¶ 140 because it is not supported by the cited material.  (*See* Pltf. App. A-117.)  Defendants object to the third and fourth sentences and the images included above because the materials cited in support -- Pltf. App. C-8, C-9 and A-60 -- lack authentication and foundation.

141. **Step 3, Opening the App to reach the Lobby Page**: When end users open the DoubleDown Casino, they begin with the DoubleDown lobby page, which contains icons representing each game available on the casino. (App. A-52 (Clelland Dep.): pp. 146-147); (App. C-29); (App. A-99). Clicking on  the screen icon "opens" the App and the Game Lobby appears on the screen. (App. A-59: ¶ 70); (App. C-1, 13 (Desktop), 14 (Mobile)). Below is the screenshot of the **Mobile version of lobby**. GC2 Graphics appear on the display. Similarly, the below images are screen shots produced by Defendants of the lobby graphics for the mobile version of the DoubleDown Casino. (App. A-58).

**OPEN APP = Display of LOBBY GRAPHICS**

Game Lobby Graphics Mobile

Coyote Moon Lobby Icon (App. C-14); (App. A-51, 111).



Pharaoh's Fortune Lobby Icon (*Id.*).



GC2's Games

Kitty Glitter Lobby Icon (*Id.*).



**RESPONSE**:  Defendants object to the notations on the images above as well as the "Lobby Icon" designations as argumentative and lacking foundation.  Defendants admit the first sentence of SOAF ¶ 141, but deny that Pltf. App. C-29 or A-99 support or relate in any way to the statement made therein.  (*See* Pltf. App. C-29, A-99.)  Defendants object to GC2's reliance on App. C-1 to support the second sentence because that document lacks foundation and authentication.  Notwithstanding the foregoing objection, Defendants deny the second sentence of SOAF ¶ 141 because the material cited fails to support the statement.  (*See* Pltf. App. A-59 ¶ 70; C-1, C-13; C-14.)  Defendants admit the third sentence of SOAF ¶ 141.  Defendants deny the fourth sentence of SOAF ¶ 141 because it is not supported by any material stating that the graphics are "GC2 Graphics."  Defendants admit the fifth sentence of SOAF ¶ 141.

142.    The images below depict screen shots of the **desktop version** of the DoubleDown lobby page showing the game icons for Coyote Moon, Kitty Glitter, and Pharaoh's Fortune. (App. A-56); (App. A-57).





**RESPONSE**:  Admitted.


143.      Unlicensed GC2 images can be seen in the images of the **Mobile Lobby screen**.  In addition, the upper right hand corner of the screen display is a small square with three lines and a forensic examination reveals that the computer code (outside the view) conveyed in connection with these images contains a link to the terms of use. (App. A-59: ¶ 73); (App. A-142).

**RESPONSE:**   Defendants  object  to  the  first  sentence  of  SOAF  ¶  143  because  it  is

argumentative and contains factual and/or legal conclusions.  Defendants deny the second sentence

of SOAF ¶ 143 because it is not supported by the cited material.  (*See* Pltf. App. A-59 ¶ 73; A-142.)


144.      **Step 4, clicking Lobby icon for a GC2 Game and reach loading pages**:  The user clicks a game icon to select and play a particular game.  (App. A-52 (Clelland Dep.): pp. 136, 145, 149).

**RESPONSE:**  Admitted.

145.     When an end user clicks on a displayed GC2 graphic representing a Lobby icon for a particular GC2 Game, the software code (digitally signed by DDI and placed on the end user device) sends a communication out to the IGT/DDI Amazon Web Servers to copy a certain game packet (containing another set of Sprite Sheets with unlicensed GC2 graphics and IGT computer code) that can connect with the math server at the IGT/DDI S3 Amazon Web Services account (controlled by IGT/DDI).  (App. A-59: ¶¶ 41-44); (App. C-2-3).

**RESPONSE:**  Defendants object to SOAF ¶ 145 because it is argumentative and contains

factual and/or legal conclusions.  Defendants also object to GC2's reliance on Pltf. App. C-2 and C-

3 because they lack authentication and foundation.  Notwithstanding the foregoing objections,

Defendants deny SOAF ¶ 145 because it is not supported by the cited material.  (*See* Pltf.'s App A-59

¶¶ 41-44; C-2; C-3.)


146.     There are things happening out of view of the consumer that are different from the display on the screen.  The computer code contains the text of the copyright management information and instructions to display the IGT logo with the images on the loading screens.[24]  There is also a link to the terms of use. (App. A-59: ¶ 46); (App. A-142).  GC2 contends this is false CMI which is conveyed in connection with the GC2 graphics for the game.  GC2 will illustrate it below.  (App. A-59: ¶ 46); (App. C-2).

| Sprite Sheet Copies Conveyed Out of View: Example when Pharaoh's Fortune Game Selected.  See  (App. C-18, 49; App. A-25B, A-117) for each Pharaoh's Fortune Sprite Sheet produced | Copies Conveyed In View and Displayed on Screen: Pharaoh's Fortune Game Selected Loading pages Screen Shots Pharaoh's Fortune Mobile.  See (App. C-20). |
| --- | --- |

---

[24] This evidences IGT NV and DDI acting jointly to provide and distribute false CMI.

**RESPONSE:**  Defendants object to footnote 24 because it is argumentative.

68



**(App. C-20).**

**(App. C-20).**

**RESPONSE**: Defendants object to SOAF ¶ 146 because it is argumentative and contains factual and/or legal conclusions. Notwithstanding the foregoing objections, Defendants deny SOAF ¶ 146 because it is not supported by the cited material. (*See* Pltf. App. A-59 ¶ 46; A-142; C-2; C-18; C-20; C-49; A-25B; A-117.)

147. When an end user selects a game icon, they are taken to certain loading pages for the selected game, and then to the game itself. (App. A-53(Clelland Dep.): pp. 166-169, 136, 145, 149). To illustrate this process, the images below depict the loading pages and gameplay screen for Pharaoh's Fortune on the mobile and desktop versions of DoubleDown Casino. These images appear from the point of selection of the game in the lobby up to the time the game appears on the screen for play. (App. A-61); (App. A-62) (App. C-3) (App. A-59: ¶ 70); (App. A-59). The IGT/DDI code instructs what Sprite Sheet images to copy in order to create the displays. (App. C-19-20 (Desktop and Mobile loading pages of Pharaoh's Fortune); App. C-33-34 (Desktop and Mobile loading pages of Coyote Moon); App. C-42-43 (Desktop and Mobile loading pages of Kitty Glitter).

**RESPONSE:** Defendants admit the first sentence of SOAF ¶ 147. Defendants object to the second and third sentences as vague because there are no "images below." Defendants further object to the third sentence because Pltf. App. C-3 lacks foundation and authentication.

Notwithstanding the foregoing objections, Defendants deny the third and fourth sentences of SOAF ¶ 147 because they are not supported by the material cited. (*See* Pltf. App. A-61; A-62; C-3; A-59: ¶ 70; C-33-34; C-42-43.)

148.    The computer code gives instructions to copy the IGT logo and place it on Pharaoh's Fortune loading page graphic, and the code has the copyright information text to convey in connection with this image. (App. A-59: ¶¶ 22, 26). There is no GC2 Mark. (App. C-18-25); (App. A-117).

**RESPONSE:** Defendants object to the first sentence of SOAF ¶ 148 because it lacks foundation. Defendants admit the second sentence.

149.    Defendants add incorrect CMI here resulting in the IGT logo and the false attribution line on the bottom both of which are separate DMCA violations and are conveyed in displays and performances by IGT/DDI code only when the game is launched. (App. C-2-3, 18-25, 32-36, 41-43 and 48); (App. A-117). Because of the way this technology is set up, the statutory damages are per game launch. See also removal discussion below.

Sprite Sheet Copies Conveyed Out of View: Example when Coyote Moon Game Selected. See (App. C-54, A-25A) for each Coyote Moon Sprite Sheet produced

Loading pages Screen Shots Coyote Moon Mobile



(App. C-54).



(App. C-34); (App. A-51).





(App. C-54).

**RESPONSE**:  Defendants object to SOAF ¶ 149 because it is argumentative, contains factual and/or legal conclusions and is vague because GC2 fails to identify which Defendant.  Defendants also object because GC2 cites over 100 pages of sprite sheets and screen shots without providing any pin cites or explanation as to how these exhibits support the statement of fact.

To the extent Defendants' objections are overruled, Defendants deny SOAF ¶ 149 because the material cited fails to support the statement.  (*See* Pltf. App. C-2-3; C-18-25; C-32-36; C-41-43; C-48; A-117; C-54; A-51.)

150.     The computer code gives instructions to distribute the Coyote Moon loading page graphic, and the code has the copyright information text to convey in connection with this image. (App. A-59: ¶ 85); (App. C-2, 3, 32-34, 36).

**RESPONSE:**  Defendants object to GC2's reliance on Pltf. App. A-59, C-2 and C-3 because

Laykin's testimony lacks foundation and the exhibits lack foundation and authentication.

Notwithstanding the foregoing objections, Defendants deny SOAF ¶ 150 because it lacks foundation

and is not supported by the cited material.  (*See* Pltf. App. A-59: ¶ 85; C-32; C-34, C-36.)

151.     Forensic examination shows what is conveyed in connection with the loading page images include computer code and imbedded in the code is the copyright notice and a link to the terms of use.  (App. A-59: ¶ 85).  DDI digitally signs the computer code.  (*Id.* at ¶ 85).  Both are conveyed in connection with the copies that appear on the Sprite Sheets.  (*Id.* at ¶¶ 51-59).

**RESPONSE:**  Defendants object to SOAF ¶ 151 because it is supported by expert opinions

and conclusions that were not disclosed in Laykin's Rule 26(a) report.  (*Compare* Laykin's Report (Pltf.

App. A-104) *with* his Declaration (Pltf. App. A-59 ¶¶ 51-57.)  To the extent the foregoing objection is

overruled, Defendants deny SOAF ¶ 151 because it lacks foundation and is not supported by the cited

material.  (*See* Pltf. App. A-59: ¶¶ 51-59, 85.)

152.     Because this is also a separate game where the Sprite Sheet copies and display copies are only provided or distributed when this game is launched it is a separate DMCA violation with each game launch.  See also removal section below and (App. A-59).

Sprite Sheet Copies Conveyed Out of View: Example when Kitty Glitter Game Selected. See (App. C-41, 59, App. A-25C, 117).

Loading pages Screen Shots Kitty Glitter Mobile (App. C-43).





(App. C-41), (App. A-117).



GC2 includes screens for Kitty Glitter here because there is evidence of removal of GC2 Mark from the loading page image that will be addressed below in the removal section. (App. C-2, 3 41-43 and 48).

**RESPONSE:** Defendants object to SOAF ¶ 152 because it is argumentative, lacks foundation and contains factual and legal conclusions. Defendants also object because in violation of Local Rule 56.1, GC2 cites other provisions of the SOAF (stating: "see also removal section below"), as opposed to citing specific materials that support the statement. In addition, Defendants object because GC2 cites: (i) Pltf. App. A-59, a 37-page declaration with 89 separately numbered paragraphs, without any pin cites; and (ii) over 100 pages of sprite sheets and screen shots without providing any pin cites or explanation as to how these exhibits support the statement of fact.

153. **Step 5, during game play:** The Sprite Sheet images for the particular GC2 Game is provided and copied onto the cache of the end user device with a link to the terms of use. While the display shows a drop down menu in the upper right hand corner, the copies in cache have the link to

the false Terms of Use provided with the copies in the sprite Sheet. (App. C-4, 49-53 (Pharaoh's Fortune)(C-4, 54-58 (Coyote Moon)(C-4, 59-63 (Kitty Glitter)).

**RESPONSE:** Defendants object to GC2's reliance on Pltf. App. C-4 because it lacks foundation and authentication. Notwithstanding the foregoing objection, Defendants deny SOAF ¶ 153 because it lacks foundation and is not supported by the cited material. (*See* Pltf. App. C-49-53; C-54-58; C-59-63.)

154. During a "spin" computer code sends a message back to the Amazon Web Server holding the "math." This server sends back code saying display these certain images at this time. What occurs on the device is that certain images are copied from the Sprite Sheet and displayed on the screen to create the performance. ▮▮▮▮▮▮▮▮▮▮▮▮ The link to the terms of use are present with and provided with the copies in Cache, and the link to the terms of use are provided with the copies of each display. (App. A-59: ¶ 85); (App. C-4, 49-53 (Pharaoh's Fortune) (C-4, 54-58 (Coyote Moon) (C-4, 59-63 (Kitty Glitter)).

**RESPONSE:** Defendants object to GC2's reliance on Pltf. App. C-4 because it lacks foundation and authentication. Defendants also object to GC2 reliance on Laykin's Declaration because the cited opinions and conclusions were not disclosed in his Report. (*Compare* Laykin's Report (Pltf. App. A-104) *with* his Declaration (Pltf. App. A-59 ¶ 85.) Notwithstanding the foregoing objections, Defendants deny SOAF ¶ 154 because it is not supported by the cited material. (*See* Pltf. App. A-59 ¶ 85; C-49-53; C-54-58; C-59-63.)

155. Because of the unique set of combination of images that exist with each spin due to the random number generator, each display is different.[25] (App. A-59: ¶ 30).

**RESPONSE:** Defendants deny SOAF ¶ 155 because it is not supported by the cited material. (*See* Pltf. App. A-59 ¶ 30.)

---

[25] GC2 submits that a separate DMCA violation is proper at this stage because the sprite sheets and display are conveyed with the link to the false terms of use.

**RESPONSE:** Defendants object to footnote 25 because it is argumentative. To the extent this objection is overruled, Defendants deny footnote 25 because it does not cite any authority.

156.     Defendants themselves identified Kitty Glitter and Maid of Money as GC2 Games used by Defendants as part of the "gap in rights" analysis. (App. A-1: ¶ 3); (App. A-15(Nash Dep.): pp. 129-134). IGT Defendants mark the Kitty Glitter derivative land based game with GC2's Mark. (App. A-1: ¶ 89); (App. A-7). Defendants now claim Kitty Glitter derivative land based game with GC2's Mark is not a derivative of GC2 games.

**RESPONSE:** Defendants deny the first sentence of SOAF ¶ 156 because it is not supported by the cited material. (*See* Pltf. App. A-1 ¶ 3; A-15 (Nash Dep.) pp. 129-34.) Defendants object to GC2's characterization of Kitty Glitter as a "derivative" land based game because that is a legal conclusion and not supported by the cited material; otherwise, Defendants admit the second sentence. Defendants object to the third sentence because it is argumentative and contains legal and/or factual conclusions.

157.     IGT Parent, IGT NV and DDI admit that under paragraph 3.1 of the Agreement GC2 agreed to ***develop games for IGT NV***. (App. A-1: ¶ 22).

**RESPONSE:** Admitted.

158.     The Agreement describes what "common elements of a slot machine game" are: Each GC2 Project shall include such video graphics and artwork commonly incorporated into a video reel gaming machine including interface, bonus round, game symbols, screens (help, attendant, and pay) and various animations. (App. A-1: ¶ 85).

**RESPONSE:** Admitted.

159.     The IGT Defendants further admit that ***all of the games referenced in paragraph 24 of the Amended Complaint*** relate to IGT NV's contractual relationship with GC2. (App. A-1: ¶ 44). The GC2 Games, Kitty Glitter, and Maid of Money which Defendants discuss in their partial Summary Judgment Motion, are listed in paragraph 24 of the Amended Complaint as are 28 other GC2 games. (*Id.*); (App. A-1: ¶ 24). Each has a different expression of these common slot machine elements. See e.g. images from GC2's Coyote Moon, Pharaoh's Fortune and Kitty Glitter Games.

**COYOTE MOON** **PHARAOH'S FORTUNE** **KITTY GLITTER**



**RESPONSE:** Defendants admit the first sentence of SOAF ¶ 159. Defendants object to GC2's mischaracterization of games as "GC2 Games" in the second sentence; otherwise, the second sentence is admitted. Defendants deny the third sentence because it is not supported by any cited material. Defendants object to the fourth sentence because it mischaracterizes the games as being "GC2's," and Defendants object to the images the fourth sentence refers to because they lack foundation and authentication. Notwithstanding the foregoing objections, Defendants deny the fourth sentence because it lacks citation to any material.

160. Currently employed by IGT, Edward Jankowski was formerly an art director at GC2 who designed the original GC2 Kitty Glitter Game. (App. A-55 (Jankowski Dep.): pp. 11, 13, 15-17). IGT asked GC2 to create a game with a particular math model that would be known as the original Kitty Glitter. (*Id.* at 182).

**RESPONSE:** Defendants object to SOAF ¶ 160 because "IGT" is vague and undefined. Subject to that objection, Defendants admit SOAF ¶ 160.

161. IGT provided a math PAR sheet to GC2. (*Id.* at 186).

**RESPONSE:** Defendants object to SOAF ¶ 161 because "IGT" is vague and undefined; otherwise, admitted.

162.    A PAR sheet is the expression of the math and how it works; it defines the hit rate and frequencies of symbols landing on the screen. (*Id.* at 18). The PAR sheet has representations of the symbols. (*Id.* at 18-19). The major symbols represent the "chase" for a game and are indicated on the PAR sheet as M1, M2, M3, M4. (*Id.*)

**RESPONSE:** Admitted.

163.    The "chase" is a set of symbols that drive wins and losses and lures a player into putting more money into a game or, in the social context, wanting more chips or credits. (*Id.* at 57-59).

**RESPONSE:** Defendants object to SOAF ¶ 163 because it mischaracterizes the evidence. The deponent testified that the "chase" is driven by a math formula. (*See* Pltf. App. A-55 (Jankowski Dep.) pp. 58-59.)

164.    Employed by DDI, Rogelio DeCasa was formerly the game designer at IGT who created the math and led the team in the development of the land based Kitty Glitter game. (App. A-9 (DeCasa Dep.): p. 18). The math dictated what symbols pay and what features, such as a bonus, are in the game. (*Id.* at 48-49). It identified major and minor symbols, "[b]ut not that the major symbol must be a picture of X." (*Id.*) IGT did not show GC2 <u>how</u> it wanted GC2 to make the game Kitty Glitter. (App. A-55 (Jankowski Dep.): p. 182). It did not provide direction on how to make the game or on the artwork and graphics. (*Id.* at 183). GC2's creative team looked at the math to figure out what the game needed and to fit the graphics into that form. (*Id.* at 57-59, 187). The artwork and graphics are a really important part of the game. (*Id.* at 59-60).

**RESPONSE:** Defendants admit the first five sentences of SOAF ¶ 164. Defendants deny the sixth sentence because it is not supported by the cited material. (*See* Pltf. App. A-55 (Jankowski Dep.) pp. 57-59, 187.) Defendants object to the last sentence because it is an inadmissible lay opinion.

165.    GC2's creative team designed the direction of the game, conceived the symbols, characters, specific character aspects, animations, and scheduled milestones to create the game. (*Id.* at 187-189). GC2's creative team created the base game interface, laid out symbol sizes, and the symbol matrix, determined whether there would be a gutter between the reel strips and pay line indicators, and designed the pay line lines. (*Id.*) They captured the design of "every single major piece of a gambling machine…." (*Id.*)

**RESPONSE:** Defendants object to SOAF ¶ 165 because it mischaracterizes the evidence. Jankowski's testimony regarding Kitty Glitter related to GC2's Kitty Glitter artwork. (*See* Pltf. App. A-55 (Jankowski Dep.) pp. 187-89.) Defendants also object to the first sentence as mischaracterizing the testimony because the deponent did not say GC2 "designed the direction of the game." (*See id.*) Notwithstanding the foregoing objections, Defendants deny the first sentence because it is not supported by the cited material, other than the statement about scheduling milestones. (*See id.*)

166. GC2 selected the minor symbols as "… the royal set, Ace through 9." (*Id.* at 198). The letters A, Q, J, K and the number 10 was art that GC2 created and it was a "design parameter that designers liked more than fruits or cherries or bananas or some other symbol that doesn't look as elaborate as the major symbols." (*Id.* at 197-199). Royal symbols were not dictated to be used when GC2 created the Original Kitty Glitter game. (App. A-9 (DeCasa Dep.): pp. 106-107).



Examples of the GC2 Kitty Glitter minor symbols, the Royals. (App. A-144).

**RESPONSE**: Defendants deny the first sentence of SOAF ¶ 166 because it is contradicted by the cited material. (*See* Pltf. App. A-55 (Jankowski Dep.) p. 198:13-24.) Defendants object to the second sentence because GC2 mischaracterizes the testimony. (*See id.*) Defendants object to the third sentence because it mischaracterizes the testimony, and GC2 has failed to establish DeCasa had the requisite personal knowledge. (*See* Pltf. App. A-9 (DeCasa Dep.) pp. 107:3-12.) DeCasa stated: "I don't remember if that was the case for Kitty Glitter." (*Id.*) Defendants object to the images and the

last sentence of SOAF ¶ 166 because the materials cited in support -- Pltf. App. A-144 -- lacks

foundation and authentication.

167.    For the major symbols, GC2 decided on kittens (App. A-55 (Jankowski Dep.): p. 189). It decided to feature four different types of cats: a white one; a Siamese cat; an orange tabby cat; and a gray/brown tabby. (*Id.* at 200-201). They appear variously facing forward, sitting up, at play, and featuring the animal's whole body, with the term WILD below their head as the bonus symbol, or below their whole body in the bonus collection feature when the symbol is turned wild.



Bonus

Bonus Symbols Turned Wild

Regular Play

Bonus Collection Feature

Bonus Collection Feature Turned Wild

Examples of the major symbols, the Cats. Bonus symbols excerpted from bonus play video from submission to US Copyright Office; regular play symbols shown here are copies of separate images - excerpts from (App. A-144).

**RESPONSE**: Defendants deny the first sentence of SOAF ¶ 167 because it is not supported

by the cited material. (*See* Pltf. App. A-55 (Jankowski Dep.) p. 189.) Defendants admit the second

sentence of SOAF ¶ 167. Defendants object to the remainder of SOAF ¶ 167, including the images

and the descriptions ascribed to the images, because it is supported by Pltf's App. A-144, which lacks

foundation and authentication.

168.     GC2 designed the base game interface, making choices about symbol sizes and other
features (App. A-55 (Jankowski Dep.): p. 188).






The base game interface and selected symbols from submission to US Copyright Office; excerpt from
(App. A-144).

**RESPONSE:**     Defendants object to the first sentence of SOAF ¶ 168 because it

mischaracterizes the evidence. The deponent explained the steps GC2 took to create the GC2 version

of Kitty Glitter. (*See* Pltf. App. A-55 (Jankowski Dep.) p. 188.) Defendants object to the second

sentence of SOAF ¶ 168 and its accompanying images because they are supported by Pltf. App. A-

144, which lacks foundation and authentication.

169.     Once the base game was done, GC2's creative team:

- started designing the free spin bonus and other items such as the math boxes, payout
  screens, and bonus screens. (App. A-55 (Jankowski Dep.): pp. 187-189).

80

- made deliberate choices about the bonus interface including putting the four cats at the top. (*Id.* at 200-201).

- chose diamonds as the collection feature next to the major symbols at the top of the bonus interface. (*Id.* at 201-202).

- decided on a bowl as a bonus symbol. (*Id.* at 202, 203).

- elected a "Pretty Kitty Bonus" symbol. (*Id.* at 202).

- decided to put diamonds along the sides of the frame. (*Id.*)

- added sparkles to the letters – "[t]o make it look more wealthy. So this is a kitten game, and it's a wealth game. ... Glitter is sparkly so that's why we did that." (*Id.*) The GC2 creative team decided to put diamonds on top of the "i" letters in the title, "Kitty Glitter." (*Id.*)

- chose to put the four cats at the top of the interface as a bonus collection feature and created the artwork and graphics for those characters. (*Id.* at 199-200).

- decided to add diamonds at the top by the four cats to serve as the bonus collection feature and designed the associated artwork and graphics. (*Id.* at 201) It was a lot of work to create the working Kitty Glitter game, "[i]t was a big game." (*Id.* at 193).



GC2 Bonus Play Interface

**RESPONSE:** Defendants object to SOAF ¶ 169 because it mischaracterizes the evidence. The deponent explained the steps GC2 took to create GC2's version of Kitty Glitter. Defendants object to the accompanying image because it lacks foundation and authentication. Finally, Defendants deny bullets 2-6 and 8-9 because the cited material fails to support the statements. (*See* Pltf. App. A-55 (Jankowski Dep.) pp. 200-03.) The deponent did not testify that GC2 chose any symbol for any specific purpose or role in the game. (*See id.*)

170. GC2 decided to add animations for the kittens throughout the game. (*Id.* at 187). Getting three of the Pretty Kitty Bonus Symbols in the second, third, and fourth reel will initiate the free spin bonus. When the diamond appears in the fifth reel, the diamond glows and spins and the word WILD and BONUS spin around the turning diamond. (App. B-1A-C.)

**RESPONSE:** Defendants object to the first sentence of SOAF ¶ 170 because it mischaracterizes the evidence. The deponent explained what GC2 decided as to GC2's version of Kitty Glitter artwork. Defendants object to the second and third sentences of SOAF ¶ 170 because they are irrelevant to Defendants' Motion for Partial Summary Judgment. The statements are supported by the disk GC2 delivered to IGT NV, not the materials GC2 submitted to the copyright office, which contains GC2's copyrighted graphics and artwork. (*See* Pltf. App. B-1A-C.)

171. In the bonus interface, getting three bowls initiates the re-trigger feature – earning extra spins. The bowls splash white milk and the words PRETTY KITTY BONUS appear across the symbol frame; the words flash and bounce inside the frame of the symbol box. (App. A-5A.)

**RESPONSE:** Defendants object to SOAF ¶ 171 because it relies entirely on Pltf. App. A-5A, which contains artwork for Coyote Moon, not Kitty Glitter. But even if GC2 meant to cite Pltf. App. A-5B, the citation would still be objectionable because Pltf. App. A-5B is unauthenticated and lacks foundation. Pltf. App. A-5B also is objectionable because it is a disk containing one video, 27 images in a folder titled "graphics" and countless additional images buried in folders and subfolders, yet GC2 fails to offer any pin cite or direction.

172. Then the Free Spins Announcement appears on the screen – it appears in white and purple letters with a blue background.  In the bonus round, the diamond in the fifth reel it triggers the diamond collection feature.  The diamond symbol glows, the cat in the collection feature above the interface that will receive the diamond glows, and then the first diamond in the collection feature next to the first cat above the interface lights up (*Id.*)



**RESPONSE**: As and for their response to SOAF ¶ 172, Defendants incorporate by reference their response to SOAF ¶ 171 as though fully restated herein.

173. Once the three diamonds are populated, the respective cat turns wild – the collection cat spins, changes its attention and the word WILD appears underneath.  Then the collecting continues in the same manner with the rest of the cats. (App. B-1A-C).

   

**RESPONSE**:  Defendants object to SOAF ¶ 173 because it is irrelevant to Defendants' Motion for Partial Summary Judgment.  The statement is supported by the disk GC2 delivered to IGT NV, not the materials GC2 submitted to the copyright office, which contain GC2's copyrighted graphics and artwork (*See* Pltf. App. B-1A-C.).

174. When the bowls line up, they spin, splash white milk around, the symbol frame changes color, the words PRETTY KITTY BONUS move around the symbol screen.  *Id.*

 



*Id.*

**RESPONSE**: As and for their response to SOAF ¶ 174, Defendants incorporate by reference their response to SOAF ¶ 173 as though fully restated herein.

175.    Other creative choices GC2 made included how to design the pay lines, the backgrounds, the animations, and the information aspects of the game.

Pay Lines for the Base Play and Bonus



Patterned Backgrounds for the Base Play and Solid Backgrond for the Bonus. *Id.*



The heirarchy and value of the symbols. *Id.*



The bonus collection feature at the top of the interface. *Id.*



The bonus interface. Bonus symbols, bonus collection features, and pay line designs excerpted from bonus play video and images from submission to US Copyright Office. (App. A-144); (App. B-1A-C).

**RESPONSE**:  Defendants object to SOAF ¶ 175 to the extent it relies on Pltf. App. A-144

because that document is unauthenticated and lacks foundation.  Defendants also object to the

captions added to the images above because they lack foundation.  Further, Defendants object to

SOAF ¶ 175 because it is irrelevant to Defendants' Motion for Partial Summary Judgment.  The

statement is supported by the disk GC2 delivered to IGT NV, not the materials GC2 submitted to the copyright office, which contain GC2's copyrighted graphics and artwork. (*See* Pltf. App. B-1A-C.)

176.    GC2 delivered the original artwork and graphics it had created with a working game disk of the Original Kitty Glitter game to IGT in 2005. (App. A-55 (Jankowski Dep.): pp. 35, 43-44, 192, 197-98). GC2 gave IGT "everything they needed to create a game. … 99.9 percent of everything that they needed to create a game was delivered to them with the working demo." (*Id.* at 192-193). (App. B-1, A-C); (App. A-9 (DeCasa Dep.) pp. 75-76, 164-90).[26]

**RESPONSE:** Defendants admit that GC2 delivered the original artwork and graphics GC2 had created for the original Kitty Glitter game to IGT NV in 2005. Defendants deny that the disk contained a working game. (*See* Pltf. App. A-55 (Jankowski Dep.) pp. 190 - explaining that GC2's working demos had all the finished art, "but IGT would have to recreate all the programming").

Defendants deny the second sentence because it is directly refuted by the cited material. (*See* Pltf. App. A-9 (DeCasa Dep.) pp. 56, 59, 164-90 -- explaining that IGT NV created game prototypes, performed the engineering and created the math for Kitty Glitter. And, further stating (at 59:18-21) that math and engineering took the "longest to develop."

177.    IGT used GC2's artwork and graphics from the delivered GC2 Original Kitty Glitter game and created a prototype game. (*Id.* at 55). It put that artwork and graphics into the prototype and played the game. (*Id.* at p. 56, 58-59).

---

[26] GC2 has asked that this disk be supplied to the Court. Defendants refused that request. A "copy" of the Disk has been represented in (App. B-1, A-B). GC2 has not been allowed an inspection of the original to insure that this representation is accurate. Mr. DeCasa testified that he had in his possession and used this disk while at IGT and took the GC2 disk with him when he went to work for DoubleDown. (App. A-9 (DeCasa Dep.) pp. 77-82). DeCasa worked at DDI after IGT NV and at the time DDI was creating a Kitty Glitter DeLuxe game.

**RESPONSE:** Defendants object to footnote 26 because it is argumentative. In addition, GC2's complaints about discovery are tardy and irrelevant; Defendants produced a copy of the disk in discovery and represented that it was a true and correct copy of the original.



(App. B-1A-C)

**RESPONSE:** Admitted.

178. Later, IGT determined that it wanted the artwork and graphics to be "realistic" looking and decided to change the artwork. (App. A-9 (DeCasa Dep.): pp. 24-26). IGT assigned Kurt Anderson from the art department, and his manager, Jack Liddon, to revise the graphics on the Kitty Glitter game. (*Id.* at 216-217). All the game design department, the project managers, the artist, the technical artist, the math team, and the prototypers reviewed the GC2 artwork and graphics for the Original GC2 Kitty Glitter Game. (*Id.* at 212-214). Anderson saw the state of the Original GC2 Kitty Glitter Game. (*Id.* at 229-230). IGT reviewed GC2's artwork, and using the same game structure and symbol choices, revised that artwork. (*Id.* at 59-60).

**RESPONSE:** Defendants admit the first, second and third sentences of SOAF ¶ 178.

Defendants object to the fourth sentence of SOAF ¶ 178 because GC2 fails to establish that the

deponent had the requisite personal knowledge to testify that Andersen saw the Original GC2 Kitty

Glitter Game." DeCasa stated that he did not witness Andersen reviewing the GC2 version of Kitty

Glitter. (*See* Pltf. App. A-9 (DeCasa Dep.) pp. 229-30.) Defendants object to the fifth sentence of

SOAF ¶ 178 because it mischaracterizes the testimony. DeCasa stated that when the decision to create

new artwork was made, the instructions were "to keep the same structure in the math and engineering"

and to "recreate new art." (Pltf. App. A-9 (DeCasa Dep.) pp. 59-60.)

179. DeCasa told the IGT artists, "hey guys, we need to change up this art, let's make it more realistic. And they asked for more details and like you guys figure it out." (*Id.* at 64-65). DeCasa did not actually observe the artists and see what they did to change the artwork. (*Id.*) He did not know whether the artists copied portions of GC2's artwork and graphics. (*Id.*) He did not know how the artists created any of the artwork and graphics for the Land Based Kitty Glitter Game. (*Id.*) The math did not dictate what artwork and graphics were used. (*Id.* at 69-70). Yet, there were constraints on that creative process. (*Id.* at 65-67).

**RESPONSE:** Admitted.

180.    Within a much shorter time than it usually takes to create a game as complicated as Kitty Glitter, IGT finished the land based Kitty Glitter Game and distributed it to casino floors.  (*Id.* at 218-220:  "Four months to develop art is a short time back then, yes."); (App. A-55 (Jankowski Dep.): p. 193: "It was a big game").  IGT put GC2's Mark on the land based Kitty Glitter Game that it distributed to casinos.  (*Id.* at 180-181).  The GC2 Mark remains on all the land based Kitty Glitter Games on casino floors today.

**RESPONSE:**  Defendants object to SOAF ¶ 180 because "IGT" is vague and uindefined.

Defendants object to the first sentence of SOAF ¶ 180 because it mischaracterizes the testimony.  The

quote in GC2's citation relates solely to the development of art, not the creation of the entire game.

(*See* Pltf. App. A-9 (DeCasa Dep.) pp. 218-20.)  Further, there is no testimony that Kitty Glitter was

"complicated" or that it was a "big game" because of the art.  Defendants admit the second sentence

of SOAF ¶ 180.  Defendants deny the third sentence of SOAF ¶ 180 because it lacks citation to any

material for support.

181.    Comparing the land based Kitty Glitter Game to the GC2 Kitty Glitter artwork and graphics, there is a white cat, a Siamese cat, a bowl.  (*Id.* at 203).  There is a "Kitty Glitter" symbols square.  (*Id.* at 203-204).  The minor symbols as royals are similar.  (*Id.* at 204).  The symbol matrix frame, the pay line indicators are decorated by colors, diamonds, sparkles, or rectangles.  (*Id.*)  There is a diamond above the "i" in the words Kitty and Glitter.  (*Id.* at 205).  There are the same types of cats, the same letters, sparkles on the letters.  (*Id.*)

**RESPONSE:**  Defendants object to SOAF ¶ 181 because it is irrelevant to Defendants'

Motion for Partial Summary Judgment and argumentative.  The statement is based on comparing IGT

NV's land based game, which is not at issue in the motion.  Defendants also object to SOAF ¶ 180

because it mischaracterizes the testimony.  The cited testimony supporting the first sentence of SOAF

¶ 181 related to the deponent's review of IGT NV's land-based version of Kitty Glitter, not a

comparison of the land based game with GC2's artwork and graphics.  (App. A-55 (Jankowski Dep.)

p. 203.)  With regard to the second sentence, the deponent explained that using royals as the minor

symbols was "industry standard" and that the style of the letters is "completely different."  (*Id.* at 205.)

As for the third sentence, the deponent explained that IGT NV directed GC2 to use certain colors

for the pay line indicators, and that IGT NV changed GC2's diamonds or sparkles to rectangles.

Finally, with regard to the sparkles on the letters, the deponent stated that "[e]veryone puts sparkles on letters."

182.    When Mr. Jankowski was asked about the bowl symbol, he replied, "the bowl is obvious repurposing." Asked if it is a derivative, he responded, "yes." (*Id.* at 205-206). The use of the "Kitty Glitter" as a bonus in a square is the same as originally delivered by GC2.

**RESPONSE:** Defendants object to the first and second sentences of SOAF ¶ 182 because they are irrelevant legal and/or factual conclusions offered by a lay witness. Defendants deny the third sentence because it lacks citation to any material for support.

183.    Mr. DeCasa confirmed that Anderson was not required to put sparkles on the royal set. (App. A-9 (DeCasa Dep.): pp. 234-235). He was not required to keep the same special symbol for the collection feature – it wasn't required to be a diamond. (*Id.* at 235). Anderson was not required to have the shape where the collected symbol appears be a diamond. (*Id.* at 235-236). He wasn't required to use a bowl as a collection symbol. (*Id.* at 236). Anderson did not have to make the bowl the retrigger symbol. (*Id.*) Ultimately, DeCasa said that IGT simply required the art department to transform a cartoony version into a more realistic version. (*Id.* at 236-237).



Bonus

Regular Play

Full Body Cats Turning Wild



(App. A-7).

**RESPONSE:** Defendants object to the images and the text in SOAF ¶ 183 because they are irrelevant to Defendants' Motion for Partial Summary Judgment. The images and the statement are based on IGT NV's land based game, which is not at issue in the motion. Defendants also object to the captions over the images above because they lack foundation. Subject to the foregoing objections, Defendants admit the first five sentences of SOAF ¶ 183. Defendants deny the last sentence of SOAF ¶ 183 because it is not supported by the cited material. (*See* Pltf. App. A-9 pp. 234-35.)

184. Hitting three bowls initiates the free spin bonus. The bowls splash white diamonds and the words BONUS! and INITIATED appear across the symbol frame; the words flash and expand and light crosses the symbol box. (App. A-7).

**RESPONSE:** Defendants object to SOAF ¶ 184 because it is irrelevant to Defendants' Motion for Partial Summary Judgment. The statement is based on IGT NV's land based game, which is not at issue in the motion.




                (*Id.*)                                   (*Id.*)



(*Id.*)

185.     Then the Free Spins Announcement appears on the screen – it appears in white letters with pink and purple borders and a blue glow behind the letters while highlighted by sparkles. (*Id.*) When the diamond appears in the fifth reel, the diamond glows and the word WILD appears across the diamond.  This triggers the diamond collection feature.  The diamond symbol glows, diamond flies up to the spot in the collection feature next to the first cat above the interface.  (*Id.*)

 

(App. A-7).

**RESPONSE:**  Defendants incorporate their response to SOAF ¶ 184 as and for their response to SOAF ¶ 185 as though fully restated herein.

186.     Once the three diamonds are populated, the respective cat turns wild – the symbol in the interface glows, the word WILD appears underneath and flashes.  Then the collecting continues in the same manner with the rest of the cats.  (*Id.*)



90

**RESPONSE**:   Defendants incorporate their response to SOAF ¶ 184 as and for their response to SOAF ¶ 186 as though fully restated herein.

187.    When the bowls line up, they spin, splash white diamonds around, the symbol frame changes color, the words BONUS appear across the symbol screen.  (App. A-7).

 

**RESPONSE:**   Defendants incorporate their response to SOAF ¶ 184 as and for their response to SOAF ¶ 187 as though fully restated herein.

188.    Mr. Jankowski, the original artist for GC2, agreed that the <u>online</u> version of Kitty Glitter bears many similarities with the GC2 artwork, answering "yes" to whether the bowl is a derivative work.  (App. A-55 (Jankowski Dep.): pp. 205-206).  He agreed that the letters are the same, the sparkles are the same, and the cats are the same as GC2 originally delivered.  (*Id.* at 205).

**RESPONSE:**   Defendants object to SOAF ¶ 188 because it mischaracterizes the testimony. Jankowski did not "agree[] that the <u>online</u> version of Kitty Glitter bears many similarities with the GC2 artwork." (*See* Pltf. App. A-55 (Jankowski Dep.) pp. 205-206.)  Nor did he agree that the letters and cats are the same.  (*See id.*)  Finally, he stated: "Everybody puts sparkles on letters."  (*Id.* at 205.)

189.    Mr. DeCasa, who directed the math for the land based Kitty Glitter Game at IGT and later moved to DoubleDown, and was responsible for creating the DoubleDown Kitty Glitter Dynasty Edition game for <u>social gaming</u>. (App. A-9 (DeCasa Dep.): p. 287).  He acknowledged that he pulled artwork and graphics from the IGT Alienbrain server (where the original GC2 Kitty Glitter files and prototype were housed) (*Id.*).

**RESPONSE:**   Defendants deny the first sentence of SOAF ¶ 189 because it is not supported by the cited material.  (*See* Pltf. App. A-9 (DeCasa Dep.) p. 287.)   As to the second sentence, Defendants admit that DeCasa acknowledged that he pulled artwork and graphics from the IGT Alienbrain server, but deny the remainder of the second sentence because it is not supported by the cited material.  (*See* Pltf. App. A-9 (DeCasa Dep.) p. 287.)

190. The Major Symbols. Comparison of (App. A-7) with (B-1A-C):

| GC2 | IGT Derivative | GC2 BONUS | IGT Derivative BONUS |
|---|---|---|---|
| White Kitten | White Cat | White Kitten | White Cat |
|  |  |  |  |
| Siamese | Siamese | Siamese | Siamese |
|  |  |  |  |
| Orange Tabby | Orange Tabby | Orange Tabby | Orange Tabby |
|  |  |  |  |
| Calico Mixed Tabby | Calico Mixed Tabby | Calico Mixed Tabby | Calico Mixed Tabby |
|  |  |  |  |

| GC2 | IGT Derivative |
|---|---|
| White Kitten | White Cat |
|  |  |
| Siamese | Siamese |
|  |  |
| Orange Tabby | Orange Tabby |

 

Calico Mixed
Tabby

Calico Mixed
Tabby

 

Comparison of (App. A-7) with (B-1A-C): The Royals:

**GC2**                            **IGT Derivative**

 

Comparison of (App. A-7) with (B-1A-C): The Bonus Symbols:

**GC2**                            **IGT Derivative**

 

 

Comparison of (App. A-7) with (B-1A-C): Other Symbols:

**GC2**                            **IGT Derivative**

 

Comparison of (App. A-7) with (B-1A-C): Bonus Collection Feature Symbol:

**GC2**                            **IGT Derivative**

 

Comparison of (App. A-7) with (B-1A-C): Creative Choices/Features:



**GC2**                                    **IGT Derivative**

Base Play Pay Lines          Land Based Base Play Pay Lines

Bonus Play Pay Lines          Double Down Casino Pay Lines

Bonus Collection Features - Masthead          Land Based Bonus Collection Features – Masthead

94



Base Play Interface Background Pattered   Base Play Interface Background Pattered



Bonus Play Interface Background Solid   Bonus Play Interface Background Solid

The Diamond Symbol Glows and triggers the Diamond Collection Feature   The Diamond Symbol Glows and triggers the Diamond Collection Feature

List of Animations from Videos   List of Animations from Videos

Comparison of (App. A-7) with (B-1A-C).

**RESPONSE:** Defendants object to SOAF ¶ 190. The comparisons therein are irrelevant to Defendants' Motion for Partial Summary Judgment because GC2 compares the images from IGT NV's land based Kitty Glitter (Pltf. App. A-7), with images from the disk GC2 provided to IGT NV

95

in 2005 (Pltf. App. B-1A-C), it does not compare the online artwork with the artwork submitted to the Copyright Office. Defendants also object to the captions accompanying the images above because they are argumentative, lack foundation, and are not supported by the cited materials.

191. For context, Maid of Money is a single game among two others that appear on packaging shown in (App. A-2: ¶ 166) which also includes artwork for Pharaoh's Fortune and Kingpin Bowling as those games are sold by Masque. GC2 created the artwork and graphics for Maid of Money. (App. A-55 (Jankowski Dep.): p. 42).

**RESPONSE:** Defendants deny the first sentence of SOAF ¶ 191 because it is not supported by the cited material. (*See* Pltf. App. A-2 ¶ 166; A-55 (Jankowski Dep.) p. 42.) Defendants object to the second sentence of SOAF ¶ 191 because it mischaracterizes the testimony in that the deponent was referring to the GC2 version of Maid of Money artwork. (*See id.*)

192. GC2 delivered a working demonstration game to IGT of Maid of Money. (*Id.* at 196). IGT Reviewed it. (App. A-110) Exhibit 453 includes images of Maid of Money on Diamond Galaxy. (App. A-64 (Wisler Dep.): pp. 25-26). IGT put the Maid of Money artwork and graphics and electronic files on a drive and sent it to Masque. (*Id.* at 44).

**RESPONSE:** Defendants object to SOAF ¶ 192 because "IGT" is vague and undefined. Defendants also object because SOAF ¶ 192 is vague because it fails to distinguish between GC2's and IGT NV's version of Maid of Money. Subject to the foregoing objections, Defendants deny the first and second sentences of SOAF ¶ 192 because they are not supported by the cited material. (*See* Pltf. App. A-55 (Jankowski Dep.) p. 42; A-110.) Defendants admit the third sentence. With regard to the fourth sentence, Defendants admit that IGT NV put the artwork and graphics and other electronic files from the IGT NV version of Maid of Money on a drive and sent it to Masque.

193. By agreement, Masque made games of the IGT files including Maid of Money. (*Id.* at 154-157). Masque made digital recordings of the Maid of Money land based game in IGT's demo room. (*Id.* at 51-53). Masque created packaging for the Masque CD and DVD products including Maid of Money. (*Id.* at 92-93). Finally, Masque released Maid of Money. (*Id.* at 231-233).

**RESPONSE:** Defendants object to SOAF ¶ 193 because "IGT" is vague and undefined and GC2 fails to distinguish between GC2's and IGT NV's version of Maid of Money artwork. Subject to these objections, Defendants admit the second, third and fourth sentences.

194. IGT's General Counsel, Michael Prescott, provided GC2 with the identification of Maid of Money as a derivative of GC2's Maid of Money game. (App. A-18(Prescott Dep.): pp. 141-144, 155-156: Information provided was accurate and intended to provide GC2 with information).

**RESPONSE:** Defendants object to SOAF ¶ 194 because "IGT" is vague and undefined. Subject to its objection, Defendants deny SOAF ¶ 194 because it is not supported by the cited material. (*See* Pltf. App. A-18 (Prescott Dep.) pp. 141-144, 155-156.)

195. GC2's Maid of Money artwork and graphics were in IGT NV possession as they were trying to get GC2 to make the derivative work. GC2 declined to make the derivative work and IGT thereafter created the derivative Maid of Money land based game. (App. A-70).

**RESPONSE:** Defendants object to SOAF ¶ 195 because GC2 relies solely on App. A-70 for support and that document lacks authentication. Defendants further object because GC2's use of the word "derivative" is argumentative and a legal conclusion.

To the extent Defendants' objections are overruled, Defendants admit that GC2's version of Maid of Money artwork was in IGT NV's possession when it asked GC2 to remake Maid of Money. Defendants also admit that IGT NV created its own artwork and graphics for the IGT NV version of Maid of Money after GC2 refused to redo the artwork and graphics. Other than as expressly set forth above, Defendants deny SOAF ¶ 195 because it is not supported by the cited material. (*See* Pltf. App. A-18 (Prescott Dep.) pp. 141-144, 155-156.)

196. IGT NV Rule 30(b)(6) witness Michael Shorrock testified that Alienbrain is a source repository server, or a library for original art assets as well as other assets used in the development of the games. (App. A-27(Shorrock Dep.): pp. 22-23). Any evidence and ESI files on what was done with GC2's original artwork to create the land based derivative is and was always in IGT NV's sole and exclusive possession. GC2 requested the development files specifically as part of its request for production. (App. A-1: ¶¶ 5-6).

**RESPONSE:** Defendants deny that Michael Shorrock was IGT NV's Rule 30(b)(6) witness. (*See* Pltf. App. A-27 (Shorrock Dep.) p. 1; A-11 (Kastner Dep.) p. 7:9-17.) Defendants deny the remainder of SOAF ¶ 196 because it is not supported by the cited material. (*See* Pltf. App. A-27 (Shorrock Dep.) pp. 22-23; A-1 ¶¶ 5-6.)

197. IGT NV's initial answer raised a generic boilerplate 5th Affirmative Defense that stated: "Fifth Affirmative Defense: The FAC is barred, in whole or in part, because any copying of protected material is so trivial as to be *de minimis* and/or fall below the quantitative threshold of substantial similarity." (App. A-1: p. 103). Defendants refused to produce the development files for any game. (Dkt. at 220).

**RESPONSE:** Defendants object to SOAF ¶ 197 because it is argumentative. Subject to the foregoing objection, Defendants admit that the first sentence of SOAF ¶ 197 correctly restates Defendants' Fifth Affirmative Defense, asserted in Defendants' *amended* answer. (*See* Pltf. App. A-1 p. 105.) Defendants object to the Second Sentence of SOAF ¶ 197 because it improperly cites a 39-page document without any pin cites. Defendants also object to the second sentence of SOAF ¶ 197 because GC2's discovery complaints are tardy and irrelevant. Subject to the foregoing objections, Defendants deny the second sentence because it is not supported by the material cited. (*See* Dkt. No. 220 at 7.)

198. IGT initial disclosures (Dated December 6, 2017) and Supplemental Initial Disclosure (Dec. 28, 2017) do not identify anything about the intent of any Defendant to assert that the Maid of Money derivative identified by IGT NV through Michael Prescott, was going to be challenged in the case as not being a derivative work of GC2's Maid of Money. Neither disclosure identifies any witnesses with knowledge of the Maid of Money development, any category of documents it intends to use to support its affirmative defenses, nor do the disclosures identify or disclose any ESI or game related development files. No files on Alienbrain have been disclosed or identified in the initial disclosures.

**RESPONSE:** Defendants object to SOAF ¶ 198 because it is argumentative and irrelevant. Notwithstanding these objections, Defendants deny SOAF ¶ 198 because it is not supported by any cited material, and Defendants denied that GC2 had a copyright interest in IGT NV's Maid of Money artwork in their amended answer to the FAC. (*See* Dkt. No. 236 ¶ 195.).

199.    Defendants moved for a protective order asking the court to preclude GC2 from questioning IGT NV Defendant via Rule 30(b)(6) about Derivative works. The Court granted this limitation. (Dkt. at 182, 238). Defendants' counsel used the order to limit GC2 examination of IGT NV on derivative works. (App. A-11(Kastner Dep.): p. 200).

**RESPONSE:** Defendants object to SOAF ¶ 199 because GC2's discovery complaint is tardy and irrelevant. Defendants also object to SOAF ¶ 199 because it mischaracterizes Defendants' motion, the Court's order and Defendants' objection at the deposition. The Court held that GC2 could not ask the Rule 30(b)(6) witness whether certain artwork was infringing or a derivative, because those questions called for legal conclusions. At the deposition, Defendants asserted an objection based on that ruling. (*See* Pltf. App. A-11 (Kastner Dep.) p. 200.)

To the extent Defendants objections are overruled, Defendants deny SOAF ¶ 199 because it is not supported by the cited material. (*See* Dkt. Nos. 182, 238; Pltf. App. A-11(Kastner Dep.) p. 200).)

### [OMITTED HEADING] [27]

200.    Masque produced certain final land based files they received from IGT NV regarding Maid of Money in 2011. (App. A-64(Wisler Dep.): pp. 42-46). The final land based files in Masque's possession do not include the game creation/development files leading up to the derivative Maid of Money.

**RESPONSE:** Defendants admit the first sentence of SOAF ¶ 200. Defendants' object to the second sentence because it is argumentative and includes legal and/or factual conclusions. Subject to the foregoing objections, Defendants deny the second sentence of SOAF ¶ 200 because it is not supported by any material.

---

[27] GC2 requested production of development files as part of its discovery related to Defendants affirmative defenses. IGT Defendants objected to and did not produce any of the game creation/development files off of the Alienbrain server for Maid of Money leading up to the derivative land based game.

**RESPONSE:** Defendants object to footnote 27 because it is argumentative, and GC2's discovery complaints are tardy and irrelevant. Notwithstanding the foregoing objections, Defendants deny footnote 27. (*See* Dkt. No. 220 at 7.)

INTERNATIONAL GAME TECHNOLOGY, IGT, DOUBLEDOWN INTERACTIVE LLC and MASQUE PUBLISHING, INC.


By:    /s/ Eric N. Macey
       One of Their Attorneys

## CERTIFICATE OF SERVICE

Eric N. Macey, an attorney, hereby certifies that he served the foregoing **Defendants'**

**Response To Plaintiff GC2 Incorporated's Local Rule 56.1 Statement Of Additional Material**

**Facts,** by causing a true and correct copy thereof to be delivered by email to:

### Attorneys for GC2 Incorporated

Kara E. F. Cenar
*kcenar@greensfelder.com*
Ricardo Meza
*rmeza@greensfelder.com*
Susan Meyer
*smeyer@greensfelder.com*
GREENSFELDER, HEMKER & GALE, P.C.
200 West Madison Street, Suite 3300
Chicago, IL 60606
312-419-9090 (T)
312-419-1930 (F)

John E. Petite
*jep@greensfelder.com*
Kirsten M. Ahmad
*km@greensfelder.com*
GREENSFELDER, HEMKER & GALE, P.C.
10 South Broadway, Suite 2000
St. Louis, MO 63102
314-516-2698 (T)
314-241-8624 (F)

on this 1st day of November, 2018.

/s/ Eric N. Macey
Eric N. Macey