IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GC2 INC., | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 16 C 8784 |
| INTERNATIONAL GAME TECHNOLOGY; IGT; and DOUBLEDOWN INTERACTIVE LLC, | ) ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

GC2 Inc. has sued International Game Technology, which the Court will refer to as IGT Holdco; IGT, which the Court will refer to as IGT NV; DoubleDown Interactive LLC, which the Court will refer to as DDI; and Masque Publishing, Inc., which the Court will refer to as Masque.[1] IGT Holdco owns IGT NV. IGT NV produces and sells games used in casinos and digital games used by online casinos. DDI sells digital slot machine games for "social" play (i.e., not for gambling with real money). IGT Holdco

---

[1] The Court dismissed GC2's claims against International Game Technology PLC for lack of personal jurisdiction. *See GC2 Inc. v. Int'l Game Tech. PLC*, No. 16 C 8794, 2017 WL 2985741 (N.D. Ill. Jul. 13, 2018). Litigation of GC2's claims against WD Encore Software, Inc. (Counts 4 and 10) was stayed when it filed for bankruptcy. *See* Order of Sept. 29, 2017 (dkt. no. 168). GC2 also originally sued a number of "Doe" defendants, consisting of end-users of the products in question, but those defendants were dismissed without objection by GC2 (Counts 5 and 6). *See* Order of Aug. 14, 2018 (dkt. no. 279).

owned DDI until June 2018, when it sold its interest in DDI to DoubleU Diamond, LLC. Masque is a seller of software for digital casino games.

GC2's remaining claims are as follows: direct copyright infringement against the IGT defendants (Count 1), DDI (Count 2), and Masque (Count 3); vicarious liability for copyright infringement against the IGT defendants (Count 7), DDI (Count 8), and Masque (Count 9); contributory infringement against the IGT defendants and DDI (Count 11); violation of the Digital Millennium Copyright Act (DMCA) against the IGT defendants and DDI (Count 12); and violation of the Illinois Consumer Fraud Act (ICFA) against the IGT defendants and DDI (Count 13). All of the claims involve artwork (images and videos) that GC2 created for slot machines. GC2 licensed the artwork to IGT NV for physical gaming equipment but not for use in mobile or Internet-based gaming, as well as certain other exceptions. GC2 contends that IGT NV, together with the other defendants, used GC2's artwork without authorization for online games. All of GC2's claims stem from that central allegation.

IGT Holdco, IGT NV, DDI, and Masque have moved for summary judgment on the copyright infringement claims insofar as they relate to the games "Kitty Glitter" and "Maid of Money"; to limit GC2's recovery of profits; and on the DMCA and ICFA claims in their entirety.

## 1. Kitty Glitter and Maid of Money

A copyright infringement claim requires the plaintiff to establish ownership of a valid copyright and copying of constituent elements of the work that are original. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991); *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005). A factfinder may infer copying

where the defendant had access to the copyrighted work and the accused work is substantially similar to the copyrighted work. *Incredible Techs.*, 400 F.3d at 1011. Access is undisputed here; the issue is substantial similarity. It is assessed from the standpoint of an ordinary observer: "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." *Id.* (quoting *Atari, Inc. v. N. Am. Phillips Consumer Elecs. Corp.*, 672 F.2d 607, 614 (7th Cir. 1982)).

Starting with Kitty Glitter, no reasonable factfinder could find the images in IGT's games to be substantially similar to the protectible expression in GC2's copyrighted material. They are similar only at the conceptual level. Both games have 3 rows and 5 columns of spinning squares, and both include among the spinning squares images that correspond to high-value playing cards (A, K, Q, J, and 10). But these are common elements in slot machine games. They likely qualify as *scenes a faire* and, one way or the other, are not protectible elements. Both IGT's games and GC2's images also include among the spinning squares images that say "Kitty Glitter"—the name of the game—but GC2 likewise does not claim a copyright on the game's title.

More significantly, both GC2's images and IGT's game have images of cats. That, however, is where the similarities end. The cats in IGT's game look nothing like those in GC2's images. The GC2 cats are shown as full bodies, in active or playful poses. Some are partly outside the square frame. They move when they are part of a winning combination. Perhaps most importantly, they are somewhat cartoon-like, and they have outsized eyes. The IGT cats, by contrast, are shown in headshots only on

3

the main game screens (with the exception of some bonus images), and they are fully contained within the square frame. The cats are dour and serious and are not engaged in any apparent activity, and they are more realistic images of cats. And there are other equally significant differences between the two sets of images.

The Court agrees with GC2 that the choice of graphics, background colors, borders, design of the letters and numbers, fonts, colors, animation, and so on can be protectible elements in a slot machine game. *See Big Daddy Games, LLC v. Reel Spin Studios, LLC*, No. 12-cv-449, 2013 WL 12233949, at *15 (W.D. Wis. 2013). However, these are not at all similar in the two sets of Kitty Glitter images, let alone substantially similar.

In short, IGT may well have copied something from GC2, but what it copied was the concept of a slot game called "Kitty Glitter" with cats and diamonds, *not* the particular expression of that idea. Although the two games are premised on the same idea or concept, "ideas—as opposed to their expression—are not eligible for copyright protection." *Incredible Techs.*, 400 F.3d at 1011 (citing *Mazer v. Stein*, 347 U.S. 201 (1954)). *See* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work . . . extend to any idea . . ., concept, [or] principle . . ., regardless of the form in which it is described, explained, illustrated, or embodied in such work."). The *expression* of the two games' similar concepts in the two games is in no way similar; no reasonable jury could find otherwise.

The same is true of Maid of Money. GC2 does not even make an effort in its brief to dispute IGT's contention that its game has an entirely different look and feel from GC2's copyrighted work. *See* Pl.'s Resp. to Defs.' Mot. for Summ. J. at 16-17; Defs.'

4

Reply at 6. And indeed it does: the maids have a quite different appearances; GC2's maids are engaged in activity but IGT's are not; the letters and numbers don't have a similar look; and so on. Both games involve maids and spinning images, including images for A, K, Q, J, and 10, but that is where it ends. As with Kitty Glitter, "[t]he similarities are almost wholly the product of the games' reliance on similar but noncopyrightable game concepts." *Williams Elecs., Inc. v. Bally Mfg. Corp.*, 568 F. Supp. 1274, 1282 (N.D. Ill. 1983).

For these reasons, defendants are entitled to summary judgment on GC2's copyright infringement claims to the extent they are based on Kitty Glitter and Maid of Money.

**2.    Recovery of profits**

A prevailing plaintiff in a copyright infringement cases is entitled to recover its own actual damages as well as the defendant's profits made from the infringement. In their motion for summary judgment, defendants seek to limit GC2's recovery of profits from any given defendant to that defendant's own profits. GC2 contends that it is entitled to seek from each defendant profits generated by other defendants and from other entities, including operators of online casinos that offer IGT's games. GC2 also contends that it is entitled to seek recovery for some portion of the revenues generated in IGT Holdco's sale of DDI.

Specifically, the following points are put at issue by defendants' motion:

- The IGT defendants' liability for the profits of online casino operators that offer the allegedly infringing games.

- The IGT defendants' liability for profits earned by Masque and Encore, which maintained websites from which IGT's games could be downloaded.

- The liability of DDI and Masque for each other's profits and those of Encore.

- The IGT defendants' liability for DDI's profits after IGT sold its interest in DDI in June 2017.

- DDI's liability for profits made by its "payment processors," that is, entities (such as PayPal, GooglePlay, and Amazon) through which game users can purchase virtual "chips" to play the games.

- IGT Holdco's liability for profits it earned in the sale of its interest in DDI.

The Court addresses each of these points in turn.

The general rule in copyright infringement cases is that liability for damages is joint and several, but liability for profits is several, not joint. "[E]ach defendant is only liable to the copyright plaintiff to the extent of its own profits derived from the infringing activity; . . . 'one defendant is not liable for the profit made by another.'" *Nelson-Salabes, Inc. v. Morningside Development, LLC*, 284 F.3d 505, 517 (4th Cir. 2002) (quoting *MCA, Inc. v. Wilson*, 677 F.2d 180, 186 (2d Cir. 1981)). But there is a longstanding exception "when such defendants act as partners or as 'practical partners.'" *Nelson-Salabes*, 284 F.3d at 517 (quoting *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 519 (9th Cir. 1985)); *see also Abeshouse v. Ultragraphics, Inc.*, 754 F.2d 467, 472 (2d Cir. 1985) ("Exceptions to [the] general rule may be appropriate only where the infringement was not innocent or where the defendants 'engaged in a partnership, joint venture, or similar enterprise.'") (quoting 3 M. Nimmer, *Nimmer on Copyright* § 12.04[C][3], at 12-50 to -51 (1984)). When there is

a partnership or a "practical partnership," the partners "are each jointly and severally liable for any profits that they collectively derived from the acts of copyright infringement." *Nelson-Salabes*, 284 F.3d at 517. The determination of a "practical partnership" depends on an analysis of each entity's role, degree of direction, and financial interest in the activities of the other(s). *See id.*; *see also Belford, Clarke & Co. v. Scribner*, 144 U.S. 488, 507-08 (1892). If there is no sharing of profits, this cuts strongly against a finding of a practical partnership. *See Frank Music*, 772 F.2d at 519. Payment of royalties, contractual indemnification, and other similar arrangements are insufficient to establish an actual or "practical" partnership or joint venture. Each of these types of business relationship requires some form of joint enterprise where both parties contribute property or services, have some mutual control over the enterprise, and share or have a community of interest in profits. *See, e.g., Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 748 (7th Cir. 2006) (Illinois law).

GC2 has not offered evidence from which a reasonable jury could find that the IGT defendants were engaged in a partnership or practical partnership with the online casino operators. There is no evidence that the relationship involves any sharing of profits or losses or any joint control of business activities. Rather, the IGT parties are paid royalties based on revenues. GC2 points to, among other things, evidence that they work together to create computer code and functionality for the casino operators' websites and that IGT provides the casino operators with, among other things, marketing materials as well as information needed for the operators to get approval from regulatory authorities. But all of this, taken together, comes nowhere near what is necessary to permit a finding of a practical partnership that would allow recovery from

7

IGT of the casino operators' profits—assuming the practical partnership rule applies, in the first place, to recovery of the profits of non-parties, a question the Court need not decide definitively.

The same is true with regard to the relationship between the IGT defendants and Masque and Encore. IGT NV transmits digital files to Masque and retains the right for final approval of IGT-originated games that Masque develops and sells. The Court assumes, for purposes of the present motion, that the IGT defendants and Encore have a similar relationship. But this is not in the least bit suggestive of a practical partnership. There is no evidence of sharing of profits or losses, and no evidence of the IGT defendants' involvement in Masque's downline business activities or Masque's involvement in the business activities of the IGT entities. GC2 likewise offers no evidence from which a reasonable jury could find a partnership, or practical partnership, between DDI, Masque, and/or Encore. Nor has GC2 offered a basis for finding a practical partnership between IGT Holdco and DDI after IGT sold its interest in DDI in June 2017.

Finally, GC2 has not offered evidence that would permit it to recover from DDI the profits earned by its payment processors. Those entities are simply paid a fee based on revenues generated; there is no sharing of profits or losses and no jointly-conducted business activity.

GC2 offers an alternate theory for recovery from upstream entities of profits made by downstream users of the infringing material: constructive trust. This stems from a decision authored by Judge Learned Hand nearly eighty years ago in which the Second Circuit concluded that the plaintiff could recover profits from exhibiting a motion

picture abroad where the infringing copy had been made in the United States. The court stated:

> The [copyrighted film] negatives were "records" from which the work could be "reproduced," and it was a tort to make them in this country. The plaintiffs acquired an equitable interest in them as soon as they were made, which attached to any profits from their exploitation, whether in the form of money remitted to the United States, or of increase in the value of shares of foreign companies held by defendants. . . . [A]s soon as any of the profits so realized took the form of property whose situs was in the Untied States, our law seized upon them and impressed them with a constructive trust, whatever their form.

*Shelson v. Metro-Goldwyn Pictures Corp.*, 106 F.2d 45, 52 (2d Cir. 1939) (L. Hand, J.); *see also Los Angeles News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 991 (9th Cir. 1998). This theory, however, does not permit recovery of profits earned by non-parties to the lawsuit; the court in *Shelson* so held. *See Shelson*, 106 F.2d at 51. So it does not authorize recovery from the IGT defendants of the profits made by the online casino operators or those made by the payment processors (through whose hands the allegedly infringing materials never passed, from what the Court can determine).

Finally, GC2 argues that an entity that intentionally infringes may be held liable for profits earned by others, citing language from *Abeshouse* quoted earlier, to the effect that there may be an exception to the general rule authorizing recovery of profits only from the entity that made them "where the infringement was not innocent." *Abeshouse*, 754 F.2d at 472. But this purported exception was not actually applied in *Abeshouse*, and as best as the Court can determine it has never been applied in any other reported case since then. *Softel, Inc. v. Dragon Medical and Scientific Communications Ltd.*, No. 87 Civ. 0167, 1995 WL 606307 (S.D.N.Y. Oct. 16, 2995) mentions the point but in fact

assessed joint liability for profits under New York trade secret law. *Id.* at *1. The Court is unpersuaded that this theory of liability represents good law, at least in this Circuit, under a statute that authorizes recovery of "any profits *of the infringer* that are attributable to the infringement." 17 U.S.C. § 504(a) (emphasis added).

The only remaining damages issue referenced in defendants' motion involves GC2's contention that it is entitled to a share of the proceeds of the sale of IGT Holdco's interest in DDI. GC2 argues a theory of "indirect profits." But to recover on this basis, GC2 must establish a nexus between the infringement and the indirect profits it seeks. *See, e.g., Straus v. GVC Worldwide, Inc.*, 484 F. Supp. 2d 625, 645 (S.D. Tex. 2007) (citing *Mackie v. Rieser*, 296 F.3d 909, 815 (9th Cir. 2002)). *See also Bell v. Taylor*, 827 F.3d 699, 710 (7th Cir. 2016) ("a plaintiff must show a causal nexus between the infringement and the gross revenues"). GC2 cites no evidence from which a reasonable jury could find that the IGT entities' alleged infringement contributed at all to the sale of IGT Holdco's interest in DDI—aside from the completely unsurprising and, in the Court's view, legally insignificant fact that DDI's business related to the subject games is part of what DoubleU acquired from IGT Holdco.

For these reasons, the Court grants defendants' motion for partial summary judgment on the damages issues referenced in the motion.

**C.    DMCA claims**

As relevant here, the DMCA prohibits the following:

- Knowingly providing or distributing "copyright management information" (CMI) that is false, with the intent to induce, enable, facilitate, or conceal infringement, 17 U.S.C. § 1202(a)(1)-(2); and

- Intentionally removing or altering CMI or distributing CMI knowing that it has been removed or altered, or distributing works knowing that CMI has been removed or altered, with knowledge or reason to know that this will induce, enable, facilitate, or conceal an infringement, *id.* § 1202(b)(1)-(3).

CMI includes, as relevant here, the title or other information identifying a work, the name of the author or copyright owner of a work, and terms and conditions for use of a work. *Id.* § 1202(c).

GC2 included with its exhibits a chart, or set of charts, setting out the various bases for its DMCA claim. If the Court is understanding it right, the claim is actually made up of nearly 50 separate alterations or removals of CMI, falsifications of CMI, or instances of providing false CMI. *See* Pl.'s App. C-62 to C-66. And many of the line items on the charts list violations of multiple provisions of the DMCA, meaning that GC2 is actually asserting as many as 100 claims. GC2 is trying to stuff all of this into a single count of its complaint, which is rather inconsistent with Federal Rule of Civil Procedure 10(b). But defendants have not raised that point, and it would be a bit late for them to do so as part of a dispositive motion, so the Court will bypass it for present purposes. From a more practical standpoint, however, one has to wonder whether GC2 or its counsel have given even any thought to how the Court would go about instructing a jury on these claims, let alone how a reasonable lawyer would argue them to a jury in a coherent and reasonably succinct way. Depending on exactly what remains of GC2's DMCA claims (or sub-claims, or whatever they are appropriately called), the Court reserves the right to sever some or all of them for purposes of trial.

Fortunately, defendants do not appear to be seeking summary judgment on a claim-by-claim basis. Instead, they assert a handful of separate points, some of which concern specific claims and some of which concern all, or at least multiple claims.

- GC2 has given up any false CMI claim based on Kitty Glitter;
- GC2 has no evidence of a CMI removal claim for the land-based versions of Pharaoh's Fortune and Coyote Moon, and no basis for a claim arising from "failure to affix";
- GC2 cannot sustain a false CMI claim based on the images in the "DoubleDown Casino slots lobby";
- GC2 has no evidence of the two types of intent required under 1202(a) and (b);
- damages under the DMCA, which are assessed on a violation-by-violation basis, must be based on defendants' acts, not the number of end users that used the various games;
- damages are based on the sale/distribution/posting of a product with a violation, not the number of items of false CMI on each such product; and
- damages cannot be based on the number of times that iOS and GooglePlay performed updates to the DoubleDown Casino app.

The Court will address each argument in turn.

### a. False CMI claims regarding Kitty Glitter

The Court agrees with defendants that GC2 gave up any DMCA claim involving false CMI with respect to Kitty Glitter by its answer to an interrogatory asking it to identify all instances of false CMI in which GC2 stated, "Plaintiff has not alleged a DMCA violation regarding the Kitty Glitter work." *See* Defs.' Ex. 22 (Pls.' Ans. to Defs.'

Interoggs.) at 38. The interrogatory, however, appears to be limited to false-CMI claims, so the Court's ruling in this regard is equally so limited. The Court expresses no view on whether GC2 gave up any DMCA claims regarding Kitty Glitter that it may be asserting on other bases. The Court notes, however, that GC2 elsewhere states that it is not asserting a DMCA "removal" claim for Kitty Glitter. *See* Pl.'s Resp. to Defs.' Mot. for Summ. J. at 28.

### b. Failure to affix / removal claims regarding Pharaoh's Fortune and Coyote Moon

Defendants contend that GC2 cannot sustain a DMCA claim based on a failure to affix its mark to images from the games Pharaoh's Fortune and Coyote moon. That is certainly true with respect to a claim for removal of CMI; that subsection of the DMCA prohibits removal of pre-existing CMI or distribution knowing that pre-existing CMI has been removed. *See* 17 U.S.C. § 1202(b). The term "removed" cannot be written out of the statute. *See, e.g., Fisher v. Forrest*, 286 F. Supp. 3d 590, 609 (S.D.N.Y. 2018); *Agence France Presse v. Morel*, No. 10-cv-2730, 2014 WL 3963124, at *8 (S.D.N.Y. Aug. 13, 2014).

This does not, however, preclude a claim under subsection 1202(a) for providing false CMI. In appropriate circumstances, displaying copyrighted images without any reference to the copyright owner may constitute falsification of CMI. The Court so held in its ruling on defendants' Rule 12(b)(6) motion. *See GC2 Inc. v. Int'l Game Tech. PLC*, 255 F. Supp. 3d 812, 822 (N.D. Ill. 2017).

Finally, the Court is not persuaded by defendants' contention that GC2 cannot sustain a DMCA claim based on the claimed removal of its logo from glass artwork for the land-based versions of Pharaoh's Fortune and Coyote Moon. There appears to be

13

at least some evidence that GC2 provided its logo along with the glass artwork and that IGT NV made modifications to the artwork and took off GC2's logo. Though the details are somewhat murky to the Court, it concludes that defendants have not shown the absence of a genuine dispute of material fact on this claim.

### c. The DoubleDown Casino slots lobby

GC2 alleges DMCA violations related to the depiction of Pharaoh's Fortune and Coyote Moon in the DoubleDown Casino slots "lobby." The lobby is the screen where a user selects which game to play; it has icons for each available game (including these two), each with an image and the game's title. The images for the two games in question were created by GC2. The screen has the name DoubleDown at the top, and a version on one platform has a footer stating that "DoubleDown Casino is provided by DoubleDown Interactive, LLC in accordance with the DoubleDown Interactive, LLC Private Policy and Terms of Service."

Defendants argue that this CMI is not "conveyed in connection with copies" of artwork from the Pharaoh's Fortune and Coyote Moon games and thus is not actionable under the DMCA. In ruling on defendants' motion to dismiss for failure to state a claim, the Court concluded that a generic footer (including a "terms of use" link) is not "conveyed in connection with" a work, see *GC2 Inc. v. International Game Technology PLC*, 255 F. Supp. 3d 812, 821-22 (N.D. Ill. 2017), and the same is true here, both with regard to the footer and the name DoubleDown at the top of the page.[2] There is not a

---

[2] GC2 asks, almost in passing, for reconsideration of the Court's ruling, but it is way too late for that, and the argument is not sufficiently developed in any event, so it is forfeited.

close-enough association between the referenced CMI and the GC2 works in question for it to be considered to have been "conveyed in connection" with those works.

In response, GC2 notes that defendants' arguments describe only the version of the slots lobby for desktop computers, not the mobile app version. That is true, but it doesn't make a difference. The screens for the mobile version, which GC2 provided as part of its statement of additional facts, reflect no material difference in the placement of the allegedly false or misleading CMI. It is not "conveyed in connection with" GC2's works.

### d. Intent

The Court concludes that there is sufficient evidence to permit a reasonable jury to find both types of intent required for a DMCA violation under the relevant provisions of the statute—both the requirement of knowing conduct and the intent requirement in connection with inducing, enabling, facilitating, or concealing infringement. To find otherwise, the Court would have to view the evidence in the light most favorable to defendants, which is the opposite of the standard applicable on a motion for summary judgment.

### e. Damages

The DMCA, as relevant here, includes the following provisions for damages in civil actions:

(c) Award of damages.—

(1) In general.--Except as otherwise provided in this title, a person committing a violation of section 1201 or 1202 is liable for either--

(A) the actual damages and any additional profits of the violator, as provided in paragraph (2), or

15

> (B) statutory damages, as provided in paragraph (3).
>
> (2) Actual damages.--The court shall award to the complaining party the actual damages suffered by the party as a result of the violation, and any profits of the violator that are attributable to the violation and are not taken into account in computing the actual damages, if the complaining party elects such damages at any time before final judgment is entered.
>
> (3) Statutory damages.--
>
>> (A) At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for each violation of section 1201 in the sum of not less than $200 or more than $2,500 per act of circumvention, device, product, component, offer, or performance of service, as the court considers just.
>>
>> (B) At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for each violation of section 1202 in the sum of not less than $2,500 or more than $25,000.
>
> …
>
> (5) Innocent violations.--
>
>> (A) In general.--The court in its discretion may reduce or remit the total award of damages in any case in which the violator sustains the burden of proving, and the court finds, that the violator was not aware and had no reason to believe that its acts constituted a violation.
>
> …

17 U.S.C. § 1203.

In short, the statute permits recovery of actual damages "as a result of the violation" and profits of the violator "that are attributable to the violation," or statutory damages "for each violation." The primary question presented by defendants' motion is what constitutes a "violation" for purposes of the statutory damages provision.

The Court agrees with the court in *McClatchey v. Associated Press*, No. 3:05-cv-145, 2007 WL 1630261 (W.D. Pa. June 4, 2007)—in which an unauthorized work was

posted on a website—that "the term 'each violation' is best understood to mean 'each violative act performed by Defendant'"—not the number of ultimate recipients via download. *Id.* at *6. *Accord, Agence France Press v. Morel*, 934 F. Supp. 2d 547, 583 (S.D.N.Y. 2013) (collecting cases); *Stockwire Research Grp. Inc. v. Lebed*, 577 F. Supp. 2d 1262, 1267 (S.D. Fla. 2008). In other words, it is the actions of the defendant that matter, not the number of times that users of the defendant's website or application download or see the violative material during use of the website or app.

Next, the Court agrees with defendants that the posting of a product or image on the Internet for distribution with several items of false CMI constitutes a single violation, not multiple violations for each item of false CMI. *See Grange v. One Call Lender Servs., LLC*, No. 10-3442, 2012 WL 3065271, at *4-5 (E.D. Pa. July 26, 2012). This, however, does not necessarily preclude the possibility of violations of multiple subsections of the DMCA (e.g., providing false CMI and removal of CMI) arising from a single posting—an issue not raised in defendants' motion.

Finally, *if* GC2 is contending that each time the maker of an operating system (such as Apple or Google) updates an application like DoubleDown Casino, a separate violation of the DMCA occurs, the Court does not agree: the statute imposes liability for violations by a defendant, not a third party. But the arguments on this point on both sides are not developed enough to permit the Court to determine whether that is what GC2 is contending or, perhaps more importantly, whether updates are actually created (as defendants suggest) by the maker of the operating system, or rather by the maker of the application, which might be a different matter for purposes of DMCA liability.

### 4. ICFA claim

As relevant here, the ICFA prohibits

> [u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . .

815 ILCS 505/2(a). An award of damages under the ICFA requires a plaintiff to show "actual damage as a result of a violation" of the statute. *Id.* § 10(a). GC2 has identified no evidence of any injury to itself caused by defendants' alleged deception of the end users of their products. For this reason, defendants are entitled to summary judgment on count 13, GC2's ICFA claim.

### Conclusion

Defendants' motion for summary judgment is granted in part and denied in part as described in this memorandum opinion and order. The case remains set for a status hearing on November 13, 2018 at 9:30 a.m. Lead trial counsel for both are directed to appear.

Date: November 12, 2018

_____
MATTHEW F. KENNELLY
United States District Judge