IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GC2 INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case No. 1:16-cv-08794 |
| | ) | |
| INTERNATIONAL GAME | ) | |
| TECHNOLOGY PLC, et. al., | ) | Judge Matthew F. Kennelly |
| | ) | Magistrate Judge Mary W. Rowland |
| Defendants. | ) | |

**PLAINTIFF GC2 INCORPORATED'S ELECTION OF AN AWARD
OF STATUTORY DAMAGES FOR EACH DEFENDANTS'
DMCA VIOLATIONS UNDER 17 USC §1203(C)(3)(b)[1]**

The jury returned a verdict for GC2 Incorporated ("GC2") on all claims, including GC2's claims against each of Defendants International Game Technology ("IGT"), IGTNV, and DoubleDown for 696 violations of four (4) different sections of the Digital Millennium Copyright Act ("DMCA"). (S*ee* Verdict, pp. 11-16.) GC2 elects an award of statutory damages against each Defendant separately under 17 USC §1203(C)(3)(b) for the DMCA violations[2]. The jury's findings evidence Defendants' pervasive intent to violate the DMCA. Defendants' widespread, deliberate, continuous acts in violation of the DMCA support GC2's recovery of the maximum amount of available statutory damages ($25,000.00 per violation) against each Defendant separately for each violation[3]. This Court has discretion in determining the amount of statutory damages to be awarded within the range of $2,500.00 to $25,000.00 per violation.

---

[1] GC2 has also requested relief of injunction, costs, fees, and destruction under 17 USC §1203(b) and the Court has deferred briefing on those issues until after the issue of Statutory Damages has been addressed by the parties.

[2] Section 1203(c)(3)(B), provides: (B) At any time before final judgment is entered, a complaining party may elect to recover an award of statutory damages for each violation of section 1202 in the sum of not less than $2,500 or more than $25,000. The jury's award of damages under the copyright counts is not impacted by this election.

[3] 696 violations x $25,000 per violation x 4 statute sections = $69,600,000.00 judgement separately against each of the three defendants: IGT, IGTNV, and DDI.

59615

Under the framework described below, this Court should exercise that discretion consistent with the Congressional intent in adopting the DMCA, *e.g.* to prevent and deter fraud and to sanction misconduct.

## ARGUMENT

**I.  A MAXIMUM AWARD OF DMCA STATUTORY DAMAGES IS APPROPRIATE TO DETER DEFENDANTS' INTENTIONAL WRONGFUL CONDUCT**

**A.  The Purpose of DMCA Statutory Damages is to Deter Wrongful Conduct[4].**

Congress enacted the DMCA to address the potential for widespread copyright violations on what would become the Internet. (Information Infrastructure Task Force, Intellectual Property and The National Infrastructure: The Report of the Working Group on Intellectual Property Rights 174 (1995) ("White Paper"). Section 1202 was enacted to ensure integrity of the electronic marketplace by preventing fraud. (H.R. Rep. No. 105-551, pt. 1, at 10 (1998). To deter violations of the DMCA, courts recognize that "plaintiffs electing statutory damages may receive a windfall." *McClatchey v. Associated Press*, 305-CV-145, 2007 WL 1630261, at *6 (W.D. Pa. June 4, 2007).

The Defendants' conduct is the determining factor that courts consider when deciding the amount of a statutory damage award. "The defendant's conduct is the most important factor." *Kennedy v. Creditgo, LLC*, No. 15-1790 (JBS-KMW), 2015 WL 7760181, at *4 (D.N.J.

---

[4] Damages under Section 1203(c) of the DMCA are to be awarded in addition to damages awarded for copyright infringement under Section 504 of the Copyright Act when "a defendant is charged with unlawful use of an image, along with alteration of copyright management information." *Sheldon v. Plot Com.*, No. 15CV5885CBACLP, 2016 WL 5107072, at *16 (E.D.N.Y. Aug. 26, 2016), report and rec. adopted, No. 15CV5885CBACLP, 2016 WL 5107058 (E.D.N.Y. Sept. 19, 2016) (quoting *Kennedy v. Medgen. Inc.*, No. 14 CV 5843, 2016 WL 873043, at *2 (E.D.N.Y. Jan. 8, 2016)); see also *Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., Ltd.*, No. 11-CV-726 CBA, 2012 WL 3306600, at *4–5 (E.D.N.Y. June 13, 2012), report and rec. adopted, No. 11-CV-726 CBA RLM, 2012 WL 3306575 (E.D.N.Y. Aug. 13, 2012) ("[T]he Second Circuit has made clear that the DMCA and the Copyright Act address very distinct behaviors . . . ."); *Agence France Presse v. Morel*, No. 10-cv-2730 (AJN), 2014 WL 3963124, at *10 (S.D.N.Y. Aug. 13, 2014) (a plaintiff may recover under the DMCA and the Copyright Act, as those statutes "protect different interests").

2

Dec. 2, 2015) (analyzing request for statutory damages under Copyright Act and DMCA) (*quoting Schiffer Publ'g, Ltd v. Chronicle Books, LLC*, No. 03-4962, 2005 U.S. Dist. LEXIS 416, at *14, 2005 WL 67077 (E.D. Pa. Jan. 11, 2005)); *see also Sony Computer Ent. Am., Inc. v. Filipiak*, 406 F. Supp. 2d 1068, 1074–75 (N.D. Cal. 2005) (noting that cases analyzing statutory damage requests under 17 U.S.C. § 504(c) are often "highly persuasive if not determinative" as to the proper award under Section 1203 of the DMCA) (citing Howard B. Abrams, 2 *The Law of Copyright* § 17:62 (West 2005)). As the Supreme Court has explained in the copyright context, deterrence is an important and proper consideration in a statutory damages award in order to achieve the statute's goals:

> [A] rule of liability which merely takes away the profits from an infringement would offer little discouragement to infringers. It would fall short of an effective sanction for enforcement of the copyright policy. The statutory rule, formulated after long experience, not merely compels restitution of profit and reparation for injury but also is designed to discourage wrongful conduct. The discretion of the court is wide enough to permit a resort to statutory damages for such purposes. Even for uninjurious and unprofitable invasions of copyright the court may, if it deems it just, impose a liability within statutory limits to sanction and vindicate the statutory policy.

*F. W. Woolworth Co. v. Contemporary Arts*, 344 U.S. 228, 233 (1952); *see also Intl. Korwin Corp. v. Kowalczyk*, 855 F.2d 375, 383 (7th Cir. 1988) ("[C]ourts have repeatedly emphasized that defendants must not be able to sneer in the face of copyright owners and copyright laws. Rather, defendants must be put on notice that it costs less to obey the copyright laws than to violate them."); *Kennedy v. Creditgo, LLC*, 15-1790 (JBS-KMW), 2015 WL 7760181, at *4 (D.N.J. Dec. 2, 2015) (citing *Broad. Music,* 555 F. Supp. 2d at 544 (quoting another decision)). ("[I]t is important that an infringer 'not reap a benefit from its violation of the copyright laws [and] that statutory damages should exceed the unpaid license fees ….'").

3

59615

In this case, even the other factors that courts consider are present here and compel an award of maximum damages. Courts "consider [several] factors, namely, the difficulty of proving actual damages, the circumstances of the violation, whether Defendants violated the DMCA intentionally or innocently, and deterrence." *Sheldon*, 2016 WL 5107072, at *16 (quoting *Agence France Presse v. Morel*, No. 10 CV 2730, 2014 WL 3963124, at *10 (S.D.N.Y. Aug. 13, 2014)). While it is easy to understand the harm to GC2, it is difficult to prove actual damages for omissions of attribution to GC2 and omission of GC2's mark. As described below, examining Defendants' conduct and these other *Morel* factors, the evidence demonstrated that the conduct was intentional, deliberate, and continued for years after notice. Therefore, the Court should assess the maximum award of damages as deterrence to continued and future wrongful conduct.

### B. Defendants' Conduct Compels A Maximum Award of DMCA Statutory Damages.

Defendants have purposely disregarded their DMCA obligations for years and continue to do so today – even after the jury verdict. From as early as March 2013 up through and even continuing after trial, Defendants actively engaged in a deliberate effort to use and distribute unlicensed GC2 artwork and graphics on their online and mobile DDC platforms, without any attribution to GC2. Defendants made the calculated and strategic decision to bring GC2's well-known and popular land-based games, Pharaoh's Fortune and Coyote Moon, to their DDC platforms, where GC2's artwork and graphics were distributed with false, removed, and altered copyright management information ("CMI") on a daily basis. Defendants know their obligations under the DMCA. (Admissions Read: Tr. p. 1033-1034) Defendants are sophisticated copyright owners with a practice of warning others that there are severe criminal and civil penalties should

Defendants' works be infringed. (Sigrist; Tr. p. 699). Yet, they knowingly looked the other way when they received a request from GC2 to take down its works. Defendants have continued to blatantly ignore their obligations even after this lawsuit was filed. They must not be heard now to suggest that they are any less accountable for their violations of GC2's rights. Feigning ignorance of the import of their actions during the trial was proven incredible and unreliable. (Compare Sigrist Tr. p. 797-799 to Sigrist Tr. p. 805-809; Prescott Tr. p. 869 (Video Tr. p. 129-130); Dimino Tr. p.1035 (Video Tr. p. 42-46)).

Defendants knew full well how to properly attribute copyright information to third-party content providers and, with the flip of a switch, could have properly attributed the artwork and graphics at issue to GC2 or, alternatively, simply taken down the games. (Sigrist Tr. p. 730, 767-768). Defendants knew exactly what they were doing by keeping the works available online and they knew the consequence would be a significant statutory damages award. (Tr. p. 1033-1034). Defendants consciously chose to violate the DMCA over and over again. Their intent was clear, they were making $500,000.00 per month by infringing. (Tr. p. 820 (Kastner video p. 364 ln 25 - p. 365 ln 17). Properly attributing the artwork and graphics to GC2 consistent with IGTNV's admission that GC2 owned the copyright in its artwork and graphics would also have sounded the death knell to Defendants' litigation-manufactured defenses to GC2's copyright infringement claims.[5]

### C. Multiple Defendants Each Separately Violated the DMCA

The jury correctly found that each of the three Defendants separately violated the DMCA. (*See* Verdict, pp. 11-16.). Separate statutory damages awards at the maximum level against each

---

[5] Defendants made the conscious choice to keep the games available online, all the while knowing that they did not contend that they owned the copyrights at issue and that GC2, in fact, owned the artwork and graphics. (Tr. p. 811; (Kastner 1/6/18 depo., 47:23-48:9.)).

5

59615

Defendant is proper because each has been found to have acted knowingly and intentionally and each continues to violate the DMCA even after the jury verdict. Each has an independent ability to stop the violation, each separately benefitted from the violation directly and indirectly, and each elected to keep the games available online with false copyright management information ("CMI") after receiving GC2's request to take the works down. Only separate statutory damages awards against each Defendant will fulfill the intent of the statute to sanction this type of misconduct. Defendants' conscious choice to violate the DMCA is further evident by the fact that the games with GC2 artwork and false attribution remain on DoubleDown Casino days after the jury verdict.

The DoubleDown Casino platform ("DDC") through which the DMCA violations take place, was bought by IGT in 2012. (Sigrist Tr. p. 674). IGT directed the strategy for its two wholly owned subsidiaries to place "IGT Content" on the DDC. (Kastner Video Testimony; Tr. p.40, 43, 86, 125, 130, 136, 165-166, 252-255, 258-262)[6] The DDC is comprised of ***Defendants' owned and controlled*** computer code and artwork and graphics (contributed by IGT Defendants and DDI, some individually by Defendant IGT, and some collectively[7]) which are uploaded by Defendants onto an Amazon Web Services (AWS) cloud distribution network through an AWS account that Defendants control and operate.[8] (Sigrist Tr. p. 718-729; Laykin Tr. p. 1103-1111).

---

[6] This occurred while IGT owned 100% of DDI and IGTNV and provided strategic direction to those entities to get content onto this channel. Patti Hart, holding dual executive roles with IGT and IGTNV, admitted to the success for IGT's addition of the content to DDC, mentioning graphics as part of the "secret sauce."

[7] Sigrist TR. p. 681-682 (porting of games was a collective activity with DDI and IGTNV - two wholly owned subsidiaries of IGT); Sigrist Tr. p. 730-749 (DDI controls AWS environment and what goes into it; DDI controls the server where the media sits; package with graphics created by DDI and uploaded; Licensor Server (RGS Server) which is IGT's is different than media server and is hosted on AWS); Laykin Tr. p. 1149-1150 (Defendants' code causes activity when player hits spin).

[8] Sigrist's testimony and the documents related to the sale and subsequent licensing of the games to DoubleU confirm Defendant IGT's continued control over the "Licensor Server" sitting on the AWS after the sale. The sale documents similarly confirm that IGT's control over the infrastructure of the DDC was the subject of the "sale" to DoubleU. (Sigrist Tr. p. 738-742). Tr. p. 863 Kastner (IGT) Video testimony p. 268-270.

59615

Three sizes of graphic files were identified: Desktop (SWF files), Mobile Phone (Sprite Sheets Size 1) and Mobile Tablet (Sprite Sheets Size 2). (Sigrist Tr. p. 689-690; 700-701; Laykin Tr. p. 119-1122)[9]. At trial DDI's verified interrogatory answer (PTX Ex 94) and testimony by Joe Sigrist and forensic expert Erik Laykin identified two places on the Defendants' AWS cloud space (Media Server and GamePlay Server (RGS Code)) where Defendants' collective code and graphics were uploaded.

According to Sigrist trial testimony, IGT provides the IP Notice and attribution line (Sigrist Tr. p. 699)[10]. The computer code imbeds that language and provides the actual language for the copyright notice attribution line. The Defendants' code further provides instructions to take images from the Sprite Sheets and place "IGT" logos and attribution (not GC2's) onto the games Coyote Moon and Pharaoh's Fortune[11]. (Laykin Tr. p. 1115-1119; Sigrist Tr. p. 696-699). DDI provides CMI by uploading code with the false attribution in association with the artwork and graphics imbedded in it to its AWS server and the attribution gets placed on the display that is seen by the end user as a result of what is placed on the AWS server. (Sigrist Tr. p. 719; 746). Clelland testified that this is provided in five languages. (Video Testimony; Tr. p. 272-273). At trial, all three Defendants admitted to knowing their obligations under the DMCA and that there were no technological limitations to providing the correct CMI for the two GC2 games. (Admission; Tr. p. 1033-1034). Joe Sigrist testified about how the technology worked to place

---

[9] Hundreds of GC2 images appear in these files. Warzecha Tr. p. 326-357. This weighs in favor of maximum statutory damages.

[10] IGT and IGTNV shared the same legal department (Request for Admission read; Tr. p. 1032-1033); IGTNV became the successor in interest to DDI business. Dimino Tr. p.1035 (Video Tr. p. 182-187); Legal approves use of IGT Mark. Dimino Tr. p. 1035 (Video Tr. p. 130); Indeed, even after IGT "sold" DoubleDown to Double U, per the terms of the parties' agreement, IGT continued to maintain complete operational control over the server and game content (Tr. 738:9-24; 739:3-25), thus ensuring the continued distribution of GC2's unlicensed content on DoubleDown Casino.

[11] The evidence also showed that DDI owns the code for the applications ("App") that are placed onto the various App stores. The Apps are needed to communicate with the Defendants' code on the AWS account. (Tr. p. 1112-1114).

7

59615

correct CMI for other IP owners (i.e. High 5 Games). (Sigrist Tr. p. 697-699; 713-714). Erik Laykin testified that Defendants had an easy ability to call back and override mistaken CMI for games that were previously released, and Sigrist confirmed how easily changes get made. (Sigrist Tr. p. 730; Laykin Tr. p. 1111). Joe Sigrist testified that DDI uploads new games to the AWS account at a cadence of two games per week. (Sigrist Tr. p. 749). Erik Laykin established that standard protocol would be to update files of all games when these new uploads occurred. (Laykin Tr. p. 11140-1152). Knowing that the false attribution was being provided and distributed, IGT "sold" its shares in DDI, but continued to maintain control over servers and games through a license for the GC2 mismarked works to the new owner with the false CMI and code causing alteration, knowing the violations would multiply. (Sigrist Tr. p. 738-742).

Defendants' conduct is the antithesis of innocence[12]. It was flagrant, contumacious, and continuous, and indeed, even today, after the jury rendered a verdict against Defendants on all counts, Defendants still thumb their collective noses at GC2 and the law, and now the jury, as GC2's content still remains up on their DDC platform. Such conduct – in blatant disregard of the law and GC2's rights – will not easily be deterred, and is deserving of the maximum sanction under the DMCA. The scope of Defendants' DMCA violations further justifies the maximum allowable amount, as those violations involved hundreds of GC2 images in three sizes (desktop, mobile and tablet) and five different languages[13].

### D. Each Defendant Violated Separate Sections of the DMCA

---

[12] Section 1203(c) (5) concerning "innocent violations" does not apply here. Defendants' acts were deliberate. Also, as the jury was instructed on, and found, Defendants' exhibited knowledge and intent.

[13] The issue of mass distribution under 17 USC 1202 (a)(2) and its impact on statutory damages is an issue for which GC2 provided an offer of proof. In accordance with the Court's prior rulings, it will not be addressed herein, but is preserved for appeal.

The DMCA provides that when defendants violate separate sections, they should be held accountable for such independent consequences. Applying general principles of statutory construction, the *Sheldon* court recognized that sections 1202(a) and (b) of the DMCA are independent and "aimed at different types of conduct" and therefore found that the defendant's conduct in removing plaintiff's metadata and adding its own logo constituted separate violations of section 1202. *Sheldon*, 2016 WL 5107072, at *15-*16 ("These two actions are not dependent upon each other, and therefore, having reviewed the structure of the DMCA, this Court finds that separating the act of removal from the act of addition of copyright information into two different subsections under Section 1202 of the DMCA warrants consideration of each act of removal and each act of addition of copyright information as a separate violation."). Similarly, as the jury found that each Defendant violated separate sections of the DMCA, the Court should honor the verdict, and apply separate awards for each section to each Defendant.

## II. AN AWARD OF THE MAXIMUM DMCA STATUTORY DAMAGES IS JUST.

Other courts analyzing the *Morel* factors set forth *supra* in the context of similar egregious conduct by defendants have found that such conduct justifies an award of the maximum amount of statutory damages available under the DMCA. For instance, in *Sheldon* 2016 WL 5107058, a case in which plaintiff sought statutory damages under Sections 1202(a) and (b) of the DMCA in addition to actual damages under the Copyright Act, the court analyzed the *Morel* factors. In so doing, the court found that the defendant's intentional removal of plaintiff's metadata from a photograph and addition of its own watermark, and subsequent reproduction and distribution of that photograph despite receiving notice from plaintiff that plaintiff was the copyright owner, justified an award of the maximum statutory damages of $25,000 for each of 20 DMCA violations. *Id.* at *17 ("provision[s] [in place] to increase the

penalty for willful infringements continued after requests to desist by the copyright owner.") (citing cases).

It is well recognized that this Court should follow the DMCA and award statutory damages against Defendants for each violation found by the jury for each section of the DMCA. *See, e.g., Point 4 Data,* 2012 WL 3306600, at *14 ("[T]his Court is constrained to follow the statutory language, whatever the apparent inequities. Any criticism of the range mandated by the language of the DMCA's statutory damages provision should be addressed to Congress, not to the Court."); *Blizzard Ent., Inc. v. Reeves*, No. CV 09-7621 SVW AJWX, 2010 WL 4054095, at *3 (C.D. Cal. Aug. 10, 2010) (concluding that, although $85 million in statutory damages based on 427,393 "acts of circumvention" may seem "unreasonably large, Congress has mandated this approach and the Court is unable to deviate from it"). As other courts have recognized, "Congress has determined that in order to deter violations of the DMCA, plaintiffs electing statutory damages may receive a windfall." *McClatchey*, 2007 WL 1630261, at *6.

Here, Defendants' egregious conduct supports this Court's award of $25,000 per violation. The only way to deter these Defendants is to impose the maximum amount.

## CONCLUSION

For all of the foregoing reasons, GC2 respectfully requests that this Court award GC2 the maximum amount of statutory damages – $25,000 against each Defendant for each violation of each DMCA subsection found by the jury.

Dated: February 8, 2019                     Respectfully submitted,

                                            By: /s/ *Kara E.F. Cenar*
                                                Kara E. F. Cenar (ARDC 6198864)
                                                (kcenar@greensfelder.com)
                                                Susan Meyer (ARDC 6226450)
                                                (smeyer@greensfelder.com)

59615

Greensfelder, Hemker & Gale, P.C.
200 W. Madison St., Ste. 3300
Chicago, IL 60606
312-419-9090 (T); 312-419-1930 (F)

Kevin Hormuth
(kfh@greensfelder.com)
Kirsten M. Ahmad
(km@greensfelder.com)
Greensfelder, Hemker & Gale, P.C.
10 South Broadway, Ste. 2000
St. Louis, Missouri 63102
314-241-9090 (T); 314-241-8624 (F)

*Attorneys for Plaintiff GC2 Incorporated*

59615

## CERTIFICATE OF SERVICE

  I hereby certify that on February 8, 2019, a true and correct copy of the foregoing was served upon the following via the Court's ECF system:

Eric Macey
emacey@novackmacey.com
Joshua E. Liebman
JLiebman@novackmacey.com
Rebekah Parker
rparker@novackmacey.com
Novack and Macey
100 N. Riverside Plaza, Suite 1500
Chicago, IL 60606

*Attorneys for International Game Technology PLC,*
*International Game Technology, IGT (NV),*
*DoubleDown Interactive LLC, Masque Publishing, Inc.,*
*and WD Encore Software, LLC*

1779989

                  /s/ *Kara E.F. Cenar*

59615