**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GC2 INCORPORATED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:16-cv-8794 |
| | ) | |
| INTERNATIONAL GAME TECHNOLOGY PLC, | ) | Judge Matthew F. Kennelly |
| INTERNATIONAL GAME TECHNOLOGY, IGT | ) | |
| DOUBLEDOWN INTERACTIVE LLC, MASQUE | ) | |
| PUBLISHING, WD ENCORE SOFTWARE, DOE | ) | |
| DEFENDANTS 1-100, DOE DEFENDANTS 101- | ) | |
| 2,000,000, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' RULE 50(b) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW ON COUNT XII (DIGITAL MILLENNIUM COPYRIGHT ACT)

Eric N. Macey (#3122684)
*emacey@novackmacey.com*
Joshua E. Liebman (#6283377)
*jliebman@novackmacey.com*
Christopher S. Moore (#6256418)
*cmoore@novackmacey.com*
Rebekah H. Parker (#6301907)
*rparker@novackmacey.com*
Brittney N. Cato (#6323715)
*bcato@novackmacey.com*
NOVACK AND MACEY LLP
100 North Riverside Plaza
Chicago, IL 60606
(312) 419-6900

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

RELEVANT BACKGROUND ........................................................................................ 2

I.    GC2's New Upload Theory At Trial ............................................................... 2

II.    Defendants' Rule 50 Motion At Trial ........................................................... 3

ARGUMENT ................................................................................................................... 3

I.    Legal Standard .............................................................................................. 3

II.    No Rationale Jury Could Find That Any Of The Defendants
Possessed The Requisite *Mens Rea* To Sustain Count XII (DMCA) ............... 3

    A.    GC2 Presented No Evidence Of Intent
With Respect To Its New Violations Theory ....................................... 4

    B.    No Reasonable Jury Could Find "Intent"
Based On The Evidence Presented At Trial ......................................... 6

        1.    IGT NV's Conduct During Negotiations With Frank Warzecha ............... 6

        2.    Not Taking Games Down ......................................................... 8

        3.    Other Examples of Attribution .................................................. 8

        4.    No Evidence Concerning International Game Technology ....................... 9

III.    At The Very Least, There Was No Evidence That IGT NV
Or International Game Technology Committed Any DMCA Violations .......................... 9

IV.    No Rational Jury Could Find For Plaintiff On Its DMCA Removal Claim ..................... 10

    A.    The Glass Artwork At Issue Is Not GC2's Copyrighted Work ............................ 10

        1.    The Law Requires That The CMI Be Removed
From GC2's Original Copyrighted Artwork ........................................... 10

        2.    Coyote Moon ...................................................................... 12

        3.    Pharaoh's Fortune ................................................................ 13

    B.    GC2 Did Not Affix CMI To The Artwork At Issue ............................................. 14

CONCLUSION ................................................................................................................ 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Aaberg v. Frencesca's Collections, Inc.*,
    No. 17-cv-115, 2018 WL 1583037 (S.D.N.Y. March 27, 2018) ................................. 3

*Agence France Presse v. Morel*,
    No. 10-cv-2730, 2014 WL 3963124 (S.D.N.Y. Aug. 13, 2014) ............................. 14

*Drauglis v. Kappa Map Group, LLC*,
    128 F. Supp. 3d 46 (D.D.C. 2015) ........................................................................... 15

*Faulkner Press, L.L.C. v. Class Notes, L.L.C.*,
    756 F. Supp. 2d 1352 (N.D. Fla. 2010) ............................................................... 7, 11

*Fischer v. Forrest*,
    286 F. Supp. 3d 590 (S.D. N.Y. 2018) ................................................................... 11

*Frost-Tsuji Arch. v. Highway Inn, Inc.*,
    No. 13-00496, 2014 WL 5798282 (D. Haw. Nov. 7, 2014) ................................... 10

*Gattoni v. Tibi, LLC*,
    254 F. Supp. 3d 659 (S.D.N.Y. 2017) ................................................................... 14

*Hall v. Forest River, Inc.*,
    536 F.3d 615 (7th Cir. 2008) ................................................................................... 3

*Krechmer v. Tantaros*,
    No. 17 C 4061, 2018 WL 4044048 (2d Cir. Aug. 24, 2018) ................................... 3

*Merideth v. Chi. Tribune Co.*,
    No. 12 C 7961, 2014 WL 87518 (N.D. Ill. Jan. 9, 2014) ....................................... 15

*Monotype Imaging, Inc. v. Bitstream Inc.*,
    376 F. Supp. 2d 877 (N.D. Ill. 2005) ..................................................................... 10

*Pers. Keepsakes, Inc. v. Personalizationmall.com, Inc.*,
    975 F. Supp. 2d 920 (N.D. Ill. 2013) ..................................................................... 10

*Reno-Tahoe Specialty, Inc., v. Mungchi, Inc.*,
    No. 2:12-CV-01051-GMN-VC, 2014 WL 7336082 (D. Nev. Dec. 19, 2014) ......... 14

*Robert L. Stark Enters., Inc. v. Neptune Design Grp., LLC*,
    No. 1:16 CV 264, 2017 WL 1345195 (N.D. Ohio Apr. 12, 2017) ......................... 11

*Schiffer Publ'g, Ltd. v. Chronicle Books, LLC*,
    No. 03-4962, 2004 WL 2583817 (E.D. Pa. Nov. 12, 2004) ..................................... 8

<u>Page(s)</u>

*Shell v. Lautenschlager*,
    No. 1:15cv1757, 2017 WL 4919206 (N.D. Ohio Oct. 31, 2017) ............................................. 15

*Stevens v. Corelogic, Inc.*,
    899 F.3d 666 (9th Cir. 2018) ................................................................................................. 4, 9

*Tomelleri v. Zazzle, Inc.*,
    No. 13-CV-02576, 2015 WL 8375083, at (D. Kan. Dec. 9, 2015)........................................... 15

**Statutes**

17 U.S.C. § 1202, *et. seq.* ........................................................................................................ passim

**Rules**

Fed. R. Civ. P. 50, *et. seq.* .......................................................................................................... 1, 3

Defendants International Game Technology ("International Game Technology"), IGT ("IGT NV"), and DoubleDown Interactive LLC ("DoubleDown ") (collectively, "Defendants") by and through their attorneys, pursuant to Federal Rule of Civil Procedure 50(b), respectfully submit this Renewed Motion for Judgment as a Matter of Law on Plaintiff GC2 Incorporated's ("GC2") Claim under the Digital Millennium Copyright Act (the "DMCA").

## **INTRODUCTION**

Count XII of the Amended Complaint alleges that Defendants violated the DMCA by (1) providing or distributing false copyright management information ("CMI"); and (2) removing CMI from GC2's copyrighted works and/or distributing the works with the CMI removed. The evidence at trial unequivocally showed that both claims are based on the same images – the "splash screen" or "loading screen" to Pharaoh's Fortune (PX 18, 21, 22)[1] and Coyote Moon (PX 9, 13, 14).[2] GC2 claims that the splash screens are copied from the glass artwork for the land-based versions of the games, which contain GC2 artwork; that one of the Defendants removed the GC2 logo that appeared on the land-based glass artwork when converting it to online; and that Defendants included false CMI in the splash screen attribution lines.[3] GC2 argued to the jury that Defendants violated the DMCA by uploading the "sprite sheets" containing these images to the "media server" every time that DoubleDown added a new game to the DoubleDown Casino. (Tr. Vol. 8 at 1540:18-23; 1555:18-20.)

---

[1] Copies of PX 18, 21, 22 are attached as Group Exhibit A.

[2] Copies of PX 9, 13, 14 are attached as Group Exhibit B.

[3] *See*, *e.g.*, Trial Transcript of Proceedings Before the Hon. Matthew F. Kennelly, and A Jury, Vol. 1 at 133:10-16. Cited excerpts from the trial transcript are attached as Group Exhibit C, and cited herein as "Tr. Vol. __".

Based on the evidence adduced at trial – or the lack of evidence – no reasonable jury could find that any Defendant violated the DMCA, or particular sections of the DMCA, for at least three independent reasons. *First*, there is not a sufficient evidentiary basis to find that any Defendant possessed the requisite *mens rea* at the time of the alleged violations. *Second*, there is no evidence that IGT NV or International Game Technology were involved in the alleged violations. *Third*, GC2 fails to state a claim for removal because it was IGT NV that designed the glass artwork, created original artwork for it, and affixed GC2's logo to it in the first place.

## RELEVANT BACKGROUND

### I.  GC2's New Upload Theory At Trial

Before trial, GC2 presented at least three different theories of what constituted a DMCA violation. (*See*, *e.g.*, Dkt. No. 360 at 1-5.) The Court "effectively barred the end user theory via its rulings made on November 12, 2018 and December 10, 2018." (Dkt. No. 367.) Then, less than one week before trial began, the Court granted Defendants' Motion to Bar GC2's New DMCA Damages Disclosure based on the number of Amazon servers, leaving GC2 with only one potentially viable theory for trial – the number of times Defendants *updated* the DoubleDown Casino application or "app." (*Id.*) Defendants' expert, Erik Laykin, had opined that DoubleDown updated the app at least 22 times (Dkt. No. 360 at 4 & Ex. G), and testified at trial that there were now 53 updates. (Tr. Vol. 7 at 1139:2-4.)

Yet, in closing, GC2's counsel introduced a brand new damages theory that had never previously been disclosed: she argued that every time DoubleDown *uploaded* a *new* and *different* game to the Amazon Web Server ("AWS"), it updated all prior games as well. (Tr. Vol. 8 at 1540:13-23; 1543:8-24.) She also argued a different number of DMCA violations – 414 for Coyote Moon and 282 for Pharaoh's Fortune – based on testimony of Joseph Sigrist that DoubleDown aimed to release two new games per month. (Tr. Vol. 4 at 749:25-750:5.)

## II.    **Defendants' Rule 50 Motion At Trial**

At the close of GC2's case-in-chief, Defendants orally moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a).    (Tr.  Vol. 7 at 1154:15-1162:1.) Defendants then renewed their motion in writing before the case was submitted to the jury.  (Dkt No. 403.)

## **ARGUMENT**

## I.    **Legal Standard**

Judgment as a matter of law is appropriate when "a party has been fully heard on an issue . . . [and] a reasonable jury would not have a legally sufficient evidentiary basis to find for that party on that issue." Fed. R. Civ. P. 50(a)(1).  "In other words, the question is simply whether the evidence as a whole, when combined with all reasonable inferences permissibly drawn from that evidence, is sufficient to allow a reasonable jury to find in favor of the plaintiff.  '[A] mere scintilla' of evidence, however, will not suffice."  *Hall v. Forest River, Inc.*, 536 F.3d 615, 619 (7th Cir. 2008) (citations omitted).

## II.    **No Rationale Jury Could Find That Any Of The Defendants Possessed The Requisite *Mens Rea* To Sustain Count XII (DMCA)**

There is no evidence that any Defendant possessed the requisite *mens rea* for liability under Sections 1202(a) or (b).  Each subsection has a "double scienter requirement[.]"  *Krechmer v. Tantaros*, 17 C 4061, 2018 WL 4044048, at *2 (2d Cir. Aug. 24, 2018).  Section 1202(a) requires that GC2 prove that Defendants "*knew* that the CMI was false, *and* provided or distributed the false CMI with the *intent* to induce, enable, facilitate, or conceal infringement."  *Aaberg v. Frencesca's Collections, Inc.*, No. 17-cv-115, 2018 WL 1583037, at *6 (S.D.N.Y. March 27, 2018) (emphasis added).    Similarly, Section 1202(b) requires that Defendants *intentionally*

removed the alleged CMI or distributed it *knowing* it had been removed and had *knowledge,* or reason to know, that it would induce, enable, facilitate or conceal an infringement.

While Defendants dispute both of the double-intent prongs, this Motion concerns only the second – which requires intent to "induce, enable, facilitate, or conceal an infringement" (with respect to 1202(a)), or knowing, or having reasonable grounds to know, that removal "will induce, enable, facilitate or conceal infringement" (with respect to 1202(b)). In *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 675 (9th Cir. 2018), the Ninth Circuit closely examined the second intent prong:

> [T]he ('induce, enable, facilitate or conceal') requirement is intended to limit liability in some fashion – specifically, to instances in which the defendant knows or has a reasonable basis to know that the removal or alteration of CMI or the distribution of works with CMI removed *will* aid infringement.

*Id.* (emphasis in original). GC2 "must make an *affirmative showing* . . . that the defendant was aware or had reasonable grounds to be aware of the probable future impact of its actions." *Id.* at 674 (emphasis added). It failed to do so at trial.

## A. GC2 Presented No Evidence Of Intent With Respect To Its New Violations Theory

At trial, GC2 argued that Defendants violated the DMCA each time DoubleDown launched a new game on the DoubleDown Casino since May 2013 with respect to Coyote Moon, and since March 2015 with respect to Pharaoh's Fortune. (Tr. Vol. 8 at 1543:2-24.) GC2 argued the same exact theory in support of each subsection of the DMCA. (*Id.* at 1555:21-1558:11.)

Yet, GC2 introduced no evidence whatsoever to even suggest that when DoubleDown launched a *different* and *unrelated* game on the DoubleDown Casino, it did so with the intent to "induce, enable, facilitate, or conceal infringement" with respect to Pharaoh's Fortune and Coyote Moon. In fact, the only DoubleDown witness to testify about the process of launching new games – DoubleDown's Senior Vice President and General Manager, Joe Sigrist – stated that he:

- did not really know what sprite sheets were (Tr. Vol. 4 at 669:5-10; 701:7-15; 744:25-745:1);

- did not know what the relationship was between sprite sheets and mobile (*id.* at 722:19-21);

- did not know if 2-D artwork and graphics got transferred from the DoubleDown Casino to a phone as a "tournament sprite sheet" (*id.* at 724:4-9);

- could not recognize "tournament sprite sheet[s]" when shown them on three occasions (*id.* at 724:18-20; 726:4-15); and

- did not know whether a new package "that includes the sprite sheets" would be uploaded every time DoubleDown added a new game or feature to the DoubleDown Casino. (*Id.* at 744:10-745:1.)

How could DoubleDown have intended to facilitate or conceal infringement with respect to Coyote Moon and Pharaoh's Fortune when it launched a *new* game or updated a *different* game if DoubleDown's senior management did not even know if the allegedly infringing sprite sheets were being re-uploaded? There is simply no evidence in the record to support such an inference.

Nor is there any evidence that Defendants made any changes or updates to the games at issue – Pharaoh's Fortune and Coyote Moon. GC2's expert, Erik Laykin, admitted at trial that he "only had access to the version of the [DoubleDown Casino] application that was available at the time of download." (Tr. Vol. 7 at 1151:11-12.) He had no firsthand knowledge concerning how DoubleDown updated its app, and he did not know "what components" of DoubleDown's app were updated. (*Id.* at 1138:1-11; 1138:24-1139:1.) Laykin also had no idea if any of the updates were made specifically to the games at-issue, Coyote Moon or Pharaoh's Fortune, as opposed to another, unrelated game. (*Id.* at 1139:17-1140:13.) Importantly, he conceded that an update to an unrelated game would not cause any graphical changes in Coyote Moon or Pharaoh's Fortune, both of which would appear exactly the same to a player. (*Id.* at 1141:13-16; 1142:15-22.)

Thus, GC2 has no evidence that the launch of any *new* game or the alleged updates of *different* games were directed at or altered Coyote Moon or Pharaoh's Fortune. And, there is no evidence that any Defendant intended to facilitate or conceal infringement with respect to Coyote Moon and Pharaoh's Fortune when DoubleDown launched *new* games or made updates to *different* games. Accordingly, no reasonable jury could find that any Defendant possessed the requisite *mens rea*.

**B.     No Reasonable Jury Could Find "Intent"
        Based On The Evidence Presented At Trial**

During closing, GC2 attempted to argue intent by pointing to unrelated conduct in a transparent effort to make Defendants look bad. As explained below, none of this "evidence" could lead a reasonable jury to find that any Defendant intended to "induce, enable, facilitate, or conceal infringement[.]"

**1.     IGT NV's Conduct During Negotiations With Frank Warzecha**

GC2 accuses IGT NV of misleading it during business negotiations between Todd Nash, on behalf of IGT NV, and Frank Warzecha, on behalf of GC2. Specifically, GC2 accused IGT NV of creating the "appearance" of "certified" accounting statements (Tr. Vol. 8 at 1524:16-1525:19); taking too long to provide Warzecha with revenue information (*id.* at 1523:5-1524:15); telling Warzecha that the going royalty rate was 1-2 percent while GC2 contends it was 10 percent (*id.* at 1525:11-14); and providing "appropriate" rather than "complete" information. (*Id.* at 1525:5-10).

Even assuming the jury believed GC2's version of events (which Defendants dispute), it is completely irrelevant for at least two reasons. *First*, the context shows that these were business negotiations in which each party – GC2 included – was trying to secure the best possible deal for itself. (*E.g.*, Tr. Vol. 2 at 423:5-436:12.) For instance, during these negotiations, Warzecha made

at least two offers to sell the rights at issue *before* he received any revenue information from IGT NV (*id.* at 425:14-428:6; 429:4-432:2); and he failed to disclose to Nash or anyone else at IGT NV or DoubleDown that he had played both Coyote Moon and Pharaoh's Fortune on the DoubleDown Casino. (*Id.* at 421:8-20; 424:15-21.) Warzecha also readily admitted that he was "bluffing" when he claimed that his "colleagues" assured him that his requests for information from IGT NV were reasonable (*id.* at 435:3-18) and would "bluff and negotiate in any manner that [he] see[s] fit and put any amounts that [he] deem[s] worthy in there . . . ." (*Id.* at 435:11-14.)

Importantly, it was IGT NV that voluntarily initiated contact with GC2 for the purpose of buying the rights at issue. (PX 418; Tr. Vol. 6 at 906:15-907:11; 962:16-965:5).[4] These negotiations would never have happened if IGT NV not taken this affirmative step. That IGT NV actually brought the rights issue to the attention of GC2 runs directly contrary to any argument that IGT NV intended to induce, enable, conceal or facilitate infringement. *See, e.g., Faulkner Press, L.L.C. v. Class Notes, L.L.C.*, 756 F. Supp. 2d 1352, 1360 (N.D. Fla. 2010) (granting summary judgment for defendant on DMCA claim where it sold its product "openly," and plaintiff presented no evidence that defendant acted "with intent to aid infringement").

*Second*, these negotiations took place from April to June 2016. (DX 96, 101.)[5] They are not relevant to Defendants' intent *at the time* of the alleged violations, *i.e.*, when DoubleDown released Coyote Moon in 2013 (Tr. Vol 8 at 1543:8-10); released Pharaoh's Fortune in 2015 (*id.* at 1543:19-21); or subsequently launched new games.[6]

---

[4] A copy of PX 418 is attached as Exhibit D.

[5] Copies of DX 96, 101 are attached as Group Exhibit E.

[6] GC2 introduced only one exhibit, PX 0388 at 4, from 2015, but even that email – which concerns games not at issue in this litigation – is dated June 2015 – three months *after* the second and last game at issue was launched. (A copy of PX 0388 is attached as Exhibit F.)

To the contrary, the evidence adduced at trial showed that, beginning in January 2016, employees of IGT NV expressed confusion as to whether IGT NV had the rights to use GC2 artwork and graphics in the online space. (*E.g.*, PX 378, 380, 382, & 384).[7] Accordingly, Defendants could not have intended to induce, enable, facilitate, or conceal infringement, nor been aware that the probable impact of its conduct would lead to infringement. *See, e.g., Schiffer Publ'g, Ltd. v. Chronicle Books, LLC*, No. 03-4962, 2004 WL 2583817, at *13-14 (E.D. Pa. Nov. 12, 2004) ("because Defendants did not believe Plaintiffs had a copyright in their individual photographs, they could not have committed knowing misconduct as required by the DMCA").

### 2. Not Taking Games Down

GC2 also pointed to IGT NV and DoubleDown's failure to take down the games after the parties' negotiations ceased as evidence of intent (Tr. Vol. 8 at 1542:23-1543:1), but this is a classic red-herring. The question of whether or not IGT NV and DoubleDown had to take down the games was at issue in this trial. Defendants had various defenses that had to be resolved before they took down any games. Indeed, had Defendants "taken down" all the games then at-issue, they would have taken down Kitty Glitter and Maid of Money – the artwork of which, rightfully belonged to IGT NV, not GC2. (Tr. Vol. 4 at 710:9-17.) In any event, Defendants decision to await the outcome of the trial before taking down the games says nothing about their intent at the time DoubleDown uploaded new games.

### 3. Other Examples of Attribution

GC2 also argued that, because Defendants knew how to properly attribute CMI, as they did for a High 5 game for instance, their failure to properly attribute CMI in this case was intentional. (Tr. Vol. 8 at 1542:10-17.) However, DoubleDown's attribution lines for other games

---

[7]     Copies of PX 378, 380, 382, 384 are attached as Group Exhibit G.

say nothing about whether any of the Defendants uploaded or updated Pharaoh's Fortune or Coyote Moon with the requisite intent. It is just as consistent with a mistaken attribution.

### 4. No Evidence Concerning International Game Technology

GC2 presented zero evidence that International Game Technology possessed the requisite *mens rea.* The only evidence presented as to International Game Technology is that it shared legal and accounting departments with IGT NV. (Tr. Vol. 8 at 1557:9-11.) But the DMCA requires two levels of *mens rea* – both intentional or knowing conduct with respect to the CMI and a separate intent or knowledge that the conduct will "induce, enable, facilitate or conceal" an infringement. The second intent prong requires something additional to and different from the first. *See*, *e.g.*, *Corelogic*, 899 F.3d at 673-74 n.4 (court must interpret DMCA to "give effect, if possible, to every clause and word of a statute" and to "avoid superfluity") (citations omitted).

At best, evidence of shared departments could potentially be relevant to establishing that International Game Technology had some knowledge of the false or removed CMI (and even that is pretty thin), but it does not establish that International Game Technology did so with the intent to induce, enable, facilitate or conceal infringement.

## III. At The Very Least, There Was No Evidence That IGT NV Or International Game Technology Committed Any DMCA Violations

Defendants were found jointly and severally liable on the DMCA claim. At the very least, no reasonable jury could find that International Game Technology or IGT NV violated the DMCA. As explained above, GC2's trial theory of "violations" was based entirely on *DoubleDown* uploading new games on the DoubleDown Casino. There was no evidence whatsoever that International Game Technology or IGT NV ever updated the app or uploaded anything to the DoubleDown Casino. As to International Game Technology, there was not even any evidence that

it ever provided false CMI, distributed false CMI, removed CMI, or distributed a work knowing the CMI had been removed.

## IV.    No Rational Jury Could Find For Plaintiff On Its DMCA Removal Claim

GC2's removal claim is premised on the presence of the GC2 logo on the land-based glass artwork for the games Coyote Moon (PX 4-6)[8] and Pharaoh's Fortune (PX 10, 23, & 24)[9] and its absence from similar artwork used on the DoubleDown Casino splash screens (Exs. A & B, respectively).  No rational jury could find for GC2 on this claim as to any of the Defendants for at least two independent reasons.

*First*, the evidence established that, at best, IGT NV created *new* artwork that incorporated elements of GC2's artwork and/or was a derivative thereof, but the DMCA requires that the CMI appear on or near *GC2's original* work.  *Second*, the evidence indisputably established that it was IGT NV that affixed GC2's logo on the glass artwork, not GC2.  Thus, there was no "pre-existing CMI" on GC2's copyrighted work.  For either of these reasons, GC2's removal claim fails.

### A.    The Glass Artwork At Issue Is Not GC2's Copyrighted Work

#### 1.    The Law Requires That The CMI Be Removed From GC2's Original Copyrighted Artwork

"Section 1202(b)(1) applies only to the removal of copyright management information on (or from) a *plaintiff's **product or original work***."  *Monotype Imaging, Inc. v. Bitstream Inc.*, 376 F. Supp. 2d 877, 893 (N.D. Ill. 2005) (emphasis added); *accord Pers. Keepsakes, Inc. v. Personalizationmall.com, Inc.*, 975 F. Supp. 2d 920, 929 (N.D. Ill. 2013); *Frost-Tsuji Arch. v. Highway Inn, Inc.*, No. 13-00496, 2014 WL 5798282, at *5 (D. Haw. Nov. 7, 2014).  Thus, where

---

[8]    Copies of PX 4-6 are attached as Group Exhibit H.

[9]    Copies of PX 10, 23, 24 are attached as Group Exhibit I.

a defendant uses some of plaintiff's work in the creation of a *new* or *derivative* work, there can be no removal claim.

For instance, in *Fischer v. Forrest,* 286 F. Supp. 3d 590, 608-09 (S.D. N.Y. 2018), the court granted defendant summary judgment on plaintiff's Section 1202(b) claim where defendant created a *derivative* advertisement from plaintiff's brochure and replaced plaintiff's name with the name of a competitor "because no CMI was removed from [plaintiff's] original brochure, his website, or a copy or display of them." Similarly, in *Faulkner Press*, 756 F. Supp. 2d at 1359-60, the defendant intended to create "its own derivative work" from plaintiff's work by having students take notes from plaintiff's course, which defendant compiled into note packages. The court found that the note packages were a "different product" from plaintiff's copyrighted work, "even if, as [plaintiff] alleges, they included materials from [defendant's] work." Consequently, there could be no DMCA violation because "[n]o copyright management information was removed from [plaintiff's] product or original work[.]" *Id.* at 1359. And, in *Robert L. Stark Enters., Inc. v. Neptune Design Grp., LLC*, No. 1:16 CV 264, 2017 WL 1345195, at *11 (N.D. Ohio Apr. 12, 2017), the court granted summary judgment where defendant allegedly removed CMI during the process of converting files to CAD because the CAD system created a new product rather than removing CMI from plaintiff's product. The court held that "there is no evidence that plaintiff or its agents removed CMI from defendant's ***original work*** or 'distributed' a 'copy' of defendant's work knowing that CMI had been removed." *Id.* (emphasis added).

As explained in more detail below, the glass artwork for the Pharaoh's Fortune and Coyote Moon land-based games is *not* GC2's original copyrighted artwork; rather, it was created by IGT NV as *new* artwork that incorporated some of GC2's artwork or derivatives thereof along with

some of IGT NV's original artwork, which DoubleDown then further changed before releasing it on the DoubleDown Casino.

## 2. Coyote Moon

Mr. Jankowski, who was the GC2 art director and worked with the IGT NV artists who designed the glass artwork (Tr. Vol. 3 at 549:16-550:4; 563:16-18; 600:22-601:4), testified that:

- IGT NV employee John Yowse designed the glass artwork for Coyote Moon (*id.* at 600:2-6);

- Mr. Yowse conceived and created the background for the Coyote Moon glass artwork without using any GC2 artwork or graphics (*id.* at 600:22-601:13);

- Mr. Yowse selected which GC2 images to include on the glass artwork – the coyote and the moon (*id.* at 601:16-18);

- Mr. Yowse then improved on those GC2 images by painting over images and adjusting the overall shape and appearance (*id.* at 601:19-24); and

- The ultimate product – the glass artwork – was not "an original GC2 work." (*Id.* at 602:15-17.)

That the glass artwork is not GC2 copyrighted work is also evident by simply comparing it to the GC2 copyrighted materials for the game.[10] Among other things, the backgrounds in Exhibit B do not appear anywhere in the GC2 copyrighted materials, and the coyote and moon are positioned and shaded differently. Mr. Jankowski confirmed this and also testified that the glass artwork and the artwork used in the splash screens were *not* GC2's original work. (*Id.* at 602:15-604:1.) Further, PX 13,[11] one of the DoubleDown splash screens, includes additional changes to

---

[10]     *Compare* the artwork displaying the allegedly removed CMI on Exhibit B, *with* the GC2 copyrighted images that appear in PX 41. A copy of PX 41 is attached as Exhibit J.

[11]     *See* Group Exhibit B.

the John Yowse glass artwork. (*Id.* at 602:24-603:24.) Mr. Jankowski confirmed that it was neither original GC2 artwork nor even IGT NV's original glass artwork. (*Id.*)

### 3. <u>Pharaoh's Fortune</u>

Mr. Jankowski also worked with the IGT NV artists who designed the glass artwork for Pharaoh's Fortune and testified that:

- IGT NV employee Marcus Rothkrantz designed the glass artwork for Pharaoh's Fortune (Tr. Vol. 3 at 611:10-612:6);

- Mr. Rothkrantz designed and created the border and gold coins appearing in the glass artwork (*id.* at 612:23-613:6; *see also* Tr. Vol. 4 at 627:13-17);

- Mr. Rothkrantz selected which GC2 images to include on the glass artwork (Tr. Vol. 3 at 612:7-22); and

- Mr. Rothkrantz then improved on those GC2 images by repositioning and putting sunglasses on the pharaoh. (*Id.* at 612:9-22; Tr. Vol. 4 at 627:18-20.)

That the glass artwork is not GC2 copyrighted work is also obvious by simply comparing it to the GC2 copyrighted materials for the game.[12] Among other things, the border, gold coins, scarab on the pharaoh's head, and positioning of the pharaoh's head do not appear in the GC2 copyrighted materials. (Tr. Vol. 4 at 612:7-613:13.) The DoubleDown splash screens (Exhibit A) include additional changes to the Rothkrantz glass artwork. (Tr. Vol. 4 at 626:16-627:7.) Mr. Jankowski testified that the glass artwork and the artwork used in the splash screens were *not* GC2's original work. (Tr. Vol. 3 at 611:7-9; Tr. Vol. 4 at 628:6-9.)

---

[12] *Compare* the artwork displaying the allegedly removed CMI on Ex. A, *with* the GC2 copyrighted images that appear in PX 40. A copy of PX 40 is attached as Exhibit K.

## B.    GC2 Did Not Affix CMI To The Artwork At Issue

Section 1202(b) "prohibits removal of pre-existing CMI or distribution knowing that pre-existing CMI has been removed." (Dkt. 318 at 13); *accord Agence France Presse v. Morel*, No. 10-cv-2730, 2014 WL 3963124, at *8 (S.D.N.Y. Aug. 13, 2014). Indeed, "the existence of CMI on the [infringed work]" is the very first element of any claim under Section 1202(b). *Gattoni v. Tibi, LLC*, 254 F. Supp. 3d 659, 664 (S.D.N.Y. 2017). "To establish a violation of the [DMCA], a plaintiff must *first* show that it placed [CMI] on its copyrighted work and copies of its works[.]" *Reno-Tahoe Specialty, Inc., v. Mungchi, Inc.*, 2:12-CV-01051-GMN-VC, 2014 WL 7336082, at *11 (D. Nev. Dec. 19, 2014) (emphasis in original).

Here, there is no "pre-existing" CMI because it was *IGT NV* – not GC2 – that put GC2's logo on the land-based glass artwork for the games Pharaoh's Fortune and Coyote Moon. Both Mr. Jankowski (Tr. Vol. 3 at 598:20-599:1; 602:11-14; 613:7-13; Tr. Vol. 4 at 628:8-9) and Mr. Warzecha (Tr. Vol. 2 at 439:12-440:2) confirmed that GC2 did not place its logo on the art before providing it to GC2. And GC2 failed to introduce any evidence that *GC2* put the allegedly-removed logo on the glass artwork or the artwork used for the internet games.

The GC2 logo may have appeared on the CD cover or in the CD demo it provided IGT NV, but neither of these logos was provided for IGT NV to incorporate onto the glass artwork. (Tr. Vol. 3 at 599:9-16.) As Mr. Jankowski testified, GC2 did not put its logo on the artwork that it sent to IGT NV for IGT NV to use on the glass artwork. (Tr. Vol. 3 at 598:20-599:1; 599:9-13; 602:11-14; 613:7-13; Tr. Vol. 4 at 628:8-9.)

GC2 also cannot rely on Mr. Jankowski's testimony that GC2 provided its logo to IGT NV at some point during the course of the parties' relationship. (Tr. Vol. 4 at 655:1-3.) For something to constitute CMI, it must be "conveyed in connection with copies" of the work in question. 17 U.S.C. § 1202(c). "Generally, to satisfy that requirement, a copyright notice must be 'close to'

the work." *Drauglis v. Kappa Map Group, LLC*, 128 F. Supp. 3d 46, 60 (D.D.C. 2015). There is no evidence as to *when* Mr. Jankowski provided the logo to IGT NV for inclusion on the glass artwork. The logo would not constitute CMI unless he sent it "close to" the artwork provided for the glass – and there is no evidence that he did.

Because GC2 cannot establish pre-existing CMI on the artwork that was allegedly used by IGT NV in creating the glass, its Section 1202(b) claim fails as a matter of law. *See*, *e.g.*, *Shell v. Lautenschlager*, No. 1:15cv1757, 2017 WL 4919206, at *10-11 (N.D. Ohio Oct. 31, 2017) (no liability "for removing CMI where none was displayed in the original work"); *Tomelleri v. Zazzle, Inc.*, No. 13-CV-02576, 2015 WL 8375083, at *14 (D. Kan. Dec. 9, 2015) (granting partial summary judgment because plaintiff failed to show that the images on his website that were allegedly copied and uploaded contained CMI); *Merideth v. Chi. Tribune Co.*, No. 12 C 7961, 2014 WL 87518, at *3 (N.D. Ill. Jan. 9, 2014) (dismissing complaint because it did not "adequately allege that the photographs came into Defendant's possession with CMI attached").

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court: (a) amend the judgment to enter judgment in favor of Defendants and against Plaintiff on Plaintiff's DMCA claim (Count XII) in whole or in part; and (b) grant Defendants such other and further relief as is appropriate.

Respectfully submitted,

INTERNATIONAL GAME TECHNOLOGY, IGT, and DOUBLEDOWN INTERACTIVE LLC

By: _/s/ Rebekah H. Parker_____
                One of Their Attorneys

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned attorney, upon oath, hereby certifies that on March 26, 2019, she caused a true and correct copy of the foregoing ***Defendants' Rule 50(b) Renewed Motion for Judgment As a Matter of Law on Count XII (Digital Millennium Copyright Act)***, to be filed electronically with the Court's CM/ECF system, and that notice of this filing was sent by electronic mail to all parties by operation of the Court's electronic filing system or by email to anyone unable to receive electronic filings as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF system.

_____/s/ *Rebekah H. Parker*_____