<pre>
 1              IN THE UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3    GC2 INCORPORATED,                    )   Docket No. 16 C 8794
                                           )
 4                     Plaintiff,          )
                                           )
 5          vs.                            )
                                           )
 6    INTERNATIONAL GAME TECHNOLOGY PLC,   )   Chicago, Illinois
      et al.,                              )   December 6, 2018
 7                                         )   2:30 o'clock p.m.
                       Defendants.         )
 8

 9         TRANSCRIPT OF PROCEEDINGS - PRETRIAL CONFERENCE
            BEFORE THE HONORABLE MATTHEW F. KENNELLY
10
      APPEARANCES:
11
      For the Plaintiff:     GREENSFELDER, HEMKER & GALE, P.C.
12                           BY:  MR. RICARDO MEZA
                                  MS. KARA EVE FOSTER CENAR
13                                MS. SUSAN MEYER
                             200 West Madison Street, Suite 2700
14                           Chicago, IL  60606
                             (312) 345-5018
15
                             GREENSFELDER, HEMKER & GALE, P.C.
16                           BY:  MR. KEVIN F. HORMUTH
                             10 South Broadway, Suite 2000
17                           St. Louis, MO  63102
                             (314) 241-9090
18

19    For the Defendants:    NOVACK & MACEY, LLP
                             BY:  MR. ERIC NEAL MACEY
20                                MR. JOSHUA EDWARD LIEBMAN
                                  MS. REBEKAH HAVA PARKER
21                           100 North Riverside Plaza, Suite 1500
                             Chicago, IL  60606
22                           (312) 419-6900

23
      Court Reporter:        MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                           Official Court Reporter
                             219 S. Dearborn Street, Suite 2102
25                           Chicago, Illinois  60604
                             (312) 435-5639
</pre>

1    (The following proceedings were had in open court:)

2         THE CLERK:  Case No. 16 C 8794, GC2 Incorporated v.

3    International Game.

4         THE COURT:  All right.  So why don't I get

5    everybody's names to start off with.

6         MR. MEZA:  Ricardo Meza, M-e-z-a, on behalf of GC2.

7         MS. CENAR:  Kara Cenar on behalf of GC2.

8         MS. MEYER:  Susan Meyer, M-e-y-e-r, on behalf of GC2.

9         MR. HORMUTH:  Kevin Hormuth on behalf of GC2.

10        MR. MACEY:  Eric Macey, with Novak and Macey, on

11   behalf of defendants.

12        MR. LIEBMAN:  Joshua Liebman on behalf of defendants.

13        MS. PARKER:  And Rebekah Parker on behalf of the

14   defendants.

15        THE COURT:  Okay.  I actually -- I want to start with

16   the motion -- I want to go through the motions in limine, not

17   the expert stuff.  We will come back to the expert stuff a

18   little bit later, although I reserve the right to kind of do a

19   detour in the middle.

20        I don't think I am going to be prepared to rule on

21   the expert stuff today because I just -- I need to get a

22   better picture of it, which is what we are going to try to

23   circle back to towards the end of this.

24        So I'm going to start off with the defendants'

25   motions.  I am not necessarily going to ask questions about

1   all of them, but this is going to kind of largely go in a

2   question-and-answer format, or I may ask you, what's your

3   position on A, B, or C.

4          So starting with the defendants' first motion in

5   limine, which is the one about limiting the DMCA claims, I

6   apologize for doing this because I ought to have it committed

7   to memory right now, but I need a short memory refresher on

8   what lobby graphics are and what a sprite sheet is and how

9   they are used.

10         MR. MACEY:  Sure.

11         THE COURT:  So are they your sprite sheets or are

12  they your sprite sheets?

13         MR. MACEY:  Our sprite sheets --

14         THE COURT:  Okay.  So tell me what --

15         MR. MACEY:  -- and our lobby graphics.

16         THE COURT:  So tell me what they are.

17         MR. MACEY:  Sure.

18         THE COURT:  And how they are used.

19         MR. MACEY:  The lobby is if you download a game and

20  you open --

21         MS. PARKER:  You download the application.

22         MR. MACEY:  Download the application, okay, the

23  DoubleDown Casino application, you would go on the Internet

24  and get it.

25         THE COURT:  Right.

1          MR. MACEY:  Or go on Facebook, actually, or Apple --

2          MS. PARKER:  Apple.

3          MR. MACEY:  -- Apple iTunes or the App Store, right.

4   And you would download it.

5          When you open it up to play the games, there will be

6   multiple games showing.

7          THE COURT:  Many games.  Right.

8          MS. PARKER:  Right.

9          MR. MACEY:  And, in fact, you have to scroll through

10  to see them all.

11         THE COURT:  That's not the lobby, though.

12         MR. MACEY:  That is the lobby page.

13         THE COURT:  That is the lobby.

14         MR. MACEY:  That is the lobby page.

15         THE COURT:  So the lobby graphics would be the little

16  picture that goes with each game.

17         MR. MACEY:  Exactly.  And then you need to click on

18  that game to play that game.

19         THE COURT:  Okay.  Sprite sheets.

20         MR. MACEY:  A sprite sheet is something that you as a

21  user would never see.

22         THE COURT:  Right.

23         MR. MACEY:  Okay.  The sprite sheet has individual

24  images of various games that combine to create the graphics

25  that you ultimately do see when you play the games.  It's

1    internal --

2           THE COURT:  So from a software standpoint, that's

3    where all of the images are that the software is going to grab

4    when various things are happening --

5           MR. MACEY:  Exactly.

6           THE COURT:  -- when playing the game.

7           MR. MACEY:  Essentially, yes.  Essentially from one

8    server -- one talks to the other until it does a combine, but

9    only for the mobile application.

10          THE COURT:  All right.  Do you all agree with that?

11          MR. MEZA:  Yes, Judge, but just for clarification, so

12   when you download it, the game on the app, you get the lobby

13   images.  That's all.  When you click on one of the games --

14          THE COURT:  Right.

15          MR. MEZA:  -- Pharaoh's Fortune, that's when you get

16   the sprite sheets.

17          THE COURT:  That's when you get the images from the

18   sprite sheets.

19          MR. MEZA:  Right.

20          THE COURT:  I got it.

21          MR. MEZA:  And the sprite sheets are just a bunch

22   of --

23          THE COURT:  Just a -- it's just whole page of images,

24   basically.

25          MR. MEZA:  Yeah, a number of pages.

1          MR. MACEY:  The user never sees the sprite sheet.

2          THE COURT:  You don't see it.  I got it.  Okay.  All

3    right.  Fine.

4          Okay, then.  What I think -- it seems to me that in

5    reading the discussions of -- on the first motion in limine,

6    that it would be helpful to me, although it's in here, I

7    think, to get -- to get a handle -- make sure I have a good

8    handle on what the plaintiff's theory of the, quote, unquote,

9    distribution is, okay?  And I actually want to start with kind

10   of a hypothetical.

11         Let's say that I, Kennelly, take, let's say, Bob

12   Woodward's copyrighted article from the Washington Post and I

13   post it on Kennelly's blog, and Bob Woodward's article has a

14   little C, circle, Washington Post at the bottom of it, I take

15   that off, and I put C, Matthew Kennelly, and I put it on my

16   blog, okay?  And I have a thousand people then download it

17   from my blog.

18         Is that one DMCA violation or a thousand or something

19   in between or none of the above?

20         MR. MEZA:  It's one act.

21         THE COURT:  It's one.  Okay.  So when you're

22   telling -- when you're giving me your theory of distribution,

23   I want you to tell me how what we're talking about here

24   differs from that.  Because I thought that was going to be

25   your answer, and it seems like to me it's the right answer.

1      MR. MEZA:  Right.

2      THE COURT:  So you need to explain to me how what

3  you're talking about here is different from what I just said.

4      MR. MEZA:  The difference is after an individual

5  downloads the app and he's got the lobby photos, that person

6  presses the image for Coyote Moon, and at that point, that

7  image then gets sent, copied, onto that device.

8      THE COURT:  I'm playing this on my phone, that image,

9  the software, the app, essentially, goes out and grabs the

10  image from a server somewhere and puts it on my phone.

11      MS. CENAR:  The game packet with the sprite sheets

12  are on your phone, so there's --

13      THE COURT:  The whole thing is on my phone.

14      MS. CENAR:  The game packet, which includes multiple

15  sprite sheets for just that game, is on your phone.

16      THE COURT:  And my phone, when I download the app, or

17  when I click on the game, let's say, where does the

18  software -- where does my phone go to get all this stuff?

19      MS. CENAR:  It goes to the media server and the

20  media --

21      THE COURT:  Whose media server is it?

22      MS. CENAR:  It's IGT's and DoubleDown's media server,

23  on the AWS server.

24      THE COURT:  You're done.

25      MS. CENAR:  It's IGT and DoubleDown use Amazon Web

1    Services as the server where they are located.

2         THE COURT:  We have now introduced another term that

3    I was -- so what is Amazon Web Services?

4         Again, I apologize for being a Luddite and not

5    knowing this.

6         MS. CENAR:  Sure.

7         Amazon Web Services is a service that you subscribe

8    to, and you essentially rent space on a server that assists --

9         THE COURT:  They've got like some massive server farm

10   out in California --

11        MS. CENAR:  Distribution -- a whole distribution

12   channel that you --

13        THE COURT:  So I'm renting space from Amazon, but

14   it's the space that I'm renting.  I'm like a tenant of Amazon.

15        MS. CENAR:  You control the account.

16        THE COURT:  Okay.

17        MS. CENAR:  And so you can put whatever stuff on it,

18   you can make whatever changes, and then you hit a button, and

19   it --

20        THE COURT:  Okay.  So I'm -- I've now -- I've now

21   clicked on Coyote Moon on my phone, and my phone does what?

22   It goes to that server that's housed at Amazon Web Services,

23   and it brings all the images back to me.

24        MS. CENAR:  Brings a game packet that has a set of

25   sprite sheets, it has computer software code, and it goes to

1   the cache on your phone.

2          THE COURT:  Okay.  So am I correct that the

3   plaintiff's position is that each time somebody does that,

4   that's one distribution, one DMCA, maybe more than one, but

5   it's one -- if you download it and you download it and you

6   download it and you download it, we've got at least 40 MCA

7   violations.

8          MR. HORMUTH:  It's one act of the defendant.

9          THE COURT:  Explain to me why that's different from

10  my Washington Post example.

11         MR. HORMUTH:  The primary distinction between your

12  hypothetical and the technology that's at issue is the focus

13  on the defendants' conduct versus the user conduct going to

14  grab that blog post.  You would be passive in that after

15  you've put one --

16         THE COURT:  So why isn't it the same in the sense

17  that the defendant, and let's just say DDI for purposes of

18  discussion, that DDI has put its conduct on that Amazon Web

19  Services server one time and when you downloaded it and you

20  downloaded it and you downloaded it and you downloaded it,

21  that's just like all of those readers downloading my Bob

22  Woodward article?

23         I don't care who --

24         MR. HORMUTH:  I don't want to talk over each other --

25         MS. CENAR:  Go ahead.

1    MR. HORMUTH:  -- but I think we've got a -- and it's

2  hard to visualize.  I'll try to narrate it the best I can.

3    Did you get a chance to review it?

4    THE COURT:  I looked at that --

5    MR. HORMUTH:  That's just helpful from a -- me

6  understanding what you've seen.

7    So what you saw on that demonstrative is the

8  distribution from the media server to the device, and it's the

9  media server that speaks to DoubleDown software that's been

10  placed on that device.

11    THE COURT:  Okay.

12    MR. HORMUTH:  When -- there's a separate issue --

13    THE COURT:  Wait a second.  Say that again.  The

14  media server, which is the AWS -- Amazon Web Services

15  server -- no?

16    MR. HORMUTH:  It is.  It's --

17    MS. CENAR:  It's defendants' account on that.

18    MR. HORMUTH:  But it's controlled -- right.

19    THE COURT:  Okay.  Fair enough.

20    MR. HORMUTH:  Yes.

21    THE COURT:  It speaks to what again?

22    MR. HORMUTH:  It speaks to the DoubleDown software

23  that is placed on the phone.

24    THE COURT:  Right.  I get that.

25    MR. HORMUTH:  Back and forth.

1    What I think you're thinking of, and I'm -- it's

2  somewhat complicated, so I want to make sure we are on the

3  same page.

4        THE COURT:  Okay.

5        MR. HORMUTH:  There is a one-time issue in this case

6  which is IGT's conduct in placing and making available that

7  altered and false CMI onto the media server, but that's just

8  step one.

9        THE COURT:  And what would you call that one-time

10  violation?  That's a distribution violation, or it's a removal

11  of CMI, or what is it exactly?

12        MR. HORMUTH:  There are two things that occur there.

13  It's providing the false CMI up to the media server, and --

14        THE COURT:  So that's not the distribution violation.

15        MR. HORMUTH:  Correct.

16        THE COURT:  The thing that you're saying happens more

17  than once is the distribution violation.

18        MR. HORMUTH:  That's the speaking from the media

19  server to the DoubleDown software that is placed on the phone.

20        THE COURT:  Okay.  And so why -- if IGT only did

21  something once -- in other words, they put their stuff on the

22  media server -- why is it a separate violation every time

23  somebody downloads the game from the media server?

24        I'm going to actually -- if you want to use that

25  thing, I can actually put it up on the screen.

1          MR. HORMUTH:  That'd be --

2          MS. CENAR:  Judge...

3          THE COURT:  Go ahead.

4          MS. CENAR:  There's two things -- there's two

5     different distributions that we're talking about.  The first

6     one is from the media server to the device and its sprite

7     sheets, and then there is a distribution off the sprite sheets

8     because it's a different image.  It's a copy of the image off

9     the sprite sheet.

10          So with respect to the first image, the difference --

11    there's two differences from your article posted on your blog.

12    What's being downloaded is not the whole media server every

13    game for everything reflected in the lobby graphics.  It's a

14    single game, it's a number of sprite sheets, and it only

15    occurs when the IGT software on the device speaks to the media

16    server.

17          THE COURT:  And why does that make a difference?

18          MS. CENAR:  Well, it makes a difference because

19    they're all defendants' acts, and it's --

20          THE COURT:  I mean, there is not anybody out there,

21    there is not a little man in there, saying, okay, send this

22    thing to Cenar at this point, right?  It's software that's

23    doing all of this?

24          MS. MEYER:  Yes, your Honor, it's IGT's software that

25    they designed and had options of putting an entire game on

1   your computer --

2          THE COURT:  So you need to explain this to me because

3   I -- and I am probably more tech savvy than the average

4   federal district judge, but that's a fairly low threshold,

5   okay?

6          I have to think that when I -- that when I have this

7   Kennelly blog, it's probably not a server sitting in my house,

8   okay?  It's probably -- I'm probably renting space on a server

9   somewhere, some blog-hosting website or some blog-hosting

10  service, and that every time somebody downloads that article,

11  their computers, their phone, is sending the signal to that

12  server, and the server is sending the article to their phone.

13         MS. MEYER:  And they're getting the same article.

14  You're absolutely correct.  The article that they're

15  downloading is Bob Woodward's article.  That is that same

16  article.

17         THE COURT:  So you're saying it's different because

18  they are not getting the same thing?

19         MS. MEYER:  That's correct.

20         THE COURT:  How are they not getting the same thing?

21         MS. MEYER:  What they're getting is a packet of

22  sprite sheets, and what the technology is doing is sending it

23  to go put together different -- if we download this at the

24  same time, Kara and I can be sitting in the same place, push

25  the same button, we are not going to get the same experience.

1    It's going to be a different role, it's going to be different
2    images, it's going to be a different order of things.
3                THE COURT:  I thought you said that the game is
4    basically running off of your phone, not off of the server.
5                MS. MEYER:  No, sir.
6                MS. CENAR:  Well --
7                MS. MEYER:  I will let you finish the story.
8                MS. CENAR:  -- let me -- okay.
9                The game packet with the sprite sheets goes from the
10   media server to the cache in the device.  IGT's and
11   DoubleDown's software then says, go to this location on the
12   sprite sheet and pull this image off, put it on the screen, go
13   to this portion, pull IGT's logo off, put it on the screen, go
14   to this portion in the code, pull the copyright management
15   information, put it across the bottom, and that's different
16   than just downloading the article.
17               Downloading the article is the sprite sheets are what
18   shows up on the screen, and that's not what occurs here.  The
19   sprite sheets go to the cache, copies are made off the sprite
20   sheet and put up on the screen.  So they have essentially
21   distributed a distribution system to your phone.
22               THE COURT:  And if the focus is -- and I understand
23   that there may be some dispute about this, I made a ruling --
24   if the focus is on what the defendant did, what you're telling
25   me, I guess, is that every time somebody downloads the game,

1    it's not the somebody that's doing something, it's the
2    defendant that's doing something.
3            MS. CENAR:  Yes.
4            MR. MACEY:  That's correct.
5            THE COURT:  And the reason you're saying the
6    defendant is doing something is because -- hang on.  I'm going
7    to -- no, don't try it.  I'm groping for it.  I want to be
8    able to articulate it myself.
9            The reason you're saying the defendant is doing
10   something is that it's not just downloading a thing, it's
11   downloading a whole collection of stuff plus the mechanism by
12   which it's going to be transmitted to you.
13           MS. CENAR:  Correct.  So it's not your article coming
14   off the blog, it's essentially every letter in the alphabet or
15   every word that you put in put in a jumbled thing, and then it
16   gets compiled on the end user's part.
17           THE COURT:  Okay.  And before I flip over to defense
18   counsel and have them give their take on this, in all of the
19   cases that you guys have cited on DMCA violations, are there
20   any of them like what we are talking about here, and if so,
21   which ones?
22           MS. CENAR:  The answer is no.  This is an issue of
23   first impression with respect to an interactive thing --
24           THE COURT:  Yeah.
25           MS. CENAR:  -- and an app download.

1        So the other ones relate to putting one-time

2    McClatchey, putting it up once, and it getting distributed to

3    whoever subscribed to it.  It is sending an email.  So if I

4    send one email to you, that's one distribution, but if I send

5    one email to everybody else here --

6            THE COURT:  That's more than one.

7            MS. CENAR:  -- that's -- no.  That would still be one

8    distribution, even though there are several --

9            THE COURT:  Because they copied everybody on the same

10   one.

11           MS. CENAR:  But my email to you and my email to them

12   would be two separate distributions.

13           THE COURT:  In other words, if I send one email but I

14   send it to eight people, it's one.  If I send the same email

15   eight separate times, it's eight.  That's what the cases are

16   about.  It's not about like anything like this.

17           MS. CENAR:  No.  This --

18           MR. HORMUTH:  Not this technology, but there are

19   cases that are more analogous in terms of what is a separate

20   distribution than McClatchey.

21           THE COURT:  Like what?  Which one other than

22   McClatchey?  Because McClatchey is just -- you're basically

23   saying -- I'm looking for the case that I'm going to go read

24   that's going to tell me that what you just said would --

25   everything you just said is right.

1        MR. HORMUTH:  Okay.

2        THE COURT:  And if there is none, just tell me there

3    is none, and I won't go looking for it.

4        MR. HORMUTH:  Well, it's not this technology, but if

5    you look at the Goldman case that we cited, in the Goldman

6    case, the court didn't limit the number of DMCA violations

7    because there was evidence that the defendant in that case

8    sent infringing computer programs to multiple hospitals at

9    different times.

10       THE COURT:  Okay.  That's a different kind of

11   strategy.

12       MR. HORMUTH:  Right.

13       And the court in Goldman talked about McClatchey, and

14   Goldman --

15       THE COURT:  Right.

16       MR. HORMUTH:  -- distinguished McClatchey and said

17   McClatchey found that the act of simultaneous distribution,

18   and that's what we don't have in this case, we don't have an

19   act of simultaneous distribution --

20       THE COURT:  But we didn't in my Bob Woodward example

21   either, depending on what you call distribution.

22       MR. HORMUTH:  Right.

23       But there wasn't a simultaneous distribution of

24   copyrighted -- of a copyrighted picture to 11- -- 1,147

25   subscribers where the copyright information had been removed.

1       And then it went on to distinguish McClatchey to say

2  that unlike a television signal or an AP Wire story or perhaps

3  the blog example where it's sent simultaneously to -- or is

4  just out there one time --

5       THE COURT:  All right.  Thanks.

6       Mr. Macey, your turn.

7       MR. MACEY:  Sure.  And my colleague --

8       THE COURT:  Whoever wants to talk, that's fine.

9       MR. MACEY:  I've got it.  First, the Amazon web

10  server is not simply a storage house.  It is a dynamic

11  processor that creates connectivity that is required for you

12  to play the game.

13       So in other words --

14       THE COURT:  See now --

15       MR. MACEY:  -- if you didn't have --

16       THE COURT:  -- to the uninitiated listener like me,

17  it just sounded like you were a guy on the show The Office.

18       Say that in plainer English.

19       MR. MACEY:  Sure.

20       THE COURT:  I know you were trying.

21       MR. MACEY:  Sure.  It's not a box, it's not a digital

22  box where DDI, DoubleDown, just sends information and the

23  information just sits there.

24       THE COURT:  Okay.

25       MR. MACEY:  It's active.

1      THE COURT:  Okay.

2      MR. MACEY:  It has to do things to be able to get the

3  material on there to the end user to play the game.

4      THE COURT:  Fair enough.  I get it.

5      MR. MACEY:  So there is an intermediate entity there,

6  all right?  Even their expert attests to that.

7      Okay.  All right.  That's number one.

8      Number two, to use your example with Bob Woodward and

9  the questions that you asked each one of them, the user must

10  download.  The user must push the button to get the game.  The

11  user must push the button to get the reels to spin.  No matter

12  what happens, the user must act.  And the case law from

13  McClatchey, which you relied on in your summary judgment and

14  its progeny, all say the following:  When it is the user's

15  conduct at issue, you don't look at it.  It is the conduct of

16  DDI that's at issue here.

17      DDI does one thing.  DDI sends material, in whatever

18  form you want to call it, software or otherwise, to Amazon Web

19  Services, and that's its act.

20      Now, how many times it does that, what it does it

21  for, whether that constitutes a violation of the DMCA, causes

22  intent, those are questions not today.  But that is the act

23  that they engage in, is to send that to AWS.  From that, they

24  do nothing.  They sit back and --

25      THE COURT:  Well, they might update the software --

1       MR. MACEY:  That's a different question.  That may or

2  may not be another violation.  I understand that.  But they do

3  nothing else, okay?  From there on, nothing can happen.

4  Nothing can happen.

5       THE COURT:  So in other words, if the only version of

6  the software is version 1.0 and the only server it's sitting

7  on is Amazon Web Services -- the only service it's sitting on

8  is Amazon Web Services, there's one -- your position is

9  there's one act of distribution, and whether that game gets

10  downloaded one time -- whether that game gets downloaded one

11  time or a hundred times or a million times, it's not a hundred

12  or a million acts of distribution because you, the defendant,

13  DDI, did one thing.

14       MR. MACEY:  That's correct.  And it's the only

15  reason -- the only way it gets downloaded is for you to do it.

16       THE COURT:  Is for me to do so.

17       MR. MACEY:  Is for the user's activity.

18       Now, you asked --

19       THE COURT:  If I were to look at -- what's the case?

20       MR. MACEY:  Two.

21       THE COURT:  Two.  Okay.

22       MR. MACEY:  No, really one.  I'm sorry.

23       THE COURT:  Okay.

24       MR. MACEY:  Ms. Parker will distinguish Goldman

25  first, and I will let her do that.

1          MS. PARKER:  The Goldman case they relied on, I think

2     your Honor already realized that's a different case.  It had

3     to do with what's actually sending, a physical program to

4     different recipients at different times.  So that's obviously

5     distinguishable from what we're talking about, which is the

6     singular act of uploading it.  So that case is different.

7          The case that we think is the most analogous is one

8     that we relied upon in our summary judgment motion and reply.

9     That's the Reilly v. Plot Commerce case.

10         THE COURT:  Just -- because I know what I got in

11    front of me.  Is it cited anywhere in the motion in limine

12    stuff?

13         MS. PARKER:  I don't believe so.  Let me look.

14         THE COURT:  Okay.  Reilly.  What's the cite for it?

15         MR. MACEY:  R-e-i-l-l-y, v. Plot Commerce.

16         THE COURT:  What was the second name?  The

17    defendants' name was what?

18         MR. MACEY:  P-l-o-t, Commerce, C-o-m-m-e-r-c-e.

19         THE COURT:  What's the cite?

20         MR. MACEY:  2016 WL 6837895 (S.D.N.Y.).

21         THE COURT:  6837895.

22         MR. MACEY:  Right.

23         THE COURT:  And what's that case about?

24         MS. PARKER:  Well, in that case, the defendant

25    allegedly copied plaintiff's photograph, altered it, and

1   uploaded it to its website.  And the plaintiff sought -- the

2   defendant did that.  The plaintiff sought five statutory

3   awards for that upload because her image appeared on five

4   different web -- different pages within that website.  So not

5   just once, but it appeared five different ways five different

6   times.  And the court held that that constituted one

7   violation.

8          And the language that the court -- and the court

9   first looked at the technology, and we think that the language

10  it used is a posit here.  The court said:  Many web pages are

11  dynamic, meaning they can interact with databases before

12  assembling and displaying the final web page on a screen.  An

13  image or other content need only be uploaded once to a

14  database before it can be used to create multiple dynamic web

15  pages based on the choices made by the user of the site.

16         And in that case, plaintiff failed to present

17  evidence that defendant uploaded the photograph more than

18  once, so the court limited it to one distribution violation.

19         MR. MACEY:  We cited that in our summary judgment

20  motion.

21         MS. PARKER:  Right.  And reply as well.

22         MR. MACEY:  And we view that as exactly what's going

23  on here.  They're claiming that these sprite sheets are

24  combining to make different pages are no different than what

25  the court talked about in Reilly.  It's exactly it.  It's the

1 user that drives the technology once it's been uploaded.  DDI
2 does nothing else whatsoever.

3        So unless you have any questions, I can go into
4 this --

5        THE COURT:  No, you have given me what I need to
6 know.

7        Do you want to say something about Reilly?

8        MS. CENAR:  Yes, your Honor.  I think the -- Reilly
9 actually supports what we're saying, and this isn't the photo.
10 They're submitting a game packet --

11        THE COURT:  By the way, I'm sorry, without being
12 overly pedestrian, and not that it actually matters, but --
13 although it might, I just pulled up Reilly.  It's a report and
14 recommendation by a magistrate judge, and at the end it has
15 this kind of standard lingo about how you have X amount of
16 time to object.

17        Do we know whether this ended up becoming the ruling
18 of the court?

19        MR. MACEY:  I believe it did.

20        THE COURT:  Okay.  I mean, there is a way to find
21 out, I suppose.

22        All right.  Anyway, go ahead, Ms. Cenar.

23        MS. CENAR:  This isn't a photo that's put into a
24 website and the software of the website puts it in different
25 locations.  This is a set of sprite sheets that has a set of

1   GC2's images on them that gets sent.  And I disagree with what
2   defendants are saying, that DDI does nothing after putting it
3   on the server, because it's DDI's software once those sprite
4   sheets get distributed to the end user device that causes
5   copies to be made off the sprite sheet and additional acts of
6   altering, modifying, and providing CMI.

7          THE COURT:  Okay.  My last question on this for both
8   sides is does my determination by what we have just been
9   talking about, whether it's the scenario we are talking about
10  is one act of distribution for purposes of DMCA or more than
11  one, does my decision about that essentially determine motion
12  in limine No. 1, or is there other stuff that I also have to
13  decide?

14         MS. PARKER:  I think that determines the most
15  important aspect of motion in limine No. 1.  We had two parts
16  to it.  The first part was that the end user and as well as
17  the terms of the use -- I guess that's something we haven't
18  discussed yet -- but that stuff was already decided by you on
19  summary judgment and could not give rise to violations.

20         And then in the second part of our motion in
21  limine 1, we ask that you limit them to a maximum of six
22  violations, much like the court in McClatchey limited the
23  plaintiff there to two violations on a motion in limine.

24         So your -- what your ruling would absolutely deal
25  with the first part, which is, frankly, the biggest because

1  under their end user theory, they're seeking, you know,

2  billions to trillions of dollars in damages --

3          THE COURT:  So if I go back to plaintiff's theory for

4  a second, so if -- and this doesn't -- I ask this not because

5  it's determinative of my decision, because, hey, if the law

6  says that somebody is liable for a billion dollars, then so it

7  goes, you know, but -- pick a game.  Coyote Moon.

8          MS. CENAR:  Yes.

9          THE COURT:  If your theory is correct, then,

10  essentially, what the expert or the summary witness, whoever

11  is going to say -- present to the jury is, okay, the judge is

12  going to tell you that this is what constitutes an act of

13  distribution, and I've looked at all the records, and here's

14  how many there were, what's the number?

15          MR. MACEY:  No, I don't think -- well, go ahead.  You

16  can -- I don't believe their expert attests to that.  They use

17  something called -- a document that we produced called --

18          THE COURT:  Okay.  Fair enough.  It comes from the

19  document.

20          MS. CENAR:  It comes from the --

21          THE COURT:  Somebody is going to stand up in closing

22  argument and is going to say, Exhibit 47 proves that -- what's

23  the number?

24          MR. HORMUTH:  We have the daily average user numbers

25  and the monthly average user numbers from the defendant that

1    supply the number.

2         THE COURT:  Okay.  And what is it?

3         MS. CENAR:  It's different for each game.

4         THE COURT:  Just pull one --

5         MR. MACEY:  5.8 billion to $55.8 billion.

6         MS. CENAR:  Well, it depends on what you use --

7         THE COURT:  I don't want to talk about dollars.  I

8    want to talk about users.  The number of times it's been

9    downloaded.

10        So in other words, if you --

11        MS. CENAR:  Well, I can --

12        THE COURT:  -- take the average daily and multiply it

13   by 365 times the number of years, what are we talking about?

14        I know you know this.  I know you know this figure.

15        MS. CENAR:  For Coyote Moon on the first month --

16        THE COURT:  Yeah.

17        MS. CENAR:  -- there were 1,000,856 distributions.

18        THE COURT:  Okay.  Remind me what the -- so the DMCA

19   says X per -- it's up to X per violation.

20        MR. MACEY:  2500 to 25,000, unless you determine on a

21   remitter --

22        THE COURT:  That it's not willful.

23        MR. MACEY:  -- that it's -- that it's innocent or

24   something like that.

25        THE COURT:  Innocent, right.  Okay.

1          MS. CENAR:  And it's per violation.

2          THE COURT:  It's like other statutory copyright --

3          MR. MACEY:  Per violative act.

4          THE COURT:  All right.  And the determination -- and

5     I know I'm skipping ahead to different stuff, but the

6     determination of whether the usage was innocent or not willful

7     or whatever the trigger is to drop it down, is that a finding

8     that I make or is that a finding the jury makes?

9          MR. MACEY:  You make.

10         MS. CENAR:  That, I believe, is a court decision.

11         MR. MACEY:  Under the statute.

12         THE COURT:  I mean, assuming I could submit an

13    advisory question to the jury or something like that.  Okay.

14         All right.  So, look, my -- I am not going to give

15    you an answer to this right now because I don't know what the

16    answer is.  I don't know what my answer is.  I am going to

17    have to reread all this stuff and give it some thought.

18         I mean, I know this is a big deal.  This is maybe the

19    biggest deal.  That's probably why it's motion in limine No. 1

20    as opposed to No. 17.  And so I am going to write something

21    about it, it's probably not going to be terribly long, but

22    we're just going to set that aside and go on to other stuff.

23         MS. PARKER:  Your Honor, do you mind if I state for

24    one moment?

25         THE COURT:  I don't.  That's fine.

1     MS. PARKER:  I just want to ask, when we wrote our

2  motion in limine, it was our understanding that you had

3  already ruled on these issues.  So I just wanted to refer you,

4  when you're reviewing materials to prepare your opinion, ask

5  that you also look back at --

6     THE COURT:  Go look at my -- no, I'm --

7     MS. PARKER:  -- at our summary judgment.

8     THE COURT:  No, no, that, I am not going to do.  The

9  summary judgment filing, I am not -- you are not going to

10  incorporate by reference everything that was filed in summary

11  judgment.

12     MS. PARKER:  No, it's just -- okay.  Then the only

13  argument we made there I suppose we haven't talked about today

14  was just that courts -- the argument based on several cases,

15  including the one we just discussed, have ruled that you must

16  interpret the DMCA so as not to lead to an absurd result and

17  in that damages --

18     THE COURT:  Okay.

19     MS. PARKER:  -- were absurd when you counted -- you

20  know, based on the number of downloads.

21     MR. MACEY:  Remember the copyright file sharing where

22  people were file sharing for free?

23     THE COURT:  Oh, yeah.

24     MR. MACEY:  One of them was the LimeWire case, and it

25  ended up to be --

1    THE COURT:  The?

2    MR. MACEY:  It's called LimeWire.  We cite it in our

3    summary judgment.  That's why she's referencing it.

4    And as a result of the LimeWire case, the court says,

5    I'm not going to give, you know, billions of dollars or

6    hundreds of millions of dollars.  It's more than the music

7    industry made.  It's just not what the statute was for.

8    THE COURT:  Yeah, but --

9    MS. PARKER:  The Reilly court isn't --

10    THE COURT:  -- you know, there is -- it would seem to

11    me that there is -- and I really don't want to get off on

12    discussing this, but just as a comeback, rather, it seems to

13    me that, arguably, the question there is that -- I am not

14    supposed to rewrite statutes, okay?  That's what some people

15    call judicial activism.  It's supposed to be bad, right?  I'm

16    not supposed to rewrite statutes.  If Congress wrote a stupid

17    statute, then Congress wrote a stupid statute, and somebody

18    can go write their Congressional representative and try to get

19    it changed.

20    I am not supposed to say, well, because this statute

21    is stupid, I am not going to interpret it to mean what it

22    says.  Perhaps when you get to the next step -- in other

23    words, if somebody is found liable because a statute was

24    written in a bad way and they're given some ridiculous amount

25    of damages -- perhaps there's then a due process issue about

1   that.  I think that's probably the way these days the Supreme

2   Court looks at stuff.  But I don't know.  I could be wrong.

3           Anyway, we are done talking about that.  We are going

4   to talk about other stuff.

5           MS. CENAR:  Your Honor, if you want Eric Blake to

6   come in and explain the technology and the tutorial, who is

7   our forensic expert, we are happy --

8           THE COURT:  I've gotten a good enough explanation for

9   now.  I don't need that at this point.

10          MS. CENAR:  Thank you.

11          THE COURT:  Okay.  So let me just get kind of

12  reorganized here.

13          Okay.  So I've ruled on defendants' motion No. 2.  It

14  seems to me that motion No. 3 relates back to motion No. 1

15  because that's the evidence of the number of end users, so

16  I'll rule on that when I rule on defense motion No. 1.

17          MR. MACEY:  Right.  The only difference -- I'm trying

18  to think -- in 3, the end users is that the demonstrative

19  doesn't reflect the action of the user that struck the game in

20  the first place.

21          THE COURT:  Actually, I -- fair enough.  I do have

22  one question about No. 3 that I wanted to ask to the defense .

23          So in the plaintiff's response on No. 3, the

24  plaintiff says -- they talk about the stuff we have just been

25  talking about, but they also say -- let me just find it

1   here -- that it's also relevant to the contributory

2   infringement claim that they make, which I understand to be a

3   separate argument.

4           MS. CENAR:  Yes.

5           THE COURT:  So explain that one to me --

6           MS. CENAR:  So one of the elements on contributory

7   infringement is we have to show --

8           THE COURT:  Somebody else infringed.

9           MS. CENAR:  -- a direct infringer, and the end users

10  copying onto the cache would be the direct infringement.

11          THE COURT:  But in order to show that somebody else

12  infringed, you don't have to show that a million people a

13  month infringed.

14          MS. CENAR:  Well, it would be every time it's

15  downloaded because it goes to the public --

16          THE COURT:  No, I understand, but if it's an element

17  of the claim -- if it's an element of the claim to

18  contributory infringement that there was an act of

19  infringement.  It's not an element of the claim that there

20  were 12 million acts of infringement.  You wouldn't have to --

21  why would you have to put in the specific number of end users

22  in order to prove the contributory infringement?

23          MS. CENAR:  Only as it relates to the public

24  performance violation, that it's --

25          THE COURT:  What's that?

1    MS. CENAR:  -- it's the same people at the same time

2  or different times, different locations.  So --

3    THE COURT:  When you say "public performance

4  violation," what do you mean exactly?

5    MS. CENAR:  That the -- that the defendants

6  contribute to a public performance violation of --

7    THE COURT:  Is what you're saying that because so

8  many are using it, it was, in effect, a public performance?

9    MS. CENAR:  Yes, that it's different people at

10  different locations -- Susan and I sitting in different

11  restaurants at the same time or at different times together or

12  apart.  So that was part of what Laykin provided.

13    THE COURT:  And where does public performance come

14  into play?  Where does it fit into the whole scheme of the

15  claims?

16    MS. CENAR:  It's an act of copyright infringement,

17  and it's an act of contributory infringement.

18    MR. MACEY:  We have a separate motion --

19    THE COURT:  Is there some sort of a threshold number

20  of people who have to be doing something for it to be a public

21  performance?

22    MS. CENAR:  Not that I've seen under the law, your

23  Honor.

24    THE COURT:  So in other words, when Netflix

25  distributes movies, and let's say a million people watch Roma,

1  that's a public performance even though they're all watching
2  it separately.
3          MS. CENAR:  Yes.  Under the statutory definition of
4  public performance under 101, the answer would be yes.  17
5  U.S.C. 101.
6          THE COURT:  What's the definition under 101?
7          MS. CENAR:  To perform or display a work publicly
8  means to transmit or otherwise communicate a performance or
9  display of the work to -- you know, to the public --
10         THE COURT:  You don't need to finish that.
11         Okay.  But so what that is, that's a type of act of
12 infringement.
13         MS. CENAR:  Correct.
14         THE COURT:  Copying is one.  Public performance is
15 one.
16         MS. CENAR:  Display, distribution, yes.  It's one of
17 the six.
18         THE COURT:  It wouldn't seem to me, though -- well, I
19 mean, there is a 403 issue that comes in there -- some
20 Rule 403 issue that comes in there somewhere.
21         MR. MACEY:  And in addition -- I'll wait.
22         THE COURT:  No, go ahead.
23         MR. MACEY:  There's no damage -- there's no actual
24 damages.  There's no profits from these end users.  And if you
25 look at their pretrial order, there's no damages from this at

1  all.  So what's it for, other than to prejudice the jury that
2  there's millions of people who use this thing all the time?
3          THE COURT:  Okay.  We have talked enough about No. 3.
4  No, seriously, I have to impose some element of control here.
5          So I've already ruled on 4, I've already ruled on 5,
6  and now we are to 6, which I think is -- maybe we just kind of
7  segued into.
8          No. 6 is entitled Exclude Evidence and Argument
9  Concerning Infringement By End Users, Casinos, or Platforms.
10  And the motion basically says the plaintiff hasn't itemized
11  any actual damages from that, which is the point that
12  Mr. Macey just made, I think.
13          And the summary judgment ruling that I made precluded
14  the plaintiff from recovering the profits of third parties,
15  like the online casinos.
16          And the plaintiff says, well, we have to show -- this
17  is the same argument that we were just talking about -- we
18  have to show direct infringement by somebody else to prove
19  contributory.  It's the same thing we just talked about.
20          MS. CENAR:  I want one caveat.  You're tying
21  everything or they're tying everything to an award of damages.
22  Plaintiff has also asked for injunctive relief and
23  impoundment.
24          THE COURT:  Right, but that -- I decide that.  So, I
25  mean, if I were to conclude that something is relevant on

1  injunctive relief but not properly admissible in front of the
2  jury, for whatever reason, I can say, well, you can put that
3  in after the jury's gone.

4          So I don't need to hear more about 6.  It's the same
5  issue we were just talking about.  Let me just make a note
6  about the injunctive relief.

7          MS. CENAR:  One other, your Honor?

8          THE COURT:  Nope.  Sorry.

9          Okay.  No. 7, terms of use.

10         Okay.  So this one I have to honestly say I'm not
11 quite sure I understand what your -- what both sides are
12 fighting about.

13         So the motion says that in the motion to dismiss, I
14 concluded that the terms of use link isn't conveyed in
15 connection with the work, and I dismissed the consumer --
16 later -- or I also dismissed the Consumer Fraud Act claim.  I
17 think that was in summary judgment.

18         Therefore, the defendant argues the terms of use
19 aren't relevant, I shouldn't allow anything in about them.
20 The plaintiff says the terms of use are copyright management
21 information, or CMI, that's relevant to the DMCA violations,
22 and it contains false representations about who own the
23 artwork.  And so I should let it in for that reason.

24         The reason I got lost on this is I had no sense from
25 the motion or the response exactly what we are talking about

1    in terms of evidence at a trial.

2           So what is the -- what do you think the plaintiff is

3    going to put in that you want to keep out?

4           MS. PARKER:  That they're going to put in evidence of

5    a terms of use link at the bottom of the -- that was -- so

6    it's -- we argued this on summary judgment.  Their theory has

7    changed now.  They are looking at the packet of sprite sheets

8    of the lobby images that we talked about earlier that has an

9    image of every game.  When it was -- when AWS, the Amazon web

10   server, sent that packet over, it sent it with some code that

11   included in it terms of use, a link to the DoubleDown terms of

12   use, and like a copyright notice.

13          We think that would be barred by the same -- for the

14   same reason as your motion to dismiss ruled, that because

15   there's so many images there, it's not properly considered

16   conveyed in connection with the two games at issue out of -- I

17   counted the sprite sheet they attached as Exhibit H had 88

18   different images on it.

19          So they're talking about 2 out of 88 images conveyed

20   that our -- that this could relate to, and you previously had

21   ruled that with respect to the lobby, which is what these

22   images relate to, that was not conveyed in connection with.

23          So based on that, we think that they should not be

24   allowed to argue DMCA violations based on the terms of use.

25          MR. HORMUTH:  Your Honor --

1           THE COURT:  Hang on a second.

2           Go ahead.

3           MR. HORMUTH:  There are two issues with terms of use

4    that are separate and apart from your ruling on the lobby

5    graphics in the summary judgment.

6           Terms of use are also conveyed in connection with the

7    actual game play where the images displayed -- and that's

8    different than the lobby graphics, where it's just every icon

9    for every game that's in the lobby.  This is -- these are the

10   terms of use that are conveyed in connection with the images,

11   GC2's images, during the actual game play.

12          There's another term --

13          THE COURT:  How are they conveyed?

14          MR. HORMUTH:  They are conveyed because when you're

15   playing the game, there is a menu to the terms of use --

16          THE COURT:  Okay.

17          MR. HORMUTH:  -- and you go to the terms of use, and

18   there --

19          THE COURT:  Okay.  And it links to --

20          MR. HORMUTH:  -- there's CMI in that --

21          THE COURT:  It links the DDIs not to anything having

22   to do with GC2.  Is that the problem?

23          MS. CENAR:  Well, the terms of -- everybody talks

24   about the link of the terms of use, but the actual terms of

25   use document is evidence of a number of things.  It's a

1   license that the defendant --

2          THE COURT:  Okay.  I'm at a way simpler level than

3   you are talking about here.

4          So is this terms of use issue, is it -- it pertains

5   to the DMCA claims, not the copyright infringement claims?

6          He is nodding yes, you are nodding no.  Get on the

7   same page.

8          MS. CENAR:  It pertains to both.

9          THE COURT:  It pertains to both.

10         MS. CENAR:  It pertains to both.

11         THE COURT:  Both.

12         MR. HORMUTH:  Right.  But as it pertains to the DMCA,

13  unlike the lobby graphics, where it's just the icons --

14         THE COURT:  One question at a time.

15         Is it both or is it just one?

16         MS. CENAR:  It pertains --

17         THE COURT:  In other words, how is it relevant to the

18  copyright infringement?

19         MS. CENAR:  It's relevant to the copyright claim

20  because they are licensing unlicensed works to an end user

21  through the terms of use, and they're making representations

22  in the terms and conditions of use that they own the content

23  that is on there.

24         THE COURT:  But making a false representation about

25  who owns a copyright isn't a copyright infringement.

1              MS. CENAR:  But it's --

2              THE COURT:  Copying is a copyright infringement.

3              MS. CENAR:  Right.  But it facilitates the

4    infringement, and that's one of the elements in the DMCA, is

5    to --

6              THE COURT:  That's why I am trying to figure out

7    whether this -- this sounds like this is all related to the

8    DMCA claim, not to the copyright -- I mean, there's --

9              MS. CENAR:  Well, your Honor --

10             THE COURT:  -- a pattern jury instruction on

11   copyright infringement.  It's not -- and it doesn't say what

12   you're talking about.

13             Here's what it says.  Here's what it says the

14   plaintiff has to prove to prove copyright infringement.  It's

15   Pattern Jury Instruction 12.2.1.

16             Plaintiff has to prove three things:  The work is a

17   subject of a valid copyright, plaintiff owns the copyright,

18   defendant copied protected expression.

19             Then there's a definition of each one of those terms,

20   and the relevant one here would be the definition of copying,

21   and it doesn't say saying something false about it.  That's

22   the DMCA.

23             MS. CENAR:  Right.  But the Pattern Jury Instructions

24   also say, amend if you're going to address a violation of the

25   distribution right and the license terms deal with violation

1  of the distribution right.  The terms and conditions of use

2  are a license agreement that facilitate the distribution of

3  GC2's copyrighted works --

4  THE COURT:  Tell me where are you talking about in

5  the Pattern Jury Instruction.

6  MS. CENAR:  It's a footnote that's --

7  THE COURT:  It's a comment, but which comment to

8  which instruction?  Which instruction?

9  MS. CENAR:  Note 4:  Copied.  If the infringement

10  consists --

11  THE COURT:  What is the number of the instruction?

12  MS. CENAR:  Oh, I'm sorry.  12.1- -- 12.2.1, note 4.

13  THE COURT:  If the infringement consists of something

14  other than copying, i.e., publicly performing, publicly

15  displaying, distributing copies of, the instruction should be

16  modified accordingly.

17  Honestly, then it would just -- then we'd just

18  substitute the word "publicly performing" or "distributing" in

19  for the word "copying" in element 3.

20  It's not a copyright infringement to say that it's

21  mine when it's yours.  That's -- it might be something else.

22  MS. CENAR:  But it's evidence of their involvement in

23  acts of distributing it.

24  THE COURT:  I mean, it's not necessary.  I mean, it's

25  pretty small evidence of that.

1       Okay.  So let's just focus on the DMCA for a second.

2       So if we're talking about the terms of use, what's

3   the nature of the DMCA violation that that pertains to?  Is it

4   transmitting -- I'm probably using the wrong lingo.  Is it

5   transmitting false DMCA, or is it removing DMCA, is it both,

6   either, something else?

7       MR. HORMUTH:  It's the terms of use are conveying --

8       THE COURT:  I didn't -- I botched that.  Let me

9   restate it.

10      Is it transmitting false CMI, distributing false CMI,

11  neither of the above, or a combination thereof?

12      MR. HORMUTH:  It's attributing false CMI to the

13  images that are displayed during game play.

14      THE COURT:  Okay.  So in other words, what you're

15  saying, when it pertains to the DMCA violation on the terms of

16  use, is that when the defendant links their terms of use to

17  your images on the sprite sheet, they're transmitting

18  essentially false copyright management information about those

19  images.  And some other stuff too, but that's certainly one of

20  the things they're doing.

21      MR. HORMUTH:  Correct.

22      THE COURT:  Okay.  Stop.

23      Then why isn't the terms of use relevant?

24      MR. MACEY:  I'll let Rebekah speak.

25      THE COURT:  I don't care.

1       MR. MACEY:  First it has to be conveyed in connection

2  with the CMI.  So if you look at this, they say, well, it's

3  not there.  You have to press on the menu, you have to go to

4  another screen --

5       THE COURT:  So what Ms. Parker was saying a minute

6  ago is that's the -- what you just said is the ruling that I

7  made on the motion to dismiss, that that wasn't enough of a

8  connection.  That wasn't with, in other words.

9       Right?

10       MS. PARKER:  You ruled it wasn't conveyed in

11  connection with, and -- right.  And then they cite to this

12  Exhibit H in their response as an example of the terms of --

13  of what the terms of use -- which sprite sheets they were

14  conveyed in connection with, and that is just, you know, a

15  picture of 84 different images.

16       THE COURT:  Okay.  I understand both sides'

17  positions.  We are moving on.

18       Guys, you filed 22 motions in limine and five Daubert

19  motions.  We are moving on.

20       Okay.  No. 8, prior copyright or contract breaches by

21  the defendant.  The defendant says, basically, this is

22  improper other act evidence.  That's a summary.  But the

23  plaintiff says -- and I want to hear what the defendants'

24  response is to this.  The plaintiff's response says, This is

25  relevant to show the background of the contract's Seventh

1   Amendment and the defendants' knowledge of the plaintiff's

2   mark, copyright, whatever.

3           So respond to that.

4           MR. LIEBMAN:  Your Honor, they don't need to put in

5   evidence of the actual bad acts or the allegations of bad acts

6   to get in evidence of the party's relationship and the

7   conveyance of the artwork from GC2 to IGT NV.  They can use

8   the Seventh Amendment for that.  They can use any other

9   evidence for that.  The actual bad acts are ancillary.

10  They're a sideshow.

11          The Seventh Amendment itself is enough to establish

12  what the parties' relationship was and how IGT NV became --

13  received or took possession of GC2's artwork.

14          THE COURT:  What's wrong with what he just said?

15          MR. MEZA:  Judge, it shows -- so the Seventh

16  Amendment was entered into between GC2 and IGT as a result of

17  other conduct that IGT engaged in which required the

18  amendments and also led to the buyout in 2007, and it shows

19  GC2's state of mind with regard to what happened in 2016 when

20  they were told there was a gap of rights also, Judge.

21          THE COURT:  The last part of that, say it again.  It

22  shows?

23          MR. MEZA:  It shows GC2's state of mind with regard

24  to what he -- what was going on in his mind when he was

25  contacted March of 2016 by the defendant saying, guess what,

1    there's a gap in the rights.

2              THE COURT:  Okay.

3              MR. MEZA:  That's exactly what --

4              THE COURT:  Okay.  Gap in rights memo, or the email.

5    Okay.  Okay.

6              MR. LIEBMAN:  Your Honor --

7              THE COURT:  We are moving on to the next thing.  I

8    understand both sides' positions.

9              Defendants' -- next thing is defendants' breach of

10   the Seventh Amendment to the contract.  Defendant says not

11   relevant because there's no breach of contract claim.

12   Plaintiff says relevant because operating outside the scope of

13   a license is an act of infringement.

14             So what's wrong with that?

15             MR. LIEBMAN:  Your Honor, well, it's similar to the

16   one we just argued, the eighth motion.  They can use the

17   Seventh Amendment for whatever purpose they want to without

18   arguing that it was entered into because of a prior breach --

19             THE COURT:  No, I'm on motion -- I'm sorry.  I didn't

20   preface this well enough.  I'm on motion No. 9 now.

21             MR. LIEBMAN:  Right.  They can use the Seventh

22   Amendment without arguing that we breached -- that IGT NV

23   breached the Seventh Amendment.  IGT NV does not contend, is

24   not going to --

25             THE COURT:  So what does that mean in practical

1    terms?  How are they going to use the Seventh Amendment and
2    nobody is going to say anything about how you were running
3    afoul of it?

4         MR. LIEBMAN:  Well, your Honor, we are not going
5    to -- we don't claim -- defendants do not claim that they had
6    a license to use this artwork.  That's not going to be a
7    defense in this case.  So whether we breached the agreement or
8    not, it doesn't matter.  For the elements of their proving
9    copyright infringement or the DMCA claim, whether we breached
10   the agreement or not, whether we had an agreement in the first
11   place or not, really doesn't matter.

12        Another important point, your Honor, is that we don't
13   want -- we're concerned that at the close of their case,
14   plaintiff will move to amend their pleadings to conform with
15   the evidence that was established --

16        THE COURT:  I want to make that a no-brainer.  That's
17   not going to happen.  So solved that problem.

18        MR. LIEBMAN:  So, your Honor, we think the breach is
19   prejudicial, they argue that we breached the contract, and
20   it's just unnecessary to prove the elements of their claim.

21        THE COURT:  Okay.  Respond to what he just said.

22        MS. CENAR:  One of the things that has not been
23   discussed that we do intend to do is the failure to affix the
24   GC2 mark, which is a requirement under the agreement, and that
25   relates --

1    THE COURT:  Failure to -- you didn't say "fix," you
2  said "affix."
3         MS. CENAR:  Affix.
4         THE COURT:  Okay.  Got it.
5         MS. CENAR:  -- (continuing) the GC2 mark and that
6  that was a requirement of the parties, that that was part of
7  the -- it's part of the alter and removing part of the DMCA,
8  but also was a requirement for them.  And so we would intend
9  to address that --
10        THE COURT:  How does that relate to the copyright or
11  the DMCA claims?
12        MS. CENAR:  Because that's the altering and
13  removing --
14        THE COURT:  I see.
15        MS. CENAR:  -- elements.
16        THE COURT:  So you're saying that if they were
17  contractually obligated to affix the mark and they didn't,
18  that amounts to an alteration?
19        MS. CENAR:  The fact that they took the graphics,
20  removed GC2's mark from it, removed IGT's mark from it, is an
21  act of removal.
22        THE COURT:  See, what you just -- yeah, okay --
23        MS. CENAR:  And then -- and then replacing IGT's mark
24  on it and replacing the copyright notice on it that's just IGT
25  is an act of alteration.

1      THE COURT:  All of that, I get.  How does that relate
2    to whether they breached the Seventh Amendment?

3      MS. CENAR:  Because it's a -- it's their knowledge
4    that they had a requirement to --

5      THE COURT:  Is knowledge an element of one of these
6    claims?

7      MS. CENAR:  Yes.  Under the DMCA, it is.

8      MR. LIEBMAN:  Your Honor, the Seventh Amendment does
9    not apply to online gaming.  It only applies to land-based
10   gaming.  Whether we had a contractual obligation to place the
11   mark on anything at all, particularly land-based games, has
12   nothing to do with the DMCA claim.

13     And your Honor already ruled in summary judgment that
14   there has to be preexisting CMI for there to be a removal CMI
15   claim, and that provision of the contract just -- it's just
16   not relevant to the DMCA claim at all.

17     THE COURT:  Okay.  I have ruled on 10 through 13.
18   I've ruled on 15 through 17.  So that leaves 14, and 14 is
19   entitled Exclude Evidence of Revenue Figures Other Than the
20   Most Recently Produced Amount.

21     So the response that the plaintiff filed in my view
22   raises a legitimate problem in the sense that, well, you know,
23   we've got to put all this in through deposition testimony.
24   When the depositions were taken, we had a set of information.
25   If we now have to use the current information, it completely

1    screws up the presentation of that testimony.  And so that
2    would seem to be a little problem, which perhaps you are going
3    to tell me momentarily has been solved because the alternative
4    that I proposed on plaintiff's motion in limine No. 2 is one
5    that the defendant is agreeing to do, because that would solve
6    this problem, I think.

7         The second issue has to do with expert reliance on
8    figures, which maybe is different, but the experts are
9    actually going to be here.

10        So what about what I've identified is a potential
11   serious problem?

12        MR. LIEBMAN:  Well, your Honor, with regard to the --
13   their presentation of the case -- you know, what this motion
14   in limine really gets to, your Honor, what we're concerned
15   about, is plaintiff arguing that IGT NV presented -- knowingly
16   presented inaccurate or incomplete information at different
17   points in time.  That's what we really don't want to happen.
18   If they have to use --

19        THE COURT:  Stop.

20        Is that where this is going?  Is that something
21   you're intending to do, planning to do, proposing to do,
22   thinking about doing?

23        MS. CENAR:  No, but their expert is relying on
24   exchanges with Frank Warzecha and Todd Nash in 2016, and in
25   those discussions --

1        THE COURT: I already said something about that in
2  the rulings that I made. So you --

3        MS. CENAR: Well, that's one of the points of
4  clarification that we wanted to ask you about the rulings that
5  you did issue.

6        But defendants' expert, Dana Trexler, is relying on
7  that exchange --

8        THE COURT: Right.

9        MS. CENAR: -- and what Mr. Warzecha valued the claim
10  at at that point in time as one of her bases for actual damage
11  calculations.

12        THE COURT: Right.

13        MS. CENAR: It's our contention that the revenue
14  numbers that they provided to him at that time were incomplete
15  and inaccurate and that they --

16        THE COURT: And when I said -- when I said in -- hang
17  on a second.

18        What I said in -- on page 2, ruling on motion in
19  limine No. 10, when I granted the defendants' motion to
20  exclude evidence relating to settlement disclosure --
21  discussions, when I said, quote, This does not preclude GC2
22  from challenging the completeness or accuracy of figures
23  relied upon by a defense expert regarding damages, close
24  quote, what you just said is exactly what I was referring to.

25        MS. CENAR: Right. But there were exchanges between

1    the parties on deliberate --

2            THE COURT:  Let me kind of get to the nub of it here.

3    Is the point that you just want to be able to show that the

4    defendants' expert relied on information that has since been

5    proved to be incomplete or the wrong information, or are you

6    trying to also make the point that somebody was trying to pull

7    the wool over somebody's eyes back in 2016?

8            MS. CENAR:  Both, actually.

9            THE COURT:  What's the relevance of the second point?

10           MS. CENAR:  Because they're relying on what

11   Mr. Warzecha valued his artwork at at the time based on --

12           THE COURT:  Remind me who Warzecha is?

13           MR. LIEBMAN:  GC2.

14           MS. CENAR:  He is GC2.

15           THE COURT:  Got it.

16           MR. LIEBMAN:  Your Honor, that goes to the first

17   part --

18           THE COURT:  Stop.  I am not done with her yet.

19           Yeah, I am having a hard time seeing what the

20   probative value is of contentions that the info they gave him

21   at that time was deliberately incorrect as opposed to just

22   wrong.

23           MS. CENAR:  Because there's email exchanges that --

24           THE COURT:  So what?  I mean, so what?  What does

25   that have to do with anything?

1     MS. CENAR: Because --

2     THE COURT: How does that help you -- let's talk

3 about Rule 401, which says -- okay, which says, and I quote,

4 Evidence is relevant if it has any tendency to make a fact

5 more or less probable than it would be without the evidence

6 and the fact is of consequence in determining the action.

7     So what's the fact that's of consequence in

8 determining the action showing that they deliberately provided

9 false information in 2016 would make more or less probable?

10     MS. CENAR: Because Mr. Warzecha was giving a

11 valuation of resolution of this -- commercial resolution of

12 this dispute.

13     THE COURT: But that goes back to settlement. You

14 can't do that. That's an easy one.

15     MS. CENAR: Okay. If the settlement is out, then --

16     THE COURT: Like I said, can't do that. That's

17 called a ruling.

18     All right. We are basically done with everything I

19 want to talk about on the defense motions.

20     Oh, I'm sorry. There may have been one other little

21 piece of that one. Excuse me. I just got to read through --

22 interpret something in my notes.

23     No.

24     Now I want to talk about what is left on the

25 plaintiff's motions.

1    There's only one -- well, okay.  There's two things

2  on the plaintiff's motions, one of which I am going to make an

3  oral ruling on, but I don't need to hear more commentary on,

4  which I am going to do at the very end.

5    The second is this whole issue of where we are going

6  on the question of when the witnesses are coming in.  So have

7  you had a chance to give that any -- I know it's been just

8  since this morning.

9    MR. MACEY:  If I bring somebody in, they don't have

10  to put on their -- well, it's up to them.  I don't think they

11  should do both, but they don't have to read the deposition

12  testimony.

13    I've told them who our shall witnesses already will

14  be.  If there is a may witness I take off the may list, I will

15  tell them ahead of time.

16    THE COURT:  So you basically have rejected the

17  solution that I proposed, which was your alternative

18  suggestion, which was --

19    MR. MACEY:  What was my alternative?

20    THE COURT:  -- you bring them in during the

21  plaintiff's case and as -- you get to examine them to your

22  heart's content without any restriction on the scope.

23    MR. MACEY:  No, that's what I said I'm --

24    THE COURT:  So you are going to bring them in during

25  the plaintiff's case.

1          MR. MACEY:  Yeah, yeah, but I have to tell them --

2          THE COURT:  Okay.  Fine.

3          MR. MACEY:  But I have one request.

4          THE COURT:  What's the request?

5          MR. MACEY:  Well, my problem is is that I won't have

6    any witnesses.  I'll have no fact witnesses.

7          THE COURT:  I can explain all of this to the jury.

8          MR. MACEY:  That's all I care about.

9          THE COURT:  I will absolutely -- you probably will

10   need to remind me, but I am going to explain it all to the

11   jury at the beginning --

12         MR. MACEY:  That's all I care about.

13         THE COURT:  -- that normally what would happen is the

14   plaintiff would call witnesses, and then the defendant would

15   call witnesses, there's some of the witnesses that would be

16   put on by both sides, by deposition and otherwise.  I have

17   decided, and I directed the parties as a means of streamlining

18   the trial, that those witnesses would be brought in during the

19   plaintiff's case even though they're really defense witnesses

20   and you should not hold that against the defendant in any way,

21   shape, or form because it's a decision that I made.

22         MR. MACEY:  Good.

23         THE COURT:  Something like that will do it?

24         MR. MACEY:  Fine.  I just need advance warning.

25   They're coming in from Seattle and Nevada --

1   THE COURT:  Right.  Okay.

2   MR. MACEY:  -- I think, and Colorado.

3   No, no.  Mr. Whistle will be here.

4   THE COURT:  Okay.

5   MR. MEZA:  And, Judge, if we could just have advance

6   warning with a reasonable time --

7   THE COURT:  I think he is going to want to know --

8   MR. MACEY:  I've already told them all the

9   shall-calls --

10  MR. MEZA:  Right.  I'm talking about the may-calls.

11  MR. MACEY:  Yeah, there might be only one that I know

12  of.

13  THE COURT:  Okay.  Fair enough.  You'll work that

14  out.  I'm confident you'll work that out.

15  Okay.  I want to flip ahead to the expert stuff,

16  which I am not going to be able to rule on today, but I really

17  want to get more of a -- how shall I put it? -- big picture

18  sense.

19  Okay.  So the -- I actually want to start with the

20  defense.  The defense has got, if I'm understanding this

21  correctly, two expert witnesses, Trexler and Hawkins; is that

22  right?

23  MR. MACEY:  That's correct, your Honor.

24  THE COURT:  Okay.  So I know what Hawkins' testimony

25  is because there is a motion in limine on him, and so I've

1      read his report a couple of times.

2              What exactly is Trexler going to talk about?

3              MR. MACEY:  Trexler is going to say, based on

4      reviewing -- this is real general.

5              THE COURT:  Yeah.  That's what I am looking for.

6              MR. MACEY:  Based on reviewing other license

7      agreements -- well, we all know what the revenue is.  That's

8      really not a fight in this case.  She's going to say, these

9      are what the costs are, based on the information she has,

10     which gets you down to profits.

11             And then she's going to say based on reviewing

12     license agreements, based on reviewing -- what do they call

13     them? -- works-for-hire agreements --

14             THE COURT:  Yeah, works-for-hire agreements.

15             MR. MACEY:  -- okay, et cetera, those kinds of

16     things, she will opine what percentage she maintains art would

17     have --

18             THE COURT:  She is going to apportion the profits,

19     basically.

20             MR. MACEY:  Exactly, exactly.

21             THE COURT:  Profits apportionment.

22             MR. MACEY:  Also --

23             THE COURT:  Is she also going to talk about

24     reasonable royalty?

25             MR. MACEY:  Yes, she does that too.

1          THE COURT:  Okay.  Because that's damages, not

2   profits, right?

3          MR. MACEY:  That is correct.  She will do a

4   reasonable royalty on a --

5          THE COURT:  But she's talking about both damages and

6   the profits side of the relief aspect.

7          MR. MACEY:  Exactly.

8          THE COURT:  On damages, she's talking largely about

9   reasonable royalty.  On revenue, she's basically saying, here

10  is the cost and here is how you apportion the profits.

11         MR. MACEY:  Thank you.

12         THE COURT:  Okay.  So now -- now we get to Hawkins.

13         MR. MACEY:  Yes.

14         THE COURT:  And I kind of read Hawkins as doing the

15  same -- I mean as talking about the same topics.

16         MR. MACEY:  Different way.

17         THE COURT:  In a different way.

18         MR. MACEY:  Same topics.  Not -- yeah, in a different

19  way.

20         THE COURT:  Okay.  And since -- and part of this is I

21  don't have the benefit of Trexler's report.  I mean, I am not

22  saying it's not buried in some summary judgment material

23  somewhere.  I am talking about what I got right now.

24         So can you kind of give me in a big picture sense the

25  difference in -- when you say "in a different way," what do

1  you mean?

2          MR. MACEY:  I'm a game developer.  I've been

3  developing games since EA -- since I started EA Sports back in

4  the '80s, I think.  Okay?  This is what I do for a living.

5  I'm a business person.  Okay?  This is what I do for a living,

6  developing these games all the time.  I have to pay artists, I

7  have to pay engineers, I have to pay for all the costs related

8  to developing a game.  Okay?

9          I put an economic value on art as a businessperson as

10  it relates to the game development and the revenue and profits

11  that are attributable to it.  I believe, in my opinion and

12  based on my experience, with specific statements of

13  experience, okay, that this art is relatively replaceable,

14  okay, and, therefore, I would not pay a lot more money for it,

15  et cetera, et cetera.

16          THE COURT:  Okay.

17          MR. MACEY:  That's essentially his opinion.

18  Hawkins -- Trexler really doesn't do that.

19          THE COURT:  What's Trexler's background?

20          MR. MACEY:  Well, Trexler is a CPA --

21          THE COURT:  Okay.  So it's from a -- it's from a

22  financial standpoint --

23          MR. MACEY:  Absolutely.

24          THE COURT:  -- as opposed to --

25          MR. MACEY:  Hawkins is a business perspective.

1   Different method, different.

2          THE COURT:  Okay.  All right.  Now, plaintiff's

3   experts.  Give me just a second here.

4          MR. MACEY:  I'll let them --

5          THE COURT:  So as I understand it, we've got -- not

6   necessarily in this order, we've got Laykin -- I am talking

7   about all the experts.  We have Laykin, we have Holt, we've

8   got John, and we've got there's one other one.

9          MS. CENAR:  Gaud.

10         THE COURT:  Right.  Gaud, G-a-u-d.  Okay.

11         Laykin is not talking about anything relating to

12  damages or profits, right?

13         MR. MEZA:  He is the technical --

14         THE COURT:  He is talking about this is how this

15  whole stuff works and this is when distribution happens and

16  all this kind of stuff.

17         MR. MEZA:  Correct.

18         THE COURT:  That's not related to any -- Holt, whose

19  stuff I've read, she's on your will-call list, and she's going

20  to talk about both royalty, reasonable -- she is going to talk

21  about both royalty, reasonable -- she's going to talk about

22  both damages and profits; am I right?

23         MS. CENAR:  Yes.

24         MR. MEZA:  Correct.

25         THE COURT:  Now, you guys have referred to the other

1   two -- and I recognize, by the way, so just to be clear and

2   just so I make sure you understand that I know what the

3   standard is -- on damages, the plaintiff has the burden of

4   proof.  On profits, the plaintiff just has to show the

5   revenues, and the burden shifts to the defendant to prove

6   costs and apportionment.

7         So Laykin is actually partly an affirmative witness

8   and partly a rebuttal witness because she is rebutting the

9   profits stuff, right?

10         MS. CENAR:  You mean Holt.

11         MR. MEZA:  Holt.

12         THE COURT:  Holt.

13         MR. MEZA:  That's correct.

14         THE COURT:  Now, explain to me where -- and I've read

15   the reports, but I want you to explain to me where kind of in

16   the big picture John and Gaud fit in.  What exactly are they

17   rebutting, because you have called them rebuttal experts.

18         MR. MEZA:  So Mr. Hawkins is going to say to the jury

19   the artwork, the GC2 artwork graphics, represented less than 1

20   percent --

21         THE COURT:  Minimal value.

22         MR. MEZA:  1 percent.

23         THE COURT:  Right.

24         MR. MEZA:  And they're going to rebut that.  They're

25   going to say the value actually is about 50 percent because --

1    THE COURT:  Okay.  So here's my question.  So
2  partly -- so does Holt's testimony rebut what you just
3  described from Hawkins' testimony at all?
4    MS. CENAR:  Holt's testimony addresses the position
5  of both Trexler and Hawkins that this is low cost and the
6  graphics can be easily swapped out.
7    THE COURT:  Okay.
8    MS. CENAR:  Gaud testifies that art and graphics are
9  not low cost and they cannot be easily swapped out without
10  impact on revenues from the same --
11    THE COURT:  Where does John fit in?
12    MS. CENAR:  And John addresses the Hawkins low cost,
13  that these are --
14    MR. MEZA:  Works for hire.
15    MS. CENAR:  -- fungible works for hire.
16    THE COURT:  Okay.  So is there -- are John and -- I
17  mean, how -- what's -- I asked Mr. Macey what's the difference
18  between Trexler and Hawkins.  I'm asking you what's the
19  difference between John and Gaud.
20    MS. CENAR:  I think they address different parts of
21  Hawkins' report, and Gaud addresses a part of Hawkins' report
22  and Trexler's opinion that she has a copyright design-around
23  theory, right, where you can just swap out the graphics for
24  non-infringing, and he addresses how that has impact -- that's
25  risky and has impact on revenues.

1    Whereas, Hawkins says it can be swapped out with no
2    risk, and Trexler adopts that from an economic perspective.
3    So Gaud actually touches the economic perspective of
4    Trexler and the business perspective of Hawkins.
5    THE COURT:  Okay.  So I want to talk about -- I want
6    to talk about Hawkins a second here, but it's really not just
7    about -- I want to ask some questions about Hawkins, but it's
8    really not just about Hawkins.  It's about a lot of this
9    stuff.  And, again, I have not read or seen, at least not
10   recently, Trexler's report, which I put in a different
11   category.
12   So I read Hawkins' report.  He's got this very, you
13   know, long and illustrious background in developing digital
14   games -- we used to call video games -- digital games.  I
15   understand I believe his testimony that relates to reasonable
16   royalty.  And what I mean by that is when he says you can't
17   possibly pay more than a relatively small percentage for
18   artwork because you got to spend all this money on marketing
19   and you got to spend all this money on distribution and Amazon
20   is taking a slice and everybody is taking a slice and you
21   can't just economically -- it just doesn't work, you can't
22   spend a lot of money on this, and by the way, there's a
23   million and one people who do this stuff, and not that they're
24   all fungible, but they're kind of like a dime a dozen, that's
25   an overstatement of what he says, that I see as relating

largely to reasonable royalty.  We would not pay -- a reasonable person would not pay people who did this artwork more than X.

It maybe has some sort of tenuous logical relationship to profits, but I see the profits testimony as different.

And so when you get over to the profits aspect of it, it becomes -- it becomes to me -- and I have to say I think I kind of say the same thing about some of what I have seen on the plaintiff's side, and I can't quote you chapter and verse on exactly who the witness or witnesses are -- but it's basically -- it becomes a lot more -- touchy-feely is the wrong word, but that's kind of what the sense I get.

In other words, this guy hasn't done a study to say, okay, I've analyzed the various factors that go into determining what -- determining the profitability of the game, and I kind of pull them out in these various ways and in these various proportions.  And I wouldn't say that somebody has to have done a study, but they have to have some kind of a methodology that we can kind of figure out what it is, and it can be critiqued, potentially replicated or at least, you know, attempt to replicate it, and I am having a hard time finding that in here.  It all seems like it's like, I'm the guy who knows everything about this business, and here's the answer, less than 1 percent.

1      So can you help me out on this a little bit?

2           MR. MACEY:  Sure.  I agree with you except for one

3    point.

4           THE COURT:  What's the one point?

5           MR. MACEY:  Okay.  He testifies what it usually costs

6    to buy this type of artwork.  For example, he compares a slot

7    game -- do you know Fortnite?  Do you know -- okay.  A game

8    where there is an avatar, where you control somebody, and

9    they're moving around, and you're playing with multiple people

10   all over the --

11          THE COURT:  It's an interactive game.

12          MR. MACEY:  Exactly.

13          Okay.  This is a slot game, okay?

14          THE COURT:  It's not interactive at all.

15          MR. MACEY:  And he compares the cost with respect to

16   that and says, these costs are de minimis for this kind of a

17   thing.

18          If you look at the decision that actually both sides

19   site, and it's the Ty, Inc., decision, we both cite it, okay?

20   And what the judge said there --

21          THE COURT:  That's the one where the judge says

22   nobody is an expert in this?

23          MR. MACEY:  Yeah, but he went on and said what it

24   usually costs to buy the copyright-protected material is

25   relevant to a person, and he permitted testimony for that.

1    And that's what Mr. -- that's that portion of what

2    Mr. Hawkins' testimony will be.

3           With respect -- everybody else is gestalt.  I agree

4    with you.

5           THE COURT:  Yeah, okay.  I mean, I don't know exactly

6    everything that was in front of the judge in Ty -- I'm

7    forgetting who that was --

8           MR. MACEY:  Who is the former State Police

9    commissioner?

10          MS. PARKER:  Judge Zagel.

11          MR. MACEY:  Judge Zagel.

12          THE COURT:  Judge Zagel.  I don't --

13          MR. MACEY:  Thank you.

14          THE COURT:  I don't know exactly everything that was

15   before him at the time, and I guess it would be hard to -- it

16   would be hard to dispute the proposition that what it costs is

17   relevant, but I don't think that's what we are talking about

18   when we are talking about these witnesses' testimony.

19          I mean, it's one thing to say, hey, this stuff is

20   cheap, never pay more than 20 grand for it, never pay more

21   than 30 grand, I have done a survey, nobody pays more than 20

22   grand for this.  That's one thing.

23          But then to translate that into what's its

24   contribution into profitability, I mean, is another thing.

25          So, for example, I mean, you know, I used -- I used

1    the -- and I have not seen the movie -- Roma, okay?  So the

2    lead actor in that movie is somebody who never acted before,

3    never been in a movie before, probably had to pay her 30

4    grand, okay?  And maybe she ends up winning an Academy Award,

5    and maybe what people read and see about her ends up being

6    this massive contribution to the profitability of the movie,

7    and it's not just that this very famous director made it.

8         The fact that you only put X into something doesn't

9    mean that -- the costs aren't necessary -- aren't -- I guess

10   my point is that the cost of something is not necessarily

11   proportional to its contribution to the profitability.  That

12   seems to me to be a question of economics that really isn't

13   addressed by at least what I've seen here.

14        In other words -- and that's -- it's clear that

15   that's the connection that Mr. Hawkins is trying to draw and

16   that you are drawing is that, okay, we wouldn't pay more than

17   this for it, how could it possibly contribute much to

18   profitability --

19        MR. MACEY:  An investor -- it's an investor decision.

20   It's like any -- it's like you bring in a venture capital guy

21   who says, I want you to put up this kind of money.  He says,

22   well, I'm not going to pay this much for artwork because it

23   doesn't -- it's not going to -- I'm -- because I care about

24   the profitability, and this has nothing to do with the

25   profitability, as far as I'm concerned --

1          THE COURT:  Yeah.  The part that --

2          MR. MACEY:  -- so I'm not going to pay a lot for

3    it --

4          THE COURT:  The part --

5          MR. MACEY:  -- any more than I would have paid -- I'm

6    sorry.

7          THE COURT:  The part that I am having a hard time

8    getting is how he knows that.  In other words, how he knows or

9    what's his basis for saying that it doesn't contribute to the

10   profits.

11         MR. MACEY:  Because, see, he has invested and created

12   and done this for the past 40 years.  That's what he does for

13   a living.  Okay?  That's exactly what he does for a living.

14         And the other thing he testifies to is that because

15   DDI --

16         THE COURT:  I guess my -- I guess my problem -- or

17   part -- it's not my whole problem.  Part of my problem is,

18   okay, I get that, the guy is in the business.  But I think

19   that what Daubert contemplates is that this isn't just gut.

20   And there may be situations in which gut's good enough, but

21   that's kind of what I am getting out of -- I like to say it's

22   not necessarily just him.  It's a lot of this testimony.  My

23   big kind of overarching view was I either let it all in or I

24   don't let any of it in, okay?  But a lot of it seems to me to

25   be gut, and I'm not sure that I'm persuaded at this point that

1   determining something -- some factor's contribution to
2   profitability is something that's appropriately based on
3   educated -- highly educated gut.  That's the part I am having
4   trouble with.
5        So it would be helpful -- and this is an issue with
6   some of the people on the plaintiff's side too.  So if anybody
7   wants to try to help me out on that.
8        MR. MACEY:  Well, the other point I believe that
9   Mr. Hawkins makes repeatedly is the fact that what DoubleDown
10  did is when they started this business, they used Facebook as
11  the platform.  And because Facebook was such a huge new media
12  for a social media, it generated huge revenues, and,
13  therefore, the profitability was a function, not simply of the
14  artwork, but of the platform that it was put on to be able to
15  generate the revenues.  And that's based on someone who has
16  had this experience in the business of developing games and
17  putting them on various platforms.
18        THE COURT:  How does he figure out that this is 1
19  percent?
20        MR. MACEY:  How does he get to that number?
21        THE COURT:  It's a number.
22        MR. MACEY:  I agree with that.  That is based on
23  experience and what he'd be willing to pay for artwork under
24  these circumstances for these casino games online.
25        THE COURT:  So who is your countervailing person or

1   people with regard to this aspect of Hawkins' testimony?

2          MS. CENAR:  Gaud is our main one, your Honor, and he

3   does it in two ways.  He does it with respect to approaching

4   the cost piece of it, that Hawkins is off base as to the cost

5   of artwork, and that artwork is fungible and the less than 1

6   percent.  And he also addresses it from the you just can't

7   swap out graphics for cheap alternatives or go to a -- you

8   know, a Chinese company to do just okay graphics for these

9   when you're using known artwork and graphics.

10         THE COURT:  Okay.  Let me ask my question in a

11  different way.

12         So if I were to say that the profits aspect of

13  Hawkins' testimony is he is describing all of the factors that

14  contribute to profitability of a game like this, full stop, I

15  am not saying that this is 10 percent and this is 5 percent

16  and this is 3 percent and this is 20 percent, who is the

17  person -- is there a person on the plaintiff's side that's

18  going to come in and say, he's wrong about that and let's take

19  it to the next step?

20         Is there somebody who is going to come and say when

21  Hawkins -- if I let Hawkins testify, when Hawkins says that I

22  know from my experience that the fact that they were

23  distributing this thing on Facebook was a very significant

24  driver of profitability, is there somebody who is going to

25  say, he's evaluating that wrong, or, he's overweighing that,

1    or is there somebody who is doing that?

2             MS. CENAR:  No.  There are fact witnesses that say

3    the opposite of what Hawkins says.

4             THE COURT:  Not an expert, though.

5             MS. CENAR:  Right.

6             THE COURT:  Okay.  All right.  I am going to regret

7    doing this, but each side can have five minutes to tell me

8    anything that you want -- a lot of ink has been spilled about

9    the experts, and I don't really need more -- it's not about

10   law, really.  It's about applying law to the facts.

11            I will give each side five minutes to say anything

12   more that you want to say about any of the experts, and you

13   don't have to use the whole five minutes or any of it.  But if

14   you want to, that's fine.  But it's no more than five.

15            MS. PARKER:  About the experts or anything?

16            THE COURT:  Just about the experts.

17            MR. MEZA:  With regard to --

18            THE COURT:  Either your own experts or the other

19   side's experts.

20            MR. MEZA:  Judge, with regard to the experts,

21   Ms. Trexler, the defendants' expert, used information that

22   you've now ruled is inadmissible.

23            THE COURT:  Which is what?

24            MR. MEZA:  Which is that 2.8 million, the settlement

25   discussions --

1          MS. CENAR:  The 2016 discussion.

2          MR. MEZA:  -- the 2016 discussions, to --

3          THE COURT:  I don't think I said it was inadmissible.

4   I said that the fact of settlement discussions was not

5   admissible.  I didn't say that any data that was exchanged

6   during the settlement discussions wasn't admissible.

7          She can use the data, and then you can attempt to

8   show that the data was -- that she relied on incorrect data.

9   And I still have an open -- there's still an open question

10  about whether you can put in or whether it was deliberately

11  incorrect.  That's something I still have to rule on.  That's

12  what I think I have done.

13         MR. MEZA:  All right.  And the other one, Judge, and

14  we didn't touch on this, is on page 3 of your ruling.

15         THE COURT:  Yes.

16         MR. MEZA:  Revenues generated by casino operators.

17         THE COURT:  Okay.

18         MR. MEZA:  So we understand the decision with regard

19  to the Deltek decision and the value of use and the casino

20  partners, but there was some revenue that IGT did receive as a

21  result of them giving that artwork to the casino partners.  So

22  that -- those moneys are in the revenue pile, and we just want

23  to --

24         THE COURT:  If it's revenue that IGT got, it's

25  revenue that IGT got.  We don't have to worry about whether it

1    came from A, B -- or we don't have to worry about whether the

2    casino operators got more or less or whatever, right?

3              MS. CENAR:  It's calculated off of that.

4              THE COURT:  So what?  Isn't the relevant number the

5    figure that IGT got, based on the ruling I made, at least?

6              MS. CENAR:  Based on your ruling.

7              MR. MEZA:  Yes.

8              THE COURT:  Okay.  Then that seems to me to be the

9    answer.

10             Okay.  Do you guys want to say anything more about

11   experts at all?

12             MR. MACEY:  Only one thing to help the Court pay

13   particular attention to Mr. Laykin's declaration, which he --

14             THE COURT:  Oh, no, I know there is an issue about

15   a 26(a)(2) disclosure.

16             MR. MACEY:  Absolutely.  Okay.  Thank you.

17             THE COURT:  I get that.

18             MR. MACEY:  That's it.

19             THE COURT:  Actually -- give me a second.  Let me

20   just look at this again and see whether there was something --

21   I'm actually glad you brought that up, because I want to see

22   whether there was something I wanted to ask about that.

23             No, I wanted to make sure it was dealt with in the

24   response.  That's fine.  I will deal with all that when I deal

25   with it.

1          MR. MACEY:  Thank you.

2          THE COURT:  Okay.  So let's talk -- before I get to

3    the last thing I have to do, let's talk a little bit -- so

4    we've got a date, I mean, I recognize that some of the rulings

5    I haven't made yet are going to impact it, but when I got to

6    the part of the pretrial -- and I know we've talked about this

7    before.  When I got to the part of the pretrial order that

8    talked about length of trial, when somebody says "no more than

9    X," I break out into a cold sweat because that could mean it

10   could be X.  And I guess I never really saw this as a two-week

11   trial.

12         So do people think it's really a two-week trial?

13   When you say "no more than two weeks," that could mean a day

14   and a half or it could mean 10 days, okay?

15         MR. HORMUTH:  It may not take the full two weeks now,

16   and we have some clarity on how we're going to handle live

17   witnesses and not be cumulative of --

18         THE COURT:  So that may -- that may resolve some of

19   those issues.

20         MR. HORMUTH:  -- so that helps a little bit.  But I

21   think it's going to be --

22         THE COURT:  So what I am going to do, though, my goal

23   is going to be to try to rule on all of the remaining motions

24   in limine within the next week or maybe a week from tomorrow,

25   and then I'm probably going to bring you back in just for a

1    quick status in chambers maybe the week right before Christmas
2    and say, okay, now I've ruled on this stuff.  I really need to
3    know how many days we are talking about here so I can just
4    plan around it.
5            So just figure that there's going to be some sort of
6    a status like that.  We may even be able to do it by phone,
7    frankly, because I know we have some out-of-town people here.
8            Okay.  So now I have one other thing to rule on.  Is
9    there anything anybody wants to -- any issues anybody wants to
10   bring up with me, clarification stuff, anything that you want
11   to --
12           MR. MACEY:  Well, the last time we were before you in
13   the jury room in the back talking at a status, you were going
14   to set a date today of when the parties had to make objections
15   to exhibits --
16           THE COURT:  Ah, okay.
17           MR. MACEY:  -- and to deposition designations.
18           THE COURT:  Dep designations.
19           Yeah, but that's probably still even a little
20   premature, though, right?
21           MR. MACEY:  I agree, because of the motions in
22   limine.
23           THE COURT:  Yeah.  Okay.  Then I'll -- what I'll do
24   is -- if I don't do that -- if I don't remember to do that
25   when I issue the ruling on the remaining motions in limine,

1   just remind me; or somebody will remind me in the status, and
2   we will talk about dates for that.

3          Okay.  So the last issue is this -- is plaintiff's
4   motion in limine No. 4.  And let me just pull up the motion
5   here.

6          It's entitled Preclude IGT from Soliciting Testimony
7   or Evidence Inconsistent with the, quote, unquote, Uncoached
8   Corporate Testimony That It Does Not Claim Copyright Ownership
9   Over the Artworks and Graphics in Coyote Moon and Pharaoh's
10  Fortune and Preclude IGT NV from Offering Contrary Testimony
11  Or Evidence.  Kind of a long title.

12         It all concerns the deposition of an individual by
13  the name of Steve Kastner, K-a-s-t-n-e-r, and some testimony
14  that was given by him.  It starts on page 47 of his deposition
15  and goes over to page, basically, 52 or top of 53.

16         And I'm making an oral ruling on this for reasons
17  that I think will become obvious, but if they are not obvious,
18  I'll explain it at the end.

19         So basically what happens, so Kastner is being
20  deposed.  He's one of the corporate witnesses designated by
21  one or more of the defendants.  And at the bottom of page 47
22  of his deposition, he's asked the following question:  Does
23  IGT NV contend that they own the copyright rights to the
24  artwork and graphics that's Exhibits 154 to 158?  And these
25  are exhibits that had been shown.  He answers -- there's no

1    objection, answers directly, without equivocation:  154 to

2    156, no, and as discussed previously, 157 and 158, there's

3    some contention.

4            "QUESTION:  Why do you say no for 154 to 156?

5            "ANSWER:  We don't contend that we own the art.

6            "QUESTION:  Okay.  Who owns the artwork and graphics

7    for 154?

8            "ANSWER:  BC2.

9            "QUESTION:  GC2?

10           "ANSWER:  GC2.  Sorry."

11           And then the material that is the bone of contention

12   in this motion happens.  The attorney who was there for the

13   defendant says -- they object to the form of the question,

14   calls for a legal conclusion.

15           The lawyer for the plaintiff says, Who owns the

16   artwork and graphics for Exhibit 155?  Lawyer for the

17   defendant says, Calls for a legal conclusion.  The witness

18   says, As stated, I believe our legal counsel would be the

19   better ones to answer that.

20           It goes, I would say, further off the rails after

21   that.

22           At the top of page -- I'm really over on -- towards

23   the bottom of page 48.  The lawyer asks -- after some more

24   colloquy, the lawyer says, You pointed to Exhibits 154, 155,

25   and 156 as IGT NV not owning the artwork and graphics,

1    question mark.

2           I interject here myself, which is precisely what the

3    guy said at the top of the page.  The lawyer for the defendant

4    says, That question called for a legal conclusion.  I missed

5    the objection, but stating it now, that question calls for a

6    legal conclusion.  The witness is here to testify about the

7    facts.

8           The witness, I say advisedly picking up on the cue,

9    says, I don't know.

10          There's some further discussion, colloquy back and

11   forth, questions about -- and similar objections.  And then at

12   some point, the lawyer -- within the next page, the lawyer for

13   the defendant says, Let's take a break.

14          The lawyer for the plaintiff finishes asking the

15   question.  Defendants' lawyer says, Objection, calls for a

16   legal conclusion.  Let's take a break.  The plaintiff's lawyer

17   insists on an answer.  The defense lawyer says, I asked for a

18   break before you asked the question.

19          There's some sniping back and forth.  A break is

20   taken for about 10 minutes.  The pending question is read

21   back.  And Mr. Kastner then does what I call, advisedly, a 180

22   and says, We actually -- for all five exhibits, we own the

23   relevant marks.

24          "QUESTION:  You own the relevant marks?

25          "ANSWER:  I'm sorry.  The copyright.

1        "QUESTION:  Okay.  Who is 'we'?

2        "ANSWER:  IGT.

3        "QUESTION:  Did you discuss this question with your

4    counsel while you were out in the hallway?"

5        Almost a rhetorical question because the answer is

6    obvious.

7        And then there is a series of privilege objections.

8        So the motion that's made is to basically bind the

9    defendant to the answer that Mr. Kastner gave unequivocally

10   under oath without objection before all of this nonsense

11   happened.  And I am not writing this in an opinion out of

12   deference to the lawyer who did all of this.

13       The objections were improper, they were legally

14   frivolous, and they had no good-faith basis.  These were not

15   questions that called for legal conclusions.  They were

16   calling for factual testimony and the company's position.

17       The objections, I am finding, were interposed for an

18   improper purpose; specifically, to signal to the witness to

19   modify his testimony and to change his answers.  There is

20   absolutely not a single bit of doubt or hesitation in my mind

21   that that was the exact purpose for which this was done.  It

22   was completely improper conduct by an attorney that went

23   beyond the bounds of appropriate advocacy.  And it worked.

24   The witness first started to hedge, then backed off, and then

25   reversed his testimony entirely.

1    It is not appropriate to allow the defendants to

2   benefit from this completely improper conduct by their lawyer.

3    So the first part of it is easy and was agreed to by

4   the defendant.  None of the postbreak testimony can be used by

5   the defendant.  That was agreed to.

6    None of it can be referenced by the defendant or the

7   witnesses if he testifies live, that part wasn't agreed to,

8   unless the plaintiff decides to elicit it.

9    The plaintiff can introduce page 47, line 23, to

10  page 48, line 9, and stop right there.  And if the plaintiff

11  does that, the defendant may not introduce the other

12  testimony, nor may the witness reference it if he testifies

13  live.

14    Now, I can imagine from a strategic standpoint the

15  plaintiff saying -- and I think -- I mean, if it were me, I'd

16  almost do it this way, but it's not my call -- the plaintiff

17  saying, I just want to put the whole thing in in front of the

18  jury and let them see it in all of its glory, including the

19  request for a break and going out in the hall and he comes

20  back and do -- does a 180.  And you just lay it in front of

21  the jury and say, there it is, ladies and gentlemen, right

22  there.  But that's a -- or maybe everything right up to the

23  break.

24    That's a strategic question.  The plaintiff can do

25  that if it wants to.  If it stops -- if you decide to present

1   it up to the break and not past the break, the defendant

2   cannot put in any of the postbreak testimony or elicit it from

3   this witness.

4           And if -- and then the last piece of this is that

5   given my view, which I've expressed on one of the other

6   motions in limine, I think it was No. 3 by the plaintiff on

7   the binding -- on the nature of the binding effect or not

8   binding effect of 30(b)(6) testimony -- in other words, that

9   it doesn't bar a party from trying to contradict it -- I'm not

10  going to bar the defendant from trying to contradict it during

11  the trial, but if the defendant attempts to do so, there will

12  be an instruction to the jury regarding the effect of

13  Rule 30(b)(6) testimony as I've discussed elsewhere.

14          Okay.  So motion in limine No. 4 by the plaintiff is

15  granted to that extent.  And all I am going to say is that the

16  opinion was written, okay, and I am not issuing it that way,

17  and I haven't named anybody.

18          So there you go.

19          I'll issue a written ruling on everything else, like

20  I say, within the next week or eight days, and I'll get you

21  back in here for a status or on the phone a week after that,

22  the week after that.  Okay?

23          Take care.

24    (Which were all the proceedings had in the above-entitled

25  cause on the day and date aforesaid.)

1    I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.
2

3    _____            _____
     Carolyn R. Cox                             Date
     Official Court Reporter
4    Northern District of Illinois

5    /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25