**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **GC2 INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **Case No. 16 C 8794** |
| ) | |
| **INTERNATIONAL GAME TECHNOLOGY,** ) | |
| **IGT, DOUBLEDOWN INTERACTIVE LLC,** ) | |
| **and MASQUE PUBLISHING, INC.,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

GC2 Inc. sued International Game Technology, IGT,[1] Doubledown Interactive

LLC, and Masque Publishing, Inc. alleging copyright infringement and violations of the

Digital Millennium Copyright Act (DMCA). GC2's claims went to trial in January 2019.

The jury found unanimously in GC2's favor. Specifically, the jury found that each of the

defendants had both directly and vicariously violated GC2's copyrights, that IGT

Holding, IGT NV, and Doubledown had also contributorily infringed, and that IGT

Holding, IGT NV, and Doubledown had committed 696 separate violations of the

DMCA.

The defendants have filed several post-trial motions. They ask for partial

judgment as a matter of law on the DMCA claims on the basis that evidence did not

---

[1] For clarity, the Court will refer to the parent, International Gaming Technology, as IGT
Holding and the subsidiary, IGT, as IGT NV in reference to its status as a Nevada
corporation.

support the jury's verdict; for a new trial, remittitur, and/or to alter the verdict; and for attorney's fees under the Copyright Act. GC2, the plaintiff, has moved for a permanent injunction, supplemental damages, prejudgment interest, attorney's fees, and costs. For the reasons below, the Court (1) denies the defendants' motion for partial judgment as a matter of law; (2) denies the defendants' motion for a new trial, remittitur, and/or to alter the judgment; (3) grants GC2's motion for a permanent injunction; (4) denies GC2's motion for supplemental damages; (5) grants GC2's motion for prejudgment interest in part; (6) denies GC2's motion for attorney's fees; and (7) denies the defendants' motion for attorney's fees. The Court will rule separately on GC2's bill of costs.

## Background

There are four defendants in this case: IGT Holding, IGT NV, Doubledown, and Masque. IGT Holding owns IGT NV, a Nevada corporation. IGT NV produces and sells land-based games played in physical casinos. Until June 2018, IGT Holding also owned Doubledown.[2] Doubledown develops and distributes digital slot machine games. Masque sells digital casino games and licensed art from IGT Holding.

### A.    Infringing games and artwork

GC2 developed artwork, images, and thematic elements for games that are primarily displayed on physical wagering machines such as slot machines. The company has created artwork and videos for a series of wagering games, including those at issue in this suit: Coyote Moon, Pharaoh's Fortune, Lucky Lion Fish, Festival Fantastico, Kingpin Bowling, and Wild Goose Chase. GC2 licensed some of its artwork

---

[2] In 2018, IGT Holding sold its interest in Doubledown to DoubleU Diamond, LLC. At times relevant to these motions, however, Doubledown was a wholly owned subsidiary of IGT Holding.

to IGT NV beginning in 2003 for use in the development of these physical slot machine games.  Although these games were successfully developed and deployed to casinos, several disputes arose between the companies, leading to a 2007 contract—styled as the seventh amendment to the parties' original agreement—intended to wind up their relationship.  In this agreement, IGT NV retained a perpetual license to the GC2 artwork used for the physical land-based machines the companies jointly developed.  But the agreement did not give up all the rights to the art used in the disputed games; it expressly reserved GC2's rights to its artwork for use in, among other things, development of internet gaming programs.

IGT Holding eventually entered the online gaming industry, developing and selling digital games through its then-subsidiary Doubledown.  Specifically, Doubledown operated Doubledown Casino, which offered online games to consumers on its website and through third-party websites like Facebook.  Among these, GC2 alleged in this suit, were online digital versions of the six disputed games.  IGT Holding also licensed digital games containing GC2's artwork to Masque, a third-party publisher.  Masque's customers were able to purchase the disputed games for digital download or in CD/DVD format.

GC2 alleged that the defendants collectively infringed its copyrights by developing and distributing the disputed games.  It also alleged that IGT Holding, IGT NV, and Doubledown violated the DMCA, which, among other things, makes it unlawful to manipulate copyright management information—i.e., the material typically displayed on or near copyrighted materials identifying their authors or owners.  Specifically, GC2 alleges that the defendants removed or altered GC2's copyright management

3

information from the artwork in question during the process of developing the disputed games and then distributed the artwork knowing that the information had been so removed or altered.

## B.   Procedural history

GC2 filed suit in September 2016.  In addition to the claims that went to trial, the original complaint included claims under the Illinois Consumer Fraud and Deceptive Business Practices Act.  The complaint originally named all of the current defendants as well as International Game Technology PLC, a European affiliate of IGT Holding; WD Encore Software, LLC, another distributor with a similar relationship to IGT as Masque; and several unidentified "Doe" defendants consisting of end-users of the products in question.  The defendants first moved to dismiss for failure to state a claim in December 2016.  The Court denied that motion, though it narrowed somewhat the scope of the DMCA count.  *See GC2 Inc. v. Int'l Game Tech. PLC* (*GC2 I*), 255 F. Supp. 3d 812, 822-23 (N.D. Ill. 2017).

One of the original defendants, IGT PLC, also moved to dismiss for lack of personal jurisdiction.  The Court granted that motion, concluding that the company—organized under the laws of England and Wales—lacked sufficient contacts with the forum to permit personal jurisdiction.  *See GC2 Inc. v. Int'l Game Tech. PLC* (*GC2 II*), No. 16 C 8794, 2017 WL 2985741, at *10 (N.D. Ill. July 13, 2017).  The Court also subsequently stayed GC2's claims against another defendant, WD Encore, when it filed for bankruptcy.  *See* Order of Sept. 29, 2017, dkt. no. 168.  Finally, the Court dismissed the counts against the Doe defendants without objection by GC2.  *See* Order of Aug. 14, 2018, dkt. no. 279.

The remaining defendants moved for partial summary judgment after the close of discovery. On the copyright infringement claims, the defendants sought summary judgment that two games besides the six that eventually went to trial—Kitty Glitter and Maid of Money—did not infringe GC2's copyrights. They also sought summary judgment on GC2's claims based on the DMCA and Illinois consumer fraud statutes in their entirety. The Court granted the defendants' motion with respect to Kitty Glitter and Maid of Money and with respect to the Illinois statutory claim but denied the motion on the DMCA claim. *See GC2 v. Int'l Game Tech.* (*GC2 III*), No. 16 C 8794, 2018 WL 5921315, at *8 (N.D. Ill. Nov. 12, 2018).

## C. Jury verdict

GC2's claims for direct, vicarious, and contributory copyright infringement and violations of the DMCA against IGT Holding, IGT NV, Doubledown, and Masque went to trial in January 2019. As previously noted, the jury unanimously found for GC2. Specifically, it found each of the defendants had both directly and vicariously violated GC2's copyrights in relation to all six of the disputed games; that IGT Holding, IGT NV, and Doubledown had also contributorily infringed with respect to all six games; and that IGT Holding, IGT NV, and Doubledown had committed 696 separate violations of the DMCA in relation to the Coyote Moon and Pharaoh's Fortune games.

The DMCA violations require a bit more explanation. Among other things, the DMCA makes it unlawful to (1) knowingly provide false copyright management information in connection with copies, displays, or the public performance of copyrighted material; (2) intentionally remove or alter copyright management information without the copyright holder's authority; (3) distribute copyright management information knowing

5

that it has been removed or altered without the copyright holder's authority; or (4) distribute or publicly perform copyrighted material knowing the corresponding copyright management information has been removed or altered without the copyright holder's authority. *See* 17 U.S.C. § 1202(a)-(b). GC2 advanced a theory of liability at trial whereby the defendants involved in distributing the online versions of the disputed games would be liable for each instance the games were updated—and, as a result, reuploaded—to a server accessible to players. GC2 contended that the evidence showed that there were 414 such updates for Coyote Moon and 282 for Pharaoh's Fortune—or 696 in total. The jury accepted that contention and found 696 separate instances of each of the four types of DMCA violations outlined above. The Court accepted the jury's verdict but determined that these four types of violations overlapped and therefore merged them into a cumulative total of 696 DMCA violations. *See* Order of Feb. 20, 2019, dkt. no. 416.

Finally, the jury also awarded damages. In addition to actual damages, the jury concluded that 75% of the profits earned on the infringing games were attributable to GC2's copyrighted materials. On the infringement counts, the jury awarded GC2 damages of $4,122,464.81 against IGT NV ($536,677 in actual damages and $3,585,787.81 in disgorged profits); $12,017,709.46 against Doubledown ($1,566,272 in actual damages and $10,451,437.46 of disgorged profits); and $134,878.74 against Masque ($53,790 in actual damages and $81,088.74 in disgorged profits)—a total award of $16,275,053.01 on the copyright infringement counts. *See* Judgment, dkt. no. 421. GC2 opted for statutory damages for the 696 DMCA violations that the jury found IGT Holding, IGT NV, and Doubledown had committed. *See* 17 U.S.C. § 1203(c)(3).

6

The Court concluded that a valuation on the low end of the statutory scale was appropriate and awarded $2,500 per violation, for a total of $1,740,000 in DMCA damages. *See* Order of Feb. 20, 2019, dkt. no. 416.

## Discussion

The defendants have moved for partial judgment as a matter of law on GC2's DMCA claims; for a new trial, remittitur, and/or to alter the verdict; and for attorney's fees under the Copyright Act. GC2, the plaintiff, has moved for a permanent injunction, supplemental damages, prejudgment interest, attorney's fees, and costs. The Court addresses each in turn.[3]

**A.      Defendants' motion for judgment as a matter of law**

Under Federal Rule of Civil Procedure 50, a party who does not bear the burden of proof may move for judgment as a matter of law on an issue at the close of the opposing party's case. *See* Fed. R. Civ. P. 50(a). If the Court determines that the party who bears the burden of proof on a particular issue has not presented a "legally sufficient evidentiary basis to" support a jury verdict in its favor, the Court may resolve the issue against that party. *Id.* The moving party can renew their motion at the end of trial. *See* Fed. R. Civ. P. 50(b). The question for the Court in reviewing a motion for judgment as a matter of law after the jury has returned a verdict "is simply whether the evidence as a whole, when combined with all reasonable inferences permissibly drawn from that evidence, is sufficient to allow a reasonable jury to find in favor of the plaintiff."

---

[3] At the outset, the Court notes that the parties have litigated these post-trial motions at great length—more than 200 pages of briefing in total. The Court will not separately address every argument advanced by the parties. The contentions that merit discussion, however, are addressed below.

*Hall v. Forest River, Inc.*, 536 F.3d 615, 619 (7th Cir. 2008).  Evidence is to be "construe[d] . . . strictly in favor of the party who prevailed before the jury." *Thorne v. Member Select Ins. Co.*, 882 F.3d 642, 644 (7th Cir. 2018) (internal quotation marks omitted).  "[T]he question is not whether the jury believed the right people, but only whether it was presented with a legally sufficient amount of evidence from which it could reasonably derive its verdict.  Overturning a jury verdict is a hard row to hoe." *Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 638 (7th Cir. 2003) (internal quotation marks omitted) (citations omitted).

The defendants moved for judgment as a matter of law under Rule 50(a) orally at the close of GC2's case at trial and again in writing before the case was submitted to the jury.  The Court took those motions under advisement.  The defendants then renewed their motion after the jury returned its verdict.  The defendants argue they are entitled to relief on two grounds.[4]  First, they contend that insufficient evidence of intent or knowledge was presented at trial to satisfy what they call the DMCA's "double scienter" requirement.  Second, the defendants argue that the evidence presented could not, as a matter of law, support liability under the DMCA's provisions for manipulation of copyright management information.

At the outset, GC2 contends that this motion is procedurally barred because the defendants' renewed motion under Rule 50(b) impermissibly exceeds the scope of their original Rule 50(a) motion.  GC2 points to *Zelinski*, where the Seventh Circuit held that

---

[4] In addition to these two grounds, the defendants also initially argued that there was insufficient evidence to hold IGT Holding or IGT NV liable for the DMCA violations.  The defendants withdrew this argument in their reply brief.  *See* Defs.' Reply in Supp. of Rule 50 Mot., dkt. no. 469, at 3.

a party seeking to renew a motion for judgment as a matter of law must have first moved for a directed verdict on the issue under Rule 50(a). *Zelinski*, 335 F.3d at 638, *see also Nelson Bros. Prof'l Real Estate, LLC v. Freeborn & Peters, LLP*, 773 F.3d 853, 856 (7th Cir. 2014) (holding that a party "waived [an] argument in the district court by not making it until after the jury's verdict, which was too late" under Rule 50).

The defendants counter that their original motions were sufficiently broad and that GC2's reading of the verbal and written Rule 50(a) motions is unreasonably crabbed. They point to another Seventh Circuit case, *Andy Mohr Truck Center, Inc. v. Volvo Trucks North America*, 869 F.3d 598, 602 (7th Cir. 2017), which they say adopted a more forgiving standard than that proposed by GC2. In *Andy Mohr*, the Seventh Circuit drew a distinction between "grounds" for relief—which must be articulated in a Rule 50(a) motion to be renewed in a Rule 50(b) motion—and "arguments in support" of those grounds—which may be honed and modestly changed between motions. *See id.* at 604-05 ("The district court, however, understood Volvo as merely advancing a new argument in support of a ground that appeared in its original 50(a) motion: that the evidence was insufficient.").

The Court concludes that, in light of *Andy Mohr*, the defendants' Rule 50(b) motion is not procedurally barred. Although the defendants' arguments have no doubt changed to some extent since their motion at the close of GC2's case and since the jury returned a unanimous verdict against them, they nevertheless still "add up to the same thing: [the evidence] was a legally insufficient basis upon which to" find that GC2 met its burden of proving the defendants' intent or violations of the DMCA's substantive provisions governing copyright management information. *See id.* at 605.

### 1. DMCA's intent and knowledge requirements

The defendants first seek judgment as a matter of law that there was insufficient evidence from which a jury could find they had the dual scienter required by the DMCA. Section 1202 of the DMCA prohibits "knowingly" providing or distributing false copyright management information "with the intent to induce, enable, facilitate, or conceal infringement." 17 U.S.C. § 1202(a)(1)-(2). Section 1202 also prohibits removing or altering copyright management information. Specifically, section 1202(b) states:

> No person shall, without the authority of the copyright owner or the law —
> (1) intentionally remove or alter any copyright management information,
> (2) distribute or import for distribution copyright management information knowing that the copyright management information has been removed or altered . . . , or
> (3) distribute, import for distribution, or publicly perform works . . . knowing that copyright management information has been removed or altered . . .
> knowing, or . . . having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement of any right under this title.

*Id.* § 1202(b)(1)-(3). The Seventh Circuit has not had occasion to interpret these statutory sections but other circuits have concluded they bear a "double scienter requirement." *Krechmer v. Tantaros*, 747 F. App'x 6, 9 (2d Cir. 2018) (interpreting section 1202(a)); *see also Stevens v. Corelogic, Inc.*, 899 F.3d 666, 674 (9th Cir. 2018) (interpreting section 1202(b)). That is, to satisfy the statute, GC2 had to show that the defendants "knowingly"—or, in the case of removal or alteration of copyright management information, "intentionally"—undertook the violative actions either with "intent to" or "knowledge, or . . . having reasonable grounds to know" that its actions "will induce, enable, facilitate, or conceal" infringement. 17 U.S.C. § 1202(a)-(b).

As noted previously, the jury accepted GC2's upload theory of liability and found IGT Holding, IGT NV, and Doubledown liable for 696 violations of each of these four

prohibitions—414 related to the online version of Coyote Moon and 282 related to Pharaoh's Fortune. Although the Court found it necessary because of potential overlap to collapse these into a single set of 696 violations, that does not change the fact that the jury reached a unanimous verdict with respect to each of the four forms of violation. In order for the defendants to prevail on this motion, therefore, they must demonstrate that the evidence presented at trial was insufficient to support any of the four types of violations found by the jury.

The defendants contend that the evidence did not support a finding that they possessed either required layer of intent or knowledge for each of the 696 violations. First, they emphasize that GC2's theory of liability required the jury to infer that the defendants acted with intent or knowledge each time they "launched a new game or updated a different game" besides Coyote Moon and Pharaoh's Fortune. The defendants seem to argue that they could not have possessed such intent or knowledge where they simply modified an unrelated game because such a modification "would not cause any graphical changes to Coyote Moon or Pharaoh's Fortune." Defs.' Br. in Supp. of Rule 50 Mot., dkt. no. 421, at 5.

The defendants next attack GC2's use of evidence that IGT NV negotiated in bad faith regarding the disputes underlying this lawsuit. They specifically dispute the relevance of evidence about alleged misrepresentations made by an IGT NV executive during 2016 discussions with GC2 about paying royalties for the infringing works. But rather than contesting GC2's interpretation of this evidence—that IGT NV employees apparently falsified accounting statements and misrepresented standard royalty rates— the defendants contend, without citation, that the misrepresentations are irrelevant

11

because they occurred during "business negotiations" before litigation started.  *See id.* at 7.  They also contend that the evidence is irrelevant because the negotiations took place long after the DMCA violations began.  In other words, the defendants say that the evidence arose too early but also too late to be relevant.  The defendants further argue that the jury should not have been allowed to consider the defendants' delay in taking Coyote Moon and Pharaoh's Fortune down from their gaming platform after they became aware of GC2's infringement contentions and that the defendants' correct attribution of other artwork licensors' copyright ownership on other games on its platform was irrelevant because it was "just as consistent with a mistake[ ]."  *Id.*[5]

The Court is unpersuaded by the defendants' effort to paint the trial as bereft of evidence of their knowledge or intent.  First, the defendants point to no authority for the proposition that a plaintiff must make the requisite showing with direct, rather than circumstantial, evidence.  And, indeed, there is significant persuasive authority to the contrary from the related context of contributory infringement under the Copyright Act. *Cf. Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 934-35 (2005) (discussing narrow limitations on vicarious copyright liability based on imputed intent, but noting that nothing "requires courts to ignore evidence of intent," including evidence of "constructive knowledge" (citation omitted) (internal quotation marks omitted));

---

[5] The defendants' final related argument—that there was no evidence to tie IGT Holding to IGT NV's misdeeds because they are separate legal entities—warrants no more than a footnote.  It was uncontested at trial that IGT NV is a wholly owned subsidiary of IGT Holding and that the entities share a single legal department.  The jury could reasonably have found that evidence of knowledge and/or intent of the violations among members of that legal department bears equally on IGT Holding's intent as it does on IGT NV's. *See, e.g.*, Dimino Dep., Ex. F to Pl.'s Resp. in Opp'n to Rule 50 Mot., dkt. no. 454-6, at 9-21.  The soundness of the jury's conclusions about IGT Holding's intent and knowledge thus reasonably rise and fall with its conclusions about IGT NV.

*Microsoft Corp. v. Rechanik*, 249 F. App'x 476, 479 (7th Cir. 2007) (finding that "ostrich-like" business practices were sufficient to support a finding of intent for purposes of contributory infringement).  Nor need the plaintiff even demonstrate that a DMCA defendant did actually induce, enable, facilitate or conceal infringement for liability to attach.  *See Stevens*, 899 F.3d at 674.  Rather, because the second scienter requirement is forward looking, GC2 needed only to "make an affirmative showing, such as by demonstrating a past 'pattern of conduct' or 'modus operandi,' that the defendant was aware or had reasonable grounds to be aware of the probable future impact of its action."  *Id.*

The Court concludes, construing the evidence and drawing reasonable inferences in favor of the verdict, *see Thorne*, 882 F.3d at 644, that GC2 met its burden to demonstrate both layers of intent or knowledge at trial.  Contrary to the defendants' protests, the jury had the benefit of significant evidence supporting the necessary inferences.  The jury could, for instance, infer that the defendants acted with the first requisite layer of intent or knowledge from, among other evidence, testimony related to the seventh amendment to the parties' license agreement (which expressly reserved rights to development and distribution of online games); testimony that the defendants were contractually obliged to (but did not) provide copyright management information in relation to the art licensed from GC2 despite their faithful application of such information to artwork provided by other licensors; and other evidence about the sophisticated nature of the defendants' business, which involved regular negotiation of intellectual property rights.  It would also be reasonable to infer that the defendants—companies engaged in producing and distributing online games—knew that each time they updated

or launched a game in the Doubledown Casino they reuploaded the entire game library, thereby causing the unlawfully removed or manipulated copyright management information to again be distributed to the public.  Likewise, the jury could infer that IGT Holding, IGT NV, and Doubledown knew or should have known that their unlicensed distribution of artwork missing copyright management information to their customers could lead their customers to infringe GC2's copyrights.

Put another way, "the evidence as a whole, when combined with all reasonable inferences permissible drawn from that evidence, is sufficient to allow a reasonable jury to find in favor of the plaintiff."  *Hall*, 536 F.3d at 619.  The DMCA's dual knowledge and intent requirements provide no basis to disturb the jury's verdict.

### 2.    DMCA removal claims[6]

Next, the defendants ask the Court to grant IGT Holding and IGT NV judgment as a matter of law on the substantive DMCA removal claim because, according to the defendants, the conduct proven at trial is not actionable under the statute.  As noted previously, section 1202(b) of the DMCA prohibits "intentionally remov[ing] or alter[ing] any copyright management information . . . knowing, or . . . having reasonable grounds to know, that it will induce, enable, facilitate, or conceal an infringement . . . ."  17 U.S.C. § 1202(b)(1).  First, the defendants contend that this provision does not apply to the

---

[6] The Court notes that the defendants' arguments specific to the DMCA removal claims under 17 U.S.C. § 1202(b)(1) would not warrant disturbing jury's verdict even if the Court agreed with defendants' contentions.  This is because, as noted above, the Court collapsed the four types of DMCA violations found by the jury under section 1202(a) and (b)(1)-(3) into a single set of 696 violations.  Even if the removal claims were subject to judgment as a matter of law, the other DMCA claims on which the jury found for the plaintiff would still support its verdict.  The Court nevertheless addresses these arguments for the sake of completeness.

sorts of works at issue here. Second, the defendants contend that they cannot be liable because GC2 provided its copyrighted materials to them separate from its copyright management information and that the defendants therefore did not "remove" that information within the meaning of the statute.

### a.   Application to collaborative derivative works

The defendants contend, in effect, that the statute simply cannot apply to collaborative or derivative works. They cherry pick language from district court opinions that held, for instance, that "[s]ection 1202(b)(1) applies only to the removal of copyright management information on (or from) a plaintiff's product or *original work*." *Monotype Imaging, Inc. v. Bitstream Inc.* (*Monotype II*), 376 F. Supp. 2d 877, 893 (N.D. Ill. 2005) (emphasis added). The defendants go on to note that, in this case, GC2 willingly sent them the disputed artwork to be incorporated into the land-based Coyote Moon and Pharaoh's Fortune game systems that the companies were jointly developing. Because the artwork used in the online versions of the game was the result of a collaborative process, the defendants contend, it was *not* the "plaintiff's product or original work" and removal of copyright management information was therefore not a violation.

The defendants argue that the distinction they seek is supported by cases like *Fischer v. Forrest*, 286 F. Supp. 3d 590, 608-09 (S.D.N.Y. 2018), *appeal docketed*, 18-2959 (2d Cir.), where a court granted a defendant's motion for summary judgment on DMCA claims. Not so. The ruling in *Fischer* was expressly premised on the fact that the allegedly violative materials reproduced only tiny portions of the protected works. *Id.* at 609 ("Aside from four discrete phrases among the many used on [the disputed] brochure and website, there is no similarity between [the plaintiff's] original work and

15

[the allegedly violative] advertisement.").  Such a small portion could not, in that court's view, be characterized as a wholesale reproduction of the plaintiff's work.  Likewise, the defendants cite *Faulkner Press, LLC v. Class Notes, LLC*, 756 F. Supp. 2d 1352, 1359 (N.D. Fla. 2010), for the proposition that removal liability is inappropriate where a defendant creates a "different product" using "materials from" a plaintiff's copyrighted materials without attribution.  But *Faulkner Press* likewise involved circumstances vastly different from those presented here.  The materials in question were notes taken in a class taught from a copyrighted textbook.  *See id.*  The court concluded that when "student note takers simply took notes from [a] course and those notes were" aggregated for resale, they did not "remove" copyright management information from the textbook within the meaning of the statute.  *Id*

Even the faintest scrutiny unravels the defendants' attempts to argue by analogy to these cases.  Neither *Fischer* nor *Faulkner Press* nor any of the other cases cited by the defendants stands for the broad proposition that derivative or collaborative works are categorically excluded from protection under the DMCA's provision for removal of copyright management information.  Indeed, the "original work" language on which the defendants precariously rest their entire argument does not even appear in the statute.  Rather, it is entirely a product of district court opinions focused on different language in provision.

Here, in contrast with *Fischer* and *Faulkner Press*, GC2 presented undisputed evidence that it provided the defendants with artwork for Coyote Moon and Pharaoh's Fortune for use in the development of land-based games, which was then used, in its entirety, in the online versions of the games later developed by the defendants.  The

defendants do not contest that much. They do not even contest that the artwork appeared without attribution. The defendants simply argue that because they modified the artwork provided by GC2, creating a derivative work, there was no longer an "original work" from which to remove the copyright management information. That argument is wholly without merit and provides no basis to upset the jury's verdict on this claim.

### b. "Pre-existing" copyright management information

The defendants' final argument for judgment as a matter of law on the DMCA claim is closely related to the previous one. They contend that IGT Holding, IGT NV, and Doubledown are entitled to judgment as a matter of law on the removal claim because the relevant DMCA provision only applies where copyright management information was placed on the disputed material by the plaintiff itself. In support of this position, they cite only a handful of district court opinions—including the opinion of this Court on the defendants' motion for summary judgment—that used the word "pre-existing" to describe copyright management information protected by the provision. *See, e.g.*, *GC2 III*, 2018 WL 5921315, at *6; *Reno-Tahoe Specialty, Inc. v. Mungchi, Inc.*, 12-CV-01051-GMN-VC, 2014 WL 7336082, at *11 (D. Nev. Dec. 19, 2014).

The defendants argue that because GC2 willingly provided them the disputed artwork on a CD in a form not already bearing copyright management information for use on the land-based game machines the companies were collaboratively developing, and because it was *the defendants* who actually placed GC2's logo on the artwork used on the land-based machines, the information was not "pre-existing" on the artwork. As a result, the defendants contend, GC2 cannot now claim that the defendants removed

17

that information within the meaning of the statute.  GC2 counters that the CD on which

the artwork was transmitted also included a copy of GC2's logo, which undisputedly

qualifies as "identifying information" subject to protection under the statute.  *See* 17

U.S.C. § 1202(c) (defining copyright management information to include "information

conveyed in connection with" protected material, including "[t]he name of, and other

identifying information about, the copyright owner of the work"); *Agence France Presse*

*v. Morel*, 769 F. Supp. 2d 295, 305 (S.D.N.Y. 2011) (concluding that information

identifying a copyright owner communicated near, but not actually on, a copyrighted

image qualified as copyright management information).  GC2 further contends that it

presented evidence at trial that the defendants were contractually obliged under the

parties' licensing agreement to affix the copyright management information in question

to the GC2 artwork transmitted to them before it could be used on land-based games.

The Court again concludes defendants' argument lacks merit.  Indeed, the Court

already rejected a version of this argument when, on the defendants' first motion to

dismiss, it adopted the reasoning from *Monotype Imaging, Inc. v. Bitstream, Inc.*

(*Monotype I*), No. 03 C 4349, 2005 WL 936882 (N.D. Ill. Apr. 21, 2005).  *Monotype* held

that although the defendant had not literally "removed" copyright notices "but instead

[made] copies of the [disputed materials] without including the copyright notice, [this did]

not preclude liability under the DMCA."  *Id.* at *8.  Here, as in *Monotype*, the defendants

cannot hide behind an unreasonably crabbed reading of the word "remove."  As with

their previous contention, the defendants here rest their argument on language used by

district courts presented with disputes readily distinguishable from those at issue here.

Nowhere does the text of section 1202 suggest that removal of copyright management

18

information is only a violation if that information was placed on the copyrighted materials by the plaintiff itself.  Such a reading would lead to the absurd result where a copyright owner who contracts with another entity to manufacture their products—and in the process to affix copyright management information—could not avail itself of the DMCA's removal provisions.  The Court declines to adopt the defendants' requested approach.

For the reasons described above, the Court denies the defendants' motion for judgment as a matter of law.

**B.    Defendants' motion for a new trial, remittitur, and/or alteration of the verdict**

The defendants next move under Federal Rule of Civil Procedure 59 for a new trial, remittitur of the jury's verdict on the copyright claims, and/or to alter the verdict on the DMCA claims.  First, the defendants argue that they are entitled to a new trial or remittitur because the jury's verdict awarding GC2 75% of the defendants' profits from the disputed games was unsupported by evidence and resulted from misleading and unfairly surprising arguments.  Second, the defendants argue that GC2 unfairly sprung a new DMCA liability theory on them during the trial and that the jury's verdict on the DMCA claims was both against the manifest weight of the evidence and resulted in GC2 receiving impermissibly duplicative damages.  Third, the defendants contend that the Court improperly admitted certain evidence that was so prejudicial that they are entitled to a new trial.  Finally, the defendants argue that even if none of the above are sufficient, the cumulative effect of these errors warrants a new trial.

A new trial is warranted under Rule 59(a) if the verdict was against the manifest weight of the evidence or if the trial was fundamentally unfair to the moving party.  *See, e.g.*, *Whitehead v. Bond*, 680 F.3d 919, 927 (7th Cir. 2012).  The Seventh Circuit has

19

cautioned that a court should grant a new trial "only if the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Plyler v. Whirlpool Corp.*, 751 F.3d 509, 513 (7th Cir. 2014) (internal quotation marks and citation omitted).

Similarly, in considering a request for remittitur under Rule 59(a), a district court must grant "proper deference to the jury's verdict and limit[ ] its inquiry to three questions: whether the award is monstrously excessive; whether there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas[;] and whether the award is roughly comparable to awards made in similar cases." *Farfaras v. Citizens Bank & Tr. of Chi.*, 433 F.3d 558, 566 (7th Cir. 2006) (internal quotation marks omitted). "In other words, the court looks only at the 'bottom line,' to make sure it's reasonable, and doesn't worry about the mental process that led there," even if that process may have involved "guesswork, intuition, or compromise." *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000).

A district court also has authority to modify or amend a judgment after its entry. *See* Fed. R. Civ. P. Rule 59(e). But this is an "extraordinary remed[y] reserved for the exceptional case." *Childress v. Walker*, 787 F.3d 433, 442 (7th Cir. 2015) (internal quotation marks omitted). A Rule 59(e) motion "does not provide a vehicle for a party to undo its own procedural failures, and it certainly does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment." *United States v. Resnick*, 594 F.3d 562, 568 (7th Cir. 2010) (internal quotation marks omitted). Nor may a party use Rule 59(e) to

"rehash previously rejected arguments." *Vesely v. Armslist LLC*, 762 F.3d 661, 666 (7th Cir. 2014) (internal quotation marks omitted). "Amendment of the judgment is proper only when the movant presents newly discovered evidence that was not available at the time of trial or if the movant points to evidence in the record that clearly establishes a manifest error of law or fact." *Stragapede v. City of Evanston*, 865 F.3d 861, 868 (7th Cir. 2017) (internal quotation marks omitted).

### 1.    Apportionment of damages

The first ground for relief advanced by the defendants concerns the copyright infringement damages awarded by the jury. The Copyright Act authorizes the recovery of "the actual damages suffered" by a copyright owner as well as "any profits of the infringer that are attributable to the infringement." 17 U.S.C. § 504(b). As noted above, the jury awarded modest actual damages and found that 75% of each of the defendants' relevant profits—those made from the disputed games—were attributable to their infringement of GC2's copyrights.

The defendants take issue both with GC2's decision not to call its expert witness and with purportedly misleading arguments it made at closing. They contend that GC2's failure to call the witness made the trial fundamentally unfair and that the absence of her testimony caused the jury's verdict to be against the manifest weight of the evidence. First, the defendants emphasize that the only expert testimony presented on the issue of damages was from their own expert, who opined that only 5% of the relevant profits were attributable to the defendants' infringing use of GC2's artwork. This much is undeniably true; after cross-examining the defendants' expert, GC2 opted not to put on its own rebuttal witness on the issue of profits. If it had, the defendants contend, that

21

rebuttal expert would have testified that only 25% of the defendants' profits were attributable to the infringement.  Instead, however, GC2's attorney argued at closing that 75-80% of the relevant profits were attributable to the disputed artwork.  The defendants say that that range—the lower end of which was apparently adopted by the jury—was unsupported by evidence and that GC2's choice not to call its expert was unfairly surprising.

Second, the defendants claim that GC2 mischaracterized their burden of proof.  The parties agree that, once a plaintiff has produced evidence of an infringer's gross revenues, the burden shifts to the infringer to prove what portion of its profits were attributable to the infringing use.  *See* 17 U.S.C. § 504(b).  But the defendants say that GC2's lawyer mischaracterized this burden during closing arguments when she suggested that the defendants had to prove not only what portion of the profit was attributable to the infringement but also to what other aspects of the infringing works the remaining profits were attributable.

Third, the defendants argue that GC2's counsel deceived the jury during closing arguments by misrepresenting certain key evidence.  Specifically, they point to GC2's use of consumer surveys that were admitted into evidence at trial.[7]  These surveys measured what portion of respondents thought various elements of Doubledown's games were "important" to the games' success.  The surveys revealed that 80% of consumers thought that "graphics and sound" were important to the success of Doubledown's games.  For comparison, 80% also said that "ease of use" was important,

---

[7] The defendants also maintain the surveys were inadmissible.  But during trial they objected only on hearsay grounds.  The Court correctly overruled that objection under the business records hearsay exception.  *See* Fed. R. Evid. 803(6).

and another 70% said the same of "ability to access games."  The defendants point out that this survey did not seek to apportion the value of a given attribute but rather quantified how many consumers thought each separate attribute was important to the games' success.  But, they say, GC2 represented during its closing argument that the survey indeed established what portion of the defendants' profits was attributable to the infringing artwork.  The defendants arguably have a point:  GC2's attorney correctly characterized the survey as measuring "how important the quality of art and graphics were" but then stated that "the players' response was over 80 percent"—which one could interpret as suggesting that survey respondents were asked to apportion the value of various game characteristics and attributed over 80 percent of the value to the art and graphics.  Tr. Excerpt, Grp. Ex. B to Pl.'s Br. in Opp'n to Rule 59 Mot., dkt. no. 457-2, at 1540:21-24.

The Court is unpersuaded, however, that the defendants' contentions entitle them to a new trial or remittitur.  Initially, the Court notes that each of the defendants' arguments concerning closing arguments was forfeited when they failed to object at trial.  *See Venson v. Altamarino*, 749 F.3d 631, 657 (7th Cir. 2014); *Soltys v. Costello*, 520 F.3d 737, 745 (7th Cir. 2008).  But even assuming they were not, the verdict must stand as is.

The defendants' first two arguments can be disposed of quickly.  First, GC2 was well within its rights when it opted not to call its damages rebuttal expert at trial.  It knew that the defendants bore the burden of demonstrating apportionment under the statute and concluded that cross-examination and the evidence already before the jury were sufficient to rebut the defendants' expert's apportionment opinion.  And, indeed, the

defendants also made a strategic decision when they did not to object to GC2's failure to call its expert on the basis of unfair surprise but rather opted to argue in closing that GC2's failure to call its rebuttal expert supported their apportionment theory. The far-flung authorities cited by the defendants do not support a different outcome. These cases, which involved unpredictable lurches in expert testimony, *see, e.g.*, *Becton Dickinson & Co. v. Tyco Healthcare Grp. LP*, No. 02-1694, 2006 WL 890995, at *10-12 (D. Del. Mar. 31, 2006), are nothing like this case, where the plaintiff simply opted not to call an expert to testify in rebuttal on an issue upon which the defendants bore the burden of proof.

The defendants' second theory fares no better. They claim the GC2 misled the jury on their burden of proof by suggesting the jury could consider their failure to provide a thorough accounting of the aspects of the infringing works *besides* the disputed artwork contributed to the defendants' profits. Beyond the fact that the defendants did not object to this argument at trial, their position is foreclosed by the statute. Section 504(b) of the Copyright Act states that, once a plaintiff has proven a defendant's gross profits, "the infringer is required to prove his or her deductible expenses and the elements of profit *attributable to factors other than the copyrighted work*"—not the portion of his or her profits attributable to the copyrighted work itself. 17 U.S.C. § 504(b) (emphasis added). GC2's closing argument bemoaned by the defendants is not an artifice of deception but rather a fair characterization of the burden expressly imposed by the statute.

This leaves the defendants' third argument, regarding the claimed misstatement by GC2's attorney during closing argument about the import of the Doubledown

24

consumer surveys.  The Court again notes that the defendants did not make this objection contemporaneously, meaning that they forfeited the point.  Even if they did not, however, the Court would conclude that the defendants have not made out a persuasive case that this single sentence during closing argument had any impact on the jury's verdict.  After all, the jury had already heard undisputedly accurate testimony about the surveys during which they were characterized correctly as capturing the proportion of respondents who found particular aspects of Doubledown games to be important game components—not the portion of profits attributable to the disputed artwork.  And the jury had access to the surveys themselves during deliberations and easily could have confirmed their scope and thus discerned their import.

In addition, as GC2 points out, there was also other evidence supporting the jury's verdict.  For instance, one expert witness testified that slot machines are essentially art plus math and that compelling visuals are critical to effectively translating even the best math into a successful game.  Other witnesses testified that the defendants expressly targeted widely recognized land-based games like Coyote Moon and Pharaoh's Fortune for development of online versions in order to capitalize on the recognition of those games' artwork. Taken alongside the surveys and other evidence, there was plenty of evidence from which a reasonable jury could reach the 75% apportionment number.

After carefully reviewing the record, Court concludes that the jury's verdict was not contrary to the manifest weight of the evidence, nor did it result in a miscarriage of justice.  *See Plyler*, 751 F.3d at 513.  Likewise, the verdict is not "monstrously excessive," lacking any "rational connection" to the evidence, or "indicat[ative] that it is

25

merely a product of the jury's fevered imaginings or personal vendettas." *Farfaras*, 433 F.3d 566. Even accepting the defendants' argument that there was insufficiently precise quantitative evidence in the record to lead the jury to the 75% apportionment figure, the Seventh Circuit's recognition that "the fact that the jury was not given the materials for constructing a rational path from the evidence to the verdict is not fatal" surely applies. *Outboard Marine Corp. v. Babcock Indus., Inc.*, 106 F.3d 182, 186 (7th. Cir. 1997). Looking only to the "bottom line" and not "the mental process that led there," as the Court must when reviewing a jury's damages calculation, *Tuf Racing Prods.*, 223 F.3d at 591, the Court concludes that there was sufficient evidence in the record to support the jury's verdict and thus declines to disturb its judgment.

## 2. DMCA verdict

As discussed in relation to the defendants' motion for judgment as a matter of law, the DMCA prohibits removing or altering copyright management information as well as distributing copyrighted materials knowing that their copyright management information has been unlawfully modified. The statute permits a prevailing plaintiff to opt for statutory rather than actual damages and authorizes the presiding court to "award statutory damages for each violation of section 1202 in the sum of not less than $2,500 or more than $25,000" per violation. 17 U.S.C. § 1203(c)(3)(B). As discussed previously, the Court collapsed the jury's verdict into a single set of 696 DMCA violations—414 for Coyote Moon and 282 for Pharaoh's Fortune—and awarded $2,500 per violation.

The defendants advance three arguments in support of their request for a new trial or for the DMCA verdict to be amended. First, sounding a familiar note, the

defendants again contend they were unfairly surprised, this time by a "new" DMCA liability theory supposedly sprung on them by GC2 in the eleventh hour. Next, they argue that the verdict should be modified because the evidence does not support the jury's finding of 696 DMCA violations. The defendants also argue that the DMCA award is improperly duplicative of the copyright damages awarded by jury.

### a. Surprise

The defendants' first argument is no more persuasive here than it was before. They contend that GC2 "dreamed up" a new theory of liability in their closing arguments and that its conduct was "the very definition of trial by ambush." Defs.' Br. in Supp. of Rule 59 Mot., dkt. no. 433, at 13. Under GC2's purportedly new theory, the defendants would be liable for a separate DMCA violation each time they updated the Doubledown Casino app, including—and this is the part the defendants say surprised them—each time the defendants launched a new game in the app because launching a new game necessarily involved the re-upload of the entire game catalog to the server where the games were stored. The defendants say that this theory should have been disclosed earlier.

But, GC2 counters, the theory was conspicuously part of the case long before trial. For instance, the defendants' attorneys apparently acknowledged the legal significance of uploading copyrighted materials to the server on which Doubledown's games were stored during the pretrial conference and even proposed a jury instruction on the subject. Then, at trial, witnesses testified to the number of new games uploaded each month by Doubledown, and to the fact that each new game upload package contained a copy of the disputed Coyote Moon and Pharaoh's Fortune artwork. Finally,

GC2's attorney argued during her closings that each time a new game was uploaded in a package that included the allegedly infringing materials, that constituted a separate DMCA violation. The defendants did not object during closing arguments that GC2's counsel's upload and reupload theory was new, surprising, or in any way outside the ambit of the upload-focused liability theory proposed in leadup to trial, and thus they forfeited their arguments on this point. *See Venson*, 749 F.3d at 657 (7th Cir. 2014); *Soltys*, 520 F.3d at 745.

Even if the argument was not forfeited, however, the Court concludes that there was no unfair surprise warranting a new trial. Despite their briefs' dramatic flair, the defendants were undisputedly aware that GC2 intended to argue that the act of uploading the copyrighted materials to a server on which they were accessible by Doubledown's customers constituted a violation of the DMCA's prohibition against distributing materials with removed or altered copyright management information. Given this awareness, the distinction the defendants now seek to draw—between reuploads of the artwork related to updating the Doubledown Casino app as a whole and reuploads related to launching new games—is at best untenable. In sum, the Court is unpersuaded that the defendants were unfairly "ambushed" by GC2's predictable upload arguments made at trial.

### b. DMCA violations

Next, the defendants contend that the verdict should be amended because the evidence does not support the jury's finding of 696 DMCA violations. They take issue with the jury's choice to credit testimony that the defendants reuploaded the disputed assets associated with Coyote Moon and Pharaoh's Fortune 138 and 94 times,

respectively (for a total of 232 reuploads), and that each upload actually constituted three separate distributions of the assets because each game came in three separate sizes—phone, tablet, and desktop—leading to the total of 696 violations. The defendants contend that the correct number is actually at most two or four DMCA violations—(1) two violations flowing from the original game uploads and (2) zero or two violations under section 1202(b)(1) for removing the copyright management information in the first instance. According to the defendants, because the reuploads of the games were substantively unchanged from the previous versions, only the original uploads qualify as distributions under DMCA. Citing *Reilly v. Plot Commerce*, No.15-CV-05118 (PAE) (BCM), 2016 WL 6837895, at *11 (S.D.N.Y. Oct. 31, 2016), they argue that "[c]ounting every purported reupload as a separate DMCA violation even though no visual changes were made to the art or [copyright management information] puts form over substance and leads to an absurd result." Defs.' Br. in Supp. of Rule 59 Mot., dkt. no. 433, at 16.

This argument is closely related to the defendants' purported surprise at GC2's upload theory, and it faces a similar fate. Contrary to the defendants' protests, the statute makes it a violation to, among other things, "distribute . . . works[ ] or copies of works . . . knowing that copyright management information has been removed or altered without authority of the copyright owner or the law . . . ." 17 U.S.C. § 1202(b)(3). The statute does not only prohibit, as the defendants would have it, the *first* such distribution; it forbids *all* of them. The Court is satisfied, applying the language of the statute, that that the jury followed the Court's instructions and permissibly determined that the defendants committed 696 violations of the DMCA when they uploaded or

29

reuploaded copyrighted assets associated with Coyote Moon and Pharaoh's Fortune to servers accessible by Doubledown Casino users. Drawing reasonable inferences in favor of the verdict, the evidence also supported the jury's conclusion that each reupload constituted three separate violations because three separate versions of the copyright works found to have had removed or altered copyright management information were uploaded.

The defendants' reliance on *Reilly* to argue the contrary is misplaced. The court in *Reilly* expressly endorsed an understanding of DMCA liability focused on the defendant's conduct, whereby the defendant was held responsible for each "web upload" of infringing material. *See Reilly*, 2016 WL 6837895, at *11 (adopting the reasoning of *McClatchey v. Associated Press*, No. 3:05-cv-145, 2007 WL 1630261, *8 (W.D. Pa. June 4, 2007)). The "absurd result" the court disavowed was one where the defendant would have been held responsible for a separate DMCA violation for each and every end user who accessed the copyright works—precisely the same result this Court disavowed twice in rejecting GC2's end-user theory. *Compare id.*, *with GC2 III*, 2018 WL 5921315, at *8 (adopting *McClatchey*'s reasoning); Order of Dec. 12, 2018, dkt. no. 348, at 4 (same).

Because, as discussed above, the Court collapsed the four separate types of DMCA violations found by the jury into a single set of 696 violations, the Court need not address the defendants' arguments about removal. In other words, the preceding analysis is sufficient to uphold the 696 violations found by the jury.

### c. Duplicative damages

Finally, the defendants argue that the DMCA damages awarded to GC2 were

improperly duplicative of the copyright damages awarded by the jury. They cite *Duran v. Town of Cicero*, 653 F.3d 632, 640 (7th Cir. 2011), for the proposition that "[a] plaintiff is only entitled to a single recovery for a single injury, regardless of the number of legal theories that could apply." Defs.' Br. in Supp. of Rule 59 Mot., dkt. no. 433, at 15. Specifically, the defendants contend that GC2 put on no separate evidence of injuries sustained as a result of the DMCA violations and that the statutory damages awarded for those violations is thus necessarily duplicative of the damages awarded on the copyright claims.

To be sure, *Duran* precludes double recovery for the same injury. Here, however, GC2 has not been doubly compensated for any single harm. Rather, "because the Copyright Act and the DMCA protect different interests"—that is, they create separate tort causes of action designed to remedy different harms—the awards here compensate distinct injuries. *See Agence France Presse v. Morel*, No. 10-cv-2730 (AJN), 2014 WL 3963124, at *10 (S.D.N.Y. Aug. 13, 2014); *see also Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 443 (2d Cir. 2001) (contrasting the focus of the "the DMCA, [which] targets the circumvention of digital walls guarding copyrighted material (and trafficking in circumvention tools), but does not concern itself with the use of those materials after circumvention has occurred," which is the scope of the Copyright Act). Courts across the country have determined that, as a result, DMCA damages "may be awarded in addition to damages awarded for copyright infringement under section 504 of the Copyright Act when 'a defendant is charged with unlawful use of an image, along with alteration of copyright management information.'" *Sheldon v. Plot Commerce*, No. 15 CV 5885 (CBA) (CLP), 2016 WL 5107072, at *16 (E.D.N.Y.

31

Aug. 26, 2016) (quoting *Kennedy v. Medgen. Inc.*, No. 14-CV- 5843 (ADS) (AYS), 2016 WL 873043, at *2 (E.D.N.Y. Jan. 8, 2016)).

Moreover, contrary to the defendants' contention, the DMCA authorizes a plaintiff to opt for statutory damages even where it cannot adequately support a claim for actual damages. *See id.*; *see also Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1194 (9th Cir. 2001) (holding, in the closely analogous context of the Copyright Act's statutory damages provision, that "[a] plaintiff may elect statutory damages 'regardless of the adequacy of the evidence offered as to his actual damages and the amount of the defendant's profits'" (quoting 4 Nimmer on Copyright § 14.04(A))). This option protects plaintiffs where they have the evidence necessary to prove DMCA violations but where proving actual damages would be difficult. *See, e.g.*, *Curet-Velázquez v. ACEMLA de P.R., Inc.*, 656 F.3d 47, 59 (1st Cir. 2011) (noting the utility of statutory damages where a defendant has refused to cooperate in damages calculations).

Considering each of the various and sundry arguments made by the defendants, the Court concludes that they have fallen far short of demonstrating that this is an "exceptional case" warranting the "extraordinary remed[y]" of altering the jury's verdict. *Childress*, 787 F.3d at 442.

### 3.    Evidentiary issues

The defendants also argue that evidentiary errors made by the Court warrant a new trial. *See Barber v. City of Chicago*, 725 F.3d 702, 715 ("An evidentiary error warrants a new trial 'only if the error affects a substantial right of the party.'" (quoting Fed. R. Evid. 103(a))). Specifically, they point to the deposition testimony of Amy Baker,

an IGT NV accountant, about an e-mail exchange she had with an IGT NV executive, Todd Nash, regarding negotiations between IGT NV and GC2 in the leadup to this litigation.[8]  In short, Baker testified about Nash asking her to give an ad hoc royalty statement the appearance of an official internal document during the defendants' efforts in mid-2016 to negotiate a license for the infringing artwork with GC2.  The catch:  the royalty the defendants offered was a small fraction of what they believed the artwork was worth.  GC2 says that the e-mails indicate that the negotiations were undertaken in bad faith and that the defendants knew they had infringed (and continued to infringe) GC2's copyrights.

The defendants contend that this deposition testimony was unfairly prejudicial and lacked probative value, and that its only purpose was to "inflame the jury by suggesting that Defendants were attempting to pull one over on GC2."  Defs.' Br. in Supp. of Rule 59 Mot., dkt. no. 433, at 19.  GC2, on the other hand, contends that the defendants forfeited this argument by expressly withdrawing their objection during trial and that even if they had not, the deposition testimony was properly admissible.  GC2 also points out that the defendants themselves introduced the e-mails about which Baker testified in her deposition in an effort to support their proposed valuation of GC2's artwork.  Finally, GC2 says that Baker's testimony was admissible for the purpose of impeaching Nash's character for truthfulness because he testified at trial.

Declaring that evidence is unfairly prejudicial does not make it so.  This is a case

---

[8] The defendants initially also protested the admission of testimony from Kimberly Dimino regarding the fact that the defendants did not own trademarks related to the disputed games.  They withdrew this argument after GC2 pointed out that it was, in fact, the defendants' attorney who brought up trademarks in the first place during his opening statement at trial.

in which GC2, the plaintiff, accused the defendants of knowingly violating its copyrights by exceeding the scope of a series of licensing agreements between the entities. Evidence throughout the trial went to fleshing out the background of these businesses' relationship, including their frequent hard bargaining with one another. Indeed, Nash himself was questioned at length at trial about the very same e-mail chain about which Baker testified in her deposition, and GC2 successfully elicited testimony from him to much the same effect: Nash, on behalf of IGT NV, sought to substantially low-ball GC2 in negotiating royalties he believed the company owed GC2.

Not all prejudice is unfair. Indeed, relevant evidence presented at trial will necessarily prejudice one side or the other. The question here is whether and how Baker's deposition was *unfairly* prejudicial. Because there is no basis to say that any unfair prejudice followed from the admission of Baker's testimony—the most prejudicial bits of which were admitted without objection in other forms—the purported evidentiary basis for a new trial is overruled.

### 4. Cumulative error

Finally, the defendants argue in passing that cumulative errors warrant a new trial. *See Nelson v. City of Chicago*, 810 F.3d 1061, 1074 (7th Cir. 2016) ("[W]here there are several errors, each of which is harmless in its own right, a new trial may still be granted if the cumulative effect of those otherwise harmless errors deprives a litigant of a fair trial." (internal quotation marks omitted)). Because the defendants have not successfully demonstrated a single error, there is no basis to find in their favor on cumulative errors.

For the reasons described above, the Court denies the defendants' motion for a

new trial, remittitur, and/or to alter the verdict.

**C.    Plaintiff's motion for a permanent injunction, supplemental damages, and prejudgment interest**

Having determined that the jury's verdict will stand, the Court turns next to the

plaintiff's motion for a permanent injunction and other posttrial relief.

**1.    Permanent injunction**

To obtain a permanent injunction, a plaintiff must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). Historically, the Seventh

Circuit endorsed a presumption of irreparable injury and inadequate remedies in certain

intellectual property cases, but the court disavowed that presumption after the Supreme

Court's decision in *eBay*. *See Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir.

2012) ("*eBay* . . . made clear that there is no such presumption."). Ultimately, whether

to grant or deny injunctive relief "is an act of equitable discretion by the district court."

*eBay*, 547 U.S. at 391.

GC2 seeks a permanent injunction and an order requiring the defendants to

destroy any remaining copies of the infringing materials. The parties dispute only the

first three equitable factors from *eBay*—that is, the defendants do not contend that the

public interest would be disserved by an injunction.

GC2 first incorrectly contends, citing outdated authorities, that it need not show

irreparable injury or that its remedies at law are inadequate in order to get an injunction.

Apparently realizing its error, however, GC2 expands in its reply brief on what it views

35

as irreparable harms.  It points to evidence presented at a recent hearing on this motion that the disputed games remain available online—including from at least one website that purports to be affiliated with the defendants—despite the defendants' reported efforts to take the games down after the jury's infringement verdict.  In addition to being playable via third-party websites, the defendants also admit that that the infringing games remain on the defendants' servers—they have simply been disabled for online play.  Moreover, GC2 contends that the damages awarded at trial were tailored only to address past injuries and that the award therefore does not demonstrate the adequacy of remedies at law.  The defendants, on the other hand, contend that they have done all they can to prevent public access to the disputed games and that there is no risk of ongoing infringement or otherwise irreparable harm.  They say that the damages awarded at trial were adequate to redress GC2's injuries.

GC2 also contends that the balance of the hardships tips in its favor because the defendants "have no legally cognizable rights."  Pl.'s Br. in Supp. of Mot. for Perm. Inj., dkt. no, 414, at 8.  It does not, however, cite any authority for the proposition that the Court ought only to consider incumbrances on legal "rights," however that term is defined in this context, in the balance-of-hardships analysis.  The Court therefore declines to so limit the inquiry.  The defendants, for their part, argue that an injunction would be incredibly burdensome because a couple of infringing images—small depictions of artwork from the Pharaoh's Fortune and Lucky Lion Fish games—appear on brochure inserts that were included in the cases of game CDs produced by Masque.  Each of these cases would need to be opened and each brochure removed if GC2's proposed injunction were to issue.

The Court is persuaded, assessing each of the four equitable factors, that a permanent injunction is appropriate. First, on irreparable harm and the adequacy of the remedy at law, the Court notes that the defendants' efforts to remove the infringing materials have thus far met with only moderate success. For instance, even after briefing on this motion began, GC2 pointed to websites affiliated with the defendants (which the defendants apparently had not discovered) on which the infringing materials were still accessible, including a YouTube account the defendants admit was associated with them. Nor do the defendants meaningfully dispute that the games are still on their servers and are again copied, potentially in violation of GC2's copyrights, each time the servers are backed up. Likewise, the defendants cannot dispute that the games in question are still accessible online; they simply argued at the hearing on this motion that the versions of the disputed games that remain online were pirated and are not affiliated with the defendants.[9] In any event, the continued online accessibility of the disputed games is troubling.

The Court is also persuaded by GC2's arguments that the ongoing (and future) infringement injures GC2's intellectual property rights in ways that are not readily compensable by money damages. For instance, if a consumer is exposed to poorly rendered or otherwise subpar versions of GC2's artwork and themes, she may attribute the quality to GC2 itself. That loss cannot easily be quantified. The fact that the Copyright Act provides for—and GC2 was awarded—damages for the defendants' past

---

[9] The Court notes that at least one of the websites on which the games remain playable professes a partnership with the defendants. The website's identification of IGT as a partner does not, of course, prove that such an association exists, but it is nevertheless probative.

infringement does not prove otherwise. *Cf. BMG Music v. Gonzalez*, 430 F.3d 888, 893 (upholding the issuance of an injunction in addition to a damages award). Taking these considerations together, the Court concludes that GC2 has sufficiently shown that it has suffered and, unless it is granted a permanent injunction, is likely to suffer irreparable harm for which its remedies at law are inadequate.

The Court also concludes that GC2's hardships mostly outweigh the defendants'. Specifically, GC2 faces considerable hardships related to its intellectual property rights likely being continually infringed. The only hardship seriously argued by the defendants in their filings or at the hearing on this motion is that associated with replacing brochures that were inserted in CD cases produced by Masque—only one of a range of ongoing infringements alleged by GC2. It does not, therefore, contest that the hardships tilt in favor of the plaintiffs on each of the other infringing uses.

But the injunction must be narrower than GC2 proposes. Because the plaintiff has made an insufficient showing of harm from the brochures to overcome the defendants' hardships, the injunction will exclude the existing Masque CD inserts. Indeed, GC2 has presented no evidence that it will suffer any harm from the tiny depictions of artwork from Pharaoh's Fortune and Lucky Lion Fish that appear in those brochures. The defendants, on the other hand, argued persuasively during the hearing on this motion and in their filings that it would require significant time and resources to remove the existing brochures from the Masque CD cases. For these reasons, the Court is persuaded that the defendants' burdens outweigh the plaintiff's de minimis injuries in this limited respect.

In sum, the Court finds that the equitable factors from *eBay* support the issuance

of a permanent injunction. The defendants must delete, destroy, or otherwise abate infringement of GC2's copyrights—with the exception of the existing Masque brochures—subject to the terms of the injunction outlined below.

### 2. Supplemental damages and accounting

GC2 also seeks supplemental damages and an accounting. Citing cases from the patent context, it argues that it should be awarded additional damages based upon the revenues made by the defendants from the infringing works after the latest date for which revenue information was presented at trial. According to GC2, this sort of supplementation is routine and should be calculated on a pro rata basis in accordance with the damages awarded by the jury. It contends, however, that the information necessary to make this calculation is in the defendants' sole custody and that the Court should therefore order an accounting by an independent auditor.

The defendants make three arguments against awarding supplemental damages. First, they contend that GC2 should not be allowed to recover supplemental damages because it opted not to call its damages expert at trial as part of its strategy to argue for a 75-80% apportionment figure, discussed above. Second, the defendants argue that supplemental damages are a device of patent law peculiar to that statute and that GC2 is effectively asking for an improper additur by seeking to import the concept. Third, and closely related to their first argument, the defendants cite patent cases for the proposition that, even if supplemental damages could be awarded, GC2 forfeited any claim it had by opting not to put on available evidence of future damages.

The Court is persuaded that supplemental damages are inappropriate in this case. Assuming without deciding that patent cases on supplemental damages supply

the correct standard, GC2 cannot recover supplemental damages because it made the strategic decision not to put on its evidence of the defendants' future profits. *See, e.g.*, *TransPerfect Glob., Inc. v. MotionPoint Corp.*, No. C 10-2594 CW, 2014 WL 6068384, at *4 (N.D. Cal. Nov. 13, 2014) (declining to award supplemental damages where the prevailing plaintiff bore some responsibility for the jury's failure to award continuing damages). As the Court noted above, GC2 was well within its rights when it opted not to put on its damages expert at trial. But just as it reaped the upside of that strategic decision—to the tune of a 75% apportionment finding by the jury—it must also bear the consequences. The expert that GC2 opted not to call, according to her report, was prepared to testify regarding the defendants' projected future profits resulting from their infringement of GC2's copyrights. Had the jury heard her testimony, it would have been equipped to award damages beyond the period for which revenue figures were presented at trial. But GC2 opted not to provide that information for strategic reasons. In so doing, the Court concludes, it forfeited the right to supplement its damages.

### 3. Prejudgment interest

Finally, GC2 also seeks prejudgment interest on both its Copyright Act and DMCA judgments. In the Seventh Circuit, prejudgment interest is "presumptively available to victims of federal law violations" because "[w]ithout it, compensation of the plaintiff is incomplete and the defendant has an incentive to delay." *Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989); *see also McRoberts Software, Inc. v. Media 100, Inc.*, 329 F.3d 557, 572 (7th Cir. 2003). Although awarding prejudgment interest is ultimately at the district court's discretion, the Seventh Circuit has made clear that "prejudgment interest should be awarded unless there is a sound

reason not to do so." *Matter of P.A. Bergner & Co.*, 140 F.3d 1111, 1123 (7th Cir. 1998).

The defendants nevertheless argue that the Court should decline to award prejudgment interest. They emphasize that prejudgment interest is designed to make a plaintiff whole and that GC2 was already awarded disgorged profits in addition to the actual damages it proved at trial. They also argue that prejudgment interest is inappropriate for statutory damages awards. In the defendants' view, prejudgment interest on the disgorged profits and statutory damages would amount to a windfall for GC2. GC2, on the other hand, notes that most of the case law cited by the defendants drawing the distinction they seek comes from outside the Seventh Circuit and thus should not displace the default rule from *Gorenstein*.

The Court concludes that prejudgment interest in appropriate for some but not all of GC2's damages. Specifically, the Court is persuaded that interest should be calculated and awarded with respect to the actual damages and disgorged profits awarded under section 504(b) of the Copyright Act. After all, the dual purposes underlying the rule adopted in *Gorenstein* and reaffirmed repeatedly since are to "compensat[e] . . . the plaintiff" and to discourage delay by the defendant. *Gorenstein*, 874 F.2d at 436; *see also McRoberts*, 329 F.3d at 572. The Court sees (and the defendants provide) no "sound reason," *P.A. Bergner & Co.*, 140 F.3d at 1123, why prejudgment interest on profits that a jury has found to have been wrongly earned through infringement would fall outside these broad purposes. The defendants have therefore failed to overcome the presumption that prejudgment interest is available for these damages.

Prejudgment interest is inappropriate, however, with respect to the DMCA statutory damages award.  "[T]here is no need for a discretionary award of prejudgment interest where the amount of the underlying statutory award is itself discretionary and can be set at a figure which compensates the plaintiff for, among other things, the time that has elapsed since the defendant infringed her rights."  *Reilly*, 2016 WL 6837895, at *12.  Because the Court is satisfied that the DMCA statutory damages award adequately compensates GC2 for it injuries and for the time that has elapsed, the Court declines to award prejudgment interest on those damages.

## D.     Motions for attorney's fees

Both GC2 and the defendants have moved for attorney's fees under the Copyright Act.  Section 505 of the Act allows the Court to "award a reasonable attorney's fee to the prevailing party."  17 U.S.C. § 505.  At the threshold, a party seeking recovery of attorney's fees must demonstrate that it is the "prevailing party." The Supreme Court and Seventh Circuit have explained that "the touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties."  *CRST Van Expedited, Inc. v. EEOC*, 136 S. Ct. 1642, 1646 (2016) (internal quotation marks omitted); *see also HyperQuest, Inc. v. N'Site Sols., Inc.*, 632 F.3d 377, 387 (7th Cir. 2011) (articulating the same standard).  If a party successfully demonstrates that it is a prevailing party, the reviewing court next considers the nonexclusive factors endorsed by the Supreme Court in *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994):  (1) the frivolousness of the claims or defenses asserted by the non-prevailing party; (2) that party's motivations in pursuing its claims or defenses; (3) the objective unreasonableness (both in the factual and in the legal components of

the case) of those claims or defenses; and (4) the need for compensation or deterrence. *Id.*; *see also HyperQuest*, 632 F.3d at 387.

### 1. GC2's motion for fees

GC2 seeks attorney's fees on its copyright claims. At the threshold, the Court concludes that GC2—the party that won at trial—satisfies the statute's "prevailing party" requirement. Although the defendants rather incredibly argue that, because they prevailed on their motions to dismiss and part of their motion for summary judgment, GC2 was not the *only* prevailing party and thus does not satisfy the statute, that argument is specious and warrants no deeper analysis. (Indeed, the Court notes that the defendants contradict themselves in their own motion for attorney's fees, discussed below.) The Court also notes that, contrary to the defendants' suggestion, plaintiffs are not categorically ineligible for attorney's fees under the statute. *See, e.g.*, *Mango v. BuzzFeed, Inc.*, 356 F. Supp. 3d 368, 379 (S.D.N.Y. 2019) (granting attorney's fees to a prevailing copyright plaintiff); *cf. CRST*, 136 S. Ct. at 1651-52 (reaffirming that similar attorney's fees language in Title VII permits recovery of fees by any prevailing party after consideration of factors similar to those in *Fogerty*).

The *Fogerty* factors, however, do not support an award of attorney's fees to GC2. Indeed, GC2 hardly attempts to apply them to the circumstances of this case. To the extent that it tries, GC2 seems to misunderstand to whom the factors apply by asserting that its own claims were not frivolous and that it is therefore entitled to fees. It would be challenging to argue that claims on which a party prevailed were frivolous; that is why the *Fogerty* factors apply to the non-prevailing party's claims or defenses and not to the victor's. But rather than correctly applying *Fogerty* to the defendants' claims and defenses, GC2 embarks on a free-wheeling recitation of each misdeed it contends the

defendants committed before and during this litigation in a plea to award attorney's fees as a form of deterrence lest the defendants "enjoy the windfall of their business decision and be undeterred from engaging in future infringement." Pl.'s in Supp. of Pl.'s Mot. for Perm. Inj. & Misc. Relief, dkt. no. 414, at 13. Beyond ignoring the fact that GC2 has already won more than $17 million in damages and disgorged profits (a sum doubtless sufficient to address any concerns of the defendants "enjoying a windfall"), this discussion was neither particularly persuasive nor relevant to the question of attorney's fees, which primarily rests on whether the losing party's litigation positions were so meritless as to be frivolous or objectively unreasonable. As a result, GC2 has failed to demonstrate this is entitled to attorney's fees under *Fogerty* and its motion is denied.

### 2. Defendants' motion for fees

The defendants also move for attorney's fees. In what might be generously described as a courageous contradiction of their own position on the plaintiff's fee motion, the defendants here contend that they fit the statutory definition of "the prevailing party" because they (1) succeeded on a motion dismiss for lack of personal jurisdiction with respect to an international affiliate, IGT PLC, *see GC2 II*, 2017 WL 2985741, at *10; and (2) partially prevailed on a motion for summary judgment on two disputed games besides the six that made it to trial (Maid of Money and Kitty Glitter) and a claim under the Illinois consumer fraud statute, *see GC2 III*, 2018 WL 5921315, at *8. The defendants place great emphasis on the Seventh Circuit's holding in *HyperQuest* that "[d]efendants who defeat a copyright infringement action are entitled to a strong presumption in favor of a grant of fees." *HyperQuest*, 632 F.3d at 387.

GC2 contends that the defendants are not prevailing parties because their victories were only jurisdictional or partial. First, they cite long-outdated authorities for

44

the proposition that obtaining a dismissal for lack of personal jurisdiction does not render the movant a "prevailing party" because the plaintiff could simply refile elsewhere. *See, e.g.*, *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 00 C 2447, 2004 WL 421739, at *2 (N.D. Ill. Feb. 5, 2004). GC2 is simply wrong. In the decade or more since the most recent case cited by GC2, courts have clarified that even jurisdictional victories can satisfy the "prevailing party" requirement. Most notably, the Supreme Court held in *CRST* that:

> Common sense undermines the notion that a defendant cannot "prevail" unless the relevant disposition is on the merits. Plaintiffs and defendants come to court with different objectives. A plaintiff seeks a material alteration in the legal relationship between the parties. A defendant seeks to prevent this alteration to the extent it is in the plaintiff's favor. The defendant, of course, might prefer a judgment vindicating its position regarding the substantive merits of the plaintiff's allegations. The defendant has, however, fulfilled its primary objective whenever the plaintiff's challenge is rebuffed, irrespective of the precise reason for the court's decision. The defendant may prevail even if the court's final judgment rejects the plaintiff's claim for a nonmerits reason.

*CRST*, 136 S. Ct. at 1651. Instead of a categorical distinction between victories on the merits and those on procedural or jurisdictional grounds, the Supreme Court reaffirmed that "the touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties." *Id.* at 1646. The Court therefore rejects GC2's argument that the defendants cannot be considered prevailing parties with respect to their successful motion to dismiss claims against IGT PLC.

Applying the standard from *CRST*, the Court concludes that the defendants were, in fact, prevailing parties with respect to that motion to dismiss. *See GC2 II*, 2017 WL 2985741, at *10. Because one of the defendants, IGT PLC, was dismissed entirely from the suit, the defendants' successful motion to dismiss for lack of personal

45

jurisdiction unquestionably altered the legal relationship of at least some of the parties. The same cannot be said, however, regarding the partial grant of summary judgment on the claims involving Maid of Money and Kitty Glitter and the Illinois statutory fraud claim. *GC2 III*, 2018 WL 5921315, at *8. Although the defendants were partly successful, winning summary judgment on the two games and the Illinois statutory claim but losing on the part of their motion that sought summary judgment on the DMCA claim, that outcome did not meaningfully alter the legal relationship of the parties. The claims that were essential to the action—those under the Copyright Act and DMCA—remained alive and proceeded to trial. The potential for liability against each of the defendants who sought summary judgment was materially unchanged. The Court therefore concludes that the defendants were not the prevailing party, as defined in *CRST*, with respect to their partially successful motion for summary judgment.

This leaves only the question whether attorney's fees should be awarded under *Fogerty* for the claims against IGT PLC, the defendant that successfully sought a motion to dismiss and therefore was a prevailing party. The defendants contend that all four factors favor an award of fees. They argue that GC2 knew that IGT PLC was beyond this Court's jurisdiction but named it in order to punish the defendants with abusive jurisdictional discovery. The defendants contend that GC2's actions were thus frivolous, begotten of vexatious motives, and objectively unreasonable, and that attorney's fees therefore must be awarded to deter future misconduct and compensate the defendants for the hardship. They cite *Bridgeport Music Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 886 (6th Cir. 2004), for the proposition that incautiously naming extra defendants is evidence of bad faith warranting a fee award. GC2 disputes the defendants' account

and especially their citation to *Bridgeport Music*. That case, it points out, was about a plaintiff who indiscriminately named literally hundreds of defendants in a nearly 500-count complaint. *See id.* This case, where the plaintiffs named an international affiliate of the remaining defendants, bears no resemblance, according to GC2. And besides, GC2 contends, it was reasonable to name IGT PLC and to conduct discovery regarding personal jurisdiction.

The Court concludes that *Fogerty* factors do not support an award of attorney's fees to IGT PLC. There is little evidence beyond the defendants' speculation that GC2's claims against IGT PLC were frivolous or made in bad faith. Indeed, despite the defendants' bald assertions that GC2 knew IGT PLC was an improper defendant, it also seems to admit that only after jurisdictional discovery was it "reveal[ed]" that IGT PLC was beyond this Court's jurisdiction. Defs.' Br. in Supp. of Mot. for Atty's Fees, dkt. no. 424, at 6. Particularly in the context of this case, where GC2 took many of its claims against the remaining defendants to trial and won, it would be incongruous to find that its claims against one of the defendants' affiliates were frivolous, objectively unreasonable, or begotten of ill motives simply because IGT PLC did not prove to have sufficient contacts with this district to confer personal jurisdiction. The defendants' motion for attorney's fees is therefore denied.

### Conclusion

For the foregoing reasons, the Court (1) denies the defendants' renewed motion for partial judgment as a matter of law; (2) denies the defendants' motion for a new trial, remittitur, or alteration of the verdict; (3) grants the plaintiff's motion for a permanent injunction (as set out below); (4) denies the plaintiff's motion for supplemental damages;

(5) grants the plaintiff's motion for prejudgment interest with respect to only the Copyright Act damages; (6) denies the plaintiff's motion for attorney's fees; and (7) denies the defendants' motion for attorney's fees. The Court will rule separately on GC2's bill of costs.

The Court hereby permanently enjoins IGT Holding, IGT NV, Doubledown, Masque, and all other persons or entities acting in concert or participation with them from:

> (1) distributing, providing, displaying, or marketing GC2's artwork and graphics, including any derivatives, for the titles Pharaoh's Fortune, Coyote Moon, Lucky Lion Fish, KingPin Bowling, Festival Fantastico, and Wild Goose Chase for online, social, DVD/CD, downloadable versions, internet real money gaming, non-wagering, and any other uses other than licensed land-based gaming uses on Gaming Machines as that term is defined in the seventh amendment to the parties' Development Agreement and other than use in the Masque brochures discussed above;

> (2) retaining GC2's artwork and graphics, including derivatives, for the same titles on www.igt.com, Amazon Web Services servers, physical hard drives, desktops, packaging files, or other materials which contain GC2's artwork, other than licensed land-based gaming uses as defined above and other than as used in Masque brochures that are already in existence; and

> (3) removing, altering, providing, or distributing copyright management information in connection with Pharaoh's Fortune and Coyote Moon which incorporate GC2 artwork and graphics or derivatives thereof in violation of the DMCA.

GC2's counsel is directed to draft an injunction order incorporating these terms and any other necessary and appropriate language, provide it to defendants' counsel by noon on July 16, 2019 for review, and file a proposed form of injunction by noon on July 17, 2019, with any objections to form by defendants to be filed by 5:00 p.m. on July 17. The case is set for a status hearing on July 18, 2019 at 9:30 a.m., though the Court reserves the right to vacate that hearing if it does not require further input from the

parties regarding the injunction.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  July 15, 2019